UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2016 OCT 26  PM 1: 33

CLERK
BY_____ LAW
DEPUTY CLERK

GARRETT AND RALPH STITTS, LEON ATWELL,
VICTOR BARRICK, DANIEL BAUMGARDER,
WILLIAM BOARD, GEORGE BOLLES, ROGER
BOLLES, ANDY BOLLINGER, THOMAS
BOLLINGER, LOGAN BOWER, DWIGHT
BRANDENBURG, BERNARD BROUILLETTE,
THOMAS BROUILLETTE, AARON BUTTON,
HESTER CHASE, THOMAS CLARK, THOMAS
CLATTERBUCK, PAUL CURRIER, GERRY
DELONG, PETE AND ALICE DIEHL, MARK
DORING, MARK AND BARBARA DULKIS, GLEN
EAVES, MIKE EBY, WILLIAM ECKLAND, DOUG
ELLIOT, JAMES ELLIOT, WENDALL ELLIOTT,
MICHAEL FAUCHER, DAVID AND ROBIN
FITCH, DUANE AND SUSAN FLINT, JOSEPH
FULTS, RICHARD GANTNER, STEFAN AND
CINDY GEIGER, WILLIAM GLOSS, JOHN
GWOZDZ, DAVID AND LAURIE GRANT, JIM
AND JOYCE GRAY, DENNIS HALL, ROGER AND
JOHN HAMILTON, NEVIN AND MARLIN
HILDEBRAND, JAKE AND HARLEN HILLYERD,
RICHARD AND TERRI HOLDRIDGE, PAUL
HORNING, TERRY AND ROBERT HUYCK,
DONALD SCOTT HYMERS, TERRY INCH,
RANDY AND LYNETTE INMAN, THEODORE
JAYKO, JACK KAHLER, JAMES AND TERESA
KEATOR, JIM AND SHARON KEILHOLTZ,
GEORGE KEITH, LEE AND ELLEN KLOCK,
MIKE AND LISA KRAEGER, FRED LACLAIR,
TIM LALYER, FRANK AND JOHN LAMPORT,
CORRINE LULL, CHARLES AND GRETCHEN
MAINE, THOMAS AND DEBORA MANOS, FRED
MATTHEWS, RUSSELL MAXWELL, GERRY
MCINTOSH, STEPHEN MELLOTT, JOHN AND
DAVID MITCHELL, THOMAS MONTEITH,
WALT MOORE, RICHARD AND SHEILA
MORROW, DEAN MOSER, MELISSA MURRAY
AND SEAN QUINN, THOMAS NAUMAN,
CHARLES NEFF, DAVID NICHOLS, MICHAEL
NISSLEY, LOU ANN PARISH, DANIEL PETERS,
MARSHA PERRY, CAROLYN AND DAVE POST,
JUDY LEE POST, SCOTT RASMUSEU, BRIAN

Docket No. _2:16·cv-287_

REAPE, DAVID AND LYNETTE ROBINSON,
BRIAN AND LISA ROBINSON, CALVIN ROES,
BRADLEY ROHRER, PAUL AND SARAH
ROHRBAUGH, ROBERTA RYAN, SCOTT AND
LIN SAWYER, S. ROBERT SENSENIG, THOMAS
AND DALE SMITH, DALE AND SUSAN SMITH,
DENNIS SMITH, DONALD T. AND  DONALD M.
SMITH, ROGER AND TAMMY, SMITH, TODD
SNYDER, RICHARD SOURWINE, DANNY
SOURWINE, RANDY SOWERS, SHANE
STALTER, GEORGE AND SHIRLEY
STAMBAUGH, TRACY STANKO, STEPHEN
SOURWINE, RICHARD SWANTAK, GEORGE
AND PATRICIA THOMPSON, JEREMY
THOMPSON, KEN AND JUDY TOMPKINS,
DANIEL VAUGHN, MARK VISSAR, ERIC
WALTS, EDWARD WALLDROFF, GERALD
WETTERHAHN, JR., EUGENE WILCZEWSKI,
STEVE WILSON

     Plaintiffs,

v.

DAIRY FARMERS OF AMERICA, INC., and
DAIRY MARKETING SERVICES, LLC,

     Defendants.

## COMPLAINT AND JURY DEMAND

Plaintiffs, who collectively represent more than 115 Federal Milk Marketing Order 1

dairy farms and over 20,000 head of cattle (referred to herein as "Farmers United" or

"Plaintiffs"), file this action against Defendants Dairy Farmers of America, Inc. ("DFA") and

Dairy Marketing Services, LLC ("DMS") (together referred to as "Defendants").  Plaintiffs seek

treble damages and injunctive relief for Defendants' violations of Sections 1 and 2 of the

Sherman Act, 15 U.S.C. §§ 1 and 2.

## NATURE OF THE CASE

1.     Each Plaintiff herein was a class member in <u>Alice H. Allen et al. v. DFA and DMS</u>, Case No. 5:09-CV-230 (D. Vt. 2009) (the "Class Action").  Pursuant to the Court's Order Granting Preliminary Approval of the Settlement dated February 8, 2016, putative class members were granted the right to "opt-out" of the Class Action and pursue claims directly against Defendants.  Each of the Plaintiffs has done so.

2.     Plaintiffs are cognizant of the fact that the Class Action has been pending since 2009 and that the Court (Reiss, J.) has issued a series of substantive orders, including on a motion to dismiss and a motion for summary judgment.  Plaintiffs, therefore, have included herein the claims that the Court has already ruled sufficient to proceed to trial.

3.     Plaintiffs have attempted to mirror the allegations in the Revised Consolidated Amended Class Action Complaint dated November 12, 2010 (the "Class Action Complaint").[1] Due to Defendants' liberal use of the April 29, 2010 protective order, much of the record for the Class Action is under seal and/or heavily redacted, including the entire record of summary judgment and even portions of the Class Action Complaint itself.

4.     At the same time, some of the information and allegations in the Class Action Complaint -- most recently amended in 2010 -- is stale.  Plaintiffs, therefore, have updated the allegations to the best of their ability without access to the record evidence.

5.     As detailed herein, since the Class Action Complaint, the Defendants' vice-grip on the Northeast milk industry has tightened and choked some of the last remaining vestiges of competition.

---

[1] The allegations contained in the Class Action Complaint (including without limitation, those allegations that have been redacted) are hereby incorporated by reference.

6.    Defendants' acquisition appetite remains unsatiated.  In particular, since the filing

of the Class Action Complaint, Defendants and their Co-conspirators have made a number of

mergers and acquisitions including, without limitation:

a.  On April 1, 2009, Dean acquired the Consumer Products Division of Foremost Farms USA, a dairy cooperative, including two milk processing plants in Wisconsin.

b.  On April 19, 2011, DFA acquired Keller's Creamery LP ("Keller's"), based in Harleysville, Pennsylvania, the nation's second-largest manufacturer of butter.  In July 2012, DFA closed the Harleysville facility, moving the warehousing and distribution to Balford Farms, a privately-owned dairy distributor in Burlington, New Jersey.

c.  On or around February 21, 2012, DFA acquired Guida-Seibert Dairy Co., Inc. ("Guida's Milk"), located in New Britain, Connecticut, the leading milk processors in New England.

d.  On or around September 4, 2013, DFA acquired Dairy Maid Dairy ("Dairy Maid"), located in Frederick, Maryland, a dairy processor.  Rick Smith, the CEO of DFA, explained that the acquisition of Dairy Maid aligned with DFA's "strategy to increase its commercial footprint and expand ownership in the fluid and fresh dairy category."

e.  On or around January 31, 2014, DFA acquired Oakhurst Dairy ("Oakhurst"), a family-owned dairy processor located in Portland, Maine.

f.  On or around April 1, 2014, DFA and Dairylea Cooperative, Inc. ("Dairylea"), a cooperative based in the Northeast, merged.  This combined Dairylea's 1,200 members with DFA's 13,000 members nationwide, thereby drastically increasing DFA's market share

g.  On or around December 31, 2015, DFA acquired the Müller Quaker yogurt plant in Batavia, New York, a $208 million facility previously owned by PepsiCo and the Theo Müller Group.

h.  On June 20, 2016, Dean acquired the manufacturing and retail ice cream business of Friendly's Ice Cream.

7.    In short, as of 2015, DFA had a stake in 77 dairy processing facilities across the

United States.  And, as of 2016, DFA was the largest milk processor in the world.  DFA's 8,000

(plus) member farms nationwide produce approximately 46 billion pounds of milk annually,

representing more than 20% of the total United States milk production. DFA also markets approximately 30% of the total United States milk production, which constitutes approximately three-quarters of DFA's total revenue.

8.      Thus, DFA's market share as a cooperative has drastically increased. Indeed, in 2000, 26% of the milk marketed in the United States was by non-cooperatives. This number dropped to 14% in 2014. In the Northeast in particular, there were about 40% fewer cooperative associations operating in 2014 as compared to 2000. While DFA controlled approximately 11% of the producers in the Northeast in 2010, that number has increased to approximately 21% as of 2016.

9.      Dean currently owns more than 110 processing plants across the country and is one of the largest processors and distributors of milk and other dairy products in the United States.

10.     Not only has Defendants' market share increased since the filing of the Class Action Complaint, Defendants' threats and retaliation against Northeast dairy farmers -- each of which constitute a continuing violation of the antitrust law -- have escalated, as further detailed herein.

11.     The most recent (and blatant) example of which is DFA and DMS milk inspectors making "special trips" (*i.e.*, unrelated to scheduled milk inspections) to thousands of dairy farms to coerce support for the Class Action settlement. By sending the very people who are empowered to reject the farmers' milk, the unmistakable message being sent by Defendants was "support the settlement or face the consequences." As a result, Defendants were able to extract over 1,200 form letters of support for the 2015 settlement - - compared to the three letters of support they had for the 2014 settlement (which was for the same monetary amount).

12.     Upon information and belief, DFA has also threatened farmers who opted out of the Class Action to join this lawsuit.

13.     The conspiracy described herein has netted Defendants, their Co-conspirators and their management tremendous sums of money.  For example, Gary Hanman (DFA) was paid $31.6 million during his seven-year tenure at DFA, including bonuses for increasing the cooperative's market share.  Gregg Engles (Dean) was paid approximately $156 million between 2004 and 2012.  Plaintiffs, however, did not share in DFA's success.

## PARTIES

Plaintiffs

14.     Plaintiffs are more than 115 Order 1 dairy farms, whose names and addresses are listed on Exhibit A.  Plaintiffs collectively are referred to herein as "Farmers United" or "Plaintiffs."

Defendants

15.     DFA is ostensibly a not-for-profit corporation organized and existing under the laws of the State of Kansas with its principal place of business at 10220 North Ambassador Drive, Kansas City, Missouri 64153, and with its Northeast Council headquarters located at 5001 Brittonfield Parkway, East Syracuse, New York 13057.  DFA is organized as a "cooperative marketing association" under Chapter 17, Article 16 of the Kansas General Statutes.  DFA is by far the largest dairy cooperative in the United States with over 14,000 dairy producers.  DFA has approximately 2,446 member farms in the Northeast, which represents a 27% increase since 2009.  DFA is a vertically integrated cooperative that not only engages in the production of raw Grade A milk, but also markets, hauls, processes, bottles and distributes raw Grade A milk. Indeed, DFA is also the largest milk processor in the world.

6

16.     DMS is a limited liability company organized under Delaware law with its principal place of business at 5001 Brittonfield Parkway, Syracuse, New York 13221.  DMS was established in 1999 through an agreement between DFA and Dairylea Cooperative Inc.  DMS is currently owned by DFA and St. Albans Cooperative Creamery, Inc. ("St. Albans") and DFA exercises control over DMS.  DMS is a marketing agency that markets milk for more than 5,500 farms, including independent dairy farmers and cooperatives, throughout the Northeast even though DMS received no authorization from independent dairy farmers to do so.  Upon information and belief, DMS markets approximately 50% of raw Grade A milk in the Northeast.

Co-conspirators

17.     Co-conspirator Dean is a for-profit corporation organized and existing under the laws of the State of Delaware with its principal place of business at 2515 McKinney Avenue, Suite 1200, Dallas, Texas  75201.  Dean is one of the largest raw Grade A milk processors in the Northeast and in the United States.

18.     Defendants also have conspired with Dairylea (prior to its acquisition by DFA), Agri-Mark Family Dairy Farms ("Agri-Mark"), members of the Greater Northeast Milk Marketing Agency ("GNEMMA"), Farmland Dairies LLC, National Dairy Holdings LLC ("NDH"), HP Hood LLC ("Hood") and other processors, certain individuals named below and other entities and persons, the identities of which are presently unknown (collectively "Co-conspirators").

## JURISDICTION, VENUE, AND INTERSTATE COMMERCE

19.     This action is brought under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

20.     This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1337 and 15 U.S.C. §§ 15 and 26.

21.     This Court has personal jurisdiction over DFA and DMS because they systematically and continuously transact substantial business in the United States and in this District.

22.     Venue is proper in this District pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391 because Defendants inhabit, transact business, reside, are found, or have an agent in this District, and a substantial part of the events or omissions giving rise to the claim occurred in this District.

23.     Defendants' business activities that are the subject of this complaint are within the flow of, and substantially have affected, interstate trade and commerce.  DFA markets, processes and ships raw Grade A milk across state lines.  DMS markets raw Grade A milk across state lines.  Both Defendants send and receive substantial payments across state lines from the sale of raw Grade A milk.

## THE MILK INDUSTRY

The Relevant Market

24.     The relevant geographic market is the Northeast United States.  The Northeast market consists of Federal Milk Marketing Order 1 ("Order 1"), which covers areas in Delaware, District of Columbia, Connecticut, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, Vermont and Virginia.  Since Order 1's formation in 2000, the number of producers has declined from 18,009 in 2000 to 11,519 in August 2016, which represents a 36% decrease.

25.     DFA's Northeast Council manages its operations in the same geographic areas as the Northeast.  DFA and DMS evaluate and treat the Northeast as a separate market in their

business activities and internal documents. Gregory Wickham, DFA's current CFO who previously served as president and CEO of DMS, referred to the Northeast as a distinct market in connection with DFA's and DMS's milk sales, production and marketing activities. The Court has ruled in the Class Action that Plaintiffs can establish at trial that Order 1 is a relevant geographic market. *See* Class Action D.E. No. 525, Opinion and Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment ("SJ Order") at 12.

