U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2017 AUG 21  PM 2: 57

CLERK

BY_____
    DEPUTY CLERK

# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF VERMONT

GARRETT AND RALPH SITTS, LEON )
ATWELL, VICTOR BARRICK, DANIEL )
BAUMGARDER, WILLIAM BOARD, )
GEORGE BOLLES, ROGER BOLLES, ANDY )
BOLLINGER, THOMAS BOLLINGER, )
LOGAN BOWER, DWIGHT )
BRANDENBURG, BERNARD )
BROUILLETTE, THOMAS BROUILLETTE, )
AARON BUTTON, HESTER CHASE, )
THOMAS CLARK, THOMAS )
CLATTERBUCK, PAUL CURRIER, GERRY )
DELONG, PETE AND ALICE DIEHL, MARK )
DORING, MARK AND BARBARA DULKIS, )
GLEN EAVES, MIKE EBY, WILLIAM )
ECKLAND, DOUG ELLIOT, JAMES ELLIOT, )
WENDALL ELLIOTT, MICHAEL FAUCHER, )
DAVID AND ROBIN FITCH, DUANE AND )
SUSAN FLINT, JOSEPH FULTS, RICHARD )
GANTNER, STEFAN AND CINDY GEIGER, )
WILLIAM GLOSS, JOHN GWOZDZ, DAVID )
AND LAURIE GRANT, JIM AND JOYCE )
GRAY, DENNIS HALL, ROGER AND JOHN )
HAMILTON, NEVIN AND MARLIN )
HILDEBRAND, JAKE AND HARLEN )
HILLYERD, RICHARD AND TERRI )
HOLDRIDGE, PAUL HORNING, TERRY )
AND ROBERT HUYCK, DONALD SCOTT )
HYMERS, TERRY INCH, RANDY AND )
LYNETTE INMAN, THEODORE JAYKO, )
JACK KAHLER, JAMES AND TERESA )
KEATOR, JIM AND SHARON KEILHOLTZ, )
GEORGE KEITH, LEE AND ELLEN KLOCK, )
MIKE AND LISA KRAEGER, FRED )
LACLAIR, TIM LALYER, FRANK AND )
JOHN LAMPORT, CORRINE LULL, )
CHARLES AND GRETCHEN MAINE, )
THOMAS AND DEBORA MANOS, FRED )
MATTHEWS, RUSSELL MAXWELL, GERRY )
MCINTOSH, STEPHEN MELLOTT, JOHN )
AND DAVID MITCHELL, THOMAS )
MONTEITH, WALT MOORE, RICHARD )
AND SHEILA MORROW, DEAN MOSER, )
MELISSA MURRAY AND SEAN QUINN, )
THOMAS NAUMAN, CHARLES NEFF, )

DAVID NICHOLS, MICHAEL NISSLEY, LOU )
ANN PARISH, DANIEL PETERS, MARSHA )
PERRY, CAROLYN AND DAVE POST, JUDY )
LEE POST, SCOTT RASMUSEU, BRIAN )
REAPE, DAVID AND LYNETTE ROBINSON, )
BRIAN AND LISA ROBINSON, CALVIN )
ROES, BRADLEY ROHRER, PAUL AND )
SARAH ROHRBAUGH, ROBERTA RYAN, )
SCOTT AND LIN SAWYER, S. ROBERT )
SENSENIG, THOMAS AND DALE SMITH, )
DALE AND SUSAN SMITH, DENNIS SMITH, )
DONALD T. AND DONALD M. SMITH, )
ROGER AND TAMMY, SMITH, TODD )
SNYDER, RICHARD SOURWINE, DANNY )
SOURWINE, RANDY SOWERS, SHANE )
STALTER, GEORGE AND SHIRLEY )
STAMBAUGH, TRACY STANKO, STEPHEN )
SOURWINE, RICHARD SWANTAK, )
GEORGE AND PATRICIA THOMPSON, )
JEREMY THOMPSON, KEN AND JUDY )
TOMPKINS, DANIEL VAUGHN, MARK )
VISSAR, ERIC WALTS, EDWARD )
WALLDROFF, GERALD WETTERHAHN, )
JR., EUGENE WILCZEWSKI, STEVE )
WILSON, )
                                                    )
                Plaintiffs,                         )
                                                    )
        v.                                          )    Case No. 2:16-cv-287
                                                    )
DAIRY FARMERS OF AMERICA, INC.                      )
and DAIRY MARKETING SERVICES,                       )
LLC,                                                )
                                                    )
                Defendants.                         )

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
## DEFENDANTS' MOTION TO DISMISS

(Doc. 16)

Plaintiffs filed this action seeking relief pursuant to the Sherman Act, 15 U.S.C.

§§ 1-2, for alleged antitrust violations committed by Defendants Dairy Farmers of

America, Inc. ("DFA") and Dairy Marketing Services, LLC ("DMS"). Plaintiffs, who

refer to themselves as "Farmers United," are more than 115 dairy farmers who opted out

2

of a settlement approved by the court in a class action styled *Allen v. Dairy Farmers of America, Inc.*, No. 5:09-cv-230 (the "Class Action").

Pending before the court is Defendants' motion to dismiss Plaintiffs' First Amended Complaint for Lack of Antitrust Standing (Doc. 16). Following oral argument on May 2, 2017, the court granted Plaintiffs leave to file a Revised First Amended Complaint ("RFAC") (Doc. 29), which they timely filed on May 23, 2017. Defendants filed a post-hearing memorandum renewing their motion to dismiss on June 13, 2017, whereupon the court took the motion under advisement.

