**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF VERMONT**

| | |
|---|---|
| **GARRETT SITTS, et al.,**<br><br>        **Plaintiffs,**<br><br>**v.**<br><br>**DAIRY FARMERS OF AMERICA, INC., and**<br>**DAIRY MARKETING SERVICES, LLC,**<br><br>        **Defendants.** | **Civil Action No. 2:16-cv-00287-cr** |

**DAIRY FARMERS OF AMERICA, INC. AND DAIRY MARKETING SERVICES,**
**LLC'S OPPOSITION TO**
**PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS**

## TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................1

ARGUMENT ..........................................................................................................................2

I.      Plaintiffs Are Not Entitled To The Financial Minutia They Seek Because It
        Would Not Answer The Questions They Raise ...............................................................2

        A.      There Is No Such Thing As "DFA Corporate" That Operates
                Independently Of DFA's Farmer Member-Owners.................................................2

        B.      DFA Has Already Agreed To Produce Documents That Answer The
                Questions Plaintiffs Raise In Their Motion About How DFA Decides To
                Account For And Allocate Revenues From Processing Operations.........................5

II.     Plaintiffs Offer No Legal Basis To Compel DFA To Produce Highly Sensitive,
        Personal Financial Information About 24 Of Its Employees ...............................................8

        A.      The Personal Financial Details Of These 24 Employees Are Not Relevant
                To Any Of Plaintiffs' Claims....................................................................................9

        B.      This Personal Financial Information Is Not Relevant To DFA's Capper-
                Volstead Act Defense Either...................................................................................11

III.    The Information Plaintiffs Seek About The Allen Settlement Is Duplicative And
        Irrelevant ..................................................................................................................12

CONCLUSION......................................................................................................................15

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Allen v. Dairy Farmers of Am., Inc.,*
2014 WL 2610613 (D. Vt. June 11, 2014) ..................................................................14

*Atchison Cnty. Farmers Union Co-op Ass'n v. Turnbull,*
241 Kan. 357 (Kan. 1987)..........................................................................................5

*Gonzalez v. Allied Concrete Indus.,*
2016 WL 4444789 (E.D.N.Y. Aug. 23, 2016).............................................................9

*Hanson v. Ontario Milk Producers Corp.,*
294 N.Y.S.2d 936 (N.Y. Sup. 1968)..........................................................................5

*Lightner v. Lightner,*
46 Kan. App. 2d 540 (Kan. 2011)............................................................................12

*Neogenix Oncology, Inc. v. Gordon,*
2017 WL 1207558 (E.D.N.Y. Mar. 31, 2017)............................................................10

*Pittman v. Groveowners Coop. of Loxahatchee, Inc.,*
534 So. 2d 1207 (Fla. Dist. Ct. App. 1988) ..........................................................5, 11

*Tottenham v. Trans World Gaming Corp.,*
2002 WL 1967023 (S.D.N.Y. June 21, 2002) ...........................................................7

*Vaigasi v. Solow Mgmt. Corp.,*
2016 WL 616386 (S.D.N.Y. Feb. 16, 2016).............................................................8

**STATUTES**

11 Ver. Stat. Ann. Tit. § 994.........................................................................................3

15 Pa. Cons. Stat. Ann. § 7506 ....................................................................................3

7 U.S.C. § 291..........................................................................................................4, 11

Conn. Gen. Stat. § 33-195............................................................................................3

K.S.A. § 17-1601 .........................................................................................................3

K.S.A. § 17-1602(b)......................................................................................................3

K.S.A. § 17-1604 ..........................................................................................................3, 4

K.S.A. § 17-1605(a) ..........................................................................................................3

K.S.A. § 17-1605(h) ..........................................................................................................3

K.S.A. § 17-1605(i) ..........................................................................................................3

K.S.A. § 17-1628 ..........................................................................................................12

Md. Code Ann., Corps. & Ass'ns § 5-502 ..........................................................................3

Me. Rev. Stat. Ann. tit. 13, § 1822 ....................................................................................3

N.H. Rev. Stat. Ann. § 301:3 ............................................................................................3

N.Y. Coop. Corp. Law § 13 ..............................................................................................3

R.I. Gen. Laws § 7-7-2......................................................................................................3

