U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2019 JUL 23 PM 2:34

CLERK

BY_____ (signature)
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

GARRETT AND RALPH SITTS, LEON )
ATWELL, VICTOR BARRICK, DANIEL )
BAUMGARDER, WILLIAM BOARD, )
GEORGE BOLLES, ROGER BOLLES, ANDY )
BOLLINGER, THOMAS BOLLINGER, )
LOGAN BOWER, DWIGHT )
BRANDENBURG, BERNARD )
BROUILLETTE, THOMAS BROUILLETTE, )
AARON BUTTON, HESTER CHASE, )
THOMAS CLARK, THOMAS )
CLATTERBUCK, PAUL CURRIER, GERRY )
DELONG, PETE AND ALICE DIEHL, MARK )
DORING, MARK AND BARBARA DULKIS, )
GLEN EAVES, MIKE EBY, WILLIAM )
ECKLAND, DOUG ELLIOT, JAMES )
ELLIOT, WENDALL ELLIOTT, MICHAEL )
FAUCHER, DAVID AND ROBIN FITCH, )
DUANE AND SUSAN FLINT, JOSEPH )
FULTS, RICHARD GANTNER, STEFAN )
AND CINDY GEIGER, WILLIAM GLOSS, )
JOHN GWOZDZ, DAVID AND LAURIE )
GRANT, JIM AND JOYCE GRAY, DENNIS )
HALL, ROGER AND JOHN HAMILTON, )
NEVIN AND MARLIN HILDEBRAND, JAKE )
AND HARLEN HILLYERD, RICHARD AND )
TERRI HOLDRIDGE, PAUL HORNING, )
TERRY AND ROBERT HUYCK, DONALD )
SCOTT HYMERS, TERRY INCH, RANDY )
AND LYNETTE INMAN, THEODORE )
JAYKO, JACK KAHLER, JAMES AND )
TERESA KEATOR, JIM AND SHARON )
KEILHOLTZ, GEORGE KEITH, LEE AND )
ELLEN KLOCK, MIKE AND LISA )
KRAEGER, FRED LACLAIR, TIM LALYER, )
FRANK AND JOHN LAMPORT, CORRINE )
LULL, CHARLES AND GRETCHEN MAINE, )
THOMAS AND DEBORA MANOS, FRED )
MATTHEWS, RUSSELL MAXWELL, )
GERRY MCINTOSH, STEPHEN MELLOTT, )
JOHN AND DAVID MITCHELL, THOMAS )
MONTEITH, WALT MOORE, RICHARD )
AND SHEILA MORROW, DEAN MOSER, )
MELISSA MURRAY, SEAN QUINN, )
THOMAS NAUMAN, CHARLES NEFF, )

DAVID NICHOLS, MICHAEL NISSLEY,         )
LOU ANN PARISH, DANIEL PETERS,          )
MARSHA PERRY, CAROLYN AND DAVE          )
POST, JUDY LEE POST, SCOTT              )
RASMUSEU, BRIAN REAPE, DAVID AND        )
LYNETTE ROBINSON, BRIAN AND LISA        )
ROBINSON, CALVIN ROES, BRADLEY          )
ROHRER, PAUL AND SARAH                  )
ROHRBAUGH, ROBERTA RYAN, SCOTT          )
AND LIN SAWYER, S. ROBERT SENSENIG,     )
THOMAS AND DALE SMITH, DALE AND         )
SUSAN SMITH, DENNIS SMITH, DONALD       )
T. AND DONALD M. SMITH, ROGER AND       )
TAMMY, SMITH, TODD SNYDER,              )
RICHARD SOURWINE, DANNY                 )
SOURWINE, RANDY SOWERS, SHANE           )
STALTER, GEORGE AND SHIRLEY             )
STAMBAUGH, TRACY STANKO, STEPHEN        )
SOURWINE, RICHARD SWANTAK,              )
GEORGE AND PATRICIA THOMPSON,           )
JEREMY THOMPSON, KEN AND JUDY           )
TOMPKINS, DANIEL VAUGHN, MARK           )
VISSAR, ERIC WALTS, EDWARD              )
WALLDROFF, GERALD WETTERHAHN,           )
JR., EUGENE WILCZEWSKI, STEVE           )
WILSON, DALE COVERT, FAMILY DAIRY       )
FARMS, LLC, RICHARD PUGH,               )
                                        )
            Plaintiffs,                 )   Case No. 2:16-cv-287
                                        )
        v.                              )
                                        )
DAIRY FARMERS OF AMERICA, INC.          )
and DAIRY MARKETING SERVICES,           )
LLC,                                    )
                                        )
            Defendants.

