U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2019 SEP 27 PM 12: 25

CLERK
BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

GARRETT AND RALPH SITTS, LEON          )
ATWELL, VICTOR BARRICK, DANIEL         )
BAUMGARDER, WILLIAM BOARD,             )
GEORGE BOLLES, ROGER BOLLES, ANDY      )
BOLLINGER, THOMAS BOLLINGER,           )
LOGAN BOWER, DWIGHT                     )
BRANDENBURG, BERNARD                    )
BROUILLETTE, THOMAS BROUILLETTE,       )
AARON BUTTON, HESTER CHASE,            )
THOMAS CLARK, THOMAS                    )
CLATTERBUCK, PAUL CURRIER, GERRY       )
DELONG, PETE AND ALICE DIEHL, MARK     )
DORING, MARK AND BARBARA DULKIS,       )
GLEN EAVES, MIKE EBY, WILLIAM          )
ECKLAND, DOUG ELLIOT, JAMES            )
ELLIOT, WENDALL ELLIOTT, MICHAEL       )
FAUCHER, DAVID AND ROBIN FITCH,        )
DUANE AND SUSAN FLINT, JOSEPH          )
FULTS, RICHARD GANTNER, STEFAN         )
AND CINDY GEIGER, WILLIAM GLOSS,       )
JOHN GWOZDZ, DAVID AND LAURIE          )
GRANT, JIM AND JOYCE GRAY, DENNIS      )
HALL, ROGER AND JOHN HAMILTON,         )
NEVIN AND MARLIN HILDEBRAND, JAKE      )
AND HARLEN HILLYERD, RICHARD AND       )
TERRI HOLDRIDGE, PAUL HORNING,         )
TERRY AND ROBERT HUYCK, DONALD         )
SCOTT HYMERS, TERRY INCH, RANDY        )
AND LYNETTE INMAN, THEODORE            )
JAYKO, JACK KAHLER, JAMES AND          )
TERESA KEATOR, JIM AND SHARON          )
KEILHOLTZ, GEORGE KEITH, LEE AND       )
ELLEN KLOCK, MIKE AND LISA             )
KRAEGER, FRED LACLAIR, TIM LALYER,     )
FRANK AND JOHN LAMPORT, CORRINE        )
LULL, CHARLES AND GRETCHEN MAINE,      )
THOMAS AND DEBORA MANOS, FRED          )
MATTHEWS, RUSSELL MAXWELL,             )
GERRY MCINTOSH, STEPHEN MELLOTT,       )
JOHN AND DAVID MITCHELL, THOMAS        )
MONTEITH, WALT MOORE, RICHARD          )
AND SHEILA MORROW, DEAN MOSER,         )
MELISSA MURRAY AND SEAN QUINN,         )
THOMAS NAUMAN, CHARLES NEFF,           )

DAVID NICHOLS, MICHAEL NISSLEY, )
LOU ANN PARISH, DANIEL PETERS, )
MARSHA PERRY, CAROLYN AND DAVE )
POST, JUDY LEE POST, SCOTT )
RASMUSEU, BRIAN REAPE, DAVID AND )
LYNETTE ROBINSON, BRIAN AND LISA )
ROBINSON, CALVIN ROES, BRADLEY )
ROHRER, PAUL AND SARAH )
ROHRBAUGH, ROBERTA RYAN, SCOTT )
AND LIN SAWYER, S. ROBERT SENSENIG, )
THOMAS AND DALE SMITH, DALE AND )
SUSAN SMITH, DENNIS SMITH, DONALD )
T. AND DONALD M. SMITH, ROGER AND )
TAMMY, SMITH, TODD SNYDER, )
RICHARD SOURWINE, DANNY )
SOURWINE, RANDY SOWERS, SHANE )
STALTER, GEORGE AND SHIRLEY )
STAMBAUGH, TRACY STANKO, STEPHEN )
SOURWINE, RICHARD SWANTAK, )
GEORGE AND PATRICIA THOMPSON, )
JEREMY THOMPSON, KEN AND JUDY )
TOMPKINS, DANIEL VAUGHN, MARK )
VISSAR, ERIC WALTS, EDWARD )
WALLDROFF, GERALD WETTERHAHN, )
JR., EUGENE WILCZEWSKI, STEVE )
WILSON, )
 )
         Plaintiffs, )
 )
     v. )       Case No. 2:16-cv-287
 )
DAIRY FARMERS OF AMERICA, INC. )
and DAIRY MARKETING SERVICES, )
LLC, )
 )
         Defendants.

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(Doc. 91)

Plaintiffs are dairy farmers who opted out of a settlement approved by this court in a class action styled *Allen v. Dairy Farmers of America, Inc.*, No. 5:09-cv-230 (the "*Allen* settlement"). They seek relief pursuant to the Sherman Act, 15 U.S.C. §§ 1-2, for alleged antitrust violations committed by Defendants Dairy Farmers of America, Inc. ("DFA")

and Dairy Marketing Services, LLC ("DMS") (collectively, "Defendants"). Because of their corporate structure, Defendants are considered a single entity for purposes of Plaintiffs' claims. In their Revised First Amended Complaint ("RFAC"), Plaintiffs assert that Defendants and their alleged co-conspirators engaged in a conspiracy to monopsonize in violation of 15 U.S.C. § 2 (Count I); attempted to monopsonize in violation of 15 U.S.C. § 2 (Count II); engaged in monopsonization in violation of 15 U.S.C. § 2 (Count III); and participated in a conspiracy to restrain trade in violation of 15 U.S.C. § 1 (Count IV).

Pending before the court is Defendants' motion for summary judgment (Doc. 91) seeking judgment as matter of law in their favor because: (1) Plaintiffs cannot establish a single conspiracy among Defendants and their alleged co-conspirators; (2) Plaintiffs cannot establish the alleged conspiracy impacted each Plaintiff individually; and (3) Plaintiffs cannot establish that Defendants possess monopsony power or a dangerous possibility of achieving monopsony power. Plaintiffs oppose the motion. On April 9, 2019, the court heard oral argument, at which time it took the pending motion under advisement.

Plaintiffs are represented by Dana A. Zakarian, Esq., Elizabeth A. Reidy, Esq., Gary L. Franklin, Esq., Joel G. Beckman, Esq., and William C. Nystrom, Esq. Defendants are represented by Alfred C. Pfeiffer, Jr., Esq., Elyse M. Greenwald, Esq., Ian P. Carleton, Esq., Jennifer L. Giordano, Esq., Margaret M. Zwisler, Esq., and W. Todd Miller, Esq.

## I.      Plaintiffs' Proposed Product and Geographic Markets.

For each of their claims, Plaintiffs allege a relevant product market of raw Grade A milk, a fungible, homogenous, and perishable commodity. As a relevant geographic market, Plaintiffs allege Federal Milk Marketing Order ("FMMO") 1 ("Order 1"), which covers all or portions of Vermont, New Hampshire, New York, Massachusetts, Rhode Island, Connecticut, New Jersey, Delaware, Maryland, and Virginia. Certain rudimentary uncontested facts regarding the production of milk, some of which may be obvious, are helpful in describing the proposed product and geographic markets.

Because raw Grade A milk is homogenous, perishable, and fungible and because it is generally hauled from more than one dairy farm at a time, a dairy farmer's milk typically must be inspected, tested, and weighed at the time of pickup. Individual dairy farms that do not have the ability to test, haul, weigh, or market their own milk must contract for these services.

Dairy cows produce milk seven days a week, a schedule that cannot be immediately adjusted for demand short of throwing away milk. As a result, dairy farmers must find a processor that will take their milk regardless of demand. Balancing is a process whereby a balancing plant accepts the excess milk supply so that it may be converted into other dairy products that are less perishable than drinking milk such as butter, cheese, ice cream, sour cream, and yogurt.

A FMMO is a geographically defined fluid milk demand area subject to FMMO laws and regulations in which the U.S. Department of Agriculture establishes a minimum milk price so that those who buy milk from producers are required to pay no less than the established price. Each FMMO sets the price of raw Grade A milk based at least in part on its regulated components: butterfat, protein, non-fat milk solids, and others (non-fat and non-protein solids). In Order 1, this is known as "component pricing." An FMMO also sets standards for milk quality. Milk that is "pooled" in a FMMO must comply with these standards.

The price paid to dairy farmers for their milk is based not only on the volume of milk produced but also reflects its quality. Dairy farmers receive "over-order premiums" for their milk in addition to component pricing and other premiums. Over-order premiums are the difference between the actual price paid to a dairy farmer producer by a processor or cooperative and the FMMO's minimum price.

For purposes of their pending motion, Defendants do not contest Plaintiffs' proposed product and geographic markets.

## II.  The Undisputed Facts.

### A.  Defendants' Milk Marketing Activities.

DFA is a member-owned milk marketing cooperative based in Kansas City, Kansas. It is the largest dairy cooperative in the United States and the fourth largest dairy cooperative in the world based on sales. DFA's members, all of which are producers of raw milk, include both individual dairy farmers and other member-owned milk marketing cooperatives.

DFA is also one of the largest milk handlers in the United States. It owns or controls forty-two manufacturing facilities with over 6,000 employees and exports its products worldwide. In 2017, DFA's annual sales substantially exceeded a billion dollars. DFA divides its business into two business segments: "Milk Marketing" and "Commercial Investments." "Milk Marketing" directs the marketing of DFA member milk. "Commercial Investments" consists of a nationwide network of owned and affiliated dairy product manufacturers that process DFA members' milk into value-added dairy products. In addition, DFA's "Commercial Investments" segment participates in joint-venture partnerships and affiliate relationships with leading food manufacturing and marketing companies.

Until April 1, 2014, Dairylea Cooperative Inc. ("Dairylea") was a member-owned dairy cooperative based in Syracuse, New York. In 1999, DFA and Dairylea jointly formed DMS, a milk marketing entity that provides services to its customers such as hauling, testing, marketing, balancing, pricing, and invoicing. From 1999 until 2003, DFA and Dairylea each owned 50% of DMS. In 2003, St. Albans Cooperative Creamery ("St. Albans"), a member-owned dairy cooperative based in St. Albans, Vermont, became a part owner of DMS. Until April 2014, St. Albans owned one third of DMS with DFA and Dairylea each owning a remaining third. Since April 2014, DFA has owned 90% of DMS and St. Albans has owned 10%.

In May 2002, Dairylea became a member cooperative of DFA and on April 1, 2014, it merged with DFA. St. Albans became a DFA member in March 2003. In April

2014, Mount Joy Farmers' Cooperative Association ("Mt. Joy"), a former member cooperative of Dairylea, became a member cooperative of DFA.

**B.    Defendants' Supply Agreements in the Northeast.**

From 2005 through the present, in addition to DFA's ownership of milk processing facilities in Order 1, Defendants entered into a series of supply agreements with milk processors in the Northeast. Defendants' Statement of Undisputed Facts ("SUF") describe these agreements as follows:

16. Between 2005 and the present, DFA has marketed raw milk to its customer, HP Hood ("Hood"), pursuant to the terms of supply agreements between DFA and Hood.

17. Between 2005 and the present, DFA has marketed raw milk to its customer, Dean Foods ("Dean" or "Dean/Suiza"), pursuant to the terms of supply agreements signed by DFA and Dean/Suiza.

18. Between 2005 and the present, DFA and DMS have marketed raw milk to its customer, Kraft, pursuant to the terms of supply agreements signed by both DFA/DMS and Kraft.

19. Between 2005 and 2014, DMS marketed raw milk to its customer, Farmland, pursuant to the terms of a supply agreement signed by both DMS and Farmland. Farmland closed its Wallington, New Jersey processing plant in 2014.

20. For periods of time between 2005 and the present, DMS has marketed kosher milk to its customer, Worcester Creameries, pursuant to the terms of a supply agreement signed by both DMS and Worcester Creameries.

21. For periods of time between 2005 and the present, DMS has marketed raw milk to its customer, Fage, pursuant to the terms of a supply agreement signed by both DMS and Fage.

22. For periods of time between 2005 and the present, DMS has marketed raw milk to its customer, Euphrates, pursuant to the terms of a supply agreement signed by both DMS and Euphrates.

23. For periods of time between 2005 and the present, DMS has marketed raw milk to its customer, Great Lakes Cheese of New York ("Great Lakes Cheese"), pursuant to the terms of a supply agreement signed by both DMS and Great Lakes Cheese.

24. For periods of time between 2005 and the present, DMS has marketed raw milk to its customer, Agro-Farma (known as "Chobani"), pursuant to the terms of a supply agreement signed by both DMS and Chobani.

25. For periods of time between 2005 and the present, DMS has marketed raw milk to its customer, Sorrento Lactalis ("Sorrento"), pursuant to the terms of a supply agreement signed by both DMS and Sorrento.

26. For periods of time between 2005 and 2017, DMS and Dairylea marketed raw milk to its customer, Turkey Hill Dairy ("Turkey Hill"), pursuant to the terms of an agreement between Dairylea and Turkey Hill.

Defendants' SUF at 3-5, ¶¶ 16-26 (footnotes omitted).

### C. DMS's Outsourcing Agreements with Certain Order 1 Milk Processors.

From 2005 to the present, DMS entered into outsourcing agreements with certain milk processors in Order 1 which Defendants describe as follows:

27. In 2001, DMS entered into an outsourcing agreement with its customer, Suiza (a milk processor later acquired by Dean). Pursuant to this agreement, DMS agreed to manage the supply chain process for the independent farmers supplying raw milk to the plants that Dean/Suiza acquired from Garelick Farms ("Garelick").

28. In 2003, DMS entered into an outsourcing agreement with its customer, Dean. Pursuant to this agreement, DMS agreed to manage Dean's supply chain process for independent farmers supplying raw milk to Dean's plants in the Northeast.

29. In 2002, DMS entered into an outsourcing agreement with its customer, Crowley Foods ("Crowley"). Pursuant to this agreement, DMS agreed to manage Crowley's supply chain process for independent farmers supplying raw milk to Crowley's plants.

30. In April 2004, Hood acquired Crowley.

31. In 2004, DMS entered into an outsourcing agreement with its customer, Hood. Pursuant to this agreement, DMS agreed to manage Hood's supply chain process for independent farmers supplying raw milk to Hood's Crowley, Kemps, and Rosenberger plants.

32. In 2005, DMS entered into an outsourcing agreement with its customer, Farmland. Pursuant to this agreement, DMS agreed to manage Farmland's supply chain process for independent farmers supplying raw milk to Farmland's plants in the Northeast.