26.     The relevant product market is the market for raw Grade A milk. This "raw Grade A milk market" is treated as a distinct market by the Defendants, the industry and by federal regulations and has been recognized as a relevant product market by federal courts. Raw Grade A milk is a homogenous product such that one farmer's production of it is undifferentiated from another farmer. Dairy farmers do not have substitute markets available for their raw Grade A milk. The distinct nature of the raw Grade A milk market is recognized by the Defendants in their internal documents and treated as such by the Defendants in connection with their business activities. The Court has ruled in the Class Action that Plaintiffs can establish at trial that raw Grade A milk is a relevant product market. *See* D.E. No. 81, Opinion and Order Granting in Part and Denying in Part Defendants' Motions to Dismiss ("MTD Order") at 9-14.

Raw Grade A Milk

27.     Raw Grade A milk is highly perishable. Dairy farmers milk their cows at least twice a day and the milk must be transported from farms to raw Grade A milk processors nearly every day. Raw Grade A milk is typically stored in refrigerated bulk tanks until it is picked up by a milk hauler who transports it in insulated trucks to raw Grade A milk processing plants. Fluid Grade A milk bottling plants prepare fluid raw Grade A milk for human consumption as beverages by processing and packaging it into bottles or cartons for wholesale or retail sale. As

used in this complaint, a raw Grade A Milk processing plant prepares raw Grade A milk for human consumption and processes it into either beverage milk products or other dairy products, such as sour cream, cottage cheese, ice cream, cheese, butter or dry milk. As used in this complaint, a bottling plant is a processing plant, but not all processing plants are bottling plants.

28.     Federal milk sanitation standards distinguish between milk eligible for use in fluid products, known as Grade A milk, and milk eligible only for manufactured dairy products, known as Grade B milk. The highest standards are established for Grade A milk because of safety risks associated with fluid milk products. There is no substitute for raw Grade A milk.

29.     Pursuant to the 1937 Agriculture Act, the USDA classifies raw Grade A milk into four classes for minimum pricing purposes based upon the actual end-use of the milk:

- Class I milk is used in beverage milk products for human consumption.

- Class II milk is used to manufacture "soft" dairy products, such as sour cream, cottage cheese, ice cream, and custards.

- Class III milk, also known as "cheese milk," is commonly used to manufacture "hard" dairy products such as cheddar cheese.

- Class IV milk is used to produce butter and nonfat dry milk.

30.     Each month, the USDA calculates minimum prices pursuant to USDA formulae for each of the four classes of Grade A milk marketed in each of the geographic regions, known as Federal Milk Marketing Orders ("FMMO" or "Order"). Currently, there are 10 Orders. This complaint is concerned with raw Grade A milk in Order 1, which is commonly referred to as the "Northeast."

31.     USDA regulations mandate that cooperatives and independent dairy farmers participating in the FMMO program receive at least the weighted uniform average or minimum "blend" price for raw Grade A milk that is "pooled" on an Order. Dairy farmers "pool" raw

10

Grade A milk on an Order by delivering specified minimum quantities of raw Grade A milk to USDA-regulated fluid Grade A milk bottling plants associated with that Order. Dairy farmers' delivery of the minimum quantity of raw Grade A milk to fluid Grade A milk bottling plants is referred to as "touching base." USDA regulations require that dairy farmers touch base each month they are pooled on an Order. Dairy farmers cannot qualify or touch base by delivering raw Grade A milk to processing plants of non-fluid products, such as sour cream (Class II), cheese (Class III) and butter (Class IV).

32.     The minimum blend price for an Order is based upon the end uses of all Grade A milk pooled on that Order. Thus, for example, if 60% of all raw Grade A milk pooled on an Order was used as Class I milk (beverage milk), and the remaining 40% was used as Class III milk (cheese milk), the minimum blend price for all raw Grade A milk pooled on the Order would consist of the Class I price for 60% and the Class III price for 40%.

33.     USDA minimum prices for raw Grade A milk represent the minimum prices that raw Grade A milk processors must pay for raw Grade A milk marketed pursuant to USDA regulation. These minimum prices, however, are *less than* the farmers' cost to produce the milk. As such, the farmers must sell their milk for *more than* these minimum prices in order to survive.

34.     One of the key responsibilities of cooperatives such as DFA is to negotiate prices higher than the FMMO minimum prices (and the farmers' production cost). The amounts by which prices paid for raw Grade A milk exceed FMMO minimum prices are known generically as "over-order premiums." Prior to Defendants' antitrust violations, dairy farmers in the Northeast received over-order premiums for raw Grade A milk that more accurately reflected competitive market conditions.

35.     The actual price a dairy farmer receives for raw Grade A milk is referred to as the "mailbox price." The mailbox price for an independent dairy farmers is comprised of the FMMO minimum blend price plus any over-order premium in excess of the federal minimum blend price and bonuses for volume or quality, minus marketing costs. The mailbox price received by dairy cooperative members is calculated in the same way except additional charges may be deduced by the cooperative. Prior to Defendants' antitrust violations, dairy farmers in the Northeast received mailbox prices for raw Grade A milk that included over-order premiums that more accurately reflected competitive market conditions.

36.     Access to fluid Grade A milk bottling, processing and balancing plants in the Northeast and receipt of FMMO minimum prices and over-order premiums is necessary and essential to the economic viability of Northeast dairy farmers.

## DAIRY COOPERATIVES

37.     The Capper-Volstead Act, 7 U.S.C. §§ 291, 292, authorizes certain agricultural producers (including dairy farmers) to form voluntary cooperative associations for purposes of producing, handling and marketing farm products. Specifically, it exempts cooperatives from application of the antitrust laws so long as they meet certain criteria.

38.     Dairy cooperatives are associations of dairy farmers who agree to collectively market their raw Grade A milk. Dairy cooperatives are *supposed* to be owned, operated, and controlled by their member farmers. In other words, dairy cooperatives, which are considered not for profits, are "not organized to make [a] profit for themselves . . . but only for their members as producers." K.S.A. § 17-1602.

39.     Cooperatives typically locate buyers for their farmers' raw Grade A milk, negotiate sales prices, coordinate the hauling, perform the testing, record and report related data to milk market regulators, and process payments to member farmers for their raw Grade A milk.

40.     Dairy cooperatives (at least those organized under Kansas law such as DFA) are prohibited from: (i) marketing, handling, processing, storing or dealing in the products of nonmembers; (ii) manufacturing, selling or supplying nonmember services, products, machinery, equipment or supplies; or (iii) otherwise engage in business with nonmembers, to an "amount greater in value than such as are handled by the association for members." K.S.A. § 17-1604.

41.     Dairy cooperatives owe their producer members the duty to obtain the highest possible price for their Grade A milk. As a result, cooperatives traditionally do ***not*** invest in business ventures with processors when the profitability of these ventures depends on obtaining low cost Grade A milk.

42.     Dairy farmers can market their raw Grade A milk to processing plants in the Northeast by: (a) joining a cooperative, such as DFA; or (b) by remaining independent.

43.     Cooperatives other than DFA are referred to herein as "independent dairy cooperatives," even though some of them have very close ties to DFA.

44.     Dairy farmers that are not members of cooperatives are referred to herein as "independent dairy farmers."

45.     Independent dairy cooperatives and independent dairy farmers seek to market their raw Grade A milk to processing plants by directly contracting with plants or through agents and/or marketing associations.

13

46.     None of the independent dairy cooperatives or independent dairy farmers in the Northeast have sufficient market share to impede the exercise of the monopoly/monopsony power of DFA or DMS (which is controlled by DFA).

## DAIRY FARMERS OF AMERICA

Formation and Expansion of DFA

47.     On January 1, 1998, four dairy cooperatives (including two cooperatives that had been previously sued by the United States Department of Justice ("DOJ")) merged to form DFA. Those merging cooperatives were:  Associated Milk Producers, Inc. ("AMPI"), Mid-America Dairymen, Inc. ("Mid-Am"), Milk Marketing, Inc. and Western Dairy Cooperative, Inc.

48.     The CEO and CFO of Mid-Am, Gary Hanman and Gerald Bos respectively, became the CEO and CFO of DFA.[2]

49.     DFA is now the largest dairy cooperative in the country - - with approximately 2,400 members in the Northeast alone.  DFA's growth and expansion, however, has *not* increased the number of dairy farmers in the country.  To the contrary, DFA anti-competitive behavior has driven many small farms out of business and decimated the number of dairy farms in the United States.

DFA is *Supposed* to Operate for the Benefit of its Members

50.     A Membership and Marketing Agreement (the "Member Agreement") governs the relationship between DFA and its member dairy farmers.  The Member Agreement incorporates and is controlled by the Bylaws of DFA.

51.     A true and accurate copy of DFA's Bylaws are attached as Exhibit B and incorporated by reference herein.

---

[2] In 2008, the U.S. Commodity Futures Trading Commission found that Hanman and Bos attempted to manipulate the price of Class III milk futures contracts and fined them $12 million in civil monetary penalties.

14

52.     The DFA Bylaws provide:

This Association shall be operated on a cooperative, non-profit basis for the mutual benefit of its members as producers, and membership in the Association shall be restricted to producers who patronize the Association.  (Bylaws, § V.b).

53.     DFA's Chief Operating Officer, Brad Keating, has publicly stated that "[a]s a farmer owned cooperative, we work hard to ensure the success and profitability of dairy farmers. It is our responsibility and obligation to act in their best interest.  We take this very seriously."

54.     A true and accurate copy of Keating's Statement is attached as Exhibit C and incorporated herein by reference.

55.     DFA's website further provides that "Dairy producers are not just members of DFA, they are owners.  As owners, members receive: Earnings from the Cooperative . . . An equal voice . . . A guaranteed market for their milk . . . A competitive price for their milk . . . [and] Returns on investments made on their behalf."

56.     True and accurate screenshots from DFA's website are attached as Exhibit D and incorporated by reference herein.

DFA is Bound by the Antitrust Laws and Its Own Antitrust Policy

57.     The Capper-Volstead Act provides some immunity from the antitrust laws to DFA in connection with its marketing of milk produced by its members.  This limited immunity, however, does not extend to *all* agreements with other cooperatives or to the operations of its dairy affiliates or other processing plants.

58.     As a result of prior cases -- particularly those against Mid-Am and AMPI -- DFA is subject to ongoing consent decrees (the "Consent Decree"), which greatly restrict its activities.

59.     In an effort to comply with the Consent Decree and applicable antitrust laws,

DFA drafted a set of guidelines (the "Antitrust Policy") to set forth whether certain conduct is or

may be prohibited.

60.     A true and accurate copy of DFA's Antitrust Policy is attached hereto as Exhibit

E and incorporated by reference herein.[3]

61.     DFA's Antitrust Policy states that "DFA's objective is to vigorously and

effectively compete in the market place within the spirit and letter of the law.  Any departure

from honest and fair competition is a violation of DFA rules and will not be sanctioned."

62.     DFA's Antitrust Policy groups conduct into three categories: (i) the Black List;

(ii) the Gray List; and (iii) the White List.

63.     The Black List prohibits conduct that appears likely to violate the antitrust laws or

a major restriction in the Consent Decree.  It expressly prohibits:

    A.  Conduct concerning members and other producers:

        1.  Do not coerce or threaten a member to refrain from terminating its
            DFA membership or from delivering milk to DFA.

        2.  Do not coerce or threaten a non-member producer to join DFA or to
            deliver milk to DFA.

        3.  Do not enter into or enforce any contract that prevents any member
            (or non-member producer), after termination of its contract with
            DFA, from selling milk to any other purchaser on any terms.

        4.  Do not enter into any discussions or agreements with another
            cooperative which prohibit the solicitation of (i) each others'
            members or (ii) producers located in any particular geographic area.

                                    ***

    B.  Conduct concerning milk haulers

---

[3] DFA's Antitrust Policy is posted on Vermont's Attorney General's website, *available at*: http://ago.vermont.gov/assets/files/Dairy%20Farmers%20of%20America%20Antitrust%20Policy%20-%20Exhibit%20OOO.pdf (last accessed September 29, 2016).

7.  Do not enter in any agreement or understanding with any hauler to transport DFA member milk exclusively, or engage in threats or coercion designed to cause the hauler to refrain from transporting non-DFA milk.

***

C.  Conduct concerning processors (fluid milk packagers, cheese manufactures, etc.)

11.  Do not enter into any contracts with a fluid milk bottler or other processor having a term that exceeds on year in duration.

12.  Do not discriminate or threaten to discriminate in any way against a processor that (i) purchases (or proposes to purchase) raw milk from non-DFA sources or (ii) resells (or proposes to resell) raw milk to any other processor. . . .

DFA's Code of Conduct

64.     In addition to its Antitrust Policy, DFA's Code of Conduct also promises to comply with the laws and "preserve and promote free, fair, and open competition."

65.     A true and accurate copy of DFA's Code of Conduct is attached as Exhibit F and incorporated herein by reference.

66.     Specifically, it provides "our Antitrust Policy is designed to ensure compliance with antitrust laws.  Antitrust laws apply not only to DFA employees, but also to our subsidiaries, affiliates, officers, directors, and members. . . . DFA is committed to conducting business fairly and honestly."

67.     The DFA Code of Conduct further pledges that DFA has an "uncompromising commitment to integrity."  Specifically, it promise that DFA will  "[d]emonstrate honest and ethical conduct when dealing with members, employees, customers, partners, suppliers, competitors, and regulators [and] deal fairly and never take unlawful or unfair advantage of others to succeed."

68.     It further states:

17

Everything we do affects our members.  At DFA, we believe in conducting business activities with integrity, and that being ethical is not only the right thing to do, it also makes good business sense.  We also strive in every way to recognize and acknowledge that we work for dedicated dairy farmers who count on us to act ethically in all matters without exception.  We take pride every day in knowing that our dedication and ethical commitment to our jobs benefits DFA's hardworking member-owners across the country.  With a clear focus on integrity – for everyone, every day, every way – we maintain the highest legal and ethical standards.  This commitment is and will remain an unwavering pillar of DFA's business success.

69.     The DFA Code of Conduct also provides that its financial books and records will

transparent and accurately report its business transactions.  Specifically, it provides that:

All entries made in DFA's books and records should reflect exactly what is described by the supporting information . . . . No false or misleading entries may be made in any DFA record for any reason. . . . [and] Financial information must not be concealed from or by DFA management or auditors.