Defendants contend they are entitled to dismissal because Plaintiffs have failed to allege antitrust injury as a matter of law under the Second Circuit's recent decision in *In re Aluminum Warehousing Antitrust Litigation*, 833 F.3d 151 (2d Cir. 2016) ("*Aluminum Warehousing*"). In the alternative, Defendants assert that each Plaintiff fails to plausibly allege antitrust standing with respect to their monopolization and monopsonization claims, and that four Plaintiffs, who have not supplied milk either to DMS or to any alleged co-conspirator, have failed to establish antitrust standing to assert any claims.

Plaintiffs oppose dismissal, asserting that they have plausibly alleged antitrust standing, *Aluminum Warehousing* is easily distinguished, and they have only asserted claims that survived summary judgment in the Class Action.[1] Plaintiffs further point out that Defendants urged the Second Circuit to approve the settlement of the Class Action, arguing that dissatisfied dairy farmers could opt out of the settlement and had, in fact, already filed this separate lawsuit. In this respect, Plaintiffs appear to ask the court to

---

[1] As Defendants point out, Plaintiffs "may not claim the benefits of the class's victory." *Premier Elec. Constr. Co. v. Nat'l Elec. Contractors Ass'n, Inc.*, 814 F.2d 358, 367 (7th Cir. 1987) (concluding that "class members who opt out may not claim the benefits of the class's victory"); *see also In re Urethane Antitrust Litig.*, 2013 WL 6587972, at *3 (D. Kan. Dec. 16, 2013) (stating that "Rule 23's procedure effectively prohibits class members who opt out from benefitting from a factual finding in the class's favor").

consider Defendants' representation to the Second Circuit as judicial admissions that this lawsuit could survive a motion to dismiss.[2]

Plaintiffs are represented by Dana A. Zakarian, Esq., Elizabeth A. Reidy, Esq., Gary L. Franklin, Esq., Joel G. Beckman, Esq., and William C. Nystrom, Esq. Defendants are represented by Alfred C. Pfeiffer, Jr., Esq., Elyse M. Greenwald, Esq., Ian P. Carleton, Esq., Jennifer L. Giordano, Esq., Margaret M. Zwisler, Esq., and W. Todd Miller, Esq.

## I.     Factual and Procedural Background.

The following factual allegations are derived from the RFAC. Plaintiffs operate in Federal Milk Marketing Order 1 ("Order 1"), which covers areas in Delaware, the District of Columbia, Connecticut, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, Vermont, and Virginia. Each Plaintiff is "either:"

     i.     A current or former supplier to and/or member of DFA;

     ii.     A current or former supplier to DMS;

     iii.     A current or former supplier to one or more of the [c]o-conspirators;

     iv.     A current or former competitor of DFA; or

     v.     A current or former competitor of DMS.

(RFAC ¶ 14a.)

Exhibit A to the RFAC includes the following information regarding each Plaintiff, for all or part of the years 2005 to the present: (1) their name and address; (2) farm name; (3) the cooperative(s) of which they are or were a member; and (4) the processors buying their milk. Exhibit A also purports to identify the factual basis for each Plaintiff's antitrust standing by designating whether they are: (1) current or former members of DFA; (2) current or former suppliers to DMS; (3) current or former suppliers

---

[2] The court declines this invitation. Judicial admissions are confined to "statements of fact rather than legal arguments made to a court." *New York State Nat'l Org. for Women v. Terry*, 159 F.3d 86, 97 n.7 (2d Cir. 1998).

to a co-conspirator (and the name of the co-conspirator); and/or (4) current or former competitors of DFA/DMS.

Although Defendants criticize the lack of detail set forth in Exhibit A, they neither claim it prevents them from having sufficient notice to respond to Plaintiffs' claims, nor seek a more definite statement. *See Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) (explaining that "the principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial"); *see also Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) ("No heightened pleading requirements apply in antitrust cases."); *Dayton Superior Corp. v. Marjam Supply Co.*, 2011 WL 710450, at *8 (E.D.N.Y. Feb. 22, 2011) (stating that "antitrust allegations are governed by the notice pleading requirements contained in Federal Rule of Civil Procedure 8(a)") (alterations and internal quotation marks omitted).

Plaintiffs allege that DFA, a vertically integrated not-for-profit cooperative, is the largest dairy cooperative in the United States, with over 14,000 dairy producers, including 2,446 member farms in the Northeast United States. It is also allegedly the largest milk processor in the world and hauls, processes, bottles, and distributes raw Grade A milk. DMS is a limited liability company which was established in 1999 through an agreement between DFA and Dairylea Cooperative Inc. ("Dairylea") and is currently owned by DFA and St. Albans Cooperative Creamery, Inc. As a milk-marketing agency, it markets milk for over 5,500 farms throughout the Northeast "even though DMS received no authorization from independent dairy farmers to do so." (RFAC ¶ 16.) "Upon information and belief," DMS markets approximately 50% of the raw Grade A milk in the Northeast. *Id.*

Plaintiffs allege that Defendants, in concert with Dairylea, Agri-Mark Family Dairy Farms ("Agri-Mark"), members of the Greater Northeast Milk Marketing Agency ("GNEMMA"), Farmland Dairies LLC, National Dairy Holdings LLC ("NDH"), HP Hood LLC ("Hood"), and other known and unknown co-conspirators, "have engaged in an illegal conspiracy to restrain competition, fix and suppress prices paid to farmers and

5

monopolize/monopsonize the raw Grade A milk market in the Northeast." *Id.* ¶ 81.
Plaintiffs' RFAC asserts the following claims against Defendants:

> **Count I:** Sherman Act § 2 violation (Conspiracy to Monopolize/Monopsonize);
>
> **Count II:** Sherman Act § 2 violation (Attempt to Monopolize/Monopsonize);
>
> **Count III:** Sherman Act § 2 violation (Unlawful Monopolization/ Monopsonization);
>
> **Count IV:** Sherman Act § 1 violation (Conspiracy to Restrain Trade).