# INTRODUCTION

Plaintiffs' motion to compel responses from defendants Dairy Farmers of America, Inc. and Dairy Marketing Services, LLC (collectively, "DFA") to a few categories of their voluminous documents requests[1] is based on Plaintiffs' fundamental misunderstanding as to how cooperatives, including DFA, operate. Plaintiffs believe that there is a thing called "DFA Corporate" that not only operates wholly independent of DFA's farmer member-owners, but also intentionally acts against the interests of those farmers in order to keep more profits for "itself." Plaintiffs are particularly concerned about DFA's ownership of milk processing facilities because they believe that "DFA Corporate" is incentivized to "suppress[] the price paid to dairy farmers" in order to "increase[] the profits of their milk processors." Pls.' Mot. to Compel Produc. of Docs. (Doc. No. 50) ("Mot.") at 4. Plaintiffs also believe that "DFA Corporate" does not share any profits from milk processing with its member-owners. *Id.* Instead, Plaintiffs suspect that "DFA Corporate"

---

[1]    Plaintiffs' motion to compel paints a misleading and inaccurate picture of the course of discovery in this case. Plaintiffs make it seem that DFA has been uncooperative and has unjustifiably refused to produce highly relevant discovery by hiding behind legally baseless "boilerplate" objections. That is false. In addition to producing the entire record from the six-year *Allen* litigation, DFA has also agreed to produce—and has already started to produce—a wide variety of documents and data addressing virtually every aspect of its business in the Northeast dating back to at least January 1, 2010, which is the date that discovery ended in *Allen.* Feb. 23, 2018 Declaration of Amber L. McDonald ("McDonald Decl.") ¶¶ 5-8; *see also* Jan. 17, 2018 Declaration of Jennifer L. Giordano (Doc. No. 48) ("Giordano Decl.") ¶ 3. DFA also has agreed to search the files of 26 custodians – more than the 25 agreed-upon custodians in the *Allen* litigation – as well as produce select materials from the files of still others. McDonald Decl. ¶¶ 5-7; *see also* Feb. 23, 2018 Declaration of W. Todd Miller ("Miller Decl.") ¶ 5.

DFA did object to many of Plaintiffs' 87 sweeping document requests (343 including subparts), and for good reason; on their face, they are legally objectionable. However, DFA met and conferred with Plaintiffs for more than 10 hours to try to resolve those objections in a way that would be acceptable to both parties. McDonald Decl. ¶ 3; Giordano Decl. ¶¶ 14-15. Those efforts, in large part, paid off. The parties reached an agreement or compromise on all but the three narrow document subjects at issue in this motion. Given the breadth of Plaintiffs' discovery requests, that the parties resolved all but these limited issues demonstrates DFA's reasonable, good faith approach to document discovery and that DFA's initial objections were well-founded.

hides the milk processing profits from member-owners by allocating them to "nonmember business," unjustly distributes them to DFA executives in the form of bonuses or other compensation, and/or wastes them on "lavish perks and frills." *Id.* at 4, 6-7. This is pure fiction.

As an agricultural cooperative, the farmer-members of DFA *are* DFA; they own the cooperative, and it is run strictly for their benefit. These 100+ Plaintiffs (most of whom have never been DFA members) appear to dislike some of the business decisions DFA has made, but DFA's *13,000* other farmer-owners trust and believe in the organization's mission and the vision of its leadership—a Board of Directors elected by and comprised of the dairy farmer member-owners themselves.

Because Plaintiffs offer no valid justification for this Court to compel DFA to produce any of the categories of information at issue in this motion, DFA respectfully requests that the Court deny their motion in full.

## ARGUMENT

### I. PLAINTIFFS ARE NOT ENTITLED TO THE FINANCIAL MINUTIA THEY SEEK BECAUSE IT WOULD NOT ANSWER THE QUESTIONS THEY RAISE

#### A. There Is No Such Thing As "DFA Corporate" That Operates Independently Of DFA's Farmer Member-Owners

Plaintiffs' motion starts from a faulty premise. Plaintiffs' mistake hinges on their contention that there is an inherit conflict of interest when a cooperative owns entities that process its members' raw agricultural products because processors supposedly always want to buy the raw inputs at the lowest possible price, to the detriment of the farmers. Plaintiffs ignore that many well-known processed food brands are owned by cooperatives, including Sunkist, Welch's, Ocean Spray Cranberries, Cabot Cheese, and Land O'Lakes, and that it is common for agricultural cooperatives like these to own and invest in processing facilities. Indeed, there is a long and accepted history of agricultural cooperatives owning processing facilities.