**OPINION AND ORDER DENYING DEFENDANTS' MOTION TO STRIKE NEW EXPERT OPINION AND DENYING DEFENDANTS' MOTION TO STRIKE AN UNDISCLOSED EXPERT OPINION**
(Docs. 96 & 121)

Plaintiffs filed this action seeking relief pursuant to the Sherman Act, 15 U.S.C. §§ 1-2, for alleged antitrust violations committed by Defendants Dairy Farmers of

America, Inc. ("DFA") and Dairy Marketing Services, LLC ("DMS"). Plaintiffs, who refer to themselves as "Farmers United," are more than 115 dairy farmers who opted out of a settlement approved by the court in a class action styled *Allen v. Dairy Farmers of America, Inc.*, No. 5:09-cv-230.

Pending before the court is Defendants' February 5, 2019 motion to strike Professor Einer R. Elhauge's supplemental report. (Doc. 96.) Plaintiffs opposed the motion on February 19, 2019 and Defendants replied on March 5, 2019. Oral argument was held on April 9, 2019, at which time the court took the motion under advisement.

Also pending before the court is Defendants' May 3, 2019 motion to strike Professor Elhauge's opinion that DFA and DMS possess unilateral monopsony power because this opinion was first disclosed at his deposition. (Doc. 121.) Plaintiffs opposed the motion on May 17, 2019 and Defendants replied on May 31, 2019, at which time the court took the motion under advisement.

Plaintiffs are represented by Dana A. Zakarian, Esq., Elizabeth A. Reidy, Esq., Gary L. Franklin, Esq., Joel G. Beckman, Esq., and William C. Nystrom, Esq. Defendants are represented by Margaret M. Zwisler, Esq., Alfred C. Pfeiffer, Jr., Esq., Elyse M. Greenwald, Esq., Ian P. Carleton, Esq., Jennifer L. Giordano, Esq., and W. Todd Miller, Esq.

## I. Factual and Procedural Background.

Plaintiffs allege that Defendants, in concert with known and unknown co-conspirators, "have engaged in an illegal conspiracy to restrain competition, fix and suppress prices paid to farmers and monopolize/monopsonize the raw Grade A milk market in the Northeast." (Doc. 29 at 22, ¶ 81.) Plaintiffs' Revised First Amended Complaint asserts the following claims: Count I, conspiracy to monopsonize in violation of 15 U.S.C. § 2; Count II, attempt to monopsonize in violation of 15 U.S.C. § 2; Count III, unlawful monopsonization in violation of 15 U.S.C. § 2; and Count IV, conspiracy to restrain trade in violation of 15 U.S.C. § 1.

On or about October 3, 2018, Plaintiffs served Professor Elhauge's initial expert report (the "Initial Report") in which he used a regression analysis to measure the impact

of Defendants' alleged antitrust violations and concluded that DFA, DMS, and their co-conspirators possessed monopsony power in the raw Grade A milk market in Federal Milk Marketing Order 1. A deposition taken on November 6, 2018 included the following colloquy between Professor Elhauge and Defendants' attorney:

> Q. So that's, again, back to my question: You did not do an analysis in your report that says that either DFA or DMS or the two of them together have monopsony power on their own, apart from the conspiracy; right?
>
> A. Again, I'm not sure—I'm not positive. I don't think it's in the report, but I do believe that they themselves have about 50 percent market share and thus would likely have monopsony power on their own. But I thought as an economic matter what matters is the collective power of the entire conspiracy.
>
> Q. And again, let's be blunt: Are you offering an opinion in this case that DFA or DMS or the two of them together has monopsony power on their own?
>
> . . .
>
> A. I think they likely do. But I'm not sure it's in the report.
>
> Q. So you're not offering that opinion whether or not you think they may have it.
>
> . . .
>
> A. Well, you're asking me now, and I think they likely do have that power since they have about a 50 percent share of the market.
>
> Q. Okay. Is that an opinion you're offering?
>
> A. I think it is likely the case. I guess I'd like to investigate it further. It wasn't one of the questions I was, you know, directed to answer. But I think I do likely have that opinion.
>
> . . .
>
> Q. So it's not a question you were directed to answer; right?
>
> . . .
>
> A. Well, not explicitly, no.
>
> Q. And it's not—
>
> A. I suppose you could read that question to, you know, encompass the possibility of also answering that separate question. But I wasn't directed to explicitly separate them out.