33. In 2003, DMS entered into an outsourcing agreement with its customer, Kraft. Pursuant to this agreement, DMS agreed to manage Kraft's supply chain process for independent farmers supplying raw milk to Kraft's plants in the Northeast.

*Id.* at 6-7, ¶¶ 27-33 (footnotes omitted).

## D. Access Agreements to DocuWare.

In or around 2006, dairy farmers and their cooperatives negotiated with processors for higher prices for milk from cows that had not been treated with artificial growth hormones, commonly referred to as "rBST-free" milk. There is no chemical or physical test to confirm whether raw milk from a particular farm is rBST-free. Instead, processors are required to verify their compliance with rBST-free requirements upon the request of state inspectors. Dairy farmers who marketed their milk through DMS (including DFA and Dairylea members) signed affidavits to verify that they did not use rBST in treating their cows and their milk was therefore rBST-free. Dairylea created a central database known as DocuWare for use by DMS that contained affidavits for DMS farmers who certified that their milk was rBST-free.

DMS agreed to provide some of its processor-customers with access to DocuWare so that those customers could verify that the milk they were purchasing was rBST-free.[1]

## III. Disputed Facts.

Plaintiffs contend that Defendants have obtained control over dairy farmers' milk in Order 1 through a series of allegedly anticompetitive agreements at both the cooperative and processor levels. According to Plaintiffs' expert witness, Professor Einer R. Elhauge:

---

[1] On October 12, 2007, DFA, Dairylea, and DMS entered into an "Access Agreement" with Wawa, Inc. ("Wawa"), a processor, which permitted Wawa to access DocuWare. On October 26, 2007, DFA, Dairylea, and DMS entered into an "Access Agreement" with Cumberland Dairy, Inc. ("Cumberland Dairy"), a processor, which permitted Cumberland Dairy to access DocuWare. On February 18, 2009, DFA, Dairylea, and DMS entered into an "Access Agreement" with Chobani, a processor, which permitted Chobani to access DocuWare. On September 18, 2009, DFA, Dairylea, and DMS entered into an "Access Agreement" with Empire Cheese, Inc. ("Empire Cheese"), a processor, which permitted Empire Cheese to access DocuWare. On January 21, 2010, DFA, Dairylea, and DMS entered into an "Access Agreement" with Schneider Valley Farms Dairy, a processor, which permitted Schneider Valley Farms Dairy to access DocuWare. On June 29, 2007, DFA, Dairylea, and DMS entered into an "Access Agreement" with St. Albans which permitted St. Albans to access DocuWare. On May 8, 2007, DFA, Dairylea, and DMS entered into an "Access Agreement" with Agri-Mark which permitted Agri-Mark to access DocuWare.

8

Defendants have engaged in a multi-faceted conspiracy with processors and other cooperatives to reduce competition, acquire monopsony power, and suppress raw milk prices in the market for raw milk sales in Order 1. Defendants entered into the following explicit or inferable anticompetitive agreements: (a) agreements with other cooperatives not to compete for dairy farmers selling raw milk; (b) agreements to discourage such competition by exchanging information with other cooperatives about how much the cooperatives pay farmers for raw milk; (c) outsourcing and full supply agreements with processors to cut off raw milk outlets to independent farmers and non-conspiring cooperatives, which were coupled with most favored nations clauses to make sure that suppressed prices applied widely across processors in the market; (d) agreements to make side payments to prevent such competition for raw milk; and (e) agreements to coerce farmers who were independent or belonged to other cooperatives to join DFA in order to still have outlets for their raw milk. These agreements all anticompetitively suppressed the unregulated portion of raw milk prices paid to dairy farmers in Order 1, beginning before 2005 and continuing to the present day.

Plaintiffs' Statement of Disputed Facts ("SDF") ¶ 10, Ex. Z, (Elhauge Rep. at ¶ 4).

## A.    Defendants' Alleged Non-Solicitation Agreements.

James Kelleher, DMS's Director of Member Relations, acknowledged in his deposition that an effective way to compete for cooperative members is to go out to the farms and solicit membership by offering more favorable prices and services. Plaintiffs' SDF ¶ 13, Ex. A, Tab 2 (2018 Kelleher Dep. at 10, 17, 23-24). Mr. Kelleher further testified that competitive solicitation of cooperative members may prompt farmers to consider joining another cooperative that would pay more for their raw milk resulting in premium escalation which, in turn, could result in higher prices paid to dairy farmers. Plaintiffs' expert witness, Professor Elhauge, opines that dairy cooperatives need to pay milk producers competitive prices in order to attract and retain producers as members:

> [I]f a cooperative approaches a farmer to offer that farmer higher raw milk prices, the farmer might be incentivized to switch away from his or her existing cooperative. This will give both the existing cooperative and the other cooperatives an incentive to aggressively negotiate higher raw milk prices from processors and share as much marketing income with farmers as possible, or risk their membership base shrinking.

Plaintiffs' SDF ¶ 12, Ex. Z (Elhauge Rep. at ¶ 155).

Plaintiffs do not dispute that Defendants and Dairylea entered into "Access Agreements" with certain milk processors and cooperatives that allowed them to access DocuWare. They, however, contend that Defendants' SUF omits an essential component of those agreements that cannot be justified by any need for confidentiality: each Access Agreement prohibits the party granted access to DocuWare from soliciting any of Defendants' members or producers, including independent farmers who supply milk to DMS. Plaintiffs contend these non-solicitation agreements violate a 1977 Consent Decree[2] and DFA's own Antitrust Guidelines.[3]

For example, a May 8, 2007 agreement with Agri-Mark (which is not a member of DMS, but which sometimes markets its milk with DFA) provides in relevant part that:

### COVENANT NOT TO SOLICIT

Agri-Mark will not either directly or indirectly, whether as an individual, owner, partner, operator, joint venturer, contractor, employee of, or consultant to, any person or entity, solicit a milk marketing relationship with or perform milk marketing services for any of the producers in the DocuWare Data. This covenant shall remain in effect for so long as Agri-Mark has access to DocuWare Data and for a period of 24 months after such access is terminated.

Plaintiffs' SDF ¶ 16, Ex. P at 67.

The Agri-Mark Access Agreement identifies Agri-Mark, DFA, DMS, and Dairylea as parties to the agreement. Gregory Wickham signed the Access Agreement on

---

[2] *See* Plaintiffs' SDF ¶ 15, Ex. B, Tab 4 at § IV (Consent Decree in *United States v. Mid-America Dairymen, Inc.*, 1977 WL 1425, at *2 (W.D. Mo. May 17, 1977)) ("Defendant is hereby enjoined and restrained from: . . . maintaining or entering into any agreement with another person, except an employee or milk hauler performing services for defendant, that restricts in any way[] the solicitation by such other person of any member of defendant to terminate its membership and marketing agreement with defendant" and "the solicitation by defendant of any producer to become a member of defendant")). Rick Smith, DFA's CEO since 2006, acknowledged in his 2011 deposition that the 1977 Consent Decree has bound DFA from 1999 to the present. Plaintiffs' SDF ¶ 15, Ex. B, Tab 108 (2011 Smith Dep. at 326-27).

[3] DFA's Antitrust Guidelines state: "Under no circumstances should any officer, director, or employee of DFA accept, passively or actively, a 'non-solicitation' agreement with another cooperative" and further advise: "Do not enter into any discussions or agreements with another cooperative: Prohibiting each other from soliciting the others' members or producers located in any particular geographic area." Plaintiffs' SDF ¶ 15, Ex. B, Tab 2 at 788, 794.

behalf of Dairylea as its Chief Executive Officer ("CEO"), on behalf of DFA as its Chief Operating Officer ("COO"), and on behalf of DMS as its General Manager.

In June of 2007, Defendants and Dairylea entered into an Access Agreement with the Covenant Not to Solicit with St. Albans Cooperative. Again, Mr. Wickham signed it on behalf of Dairylea, DFA, and DMS. Plaintiffs' SDF ¶ 16, Ex. R. Plaintiffs identify several other Access Agreements that also contain the Covenant Not to Solicit, several of which were also signed by Mr. Wickham on behalf of Dairylea, DFA, and DMS.[4]

Plaintiffs contend that the Access Agreements for DocuWare are not the only non-solicitation agreements entered into by Defendants with their alleged co-conspirators. They cite an Agri-Mark board member's 2011 deposition testimony that Robert Stoddart, the Senior Vice President of membership at Agri-Mark, told the board member in October 2009 that "we have an unwritten agreement that we don't approach . . . any other members of any other co-ops." Plaintiffs' SDF ¶ 17, Ex. A, Tab 4 (2011 Reynolds Dep. at 39-40, 49) (internal quotation marks omitted). Mr. Stoddart's own testimony acknowledged this arrangement. *Id.*; Ex. A, Tab 5 (2011 Stoddart Dep. at 55). In addition, a November 2003 DMS document entitled "Membership Meeting" reflects that: "[James] Kelleher[, DMS Director of Member Relations,] reported on recent conversations with Bob Stoddart [of Agri-Mark]. Bob is indicating coop[erative]s need to work together and we shouldn't be fighting in the country." Plaintiffs' SDF ¶ 17, Ex. S. Brad Keating, CEO of DMS, testified that although he did not recall the context in which the phrase was used, in his view "in the country" meant "soliciting farms out in the field." *Id.*; Ex. B, Tab 141 (2011 Keating Dep. at 161-62).

According to Professor Elhauge:

> There is no independent economic motive for Agri-Mark to inform DFA and Dairylea of [a dairy farmer who wants to switch cooperatives], because sharing the information could only help DFA and Dairylea keep the farmer from switching to Agri-Mark. The willingness to share such information instead indicates a collective motive to mutually share information about

---

[4] *See* Plaintiffs' SDF ¶ 16, Exs. L-O, Q (Milk Processor Access Agreements for DocuWare with Cumberland Dairy, Empire Cheese, Schneider Valley Farms Dairy, Chobani, and Wawa).

11

farmers who were contemplating switching in order to help implement an agreement to prevent such competition for farmers.

Plaintiffs' SDF ¶ 18, Ex. Z (Elhauge Rep. at ¶ 163).

Plaintiffs proffer evidence that St. Albans, an alleged co-conspirator, was also a party in non-solicitation agreements in addition to the Access Agreements for DocuWare. They cite December 2002 correspondence between St. Albans and DFA in which St. Albans proposed that "[t]o assist with our relations, we expect that there would be no active solicitation of members between organizations that would include special member programs offered in overlapping membership regions." Plaintiffs' SDF ¶ 19, Ex. B, Tab 124 at 849. Gary Hanman, DFA's then-CEO, shared the letter with Rick Smith, then-St. Albans's CEO (who later succeeded Mr. Hanman as DFA's CEO). In response, Mr. Smith wrote a note pertaining to that proposal: "Obviously—but do we want this in writing—I think not" before faxing it back to DFA's CEO. *Id.* DFA CEO Hanman then responded to St. Albans's proposal, advising that DFA's antitrust lawyers:

> will not let us agree to restrict active solicitation of each other's members. However, once we are cooperating on milk pick up, marketing, distribution of market proceeds and of sharing facilities there would be little if any economic benefit causing dairy farmers to transfer their membership between St. Albans, DFA[,] or Dairylea.

Plaintiffs' SDF ¶ 19, Ex. T at 150.

St. Albans's membership manager testified that he informs James Kelleher of DMS anytime a DFA farmer contacts him about joining St. Albans and that Mr. Kelleher returns the courtesy:

> Q. Are you ever contacted by DFA members about possibly doing business with St. Albans?
>
> A. Yes.
>
> Q. Will you approach a DFA farm to solicit their business?
>
> A. I have not.
>
> Q. What about a Dairylea farm?
>
> A. I have not.
>
> Q. When you're contacted by a DFA farm about potentially doing business with St. Albans, do you provide a courtesy call to Mr. Kelleher?

A. Yes.

Q. Do you do that before you visit the farm?

A. Depends. Typically.

Q. Does Mr. Kelleher do the same thing for you if he's approached by a St. Albans farm?

A. Yes, he has.

Plaintiffs' SDF ¶ 20, Ex. A, Tab 6 (2011 Gates Dep. at 40).

In support of their claims that other alleged co-conspirators were parties to non-solicitation agreements with Defendants, Plaintiffs cite Mr. Kelleher's deposition testimony that if a cooperative's milk were in DFA/DMS's system, DFA would not solicit that cooperative's members:

Q. . . . [I]f a cooperative was marketing their milk through DMS, then DFA wouldn't approach the farms of that cooperative to try to solicit them; correct?

. . .

A. The milk was in the system. If they wanted to come to us, we would take them, but we -- no, we did not approach them.

Plaintiffs' SDF ¶ 20, Ex. A, Tab 2 (2018 Kelleher Dep. at 27). From 2010 to 2017, Mr. Kelleher could not identify a single instance in which DFA, DMS, or Dairylea solicited cooperative membership from a dairy farmer who belonged to a cooperative that was already using the DMS system. *Id.* at 58-59.

Plaintiffs claim that alleged co-conspirators Maryland & Virginia Milk Producers Cooperative ("MDVA"), Mt. Joy, and Land O' Lakes were also parties to non-solicitation agreements with Defendants. In a March 3, 2005 voice mail, Gregory Wickham reported to Rick Smith the following:

. . . Some background—in Order 1, [MDVA] has been relatively quiet from a competitive perspective in the last 18-24 months. I don't want to say they haven't called on any farms—they go where they are called. I don't think they have aggressively been going up and down the road trying to convert people. It appears as though in the last couple of weeks they may be turning over a new leaf, which is a little surprising / disappointing. We've gotten reports that they are calling, well actually it was a report that they called on a slew of Mt. Joy farms (15-20 so far). I think they are definitely,

13

absolutely, positively calling on places where they have not been asked to go. That's unusual. That's kind of breaking the balance of power so to speak. We have, because they have been relatively quiet, I would say we have been quiet in their sector. It's kind of been a subtle peace where if we get a call from one of their members, we go—and if they get a call from one [of] ours, they go. There hasn't been a lot of active, unsolicited calling. . . . Bottom line is, between you, me, [Brad] Keating [DMS's CEO], talking to Jay [Bryant, MDVA's CEO] and Mike John—we have to send a message that aggressive, unsolicited calling is going to result in us doing something that probably [Mr. Bryant] would rather not have us do. If we want to go there, we'll go there. But we can't sit back and do nothing. It is going to be darn difficult to garner support for whatever he wants to do in Carlisle and be in a JV if they are going to be going up and down the street in Order 1.