70.     As described below, DFA has broken every one of its promises to act in the best

interest of its members, abide by the antitrust laws, and hold itself to the highest level of integrity

and fair dealing.

## DAIRY MARKETING SERVICES

The Formation of DMS

71.     In 1999, DFA, Dairylea (who at the time was the largest dairy cooperative in the

Northeast) and St. Albans formed DMS.  Although technically a joint venture, DFA effectively

controls DMS.

72.     According to an affidavit by Gregory Wickham (the current chief financial officer

of DMS), dated January 18, 2011 (the "Wickham Affidavit"), DMS is indirectly owned by the

farmers who belong to and own DFA and St. Albans.

73.     DMS is a milk-marketing organization that assembles, tests and hauls raw Grade

A milk to processors for both independent farms and cooperatives (like DFA and St. Albans).

74.    According to the Wickham Affidavit, as of January 18, 2011, a number of cooperatives are members of DFA, Dairylea, St. Albans or Land-O-Lakes (a partner of DMS) or otherwise participate in marketing their milk through DMS, including but not limited to: Mount Joy, Cortland, Oneida-Madison, Lowville, United Ag Services, NFO, Schoharie, Mass Fed, Jefferson Bulk, Konhokton, South New Berlin and Farmer Family.  DMS also markets the milk of hundreds of independent dairy farmers who are not members of any cooperative.

75.    For independent farms and independent cooperatives, DMS also markets their milk (*i.e.*, it finds buyers and negotiates the price).  Thus, DMS controls how much these farms and cooperatives receive for their raw Grade A milk above the FMMO minimum price.  DMS also determines where that milk is bottled and pooled.

76.    DMS is by far the largest marketer of raw Grade A milk in the Northeast and the largest stand-alone milk marketing business in the country.  Specifically, it markets approximately 13.7 billion pounds of milk produced by more than 5,500 farms in the Northeast.  DMS also manages a hauling system of 165 contract haulers delivering more than 750 loads per day.

DFA and DMS Relationship

77.    DFA and DMS have a principal-agent relationship.  Upon information and belief, DFA now owns more than 50 percent of DMS and controls DMS's operations.

78.    DMS acts as DFA's agent in the handling of payments from processors and to dairy farmers.  Farmers who market their Grade A fluid milk through DMS are paid milk checks issued from the same bank accounts that issue milk checks to DFA members.  Vehicles that transport the inspectors who test the quality of raw milk for DMS are registered as owned by DFA.

79.     Paragraphs 54 to 56 of the Class Action Complaint contain allegations regarding the agency relationship between DFA and DMS that have been redacted.  Plaintiffs do not have access to this redacted information. Those paragraphs, including all redacted facts and allegations, are incorporated herein by reference.

80.     DMS has strengthened DFA's grip over the Northeast raw Grade A milk market in three significant ways. *First*, it provides DFA with a way to control the members of other cooperatives. *Second*, DMS provides a mechanism for DFA to control independent dairy farmers and independent cooperatives that utilize DMS.  As discussed below, through full supply and outsourcing agreements and other anticompetitive acts, DFA forced thousands of independent dairy farmers and independent cooperatives to market their milk through DMS in order to access fluid Grade A milk bottling plants. *Third*, by arranging for DMS to function as the exclusive marketing agent for all DFA members in the Northeast and all independent dairy cooperatives and independent dairy farmers that ship raw Grade A milk to Dean's Northeast processing plants, DFA established a mechanism through which over-order premiums could be fixed, suppressed and monitored.

### OVERVIEW OF THE CONSPIRACY

81.     In an unrestrained market, raw Grade A milk processors in the Northeast would compete to purchase raw Grade A milk from independent dairy cooperatives, independent dairy farmers, and cooperatives, thereby enabling Northeast dairy farmers such as Plaintiffs to obtain a price for their raw Grade A milk that would reflect actual market conditions.  Defendants, however, have engaged in an illegal conspiracy to restrain competition, fix and suppress prices paid to farmers and monopolize/monopsonize the raw Grade A milk market in the Northeast.

This activity has suppressed at artificially low levels the over-order premiums that would otherwise exist in a competitive market.

82.    As its core, the conspiracy is simple; DFA/DMS controls the milk producers and then sells the milk at a low price to processors, also partially owned by DFA/DMS.  Instead of distributing the money back to its members, DFA/DMS use complex accounting and opaque financial records to keep the money for their executives and their cronies.

83.    As a result, DFA keeps hundreds of millions of dollars earned off the backs of its member-owners, which breaches its duties and its promise to act in the best interest of its members and provide its members with a return on investments made on their behalf.

84.    Indeed, DFA's website touts that "Through DFA, our members are invested in plants and brands throughout the country that not only produce returns that go back to our members, but also create additional markets for our members milk."

85.    But in 2014, after purchasing another processing plant, Monica Massey, a DFA spokeswoman, admitted that:  "Finding a home for our members' milk has nothing to do with our investment strategy in fluid milk and ice cream."

86.    A true and accurate copy of Massey's statement is attached as Exhibit G and incorporated herein by reference.

87.    Defendants have implemented their conspiracy to eliminate competition in the raw Grade A milk market in the Northeast by undertaking a series of carefully planned and collaborative steps.

88.    Specifically, DFA and DMS, along with their Co-conspirators, conspired to put DFA/DMS in a dominant position in the Northeast and circumvent restrictions that had been

imposed by the DOJ, protect independent farmers' access to milk processing plants, and prevent collusion and suppression of prices paid for raw Grade A milk.

89. DFA and DMS further agreed with Dean to restrict competition to give DFA control over access to Dean's processing facilities and help DMS acquire a monopoly/ monopsony position in raw Grade A milk market in the Northeast.

90. DFA and DMS with other Co-conspirators, have acted and continued to act to achieve the goals of the conspiracy, including the fixing and suppression of prices paid for raw Grade A milk.

91. The DOJ and state Attorneys General raised antitrust concerns about, and formally objected to, several of the major transactions pursued by Defendants in furtherance of the conspiracy.

92. As discussed below, when the DOJ or state Attorneys General imposed conditions on such a transaction to preserve competition in the market, Defendants devised and covertly implemented schemes to circumvent those restrictions and eliminate competition in violation of the antitrust laws. In doing so, Defendants violated both the letter and the spirit of the antitrust laws and DFA's own Antitrust Policy.

## DFA'S CONTROL OVER THE MILK INDUSTRY

93. Through acquisitions, mergers, supply agreements and closures of competitors' bottling plants, Defendants secured control of the fluid Grade A milk bottling market in the Northeast (*i.e.*, the buyers). Indeed, DMS became the exclusive supplier of fluid Grade A milk to Dean and provided a significant share of the fluid Grade A milk to Hood.

94.     Defendants used their control over the fluid Grade A milk supply market to force independent dairy cooperatives and independent dairy farmers to join DFA or market their milk through DMS.

95.     These actions have injured Plaintiffs by allowing the Defendants to acquire and maintain a monopsony and use their market power to suppress the price paid to the dairy farmers.  Defendants have acted to eliminate competition between bottlers and between cooperatives and to fix and stabilize at artificially low levels prices paid to Northeast dairy farmers for fluid Grade A milk.

96.     Robert D. Wellington, Senior Vice President at Agri-Mark, provided the following written testimony to the United States Senate Judiciary Committee regarding the Northeast market:  "[L]ocal farmers quickly recognize that they have no choice but to capitulate to and join DFA in order to have a market for their milk. …  Instead of gaining membership through farmer choice as we and most other cooperatives do, DFA gains it by eliminating choice."

### A.     DFA Controls Milk Processors (the Monopsony)

97.     When DFA was formed in 1998, it was announced the DFA would provide "cost effective marketing and movement of milk" and "greater long-term value and returns" because of "access to branded and value-added markets" and "expanded product manufacturing capabilities."  However, rather than improving the "returns" of its member dairy farmers in the Northeast, DFA management aligned itself with milk bottlers/processors.

98.     As described below, DFA's management, under the direction of Bos and Hanman, embarked on an aggressive expansion into bottling/processing.  DFA has obtained ownership interests in Southern Belle Dairy Co., LLC, Hood, Keller's, Rosenberger's Dairies, Inc., Turner

Holdings, LLC, Wilcox Farms, Inc. and Melody Farms, L.L.C., Guida's Milk, Oakhurst,

DairiConcepts L.P., Dairy.com, Castro Cheese Company, and Dietrich Milk Products.

99.     Upon information and belief, DFA has invested massive amounts of its members'

monies and equity and borrowed more than $1 billion to finance DFA's and its Co-conspirators

acquisitions of milk bottling/processing plants and other related entities.  These acquisitions were

an improper use of DFA member monies and assets.

DFA and Suiza / Dean

100.    DFA is also using its control over bottling/processing plants to manipulate the

market and is best illustrated in its dealings with Co-conspirator Dean and Dean's predecessor,

Suiza.

101.    In July 1997, Suiza purchased Garelick Farms ("Garelick"), which had dairy

plants in Vermont, Massachusetts and Maine.  A year later (in July 1998), Suiza purchased West

Lynn Creamery in Massachusetts.  One month after that, it purchased the New York and

Massachusetts-based dairy plants of Cumberland Farms, which had a reputation for aggressively

competing against Suiza for contracts.  Later that same year, Suiza acquired Nature's Best Dairy

in Rhode Island and New England Dairy in Connecticut through a joint venture with DFA.

Suiza later acquired Nature's Best Dairy in Rhode Island and closed it down shortly thereafter.

102.    By January 2000, Suiza was the largest Grade A milk bottler in the United States.

DFA solidified its dealings with Suiza through another joint venture -- this time forming Suiza

Dairy Group L.P. ("SDG").

103.    Around the same time, DFA obtained a 33.8% ownership stake in Suiza's fluid

Grade A milk bottling operations **and** entered into a comprehensive full-supply agreement with

Suiza that gave DFA the exclusive right to supply all the fluid Grade A milk to Suiza's bottling plants.

104.    Suiza subsequently closed several of the bottling plants that it acquired to allegedly "eliminate capacity." These plant closings included were the Garelick bottling facility in Bennington, Vermont; Seward's Dairy in Rutland, Vermont; the New England Dairy plant in Newington, Connecticut; and the Cumberland Farms plant in Canton, Massachusetts. As a result of Suiza's acquisitions and plant closings, there was significantly less bottling capacity in the Northeast and minimal bottling capacity outside of the Suiza plant system.

105.    By 2001, following nearly a decade of consolidation and increasing interrelationships between fluid Grade A milk bottlers, Suiza was the largest buyer and bottler of fluid Grade A milk in the United States.

106.    Senator Patrick Leahy stated that Suiza had achieved its "market dominance by buying up local dairies and then closing them down."

The Dean-Suiza Merger

107.    In 2001, Dean (then the second largest buyer and bottler of fluid Grade A milk in the United States) and Suiza announced their plan to merge and operate under the name Dean.

108.    As part of the merger, Dean would buy out DFA's 33.8% stake in Suiza for $166 million. In connection with that purchase, Dean issued to DFA a $40 million promissory note that becomes due in 2021 in the amount of $96 million.

109.    The DOJ was concerned that the Suiza-Dean merger would diminish competition and generate antitrust violations. After months of negotiation with the companies, the DOJ established conditions on the merger to preserve competition. *First*, the DOJ required that DFA and Suiza modify their full-supply contract to ensure "that dairies owned by the merged firm in

the areas affected by the divestitures will be free to buy their milk from sources other than DFA."
*Second*, the DOJ required Dean and Suiza to divest 11 of Dean's and Suiza's fluid Grade A milk
bottling plants to a third party that would actively compete with the reconstituted Dean.

110.    Dean and Suiza accepted DOJ's conditions.

111.    But instead of complying, Dean, Suiza, and DFA (in furtherance of the
conspiracy) used a series of sham agreements to circumvent and thwart the DOJ's two conditions
on the merger.

DFA and Dean Circumvent the DOJ's Requirement Regarding the Supply Agreement

112.    The requirement for Dean to modify its supply agreement with DFA was intended
to ensure that Dean's bottling and processing facilities bought substantial quantities of milk from
sources other than DFA.  Instead of honoring that intent, and in furtherance of the conspiracy,
DFA and Dean entered into full-supply agreements that designated DFA and DMS as the
exclusive suppliers of milk to Dean's bottling plants.  In view of DFA's pervasive control over
DMS, this is not the type of modification that the DOJ intended when it approved the merger.

113.    It also is not the type of modification that the DOJ intended when it issued its
prior Consent Decree prohibiting DFA from entering into supply agreements with terms in
excess of one year.  To get around that requirement and ensure that their full-supply agreement
would be long-term, Dean and DFA agreed that: (1) DFA would forgive the entire balance of a
$40 million promissory note *provided that* Dean renewed a series of 20 successive one-year full-
supply agreements; and (2) Dean would pay DFA up to $47 million in liquidated damages if
Dean did not renew each of the 20 annual full-supply agreements.

114.    In January 2003, pursuant to the supply agreement with DFA, Dean assigned its
marketing agreements with the 2,500 independent dairy farmers who supplied it with fluid Grade

A milk to DMS.  Thereafter, Dean refused to deal with independent dairy farmers who had traditionally been its direct suppliers.

115.    Neither Dean, DFA, nor DMS informed these independent dairy farmers that their fluid Grade A milk would thereafter be marketed, processed, and controlled by DFA, that DFA would process the payments for their fluid Grade A milk, or that prices paid to DMS producers were fixed, suppressed, and stabilized by DFA and Co-conspirators.  In short, despite the DOJ's condition, Dean's bottling plants in the Northeast continued to have full-supply agreements with DFA, and the independent dairy farmers who provided milk to Dean were forced to market their milk through DMS in order to access Dean's bottling plants.

116.    Thus, DFA and DMS had, and continue to have, exclusive control over the supply of fluid Grade A milk to Dean, which dominates the bottling market in the Northeast.  Farmers in the Northeast who want to sell fluid Grade A milk to one of Dean's more than fifty brands must join DFA or utilize DMS.

Dean and DFA Circumvent the DOJ's Requirement Regarding Divestiture

117.    The DOJ's second condition to approving the merger was that Dean and Suiza divest 11 of their fluid Grade A milk bottling plants to a third party *that would actively compete with the reconstituted Dean*.