## II. Conclusions of Law and Analysis.

### A. Standard of Review.

In adjudicating a motion pursuant to Fed. R. Civ. P. 12(b)(6), the court is "guided by '[t]wo working principles[.]'" *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (alteration in original). First, "a court must accept as true all of the [factual] allegations contained in a complaint[,]" a "tenet" that is, however, "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss" and a claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678-79.

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks omitted). "Determining whether a complaint states a plausible claim for relief will[]. . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

To maintain an action, "[a]n antitrust plaintiff must show both constitutional standing and antitrust standing." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 770 (2d

Cir. 2016). Antitrust standing is "a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement [the court] must dismiss it as a matter of law." *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 75 (2d Cir. 2013) (internal quotation marks omitted). To establish antitrust standing, a plaintiff must satisfy "two imperatives[.]" *Id.* at 76.

First, the plaintiff must allege antitrust injury, which is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489 (1977). To determine whether Plaintiffs plausibly allege antitrust injury, the court must "evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 (1983) ("*AGC*"); *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 122 (2d Cir. 2007) (stating that "[t]he necessary 'antitrust injury' is an injury attributable to the anticompetitive aspect of the practice under scrutiny").

Second, each plaintiff must allege that he or she is an "efficient enforcer" of the antitrust laws. *See Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 443 (2d Cir. 2005) (stating that antitrust injury "would not necessarily establish [plaintiffs'] standing to sue" because other considerations "may sometimes indicate that a party who states an antitrust injury is nevertheless not a proper antitrust plaintiff"); *see also Pearson Educ., Inc. v. Allen Air Conditioning Co.*, 2014 WL 2154099, at \*6 (S.D.N.Y. May 22, 2014) ("Every plaintiff asserting a claim arising under the antitrust laws must allege a sufficient basis for antitrust standing"). An efficient enforcer of the antitrust laws is one who is a "proper party to perform the office of a private attorney general and thereby vindicate the public interest in antitrust enforcement." *Gelboim*, 823 F.3d at 780 (internal quotation marks omitted).

## B. Whether Plaintiffs Have Alleged Antitrust Injury Under *Aluminum Warehousing.*

Defendants rely on the Second Circuit's recent decision in *Aluminum Warehousing* for the proposition that dismissal is required because Plaintiffs allege their

injuries occurred in a separate and distinct market from the one in which Defendants allegedly engaged in anti-competitive conduct. They argue this case "remains a tale of two markets: (1) the market for the purchase of raw Grade A milk from farmer-producers, like plaintiffs (the 'producer market'), and (2) the market for the sale of raw Grade A milk to processors, like Dean and Hood (the 'processor market')." (Doc. 16-1 at 7.) Plaintiffs counter that they have plausibly alleged a single market in which both they and Defendants participate, in which Defendants' anticompetitive conduct occurred, and in which Plaintiffs sustained their injuries.

In *Aluminum Warehousing*, the plaintiffs (three groups of end-users of aluminum referred to as "Purchasers," "Commercials," and "Consumers") alleged that the defendants manipulated the price of aluminum in the Detroit metropolitan area by artificially increasing the cost of storing aluminum in London Metal Exchange ("LME") warehouses. As a result, the Purchasers paid a higher price for aluminum and then "passed that inflated cost to downstream purchasers of aluminum like Commercials, and eventually, Consumers." 833 F.3d at 156. However, Commercials and Consumers "disavow[ed] participation in any of the markets in which the defendants operate." *Id.* at 161-62 (stating that they "did not store aluminum in the defendants' warehouses; they did not trade aluminum futures contracts with the defendants; and they do not allege that any of the aluminum they purchased was ever stored in any of the defendants' warehouses, or was the underlying asset for any of the defendants' futures trades").

The Second Circuit affirmed the district court's conclusion that Commercials and Consumers "lack[ed] antitrust standing on the ground that they did not (and could not) suffer antitrust injury[,]" *id.* at 154, explaining that:

[t]he upshot is that to suffer antitrust injury, the putative plaintiff must be a participant in the very market that is directly restrained. Usually, that market is the one in which the defendant operates, such as when the plaintiff is a competitor or consumer of the defendant, but sometimes the defendant will corrupt a separate market in order to achieve its illegal ends, in which case the injury suffered can be said to be "inextricably intertwined" with the injury of the ultimate target. Regardless, antitrust injury is suffered by participants in the restrained market (or markets).

8

*Id.* at 161. The court held that the allegedly anti-competitive conduct "took place (if at all) in the LME-warehouse storage market, and that is where the direct, immediate impact would have been felt. Consumers and Commercials do not and cannot allege that they participated in that market." *Id.* at 162.