2

Cooperatives invest in processing facilities for a number of reasons—all of which benefit their farmer owners: (1) to ensure sufficient processing capacity for members' raw products (here, milk), (2) to generate more value for the raw products, which allows farmers to participate in the returns from the value added by downstream operations, (3) to facilitate sales of the processed goods downstream, and (4) to seek ways to expand demand for the members' products each year. In short, it is well-recognized that owning processing facilities *benefits* the farmer-members.

The Kansas statute that governs DFA's cooperative structure—the Kansas Cooperative Marketing Act—deems DFA to be a nonprofit entity, noting that cooperatives formed under the Act "are not organized to make profit for themselves, as such, or for their members as such, but only for their members as producers."  K.S.A. § 17-1602(b).  Consistent with this charter, DFA's farmer member-controlled Board of Directors establishes the strategies of how best to improve the economic condition of the cooperatives' farmer-members, with input from management, Area Councils also composed of farmer-members, and DFA's farmer delegates.

The Kansas Cooperative Marketing Act recognizes that "processing" is one of many legitimate and beneficial activities for a cooperative, and thus, expressly permits cooperatives to own processing assets.  *See, e.g.*, *id.* §§ 17-1604, -1605(a), (h), (i).  Indeed, the stated purpose of the statute is to "make the distribution of agricultural products as ***direct*** as can be efficiently done between producer and consumer."  *Id.* § 17-1601 (emphasis added).  A cooperative's ownership of processing facilities certainly meets this objective.[2]

---

[2]     Many states in the Northeast where Plaintiffs reside have cooperative laws that recognize it is appropriate for cooperatives to own/invest in processing.  *See, e.g.*, N.Y. Coop. Corp. Law § 13; 11 Ver. Stat. Ann. Tit. § 994; N.H. Rev. Stat. Ann. § 301:3; Me. Rev. Stat. Ann. tit. 13, § 1822; 7 R.I. Gen. Laws § 7-7-2; Conn. Gen. Stat. § 33-195; Md. Code Ann., Corps. & Ass'ns § 5-502; 15 Pa. Cons. Stat. Ann. § 7506.

Contrary to Plaintiffs' suggestion (Mot. at 4, 6), there is nothing improper about a cooperative engaging in business with "nonmembers."  Both the Kansas Cooperative Marketing Act and the Capper-Volstead Act expressly recognize that it is lawful and appropriate for cooperatives to engage in business with nonmembers, so long as they do not do so in "an amount greater in value than such as are handled by the association for members."  K.S.A. § 17-1604; 7 U.S.C. § 291.   Like virtually all other agricultural cooperatives, DFA easily meets this requirement.

While DFA is a not-for-profit corporation, DFA, like other cooperatives (and, frankly, every sensible business venture), does not and cannot return to its member-owners every dollar that it receives in revenue each year.  In addition to paying ordinary business expenses, DFA uses some of the revenues for investment expenses (in current and future manufacturing operations) to ensure the continued success of the cooperative and its farmer-members.  DFA's Board oversees these investment decisions.   Thus, the Board of farmer-members decide, by exercising their business judgment, whether and to what extent to invest DFA's revenues, including, for example, by purchasing processing assets.

DFA's farmer member-controlled Board has supported and approved investments in processing operations since DFA was founded in 1998.  (DFA's predecessor cooperatives also had investments in processing operations.)  That is because the Board knows and understands the benefits—and arguably, necessity—of processing investments.  The Board decides how much of the revenues DFA makes from processing (as well as DFA's other revenue sources) is re-invested in the business and how much is returned to the farmer member-owners through patronage dividends.

Although Plaintiffs may want to second-guess the business decisions made by DFA's Board, the law does not work that way. DFA's thousands of other farmer member-owners trust the Board members—the very Board members the farmers elect—to represent their interests, and to make business decisions. These Board decisions, which necessarily involve business judgment, are legally unreviewable absent exceptional circumstances, which Plaintiffs do not allege here.[3] This is not unique to DFA; corporate governance works like this in countless businesses every day.