4

Q. And you didn't explicitly separate them out?

. . .

A. As far as—it's a long report. But I don't think in this section that I ever separate out DMS and DFA shares alone. But you could easily do so from the backup and the data that I provided. So I guess in that sense, since the backup is disclosed already, it is there in my analysis.

. . .

Q. But again, you'd actually have to go back and look at your data and do that analysis and set it forth in a report if you were going to render that opinion; right?

. . .

A. I know that it has about a 50 percent market share for DMS and DFA combined. I know it's higher in some years and lower in other years than 50 percent. So that I can state confidently from the data?

Q. Is that the only factor you'd need to know to know whether they had monopsony power on their own?

A. Well, I'm trying to think why it would be relevant. It seems like it would be relevant only if we thought—we accepted some premise that the other co-conspirators didn't also participate. But if they didn't participate, then that would mean that DFA and DMS were the only conspirators and that they did—were able to suppress prices. So I think that would support the inference. The evidence about inelasticity would be the same, and the evidence about entry barriers would be the same. So I think it is the case that at least if I accept the premise, which I think is incorrect, that the other co-conspirators were not involved, that that would allow an inference of monopsony power.

(Doc. 122-2 at 7-11.)

When questioned in his deposition, Defendants' expert witness Professor Edward Snyder indicated that he reviewed Professor Elhauge's market share calculations for DFA and DMS in the process of producing his opinion:

Q. Right. I'm asking about DFA and DMS, the defendants. Did you calculate their market share?

A. I didn't. I didn't do any separate calculations. My—I read—my recollection is that Professor Elhauge's calculation put it at—it could be 40 percent. I can check that.

Q. Okay.

5

A. I didn't do a separate calculation.

Q. Okay, so you're offering an opinion that there is no evidence of defendants' monopsony power, but you didn't calculate defendants' market share in Order 1; is that correct?

A. Well, I reviewed Professor Elhauge's calculations. I didn't separately calculate them, no.

. . .

Q. Okay. You understand that one way that he calculated market share is to look at the amount of milk that they produced versus the total amount of milk produced in Order 1?

A. The combination of DFA and DMS?

Q. Yes.

A. That sounds right.

(Doc. 125-5 at 3-5.)

On or about November 30, 2018, Defendants served two expert rebuttal reports—one authored by Professor Snyder (the "Snyder Report") and one authored by Professor Daniel Sumner (the "Sumner Report"). Among other things, Professor Sumner found a problem with Professor Elhauge's reliance on a producer-location-based proxy, stating in his report: "[Professor] Elhauge calculates federal minimum prices that reflect handler location when available, and when it is not available he approximates it by using only the producer's location. This is a problem because many producers do not deliver to a handler near their farm." (Doc. 107 at 3) (citing the Sumner Report) (emphasis omitted).

On January 18, 2019, Professor Elhauge submitted a Supplemental Expert Report (the "Elhauge Supplemental Report"), in which he explains:

> The Sumner Report revealed certain data processing errors in my initial report, but only partially corrected them in the regression analysis. Pursuant to my obligation under Federal Rule of Civil Procedure 26(e) to supplement my report when information arises that suggests it is incomplete or incorrect, I file this supplemental report to fully correct my initial regression. Because I understand that the scheduling order in this case does not provide for a reply report, I limit this report to correcting my initial report. I thus do not respond to various other claims in the Snyder Report and the Sumner Report that claim my analysis is "incomplete" or

contains "flaws[,]" "limitations[,]" or "errors" because those claims are all inaccurate and thus require no correction of my initial report.

(Doc. 97-1 at 3.)