Plaintiffs' SDF ¶ 21, Ex. U. Thereafter, in a document entitled "Maryland-Virginia Relationship," DMS documented that the situation with MDVA had improved: "On some of our farms/better recently/actually calling us when they get called" but further noted that MDVA was "All over [Land O' Lakes] farms" and there may be a "[t]rust factor" because they "[c]alled on Turkey Hill" and because "[i]ntelligence says [they are] talking to Shenandoah, Clover, [and] Dairy Maid[.]" Plaintiffs' SDF ¶ 21, Ex. W.

In August of 2008, when Defendants heard "rumors" that MDVA field representatives had tried to solicit several DMS farms, DMS's representative contacted MDVA CEO Jay Bryant, documenting his response to Rick Smith, DMS's CEO, in relevant part as follows:

We've reached out to Jay a few times regarding rumors—both Sonia and Greg [Wickham]. Jay has continued to commit that they are not going to take these producers and are not procuring milk. Jay's most recent response was that he can't control hauler or field rep rumors, but he controls member procurement decisions and he has already described that they are not taking these members. Despite a few ongoing rumors, we didn't think we could continue to go back to Jay again as he has confirmed his position and hasn't yet demonstrated anything to the contrary. However, I asked Greg Wickham to help facilitate a meeting with Jay so I could meet him eye to eye. I believe we will meet at NMPF. Despite Jay's commitment, the fact that his field reps are throwing around numbers to our members does create challenges for us and we need to get some agreement on that point.

I will immediately inform you if we become confident that we are at risk of losing one of these members.

Plaintiffs' SDF ¶ 22, Ex. X.

Plaintiffs contend that Mt. Joy's participation in non-solicitation agreements with Defendant is reflected in a February 3, 2000 memo from Brad Keating (then-DMS Director of Operations) to Rick Smith (then-Dairylea's CEO) that states in relevant part: "Jim [Kelleher] mentioned that Mount Joy is currently soliciting DFA farms. Mount Joy claims that if they don't take the farms, the farms will go to Lanco. We should curtail this practice." Plaintiffs' SDF ¶ 23, Ex. B, Tab 149 at 925. Mt. Joy was a DMS cooperative at the time.

Plaintiffs further cite DMS's alleged threat to raise milk prices and reduce supply if Queensboro solicited DFA members. Plaintiffs' SDF ¶ 68, Ex. FFF (2/20/01 DMS memo regarding "customer conversations" stating in part: "I also spoke with Butch Miller. I told him if we lose farms to Queensboro his price was going up and his volume was going down. No problem, Butch does not want to compete with us on the farm.").

In September 2002, upon hearing a report that NFO (a cooperative marketing through DMS) was engaging in price competition for members with DFA, then-DFA CEO Gary Hanman instructed a DFA employee to "visit with NFO leadership and redirect that effort. They should not be soliciting DFA members" to "become members of NFO, particularly when DFA is responsible for marketing the milk for NFO members." Plaintiffs' SDF ¶ 23, Ex. B, Tab 108 (2011 Smith Dep. at 333-35).

2003 DMS staff meeting minutes similarly report that Land O' Lakes "is soliciting our farms in the Lancaster, PA area. Greg Wickham [then an officer of both DMS and Dairylea] will correct immediately." Plaintiffs' SDF ¶ 24, Ex. A, Tab 8 at 209-12 (internal quotation marks omitted).

Plaintiffs proffer evidence that the non-solicitation agreements remain in full force and effect, citing a post-*Allen* settlement 2016 communication in which a United Ag employee tells a DFA employee: "I thought that there was an arm's length agreement that we would not actively solicit your farms, nor you ours." Plaintiffs' SDF ¶ 23, Ex. B, Tab

15

46 at 867. They also proffer statistics that they claim demonstrate that once a dairy farm comes within the DFA/DMS umbrella, it is rare for it to switch cooperatives. They cite Defendants' view that "DMS is one cooperative and it's got members inside of the cooperative. It's all one" and that "DFA and its affiliates [are also] one." Plaintiffs' SDF ¶ 25, Ex. B, Tab 108 (2011 Smith Dep. at 298-99, 303, 314).

Plaintiffs claim that co-conspirator cooperatives participating in the non-solicitation agreements shared farmer pay prices even though such information is considered confidential. *See* Plaintiffs' SDF ¶¶ 30-31, 33, Ex. EE at 429 (May 2006 DMS "Management Follow Up" which states: "It is Important to maintain communications amongst member organizations regarding . . . pay prices. . . . When DMS members are instituting pay price adjustments to dairy farmers there should be coordination and discussion with individuals of member organizations"); Ex. B, Tab 44 (2011 Kelleher Dep. at 100-02) (discussing how Mr. Kelleher met with Robert Stoddart, Agri-Mark Senior Vice President of membership, and asked if Agri-Mark's pay programs with its dairy farmers had changed. Mr. Stoddart confirmed that they had and explained how); Ex. CC (July 9, 2001 email in which Rick Smith asks Greg Wickham if there is any way they can reciprocate by providing Agri-Mark with information about Defendants' pay programs in New England). In addition, Plaintiffs assert that Defendants acknowledge that they had access to cooperatives' farmer pay program information through DMS. Plaintiffs' SDF ¶ 33, Ex. B, Tab 149 (February 2000 memo) ("We need to do a side by side producer check comparison for Mount Joy, Dairylea and DFA"). Plaintiffs contend that overlapping current and successor officers of DFA, DMS, and Dairylea facilitated these allegedly anticompetitive communications. At least two senior executives, Brad Keating and Greg Wickham, held executive positions in all three organizations.

James Kelleher, DMS's Director of Member Relations, testified that knowing what competing cooperatives were paying their dairy farmers for their milk was helpful in retaining Dairylea and DFA members:

Q. In figuring out what you were going to have to pay these farms to keep them in the Dairylea or DFA fold, was it helpful to you to know what price your competitor was paying?

. . .

A. Yes.

Plaintiffs' SDF ¶ 28, Ex. B, Tab 44 (2011 Kelleher Dep. at 103-04).

To incentivize participation in the non-solicitation agreements, Plaintiffs proffer evidence that Defendants offered multimillion-dollar payments for agreements not to compete for independent dairy farmers' milk and to convert those dairy farmers to DFA/DMS. Plaintiffs' SDF ¶ 47, Ex. B, Tab 27 (8/15/01 emails from G. Wickham to J. Clark) ("We consider them payment for non compete on the independent supply"); Ex. B, Tab 29 (1/10/02 memo from G. Wickham to R. Smith) ("We paid them [Suiza] the $1 million lump sum to get the independents converted and are paying $250,000 a quarter in 2002"); Plaintiffs' SDF ¶ 52 (citing DFA's VP of Accounting's November 2003 email: "[Dean] turned over the milk supply to us and we are repaying 'damages' to Dean") (emphasis omitted); Plaintiffs' SDF ¶ 46, Ex. B, Tab 128 at 944 (2001 Suiza Memo: "We have a general understanding with DFA that over some period of time, our independent producers will convert to be members of DFA").

Professor Elhauge concludes that the effect of competition in cooperative membership is higher prices paid to dairy farmers for their milk and that a non-solicitation agreement coupled with the sharing of farmer pay price information has and had the effect of suppressing over-order premiums paid to dairy farmers for their raw Grade A milk in Order 1. Plaintiffs' SDF ¶ 142, Ex. Z (Elhauge Rep. at ¶¶ 173, 175-76, 180).

## B.  Outsourcing Agreements and Most Favored Nation Pricing.

Although Plaintiffs do not dispute the identification of various outsourcing agreements in Defendants' SUF, they contend that Defendants have failed to describe the material terms of those agreements and their negative impact on competition in Order 1. Plaintiffs cite testimony from Defendants' senior executives, as well as from executives

of Agri-Mark, Dairylea, St. Albans, MDVA, Lanco, Land O' Lakes, Garelick, and Dean, that cooperatives and processors compete for dairy farmers' milk (because both can buy milk directly from the farmer). Plaintiffs' SDF ¶¶ 36-37.[5]

Plaintiffs contend that Defendants' outsourcing agreements with milk processors, whereby a processing plant continues to purchase raw Grade A milk from independent purchasers but "outsources" its collecting, hauling, testing, marketing, and pricing services to DMS, has the effect of limiting independent producers' options for bringing their milk to market. Professor Elhauge opines that Defendants' outsourcing agreements are contrary to the economic interests of the processors with whom DFA competes:

> [B]y outsourcing to DFA/DMS and by entering into full supply agreements, a processor loses the ability to negotiate raw milk prices from multiple sources and confers additional market power upon DFA/DMS in the sale of raw milk to processors. The independent, non-conspiratorial motive of any processor should therefore be to avoid agreements that would give DFA/DMS greater power to extract higher raw milk prices from the processor.

Ex. Z (Elhauge Rep. at ¶ 198). In support of this opinion, Professor Elhauge cites the testimony of a Dean representative who acknowledged that he was not aware of any benefits Dean received as a result of its outsourcing agreement because, without the agreement, "[y]ou had an opportunity to go into the marketplace and get the best deal you could." Plaintiffs' SDF ¶ 53, Ex. A, Tab 13 (2018 Bernon Dep. at 42-45, 48); Ex. XX (01/04/99 Dean internal memorandum) ("[A]n independent supply gives us a cost advantage when compared to an alternative co-op supply and allows us to control our own destiny with regards to the availability & reliability of a supply"). Professor Elhauge further cites Dean's 2009 engagement of McKinsey & Company to evaluate Dean's milk supply options pursuant to which Dean received an estimate that it could save $100 million annually by direct sourcing milk rather than purchasing it through

---

[5] Gary Hanman, DFA's former CEO, testified that DFA directly competes with processors for the supply of milk. Plaintiffs' SDF ¶ 36, Ex. A, Tab 11 (2011 Hanman Dep. at 84-85) ("Q. [W]hen you were the CEO of DFA, did you consider processors direct competitors of DFA with regard to milk procurement? A. Yes.").

18

DMS. Professor Elhauge opines that these facts support a conclusion that side agreements and payments from Defendants motivated co-conspirator processors to enter into non-competitive outsourcing agreements that conflict with their own economic best interests. Plaintiffs' SDF ¶¶ 52-53, Ex. Z (Elhauge Rep. at ¶¶ 195-200). He further opines that these facts support "[a] conspiracy where cooperatives like DFA and marketing agencies like DMS agree with processors . . . to restrict competition for milk supply [that] suppresses raw milk prices by preventing competition to vie for that milk supply by offering competitive prices." Ex. Z (Elhauge Rep. at ¶ 201).

Plaintiffs contend that DFA initially gained its footing at the processor level with its December 1998 joint venture with Suiza, which was at the time "one of the nation's leading" processors of dairy products. Plaintiffs' SDF ¶ 43, Ex. GG at 42; Ex. Z (Elhauge Rep. at ¶¶ 186-87) (internal quotation marks omitted). Plaintiffs concede that Defendants' SUF accurately explains the relationship between Dean and Suiza; however, Plaintiffs cite other facts which they contend further explain this relationship, including alleged agreements between DFA and Suiza that allowed DFA to either convert independent producers to DFA membership or required them to utilize DMS's marketing services. They note that in 2001, when Suiza sought to merge with Dean, the second largest dairy processor in the nation, the Department of Justice ("DOJ") expressed concerns regarding the merger. In the course of the DOJ discussions, DFA disclosed that it owned half of processor National Dairy Holdings ("NDH").

To address DOJ's concerns, the merger participants agreed to make certain concessions. DFA agreed to sell its interest obtained through the Suiza joint venture; DFA, Dean, and Suiza agreed that the Dean/Suiza entity would divest certain processing plants; DFA agreed not to control or have input into NDH's day-to-day operational decisions for NDH's processing plants (including decisions on customers, products, pricing, and bidding); DFA agreed to remove "most favored nations" provisions from some of its supply agreements; and the merger participants agreed there would be a carve-out for sixteen non-Order 1 processing plants (removing them from DFA and the merged entity's milk supply agreements). Plaintiffs' SDF ¶ 44, Exs. JJ, LL-OO.

Professor Elhauge opines that DFA violated each of these concessions. Plaintiffs' SDF ¶ 44, Ex. Z (Elhauge Rep. at ¶ 187) (listing DOJ's requirements and noting that "DFA and the combined Dean-Suiza entity nullified the protections that had been required by the DOJ").

For example, although Defendants' SUF accurately states that in April 2004 Hood acquired Crowley, Plaintiffs assert that when Hood purchased the Crowley processing plants, it also purchased additional processing plants from NDH. As part of Hood's acquisition of Crowley, DFA obtained a 22% ownership interest in Hood. Hood, in turn, entered into full supply and outsourcing agreements with DFA for the plants acquired from NDH. Plaintiffs contend this effectively conferred operational control over NDH to DFA.[6]

Similarly, although DFA agreed to divest its 33.8% stake in the Suiza joint venture, a 2003 internal memo noted that "Suiza Foods granted a full supply agreement to DFA at the time of the DFA-Suiza divestiture . . . with the expressed intent of making DFA the full, sole supplier to what would become the new Dean Foods." Plaintiffs' SDF ¶ 49, Ex. SS. An internal January 24, 2005 email sent to DFA's Corporate Finance Manager summarized the agreement as follows:

> DFA has 20 year contract to supply 100% of Dean Foods milk (other than plants currently under contract with another milk supplier). We currently supply roughly 2/3's of their milk need. Although it's a 20 year agreement, by consent decree, it is cancelable by Dean with one year notice BUT there is a significant payment due from them to us should they cancel.

Plaintiffs' SDF ¶ 49, Ex. UU.

---

[6] Professor Elhauge asserts that: "Despite DFA's representations to the DOJ that it did not control NDH, DFA in fact had substantial control of NDH's operations[.]" Ex. Z (Elhauge Rep. at ¶ 203 n.480) (citing DFA's 50% ownership of NDH with the other 50% held by "3 seasoned dairy industry executives," one of whom represented in a meeting that he and then-DFA CEO Gary Hanman "were NDH," as well as a September 2001 milk supply agreement whereby DFA would supply all of NDH's milk requirements, except for any existing contracts which would not be renewed) (internal citations and footnotes omitted).

Plaintiffs further proffer evidence that on January 1, 2002, DFA inserted the following most favored nation clause in all of its agreements with Dean's plants in the Northeast:

> In no event, shall the price charged by Seller to Buyer for Milk delivered to a particular Plant be higher than the lowest Milk price (giving effect to any applicable credits, including seven day receiving credits and credits for farm weights and tests) charged by Seller to any other comparable customer for sales located in the applicable market area of such Plant.