118.    Instead of divesting the 11 plants to an independent third party that would compete with Dean, DFA and Dean divested them to Co-conspirator NDH -- a company formed, owned and controlled by DFA and two former Dean executives.  Indeed, DFA's initial ownership stake in NDH was 50% and later increased to 87%.

119.    Upon information and belief, DFA and its subsidiaries provided more than $400 million in financing for NDH's purchase of the 11 bottling plants.

27

120.     Upon information and belief, in forming NDH, DFA and its partners agreed that DFA must approve any decision to commit NDH to any contracts or expenditures exceeding $50,000, to appoint new NDH officers, or to change the compensation of NDH's officers.  As a result, NDH did not take any significant action without DFA's express approval or without having been directed to take such action by DFA.

121.     DFA installed Allen Meyer as CEO of NDH.  Meyer had co-founded the Southern Foods Group with DFA and subsequently merged it with DFA into Suiza's bottling operations.

122.     The DOJ has accused Meyer of operating as functionary for DFA who colludes with DFA to eliminate competition while claiming to operate NDH as an independent competitor.  The DOJ has specifically alleged that DFA and Meyer have "a long history of friendly and mutually profitable financial dealings," that Meyer "has a substantial incentive to keep DFA happy so that he can continue to receive profitable business opportunities," that "Meyer enjoys a share of the profits and potential appreciation that is far out of proportion to his investment in NDH/Flav-O-Rich, thanks to DFA," and that the "prospect of future ventures with DFA affords Meyer a strong incentive to manage [NDH] in a manner that serves DFA's interests in eliminating competition."

123.     Not surprisingly, shortly after NDH acquired the 11 bottling plants (divested by Dean and Suiza), it entered into exclusive, full-supply agreements with DFA -- including such agreements for its plants in Concord, New Hampshire and Albany, New York.

124.     In late December 2001, the wife of NDH's CEO Meyer signed a $1 million check -- using NDH funds -- to then DFA Board Chairman Herman Brubaker.  This transaction was concealed from, and not approved by, DFA's Board of Directors.  This unauthorized transfer was concealed from DFA members until May 8, 2008, when DFA's CEO, Rick Smith, informed

DFA members of the "unfortunate" unauthorized transfer. Smith further confirmed that Hanman knew about the transfer.

The Dean-Suiza Merger Solidified Defendants' Monopoly/Monopsony Power in the Northeast Milk Market

125.   Through the Dean-Suiza merger, Dean and DFA significantly strengthened each other's control over the milk supply in the Northeast, furthering the aims of the conspiracy. DFA aided Dean by creating NDH and funding its purchase of the 11 milk processing plants whose divestiture was necessary to obtain clearance from the DOJ for the merger. DFA then used its control over NDH to ensure that NDH would not vigorously compete with Dean for the purchase or sale of milk. Dean, in turn, agreed to cease purchasing raw milk from independent dairy farmers and independent dairy cooperatives and to enter into full-supply agreements with DFA and DMS for its Northeast bottling plants.

126.   As a result of the merger, Dean became the largest fluid milk processor in the Northeast. Throughout the relevant period, Dean has dominated the market for bottling fluid Grade A milk in the Northeast, controlling approximately 80% of the market in Massachusetts and Rhode Island, approximately 70% in New England and northern New Jersey, and over 60% in Connecticut.

127.   As a result of the merger, NDH became the second largest fluid milk processor in the Northeast.[4]

128.   As a result of the merger, and in contravention of the conditions imposed by the DOJ, DFA established ownership of and control over NDH and entered into full-supply agreements with both Dean and NDH.

---

[4] This continued for several years until NDH sold its fluid Grade A milk bottling plants to Hood in 2004.

Hood-NDH Alliance

129.    In November 2002, Hood and NDH, then owned and controlled by DFA, attempted to merge.  The merger proposal was prepared by Hanman (DFA) who wanted to further expend DFA's dominance over the Northeast market by establishing supply agreements with Hood.  Under the original merger proposal, DFA would have had an exclusive right to supply fluid Grade A milk to all Hood plants, including milk that was being supplied by Agri-Mark.  In December 2002, Hanman said of the merger proposal, "What we're really in this for is to gain market share."

130.    Due to strong objections by state Attorneys General, the merger proposal was restructured on May 12, 2003 into an unusual exchange of both stock and CEOs.  Under the revised proposal, three transactions would take place: (1) Hood would acquire a 30% interest in NDH; (2) DFA would acquire a 15% interest in Hood; and (3) Hood and NDH would trade their respective CEOs.

131.    Robert D. Wellington, Senior Vice President at Agri-Mark, provided the following written testimony to the United States Judiciary Committee regarding the restructured transaction:

> It is plain that the contemplated three-way federation between and among DFA, NDH and Hood is inherently and inescapably fraught with anti-competitive dangers.  As a result of the transaction, Hood, which is the prize DFA is pursuing, will be 15% owned by DFA.  This will represent a substantial degree of DFA control over Hood.  Moreover, Hood in turn will acquire a 30% interest in NDH, thus becoming a co-venturer with DFA in NDH.  There is no ambiguity as to what is going on here:  DFA, NDH and Hood will be fused into a single, coordinated economic unit.  To cement the relationship, Hood's president and chief executive, John Kaneb, will become chairman and chief executive of NDH and NDHs current president, Tracy Noll, will move over to become Hood's president.  In short, the proposed transaction is a 'virtual merger' of DFA, NDH and Hood.

132.    In 2004, following the exchange of stock and CEOs between Hood and NDH,

NDH sold all of its Northeast fluid milk bottling plants -- which were located in Binghamton,

New York; Albany, NY; Concord, NH; and Lancaster, PA -- to Hood.  As 50% owner of NDH

and 15% owner of Hood, DFA was again on both sides of the transaction.

133.    As a result of the stock and ownership exchange between Hood, NDH and DFA

and NDH's sale of Crowley Foods, Hood became the second largest fluid Grade A milk bottler

in the Northeast.

Hood Supply Agreements with DFA and DMS

134.    After the stock and ownership exchange between Hood and NDH, Hood

designated DMS to be a major supplier of its fluid Grade A milk supply, further consolidating

DFA's control of the Northeast milk supply.

135.    Upon information and belief, when Hood purchased Crowley from NDH, DFA

continued to be exclusive provider of fluid Grade A milk to the Crowley bottling plants acquired

by Hood.

136.    Agri-Mark is the only cooperative that supplies fluid Grade A milk to Hood that is

not a member of DFA or does not regularly market its milk through DMS.  However, upon

information and belief, DFA engaged in the following activities to eliminate competition with

and limit the growth of Agri-Mark: (1) entered into an agreement to allocate markets and not

compete with Agri-Mark, whereby DFA would continue to allow Agri-Mark to supply milk to

Hood in return for Agri-Mark's agreement not to compete with DFA or DMS for farmer

membership or supply contracts; (2) used its ownership interests in supply contracts with Hood

to limit the volume of fluid Grade A milk that Hood obtained from Agri-Mark; (3) ensured that

bottling plants newly acquired by Hood were supplied by DMS, not Agri-Mark; and (4) forced

Agri-mark to market some of its fluid Grade A milk through DMS in order to access Dean's

bottling plants. Thus, DFA and DMS exercise control over all of the milk supplied to Hood,

either by directly supplying the milk to Hood or by eliminating competition with and controlling

the growth of Agri-Mark.


DFA Continues to Acquire Processing Plants and Tighten Its Grip Over the Milk Buying Market
in the Northeast

     137.    DFA's quest to control the buying market for Grade A Milk in the Northeast has

continued through this day. Indeed, DFA's strategy appears to be to buy up the other producers

and either force them into DFA/DMS full supply contracts or shut them down to eliminate

competition.

     138.    DFA's acquisitions include, without limitation:

- On or around March 1, 2006, DFA acquired Dietrich's Milk Products LLC, located in Reading, Pennsylvania, an entity that manufactured wholesale and/or retail dairy products.

- On or around May 5, 2009, DFA acquired Flav-O-Rich, Inc., Dairy Rich Corporation and DRMI Corporation.

- On or around May 8, 2009, DFA acquired a subsidiary of NDH.

- On or around November 1, 2010, DFA acquired Castro Cheese Company, Inc.

- On or around April 15, 2011, DFA became the 100% equity owner in Kemps LLC ("Kemps"), which produced and marketed milk, ice cream and other dairy products and had an ice cream plant in Suffield, Connecticut.

- On or around April 19, 2011, DFA acquired all of the ownership interest[5] in Keller's, a Pennsylvania based creamery that was the second largest manufacturer of butter in the United States. Fifteen months later (in July 2012), DFA closed Keller's Pennsylvania facility, moving the warehousing and distribution to Balford Farms, a privately-owned dairy distributor in Burlington, New Jersey.

---

[5] Keller's was originally formed in May of 2000 as a joint venture between DFA and Frank Otis and Glenn Millar.

- On or around February 21, 2012, DFA acquired Guida's Milk located in New Britain, Connecticut. Guida's Milk was one New England's leading milk processors.

- On or around September 4, 2013, DFA acquired Dairy Made Dairy.

- On or around January 31, 2014, DFA acquired Oakhurst, a milk processing / bottling facility located in Maine.

- On or around July 17, 2014, DFA acquired Agri-Operations, Inc.

- On or around December 15, 2015, DFA acquired the Muller Quaker Dairy Plant.

139.    By 2015, DFA had a stake in 77 dairy processing facilities across the United States. And as of today, DFA is the largest milk processor in the world.

140.    In addition to gobbling up processing plants, DFA/DMS also acquired several transportation and hauling companies. These acquisitions include, without limitation:

- On or around November 4, 2008, DFA acquired Milk Transport Management, LLC.

- On or around July 30, 2014, DFA acquired Southwest Milk Logistics, Inc.

141.    DFA/DMS also have tightened their grip over the Northeast market through the expansion of their Co-conspirators, including Dean. Because DFA/DMS long term exclusive supply agreements with Dean, any expansion eliminates competition in the marketplace and furthers the conspiracy.

142.    According to a 2010 Dean filing with the Securities Exchange Commission, Dean made more than 40 acquisitions between 1994 and 2009.

143.    For example, in January 2004 Dean purchased Horizon Organic (the country's leading brand of organic dairy foods). Similarly, in April 2009, Dean acquired the Consumer

Products Division (including two milk processing plants in Wisconsin) from Foremost Farms USA, a dairy cooperative.

144.    Most recently, on June 20, 2016, Dean acquired the manufacturing and retail ice cream business of Friendly's Ice Cream.

145.    Through these acquisitions, Dean has further reduced competition and furthered the conspiracy.

**B.    DFA/DMS Also Control Producers (the Monopoly)**

146.    DFA's control over producers (*i.e.*, farmers) has increased drastically over the years due to its merger/acquisition of several key cooperatives.  In particular, since the filing of the Class Action Complaint, DFA's Northeast membership has grown by nearly 60% and its market share in the Northeast has doubled:

|  | DFA Member Farms – Northeast | Dairy Farms - Northeast | DFA Control - Northeast |
|---|---|---|---|
| 2010 | 1,552 | 13,429 | 11.5% |
| 2011 | 1,577 | 12,965 | 12.1% |
| 2012 | 1,577 | 12,177 | 12.9% |
| 2013 | 1,467 | 11,915 | 12.3% |
| 2014 | 2,571 | 11,702 | 21.9% |
| 2015 | 2,546 | 11,356 | 22.4% |
| 2016 | 2,446 | 11,519 (as of August 2016) | 21.2% |

DFA Captures St. Albans

147.    Prior to February 2000, Stop & Shop, one of the largest supermarket chains in New England, had been processing its own fluid Grade A milk at its Readville, Massachusetts plant with milk provided by St. Albans. A substantial share of the fluid milk produced by St. Albans was processed at Stop & Shop's plant.

148.    In February 2000, Stop & Shop entered into an agreement with Suiza, then partially owned by DFA and exclusively supplied by DFA. The agreement required Suiza to pay approximately $50 million to Stop & Shop in return for Stop & Shop closing down its Readville bottling plant, selling the plant's assets to Suiza, and agreeing to purchase and sell fluid milk products exclusively bottled by Suiza for a 15-year period. Because DFA was the exclusive supplier of fluid milk to Suiza, the agreement would greatly expand DFA's dominance in the Northeast and greatly damage St. Albans by eliminating the primary buyer of its milk.

149.    The Attorneys General of Connecticut, Maine, Massachusetts, New Hampshire, and Rhode Island were concerned that the Suiza-Stop & Shop transaction would eliminate competition in the Northeast fluid Grade A milk market by expanding DFA's dominance over the supply of fluid Grade A milk at the expense of St. Albans and by reducing the availability of bottling capacity not controlled by Suiza.

150.    To address their antitrust concerns, the Attorneys General entered into a settlement agreement with Suiza and Stop & Shop that contained the following requirements:

- Suiza shall make available to its competitors 30 million gallons of its New England milk processing capacity per year, for a period of five years.

- Suiza and Stop & Shop shall not honor or enter into agreements to restrict Stop & Shop stores from selling competitors' milk.

- Stop & Shop shall not sell the processing assets of the Readville plant to Suiza.

35

- Suiza shall not sell, close or cease operations of, or purchase an ownership interest in, any New England dairy plants without first notifying the Vermont Attorney General.

151.    Once the agreement was consummated, Stop & Shop shut down its Readville processing plant and sold its assets. The plant closure immediately increased Suiza's market share of fluid milk sales to supermarkets to approximately 80-90% in Boston and Rhode Island and approximately 65% in all of New England.

152.    As a result of the plant closure, St. Albans had little choice but to rely on Suiza's (and later Dean's) processing plants in order to sell its Grade A fluid milk. Yet, under the settlement agreement, Suiza (and later Dean) was only required to offer its processing capacity to St. Albans for five years.

153.    During St. Albans' annual meetings, Hanman said that DFA was interested in "folding" St. Albans into DFA, which effectively had long-term exclusive supply contracts with Dean.

154.    To ensure long-term access to fluid Grade A milk processing plants, St. Albans was forced to market its milk through DMS. On February 24, 2003, St. Albans issued the following statement:

> Over the last several years processing plants in the Northeast have closed or been acquired by major processors. St. Albans Cooperative Creamery, Inc. experienced a significant change in its Class I account in 2000 with Stop & Shop's decision to close their bottling facility. . . . The Board of Directors and Management of the St. Albans Cooperative Creamery, Inc. have determined that access to the Class I market, fluid milk for bottling, is essential to the viability of the Cooperative. The Cooperative needs to maintain at a minimum, 20 percent of its milk volume as Class I to qualify and receive the benefits under the Federal Order System. . . . After careful and full analysis, the St. Albans Cooperative Board of Directors has agreed to an annual membership and marketing agreement with DFA. This is not a merger of these two organizations. This is an annual marketing and membership agreement that will assure St. Albans Cooperative

access to markets in the Northeast and allow St. Albans to be competitive in returns to its dairy farmer members.