District courts within the Second Circuit applying *Aluminum Warehousing* have evaluated whether the putative plaintiffs allege "participa[tion] in the very market that is directly restrained." *Id.* at 161. In some of these cases, as in *Aluminum Warehousing*, the plaintiffs conceded that they did not participate in the same market as the defendant. *See, e.g., Harry v. Total Gas & Power N. Am., Inc.*, 2017 WL 1134851, at *12 (S.D.N.Y. Mar. 27, 2017) (granting motion to dismiss and rejecting plaintiffs' "argu[ment] that they need not have participated in the precise market in which the anticompetitive conduct is alleged to have occurred"); *NYPL v. JPMorgan Chase & Co.*, 2017 WL 1133446, at *5 (S.D.N.Y. Mar. 24, 2017) (granting motion to dismiss on the grounds that "Plaintiffs admitted in their opposition . . . that the FX spot market is 'completely different' from the end-user market" and that "any injury Plaintiffs suffered was in a market separate from the one that Defendants allegedly manipulated, and therefore does not qualify as an antitrust injury").

Here, in contrast, Plaintiffs allege a single market for raw Grade A milk in which both they and Defendants participate.[3] They have thus not "disavowed" participation in the very market they allege Defendants restrained. *See Merced Irrigation Dist. v. Barclays Bank PLC*, 220 F. Supp. 3d 412, 416 (S.D.N.Y. 2016) (denying motion to dismiss and holding that "[w]hereas the *Aluminum* defendants manipulated the market for

---

[3] *See, e.g.*, RFAC ¶ 81 ("Defendants and their Co-conspirators[] . . . have engaged in an illegal conspiracy to restrain competition, fix and suppress prices paid to farmers and monopolize/monopsonize the raw Grade A milk market in the Northeast."); *id.* ¶ 82 ("At its core, the conspiracy is simple; DFA/DMS control both the milk producers (the farmers) and the milk processors, which buy raw Grade A milk at an artificially low price from the farmers."); *id.* ¶ 137 ("DFA's quest to control the buying market for Grade A milk in the Northeast has continued through this day."); *id.* ¶ 141 ("DFA/DMS also have tightened their grip over the Northeast market through the expansion of their [c]o-conspirators, including Dean."); *id.* ¶ 170 ("By controlling the milk market, DFA can force farmers and independent cooperatives to join DFA or market their milk through DMS.").

warehouse services, which affected the market for aluminum, Barclays allegedly manipulated the market for electricity, which is exactly the market in which Merced traded, and what Merced purchased").

Defining a relevant market is a fact-dependent inquiry generally ill-suited for the motion to dismiss phase. *See Todd*, 275 F.3d at 199-200 (stating that "[b]ecause market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant . . . market"). As the United States Court of Appeals for the Ninth Circuit observed:

> Antitrust injury requires that the "injured party be a participant in the same market as the alleged malefactors." The defendants here contend that they are in one market (cheese) while the plaintiffs are in another (fluid milk). But the complaint's allegations unmistakably place all parties in the milk market—the defendants as buyers and the plaintiffs as sellers—and even have them transacting business with each other. For present purposes those allegations must be accepted as true.

*Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 989 (9th Cir. 2000) (citation omitted).

Because Plaintiffs plausibly allege a single market in which both they and Defendants participate for the purchase and sale of raw Grade A milk, *Aluminum Warehousing* is distinguishable and does not require dismissal. Defendants' motion to dismiss on this basis is therefore DENIED.[4]

### C. Whether to Dismiss Plaintiffs' Monopolization Claims for Lack of Antitrust Standing.

Plaintiffs' monopolization claims allege:

> Defendants and the [c]o-conspirators have used their monopsony power to block access to the processors and leave the independent farmers and independent cooperatives without a market for their milk. **In doing so,**

---

[4] The court does not address Plaintiffs' alternative argument that their alleged injuries are "inextricably intertwined" with Defendants' alleged anti-competitive conduct under *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 484 (1982) (holding that where plaintiff's injury "was inextricably intertwined with the injury the conspirators sought to inflict[,]" such an injury "falls squarely within the area of congressional concern"); *see also In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016) (acknowledging that the "universe of potential plaintiffs is not strictly limited to participants in the defendants' market").

**they have eliminated competition in the supply base and obtained a monopoly on the sell side of the market.** This monopoly further enables Defendants and the [c]o-conspirators to further reduce the supply base and eliminate competition on the sell side of the market.

(Doc 21 at 21-22 (quoting RFAC ¶ 49)) (emphasis in original).

[T]o state a claim for monopolization under Section 2 of the Sherman Act, a plaintiff must establish "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."

*PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)).

"To state an attempted monopolization claim, a plaintiff must establish '(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'" *Id.* (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)). "The elements of a conspiracy to monopolize are (1) proof of a concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly, and (2) the commission of an overt act in furtherance of the conspiracy." *Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 795 (2d Cir. 1987) (internal quotation marks omitted).

Defendants contend that Plaintiffs' monopolization claims must be dismissed for failure to satisfy both prongs of antitrust standing because they have not plausibly alleged antitrust injury and because suppliers to an alleged monopolist cannot be efficient enforcers of the antitrust laws. The court "ascertain[s] antitrust injury only by identifying the anticipated anticompetitive effect of the specific practice at issue and comparing it to the actual injury the plaintiff alleges." *Port Dock*, 507 F.3d at 122.