### B.  DFA Has Already Agreed To Produce Documents That Answer The Questions Plaintiffs Raise In Their Motion About How DFA Decides To Account For And Allocate Revenues From Processing Operations

Plaintiffs argue that they are moving to compel thirteen years' worth of various detailed financial statements (balance sheets, profit and loss statements, income statements, general ledgers, etc.) from every DFA-affiliated entity regardless of its connection to milk processing because they need these documents to understand (1) how DFA allocates member and nonmember business, (2) the way DFA determines annual patronage dividends to members (and specifically, whether processing revenues are included), and (3) the business judgments behind DFA's financial expenditures. *See* Mot. at 4-6. Plaintiffs contend that they need this level of financial detail because there is no other way for them to understand whether DFA is appropriately using revenue that it generates from milk processing operations. *Id.* at 6.

---

[3]     *Atchison Cnty. Farmers Union Co-op Ass'n v. Turnbull*, 241 Kan. 357, 359 (Kan. 1987) (holding under Kansas law that court would not substitute its judgment for the judgment of a cooperative's board of directors acting within the terms of its lawful articles of incorporation and bylaws); *Pittman v. Groveowners Coop. of Loxahatchee, Inc*., 534 So. 2d 1207, 1210 (Fla. Dist. Ct. App. 1988) ("The decision to increase Kabat's compensation constituted a business judgment which the trial court properly upheld in the absence of appellants' proof of bad faith on the part of [the cooperative]."); *Hanson v. Ontario Milk Producers Corp*., 294 N.Y.S.2d 936, 940 (N.Y. Sup. 1968) (applying business judgment rule to decision by cooperative's board of directors).

As DFA has advised Plaintiffs repeatedly, the detailed financial statements that Plaintiffs requested in their document requests ("RFPs") 41(c), 42(c), 65(d)-(k) and 67 would not answer Plaintiffs' questions, and therefore, they are not relevant to any of Plaintiffs' stated justifications for requesting the documents.  McDonald Decl. ¶¶ 9-10.  For example, even if DFA were to produce the balance sheets, income statements, profit and loss statements, general and administrative legers, etc. for all of the requested entities (many of which DFA does not even possess) for the *thirteen years* requested, those documents would not tell Plaintiffs anything about how DFA calculated member and nonmember business in any given year, or how DFA determined any annual patronage dividends, or the extent to which financial expenditures/investments were Board-approved.

Although the documents that Plaintiffs seek in RFPs 41(c), 42(c), 65(d)-(k) and 67 would not answer these questions, DFA agreed to produce other documents that do answer Plaintiffs' questions.  For example, DFA is producing documents sufficient to show the components (including amounts) of DFA's member and nonmember business each year.  McDonald Decl. ¶¶ 7, 9.  These documents show (contrary to Plaintiffs' claim, Mot. at 6) that DFA's nonmember business has never exceeded its member business.  Similarly, DFA is also producing (1) the meeting minutes from DFA's Board of Directors and Northeast Area Council, (2) business strategy documents contained in the files of 26 custodians, (3) information about its annual patronage dividends, (4) its annual and monthly financial statements, (5) documents that identify all entities that it wholly or partially owns and all joint-venture and affiliate relationships, and (6) all contracts with milk processors in the Northeast.  McDonald Decl. ¶¶ 7, 9.  These documents answer Plaintiffs' questions about whether DFA is appropriately using and accounting for revenues from

processing operations (it is) and whether DFA's farmer member-controlled Board is exercising ordinary business judgment about DFA's financial investments and expenditures (it is).

Contrary to Plaintiffs' theory, DFA is not hiding the answers to Plaintiffs' questions; it is producing documents that answer them. However, those documents are *not* the financial minutia for which Plaintiffs are moving to compel.

As DFA stated to Plaintiffs during the parties' meet and confers, Plaintiffs cannot possibly contend that the information DFA will be producing is insufficient because Plaintiffs have not yet seen all of it. McDonald Decl. ¶ 10. DFA also told Plaintiffs that if, after they review DFA's forthcoming productions, they legitimately believe that they need certain additional financial information, DFA will consider that request in good faith. *Id*. Plaintiffs refused. Because Plaintiffs have not articulated even one legitimate reason for needing these particular financial documents given the other documents DFA will be producing, DFA can only assume that Plaintiffs want these materials for some other purpose. However, the law does not permit Plaintiffs to use discovery as a fishing expedition. *See, e.g., Tottenham v. Trans World Gaming Corp.*, 2002 WL 1967023, at *1-2 (S.D.N.Y. June 21, 2002).