Professor Elhauge acknowledges that he inadvertently omitted some delivery data[1] and acknowledges that for transactions lacking delivery data, he initially used a producer-location-based proxy employed in the *Allen* case in which federal minimum prices were approximated using the producer's location. He contends that the missing delivery data identified in the Sumner Report revealed that the producer-location-based proxy was not a reliable substitute for actual delivery data because use of the actual delivery data differed substantially from the proxy. He explains: "If the producer-location-based approximation truly allowed for an unbiased estimation of the location-based adjustment, then replacing the proxy with the actual processor location should not have significantly affected the estimation of the conduct variable coefficient in the regression model." (Doc. 97-1 at 6.)

In his Supplemental Report, Professor Elhauge replaced the producer-location-based proxy with a proxy based on the average location adjustments for farmers in the same zip code with delivery data that specifies the processors to whom they sell. To make this correction, he altered two commands in his regression analysis but did not add any new data that had not been produced in discovery. However, because there were some zip codes for which there was no actual delivery data, for these zip codes, the new proxy proved unworkable because there were no values with which to generate an average. Professor Elhauge therefore excluded these observations from the data set forth in his Supplemental Report. Defendants describe the changes wrought by Professor Elhauge's Supplemental Report as follows:

---

[1] Professor Elhauge attributes this error to Defendants' production of delivery data over a nine-month period as part of forty-one separate data productions, noting that the "keys" needed to decipher the data were produced in fifteen separate sets over a six-month period. He states: "We made every effort to ensure that our data set captured all delivery data from these multiple productions. Unfortunately, it appears that some data was missed." (Doc. 97-1 at 4, n.2.)

7

<u>First</u>, Professor Elhauge changes his original farmer-location proxy to an entirely "new proxy" that he introduced for the first time in this supplement. As Professor Elhauge describes it, he did not use any new facts or data to create this new proxy. Instead, he used data produced during discovery to approximate a farmer's delivery location based on the delivery location for other farmers in the same zip code. <u>Second,</u> he replaced about 362,000 data observations that previously relied upon farmer-location with his new proxy. He could not, however, calculate his new proxy for about 43% of the observations that still lacked delivery information after his data entry errors were corrected. Thus, <u>third,</u> he threw out 274,399 observations that were not affected by his original delivery-data errors because they did not fit his new proxy. In sum, Professor Elhauge did not simply correct data-entry errors; he created a materially new analysis that changed or discarded approximately 54% of the data observations in the already-corrected dataset.

Armed with a dataset containing a new proxy and hundreds of thousands of altered observations, Professor Elhauge then recalculated his original regression. The result was to re-inflate his average damages from the corrected-estimate to even higher than Professor Elhauge estimated in his initial regression analysis and report.

(Doc. 96 at 5-6) (footnotes omitted).

Plaintiffs, in contrast, describe Professor Elhauge's work as follows:

Professor Elhauge's investigation included: (1) reviewing Professor Sumner's report and "corrected data set," the 41 separate productions of delivery data, the regression data from the Class Action; (2) checking every alleged error to determine whether there was any error (often there was none); and (3) determining how, if at all, the error effected the regression (generally correcting the errors alleged by Professor Sumner *increased* the estimated damages).

(Doc. 107 at 2, n.2.)

## II. Conclusions of Law and Analysis.

Federal Rule of Civil Procedure 26(a) requires a party to disclose to the other parties the identity of any expert witness it may use at trial and to accompany that disclosure with a written report, which must contain "a complete statement of all opinions the witness will express and the basis and reasons for them[.]" Fed. R. Civ. P. 26(a)(2)(B)(i). Rule 26(e) further provides that:

8

> A party who has made a disclosure under Rule 26(a)[] . . . must supplement or correct its disclosure or response[] . . . in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing[.]

Fed. R. Civ. P. 26(e)(1)(A).

For an expert report disclosed pursuant to Rule 26(a)(2)(B), "the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." Fed. R. Civ. P. 26(e)(2). "Unless the court orders otherwise, [pretrial] disclosures must be made at least 30 days before trial." Fed. R. Civ. P. 26(a)(3)(B).