Plaintiffs' SDF ¶ 50, Ex. RR at 110. Professor Elhauge cites DFA's former CFO's testimony that the most favored nation clause was not favorable to DFA. He opines that, in contrast, it was beneficial to Dean because it prevented DFA from "exercis[ing] its monopoly power by engaging in price discrimination, raising raw milk prices to Dean Foods while continuing to offer DFA's own plants low raw milk prices." Plaintiffs' SDF ¶ 57, Ex. Z (Elhauge Rep. at ¶ 199). This, in turn, had a negative impact on price according to Professor Elhauge because DFA "would be incentivized to provide low raw milk prices to its own plants, which would then necessitate provision of those low prices to other processors." *Id.* DFA's Antitrust Policy acknowledges that "Antitrust concerns often arise when a supplier provides preferential treatment to less than all of its customers, for example through 'most-favored nation' clauses in milk supply agreements." Ex. B, Tab 2 at 780.

Professor Elhauge identifies a series of payments between DFA and Dean that "suggest[] that despite no obligation to do so, Dean Foods paid $28.45 million to DFA with the expectation that it would be repaid upon a maintenance of full supply agreements." Ex. Z (Elhauge Rep. at ¶ 196). Plaintiffs contend that DFA continued to make quarterly rebate payments to Dean from 2009 until at least June 2017. They identify over $70 million in payments to Dean/Suiza and Farmland which they contend were in exchange for an agreement not to compete for independent farmers' milk. Professor Elhauge opines that:

21

> Absent a conspiracy to lower raw milk prices by eliminating competition in purchasing raw milk from farmers and providing side payments to processors, giving DFA and DMS full control over the raw milk supply would be contrary to the independent interests of Suiza and Dean Foods because it would give DFA and DMS a monopoly that they could use to increase raw milk prices to processors [notwithstanding the fact that] Suiza and Dean Foods have long recognized that having an independent milk supply is more advantageous than sourcing through supply controlled by cooperatives.

Plaintiffs' SDF ¶ 53, Ex. Z (Elhauge Rep. at ¶ 197).

According to Plaintiffs, DFA has used its arrangement with Dean as a template for other processors. In a November 2004 presentation, DFA announced that the "Dean outsourcing agreement served as a predicate for subsequent outsourcing projects with NDH and Kraft, and others (most recently Hood-Rosenberger)[.]" Plaintiffs' SDF ¶ 59, Ex. B, Tab 32 at 703. Defendants also offered most favored nations pricing to three of their largest customers in the Northeast: Dean, HP Hood, and Kraft. In 2016, these three DFA/DMS customers accounted for 35% of DFA's milk sales in the Northeast. DFA also provides most favored nation pricing to its own processing plants, which accounted for 10% of the total milk sales in the Northeast for the same time period. Professor Elhauge opines that Defendants used most favored nations pricing to attract non-cooperative processors with lower prices at the processor level, which they offset with lower prices to dairy farmers for their milk.[7] He concludes that "[t]he use of [most favored nations clauses] thus contributes to the suppression of prices across Order 1." Plaintiffs' SDF ¶ 74, Ex. Z (Elhauge Rep. at ¶ 217).

Plaintiffs proffer evidence that throughout the alleged conspiracy, DFA invested not only in its own processing capacity at its own plants, but sought and obtained control of other processors through outsourcing agreements, citing not only the 2001 outsourcing agreement with milk processor Suiza (later acquired by Dean) but in addition a 2002 outsourcing agreement with Crowley; 2003 outsourcing agreements with Dean and Kraft,

---

[7] Professor Elhauge opines that these low prices do not negatively impact DFA because its financial performance as a cooperative depends only on the volume of raw Grade A milk sold by DFA members, not its price.

respectively; a 2004 outsourcing agreement with Hood (whereby DMS agreed to manage the supply chain from Hood's Crowley, Kemps, and Rosenberger plants); and a 2005 outsourcing agreement with Farmland coupled with a full supply agreement with a term exceeding one year whereby Farmland agreed not to compete or convert independent farmers to DFA/DMS in exchange for a $3.36 million payment.

Professor Elhauge opines that the effect of these outsourcing agreements was and is to allow Defendants to gain control over the collecting, hauling, testing, and pricing of raw Grade A milk so that the processor itself loses the ability to negotiate prices from multiple sources, including with independent producers. In this respect, he contends the outsourcing agreements function as non-competition agreements because they allow Defendants to control access to processors which, in turn, allows Defendants to require independent farmers to either join DFA, market through DMS, or risk having no processor for their perishable milk. Plaintiffs' SDF ¶¶ 75, 77-81, Ex. Z (Elhauge Rep. at ¶¶ 201, 218-223).

## C.    Full Supply Agreements.

Although Plaintiffs do not dispute the existence of the milk supply and sales agreements set forth in Defendants' SUF, they contend that each of these agreements is a full supply agreement with a term exceeding one year in violation of the 1977 Consent Decree which states: "Defendant is hereby enjoined and restrained from entering into or enforcing any Milk Sales Agreement containing a term in excess of one (1) year." Plaintiffs' SDF ¶ 69, Ex. B, Tab 4. They further cite DFA's Antitrust Policy which states: "Do not enter into milk supply agreements with processors for a period greater than one year." Plaintiffs' SDF ¶ 69, Ex. B, Tab 2, App'x B at 3. Plaintiffs assert that Defendants' position that a twelve-month cancellation notice period creates a one-year term evades both the letter and spirit of the Consent Decree. Plaintiffs' SDF at ¶ 69, Ex. B, Tab 8 (2/17/14 emails from Brad Keating to Sharad Mathur) ("By giving you the right to cancel anytime with a 12 month notice we are in compl[iance] with the consent decree[.]").

Plaintiffs allege that the following agreements are full supply agreements[8] with terms that exceed one year:

(1) From October 1, 2006 to September 30, 2009, DMS entered into a Milk Supply Agreement with its customer milk processor Euphrates with a three-year term. In the case of the Euphrates Milk Supply Agreement, the language in question states:

> The initial term ("Initial Term") of this Agreement shall commence on October 1, 2006 and shall, unless earlier terminated as provided herein, continue through September 30, 2009. This Agreement shall automatically renew for additional three-year periods (each a "Renewal Term") beginning October 1 of each renewal period. Notwithstanding anything contained herein to the contrary, either party may terminate this Agreement at any time, including but not limited to the Initial Term or any subsequent Renewal Term by providing the other party written notice twelve (12) months prior to the date of termination.

Plaintiffs' SDF ¶ 69, Ex. B, Tab 10 at 1;

(2) DMS and Kraft entered into a 2003 full supply agreement for Kraft's plants in the Northeast which states: "The term of this Agreement shall be for ten (10) years beginning September 1, 2003." Plaintiffs' Ex. B, Tab 6 at 2. The agreement includes a most favored nations clause. A second agreement for the time period between June 1, 2014 and May 31, 2017 between Kraft and DFA/DMS was for a term of three years. Plaintiffs' Ex. B, Tab 7 at 5;

(3) DMS and Worcester Creameries entered into a two-year (October 1, 2011- September 30, 2013) full supply agreement for rBST-free kosher milk. Plaintiffs' Ex. B, Tab 5. This agreement does not contain a right to cancel the agreement with twelve months' notice;

(4) DMS and Great Lakes Cheese entered into a full supply agreement with a five-year term (April 1, 2009-March 31, 2014). Plaintiffs' Ex. B, Tab 11 at 2;

---

[8] Although both Plaintiffs and Professor Elhauge contend that the identified agreements are "full supply agreements" whereby DMS agreed to supply the processor with all the milk it requires, the terms of some of the agreements do not permit the court to make that determination without additional information.

(5) DMS entered into a full supply agreement with its customer Fage for a four-year term (January 1, 2018-December 31, 2022). Plaintiffs' Ex. GGG at 2;

(6) DFA entered into a series of full supply agreements with HP Hood with a term of ten years (April 1, 2018-March 31, 2028) which included most favored nations pricing. Plaintiffs' Ex. B, Tab 182;

(7) DMS and Dairylea entered into a 90% supply agreement with Turkey Hill for a term of two years (May 1, 1998-April 30, 2000). Plaintiffs' Ex. II;

(8) DMS and Chobani/Agro-Farma entered into a full supply agreement with a four-year term (January 1, 2007-December 31, 2010). Plaintiffs' Ex. B, Tab 12;

(9) DMS and Farmland entered into an outsourcing agreement with a five-year term (July 1, 2005-June 30, 2010). Plaintiffs' Ex. B, Tab 9; and

(10) DMS entered into a full supply agreement with its customer Sorrento for a three-year term (February 1, 2009 and January 31, 2012). Plaintiffs' Ex. B, Tab 13.

Plaintiffs note that as part of the *Allen* class action settlement, Defendants agreed not to enter into any new full supply agreements in Order 1 for four years. They contend that nonetheless on February 1, 2017, DFA entered into a new, two-year term full supply agreement with Dean for its Lansdale, Pennsylvania plant. Plaintiffs' SDF ¶ 71, Ex. B, Tab 31 at 1 ("Effective February 1, 2017, DFA will assume 100% of Lansdale, PA supply").[9]

---

[9] Professor Elhauge describes DFA's agreement with Dean as follows:

> In 2015 defendants settled a class action that, similar to the present case, alleged that defendants conspired to suppress farmer pay prices in Order 1. As part of that settlement, defendants agreed that they would not enter into any new full supply agreements for four years. Nevertheless, in January 2017, DFA entered into a full supply agreement with Dean Foods for its Lansdale, Pennsylvania plant. The agreement, which became effective on February 1, 2017, was for a two year term. Prior to that agreement, Lansdale had received 60% of its milk from DFA and the other 40% from Maryland-Virginia Milk Producers Cooperative Association (MDVA). Following the agreement, DFA took over full supply to the plant.

Plaintiffs' Ex. Z (Elhauge Rep. at ¶ 214) (footnotes omitted).

## D. Defendants' Alleged Retaliation and Threats Against Independent Producers as Part of an Effort to Convert Them to DFA/DMS.

Plaintiffs claim that in 2017 Defendants engaged in a plan to force independent farmers to join DFA and thereby eliminate any remaining potential for competition for those farmers' milk supply while cutting off their access to services they needed to bring their milk to market. According to Professor Elhauge:

> Defendants . . . implemented a scheme to coerce the farmers who were independent or sold raw milk through other cooperatives to have to join DFA in order to still have outlets for their raw milk. By doing so, DFA could further eliminate any remaining potential for competition for milk supply from the independent coops and farmers. This agreement also enabled DFA to further increase its capital via the capital retains required of new members. By coercing these independent farmers to join DFA as dues paying members, DFA accomplished two goals. First, it eliminated potential competition in the Northeast. Second, it increased its retained equity, which could then be used to finance new acquisitions of commercial investments and grow its empire.

Plaintiffs' SDF ¶ 76, Ex. Z (Elhauge Rep. at ¶ 7).

In support of his opinion, Professor Elhauge points to a January 19, 2017 letter which DMS sent to approximately 794 independent farmers, informing them that it would "de-pool portions, or all, of [their] milk supplies[,]" and advising that they could either "explore other marketing options"[10] or "join a cooperative within the DMS milk marketing system." Plaintiffs' SDF ¶ 77, Ex. B, Tab 37. In March 2017, DMS sent a second letter to independent farmers, advising that it would be sending a notice of termination and that "[i]f you can't find another market, DFA will offer you membership and will continue to market your milk." Plaintiffs' SDF ¶ 80, Ex. B, Tab 38. Plaintiffs contend that because of this "independent plan" DFA's membership increased by 40% in a single year. Plaintiffs' SDF ¶ 77.

---

[10] In his deposition, DMS's CEO Brad Keating could not identify any cooperatives or processors in the Northeast that were accepting new members or additional milk in 2017. Plaintiffs' SDF ¶ 79, Ex. A, Tab 8 (2018 Keating Dep. at 97-108). Likewise, a DFA board member testified that "anybody who was looking to find an independent market to take them probably couldn't find one." Plaintiffs' SDF ¶ 79, Ex. A, Tab 27 (Bikowsky Dep. at 170).

On March 28, 2017, DMS terminated the remaining independent farmers, advising that "the last date that DMS will pick up your milk will be October 31, 2017." Plaintiffs' SDF ¶ 80, Ex. B, Tab 38. When asked whether "DMS was advising the independent farmers that at some point it was no longer going to pick up their milk unless they joined DFA[,]" a DFA board member testified: "That would be correct." Plaintiffs' SDF ¶ 80, Ex. A, Tab 27 at 166-67. Of the 794 independent farmers that were terminated by DMS, 630 joined DFA as members.[11]

Plaintiffs assert that as part of Defendants' alleged effort to force independent dairy farmers under the DFA/DMS umbrella, beginning in November 2016 and throughout 2017, DMS terminated its marketing agreements with all participating cooperatives (approximately sixteen cooperatives) which caused some of those cooperatives to either dissolve or join DFA. DFA then shut down DMS because it no longer needed DMS to operate as a separate milk marketing company. Claiming Defendants' reasons for doing so were pretextual, Plaintiffs cite Professor Elhauge's explanation of Defendants' economic motive for driving the independent milk supply to sell through DFA and for paying DFA's members lower prices for their milk:

> Generally, a cooperative that only makes its money from marketing the raw milk of its farmers, and engages in no other lines of business, will be motivated to secure the highest practical price for its members' milk. However, DFA is also heavily invested in the dairy process business: . . . DFA's "Milk Marketing" segment is distinct from its "Commercial Investments" segment, with the latter involved in an array of dairy processing operations. . . . [T]hese dairy processing activities benefit from *lower* raw milk prices, because those dairy processing operations utilize raw milk as an input. This creates an inherent conflict and motivation for DFA to suppress milk prices.

---

[11] In paragraphs 90-92 of the SDF, Plaintiffs proffer evidence of Defendants' threats to and retaliation against independent farmers who resisted pressure to join DFA/DMS. This evidence, which otherwise appears to consist of hearsay, may be admissible for its effect on the independent farmers' state of mind. *See United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013) ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay. Thus, a statement offered to show its effect on the listener is not hearsay.") (citation, alteration, and internal quotation marks omitted).