155.    St. Albans subsequently joined DFA, invested in DFA's equity program and gained one seat on the board of DFA, two on DFA's Northeast Council and three on the board of DMS.

156.    After St. Albans joined DFA and contracted with DMS, the over-order premiums that were paid to St. Albans member farmers decreased significantly.

DMS Forces Farmland Dairies to Market its Milk Through DMS

157.    In 2005, Farmland Dairies entered into an exclusive supply agreement with DMS. About 400 farmers who shipped independently to Farmland Dairies subsequently received a letter stating that Farmland Dairies was no longer buying milk directly from them, but rather obtaining it through a new full-supply contract with DMS.

158.    As a result, the independent farmers who had previously provided milk to Farmland Dairies were required to market their milk through DMS in order to access bottling or balancing plants.

DFA Captures Dairylea in 2014

159.    On April 1, 2014, Dairylea merged into DFA.  At the time of the merger, Dairylea was the sixth largest dairy cooperative.  The merger combined Dairylea's 1,200 members (plus 850 members who market milk via partnerships with Dairylea) with DFA's members, resulting in DFA representing over 20% of the nation's dairy operations.

160.    As a result of the merger, DFA became the largest dairy cooperative in the United States.

DFA Enters into Non-Solicitation Agreements with Other Cooperatives

161.    DFA's Antitrust Policy expressly prohibits any formal or informal non-

37

solicitation agreements with other cooperatives.  Specifically, item 4 on DFA's "Black List" of prohibited conduct states: "Do not enter into any discussions or agreements with another cooperative which prohibit the solicitation of (i) each other's members or (ii) producers located in any particular geographic area."

162.    Despite its knowledge that such agreements are illegal and improper, DFA has agreed with other cooperatives to restrict competition and solicitations of each other's members.

163.    For example, management at Agri-Mark told one of its officials that it had an unwritten agreement with other cooperatives (including DFA) not to approach dairy farmers for business if they were in other cooperatives.  After the official met with another farmer to discuss the possibility of selling milk to Agri-Mark, he was told to cease this competitive activity because of Agri-Mark's non-solicitation agreement with other cooperatives.  The official has complained to management at Agri-Mark about its "collusion" to suppress competition for purchases from dairy farmers.

164.    Similarly, when dairy farmer Jonathan Haar explored selling milk to Agri-Mark, he was told by Agri-Mark's field representative that Agri-Mark had an unwritten agreement with DFA that Agri-Mark and DFA would not approach each other's farmers to solicit business.  He was also told that as part of the unwritten agreement, if a farmer who was a member of a cooperative approached a second cooperative, the second cooperative would alert the original cooperative to the farmer's effort to explore alternatives.  Dave Wilbur of Agri-Mark told Haar that Agri-Mark will not solicit or "knock on the doors" of DFA farmers.

165.    Peter Barrett, a dairy farmer in Vermont, stated that prior to being coerced into joining Dairylea, Agri-Mark would regularly suggest that he join their cooperative.  Agri-Mark stopped reaching out to him once he joined Dairylea.

38

166.     Jeffery Marcus, the owner of Marcus Dairy, stated that Marcus Dairy would not solicit DFA farmers to sell milk directly to Marcus Dairy and would only talk to new farmers if they approach Marcus Dairy first.

167.     These agreements among DFA and DMS and their Co-conspirators have suppressed competition and lowered the price that dairy farmers in the Northeast can obtain for their milk. Without dairy cooperatives and processors seeking their supply of raw Grade A milk, dairy farmers have no effective alternative that would allow them to receive a competitive price. Absent the conspiracy and their illegal agreement not to compete, Northeast raw Grade A milk processors would compete with cooperatives for the purchase of raw Grade A milk from dairy farmers.

## DEFENDANTS USE THREATS AND INTIMIDATION
## TO MAINTAIN THEIR CONTROL OVER THE MARKETPLACE

168.     DFA/DMS's control over both the milk supply (via the farmers) and the market demand (via the processing plants), gives it unique strength and leverage to maintain its monopoly/monopsony power.

169.     By controlling the milk supply, DFA can force processing plants to enter into full supply agreements and/or refuse to deal with independent farmers and independent cooperatives. Upon information and belief, DFA has threatened not to supply processing plants (and effectively shut them down) unless they stop buying from independent farms/cooperatives.

170.     By controlling the milk market, DFA can force farmers and independent cooperatives to join DFA or market their milk through DMS. It also can prevent farmers from leaving DFA or attempting to market their milk through someone other than DMS. Indeed, it is not necessary that DFA and DMS retaliate against all or even most farmers. The mere threat of what they can do deters farmers who might choose other alternatives. It further strengthens the

conspiracy, as well as DMS's market position, resulting in an ability to suppress competition and prices paid to all farmers.

171.    For example, when DFA member Durwood Bast attempted to quit DFA and sell his milk to independent processor Queensboro Farm Products, Inc. ("Queensboro"), DMS threatened to halt DFA's sales of milk to Queensboro if it purchased any milk from Bast. As a result, Queensboro chose not to purchase milk from Bast and he was forced to renew his membership in DFA.

172.    DMS also has told its customers (including, but not limited to plaintiffs Tom Clark and Dan Smith) who are independent farmers/cooperatives, that the market is drying up and pretty soon it is going to start dropping people, but that those who are DFA members will never be dropped and will continue to have a market for their milk.  Upon information and belief, these threats have succeeding in scaring many independent farmers into joining DFA.

DFA/DMS Uses Inspections to Control Farmers

173.    Because they produce a food, dairy farms must be routinely inspected for cleanliness and health code issues.  Although the law requires a minimum of two inspections per year, there is no maximum number of inspections.

174.    Inspections are usually not announced.  If a farm's milk tests high for bacteria or other contaminants during a routine milk test (discussed below), an inspection may follow.

175.    For DFA members and farms who market their milk through DMS (either directly or through their cooperative), the inspections are performed by a DFA or DMS employee.

176.    Because DFA/DMS conduct these inspections, they can be used as a cudgel to intimidate farmers who seek to leave DFA/DMS or who speak out against their practices.

40

177.    For example, in June 2007, plaintiff Garrett Sitts (a then DFA member) attended a

DFA/DMS event in Wilbur Park Oneonta, New York. During a question and answer session,

Sitts asked DFA regional manager Karen Cole whether she also worked for Dean and/or Hood.

Smith (DFA's CEO), immediately interrupted and sought to embarrass and deter Sitts from his

questions -- asking Sitts whether he was a member of the communist party. The *very next day*, a

DFA truck came to Sitts' farm to "calibrate his milk tank." Notably, DFA sought to perform the

calibration *without* a representative from the county weights and measures department being

present.

178.    Similarly, when a group of farmers in Central Pennsylvania attempted to end their

relationship with DMS in 2009, DMS inspector Joe Hauk threatened to impose multiple health

code violations on those farmers, and if that failed to deter their departure, he further threatened

to instruct haulers not to transport those farmers' milk and to void all contracts with haulers that

disobeyed his instruction.

179.    In October 2010, Dairy Nutrionist W. Jason Swallows heard two local DFA/DMS

milk inspectors and a Land O' Lakes inspector at Penn 80 Truck Stop in Milton, Pennsylvania

discussing dairymen that were trying to leave DFA/DMS. When asked what he was going to do

about it, one inspector said that he would threaten to void the contract with the milk hauler if he

attempted to haul the dairymen's milk elsewhere. And if that did not work, he would threaten

the dairymen with health code violations.

180.    The most recent example of using milk inspectors to bully farmers was done in

connection with the 2015 settlement of the Class Action. To concoct support for the settlement,

DFA sent its milk inspectors to the farms with a pre-printed letter of support for the settlement in

hand. The message delivered was clear -- "support the settlement or face the consequences."
DFA's scare tactic worked and it was able to extract over 1,200 signatures.

DFA/DMS Use Milk Testing to Control Farmers

181.    DFA/DMS also threatens and intimidates farmers through milk testing.

182.    When milk is picked up at the farm, the milk hauler takes a sample and stores it in
a cooler. The hauler then pumps the milk into the tanker, where it is mixed with milk from other
farms. The purpose of the sample is so that milk from the farm can be tested for its quality and
components, which impact the premium that the farmer is paid. Additionally, because the milk
from several farms is carried in the same tanker, contaminated milk from one farm can spoil the
entire truckload. If that occurs, the farm supplying the contaminated milk must pay for the entire
load.

183.    The samples of milk are sent to a laboratory for testing called DairyOne
Cooperative, Inc. ("DairyOne"). According to DairyOne's website, DairyOne "is closely aligned
with Dairy Farmers of America."

184.    DairyOne tests the milk samples and then provides the results to DFA. The
results are then printed on DFA letterhead and sent to the farmers with their milk checks.

185.    Because DFA has access to the results, it has the ability to change them and, upon
information and belief, has done so in the past.

186.    For example, in the Fall of 2005, plaintiff Donna Hall and several other farmers
were interviewed by Lou Dobbs about problems they had encountered with DFA and DMS.
Shortly after these interviews, Hall and the other farmers were told by DFA's inspector that their
milk had a high bacteria count which reduced the amount of their milk payments from DFA. On
further investigation, Hall and the other farmers learned that the normal test results obtained by

42

DFA did not show a high bacteria count, but that the DFA inspector had used a manual override and determined that their bacterial counts were purportedly excessive.

187.    Similarly, DFA used bogus milk tests as a way to retaliate against plaintiff Sitts for questioning its practices. In or around 2004, DFA picked up a load of approximately 4,500 pounds of milk from Sitts' farm, leaving about 1,500 pounds left in his tank. As was its usual practice, DFA took a sample of the milk for testing. The next day DFA picked up the remaining 1,500 pounds and again took a sample for testing. About two weeks later, DFA sent Sitts the test results for the first load of milk (*i.e.*, the 4,500 pounds). According to those results, the first load was contaminated with a 920,000 bacteria count (which is more than nine times higher than the legal limit for fluid grade A milk). They further informed him that he had spoiled the entire truckload of milk and would have to pay for it. Shortly thereafter, DFA sent Sitts the test results from the second load (*i.e.*, the 1,500 pounds that was left in the tank). This load -- which was the *same milk* -- had a low bacteria count.

DFA/DMS Uses Charges and Fees to Retaliate Against Farmers

188.    Another means by which DFA/DMS force farmers to join or stay with DFA is to threaten them with higher "charges" like trucking fees, dumping fees, etc.

189.    For example, Vince Neville was an independent dairy farmer and sold to the Crowley plant in Binghamton, New York. In approximately 2007, DMS tripled the trucking costs in the area. DMS then informed Neville and other dairy farmers that they would have to join DFA or Dairylea if they wanted more reasonable hauling charges.

190.    Peter Barrett was an independent farmer until approximately 2007, when Hood bought a plant in Concord, NH to which he had shipped milk for many years. After the acquisition, DFA, DMS and Dairylea told him that his hauling costs would rise if he remained

independent (in comparison to cooperative members). As a result, Barrett reluctantly joined Dairylea (which is now part of DFA).

191.    In approximately 2007, Peter Southway, a dairy farmer in New Jersey, began selling parts of his fluid milk to a local cheese-maker. Immediately thereafter, two officials from DMS (John Rockefeller and Brent Bunce) drove from Syracuse, NY and informed Southway that he was not permitted to sell milk to anyone other than DMS. Six months later, they returned and threatened to impose a $100 trucking charge if Southway refused to sell all of his fluid milk through DMS.

192.    DFA and DMS have punished haulers who contracted to transport milk for former DFA members or dairy farmers who used to market their milk through DMS. For example, when Tom Bowman, an independent hauler who had hauled milk for DFA and DMS for approximately 15 years, agreed to transport milk for a farmer who had quit DFA, DMS terminated all its contracts with Bowman.

DFA/DMS Use Balancing Facilities to Control Farmers.

193.    When supply of raw Grade A milk exceeds demand, balancing plants store the milk until demand increases. Raw Grade A milk balancing plants are particularly critical during weekends and holidays when processing plants are closed, as they store the raw Grade A milk until the processing plants reopen, and convert bulk supplies of surplus raw Grade A milk into storable, non-fluid commodities such as cheese (Class III) or powdered milk (Class IV).

194.    It is impossible for an independent dairy farmer or independent dairy cooperative to operate in the Northeast market without access to raw Grade A milk balancing plants.

195.    DFA/DMS controls a significant majority of the balancing plants in the Northeast market.

196.    In addition, Dean and other Co-conspirators have given DFA/DMS control over access to Dean's bottling facilities.

DFA Floods the Market with Milk from Other Federal Orders

197.    Due to seasonal and other variations in Grade A milk production and demand and uneven distribution of dairy farmers throughout the United States, the utilization of raw Grade A milk for Class I purposes varies between Orders.

198.    On some orders, such as Order 1, where demand for fluid Class I dairy products often exceeds raw Grade A milk production, Class I utilization has traditionally been higher than in other areas, such as the Southwest, where demand for fluid Class I dairy products does not exceed raw Grade A milk production. Consequently, Orders with high Class I utilization generally have higher FMMO minimum blend prices than Orders with lower Class I utilization.

199.    Shifting substantial quantities of Grade A milk from one order to another is referred to as "diluting" or "flooding" a pool because the "outside" raw Grade A milk increases the total volume of raw Grade A milk pooled to the point that it decreases the Order's Class I utilization, and hence reduces the minimum blend prices. Because DFA has the capacity to flood pools, it can use that power, as well as other means, to stifle competition in the Northeast market.

DFA Dumps Milk and Reduces the Pool Price in Order 1

200.    When there is an excess milk supply, DFA and DMS are permitted to dump milk. The dumping of milk in the Northeast, however, is subject to regulation and oversight by the Order 1 market administrator.

201.    Upon information and belief, over the past several years DFA and DMS have manipulated the milk dumping process to secure a windfall for Defendants and the Co-conspirators. Specifically, upon information and belief, DFA and DMS are skimming all or most

45

of the cream from the milk before it is dumped. They then dump the skimmed milk and report it

to the Market Administrator. This has two effects that benefit Defendants and hurt the farmers.