In this case, Plaintiffs allege Defendants' alleged anticompetitive practices include a series of mergers with and acquisitions of milk cooperatives and processors, full-supply agreements, non-solicitation agreements, and other less formal arrangements which resulted in the closure of competing bottling plants. They claim that these anticompetitive practices, in turn, forced independent dairy cooperatives and independent

dairy farmers to join DFA and market their milk through DMS, resulting in prices for raw Grade A milk that were too low.

"The danger to customers from monopolization of the production level is the danger that the monopolist will raise prices and restrict output." *Id.* at 123; *see also Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S 85, 107-08 (1984) ("Restrictions on price and output are the paradigmatic examples of restraints of trade that the Sherman Act was intended to prohibit.").

> Where a defendant is alleged to have acquired other firms in order to achieve monopoly power at the manufacturing level of a product market, dealers or distributors terminated in the aftermath do not have standing to assert claims under [S]ection 2 of the Sherman Act . . . for monopolization at the manufacturing level.

*Port Dock*, 507 F.3d at 123. "Dealers in this situation lack standing because their particular injury was not caused by an exercise of the defendant's newly acquired power to raise prices." *Id.*; *see also Dyer v. V.P. Records Retail Outlet, Inc.*, 2008 WL 2876494, at *6 (S.D.N.Y. July 24, 2008) ("A plaintiff also lacks standing if its injury does not arise from monopolization-*i.e.*, if the defendant's power to raise prices or restrict output does not cause the plaintiffs injury.").

The RFAC is bereft of factual allegations that Defendants' alleged monopolistic conduct has resulted in increased prices. In their opposition brief, Plaintiffs identify only one allegation of antitrust injury related to Defendants' alleged monopolization: "DFA and DMS are able to reduce the supply base for/output of raw Grade A milk." (Doc. 21 at 22 n.17 (citing RFAC ¶ 94) (internal quotation marks omitted).) This conclusory statement falls short of plausibly alleging that the output of raw grade A milk has actually been reduced or that Plaintiffs have suffered antitrust injuries stemming from Defendants' allegedly monopolistic conduct. *See Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 289 (2d Cir. 2006) (holding that conclusory allegations unsupported by facts cannot "substitute for minimally sufficient factual allegations") (internal quotation marks omitted).

At the court's May 2, 2017 hearing, Plaintiffs' counsel conceded that Plaintiffs had not alleged such antitrust injuries. *See* Doc. 27 at 68:17-20 ("Monopoly claims, as I said before, typically have two types of injuries: An injury to a consumer. Because of the selling power I have, I can charge you too much money. That's not what we are alleging."). Instead, Plaintiffs maintain that they have been harmed as Defendants' "competitors" because their "supplied product is passed along relatively unchanged." *Aventis Envtl. Sci. USA LP v. Scotts Co.*, 383 F. Supp. 2d 488, 497-98 (S.D.N.Y. 2005) (denying motion for summary judgment for lack of antitrust standing and holding that "[i]n this case, rather than having exited the market and become a mere supplier, AgrEvo EH remained a competitor in every relevant economic sense") (internal quotation marks omitted). Plaintiffs read *Aventis* too broadly. Under *Aventis*, a supplier is not converted into a competitor merely because the supplier's product passes through processing relatively unchanged. Rather, in *Aventis*, the plaintiff was a "former competitor" of the defendant and retained the supply of "the only active ingredient[] . . . in fully formulated ready-to-use ('RTU') form" for a product which defendant then "packaged and sold to retailers . . . without any further alteration." *Id.* at 496-97. Because Plaintiffs make no comparable allegations, *Aventis* is inapposite.

Even assuming *arguendo* that Plaintiffs plausibly allege they are Defendants' competitors, at the court's May 2, 2017 hearing, Plaintiffs' counsel asserted that Defendants' alleged monopoly power has facilitated the sale of milk products at too low of a price, "wip[ing] out" competition. *See* Doc. 27 at 68:21-25 (stating that Plaintiffs' injuries occur when Defendants' alleged market power enables them to "sell [a]t too little a price and drop the market down and wipe out [the] competition"). However, "cutting prices in order to increase business often is the very essence of competition." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 594 (1986). "In cases seeking to impose antitrust liability for prices that are too low, mistaken inferences are especially costly, because they chill the very conduct the antitrust laws are designed to protect." *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 451 (2009) (internal quotation marks omitted); *see also Spectrum Sports*, 506 U.S. at 459 (stating that "[t]he

13

concern that § 2 might be applied so as to further anticompetitive ends is plainly not met by inquiring only whether the defendant has engaged in 'unfair' or 'predatory' tactics"). "Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990); *see also id.* at 344 (stating that "[t]he antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior").

An exception to the general rule that damages as a result of monopolization do not arise from prices that are too low is a predatory pricing claim. That claim is:

> carefully limited the circumstances under which plaintiffs can state a Sherman Act claim by alleging that prices are too low. Specifically, to prevail on a predatory pricing claim, a plaintiff must demonstrate that: (1) "the prices complained of are below an appropriate measure of its rival's costs"; and (2) there is a "dangerous probability" that the defendant will be able to recoup its "investment" in below-cost prices.

*Pac. Bell*, 555 U.S. at 451 (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 224 (1993)). Plaintiffs neither allege predatory pricing, nor a "dangerous probability" that Defendants will recoup their investment in below-cost prices. *Brooke Grp.*, 509 U.S. at 224. Plaintiffs therefore cannot sustain their burden of alleging antitrust injury for their monopolization claims. *See Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 116 (1986) ("To hold that the antitrust laws protect competitors from the loss of profits due to such price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share. The antitrust laws require no such perverse result[.]").