The fact that the *Allen* plaintiffs did not pursue the degree of financial minutia that Plaintiffs seek to compel in this motion further confirms its lack of relevance. *See* Miller Decl. ¶ 10. Plaintiffs admit that their claims and theories are the *same* as the *Allen* plaintiffs. *See, e.g.*, Pls.' Mot. to Compel Answers to Interrogs. (Doc. No. 46), at 2. The *Allen* plaintiffs were satisfied with the financial and accounting information DFA produced in that case. Here, DFA has not only agreed to produce the same type of information that the plaintiffs found sufficient in *Allen* (updated since 2010), it has agreed to produce even more. Miller Decl. ¶¶ 7-8; McDonald Decl. ¶¶ 6-9. However, DFA reasonably drew the line at clearly irrelevant documents.

7

Plaintiffs mistakenly suggest there would be no burden on DFA to produce these documents because DFA allegedly "already compiled and provided these documents to their auditors to prepare the consolidated financial statements." Mot. at 6. That is not true. Plaintiffs' requests are expansive. They seek virtually every type of financial document that exists for every entity with which DFA has (or had) any business connection (whether wholly or partially owned, or through a joint-venture or alliance) for the last ***thirteen years***. *See* Giordano Decl. Ex. 1 (Doc. No. 48-1) at 24, 30-31. None of this is neatly compiled and ready to produce. McDonald. Decl. ¶ 11. The burden on DFA to produce this level of financial detail is extensive, and that effort is not only wasteful, it is grossly disproportionate to the needs of this case, especially considering that Plaintiffs (a much smaller group of plaintiffs than in *Allen*) already have the full *Allen* record, and DFA agreed to update since 2010 the same type of financial and accounting information produced in *Allen*. Miller Decl. ¶¶ 7-8; Giordano Decl. ¶¶ 3, 9; McDonald Decl. ¶ 8; *see also Vaigasi v. Solow Mgmt. Corp.*, 2016 WL 616386, at *13-14 (S.D.N.Y. Feb. 16, 2016) (denying motion to compel information disproportionate to the needs of the case).

## II. PLAINTIFFS OFFER NO LEGAL BASIS TO COMPEL DFA TO PRODUCE HIGHLY SENSITIVE, PERSONAL FINANCIAL INFORMATION ABOUT 24 OF ITS EMPLOYEES

Plaintiffs' RFPs 61-64 request highly sensitive and detailed personal financial information about **24** individual DFA employees dating back thirteen years, and the requests are extraordinarily broad. Giordano Decl. Ex. 1 (Doc. No. 48-1) at 2-3 (defining "corporate executives" to include 24 current or former DFA employees), 29-30 (RFPs 61-64). Plaintiffs demand a wide swath of highly personal information far beyond mere salaries and bonuses, including, for example, the amount of money in each employee's own 401K and other retirement accounts, as well as any stock options, loans, and investments. *Id.* at 29-30. Although Plaintiffs claim they need to know this information to determine whether these individuals receive any compensation related to milk

processing, their requests are not limited to the subject matter of milk processing.  For example, knowing the amount of money in a certain employee's 401K account would not tell Plaintiffs anything about whether DFA financially incentivized that employee to allegedly keep milk prices low because of DFA's milk processing relationships.  Plaintiffs' attempt to fish around in these employees' personally sensitive information is an abuse of the discovery process and should be denied.[4]  *Cf. Gonzalez v. Allied Concrete Indus.*, 2016 WL 4444789, at *3 (E.D.N.Y. Aug. 23, 2016) (refusing to compel production of six years of ATM receipts as a "wholesale intrusion into Plaintiffs' personal affairs" based on defendants' "speculation").