A party's "duty to supplement its initial expert report does not arise when [a party] seeks to bolster its earlier submission, but rather, arises only if the expert *subsequently* learns of information that was previously unknown or unavailable, that renders information previously provided in an initial report inaccurate or misleading because it was incomplete[.]" *Allen v. Dairy Farmers of Am., Inc.*, 2014 WL 2040133, at *5 (D. Vt. May 16, 2014) (citation omitted); *see also Cedar Petrochems., Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 278 (S.D.N.Y. 2011) (noting that "experts are not free to continually bolster, strengthen, or improve their reports by endlessly researching the issues they already opined upon, or to continually supplement their opinions") (internal quotation marks omitted); *Lidle v. Cirrus Design Corp.*, 2009 WL 4907201, at *5 (S.D.N.Y. Dec. 18, 2009) ("Rule 26(e) is not[] . . . a vehicle to permit a party to serve a deficient opening report and then remedy the deficiency through the expedient of a 'supplemental' report."). Consequently, "[i]f an expert's report does not rely [on] any information that was previously unknown or unavailable to him, it is not an appropriate supplemental report under Rule 26." *Allen*, 2014 WL 2040133, at *5.

In assessing whether to exclude an expert witness report, the Second Circuit directs trial courts to consider the following:

> (1) the party's explanation for the failure to comply with the [disclosure requirement]; (2) the importance of the testimony of the precluded witness[es]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance.

*Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006) (internal quotation marks omitted) (citing *Patterson v. Balsamico*, 440 F.3d 104 (2d Cir. 2006)). "Before the extreme sanction of preclusion may be used by the district court, [the court] should inquire more fully into the actual difficulties which the violation causes, and must consider less drastic responses." *Outley v. City of New York*, 837 F.2d 587, 591 (2d Cir. 1988).

## A. Whether to Exclude Portions of Professor Elhauge's Supplemental Report.

Defendants ask the court to strike portions of the Elhauge Supplemental Report because Plaintiffs failed to comply with Federal Rule of Civil Procedure 26(e) and because the Supplemental Report is untimely under the Scheduling Order.[2] Defendants acknowledge that Professor Elhauge should be allowed to update his data set to include the missing data identified by Professor Sumner, but assert that he should not be permitted to make any other changes to his Initial Report. Plaintiffs respond that Professor Elhauge was required to supplement his Initial Report in order to address inaccuracies that he became aware of after receiving the Sumner Report and that it would be contrary to the interests of justice to require him to testify to data he knows is inaccurate.

The data upon which Professor Elhauge relies in his Supplemental Report was available to him when he produced his Initial Report. According to Plaintiffs, his failure

---

[2] The June 21, 2018 Scheduling Order required submission of expert reports on or before September 21, 2018. On December 12, 2018, the court granted the parties' joint motion to revise the discovery schedule, ordering that "[i]f plaintiffs choose to supplement their expert's report based on any new information learned during the December 19, 2018 second deposition of DFA's CEO, Rick Smith, plaintiffs shall do so by January 4, 2019." (Doc. 88 at 1, ¶ 2.) Plaintiffs do not contend that the Elhauge Supplemental Report is based on information obtained as a result of Mr. Smith's second deposition.

10

to include this data was a mistake attributable at least in part to the piecemeal manner in which the data was provided. Plaintiffs further contend that this mistake exposed a bias in the location proxy that also required correction. Defendants counter that Professor Elhauge could have tested for this bias using the data that he relied upon in his Initial Report and that any fault lies in Professor Elhauge's acceptance of the *Allen* proxy without testing it. The court agrees. The first *Outley* factor thus weighs in favor of striking the Elhauge Supplemental Report as the mistakes in the Initial Report could and should have been avoided.

With respect to the second *Outley* factor, the information encompassed in the Elhauge Supplemental Report is central to Plaintiffs' case and damages calculation. As Plaintiffs point out, requiring Professor Elhauge to rely on his initial regression analysis would "require Professor Elhauge to give inaccurate testimony based on a proxy he now knows is biased[.]" (Doc. 107 at 11.) The importance of the Elhauge Supplemental Report therefore weighs in favor of allowing its use. *See Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213 (2d Cir. 2009) (holding that the trial court abused its discretion in excluding an expert opinion for noncompliance with a pretrial order where, among other things, "the testimony of [the excluded expert] was critical to [defendant]'s defense on the issue of causation"); *Scientific Components Corp. v. Sirenza Microdevices, Inc.*, 2008 WL 4911440, at *4 (E.D.N.Y. Nov. 13, 2008) (denying a motion to strike, the court explained that the rebuttal report was "important to plaintiff's case"); *Lab Crafters, Inc. v. Flow Safe, Inc.*, 2007 WL 7034303, at *7 (E.D.N.Y. Oct. 26, 2007) (noting that because the rebuttal expert testimony was of "grave importance to defendant's case[,]" it "warrant[ed] admission under this factor of the test").