In an October 2000 memo, Rick Smith (then-Dairylea-CEO and current DFA CEO) wrote to Gary Hanman (then-DFA-CEO) that "just like in operating fluid plants, there is a conflict of interest in selling your own milk to your own manufacturing facilities." Rick Smith explained the conflict . . . during a lawsuit against DFA in the Southeast Order [wherein] he testified that when operating a fluid milk plant that is its own processor, one wants to buy raw milk at the cheapest price, but a cooperative acting on behalf of farmers selling raw milk wants to sell that raw milk at the highest price. Similarly, Alan Bernon (former owner and operator of milk processor Garelick Farms, former President of milk processor Dean Foods Group, and current DFA Senior Advisor of Mergers and Acquisitions) testified that a processor always wants to pay the lowest possible price for the best quality milk. Bernon was also asked about multiple DFA acquisitions from 2010 to 2017, including Kemps, Cass Clay, Guida, DairyMaid, Oakhurst, and Cumberland Dairy (all of which are milk processors); for each of these acquisitions, Bernon admitted that it was in the best interest of these DFA entities to pay the lowest price for the best quality of raw milk. He further stated that: "I think that's true of all these transactions that are processing milk." Thus, DFA's "Commercial Investments" segment will be more profitable when raw milk prices are lower.

. . .

A reduction in the raw milk prices that DFA receives as a seller of raw milk also does not reduce DFA's net income from selling raw milk less than it could benefit DFA's net income as a processor of raw milk. This is because DFA's income statements show that its net income from the sale of members' raw milk has been a fixed [redacted] cents per cwt for at least the last ten years, even though the raw milk prices paid to its members have ranged from $13.05 to $24.17 per cwt during this period. Thus, any decreases in raw milk prices paid by processors are passed through to members, and DFA's financial performance as a raw milk cooperative depends only on the *volume* of raw milk sold by DFA members, not the raw milk prices. In contrast, reducing raw milk prices directly increases DFA's profit per unit as a processor. Accordingly, DFA as an entity financially benefits from reducing raw milk prices (which increases its profits per unit as [a] processor without affect[ing] its profits per unit as a cooperative raw milk seller), while maintaining as much raw milk volume as possible (by driving farmers to have to sell through DFA).

Plaintiffs' SDF ¶ 99, Ex. Z (Elhauge Rep. at ¶¶ 129-30, 133)[12] (footnotes omitted); *see also* Plaintiffs' SDF ¶ 98, Ex. KKK at 77 (DFA's 2015 Financial Report stating: "Lower milk and other dairy commodity prices during 2015 led to an increase in net income from our commercial investments . . . over the prior year."). DFA's Antitrust Guidelines caution:

> Do not agree to more favorable terms for processing plants which are partially owned by DFA which are not justified by market conditions. In other words, do not favor processor profitability over raising or maintaining producer milk prices.

Plaintiffs' SDF ¶ 100, Ex. B, Tab 2 at 95.

Plaintiffs proffer admissible evidence from which a rational jury could conclude that DFA management favored growth of its commercial operations and empire building over the interests of its farmer-members, including through executive compensation and benefits which were not fully disclosed to DFA members and improper payments to DFA Board Members and Area Council Members.[13]

---

[12] Professor Elhauge qualifies his opinion as follows:

> I am not claiming that DFA's farmer-members do not benefit from higher raw milk prices. I am merely noting that DFA's financial performance at the cooperative-entity-level (as reflected on DFA's own income statements) show that its raw milk sales profitability (at the cooperative-entity-level) is tied only to volume, not price. And that therefore, DFA's overall per-unit profitability (at the cooperative-entity-level) can only rise as raw milk prices fall.

Plaintiffs' SDF ¶ 99, Ex. Z (Elhauge Rep. at ¶ 133 n.261).

[13] In 2001 then-DFA CEO Hanman "played a role in arranging for the unauthorized transfer of money, to be paid through a DFA affiliate, to [a] former DFA Board Chairman [who] received $1,000,000. This transaction was not approved by DFA's Board of Directors." Plaintiffs' SDF ¶ 112, Ex. VVV (internal quotation marks omitted). Rick Smith, DFA's current CEO, acknowledged that this was an "inappropriate payment" that violated DFA's policies. *Id.*, Ex. A, Tab 1 at 36. An Area Council member similarly received unauthorized and improper payments for more than four years that were neither disclosed to nor approved by DFA's board. *Id.*, Ex. WW at 28.

### E. Identity of Alleged Co-Conspirators and the Nature and Timing of their Alleged Participation in the Conspiracy.

Based on the foregoing, Plaintiffs assert that an alleged conspiracy created and maintained by Defendants in Order 1 involved the following alleged co-conspirators:

**Alleged Co-Conspirators at the Cooperative Level**

(1)     Dairylea (from pre-2005 until Dairylea's merger with DFA in 2014) based on an alleged agreement not to compete for farmers with DFA, St. Albans, and other cooperatives marketing through DMS; agreements to share the prices it and rival cooperatives paid to farmers; and an agreement to set the prices paid to independent farmers affiliated with DFA and Dairylea;

(2)     St. Albans (pre-2005 to the present) based on alleged agreements not to compete for farmers with DFA, Dairylea, and other cooperatives marketing through DMS; verbal and written non-solicitation agreements; and, as a member of DMS, a party to the mutual exchange of farmer pay prices among DMS cooperatives;

(3)     Agri-Mark (pre-2005 to the present) based on an alleged agreement not to compete for farmers with DFA, Dairylea, and other cooperatives marketing through DMS; verbal and written non-solicitation agreements; and, as a member of DMS, a party to the mutual exchange of farmer pay prices among DMS cooperatives;

(4)     Land O'Lakes (2004 to the present) through an alleged agreement not to compete for farmers with cooperatives marketing through DMS; a non-solicitation agreement; and as a party to the mutual exchange of farmer pay prices among DMS cooperatives; and

(5)     MDVA (pre-2005 to the present) based on the alleged mutual sharing of information regarding farmer pay prices with DFA, Land O' Lakes, and other cooperatives, and a 2005 non-solicitation agreement.

**Alleged Co-Conspirators at the Processor Level**

(6)     Dean Foods/Suiza (pre-2005 to the present) based on alleged full supply agreements, outsourcing agreements, most favored nations clauses, and side payments not to compete;

(7)     Farmland (2005 to the present) based on an alleged full supply agreement, outsourcing agreements, most favored nations clauses, and side payments not to compete;

(8)     HP Hood (2004 to the present) based on alleged full supply agreements, outsourcing agreements, most favored nations clauses, and side payments not to compete;

(9)     Kraft (2003 to the present) based on alleged full supply agreements, outsourcing agreements, most favored nations clauses, and side payments not to compete;

(10)    Wawa, Cumberland Dairy, Chobani, Empire Cheese, and Schneider Valley Farms Dairy based on alleged explicit agreements not to solicit DMS members;

(11)    Queensboro based on an alleged unwritten agreement not to solicit DMS members;

(12)    Elmhurst, Worcester Creameries, Fage, Great Lakes Cheese, Chobani, and Sorrento based on alleged full supply agreements; and

(13)    To the extent that any of the alleged co-conspirators (including DFA, Agri-Mark, and MDVA) own processing plants in the Northeast, Plaintiffs contend that the volume from these plants is included in the alleged conspiracy.

### F.     Defendants' Alleged Market Share, Monopsony Power, and Suppression of Prices in Order 1.

Professor Elhauge opines that Defendants have a market share of 50%[14] and that, when coupled with market conditions in Order 1, Defendants likely have monopsony power even in the absence of their co-conspirators. If Defendants' market share is combined with that of the other alleged co-conspirators, Professor Elhauge opines that from 2005 to 2017, the conspirators' market share in Order 1 ranged from 61.9% to 75.8%.

Professor Elhauge opines that market characteristics contributing to Defendants' monopsony power include: the high barriers to market entry based on the significant cost of constructing milk processing plants; the history of plant closures; the lack of dairy farmers in Order 1 that both produce milk and own their own Class I distributing facility; the need to access balancing plants that accept excess milk supply; and the inelasticity in milk pricing whereby production is relatively non-responsive to changes in price.

---

[14] Plaintiffs explain: "Defendants' market share is a simple mathematical calculation that is derived from Defendants' own data -- the volume of non-organic raw milk (in pounds) pooled on Order 1 by Defendants, divided by the total volume of milk pooled on Order [1]." (Doc. 102 at 40) (citing Plaintiffs' SDF ¶¶ 128-29). They further observe: "Defendants have calculated their own market share in the Northeast as between 40% and 56% depending on the year." *Id.* at 41 (citing Plaintiffs' SDF ¶ 133) (emphasis omitted).

Professor Elhauge conducted a regression analysis in which he compared the over-order premiums paid to dairy farmers in Order 32 (which is uncontaminated by the alleged conspiracy) with the over-order premiums in Order 1 for the same time period to determine the impact of the alleged conspiracy on those premiums. He claims his regression analysis demonstrates actual suppression across Order 1 by Defendants of $0.78 per hundredweight of raw Grade A milk. According to Professor Elhauge, because the alleged conspiracy has marketwide impact, individual farmer characteristics are not important. In his deposition testimony, he opined:

> [I]f I had an individual farmer case, I'd do exactly the same regression to estimate their injury, and it would be 78 cents. It would be no different if there was just one farmer or all the farmers, because it's a marketwide harm, it's not an individual harm. It's an antitrust case, not a tort case.
>
> . . .
>
> The individual farmer characteristics are the same in the but-for world and in the actual world. So variation among the farmers doesn't matter. If you're a farmer that would have received a higher price in the actual world relative to the average farmer, you also would receive a higher price relative to the average in the but-for world. So the suppression of prices, marketwide prices by 78 cents would apply across the board to all the farmers.

Plaintiffs' SDF ¶ 144, Ex. A, Tab 33 (2018 Elhauge Dep. at 195-97). Plaintiffs contend that their total damages are "at least $26.9 million through January 2017 alone." Plaintiffs' SDF ¶ 145 (citing Ex. Z (Elhauge Rep. at ¶¶ 234-71)).

## IV.   Conclusions of Law and Analysis.

### A.   Standard of Review.

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' . . . if it 'might affect the outcome of the suit under the governing law.'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 39-40 (quoting *Anderson*, 477 U.S. at 248). The court

32

"constru[es] the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in his favor." *McElwee v. Cty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012).

The moving party always "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). When the moving party has carried its burden, its opponent must produce "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (internal quotation marks omitted).

In this case, a multitude of facts are disputed. That alone, however, will not preclude summary judgment because not all disputes of fact are material – "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## B. The Nature of Plaintiffs' Claims.

Plaintiffs are dairy farmers in Order 1 who allege Defendants conspired with cooperative co-conspirators as well as processor co-conspirators to depress prices paid to dairy farmers for their raw Grade A milk.[15] Each of Plaintiffs' four claims sound in

---

[15] Defendants assert Plaintiffs are pursuing a "new theory" (Doc. 92 at 7) in which "[t]hey boldly claim that DFA orchestrated a single conspiracy for the entire thirteen-year period at issue in this case among the cooperatives and processors that were also mentioned as conspirators in *Allen*." *Id.* at 6. Plaintiffs counter that they are instead "pursuing the *same claims* (supported by the same evidence) that the [c]ourt ruled were sufficient to proceed to trial [in *Allen*]." (Doc. 102 at

33

monopsony. "[A] monopsony is to the buy side of the market what a monopoly is to the sell side[,]" and thus "[m]onopsony power is market power on the buy side of the market." *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 320 (2007). A monopsony may exist when purchasers of raw Grade A milk exert unlawful control over where producers of that milk can either sell their product or the price at which they can sell it. *See Sony Elecs., Inc. v. Soundview Techs., Inc.*, 157 F. Supp. 2d 180, 184 (D. Conn. 2001) (explaining that a monopsony is "an arrangement where a buyer uses its market share power to reduce the purchase price of goods" from a seller or sellers). "The kinship between monopoly and monopsony suggests that similar legal standards should apply to claims of monopolization and to claims of monopsonization." *Weyerhaeuser Co.*, 549 U.S. at 322.

Because this case involves agricultural cooperatives, the Capper-Volstead Act shields certain activities from antitrust liability. "The Capper-Volstead Act removed from the proscription of the antitrust laws cooperatives formed by certain agricultural producers that otherwise would be directly competing with each other in efforts to bring their goods to market." *Nat'l Broiler Mktg. Ass'n v. United States*, 436 U.S. 816, 822 (1978) (footnote omitted). It therefore "gives farmers the right to combine into cooperative monopolies." *Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037, 1040 (2d Cir. 1980). As a result, "[i]t is not a violation of the Sherman Act for the members of an agricultural cooperative to carry out the legitimate objectives of their association which follow naturally from their attempts to achieve unity of effort and the voluntary elimination of competition among themselves." *Id.* at 1045. However, the Capper-Volstead Act does not extend immunity for conduct "outside the 'legitimate

---

8.) Both parties are correct. Plaintiffs' claims have been winnowed from the claims presented in *Allen* and are supported by new and additional evidence explained in Professor Elhauge's 173-page expert witness report. Professor Elhauge reaches conclusions regarding the anticompetitive impact of some of Defendants' alleged anticompetitive conduct that the *Allen* class action plaintiffs' expert witness did not. However, in essence, Plaintiffs' claims are grounded in the same theories at issue in *Allen*—a multifaceted conspiracy that operates at both the cooperative and processor levels of the market.

objects' of a cooperative[,]" including restraining or monopolizing trade, or suppressing competition. *Md. & Va. Milk Producers Ass'n v. United States*, 362 U.S. 458, 468 (1960) (internal quotation marks omitted); *see also Fairdale Farms, Inc.*, 635 F.2d at 1044 ("Of course, a cooperative may neither acquire nor exercise monopoly power in a predatory fashion by the use of such tactics as . . . harassment, . . . coerced membership, and discriminatory pricing.") (citations omitted).

## C. Defendants' Motion for Summary Judgment.

Defendants advance three arguments in support of summary judgment in their favor. First, they claim that Plaintiffs seek to establish a hub-and-spoke conspiracy but have not alleged a rim to the wheel because they have proffered no evidence that the alleged co-conspirators conspired with each other. In the absence of a hub-and-spoke conspiracy, Defendants claim Plaintiffs' single conspiracy claims set forth in Counts I and IV of the RFAC must fail.

Defendants further argue that even if Plaintiffs could establish a single conspiracy, they cannot establish that each Plaintiff suffered antitrust impact—that is, an individualized injury in addition to any injury to competition. Without antitrust impact, Defendants argue that Plaintiffs cannot present their claims to a jury.