*First*, the dumped milk is assessed a low value that is factored into the Order pool pricing. Upon

information and belief, this artificially deflates the price paid to all farmers in the Order. *Second*,

upon information and belief, DFA and DMS keep the cream (which is the most valuable portion

of the milk) without paying the farmers a premium for it.

## IMPACT ON DAIRY FARMERS

202.    As a direct and proximate result of the antitrust violations alleged herein,

Plaintiffs have been injured and have sustained damages in that the prices received for raw Grade

A milk. Specifically, over-order premiums have been artificially reduced below levels that

would have received but for Defendants' unlawful agreement not to compete in the raw Grade A

milk market in the Northeast. As a result of this conspiracy, Defendants have reaped hundreds of

millions of dollars of profits that would have otherwise been paid to their members.

203.    As a direct and proximate result of the antitrust violations alleged herein, the

amount of over-order premiums paid to farmers shrank, while the profits to the processors

increased.

204.    In a competitive raw milk market, the mailbox prices in the Northeast would be

higher than the mailbox prices in the Midwest because (1) transportation costs are greater in the

Northeast than in the Midwest and (2) a greater proportion of the raw milk produced in the

Northeast is converted to fluid Class I milk than in the Midwest, where much of the milk is used

to manufacture cheese and other dairy products. As a direct and proximate result of the antitrust

violations alleged herein, however, the mailbox prices received by dairy farmers are, on average,

greater in the Midwest than the Northeast.  Professor Ron Cotterill, professor of agricultural

economics at the University of Connecticut, testified,

> So why are mailbox prices less in the Northeast than the Midwest?  . . .  The answer is that retailers and processors in the northeast are not paying over-order premiums that are as high as those in the Midwest. . . . Northeast raw milk markets, relatively speaking, are dominated by the milk channel firms at the expense of the region's dairy farmers.  Monopsony power in the northeast dairy market is a major force.

205.    Peter Carstensen, an antitrust professor at the University of Wisconsin Law

School, explained, "Where there is a competitive market for buying milk, dairy farmers are paid

more.  When DFA comes to dominate a market, then farmers are paid less.  Monopolists behave

like monopolies."

### DEFENDANTS AND CO-CONSPIRATORS RECEIVE LUSH PAYDAYS

206.    Upon information and belief, the profits of Defendants' and their Co-conspirators

have greatly increased during the relevant period.  During a teleconference with analysts in May

2009, Dean's CFO bragged that cheap raw milk had created "the perfect sunny day" for the $12

billion corporation.

207.    For example, DFA's net sales has increased drastically since 2009:

|        | DFA Net Sales | DFA Net Income | DFA Affiliate Earnings |
|--------|---------------|----------------|------------------------|
| 2009   | $8.1 billion  | $65.6 million  | $83.6 million          |
| 2010   | $9.8 billion  | $43.7 million  | $50.9 million          |
| 2011   | $13 billion   | $40.2 million  | $39 million            |
| 2012   | $12.1 billion | $83 million    | $58 million            |
| 2013   | $12.8 billion | $61.3 million  | $72.8 million          |
| 2014   | $17.9 billion | $43.1 million  | (not available)        |

|  | **DFA Net Sales** | **DFA Net Income** | **DFA Affiliate Earnings** |
|---|---|---|---|
| **2015** | $13.8 billion | $94.1 million | (not available) |

208.    DFA's financials are not publicly available and it takes measures to preclude its members from discovering more information.

209.    Not only did the entities make tremendous sums of money, but so did management.  Hanman (DFA) was paid $31.6 million during his seven-year tenure at DFA, including bonuses for increasing the cooperative's market share.  Engles (Dean) was paid approximately $156 million between 2004 and 2012.  Plaintiffs, however, did not share in these monies.

## CONCEALMENT AND TOLLING

210.    During the relevant period, Defendants have affirmatively concealed from Plaintiffs the unlawful combinations, conspiracies and agreements among Defendants alleged herein.

211.    By their very nature, the price-fixing activities described herein, and the efforts to fix and suppress milk prices, were secret and, in fact, self-concealing activities.  Defendants did not disclose their coordinated pricing activities and communications involving Defendants and their Co-conspirators.  Defendants thus hid from dairy farmers, among other things, the existence of "silent rebates" and "competitive credits," which depressed the prices farmers actually received for milk.  Nor was there any disclosure, or public information, of the fact that such activities and agreements were being reached outside the parameters of the Capper-Volstead Act.

48

212.    Defendants went to considerable length to conceal their concerted activity.
Indeed, as explained above, Defendants gained approval of their activities -- and determinations
that the activities were lawful and would not have anticompetitive consequences -- by
misrepresenting the nature of their agreements (and purported adherence to competitive
safeguards) to the DOJ. Thus, Defendants publicly trumpeted DOJ's review and approval of
their activities. In light of these public statements that DOJ had reviewed and approved their
actions as lawful and not anticompetitive, it was entirely reasonable for Plaintiffs to accept those
conclusions. In fact, Defendants issued press releases and/or made other public statements
highlighting the DOJ's approval of their activities for the precise purpose of communicating to
the public, and participants in the industry such as the Plaintiffs, that their activities had been
carefully reviewed and were lawful.

213.    This is illustrated by the conspirators' public statements relating to the Dean-
Suiza merger, the DOJ's review of the merger and the safeguards that were purportedly in place
to protect competition. On April 9, 2001, Suiza and Dean issued a press release touting the
competitive benefits of their proposed merger. Engles, who at the time of the merger was
Suiza's CEO, stated "[b]y combining with Dean Foods, we will also generate greater efficiencies
and scale to invest in innovation and growth. This opportunity should translate into increased
consumption – a benefit for the entire industry, from dairy farmers to consumers."

214.    On May 10, 2001, Dean issued a press release stating that relevant materials
relating to the Dean-Suiza merger were being submitted to the DOJ and steps were being taken
to address any potential competitive concerns. According to Dean's statement:

> [t]he companies have carefully analyzed the transaction for areas of overlap and
> based on their analysis have identified the operations of six plants in five states
> that will be sold *to resolve potential antitrust problems and to facilitate approval
> for this pro-competitive transaction.* The company expects the merger to be

49

approved in the third or fourth quarter of calendar 2001 and belies that *the merger plan preserves competition, while providing benefits to dairy farmers, consumers and the entire industry.* (emphasis added).

215.    On May 8, 2001, Dean prepared a "Merger News Bulletin" and filed this with the

Securities and Exchange Commission. Dean stated that "[t]he new company will be committed

to increasing fluid milk consumption, which will benefit producers, processors and the entire

industry." Dean further stated that the merger was going to receive a "comprehensive" review

by the federal government and that it was:

> confident that the transaction will be approved. We believe our decision to divest the four Dean Foods and two Suiza Foods facilities will resolve any regulatory issues related to the merger. *The dairy industry is and will remain highly competitive at both local and regional levels.* This transaction creates a company that benefits consumers and retailers by providing a broader range of products. . . . We believe that regulators will see the merits of this transaction and endorse it. (emphasis added).

216.    Dean's public submission of May 8, 2001 further stated:

> [t]here will continue to be vigorous competition from other well-known local and regional rivals in every market where the new Dean Foods will operate. The formation of National Dairy Holdings, L.P., will create an additional large-scale dairy competitor. We believe this transaction is a very positive one for the dairy industry in this country. The merger will create a more efficient player in the foods industry capable of increasing funding for marketing and product innovation. The company will also be committed to reversing declining fluid milk consumption – something that will benefit the entire industry.

217.    As set forth above, however, Dean and Suiza did not disclose to the DOJ -- or the

public – the actions that were being taken to circumvent the competitive safeguards required by

the Justice Department. Thus, the DOJ erroneously believed -- and, based on Dean and Suiza's

assurances, so informed the public on December 18, 2001 -- that the parties to the merger had

"agreed to modify Suiza's supply contract with DFA to ensure that dairies owned by the merged

firm in the areas affected by the divestitures will be free to buy their milk from sources other

than DFA." Thus, unaware of the secret steps taken by Dean, Suiza and DFA to undermine the

Justice Department's safeguards, the Department assured the public that the safeguards in place "ensure that consumers of milk … continue to get the benefits of competition – increased choices for consumers resulting in lower prices and better service. Maintaining competition in the dairy industry is important for American consumers."

218.    Similarly, in connection with the NDH-Hood transaction described above, the proposed merger was expressly modified for the purported purpose of addressing all regulatory and anticompetitive concerns. On June 1, 2003, the press reported that "[f]aced with government opposition to a planned merger, Dairy Farmers of America, Inc. (DFA), National Dairy Holdings, L.P. (NDH) and HP Hood Inc. have restructured the proposed consolidation of NDH and Hood" and under the restructured proposal Hood and DFA would only make "minority investment[s]" in each other. The revised transaction would be "subject to government review." Tracy Noll, NDH's President, announced in June 2001 that "[a]s a result of our discussions, we believe the proposed new transaction will allow us to accomplish our original goals to expanding product lines and distribution."

219.    By highlighting the Government's review of their activities, even where the Government had received misleading or incomplete information about their schemes, the conspirators assured the public -- including the Plaintiffs -- that the Nation's chief antitrust enforcement body had reviewed their conduct and determined it to be lawful and procompetitive. For example, on August 12, 2004, DFA's General Counsel, David Geisler, publicly stated (and the press reported) that "[i]n the six years since DFA was formed, the DOJ has frequently reviewed the cooperative's various acquisitions and mergers." Geisler publicly denied "that the cooperative was trying to monopolize the raw milk market, and he noted that *the government has*

*repeatedly reviewed the cooperative's actions and not charged it with any violations.*"

(emphasis added).

220.    It was entirely reasonable for farmers, including Plaintiffs, to rely on the

conclusions of antitrust regulators (who have expertise, significant resources and the power to

secure and review the conspirators' internal records) as well as the conspirators' express public

statements that their actions were "frequently reviewed," had been modified when appropriate,

and had received imprimatur of antitrust enforcement authorities.  Moreover, while from time to

time concerns were raised by private parties, the fact that the Government has purportedly been

fully informed of defendants' activities, had "frequently reviewed" them and had allegedly

approved them, provided a reasonable basis to conclude that they were lawful.  Indeed, that is

precisely the impression defendants' sought to create when they issued press releases or

otherwise made public statements that their conduct had been carefully reviewed and approved

by the Government.

221.    Moreover, Defendants have consistently and repeatedly made statements designed

to lead the public, as well as farmers and others in the industry, to believe that prices of milk are

a function of market and regulatory dynamics, rather than unlawful price-fixing activities and

other anticompetitive conduct.  Defendants also have made numerous public statements

attempting to explain the variability of milk pricing without disclosing their unlawful price-

fixing activities.

222.    During DFA's March 25, 2003 annual delegate meeting, Brubaker acknowledged

the low prices farmers were being paid for milk but said that solving this was a matter of better

balancing supply and demand.

223.    In a 2004 newsletter, DMS told farmers that "[f]arm milk prices are projected to increase in steady steps from their current levels and could surpass $20 per hundredweight this summer." DMS again claimed that price levels were a function of underlying market conditions rather than any conspiratorial or price-fixing activities: "Milk prices will reach record high levels based on worldwide tightness in supply and demand. Here in the U.S., milk production declined by 2.2 percent in February, compared to a year earlier. At the same time, demand for dairy products has been strong. Factors contributing to the positive supply/demand situation include: Monsanto's 50 percent allocation of Posilac is not expected to change in the future. This is reducing production per cow …;" "the U.S. dairy herd has 153,000 fewer cows than a year ago …;" "There are fewer dairy heifer replacements than in past years;" and numerous other market factors. DMS concluded that "2004 looks like it will be a phenomenal milk price year. If supply and demand dynamics cause butter and cheese prices to retreat later in the year [this] will moderate the farm milk price decline for a few months." Similarly, Engles (Dean) made public statements in or about July of 2004 that dairy prices had risen "to historic highs, as did many other agricultural inputs and energy prices" but "[t]he raw milk environment is showing signs of returning to more normal levels in the third quarter."

224.    On or about March 1, 2006, Hanman (DFA) told approximately 250 farmers and political leaders at the annual meeting of St. Albans that they could anticipate a short-term problem with a drop in Class I milk prices, but they also faced a longer term problem because there were 49 replacement heifers for every cow being milked in the United States. Hanman indicated that the result would be a "tsunami" of surplus milk and declining prices.

225.    In August 2006, DMS publicly stated that "there are signs indicating an increase in milk prices in the future ... The low prices resulted from strong milk production growth and inventory buildup."

226.    On or about October 2, 2007, Engles (Dean) publicly announced that "[r]apidly increasing and record high dairy commodity costs have created a very challenging operating environment ... The third quarter has been particularly challenging as dairy commodity costs have risen sharply, hitting all-time highs. This is by far the most difficult operating environment in the history of the company ..." Jack Callahan (Dean's CFO) pointed to market conditions as the explanation for milk prices, stating that "[w]hile we had expected strong growth in milk supply to lead to lower conventional diary commodity prices toward the end of the year, it now appears that prices will likely remain high ... due in part to continued strong export demand for non-fat dry milk powder. However, we expect more favorable price movements as we get farther into 2008."

227.    In 2009, Defendants and their Co-coconspirators continued to tell farmers and the public that prices were being dictated similarly by market conditions and regulatory issues, without any mention of their price-fixing activities and other anticompetitive conduct described herein. For example, in March 2009, Smith (DFA) publicly stated at the DFA's annual meeting that low milk prices were a result of "world supply and demand. We were expending production into a growing export market." He stated that "U.S. supply/demand balance is already coming back into alignment."

228.    On or about July 17, 2009, Dean publicly stated that milk prices are generally set by the United States Department of Agriculture, and that low prices to farmers were a result of current supply and demand levels. Marguerite Copel, Dean's Vice President of Corporate

Communications, stated that "[a]t Dean Foods, we work hard to create demand for our products which in turn creates additional demand for milk and additional markets for farmers."

229.    In August 2009, Copel publicly stated that it is a "free market" place, there are lots of milk buyers besides Dean, and the price of raw milk is set by the marketplace, not by one company.  Similarly, on or about August 28, 2009, Smith (DFA) publicly stated that DFA had not engaged in collusion with Dean Foods and, to the contrary, Dean had been a good customer for DFA's members.