Assessed as a totality, the antitrust injuries Plaintiffs allege as a result of Defendants' monopolistic conduct are the same injuries Plaintiffs allege in their monopsonization claims. Unless or until Plaintiffs can allege they suffered discernible injuries as a result of Defendants' alleged monopolization, they lack antitrust standing to assert their monopolization claims, regardless of whether they classify themselves as "suppliers" or "competitors." Because Plaintiffs' monopolization claims fail to allege an

14

"injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful[,]" *Brunswick Corp.*, 429 U.S. at 489, Defendants' motion to dismiss those claims is GRANTED.

### D. Whether to Dismiss Plaintiffs' Monopsonization Claims Because of Defendants' Cooperative Structure.

"Monopsony power is market power on the buy side of the market. As such, a monopsony is to the buy side of the market what a monopoly is to the sell side and is sometimes colloquially called a 'buyer's monopoly.'" *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320 (2007) (citation omitted); *accord Todd*, 275 F.3d at 202 (stating that "in the context of monopsony[,] . . . 'the market is not the market of competing sellers but of competing buyers. This market is comprised of buyers who are seen by sellers as being reasonably good substitutes.'") (quoting Roger D. Blair & Jeffrey L. Harrison, *Antitrust Policy and Monopsony*, 76 Cornell L. Rev. 297, 324 (1991)).

As the Supreme Court has observed, monopsony power may be acquired through a "predatory-bidding scheme," in which "a purchaser of inputs 'bids up the market price of a critical input to such high levels that rival buyers cannot survive (or compete as vigorously) and, as a result, the predating buyer acquires (or maintains or increases its) monopsony power.'" *Weyerhaeuser*, 549 U.S. at 320 (quoting John B. Kirkwood, *Buyer Power and Exclusionary Conduct*, 72 Antitrust L.J. 625, 652 (2005)).

> A predatory bidder ultimately aims to exercise the monopsony power gained from bidding up input prices. To that end, once the predatory bidder has caused competing buyers to exit the market for purchasing inputs, it will seek to "restrict its input purchases below the competitive level," thus "reduc[ing] the unit price for the remaining input[s] it purchases." . . . If all goes as planned, the predatory bidder will reap monopsonistic profits that will offset any losses suffered in bidding up input prices.

*Id.* at 320-21 (alterations in original) (quoting Steven C. Salop, *Anticompetitive Overbuying by Power Buyers*, 72 Antitrust L.J. 669, 672 (2005)).

In this case, Defendants argue that Plaintiffs cannot allege antitrust injuries based on Defendants' alleged monopsony because DFA's cooperative structure and the manner

in which DMS operates render such injuries impossible. *See* Doc. 16-1 at 19 ("In fact, plaintiffs cannot allege that either DFA or DMS is even capable of achieving or obtaining the evils of a monopsony in the first place."). DFA's Articles of Incorporation and Bylaws (the "Bylaws"), which are incorporated by reference in and attached to the RFAC, state that:

> Marketing proceeds to be distributed to members for milk delivered to [DFA] for marketing will be determined after provision for payment of expenses and matured liabilities of [DFA], including marketing and operating expenses, debt service, payments on [DFA's] capital securities, and all amounts then due and payable (including declared dividends and liquidation amounts) in respect of [DFA's] preferred equity capital.

(RFAC, Ex. B § 2.10.) The Bylaws further provide that:

> [DFA] will at all times be operated on a cooperative basis for the benefit of its members. [DFA] is obligated to allocate annually as provided in this Article on a patronage basis to member patrons and nonmember patrons with whom an agreement has been entered into, all net earnings realized from business done with or for such patrons. Net earnings will be determined by deducting from [DFA's] gross receipts on such business the related costs, including the cost of all products and services, the expense of handling all products and services, the general operating and administration expenses of [DFA], including any reserves for expenses, and an appropriate share of dividends paid to the holders of [DFA's] preferred equity capital. [DFA] will maintain records sufficient to afford a permanent means for allocating each patron's pro-rata share of all [DFA] net earnings.

*Id.* § 6.1.

Based on the foregoing, Defendants contend that DFA's "cooperative structure . . . prevents it from being able to achieve the objective of a monopsonist—to increase its own profits at the expense of its input sellers." (Doc. 16-1 at 20.) The court disagrees. Plaintiffs allege that DFA is not simply a cooperative, but the "largest milk processor in the world." (RFAC ¶ 139.) DFA has allegedly attained monopsony power through a series of acquisitions undertaken with the apparent strategy of "buy[ing] up the other processors and either forc[ing] them into DFA/DMS full supply contracts or shut[ting] them down to eliminate competition." *Id.* ¶ 137.

Plaintiffs further assert that DFA's monopsony power enables it to buy raw Grade A milk from Plaintiffs at a low cost, as Plaintiffs can no longer sell to other processors at a competitive price because Defendants have limited the avenues where Plaintiffs could otherwise sell their milk. *See id.* ¶ 94 ("Defendants used their control over the fluid Grade A milk supply market to force independent dairy cooperatives and independent dairy farmers to join DFA or market their milk through DMS."); *id.* ¶ 95 ("These actions have injured Plaintiffs by allowing the Defendants to acquire and maintain a monopsony and use their market power to suppress the price paid to the dairy farmers.").