### A.    The Personal Financial Details Of These 24 Employees Are Not Relevant To Any Of Plaintiffs' Claims

RFPs 61-64 are not relevant to any claim or allegation in the complaint.  Nowhere in the complaint do Plaintiffs allege that *any* DFA employee has ever been incentivized to keep raw milk prices low through bonuses or other financial means.  Nor does the complaint allege that any executive is or has ever been invested in any milk processing facility.  The ***sole*** allegation in Plaintiffs' complaint regarding DFA's executive compensation involves the allegedly excessive compensation that DFA supposedly paid Gary Hanman during his tenure as CEO from 1998 to 2005.  Revised First Am. Compl. (Doc. No. 29) ("RFAC") ¶¶ 13, 209.  This allegation is clearly irrelevant, as Plaintiffs already have compensation-related discovery about Mr. Hanman from the

---

[4]       Plaintiffs are wrong that "this same type of information was requested and produced in the Class Action."  Mot. at 9.  Rather, during discovery in *Allen*, DFA reproduced wholesale the discovery from the *Southeastern Milk* litigation that contained some limited compensation information for certain employees.  Miller Decl. ¶¶ 4, 9 (discussing *In re Southeastern Milk Antitrust Litig.*, MDL 2:08-MD-1000 (E.D. Tenn.)).  The *Allen* plaintiffs also asked limited compensation-related questions at certain DFA depositions.  *Id.* ¶ 9.  However, no discovery approaching the scope that Plaintiffs seek here ever occurred in *Allen* (or, for that matter, in the *Southeastern Milk* litigation).  *Id.* ¶ 10.

*Allen* record; indeed, they cite it in their motion to compel. Mot. at 8 n.8-9. They are not entitled to anything more.

DFA's current CEO, Rick Smith, took over leadership of DFA in 2006 and has been at its helm ever since. The *Allen* plaintiffs pursued four years' worth of discovery about Mr. Smith's tenure (from 2006-2009), including deposing Mr. Smith himself about the details of his compensation. Miller Decl. ¶ 9. Although the *Allen* plaintiffs alleged a number of things about Mr. Smith's predecessor, Mr. Hanman,[5] the *Allen* plaintiffs never alleged, and nothing in the *Allen* record ever suggested, that Mr. Smith or any executive under his leadership was ever personally incentivized to keep milk prices low *for any reason.* That is because neither Mr. Smith, nor the farmer-members on the Board during his tenure, ever authorized—or ever would authorize—any such incentive system. Mr. Smith and his executive team (like all DFA employees) work hard every day to ensure the success and profitability of DFA's dairy farmer-members.

For these reasons, Plaintiffs have no Rule 11 basis to allege that, even if DFA produced this sensitive personal information, it would demonstrate any of the allegedly improper things about which Plaintiffs speculate. These requests are the quintessential definition of an improper fishing expedition. *See Neogenix Oncology, Inc. v. Gordon*, 2017 WL 1207558, at *10 (E.D.N.Y. Mar. 31, 2017) (denying motion to compel production of documents where moving party's claim of relevance "amounted to little more than speculation or conjecture").

---

[5] Plaintiffs completely mischaracterize what the *Allen* record shows about executive compensation and executive investments during Mr. Hanman's tenure. Mot. at 7-8, 9. However, that is not relevant to this discovery motion because, suffice to say, Plaintiffs have the full *Allen* record, so there is no reason to repeat discovery on those issues.

**B.      This Personal Financial Information Is Not Relevant To DFA's Capper-Volstead Act Defense Either**

Because none of this compensation information is relevant to Plaintiffs' claims, they try to portray their intrusive requests as relevant to DFA's Capper-Volstead Act defense because this information supposedly would show that DFA is not operating for the mutual benefit of its members.  Mot. at 7-9.  This also is wrong.

Plaintiffs argue that compensation information would show that DFA's executives have a "conflict of interest and [would] explain why DFA executives act against the interests of DFA members."  Mot. at 8.  But that argument assumes—contrary to fact—that the requested discovery would reveal such a conflict.  It would not, and Plaintiffs do not have any good faith basis to allege otherwise.   In any event, the member-elected Board expressly approves the compensation of DFA's CEO, and, in the exercise of the Board's ordinary business judgment, it has, through DFA's Bylaws, vested in the CEO the authority to employ DFA employees, which includes setting executive compensation.   As discussed above, the Board's exercise of business judgment is protected and unreviewable, absent exceptional circumstances that Plaintiffs do not allege here. *See Pittman v. Groveowners Coop. of Loxahatchee, Inc.*, 534 So. 2d 1207 (Fla. Dist. Ct. App. 1988) (finding that cooperative's decision to increase officer's compensation was a business judgment that could not be challenged in the absence of proof of bad faith); *see also supra* n.3. Plaintiffs may disagree with the Board's business decisions, but that does not mean they are wrong, much less contrary to the mutual benefit of the members or an antitrust violation.[6]