The third *Outley* factor and "[t]he touchstone for determining whether to exclude an untimely expert report is whether the party opposing [its] admission is prejudiced." *Lore v. City of Syracuse*, 2005 WL 3095506, at *4 (N.D.N.Y. Nov. 17, 2005). Defendants assert that the Elhauge Supplemental Report will severely prejudice them by "forcing a costly and time-consuming 're-do' of discovery of Plaintiffs' expert and his

11

work." (Doc. 96 at 11.) However, in essence Professor Elhauge now agrees with Defendants' expert which can hardly be deemed prejudicial.[3] Although Plaintiffs understate the importance of Professor Elhauge's corrections, Defendants overstate them. Professor Elhauge used a proxy that was not the most accurate one available. Inevitably, this affected his initial regression analysis as well as his corrected one. The reason for the change, however, is relatively straightforward and not one that requires extensive investigation or analysis. Indeed, to date, Defendants have not sought to re-depose Professor Elhauge.[4]

The fact that Defendants face a higher damages calculation if the Supplemental Report is allowed is not the type of prejudice that weighs in favor of a motion to strike. Instead, the focus is on whether any trial preparation prejudice may be cured by allowing Defendants to re-depose Professor Elhauge at Plaintiffs' expense should Defendants desire to do so. *See RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, 2002 WL 31780188, at *4 (S.D.N.Y. Dec. 11, 2002) ("[A]ny prejudice is easily cured by allowing plaintiff to depose [the expert] if [it] so desire[s]."); *Virgin Enters. Ltd. v. Am. Longevity*, 2001 WL 34314729, at *2 (S.D.N.Y. Mar. 1, 2001) (noting that "any prejudice will be remedied by the deposition of [the expert]"); *Lab Crafters, Inc.*, 2007 WL 7034303, at *8 ("Courts to address this issue have stated that any prejudice to the opposing party can be alleviated by allowing them to depose the expert prior to trial.").

On balance, although the Supplemental Report may require additional discovery on Defendants' part which is a form of prejudice, that prejudice may be cured. *See Plew v. Ltd. Brands, Inc.*, 2012 WL 379933, at *2 (S.D.N.Y. Feb. 6, 2012) ("'Exclusion of expert testimony is a drastic remedy' and is inappropriate where the movant could easily have cured the prejudice by seeking more discovery.") (citations omitted). The third

---

[3] Defendants' identification of errors in Professor Elhauge's work is fodder for cross-examination and may alone be sufficient to undermine his credibility.

[4] Plaintiffs represent that they previously made Professor Elhauge available for this purpose and Defendants declined to depose him.

12

*Outley* factor thus either weighs in favor of denying the motion to strike or, is at best, neutral.

The final *Outley* factor is the possibility of a continuance, which in this case is readily available. No trial date has been set and Defendants' motion for summary judgment is under advisement and largely unimpacted by the Elhauge Supplemental Report. A continuance to alleviate the prejudice associated with the Elhauge Supplemental Report may therefore be granted without significantly delaying the adjudication of the merits of this dispute. *See Lab Crafters, Inc.*, 2007 WL 7034303, at *8 (finding that because the trial date had not been set and the party submitting expert testimony was not seeking an extension, "this factor also weighs heavily in favor of admitting [expert] testimony"); *RMED Int'l, Inc.*, 2002 WL 31780188, at *4 (allowing a new expert report when it "will not disrupt the trial, which is set to begin almost a month from now").

Based on the totality of the *Outley* factors, the court concludes that the drastic sanction of exclusion is not warranted. As a condition precedent to the admissibility of the Supplemental Report,[5] Plaintiffs must offer a supplemental deposition of Professor Elhauge and pay for Defendants' reasonable preparation time, deposition time, and travel expenses occasioned by the need to re-depose Professor Elhauge on the subject matter of his Supplemental Report.