Finally, Defendants assert that Plaintiffs' attempted monopsony and monopsony claims in Counts II and III of the RFAC do not survive summary judgment because Plaintiffs cannot establish Defendants' monopsony power in Order 1 or a dangerous probability that Defendants would achieve it. Even if Plaintiffs could overcome this hurdle, Defendants contend that Plaintiffs cannot further establish that Defendants' monopsony power was acquired by predatory means as required by the Capper-Volstead Act.

## D. Whether Plaintiffs Can Establish the Elements of a Conspiracy Under Sections 1 and 2 of the Sherman Act (Counts I and IV).

Defendants argue that in order for Plaintiffs to prevail on their conspiracy claims in Counts I and IV of the RFAC, Plaintiffs must prove that the alleged conspiracy's participants conspired not only with Defendants, but with each other. In other words,

Defendants contend that in order to prove a "hub-and-spoke" conspiracy, Plaintiffs are required to prove that there is a "rim to the wheel." (Doc. 92 at 12.) Plaintiffs respond that they have no intention of establishing a hub-and-spoke conspiracy.

In order to understand the nature and requirements of a hub-and-spoke conspiracy, it is helpful to place this construct within the framework of the nation's antitrust laws. "The antitrust laws of the United States aim to protect consumers by maintaining competitive markets." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1191 (9th Cir. 2015).

> To establish a § 1 violation [of the Sherman Act], a plaintiff must produce evidence sufficient to show: (1) a combination or some form of concerted action between at least two legally distinct economic entities; and (2) such combination or conduct constituted an unreasonable restraint of trade either *per se* or under the rule of reason.

*Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 95-96 (2d Cir. 1998). The elements of a conspiracy to monopsonize under Section 2 of the Sherman Act are: "(1) proof of a concerted action deliberately entered into with the specific intent to achieve an unlawful monopoly, and (2) the commission of an overt act in furtherance of the conspiracy." *Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 795 (2d Cir. 1987) (internal quotation marks omitted).

A Section 1 violation "is legally distinct from that under § 2" although "the two sections overlap in the sense that a monop[sony] under § 2 is a species of restraint of trade under § 1." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940). "[T]he same kind of predatory practices may show violations of [both sections]." *Md. & Va. Milk Producers Ass'n*, 362 U.S. at 463.

Market participants that engage in the same behavior do not thereby engage in a conspiracy. As the Second Circuit recently explained:

> [P]arallel behavior that does not result from an agreement is not unlawful even if it is anticompetitive. Accordingly, to prove an antitrust conspiracy, a plaintiff must show the existence of additional circumstances, often referred to as "plus" factors, which, when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy.

These additional circumstances can, of course, consist of direct evidence that the defendants entered into an agreement like a recorded phone call in which two competitors agreed to fix prices. But plaintiffs may also present circumstantial facts supporting the *inference* that a conspiracy existed. Circumstances that may raise an inference of conspiracy include a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications. Parallel conduct alone may support an inference of conspiracy, moreover, if it consists of complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason.

. . . Thus, a finding of conspiracy requires evidence that tends to exclude the possibility that the defendant was acting independently. This requirement, however, does not mean that the plaintiff must disprove all nonconspiratorial explanations for the defendants' conduct; rather, the evidence need only be sufficient to allow a reasonable fact finder to infer that the conspiratorial explanation is more likely than not.

*United States v. Apple, Inc.*, 791 F.3d 290, 315 (2d Cir. 2015) (citations, alteration, and internal quotations marks omitted).

The Supreme Court has recognized that certain horizontal agreements "always or almost always tend to restrict competition and decrease output.'" *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d at 1191 (quoting *Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 19-20 (1979)). "Such inherently anticompetitive horizontal agreements violate the Sherman Act per se." *Id.* "Once the agreement's existence is established, no further inquiry into the practice's actual effect on the market or the parties' intentions is necessary to establish a § 1 violation." *Id.* (citing *N. Pac. Ry. v. United States*, 356 U.S. 1, 5 (1958)).

"*Per se* treatment is appropriate '[o]nce experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it.'" *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) (citation omitted). However, the Supreme Court has "expressed reluctance to adopt *per se* rules with regard to 'restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious.'" *Id.* (quoting *FTC v. Ind. Fed'n of Dentists*, 476

U.S. 447, 458-59 (1986)). As a result, *per se* treatment is generally reserved for restraints of trade that are so "manifestly anticompetitive" that its "pernicious effect on competition and lack of any redeeming virtue [is] conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm [it has] caused or the business excuse for [its] use." *Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 50 (1977) (footnote and internal quotation marks omitted).

For non-*per se* violations, courts examine restraints of trade under the rule of reason. *See Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 726 (1988).

> Under this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition. Appropriate factors to take into account include specific information about the relevant business and the restraint's history, nature, and effect. Whether the businesses involved have market power is a further, significant consideration. In its design and function the rule distinguishes between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest.

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885-86 (2007) (citations and internal quotation marks omitted).

If "the plaintiff satisfies its threshold burden of proof under the rule of reason, the burden shifts to the defendant to offer evidence of the pro-competitive 'redeeming virtues' of their combination." *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993). Defendants must "persuade the jury that [their] conduct was justified by any normal business purpose." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 608 (1985). Courts have recognized that not all business purposes will suffice:

> In general, a business justification is valid if it relates directly or indirectly to the enhancement of the consumer welfare. Thus, pursuit of efficiency and quality control might be legitimate competitive reasons[,] . . . while the desire to maintain a monopoly market share or thwart the entry of competitors would not.

*Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1183 (1st Cir. 1994), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010); *see*

*also LePage's Inc. v. 3M*, 324 F.3d 141, 163 (3d Cir. 2003) (observing that "a defendant's assertion that it acted in furtherance of its economic interests does not constitute the type of business justification that is an acceptable defense to § 2 monopolization. Paraphrasing one corporate executive's well publicized statement, whatever is good for 3M is not necessarily permissible under § 2 of the Sherman Act"). Assuming a defendant comes forward with proof of a pro-consumer business justification, "the burden shifts back to plaintiff for it to demonstrate that any legitimate collaborative objectives proffered by defendant could have been achieved by less restrictive alternatives, that is, those that would be less prejudicial to competition as a whole." *Capital Imaging Assocs.*, 996 F.2d at 543. "Ultimately, it remains for the factfinder to weigh the harms and benefits of the challenged behavior." *Id.*

Defendants seek judgment as a matter of law because Plaintiffs cannot establish a hub-and-spoke conspiracy. "In analyzing the reasonableness of an agreement under § 1, the Supreme Court has distinguished between agreements made up and down a supply chain, such as between a manufacturer and a retailer ('vertical agreements'), and agreements made among competitors ('horizontal agreements')." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d at 1191. "But the line between horizontal and vertical restraints can blur. One conspiracy can involve both direct competitors and actors up and down the supply chain, and hence consist of both horizontal and vertical agreements." *Id.* at 1192. "[O]ne such hybrid form of conspiracy [is] sometimes called a 'hub-and-spoke' conspiracy." *Id.*

The Second Circuit has described a hub-and-spoke conspiracy as consisting of "both vertical agreements between the hub and each spoke and a horizontal agreement among the spokes to adhere to the [hub's] terms, often because the spokes would not have gone along with [the vertical agreements] except on the understanding that the other [spokes] were agreeing to the same thing." *Apple, Inc.*, 791 F.3d at 314 (internal quotation marks omitted). A "rimless wheel" conspiracy is one in which "various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's

involvement in each transaction." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th Cir. 2002). The purpose of a hub-and-spoke analysis is to determine whether each co-conspirator "spoke" can be held liable for the anticompetitive conduct of the "hub," whether the "hub" is liable for the conduct of the "spokes," and whether each co-conspirator is responsible for the foreseeable anticompetitive conduct of the "wheel." *See Apple, Inc.*, 791 F.3d at 322 (observing that "the Supreme Court and our Sister Circuits have held all participants in 'hub-and-spoke' conspiracies liable when the objective of the conspiracy was a *per se* unreasonable restraint of trade"); *see also United States v. Diaz*, 176 F.3d 52, 99 (2d Cir. 1999) (holding "a jury may find a conspirator can be held responsible for the substantive [anticompetitive acts] committed by his co-conspirators to the extent those [acts] were reasonably foreseeable consequences of acts furthering the unlawful agreement, even if [the conspirator] did not himself participate in [those acts].") (internal quotation marks omitted).

Defendants urge this court to follow *Dickson* and find that Plaintiffs are precluded from establishing a single conspiracy because they cannot establish that the alleged co-conspirator cooperatives and processors conspired *with each other*. Plaintiffs counter that *Dickson* has no precedential value in the Second Circuit, was decided by a divided panel of the Court of Appeals for the Fourth Circuit, and is inapposite.

In *Dickson*, the court considered whether a debtor in bankruptcy could bring class action claims for an alleged antitrust conspiracy against personal computer manufacturers and Microsoft Corporation, an operating system manufacturer. The majority affirmed the district court's dismissal of the conspiracy claims at the pleading stage as a "rimless wheel." *Dickson*, 309 F.3d at 203. It found the complaint failed to allege a hub-and-spoke conspiracy because it "alleged discrete conspiracies," named multiple defendants, and "[c]onsequently, the district court correctly determined that it could not consider the cumulative harm" based on "multiple conspiracies between the common defendant and each of the other defendants." *Id.* at 210, 203. This, in turn, prompted the majority to find that there was "no basis . . . for concluding that either of the two licensing

agreements at issue, when considered individually, are likely to foreclose a significant share of the relevant software markets." *Id.* at 209. The majority reasoned that:

> [E]ach licensing agreement must be treated as a separate conspiracy, and only acts taken in furtherance of that alleged conspiracy are appropriately considered in determining the adverse effects of the claimed restraints on trade, not acts of one conspirator taken in furtherance of other possible, distinct conspiracies. *Cf. United States v. Bonetti*, 227 F.3d 441, 447 (4th Cir. 2002) (noting, in a criminal conspiracy, that a co-conspirator is liable for "all substantive offenses of his co-conspirator that are both reasonably foreseeable and in furtherance of the conspiracy"); *cf. also United States v. Santiago*, 906 F.2d 867, 872-73 (2d Cir. 1990) (concluding that the single conspiracy test applies to determine whether co-conspirator conduct is reasonably foreseeable and in furtherance of the conspiracy); *United States v. Gooden*, 892 F.2d 725 (8th Cir. 1989) (same). Indeed, to hold otherwise would be to suggest that the distinction between a single conspiracy and multiple conspiracies involving a common defendant is one without a difference.

*Id.* at 211.

The dissent in *Dickson* observed that "[t]he majority makes its first error when it rejects [the complaint's] allegations of a single conspiracy" *id.* at 216, because "[t]he law has been clear that there need not be an express agreement between every conspirator in order for a single conspiracy to be formed." *Id.* at 217.[16] The dissent reasoned that, to the extent the putative class "intends to rely on market power to demonstrate the likelihood of significant anticompetitive effects, the relevant issue is whether the *conspiracy* had market power in the [relevant] markets," not whether the co-conspirators independently had that power. *Id.* at 219; *see also Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 225 (5th Cir. 2001) (observing that "the reason for

---

[16] The *Dickson* dissent cited well-established authority for this conclusion. *See Dickson v. Microsoft Corp.*, 309 F.3d 193, 217 (4th Cir. 2002) (Gregory, J., dissenting) (citing *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 227 (1939) ("[I]t is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators."); *United States v. Masonite Corp.*, 316 U.S. 265, 275 (1942) ("Here, as in *Interstate Circuit*, . . . [i]t was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it"); *United States v. Tillett*, 763 F.2d 628, 632 (4th Cir. 1985) (stating that plaintiff must show that each alleged conspirator "participated in the conspiracy with knowledge of the essential nature of the plan")).

41

looking at market power is to determine whether the *combination or conspiracy*, not each individual conspirator, has the power to hurt competition in the relevant market) (emphasis supplied); *Ind. Fed'n of Dentists*, 476 U.S. at 460 ("[T]he purpose of the inquiries into market definition and market power is to determine whether an *arrangement* has the potential for genuine adverse effects on competition") (emphasis supplied).

In contrast, Plaintiffs here do not allege several conspiracies and do not allege claims against multiple defendants. In addition, unlike the plaintiffs in *Dickson*, they affirmatively rely on the aggregate impact of the alleged conspiracy's conduct and its aggregate market share and market power in Order 1. *Dickson* is thus distinguishable.[17] Even if it were not, Plaintiffs concede that they cannot establish a hub-and-spoke conspiracy, nor do they seek to do so. Although Defendants insist that Plaintiffs are either confined to establishing a hub-and-spoke conspiracy or are left with a "rimless wheel" which precludes them from establishing a single conspiracy, antitrust jurisprudence is neither so rigid, nor so formulaic. *See In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d at 1192 ("Of course, homespun metaphors for complex economic activities [such as a hub-and-spoke] go only so far. Section 1 prohibits agreements that unreasonably restrain trade, no matter the configuration they take or the labels we give them.") (footnote omitted); *see also Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC*, 148 F.3d 1080, 1087 (D.C. Cir. 1998) ("Anticompetitive conduct can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties").

---

[17] The Ninth Circuit considered *Dickson* in *William O. Gilley Enterprises, Inc. v. Atlantic Richfield Co.*, 561 F.3d 1004 (9th Cir. 2009) ("*Gilley I*"), an opinion it withdrew and superseded when it determined that the plaintiffs' claims were barred by *res judicata*. *See William O. Gilley Enters., Inc. v. Atl. Richfield Co.*, 588 F.3d 659 (9th Cir. 2009) ("*Gilley II*"). Although of no precedential value in the Ninth Circuit or elsewhere, the Ninth Circuit's *Gilley I* decision concluded that the aggregation of claims involving multiple participants is permissible and that "*Dickson* is distinguishable from the present case, as the plaintiffs here do expressly allege that each Defendant's agreements considered in the aggregate have anticompetitive effects." *Gilley I*, 561 F.3d at 1012. This case presents the same grounds for distinguishing *Dickson*.

Because Plaintiffs do not argue to the contrary, to the extent Defendants seek summary judgment in their favor that Plaintiffs have not and cannot establish a hub-and-spoke conspiracy as a matter of law, Defendants' motion is GRANTED.

## E.    Whether Plaintiffs Can Establish an Alternative Form of Conspiracy.

Defendants argue that in the absence of a hub-and-spoke conspiracy, Plaintiffs are required to prove that each bilateral agreement between DFA and each alleged co-conspirator cooperative and processor independently violated Section 1 (Count IV) or Section 2 (Count I) of the Sherman Act. Defendants further assert that Plaintiffs must establish both the existence of each agreement and that each separate agreement had an actual adverse effect on competition in the relevant market. Even if they could do so, Defendants argue that such agreements cannot rationally be understood as a single conspiracy.