230.    In September 2009, Dean issued a public statement saying that "[t]o suggest that we control the raw-milk market, or that we are the cause of low milk prices, makes no sense.  For most of the milk we buy, we pay a price that is regulated by USDA, plus premiums."

231.    In short, Defendants repeatedly communicated to farmers and the public that milk prices were a function of market conditions and, in some cases, regulatory activities (rather than price-fixing or other collusive activities).  Indeed, as explained above, they went one step further by indicating that their business activities had frequently been reviewed and approved by Government officials.

232.    Since the Class action was first filed, Defendants have continued to make public statements that they have not engaged in any form of price suppression or other anticompetitive or unlawful activity.  For example, on or about October 14, 2010, DFA publicly stated that "[w]e are continuously looking for additional ways to increase dairy farmer pay price and net returns, not suppress them, and have been successful in doing so."

233.    Plaintiffs were not aware of Defendants' unlawful price-fixing activities and other unlawful conduct described herein nor, given the nature of those activities, could they have learned of them through due diligence until after the Class Action was filed.  Indeed, the fact that

the nation's chief antitrust enforcement authorities had "frequently reviewed" Defendants' actions but had not discovered secret agreements and other steps to circumvent competitive safeguards, demonstrates that Plaintiffs and other dairy farmers could not reasonably have been expected to discover either defendants' unlawful price-fixing agreements or other anticompetitive activities challenged herein.

234.    Each of the Plaintiffs has been through the time period covered by this case actively engaged in dairy farming, an occupation which is, by its nature, extremely time-demanding. Notwithstanding this, each of the Plaintiffs made reasonable effort to stay abreast of public information that is available to them through the media. The exercise of this reasonable diligence did not, however, give Plaintiffs reason to know that Defendants were engaged in unlawful anticompetitive conduct before or after October 2005. Indeed, Defendants' public statements were directly to the contrary.

235.    In the alternative, even if Plaintiffs could have discovered that Defendants' conduct was unlawful in some respects (a factual conclusion that Plaintiffs dispute) prior to October 2005, Plaintiffs did not know, and could not have discovered through the exercise of reasonable diligence, that Defendants were engaged in unlawful, concerted efforts to fix and suppress prices.

236.    In the fall of 2009, Defendants' anticompetitive activities began to receive widespread attention, both nationally and in the Northeast. Milk prices to farmers had declined precipitously, and this free-fall in prices prompted concerns and/or allegations of collusion and anticompetitive conduct by the DOJ, Congress and other public officials. The DOJ, Congress and various state officials all commenced investigations and/or hearings relating to these

activities. This information provided a basis for each of the Plaintiffs to investigate and proceed with claims against the Defendants in this action.

237.    As a result of Defendants' concealment, any applicable statute of limitations affecting the rights of Plaintiffs has been tolled. Plaintiffs exercised due diligence to learn of their legal rights, and despite the exercise of due diligence, did not discover and could not have discovered the unlawful conduct alleged herein more than four years before commencing this action.

## CONTINUING VIOLATIONS

238.    Since the start of the conspiracy, Defendants and Co-conspirators have engaged in numerous overt acts to implement, effectuate and extend the unlawful conspiracy. Each of these overt acts caused the Plaintiffs new injuries.

239.    As discussed herein, between 1998 (when DFA was formed) and the present, DFA has merged with numerous cooperatives (such as St. Albans and Dairylea), acquired countless processing plants and other entities, and entered into several joint ventures. These mergers, acquisitions and relationships have only served to strengthen DFA's vice-grip on the milk industry in the Northeast.

240.    DFA's market share has only strengthened since the filing of the Class Action Complaint. In particular:

- On April 19, 2011, DFA acquired Keller's, the nation's second-largest manufacturer of butter.

- On or around February 21, 2012, DFA acquired Guida's Milk, the leading milk processor in New England.

- On or around September 4, 2013, DFA acquired Dairy Maid, a dairy processor.

- On or around January 31, 2014, DFA acquired Oakhurst, a dairy processor.

- On or around April 1, 2014, DFA and Dairylea merged. This combined Dairylea's 1,200 members with DFA's 13,000 members nationwide.

- On or around December 31, 2015, DFA acquired the Müller Quaker yogurt plant in Batavia, New York.

- On June 20, 2016, Dean acquired the manufacturing and retail ice cream business of Friendly's Ice Cream.

241. As a result of these acquisitions, DFA is now the largest milk processor in the world and Dean is one of the largest processors. These acquisitions, therefore, have permitted Defendants and their Co-conspirators to increase their market share in order to further the conspiracy.

242. Moreover, as described herein, Defendants have also retaliated against and/or threatened dairy farmers who (a) refused to join DFA or DMS and (b) who joined the Class Action lawsuit or this lawsuit. Defendants have threatened and/or retaliated dairy farmers in order to further the conspiracy.

243. Each of these acts -- including without limitation (i) DFA's acquisition of Keller's, Guida's Milk, Dairy Maid, Oakhurst, and Dairylea; (ii) Dean's acquisition of Friendly's Ice Cream; and (iii) Defendants continued threats and retaliation against dairy farmers, including Plaintiffs -- constitutes a series of overt acts in furtherance of the conspiracy. Each of these overt acts has injured Plaintiffs.

## COUNT ONE
## SHERMAN ACT SECTION 2 VIOLATION:  CONSPIRACY TO MONOPOLIZE/MONOPSONIZE

244. Plaintiffs incorporate by reference all of the preceding and ensuing paragraphs as if fully alleged herein.

245. The relevant geographic market is the Northeast United States, which is comprised of FMMO 1.

58

246.    The relevant product market consists of the raw Grade A milk market.

247.    At all times relevant to this complaint, Defendants have willfully, knowingly and intentionally conspired among themselves with the specific intent to monopolize/monopsonize the raw Grade A milk market in the Northeast and thereby to depress, fix and stabilize the over-order premiums paid for raw Grade A milk produced in the Northeast and to ensure that all dairy farmers of such ilk would be unable to market their raw Grade A milk except at prices that were fixed and artificially depressed by Defendants' conspiracy. This conspiracy has caused and continues to cause substantial anticompetitive effects, and achieves no legitimate efficiency benefit.

248.    Through a series of unlawful activities, including activities that defied restrictions imposed by the DOJ and state Attorneys General, Defendants willfully, knowingly and intentionally conspired among themselves with the specific intent to secure for DMS, as controlled by DFA, (or, to the extent that they are alter egos, DMS and DFA) monopoly/monopsony control over the raw Grade A milk market in the Northeast.

249.    In furtherance of the conspiracy, Defendants have committed one or more of the following overt acts: (a) DFA and Dairylea created DMS to bring non-DFA members under DFA's control; (b) With the assistance of DFA, which purchased 11 of Dean and Suiza's divested bottling plants through NDH, Dean and Suiza merged to form the largest processor in the Northeast; (c) Dean reached agreements with DFA and DMS to allow Dean to circumvent competitive safeguards imposed by the Department of Justice and, in exchange for DFA's and DMS's cooperation, assisted DMS, as controlled by DFA, in securing a monopoly/monopsony; (d) Dean reached a market allocation agreement with DFA and DMS by agreeing not to compete with DFA and DMS for the purchase of raw Grade A milk from dairy farmers and instead

59

assigning those farmers to DFA and/or DMS; (e) Dean, DFA and DMS entered into and implemented long-term full supply agreements to control Northeast dairy farmers' access to fluid Grade A milk bottling plants and raw Grade A milk processing plants; (f) Dean paid Stop & Shop to close down its bottling plant, thereby forcing St. Albans to market its milk through DMS to access fluid Grade milk bottling plants; (g) DFA and DMS entered into agreements to allocate markets and not compete with Agri-Mark and other Co-conspirators as set forth above; (h) Defendants forced Northeast dairy farmers to market their raw Grade A milk through DMS to gain access to fluid Grade A milk bottling plants; (i) Defendants forced Northeast dairy farmers to market their raw Grade A milk through DMS to gain access to raw Grade A milk balancing plants; (j) DFA and DMS threatened and punished farmers who attempted to terminate their relationships with DFA or DMS, haulers that attempted to transport those farmers' milk, and processors that attempted to purchase those farmers' milk; (k) Defendants purchased raw Grade A milk bottling and processing plants, closed them down and/or have refused to operate them with the purpose and intent of further stifling competition in the Northeast; (l) Defendants cut off Northeast dairy farmers' access to fluid Grade A milk bottling plants in the Northeast; (m) Defendants boycotted dairy farmers, cooperatives, and raw Grade A milk processors that did not comply with Defendants' conspiracy in an effort to eliminate or control these entities as competitive alternatives for dairy farmers' raw Grade A milk; (n) Defendants depressed, fixed and stabilized prices for raw Grade A milk paid to dairy farmer members of cooperatives that market their milk through DMS, independent dairy cooperatives and independent dairy farmers in the Northeast; (o) DFA acquired Dairylea, which drastically increased DFA's market share and brought Dairylea's members under DFA control; and (p) DFA acquired Guida's Dairy, Dairy Maid and Oakhurst, making DFA the largest milk processor in the world.

250.    Defendants willfully conspired among themselves with the intent that DMS, as controlled by DFA, (or, to the extent they are alter egos, DMS and DFA) would acquire, maintain and exploit monopoly/monopsony power I the raw Grade A milk market in the Northeast.

251.    As a direct and proximate result of Defendants' continuing violation of Section 2 of the Sherman Act, Plaintiffs and Class members have suffered injury and damages in an amount to be proven at trial.

252.    The foregoing conduct is a per se violation of Section 2 of the Sherman Act.  In the alternative, the foregoing conduct violated Section 2 by virtue of the rule of reason.

253.    Plaintiffs seek money damages from Defendants who are jointly and severally for these violations.  Such damages represent the additional amount Plaintiffs would have received for sales of raw Grade A milk in the absence of the violations alleged.  These actual damages should be trebled under Section 4 of the Clayton Act.  15 U.S.C. § 15.

254.    Plaintiffs also seek injunctive relief.  The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

## COUNT TWO
## SHERMAN ACT SECTION 2 VIOLATION:  ATTEMPT TO MONOPOLIZE/MONOPSONIZE

255.    Plaintiffs incorporate by reference all of the preceding and ensuing paragraphs as if fully alleged herein.

256.    The relevant geographic market is the Northeast United States, which is comprised of FMMO 1.

257.    The relevant product market consists of the market for the marketing or sale of raw Grade A milk to processing plants.

258.    DMS has attempted, and continues to attempt, to possess market power in the raw

Grade A milk market in the Northeast and maintains a dominant position in the raw Grade A

milk market in the Northeast.  DMS has acted with the specific intent to

monopolize/monopsonize and has used, and is using, its market dominance in an attempt to

eliminate competition from independent dairy farmers and independent dairy cooperatives.

259.    DFA is also liable for DMS's attempt to monopolize/monopsonize by virtue of its

principal-agent relationship with DMS.  As set forth above, DFA has manifested that DMS shall

act for it; DMS has accepted that undertaking; and the parties understand that DFA is in control

of this undertaking.  Moreover, based on the facts alleged above, DMS is subject to DFA's

direction and control; DMS was formed by DFA to act as DFA's exclusive marketing agent;

through DMS, DFA exercises control over more dairy farmers; DFA and DMS together have

punished farmers, haulers, and independent processors who operate outside of their sphere of

influence; and DFA and DMS together have harmed competition.

260.    In the alternative, DFA and DMS are alter egos by virtue of the interrelationships

set forth above and thus are both liable for the attempt to monopolize/monopsonize.

261.    This attempt to monopolize/monopsonize includes, but is not limited to, the

following conduct: (a) DFA and Dairylea created DMS to bring non-DFA members under

DFA's control; (b) With the assistance of DFA, which purchased 11 of Dean and Suiza's

divested bottling plants through NDH, Dean and Suiza merged to form the largest processor in

the Northeast; (c) Dean reached agreements with DFA and DMS to allow Dean to circumvent

competitive safeguards imposed by the Department of Justice and, in exchange for DFA's and

DMS's cooperation, assisted DMS, as controlled by DFA, in securing a monopoly/monopsony;

(d) Dean reached a market allocation agreement with DFA and DMS by agreeing not to compete

with DFA and DMS for the purchase of raw Grade A milk from dairy farmers and instead

assigning those farmers to DFA and/or DMS; (e) Dean, DFA and DMS entered into and

implemented long-term full supply agreements to control Northeast dairy farmers' access to fluid

Grade A milk bottling plants and raw Grade A milk processing plants; (f) Dean paid Stop &

Shop to close down its bottling plant, thereby forcing St. Albans to market its milk through DMS

to access fluid Grade milk bottling plants; (g) DFA and DMS entered into agreements to allocate

markets and not compete with Agri-Mark and other Co-conspirators as set forth above; (h)

Defendants forced Northeast dairy farmers to market their raw Grade A milk through DMS to

gain access to fluid Grade A milk bottling plants; (i) Defendants forced Northeast dairy farmers

to market their raw Grade A milk through DMS to gain access to raw Grade A milk balancing

plants; (j) DFA and DMS threatened and punished farmers who attempted to terminate their

relationships with DFA or DMS, haulers that attempted to transport those farmers' milk, and

processors that attempted to purchase those farmers' milk; (k) Defendants purchased raw Grade

A milk bottling and processing plants, closed them down and/or have refused to operate them

with the purpose and intent of further stifling competition in the Northeast; (l) Defendants cut off

Northeast dairy farmers' access to fluid Grade A milk bottling plants in the Northeast; (m)

Defendants boycotted dairy farmers, cooperatives, and raw Grade A milk processors that did not

comply with Defendants' conspiracy in an effort to eliminate or control these entities as

competitive alternatives for dairy farmers' raw Grade A milk; (n) Defendants depressed, fixed

and stabilized prices for raw Grade A milk paid to dairy farmer members of cooperatives that

market their milk through DMS, independent dairy cooperatives and independent dairy farmers

in the Northeast; (o) DFA acquired Dairylea, which drastically increased DFA's market share

and brought Dairylea's members under DFA control; and (p) DFA acquired Guida's Dairy, Dairy Maid and Oakhurst, making DFA the largest milk processor in the world.

262.    This scheme to monopolize/monopsonize has had success in restricting, excluding and foreclosing competition, and there is a dangerous probability of success of DMS monopolizing these markets.