> "When buyers agree illegally to pay suppliers less than the prices that would otherwise prevail, suppliers are obviously injured in fact. The suppliers' loss also constitutes antitrust injury, for it reflects the rationale for condemning buying cartels—namely, suppression of competition among buyers, reduced upstream and downstream output, and distortion of prices."

*Knevelbaard*, 232 F.3d at 988 (quoting 2 Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 375b at 297 (rev. ed. 1995)).

Where, as here, suppliers to an alleged monopsonist are paid depressed prices and the monopsonist, as a result, reaps the benefits at its processing plants, the suppliers may plausibly allege antitrust injury. *See Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 235 (1948) ("It is clear that the agreement is the sort of combination condemned by the [Sherman] Act, even though . . . the persons specially injured . . . are sellers, not customers or consumers.") (footnotes omitted); *see also Todd*, 275 F.3d at 201 ("Plaintiff is correct to point out that a horizontal conspiracy among buyers to stifle competition is as unlawful as one among sellers.").[5]

---

[5] *Accord Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1133-34 (10th Cir. 2002) (observing that "[t]he Supreme Court's treatment of monopsony cases strongly suggests that suppliers . . . are protected by antitrust laws even when the anti-competitive activity does not harm end-users"); *Dyer v. Conoco, Inc.*, 1995 WL 103233, at *5 (5th Cir. Feb. 21, 1995) (stating that "[o]ur cases have recognized that sellers to a monopsony or oligopsony can establish antitrust injury" and noting that "the seller faces a Hobson's choice: he can sell into the rigged market and take the depressed price, or he can refuse to sell at all") (internal quotation marks omitted); *N.M. Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*, 54 F. Supp. 3d 1189, 1205 (D.N.M. 2014) (holding that "[a]llegations that PHP used its market

Defendants' further argument that DFA's cooperative status precludes antitrust liability is unsupported by citation to any authority. In recognition that cooperatives may engage in conduct that otherwise violates the antitrust laws, the Capper-Volstead Act, 7 U.S.C. §§ 291-92, was enacted to "remove[] from the proscription of the antitrust laws cooperatives formed by certain agricultural producers that otherwise would be directly competing with each other in efforts to bring their goods to market." *Nat'l Broiler Mktg. Ass'n v. United States*, 436 U.S. 816, 822 (1978). The Eastern District of Tennessee concluded that whether a cooperative's structure bars recovery must await "appropriate discovery." *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 945 (E.D. Tenn. 2008) (denying motion to dismiss and rejecting DFA's argument that "DFA members would, by recovering damages, benefit from the alleged wrongdoing of their own cooperative" because "these claims cannot properly be resolved on the pleadings"). The court adopts the same approach in the instant case.

Plaintiffs have also plausibly alleged that DMS may be liable as DFA's agent for their monopsonization claims.[6] *See Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 572 (1982) (stating that the antitrust laws permit the imposition of liability based upon a principal-agent relationship). "The existence of an agency relationship need only be pled in compliance with Fed. R. Civ. P. 8." *CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 825 (S.D.N.Y. 2006). At the pleading stage, accepting Plaintiffs' factual allegations as true, DMS's liability based upon an agency theory is plausibly alleged.

---

power in the private health insurance market to lower the price it was willing to pay to buy services from Plaintiff is sufficient to confer antitrust injury" and that "so too can a seller suffer antitrust injury by a monopsonist-buyer's power in a particular market").

[6] *See, e.g.*, RFAC ¶ 77 ("DFA and DMS have a principal-agent relationship."); *id.* ¶ 80 ("DMS has strengthened DFA's grip over the Northeast raw Grade A milk market" and that "by arranging for DMS to function as the exclusive marketing agent for all DFA members in the Northeast and all independent dairy cooperatives[,] . . . DFA established a mechanism through which over-order premiums could be fixed, suppressed and monitored."); *id.* ¶ 172 ("DMS also has told its customers . . . who are independent farmers/cooperatives, that the market is drying up and pretty soon it is going to start dropping people, but that those who are DFA members will never be dropped and will continue to have a market for their milk.").

For the foregoing reasons, Defendants' motion to dismiss Plaintiffs' monopsonization claims for lack of antitrust injury is DENIED.

### E. Whether Four Plaintiffs Should Be Dismissed for Failure to Plausibly Allege They Are Efficient Enforcers of the Antitrust Laws.

Finally, Defendants argue that Plaintiffs Daniel F. Stolzfoos, David and Robin Fitch, Brian Reape, and Tracy Stanko,[7] who were neither suppliers to DMS, nor to any co-conspirator during the period of 2005 to present (the "four non-supplier Plaintiffs"), are "umbrella plaintiffs" (Doc. 23 at 9) who cannot be efficient enforcers because their injuries are too remote and their damages too speculative. As the Second Circuit recently explained, "[u]mbrella standing concerns are most often evident when a cartel controls only part of a market, but a consumer who dealt with a non-cartel member alleges that he sustained injury by virtue of the cartel's raising of prices in the market as a whole." *Gelboim*, 823 F.3d at 778.

The court agrees that Plaintiffs have sufficiently alleged that because these four individuals are within the "target area" of Defendants' allegedly anticompetitive conduct.[8] Whether these four individuals can satisfy the second prong of antitrust standing presents a closer question.

_____

[7] Prior to the filing of Exhibit A, Plaintiffs represented that only three Plaintiffs were arguably subject to dismissal on this basis. Without acknowledging the apparent discrepancy, Exhibit A indicates four Plaintiffs in this category. Because the identities of the four non-supplier Plaintiffs have been revealed in Exhibit A, Defendants' argument that dismissal is warranted because "no one could identify" the non-supplier Plaintiffs is now moot. (Doc. 16-1 at 15.)