---

[6]      Even if (contrary to the facts here) the Board or some officer somehow was found to have acted improperly, that still would not destroy the cooperative's Capper-Volstead Act protections. The Capper-Volstead Act not only protects the cooperative from liability, it also protects the individual farmer-members.  *See* 7 U.S.C. § 291.  It would make no sense to void those protections and render the farmers—including many of the Plaintiffs—potentially liable for antitrust violations simply because the farmer Board members and management they trusted to act in their interest did

**III.    THE INFORMATION PLAINTIFFS SEEK ABOUT THE ALLEN SETTLEMENT IS DUPLICATIVE AND IRRELEVANT**

Lastly, Plaintiffs move to compel documents related to DFA's collection of letters in support of the *Allen* settlement.  Mot. at 10-12.  They argue that such information is relevant to show the "massive control" DFA has over farmers and that this supposed "coercion" constitutes a continuing violation that extends the statute of limitations of their claims.  *Id.* at 10-11.  Plaintiffs are wrong on both the facts and the law.

*First*, this Court has already found that "[t]here [was] no credible evidence that the . . . [*Allen* settlement] was tainted by collusion, coercion, or bad faith."  *Allen v. Dairy Farmers of America, Inc.*, 5:09-cv-00230-cr (D. Vt. June 7, 2016) (Doc. No. 2093) at 7-8.  Plaintiffs do not articulate any basis to re-litigate this issue.  Plaintiffs merely claim that, in certain instances, the DFA field representative who approached the farmer about the settlement support letter happened also to be a state-licensed milk inspector.  Mot. at 10; *see also* RFAC ¶¶ 11, 180.  That's it.  They do not allege that these inspectors, or anyone from DFA, made any threats or engaged in any other misconduct to obtain these letters.  They also do not allege that any support letter was signed involuntarily.

*Second*, Plaintiffs already possess the information that answers the questions identified in their motion (Mot. at 11) because it is all part of the *Allen* record.  For example, Plaintiffs say they need this discovery to understand "the instructions to Defendants' field representatives as to how

---

not do so.  Plaintiffs do not cite any case to support their nonsensical interpretation of the Capper-Volstead Act, and DFA is aware of none.  Rather, the far more sensible view is that the well-established body of Kansas corporate governance law provides the recourse and remedies for any alleged malfeasance by the Board or any officer.  *See Lightner v. Lightner*, 46 Kan. App. 2d 540, 547 (Kan. 2011) ("When a corporation has been injured by those in control thereof, the well-established general rule is that the suit seeking redress for such a grievance belongs to the corporation and must be brought as a derivative action . . . ."); K.S.A. § 17-1628 (stating that "provisions of the general corporation code" govern Kansas cooperatives).

to extract letters." Mot. at 11. However, DFA described its letter collection process to the Court in *Allen*. DFA explained that it provided its field personnel with a form letter that farmers could consider signing if they wanted to support the settlement. *Allen* (Doc. No. 2083) ¶ 4. DFA further explained that it had explicitly instructed its field personnel to inform farmers that they were under no obligation to submit a letter in support of the settlement; that they could oppose the settlement if they wished; and DFA reiterated to its field representatives that they could not, in any way, pressure farmers to sign letters of support. *Id.* ¶¶ 4-6.

Plaintiffs also say they want to know the "actions taken by field representatives in carrying out those instructions." Mot. at 11. However, that too was addressed in *Allen.* The Court read each of the 1,400 letters submitted in connection with the proposed settlement (both those in favor and those in opposition); heard testimony from 35 class members, including many class members who opposed the settlement; and heard argument from counsel for the parties. *Allen* (Doc. No. 2093) at 2. Only a single class member – Johnathan Haar – ever suggested during his testimony that the letters submitted in support of the settlement had been obtained through coercion, but the basis for his contention was that, in some unspecified instances, milk inspectors had provided the form letter to the farmer and asked if the farmer was willing to sign it. *Allen*, June 1, 2016 Tr. (Doc. No. 2091) at 136-37. Throughout these extensive proceedings, neither Mr. Haar nor anyone else ever alleged that DFA (through milk inspectors or otherwise) threatened any farmer in order to obtain a support letter. Indeed, no one ever claimed that DFA did anything other than exactly what it said that it did: provided farmers with the opportunity, but not the obligation, to support the settlement.