### B. Whether to Exclude Professor Elhauge's Opinion on Whether DFA and DMS Possess Monopsony Power.

Defendants argue that Professor Elhauge should not be permitted to opine on whether DFA and DMS jointly have monopsony power because he did not offer this opinion in his Initial Report,[6] but instead disclosed this opinion during his deposition.[7]

---

[5] The court does not foreclose a challenge to the admissibility of the Supplemental Report on other grounds.

[6] Neither party attached Professor Elhauge's Initial Report to their briefing on this motion.

[7] In his written report, Professor Elhauge opines on whether DFA, DMS, and their co-conspirators possessed monopsony power, but does not offer an opinion on whether DFA and DMS possessed monopsony power independent of their co-conspirators.

13

They also assert that Professor Elhauge should not be permitted to opine that DFA and DMS have a 50% market share because this number is not included in his Initial Report.

Plaintiffs respond that Professor Elhauge's written report "properly discloses Defendants' 50% market share" in the backup data, which includes the market share for each co-conspirator, including Defendants. (Doc. 124 at 5.) Plaintiffs also note that determining whether Defendants possessed monopsony power involves the same factors and analysis that Professor Elhauge relied upon in concluding that Defendants and their co-conspirators exercised monopsony power. In their reply, Defendants dispute that Professor Elhauge's backup data "contains any calculation showing that DFA and DMS have approximately a 50% market share." (Doc. 127 at 3.)

"If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Parties may not "cure deficient expert reports by supplementing them with later deposition testimony." *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008); *see also Baker v. Anschutz Expl. Corp.*, 68 F. Supp. 3d 368, 382 (W.D.N.Y. 2014) (holding that "[a]n opinion that comes for the first time at the expert deposition is untimely") (citation omitted). Nonetheless, "Section 26(a)(2)(B) does not limit an expert's testimony simply to reading his report. No language in the rule would suggest such a limitation. The rule contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report." *Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203 (6th Cir. 2006).

As Plaintiffs point out, Defendants' expert Professor Snyder testified that he relied upon Professor Elhauge's calculation of DFA and DMS's market share in forming his opinions. There is thus no unfair surprise to Defendants with regard to Professor Elhauge's calculation of Defendants' market share.

Nor does Professor Elhauge's opinion that DFA and DMS possess monopsony power constitute impermissible "sandbagging" as his opinion is based on the same data and analysis that he relied upon in concluding that DFA, DMS, and their co-conspirators

possessed monopsony power. *See Sec. & Exch. Comm'n v. McGinnis*, 2018 WL 1633592, at *5 (D. Vt. Apr. 3, 2018) ("The purpose of Rule 37(c)(1) is to prevent the practice of 'sandbagging' an opposing party with new evidence.") (citation omitted); *Cary Oil Co. v. MG Ref. & Mktg., Inc.*, 2003 WL 1878246, at *4 (S.D.N.Y. Apr. 11, 2003) (holding that the Federal Rules regarding disclosure of expert opinions "are not designed to prohibit a witness from testifying about anything not explicitly mentioned in his Rule 26 disclosure, but rather to protect one party from being blindsided by another party with new opinions never before discussed"). More importantly, Defendants affirmatively solicited this opinion from Professor Elhauge in the course of questioning him about the basis for his conclusions.

Although Professor Elhauge did not offer an opinion regarding whether DFA and DMS independently possessed monopsony power in his Initial Report, because data in his Initial Report supports this conclusion, because Defendants solicited the opinion they seek to strike, and because Defendants "have ample time to prepare effective cross examination and consider possible witnesses to counter such discussions," striking the opinion is not warranted. *Cary Oil Co.*, 2003 WL 1878246, at *5; *see also In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 643 F. Supp. 2d 471, 482 (S.D.N.Y. 2009) ("[The expert's] omission of an obvious and readily calculated result which has now been revealed more than thirty days before trial followed a complete disclosure of his methodology and factual basis. This hardly rises to the level of unacceptable sandbagging."). Professor Elhauge, however, is confined to his deposition testimony and may not offer any supplemental testimony beyond that disclosed in response to Defendants' questioning.

## CONCLUSION

For the foregoing reasons, Defendants' motion to strike portions of Professor Elhauge's Supplemental Report is DENIED. (Doc. 96.) Defendants' motion to strike Professor Elhauge's deposition testimony is DENIED. (Doc. 121.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this _23_ day of July, 2019.

15

Christina Reiss, District Judge
United States District Court