Plaintiffs respond that because Defendants are involved in all aspects of the conspiracy and they can identify a disputed issue of fact with regard to each component of Defendants' participation, summary judgment must be denied. They further assert that both the agreements at issue as well as the alleged anticompetitive impact of the conspiracy must be considered in the aggregate, not in the piecemeal fashion upon which Defendants appear to insist. *See* 2 Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law § 310c1 at 229 (4th ed. 2014) (where multiple agreements are alleged, "it would clearly be improper for the court to examine each agreement with the same defendant separately, conclude that the agreement standing alone is insufficient to establish illegality, and dismiss the complaint without considering the impact of the aggregation").

"Identifying the existence and nature of a conspiracy requires determining whether the evidence 'reasonably tends to prove that the defendant and others had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Apple, Inc.*, 791 F.3d at 315 (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)) (alteration and internal quotation marks omitted). To establish a single conspiracy, a party need not show that every co-conspirator "participated in all aspects of

43

the conspiracy; it need only prove that the defendant was a party to the general conspiratorial agreement." *United States v. Avery*, 128 F.3d 966, 971 (6th Cir. 1997). Moreover, "the 'combination or conspiracy' element of a section 1 violation is not negated by the fact that one or more of the co-conspirators acted unwillingly, reluctantly, or only in response to coercion." *MCM Partners, Inc. v. Andrews-Bartlett & Assocs.*, 62 F.3d 967, 973 (7th Cir. 1995). To prevail on their claims, Plaintiffs must instead establish that Defendants conspired with others to further the alleged conspiracy's anticompetitive objectives and themselves "acquiesce[d] in [the] illegal scheme[.]" *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 161 (1948).[18]

Because Plaintiffs seek to hold Defendants responsible for only their own conduct and do not bring claims against Defendants' alleged co-conspirators, Plaintiffs' description of the alleged conspiracy as a single "overarching," "multifaceted" conspiracy is of scant legal significance.[19] There is no risk that a jury will find Defendants liable for a conspiracy in which they did not participate. *See United States v. Corey*, 566 F.2d 429, 431 n.3 (2d Cir. 1977) (observing that "single/multiple conspiracy analysis does not apply to the trial of a single defendant"); *United States v. Sir Kue Chin*,

---

[18] *See United States v. Apple, Inc.*, 791 F.3d 290, 324, 317 (2d Cir. 2015) (observing that "[a] horizontal conspiracy can use vertical agreements to facilitate coordination without the other parties to those agreements knowing about, or agreeing to, the horizonal conspiracy's goals" and noting that "[a]ntitrust law has never required identical *motives* among conspirators when their independent reasons for joining together lead to collusive action.") (citation and internal quotation marks omitted).

[19] In Professor Elhauge's deposition, Defendants' counsel pressed him to identify either a "single, unitary conspiracy" or "separate conspiracies with separate parties." He instead explained:

> Q. And you call it a multifaceted conspiracy. Is it a single, unitary conspiracy, or is it separate conspiracies with separate parties? . . .
>
> A. I mean, it's an overarching conspiracy. It has different component parts including, as I lay out, the agreement not to solicit farmers, agreement to exchange price information, the full supply agreements, and the payments not to compete for dairy farmers. So there's all different parts of it. But DFA and DMS are involved in all those parts of the conspiracy.

Plaintiffs' SDF ¶ 10, Ex. A, Tab 33 (2018 Elhauge Dep. at 54).

534 F.2d 1032, 1035 (2d Cir. 1976) ("We have been cited to no case which involves only one defendant and where a claim of multiple conspiracies has been sustained"); *United States v. Pauling*, 256 F. Supp. 3d 329, 335 (S.D.N.Y. 2017) (ruling that "where a single defendant is tried, there is no danger of any spill over effect, from one conspiracy to another, since the defendant is alleged to have participated in all conspiratorial conduct.") (citations and internal quotation marks omitted). In any event, "where the proof is susceptible to the inference that there was more than one conspiracy, the question of whether one or more conspiracy has been established is a question of fact for a properly instructed jury." *United States v. Maldonado-Rivera*, 922 F.2d 934, 962 (2d Cir. 1990).

With regard to Defendants' contention that the court must examine each agreement with each alleged co-conspirator independently, the Supreme Court has rejected that approach:

> It is apparent . . . that the Court of Appeals approached [plaintiffs'] claims as if they were five completely separate and unrelated lawsuits. We think this was improper. In cases such as this, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. . . . [T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole and in a case like the one before us, the duty of the jury was to look at the whole picture and not merely at the individual figures in it.

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698-99 (1962) (citations omitted); *see also Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1302 (9th Cir. 1982) (holding "in assessing the antitrust liability of a defendant, [courts] may look to the overall effects of a defendant's conduct in the relevant market"); *LePage's Inc.*, 324 F.3d at 162 ("The relevant inquiry is the anticompetitive effect of 3M's exclusionary practices considered together"); 2 Areeda & Hovenkamp, Antitrust Law § 310c1 at 229 ("An aggregation of claims may produce sufficient proof of violation or injury where violation requires that a certain legal threshold be met and no claim standing alone is sufficient to meet the threshold").

Concluding that Plaintiffs are not precluded from characterizing their claims as a single conspiracy and further concluding that the alleged anticompetitive agreements may be analyzed for their aggregate anticompetitive impact, the court turns to whether Plaintiffs have identified a disputed issue of material fact with regard to the existence of the conspiracy, the identity of its members, and the overt acts taken in furtherance of its allegedly unlawful objectives.

In this case, in addition to proffering evidence of the existence of a conspiracy to monopsonize and its participants, Plaintiffs proffer evidence that Defendants engaged in several overt acts in furtherance of the alleged conspiracy's unlawful objective to monopsonize, including, but not limited to: (1) written and unwritten non-solicitation agreements and sharing of information regarding farmer pay programs; (2) full supply agreements that exceed one year; (3) most favored nation clauses and pricing; and (4) outsourcing agreements.

### 1. Non-Solicitation Agreements and Sharing of Farmer Pay Information.

Plaintiffs have identified disputed issues of fact as to whether DFA and other co-conspirators cooperatives entered into agreements whereby they agreed not to solicit each other's members, thereby restraining dairy farmers' ability to change cooperatives to obtain a better price for their milk. Plaintiffs have further identified disputed issues of fact as to whether DFA used its access to pay program information obtained through DMS as well as pay program information obtained from DFA's direct cooperative competitors to eliminate the likelihood a dairy farmer would achieve a better price by switching cooperative membership. Plaintiffs contend these non-solicitation agreements violated a 1977 Consent Decree and Defendants' own Antitrust Guidelines. *See* Plaintiffs' SDF ¶¶ 12-33.

Professor Elhauge opines that the alleged non-solicitation agreements reduce competition for dairy farmers' cooperative memberships, thereby eliminating opportunities for them to switch cooperatives based on better prices offered by a rival cooperative. He further opines that because DFA shared information about farmer pay

46

programs, it did not have to compete with the alleged co-conspirator cooperatives on price. As DFA and the alleged co-conspirator cooperatives would otherwise be direct competitors for dairy farmer members, according to Professor Elhauge, these horizontal agreements had the effect of eliminating competition. Recognizing that it ordinarily would make no economic sense for a cooperative such as DFA to inflict this harm on its own members, Professor Elhauge opines that DFA makes its profits based on milk volume and reaps profits in other sectors of its business when milk prices paid to dairy farmers are suppressed. He explains that:

> reducing raw milk prices [paid to dairy farmers] directly increases DFA's profit per unit as a processor. Accordingly, DFA as an entity financially benefits from reducing raw milk prices (which increases its profits per unit as [a] processor without affect[ing] its profits per unit as a cooperative raw milk seller), while maintaining as much raw milk volume as possible (by driving farmers to have to sell through DFA).

Plaintiffs' SDF ¶ 99, Ex. Z (Elhauge Rep. ¶¶ 129-30, 133) (footnotes omitted); *see also* Plaintiffs' SDF ¶ 98, Ex. KKK at 77 (DFA's 2015 Financial Report stating: "Lower milk and other dairy commodity prices during 2015 led to an increase in net income from our commercial investments . . . over the prior year.").

## 2. Full Supply Agreements with Terms Exceeding One Year.

As a further overt act, Plaintiffs allege that Defendants entered into full supply agreements with processors in Order 1 which eliminated both the processor's as well as independent dairy farmers' and independent cooperative's options in the marketplace. They have proffered admissible evidence from which a rational jury could conclude that the full supply agreements in question violated a 1977 Consent Decree, Defendants' own Antitrust Policy, and in the case of Dean's Lansdale, Pennsylvania processing plants, the *Allen* settlement agreement.

In addition, Plaintiffs have proffered admissible evidence of Defendants' alleged anticompetitive motive for these agreements. They cite evidence that in a competitive market, milk processors prefer an independent supply of milk for both economic and self-determination reasons. In contrast, long-term full supply agreements have the effect of

47

funneling the independent supply of milk through the DFA/DMS conduit. Because the full supply agreements are between DFA and processors (DFA's direct competitors for the independent supply of milk) and because they are arguably contrary to the economic best interests of independent processors, Plaintiffs assert that there is a reasonable inference they were entered into for collusive purposes. They rely on Professor Elhauge's opinion that Defendants have incentivized their co-conspirator processors with side agreements and payments not to compete for the independent milk supply. *See* Plaintiffs' SDF ¶¶ 36, 43-53. According to Professor Elhauge, "[a]bsent a conspiracy to lower raw milk prices by eliminating competition in purchasing raw milk from farmers and providing side payments to processors, giving DFA and DMS full control over the raw milk supply would be contrary to the independent interests of [processors.]" Plaintiffs' SDF ¶ 53, Ex. Z (Elhauge Rep. at ¶ 197).

### 3. Most Favored Nation Clauses and Pricing.

Plaintiffs cite most favored nation clauses and pricing in Defendants' agreements during the alleged conspiracy as another overt act Defendants engaged in with an anticompetitive effect. There is no dispute that most favored nation clauses are contained in certain agreements; however, Defendants presumably dispute they are anticompetitive. In the case of most favored nation clauses and pricing, the Second Circuit has recently observed that:

> [W]e are breaking no new ground in concluding that MFNs, though surely proper in many contexts, can be misused to anticompetitive ends in some cases. Under the right circumstances, an MFN can facilitate anticompetitive horizontal coordination by reduc[ing] [a company's] incentive to deviate from a coordinated horizonal arrangement.

*Apple, Inc.*, 791 F.3d at 320 (citations and internal quotation marks omitted) (alterations in the original). Defendants' own Antitrust Policy acknowledges that: "Antitrust concerns often arise when a supplier provides preferential treatment to less than all of its customers, for example through 'most-favored nation' clauses in milk supply agreements." Ex. B, Tab 2 at 780.

48

In Order 1, Professor Elhauge opines that Defendants used most favored nation pricing to attract non-cooperative processors to enter into agreements at the processor level with Defendants which Defendants offset by paying dairy farmers less money for their milk. He concludes that "[t]he use of [most favored nation clauses] thus contributes to the suppression of prices across Order 1." Plaintiffs' SDF ¶ 74, Ex. Z (Elhauge Rep. at ¶ 217).

### 4. Outsourcing Agreements.

With regard to outsourcing agreements, Plaintiffs have identified disputed issues of fact as to whether Defendants used these agreements to force independent farmers to market their milk through DFA/DMS. Because DMS provided essential milk marketing services (such as inspecting, testing, hauling, pricing, and invoicing), eliminating independent producers' and independent cooperatives' access to those services except through DFA membership allegedly left independent milk suppliers with few other options in Order 1. Although "[a] manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently[,]" *Monsanto Co.*, 465 U.S. at 761, it cannot employ predatory means.

According to DMS: "[b]esides joining DFA as members, . . . participating coops had the 'option' of selling to different milk cooperatives in the area; buying their own milk plant; bottling [their] own milk; or pooling resources and get a bunch of milk and send it long distances." Plaintiffs' SDF ¶ 80, Ex. Z (Elhauge Rep. at ¶ 222 n.532) (citing 2018 Kelleher Dep. at 99). However, Professor Elhauge observes that "[n]one of these so-called 'options' were viable for the small coops with limited resources [that] were struggling to survive. Indeed, . . . there are substantial barriers to entry to this kind of activity." *Id.*; *see also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 484 n.32 (1992) ("It is true that as a general matter a firm can refuse to deal with its competitors. But such a right is not absolute; it exists only if there are legitimate competitive reasons for the refusal"); *LePage's Inc.*, 324 F.3d at 153, 162 (observing that "[a] monopolist's denial to competitors of access to its 'essential' goods, services or resources had been held to violate § 2" and that the defendant could "effectuate [an

49

exclusionary] plan because there was no ease of entry"). As evidence of the impact of these agreements, Plaintiffs cite the dramatic increase in DFA membership coupled with the demise of independent cooperatives when Defendants terminated independent cooperatives' access to DMS. Plaintiffs' SDF ¶¶ 76-80.

Because Plaintiffs have proffered sufficient admissible evidence to render it a jury question whether Defendants have engaged in a conspiracy to violate Sections 1 and 2 of the Sherman Act and whether they have engaged in overt acts in furtherance of that conspiracy, to the extent Defendants seek summary judgment on the sufficiency of Plaintiffs' proof, that motion is DENIED.

### F.    Whether Plaintiffs Can Establish Antitrust Impact.

Defendants contend that even if Plaintiffs can establish anticompetitive agreements, they have proffered no evidence that any of the individual Plaintiffs were impacted by Defendants' allegedly unlawful acts. Defendants characterize the necessary proof as evidence that "the alleged conspiracy actually suppressed [each Plaintiff's] milk price by eliminating the options he or she would have pursued as an individual seller that would have resulted in a higher pay price to him or her." (Doc. 92 at 17.) Defendants further assert that Professor Elhauge does not describe how the alleged antitrust violations impacted any individual Plaintiff but only draws conclusions regarding how the violations caused harm to the overall market.

Plaintiffs counter that Professor Elhauge's regression analysis properly demonstrates antitrust injury for each Plaintiff because he opines that each of Defendants' alleged anticompetitive agreements impacted all dairy farmers in Order 1 in the same manner. They further contend that in deposition Professor Elhauge clarified his opinions, explaining how he had demonstrated the impact not only on competition in Order 1, but on each individual Plaintiff.