263.    This scheme, and the predatory acts in furtherance of this scheme, constitute attempted monopolization/monopolization in violation of Section 2 of the Sherman Act, and such violation and the effects thereof are continuing and will continue unless injunctive relief is granted.

264.    As a direct and proximate result of this continuing violation of Section 2 of the Sherman Act, Plaintiffs have suffered injury and damages in an amount to be proven at trial.

265.    Plaintiffs seek money damages from DMS and DFA for these violations. These damages represent the additional amount Plaintiffs would have received for sales of raw Grade A milk in the absence of the violations alleged. These actual damages should be trebled under Section 4 of the Clayton Act. 15 U.S.C. § 15.

266.    Plaintiffs also seek injunctive relief. The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

## COUNT THREE
### SHERMAN ACT SECTION 2 VIOLATION:
### UNLAWFUL MONOPOLIZATION/MONOPSONIZATION

267.    Plaintiffs incorporate by reference all of the preceding and ensuing paragraphs as if fully alleged herein.

268.    The relevant geographic market is the Northeast United States, which is comprised of FMMO 1.

269.    The relevant product market consists of the raw Grade A milk market.

270.    DMS possesses monopoly/monopsony power in the raw Grade A milk market in the Northeast and has abused and continues to abuse that power to maintain and enhance its market dominance in the raw Grade A milk market by unreasonably restraining trade, artificially and anticompetitively reducing the price of raw Grade A milk sold by from Plaintiffs and members of the Class, eliminating competition from rival cooperatives and independent dairy farmers, and foreclosing and excluding competitors from access to raw Grade A milk bottling plants by engaging in predatory and unlawful conduct.

271.    DFA is also liable for DMS's monopolization/monopolization by virtue of its principal-agent relationship with DMS as set forth above.

272.    In the alternative, DFA and DMS are alter egos by virtue of the interrelationships set forth above and thus are both liable for unlawful monopolization/monopolization.

273.    This unlawful monopolization/monopolization includes, but not limited to, the following conduct:  (a) DFA and Dairylea created DMS to bring non-DFA members under DFA's control; (b) With the assistance of DFA, which purchased 11 of Dean and Suiza's divested bottling plants through NDH, Dean and Suiza merged to form the largest processor in the Northeast; (c) Dean reached agreements with DFA and DMS to allow Dean to circumvent competitive safeguards imposed by the Department of Justice and, in exchange for DFA's and DMS's cooperation, assisted DMS, as controlled by DFA, in securing a monopoly/monopsony; (d) Dean reached a market allocation agreement with DFA and DMS by agreeing not to compete with DFA and DMS for the purchase of raw Grade A milk from dairy farmers and instead assigning those farmers to DFA and/or DMS; (e) Dean, DFA and DMS entered into and implemented long-term full supply agreements to control Northeast dairy farmers' access to fluid

Grade A milk bottling plants and raw Grade A milk processing plants; (f) Dean paid Stop & Shop to close down its bottling plant, thereby forcing St. Albans to market its milk through DMS to access fluid Grade milk bottling plants; (g) DFA and DMS entered into agreements to allocate markets and not compete with Agri-Mark and other Co-conspirators as set forth above; (h) Defendants forced Northeast dairy farmers to market their raw Grade A milk through DMS to gain access to fluid Grade A milk bottling plants; (i) Defendants forced Northeast dairy farmers to market their raw Grade A milk through DMS to gain access to raw Grade A milk balancing plants; (j) DFA and DMS threatened and punished farmers who attempted to terminate their relationships with DFA or DMS, haulers that attempted to transport those farmers' milk, and processors that attempted to purchase those farmers' milk; (k) Defendants purchased raw Grade A milk bottling and processing plants, closed them down and/or have refused to operate them with the purpose and intent of further stifling competition in the Northeast; (l) Defendants cut off Northeast dairy farmers' access to fluid Grade A milk bottling plants in the Northeast; (m) Defendants boycotted dairy farmers, cooperatives, and raw Grade A milk processors that did not comply with Defendants' conspiracy in an effort to eliminate or control these entities as competitive alternatives for dairy farmers' raw Grade A milk; (n) Defendants depressed, fixed and stabilized prices for raw Grade A milk paid to dairy farmer members of cooperatives that market their milk through DMS, independent dairy cooperatives and independent dairy farmers in the Northeast; (o) DFA acquired Dairylea, which drastically increased DFA's market share and brought Dairylea's members under DFA control; and (p) DFA acquired Guida's Dairy, Dairy Maid and Oakhurst, making DFA the largest milk processor in the world. As a direct and proximate result of this continuing violation of Section 2 of the Sherman Act, Plaintiffs have suffered injury and damages in an amount to be proven at trial.

274.   Plaintiffs seek money damages from DMS and DFA for these violations.  These damages represent the additional amount Plaintiffs and other members of the Class would have received for sales of raw Grade A milk in the absence of the violations alleged.  These actual damages should be trebled under Section 4 of the Clayton Act, 15 U.S.C. § 15.

275.   Plaintiffs also seek injunctive relief.  The violations set forth above and the effects thereof are continuing and will continue unless injunctive relief is granted.

<div align="center">

**COUNT FOUR**
**SHERMAN ACT SECTION 1 VIOLATION**
**CONSPIRACY TO RESTRAIN TRADE**

</div>

276.   Plaintiffs incorporate by reference all preceding and ensuing paragraphs as if fully alleged herein.

277.   Defendants and Co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the raw Grade A milk market in the Northeast in unreasonable restraint of trade and commerce.

278.   The contract, combination or conspiracy consisted of an agreement between Defendants to restrain trade in the raw Grade A milk market in the Northeast in return for assisting Dean in securing greater market share and market power and obtaining raw Grade A milk priced at artificially depressed rates.

279.   In furtherance of the contract, combination or conspiracy, Defendants have committed one or more of the following overt acts:  (a) DFA and Dairylea created DMS to bring non-DFA members under DFA's control; (b) With the assistance of DFA, which purchased 11 of Dean and Suiza's divested bottling plants through NDH, Dean and Suiza merged to form the largest processor in the Northeast; (c) Dean reached agreements with DFA and DMS to allow Dean to circumvent competitive safeguards imposed by the Department of Justice and, in

exchange for DFA's and DMS's cooperation, assisted DMS, as controlled by DFA, in securing a monopoly/monopsony; (d) Dean reached a market allocation agreement with DFA and DMS by agreeing not to compete with DFA and DMS for the purchase of raw Grade A milk from dairy farmers and instead assigning those farmers to DFA and/or DMS; (e) Dean, DFA and DMS entered into and implemented long-term full supply agreements to control Northeast dairy farmers' access to fluid Grade A milk bottling plants and raw Grade A milk processing plants; (f) Dean paid Stop & Shop to close down its bottling plant, thereby forcing St. Albans to market its milk through DMS to access fluid Grade milk bottling plants; (g) DFA and DMS entered into agreements to allocate markets and not compete with Agri-Mark and other Co-conspirators as set forth above; (h) Defendants forced Northeast dairy farmers to market their raw Grade A milk through DMS to gain access to fluid Grade A milk bottling plants; (i) Defendants forced Northeast dairy farmers to market their raw Grade A milk through DMS to gain access to raw Grade A milk balancing plants; (j) DFA and DMS threatened and punished farmers who attempted to terminate their relationships with DFA or DMS, haulers that attempted to transport those farmers' milk, and processors that attempted to purchase those farmers' milk; (k) Defendants purchased raw Grade A milk bottling and processing plants, closed them down and/or have refused to operate them with the purpose and intent of further stifling competition in the Northeast; (l) Defendants cut off Northeast dairy farmers' access to fluid Grade A milk bottling plants in the Northeast; (m) Defendants boycotted dairy farmers, cooperatives, and raw Grade A milk processors that did not comply with Defendants' conspiracy in an effort to eliminate or control these entities as competitive alternatives for dairy farmers' raw Grade A milk; (n) Defendants depressed, fixed and stabilized prices for raw Grade A milk paid to dairy farmer members of cooperatives that market their milk through DMS, independent dairy

cooperatives and independent dairy farmers in the Northeast; (a) DFA and Dairylea created DMS to bring non-DFA members under DFA's control; (b) With the assistance of DFA, which purchased 11 of Dean and Suiza's divested bottling plants through NDH, Dean and Suiza merged to form the largest processor in the Northeast; (c) Dean reached agreements with DFA and DMS to allow Dean to circumvent competitive safeguards imposed by the Department of Justice and, in exchange for DFA's and DMS's cooperation, assisted DMS, as controlled by DFA, in securing a monopoly/monopsony; (d) Dean reached a market allocation agreement with DFA and DMS by agreeing not to compete with DFA and DMS for the purchase of raw Grade A milk from dairy farmers and instead assigning those farmers to DFA and/or DMS; (e) Dean, DFA and DMS entered into and implemented long-term full supply agreements to control Northeast dairy farmers' access to fluid Grade A milk bottling plants and raw Grade A milk processing plants; (f) Dean paid Stop & Shop to close down its bottling plant, thereby forcing St. Albans to market its milk through DMS to access fluid Grade milk bottling plants; (g) DFA and DMS entered into agreements to allocate markets and not compete with Agri-Mark and other Co-conspirators as set forth above; (h) Defendants forced Northeast dairy farmers to market their raw Grade A milk through DMS to gain access to fluid Grade A milk bottling plants; (i) Defendants forced Northeast dairy farmers to market their raw Grade A milk through DMS to gain access to raw Grade A milk balancing plants; (j) DFA and DMS threatened and punished farmers who attempted to terminate their relationships with DFA or DMS, haulers that attempted to transport those farmers' milk, and processors that attempted to purchase those farmers' milk; (k) Defendants purchased raw Grade A milk bottling and processing plants, closed them down and/or have refused to operate them with the purpose and intent of further stifling competition in the Northeast; (l) Defendants cut off Northeast dairy farmers' access to fluid Grade A milk

69

bottling plants in the Northeast; (m) Defendants boycotted dairy farmers, cooperatives, and raw Grade A milk processors that did not comply with Defendants' conspiracy in an effort to eliminate or control these entities as competitive alternatives for dairy farmers' raw Grade A milk; (n) Defendants depressed, fixed and stabilized prices for raw Grade A milk paid to dairy farmer members of cooperatives that market their milk through DMS, independent dairy cooperatives and independent dairy farmers in the Northeast; (o) DFA acquired Dairylea, which drastically increased DFA's market share and brought Dairylea's members under DFA control; and (p) DFA acquired Guida's Dairy, Dairy Maid and Oakhurst, making DFA the largest milk processor in the world.

280.    The agreement that Defendants have entered, maintained, renewed, and enforced with one another have had the purpose and effect of eliminating or restraining competition in the raw Grade A milk market. As a result of this agreement, Plaintiffs have been forced to accept suppressed prices for their raw Grade A milk, and otherwise have been damaged as described in this complaint. But for the conspiracy alleged herein, raw Grade A milk prices obtained by Plaintiffs and Class members in the Northeast market would have been significantly higher.

281.    The relevant geographic market is the Northeast United States, which is comprised of FMMO 1.

282.    The relevant product market consists of the raw Grade A milk market.

283.    The conduct described herein constitutes a per se violation of Section 1 of the Sherman Act. In the alternative, the conduct violations Section 1 of the Sherman Act by virtue of the rule of reason.

284.    As a direct and proximate result of Defendants' past and continuing violation of

Section 1 of the Sherman Act, as well as Defendants' other unlawful conduct, Plaintiffs have

suffered injury and damages in an amount to be proven at trial.

285.    Plaintiffs seek money damages from Defendants jointly and severally for these

violations.  These damages represent the additional amount Plaintiffs would have received for

sales of raw Grade A milk in the absence of the violations alleged.  These actual damages should

be trebled under Section 4 of the Clayton Act, 15 U.S.C. § 15.

286.    Plaintiffs also seek injunctive relief.  The violations set forth above and the effects

thereof are continuing and will continue unless injunctive relief is granted.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury pursuant to Fed. R. Civ. P. 38(b) of all issues so tribal.

## PRAYER FOR RELIEF

a.    Adjudge and declare that Defendants have engaged in unlawful conduct in

violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2;

b.    Preliminarily and permanently enjoin Defendants from violating Sections 1 and 2

of the Sherman Act, 15 U.S.C. §§ 1-2;

c.    Declare null and void the full supply agreements by and between Dean, DFA and

DMS as described herein;

d.    Preliminarily and permanently enjoin Defendants and/or any entity controlled by

any of them from entering into full supply agreements as described herein;

e.    Preliminarily and permanently enjoin Defendants and/or any entity controlled by

any of them from agreeing not to compete for the purchase of raw Grade A milk from dairy

farmers;

71

f.      Order Defendants as well as their subsidiaries and/or joint ventures to divest raw Grade A milk processing plants necessary to restore competition in the Northeast;

g.      Order Defendants, their subsidiaries or joint ventures to divest raw Grade A milk balancing plants necessary to restore competition in the Northeast;

h.      Order Defendants to submit to an independent accounting of its books, including all revenues, profits, expenses, assets and liabilities incurred, received, paid, or otherwise recorded;

i.      Declare that Defendants' activities descried above are outside the scope of the Capper-Volstead Act's grant of antitrust immunity;

j.      Against all Defendants, jointly and severally, award Plaintiffs damages in an amount to proven at trial, to be trebled with interest and the costs of this suit, including attorneys' fees; and

k.      Award such further relief, including structural remedies, as the Court deems just and proper.

Dated at Burlington, Vermont, this 26th day of October, 2016.

PRIMMER PIPER EGGLESTON & CRAMER PC

By:  _____

Gary L. Franklin, Esq.
150 South Champlain Street
P.O. Box 1489
Burlington, VT  05402-1489
(802) 864-0880
gfranklin@primmer.com

**Counsel for Farmers United**

72

Of Counsel:

<div style="margin-left: 40%;">

William C. Nystrom (BBO#559656)
Joel G. Beckman (BBO# 553086)
Dana A. Zakarian (BBO# 641058)
Elizabeth A. Reidy (BBO #625106)
NYSTROM BECKMAN & PARIS LIP
One Marina Park Drive, 15th Fl.
Boston, Massachusetts  02210
(617) 778-9100
jbeckman@nbparis.com
wnystrom@nbparis.com
dzakarian@nbparis.com
ereidy@nbpairs.com

</div>