[8] *See Calderone Enters. Corp. v. United Artists Theatre Circuit, Inc.*, 454 F.2d 1292, 1295 (2d Cir. 1971) (holding that in order to have antitrust standing, "a person must be within the 'target area' of the alleged antitrust conspiracy, *i.e.*, a person against whom the conspiracy was aimed, such as a competitor of the persons sued"). Defendants argue that the Supreme Court "overruled the 'target area' test for standing in" *AGC*, as did the Second Circuit in *Crimpers Promotions Inc. v. Home Box Office, Inc.*, 724 F.2d 290 (2d Cir. 1983). (Doc. 23 at 9-10 & n.6.) They read these cases too broadly. In *AGC*, the Supreme Court discussed the "target area" test in a footnote without either approving or disapproving of it. *See AGC*, 459 U.S. at 536 n.33 (noting that some courts "have applied the requirement that the plaintiff must be in the 'target area' of the antitrust conspiracy"). In *Crimpers*, the Second Circuit did "not hold that *Calderone* . . . ha[s] been drained of [its] precedential vitality on [its] own or very similar facts" but instead held that "courts of this circuit" must "follow the approaches adumbrated by the Supreme Court in *McCready* and [*AGC*.]" 724 F.2d at 293.

In determining whether the non-supplier Plaintiffs are efficient enforcers of the antitrust laws, the court's inquiry is guided by the following factors:

> (1) the "directness or indirectness of the asserted injury," which requires evaluation of the "chain of causation" linking [plaintiffs'] asserted injury and the [defendants' alleged anti-competitive conduct]; (2) the "existence of more direct victims of the alleged conspiracy"; (3) the extent to which [plaintiffs'] damages claim is "highly speculative"; and (4) the importance of avoiding "either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other."

*Id.* (quoting *AGC*, 459 U.S. at 540-45). "[T]he weight to be given the various factors will necessarily vary with the circumstances of particular cases." *Daniel*, 428 F.3d at 443.

Regarding the first efficient enforcer factor, the injuries alleged by the four non-supplier Plaintiffs are relatively clear and direct. Like the remaining Plaintiffs, they claim that they have systematically been paid artificially depressed prices for the raw Grade A milk they market, and that Defendants' conduct deprives them of the opportunity to receive a competitive price for that product. They further allege that Defendants' conduct has depressed "over-order premiums" and prices paid to farmers for their milk, a claim only a dairy farmer in Order 1 can assert. This is not a case in which Plaintiffs are seeking to "vastly extend the potential scope of antitrust liability in myriad markets[.]" *Gelboim*, 823 F.3d at 779. The first factor therefore militates in favor of finding, at the pleading stage, that these four non-supplier Plaintiffs are efficient enforcers of the antitrust laws.

With respect to the second factor, there are more direct victims of the alleged conspiracy than the four non-supplier Plaintiffs as more than one hundred other dairy farmers allege that they dealt directly with DMS or at least one co-conspirator. However, while "'[i]nferiority' to other potential plaintiffs can be relevant, . . . it is not dispositive." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 689 (2d Cir. 2009); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 WL 5108131, at *9 (S.D.N.Y. Sept. 20, 2016) ("The antitrust laws do not require a plaintiff to have purchased directly from a defendant in order to have antitrust standing."). Like the Plaintiffs who supplied either DMS or a co-conspirator, the four non-supplier Plaintiffs are "significantly

motivated due to their 'natural economic self-interest' in paying the lowest price possible." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d at 689 (quoting *Daniel*, 428 F.3d at 444).

Regarding the third and fourth factors, the calculation and apportionment of damages for the four non-supplier Plaintiffs may present considerable challenges. "At the same time, some degree of uncertainty stems from the nature of antitrust law." *Gelboim*, 823 F.3d at 779; *see also J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 566 (1981) (observing that "[t]he vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation"); *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 265 (1946) (stating that "[t]he most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created"). Construing the RFAC in the light most favorable to Plaintiffs, and drawing all reasonable inferences in their favor, "there is little difference regarding the proportionality of damages suffered by [the Plaintiffs], which dealt directly with Defendants, and [the four non-supplier Plaintiffs], which did not." *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 WL 5108131, at *9. "At the motion to dismiss stage, any holding that these damages would be speculative is premature." *Id.* at *11.

On balance, at the pleading stage, the four non-supplier Plaintiffs who did not supply raw Grade A milk to DMS or a co-conspirator plausibly allege that they are efficient enforcers of the antitrust laws. Defendants' motion to dismiss on that basis is therefore DENIED.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the RFAC is GRANTED IN PART AND DENIED IN PART (Doc. 16). Counts I-III are DISMISSED only insofar as Plaintiffs therein allege monopolization claims. The motion is DENIED in all other respects. As Plaintiffs have already amended their pleadings on two occasions, the court does not grant leave to amend *sua sponte*. *See Clarke v. White Plains Hosp.*, 2015 WL 13022510, at *6 (S.D.N.Y. Apr. 22, 2015) (declining to grant

leave to amend *sua sponte* where plaintiff had "twice been given the opportunity to amend" and had "not requested leave to file a third amended complaint").

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 21st day of August, 2017.

Christina Reiss, Chief Judge
United States District Court