*Third,* the fact that, in some instances, milk inspectors delivered the form letter for consideration has no legal relevance to Plaintiffs' theory that DFA has allegedly monopsonized a

13

purported market for raw milk through supposed improper relationships with milk processing facilities. The way in which DFA sought support for the *Allen* settlement would not prove anything legally relevant to that claim because it has nothing to do with the alleged source of DFA's claimed monopsony power—*milk processing*.

*Fourth*, because DFA did not threaten *any* farmer (much less any of the Plaintiffs) to support the settlement, this information also is not relevant to a statute of limitations defense. *See* Mot. at 11. As this Court has stated, a continuing violation requires that "the *plaintiff's interests are repeatedly violated*" by the defendant. *Allen v. Dairy Farmers of Am., Inc.*, 2014 WL 2610613, at *24-26 (D. Vt. June 11, 2014) (internal quotations and citations omitted) (emphasis added). And the *plaintiff* must be able to allege injury from each new overt act. *Id.* ("[A] new cause of action accrues each time *the plaintiff is injured* by an act of the defendant." (emphasis added)). Here, no plaintiff alleges that DFA threatened or coerced him/her, and none alleges any injury arising from use of milk inspectors to obtain support for the *Allen* settlement.

*Finally*, although not relevant to the instant motion, DFA is compelled to correct Plaintiffs' gratuitous and blatant mischaracterization of the events surrounding DMS's decision to issue termination notices to 746 independent farmers in early 2017. Mot. at 10. Contrary to Plaintiffs' claim, DFA did not force any farmer to join it, nor did it tell any farmer that "unless the farmers joined DFA, they would no longer be able to sell their milk to the processors who had been purchasing it for years." *Id.* DFA has attached the actual letters sent to these 746 farmers to allow the Court to see for itself that Plaintiffs' accusations are not only wrong, but grossly unfair. McDonald Decl. ¶ 12, Exs. A and B.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion to compel in full.[7]

Dated:  February 23, 2018

Respectfully submitted by:

/s/ Margaret M. Zwisler
Margaret M. Zwisler (admitted *pro hac vice*)
Jennifer L. Giordano (admitted *pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Telephone: 202-637-2200
Facsimile: 202-637-2201
Email: margaret.zwisler@lw.com
Email: jennifer.giordano@lw.com

Alfred C. Pfeiffer Jr. (admitted *pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: 415-391-0600
Facsimile: 415-395-8095
Email: al.pfeiffer@lw.com

W. Todd Miller (admitted *pro hac vice*)
BAKER & MILLER PLLC
2401 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20037
Telephone: 202-663-7820
Facsimile: 202-663-7849
Email: tmiller@bakerandmiller.com

Ian P. Carleton
SHEEHEY FURLONG & BEHM P.C.
30 Main Street, P.O. Box 66
Burlington, VT 05402
Telephone: 802-864-9891
Email: icarleton@sheeheyvt.com

---

[7]    For the same reasons set forth in DFA's January 17, 2018 Opposition to Plaintiffs' Motion to Compel Answers to Interrogatories, Plaintiffs are not entitled to any fees or costs associated with this motion.  *See* Defs.' Opp'n (Doc. No. 47) at 15.

*Counsel for Defendants Dairy Farmers of America, Inc. and Dairy Marketing Services, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 23, 2018, I electronically filed with the Clerk of Court the following document:

DAIRY FARMERS OF AMERICA, INC., AND DAIRY MARKETING SERVICES, LLC'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS

using the CM/ECF system.  The CM/ECF system will provide service of such filing via Notice of Electronic Filing (NEF) to the following NEF parties:

Joel G. Beckman, Esq. (jbeckman@nbparis.com)
Gary L. Franklin, Esq. (gfranklin@primmer.com)
William C. Nystrom, Esq. (wnystrom@nbparis.com)
Elizabeth A. Reidy, Esq. (ereidy@nbparis.com)
Dana A. Zakarian, Esq. (dzakarian@nbparis.com)

Dated:  February 23, 2018

/s/ Margaret M. Zwisler
Margaret M. Zwisler (admitted *pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Telephone:  202-637-2200
Facsimile:  202-637-2201
Email: margaret.zwisler@lw.com