A plaintiff alleging a Sherman Act violation must establish causation and injury in order to recover damages:

A private plaintiff may not recover damages under § 4 of the Clayton Act merely by showing "injury causally linked to an illegal presence in the

50

market." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 [] (1977). Instead, a plaintiff must prove the existence of "*antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." [*Id.*] (emphasis in original). In *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104 [] (1986), [the Supreme Court] reaffirmed that injury, although causally related to an antitrust violation, nevertheless will not qualify as "antitrust injury" unless it is attributable to an anti-competitive aspect of the practice under scrutiny, "since '[i]t is inimical to [the antitrust] laws to award damages' for losses stemming from continued competition."

*Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990). This is known as "antitrust impact." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 311 (3d Cir. 2008) (noting that the second element of § 4 of the Clayton Act requires a plaintiff to prove "individual injury resulting from [a] violation" of antitrust law, "also known as antitrust impact").

The Second Circuit employs "a three-step process for determining whether a plaintiff has sufficiently alleged antitrust injury." *Eastman Kodak Co. v. Henry Bath LLC*, 2019 WL 4018285, at *6 (2d Cir. Aug. 27, 2019).

> First, the party asserting that it has been injured by an illegal anticompetitive practice must identify the practice complained of and the reasons such a practice is or might be anticompetitive. Second, we consider how the practice identified by the plaintiff put the plaintiff in a worse position. Finally, we compare the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges.

*Id.* (citations, alterations, and internal quotation marks omitted).

In establishing antitrust injury, a plaintiff may rely on the aggregate effect of the alleged conspiracy. *See City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992) (ruling that "it would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect. . . . We are dealing with what has been called the 'synergistic effect' of the mixture of the elements"). An antitrust plaintiff need only proffer a "reasonable estimate" of damages. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 124 (1969) (internal quotation marks omitted). "The plaintiff may satisfy this burden without 'detailed market

analysis' by offering 'proof of actual detrimental effects[.]'" *Capital Imaging Assocs.*, 996 F.2d at 546 (quoting *Ind. Fed'n of Dentists*, 476 U.S. at 460-61); *see also Bonjorno v. Kaiser Aluminum & Chem. Corp.*, 752 F.2d 802, 812 (3d Cir. 1984) ("In constructing a hypothetical world free of the defendants' exclusionary activities, the plaintiffs are given some latitude in calculating damages, so long as their theory is not wholly speculative.").

With regard to causation, "[i]t is enough that the illegality is shown to be a material cause of the injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling his burden of proving compensable injury under [§] 4." *Zenith Radio Corp.*, 395 U.S. at 114 n.9. In this case, Plaintiffs allege Defendants and the co-conspirators artificially depressed the over-order premiums paid to dairy farmers in Order 1, not to benefit consumers, but rather to increase the profits Defendants reaped at the processor level and in other sectors of their business.

In order to demonstrate how the alleged conspiracy impacted dairy farmers in Order 1, Professor Elhauge performed a benchmark regression analysis whereby he compared the over-order premiums paid to dairy farmers for their raw Grade A milk in FMMO Order 32 (which he determined was untainted by the alleged conspiracy) with those paid in Order 1 (where the conspiracy is alleged to operate). This is an accepted methodology. *See Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 152 F.3d 588, 592 (7th Cir. 1998) (observing that "[t]he usual way to measure damages in such [a private antitrust suit] would be to compare the prices . . . inside and outside the region covered by the conspiracy . . . correcting by various statistical techniques for any nonconspiratorial factors that might have caused the prices that are being compared to be different from each other").

Professor Elhauge testified that his regression analysis demonstrates an individual impact for each Plaintiff because "the suppression of . . . marketwide prices by 78 cents would apply across the board to all farmers." Plaintiffs' SDF ¶ 144, Ex. A, Tab 33 (2018 Elhauge Dep. at 197). He further explained that if he were presented with a case on behalf of an individual farmer, he would do "exactly the same regression to estimate their injury, and it would be 78 cents." *Id.* (2018 Elhauge Dep. at 196). He notes that:

52

The individual farmer characteristics are the same in the but-for world and
in the actual world. So variation among the farmers doesn't matter. If
you're a farmer that would have received a higher price in the actual world
relative to the average farmer, you also would receive a higher price
relative to the average in the but-for world. So the suppression of prices,
marketwide prices by 78 cents would apply across the board to all the
farmers.

*Id.* (2018 Elhauge Dep. at 197). Professor Elhauge testified that his regression analysis

thus shows antitrust impact for each individual Plaintiff:

Q. Your regression doesn't purport to show whether any individual farmer
within Order 1 received a lower price or what that lower price specifically
would be for that farmer; right?

A. No, it does. It shows that there's a marketwide price suppression that
would apply to all farmers.

Q. But you're not assuming that every farmer pooling in Order 1 received
the same over-order premium; right?

. . .

A. No, I'm saying the difference between the over-order premium they
received and they would have [received] in a but-for world, the best
estimate of that is 78 cents per hundredweight for all the farmers.

*Id.* (2018 Elhauge Dep. at 195).

"Regression analysis has become increasingly common in antitrust litigation . . . to

show antitrust impact and as a method of determining damages." *In re: Domestic

Drywall Antitrust Litig.*, 322 F.R.D. 188, 213 (E.D. Pa. 2017); *see also In re Linerboard

Antitrust Litig.*, 305 F.3d 145, 153 (3d Cir. 2002) (identifying multiple regression

analysis as an acceptable method of proving impact in antitrust cases). In *Allen*, this

court found a regression analysis comparing the over-order premiums in Order 1 and

Order 32 admissible to establish individual injury. *See Allen v. Dairy Mktg. Servs., LLC*,

2013 WL 6909953, at *17 (D. Vt. Dec. 31, 2013) ("By calculating, as Dr. Rausser does,

annual price suppression for each year of the class period, and using such annual

suppression rates in conjunction with individual farmer volume during the specific year,

it is possible to calculate individual damages for each class member. While this may not

be a precise measure of each farmer's damages, it is a reasonable estimate and is not inadmissible").

Because Plaintiffs have established a genuine issue of material fact regarding whether they have suffered antitrust injury and in what amount, a jury, not the court, must determine whether Professor Elhauge's explanation of that injury is credible and persuasive. *See Anderson v. Baltimore & Ohio R.R. Co.*, 96 F.2d 796, 798 (2d Cir. 1938) ("Acceptance or rejection of the opinions of the expert witnesses was . . . for the jury.").

For the foregoing reasons, Defendants' motion for summary judgment on the issue of whether Plaintiffs can establish individualized antitrust injury is DENIED.

## G.     Whether Plaintiffs Can Establish Defendants Possessed Monopsony Power or a Dangerous Probability of Achieving It (Counts II and III).

In Count II of the RFAC, Plaintiffs allege Defendants violated Section 2 of the Sherman Act by attempting to monopsonize the raw Grade A milk market in Order 1. In Count III, they allege Defendants violated Section 2 of the Sherman Act by possessing monopsony power in the raw Grade A milk market in Order 1. Defendants argue that Plaintiffs have proffered no admissible evidence that DFA, with or without DMS, possessed or exercised monopsony power or had a dangerous probability of achieving it.

In order to state a claim for monopsonization under Section 2 of the Sherman Act, a plaintiff must establish: "(1) the possession of [monopsony] power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)) (internal quotation marks omitted). Monopsony power "can be proven directly through evidence of control over prices or the exclusion of competition, or it may be inferred from a firm's large percentage share of the relevant market." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 500 (2d Cir. 2004).

"To establish a claim for attempted [monopsonization], a plaintiff must prove: '(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a

54

specific intent to [monopsonize] and (3) a dangerous probability of achieving [monopsony] power.'" *Tops Mkts.*, 142 F.3d at 99-100 (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)).[20]

In the instant case, Plaintiffs must go one step further and establish that Defendants' monopsony power is derived from predatory acts. Defendants assert that Plaintiffs have not identified and cannot identify the wrongful conduct that is the source of their alleged market share and their expert witness Professor Elhauge has admitted that some of the conduct Plaintiffs challenge is not in itself predatory.[21] As Defendants correctly point out, pursuant to the Capper-Volstead Act, the Sherman Act "does not apply to monopoly power that results from such acts as the formation, growth and combination of agricultural cooperatives, but applies only to the acquisition of such power by other, predatory means." *Fairdale Farms, Inc.*, 635 F.2d at 1045.

Although Defendants assert that Professor Elhauge does not opine that Defendants have monopsony power, this is not accurate. Professor Elhauge initially stated in his deposition: "I just opine about the conspirators collectively hav[ing] monopsony power. I don't opine about DFA and DMS individually." Plaintiffs' Ex. A, Tab 33 (2018 Elhauge Dep. at 24). When Defendants questioned him on this point, he expanded his opinion:

> Q: . . . You did not do an analysis in your report that says that either DFA or DMS or the two of them together have monopsony power on their own, apart from the conspiracy; right?

---

[20] "Where intent of the accused is an ingredient of the [violation] charged, its existence is a question of fact which must be submitted to the jury." *Morissette v. United States*, 342 U.S. 246, 274 (1952). Likewise, "[t]he determination [of] whether a dangerous probability of success exists is a particularly fact-intensive inquiry." *United States v. Microsoft Corp.*, 253 F.3d 34, 80 (D.C. Cir. 2001).

[21] As Defendants' Capper-Volstead Act argument was raised for the first time in Defendants' Reply, the court does not analyze each alleged anticompetitive agreement and determine whether it reflects legitimate or predatory means. *Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037, 1045 (2d Cir. 1980); *see also Keefe ex rel. Keefe v. Shalala*, 71 F.3d 1060, 1066 n.2 (2d Cir. 1995) ("Normally, [courts] will not consider arguments raised for the first time in a reply brief").

A: Again, I'm not sure—I'm not positive. I don't think it's in the report, but I do believe that they themselves have about 50 percent market share and thus would likely have monopsony power on their own. But I thought as an economic matter what matters is the collective power of the entire conspiracy.

. . .

Q: So you're not offering that opinion whether or not you think they may have it.

. . .

A: Well, you're asking me now, and I think they likely do have that power since they have about a 50 percent share of the market.

Plaintiffs' SDF ¶ 133, Ex. A, Tab 33 (2018 Elhauge Dep. at 25-26). As Plaintiffs note, Defendants have calculated their own market share in the Northeast as ranging between 40% and 56% depending on the year. Plaintiffs' SDF ¶ 133.

Professor Elhauge further opines that, collectively, the conspirators' market share ranged from 61.9% to 75.8% during the relevant time period. Plaintiffs' SDF ¶ 128, Ex. Z (Elhauge Rep. at ¶ 96).[22] This is a significant market share. *See Am. Tobacco Co. v. United States*, 328 U.S. 781, 795-96 (1946) (noting that defendants' market share "accounted at all times for more than 68%, and usually for more than 75% of the national production" and observing that "[s]ize carries with it an opportunity for abuse that is not to be ignored when the opportunity is proved to have been utilized in the past") (quoting *United States v. Swift & Co.*, 286 U.S. 106, 116 (1932)). Indeed, market share in the range of 50% is evidence of monopsony power and "a party may have [monopsony] power in a particular market, even though its market share is less than 50%." *Hayden Publ'g Co. v. Cox Broad. Corp.*, 730 F.2d 64, 69 n.7 (2d Cir. 1984).

Even after a defendant's market share is properly calculated, courts "will draw an inference of [monopsony] power only after full consideration of the relationship between market share and other relevant market characteristics." *Tops Mkts.*, 142 F.3d at 98.

---

[22] *See Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1437 (9th Cir. 1995) (holding that "[t]he aggregation of market shares of several rivals is justified if the rivals are alleged to have conspired to monop[son]ize").

"These characteristics include the strength of the competition, the probable development of the industry, the barriers to entry, the nature of the anticompetitive conduct[,] and the elasticity of . . . demand." *Id.* (internal quotation marks omitted). Such an inquiry is generally rife with questions of fact that must be decided by a jury, not the court.

In his report, Professor Elhauge describes at length the market characteristics he claims contribute to Defendants' monopsony power, including the high barriers to market entry based on the significant costs of constructing milk processing plants; the history of milk processing plant closures; the dearth of dairy farmers in Order 1 that both produce milk and own their own Class I distributing facility; the limited access to balancing plants that accept perishable milk regardless of market demand; and the inelasticity in milk pricing whereby production is relatively nonresponsive to changes in price. Many, if not all, of these characteristics are either disputed or the subject of competing expert opinions. *See In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 61 (2d Cir. 2012) (reversing summary judgment and holding that "when the evidence admits of competing permissible inferences with regard to whether a plaintiff is entitled to relief, 'the question of what weight should be assigned to those inferences remains within the province of the fact-finder at a trial'") (alteration omitted) (quoting *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987)).

Plaintiffs have further identified disputed issues of fact regarding whether Defendants "coerced membership" in DFA through a series of anticompetitive agreements that were not "legitimate objects" of the "voluntary elimination of competition among themselves." *See* Plaintiffs' SDF ¶ 76, Ex. Z (Elhauge Rep. at ¶ 7) ("Defendants also implemented a scheme to coerce the farmers who were independent or sold raw milk through other cooperatives to have to join DFA in order to still have outlets for their raw milk. By doing so, DFA could further eliminate any remaining potential for competition for milk supply from the independent coops and farmers."). A cooperative "may neither acquire nor exercise monopoly power in a predatory fashion by the use of such tactics as . . . coerced membership[] . . . and discriminatory pricing." *Fairdale Farms, Inc.*, 635 F.2d at 1044.

Plaintiffs' identify evidence that several of Defendants' agreements violate a 1977 Consent Decree and Defendants' own Antitrust Policy and Guidelines. A rational jury could find this evidence demonstrates that Defendants' "acquisition of [monopsony] power" was through "predatory means." *Id.* at 1045.

Because Plaintiffs have established genuine issues of material fact regarding Defendants' market share, the alleged conspiracy's aggregate market share, whether Defendants have monopsony power or whether there is a dangerous possibility they will achieve it, and whether that monopsony power is derived from legitimate or predatory means, summary judgment in Defendants' favor with regard to Counts II and III of Plaintiffs' RFAC must be DENIED.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED IN PART AND DENIED IN PART. (Doc. 91.) Each of Plaintiffs' claims in the FRAC survives summary judgment, however, Plaintiffs cannot claim a hub-and-spoke conspiracy in support of those claims at trial.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this $27^{7h}$ day of September, 2019.

Christina Reiss, District Judge
United States District Court