## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| **GARRETT SITTS, et al.,**<br><br>    **Plaintiffs,**<br><br>**v.**<br><br>**DAIRY FARMERS OF AMERICA, INC. and<br>DAIRY MARKETING SERVICES, LLC,**<br><br>    **Defendants.** | **Civil Action No. 2:16-cv-00287-cr** |

## DEFENDANTS DAIRY FARMERS OF AMERICA, INC. AND DAIRY MARKETING SERVICES, LLC'S MOTION TO EXCLUDE VARIOUS OPINIONS OF PLAINTIFFS' MERITS EXPERT EINER R. ELHAUGE AND MEMORANDUM OF LAW IN SUPPORT

### TABLE OF CONTENTS

**Page**

I.      The Legal Standards Governing This Motion ....................................................................4

II.     Professor Elhauge Impermissibly Opines on the Existence of a Conspiracy .....................5

III.    Professor Elhauge Cannot Offer Opinions on Whether DFA Acted in Farmers'
        "Best Interest"....................................................................................................................6

IV.     Professor Elhauge Cannot Offer Interpretations of Contracts or Other Documents ..........9

V.      Professor Elhauge Cannot Testify on Parties' Mental States, Motivations, or
        Credibility .........................................................................................................................11

VI.     Professor Elhauge Cannot Narrate Plaintiffs' Case ..........................................................12

VII.    Professor Elhauge's Regression Analyses are not Reliable...............................................14

VIII.   Professor Elhauge's Regression Analyses Do Not "Fit" ...................................................18

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*24/7 Records, Inc. v. Sony Music Entm't, Inc.*,
514 F. Supp. 2d 571 (S.D.N.Y. 2007).......................................................................7

*Agritronics Corp. v. Nat'l Dairy Herd Assoc.*,
1994 WL 542203 (N.D.N.Y. Sept. 22, 1994) ...........................................................8

*Alexander v. Nat'l Farmers Org.*,
687 F.2d 1173 (8th Cir. 1982) .................................................................................8

*Allen v. DFA*,
2013 WL 6909953 (D. Vt. Dec. 31, 2013) .........................................................4, 16

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002)...................................................................14, 15, 16, 17

*Andrews v. Metro N. Commuter R.R.*,
882 F.2d 705 (2d Cir. 1989)....................................................................................7

*Bell v. Fur Breeders Agric. Co-op.*,
348 F.3d 1224 (10th Cir. 2003) ..............................................................................7

*City of Tuscaloosa v. Harcros Chems., Inc.*,
158 F.3d 548 (11th Cir. 1998) ...............................................................................5

*Crown & Cork Seal Co. v. Credit Suisse First Boston*,
2013 WL 978980 (S.D.N.Y. Mar. 12, 2013) .....................................................4, 13

*Dibella v. Hopkins*,
2002 WL 31427362 (S.D.N.Y. Oct. 30, 2002) .....................................................11

*Dzielak v. Whirlpool Corp.*,
2017 WL 6513347 (D.N.J. Dec. 20, 2017) ...........................................................20

*Falise v. Am. Tobacco Co.*,
2000 WL 1804602 (E.D.N.Y. Nov. 30, 2002).......................................................5

*Gen. Elec. Co. v. Joiner*,
522 U.S. 13 (1997)..................................................................................................7

*In re Genetically Modified Rice*,
251 F.R.D. 392 (E.D. Mo. 2008) ..........................................................................19

*Gordon v. N.E. Cent. R.R.*,
  2019 WL 4068639 (D. Vt. Aug. 28, 2019) ..................................................4, 9, 18

*Herbert v. Lisle Corp.*,
  99 F.3d 1109 (Fed. Cir. 1996)..................................................................................7

*Holiday Wholesale Grocery v. Philip Morris*,
  231 F. Supp. 2d 1253 (N.D. Ga. 2002) ...............................................................6, 12

*JamsSports Entm't v. Paradama Prods., Inc.*,
  2005 WL 14917 (N.D. Ill. 2005) ...........................................................................13

*Lippe v. Bairnco Corp.*,
  288 B.R. 678 (S.D.N.Y. 2003)...........................................................................12, 14

*Marx & Co., Inc. v. Diners' Club, Inc.*,
  550 F.2d 505 (2d Cir. 1977).................................................................................9, 11

*Media Sport & Arts v. Kinney Shoe Corp.*,
  1999 WL 946354 (S.D.N.Y. 1999)...........................................................................9

*Mid-State Fertilizer Co. v. Exch. Nat'l Bank*,
  877 F.2d 1333 (7th Cir. 1989) ................................................................................13

*Millennium Pipeline Co. v. Acres of Land, Inc.*,
  2015 WL 6126949 (W.D.N.Y. Oct. 16, 2015) .......................................................13

*In re Plastic Additives*,
  2010 WL 3431837 (E.D. Pa. Aug. 31, 2010) ..........................................................20

*Estate of Puppolo, v. Welch*,
  2017 WL 4042342 (D. Vt. Sept. 12, 2017)...........................................................8, 9

*Reed v. Advocate Health*,
  268 F.R.D. 573 (N.D. Ill. 2009)..................................................................15, 18, 19

*In re Rezulin*,
  309 F. Supp. 2d 531 (S.D.N.Y. 2004)..................................................................4, 11

*Rotman v. Progressive, Ins., Co.*,
  995 F. Supp. 2d 272 (D. Vt. June 28, 2013) .............................................................4

*Scentsational Techs., LLC v. Pepsi, Inc.*,
  2018 WL 1889763 (S.D.N.Y. Apr. 18, 2018)......................................................11, 14

*Sheet Metal Workers v. GlaxoKline*,
  2010 WL 3855552 (E.D. Pa. Sept. 30, 2010) .........................................................18

*Simuro v. Shedd*,
    2016 WL 9526418 (D. Vt. Nov. 9, 2016) ........................................................................14

*Sitts v. DFA, Inc.*,
    2019 WL 3298537 (D. Vt. July 23, 2019) ......................................................................15

*Taylor v. Evans*,
    1997 WL 1540 (S.D.N.Y. Apr. 1, 1997).........................................................................13

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016) ....................................................................................................18

*U.S. Info. Sys. v. Int'l Bhd. of Elec. Workers*,
    313 F. Supp. 2d 213 (S.D.N.Y. 2004)...........................................................................5, 6

*Union Carbide Corp. v. Montell*,
    28 F. Supp. 2d 833 (S.D.N.Y. 1998)..................................................................................5

*United States v. Apple, Inc.*,
    No. 12-cv-2826 (S.D.N.Y. May 23, 2013) .......................................................................7

*United States v. Scop*,
    846 F.2d 135 (2d Cir. 1988)............................................................................................11

*Williamson Oil Co. v. Phillip Morris USA*,
    346 F.3d 1287 (11th Cir. 2003) .........................................................................................8

## STATUTES

7 U.S.C. § 291...........................................................................................................................6, 8

## RULES

Fed. R. Evid. 403 ..........................................................................................................................4

Fed. R. Evid. 702 .....................................................................................................................4, 11

Fed. R. Evid. 702(d)....................................................................................................................15

## OTHER AUTHORITIES

Herbert Hovenkamp, *Economic Experts in Antitrust Cases, in* Modern Scientific
    Evidence (2019-2020)........................................................................................................5

Plaintiffs' expert, Einer Elhauge, a lawyer by education and a law professor by trade, was trained to argue the law and the facts with an advocate's eye. Unfortunately, that lawyer tradecraft permeates Professor Elhauge's purported "expert" testimony, rendering the vast majority of it improper and inadmissible. He openly interprets evidence (or adopts plaintiffs' lawyers' interpretation of it), and then weighs it, claiming he is "not aware of"[1] any evidence that conflicts with his "commonsense" view of the selective passages he read. Plaintiffs intend to use Professor Elhauge in this manner to lead the jury to interpret and weigh the evidence as plaintiffs wish, just as a lawyer might in closing argument. That is far outside the proper role of an expert, is not helpful to the jury, and would prejudice DFA.

The problems we address in this brief do not stem from Professor Elhauge's lack of proper economic credentials; that is a matter we will reserve for trial. But there are limits on the testimony that *any* expert may offer at trial, no matter his or her qualifications. Professor Elhauge goes far beyond those limits, offering opinions on nearly every aspect of this case, including how to interpret contracts, whether companies *in fact* entered into "unwritten agreements" over fourteen years ago,[2] and whether the "simple" words in various agreements "violated [DFA's] consent decree."[3] That is no accident; it is exactly as plaintiffs intend. In the 144 paragraphs plaintiffs used to articulate their case in summary judgment briefing, plaintiffs relied on Professor Elhauge's opinions for 134 paragraphs (or 93 percent of their case).[4] Those paragraphs were rife with

---

[1]    *See, e.g.*, Expert Report of E. Elhauge ¶ 195 (Oct. 3, 2019) ("Elhauge Initial R."), attached as Ex. 1 to the Declaration of A. Pfeiffer ("Decl.") ("I am not aware of any contemporaneous analysis conducted by DFA, DMS, or Dean Foods to quantify any purported efficiencies . . . ."); *see also id.* ¶¶ 49, 166, 212.

[2]    *See* Elhauge Initial R. ¶¶ 89, 90, 93, 162, 164 (Oct. 3, 2019) (Decl. Ex. 1).

[3]    *See id.* ¶ 212; *see also* Transcript of E. Elhauge Dep. Vol. I at 130:4-131:4 ("Elhauge Vol. I Tr.") (Decl. Ex. 6).

[4]    *See* Pls.' Stat. of Disputed Material Facts (D. Vt. Feb. 14, 2019), ECF No. 102 ("PSOF").

opinions about issues well outside of any "antitrust economist's" purview, including various entities' supposed understandings, motives, and expectations.[5] Tellingly, plaintiffs' preliminary witness list allocated only ten minutes of trial testimony to the third-party individuals with actual, personal knowledge of what the evidence in this case means. Plaintiffs allocated up to four hours to Professor Elhauge—far more than any of their other non-adverse witnesses—precisely to allow for a lengthy and improper case narration.

Professor Elhauge's relatively shorter testimony about econometric work is inadmissible because it fails to meet the basic standards of reliability. Professor Elhauge's initial model was exposed as so inherently flawed that plaintiffs' counsel conceded that Professor Elhauge "would be unable to support his regression model" without changing it and that, if forced to do so, "[h]e cannot and will not testify because it wouldn't be truthful" and would "mislead the jury."[6] Those mistakes—which the Court correctly noted "could and should have been avoided"—were not minor or isolated; those mistakes artificially inflated Professor Elhauge's damages estimate by over 40 percent and were indicative of Professor Elhauge's unreliable econometric work generally.

After abandoning his first, self-proclaimed "best" attempt, Professor Elhauge went back to the drawing board to invent a new measure of damages. But he also badly botched this. He arbitrarily chose a method that required him to throw out over a quarter-million records of milk sales—roughly a quarter of the total available records. The errors Professor Elhauge did not know he made are even worse, including one that infects an additional 10 percent of his data; he treated all those transactions as if they fell within the same ZIP code, when in reality the farms at issue

---

[5]     *See, e.g.*, PSOF ¶ 52 (citing Elhauge Initial R. ¶ 196); PSOF ¶ 60 (citing Elhauge Initial R. ¶ 203); PSOF ¶ 55 (citing Elhauge Initial R. ¶ 198).
[6]     Apr. 9, 2019 Hearing Tr. at 23:19-24:6 (Decl. Ex. 8); Pls.' Mem. in Opp'n to Defs.' Mot. to Strike at 4 ("Pls.' Opp'n").

are located across 23 states.  Professor Elhauge was completely oblivious to this error and admitted at deposition that this data "can't be included in the corrected proxy."[7]  He has since tried to submit a supplement *of his supplement*, confirming the magnitude of his second erroneous attempt.[8] Professor Elhauge's misunderstanding and misapplication of his own model renders it unreliable.

Professor Elhauge's regressions also fail the *Daubert* test because they do not fit the facts of this case.  The regressions use averages of averages of averages to hide the many individualized factors that affected farms over the vast geographic area and thirteen-year period of the alleged conspiracy.  Professor Elhauge's over-averaged results cannot tell the jury *anything* about whether any particular plaintiff was affected by the alleged conspiracy, much less reliably establish that all plaintiffs were affected, and allegedly equally, for the entire period.  His regressions, designed to glide over substantial and important variances among the plaintiffs, do not fit the *facts in this case*.

The Court should exclude Professor Elhauge's opinion (1) that a conspiracy or conspiracies, in fact, existed; (2) that DFA did not operate in farmers' "best interest"; (3) that the jury should interpret a contract or document in a certain way; (4) that parties had a particular motivation or mental state when making a decision, or are not credible; and (5) about his measures of damages and antitrust impact.  Additionally, the Court should preclude Professor Elhauge from presenting a lawyer-like narration or summary of plaintiffs' case.

To be clear, we do not seek to exclude all of Professor Elhauge's testimony regarding DFA or the milk industry.  We note that this Court has recognized, in the context of antitrust conspiracy allegations, that an economic expert may "opine regarding the identity of coconspirators, their

---

[7]    Transcript of E. Elhauge Dep. Vol. II at 394:18-395:3 (Nov. 15, 2019) ("Elhauge Vol. II Tr.") (Decl. Ex. 7).

[8]    DFA intends to promptly move to strike the "Second Supplemental Expert Report of Einer R. Elhauge" that plaintiffs served at 9:17 p.m. on the Friday before New Year's.  DFA respectfully reserves the right to address that belated report's assertions should the Court permit it to stand.

economic incentives to participate in the conspiracy (including the incentives of their management), and whether 'the climate' of a specific market was consistent with a conspiracy." *Allen v. DFA*, 2013 WL 6909953, at *11 (D. Vt. Dec. 31, 2013) (the "*Allen*" case).  This motion does not attack Professor Elhauge's testimony on those issues (though we disagree with it).  But the challenged opinions go far beyond what this Court, and others, have permitted.

## I.    THE LEGAL STANDARDS GOVERNING THIS MOTION

This Court is well versed on its "gatekeeping" role against unqualified or unreliable expert testimony under Federal Rule of Evidence 702, 403, and *Daubert*.  We focus here on a few principles most directly applicable to Professor Elhauge's specific testimony.

First, an expert may not offer legal conclusions or other "testimony [that] will usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it."  *Gordon v. N.E. Cent. R.R.*, 2019 WL 4068639, at *3 (D. Vt. Aug. 28, 2019) (Reiss, J.).

Second, expert testimony that "merely repeats or recasts" documentary evidence "is not testifying as an expert witness based upon specialized knowledge, but rather is acting as a conduit for another witness's testimony in the guise of an expert's opinion."  *Rotman v. Progressive, Ins., Co.*, 995 F. Supp. 2d 272, 283 (D. Vt. June 28, 2013) (Reiss, J.).

Third, opinions about "intent, motives or states of mind of corporations, regulatory agencies and others have no basis in any relevant body of knowledge or expertise."  *In re Rezulin*, 309 F. Supp. 2d 531, 546 (S.D.N.Y. 2004).

Fourth, an expert's testimony must "fit" the facts of the case, "and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes."  *Gordon*, 2019 WL 406839, at *3.

Substantial portions of Professor Elhauge's testimony violate these principles.

## II.  PROFESSOR ELHAUGE IMPERMISSIBLY OPINES ON THE EXISTENCE OF A CONSPIRACY

It is well established in antitrust cases that economic experts may not offer "the ultimate legal conclusion about whether a conspiracy existed or anticompetitive conduct actually occurred." *U.S. Info. Sys. v. Int'l Bhd. of Elec. Workers*, 313 F. Supp. 2d 213, 241 (S.D.N.Y. 2004); *Falise v. Am. Tobacco Co.*, 2000 WL 1804602, at *1 (E.D.N.Y. Nov. 30, 2002) (precluding "conclusory opinion that Defendants engaged in a conspiracy"); *Union Carbide Corp. v. Montell*, 28 F. Supp. 2d 833, 843 (S.D.N.Y. 1998) ("They are not to testify that this conduct was either 'anti-competitive' or 'unlawful.'").  That is as it should be, because "the discipline of economics ha[s] no competence to determine" what "amount[s] to a legal 'agreement.'"  Herbert Hovenkamp, *Economic Experts in Antitrust Cases, in* Modern Scientific Evidence § 38-2.0, at 179 (2019-2020) (Decl. Ex. 14).  Instead, "those determinations are the province of the *trier of fact*."  *U.S. Info. Sys.*, 313 F. Supp. 2d at 241; *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 565 (11th Cir. 1998) (concluding the "trier of fact is entirely capable of determining" whether documents are "reflective of collusion").

Professor Elhauge repeatedly violates that established limitation on expert testimony by opining that he has determined that a conspiracy, as a matter of fact, existed.  Indeed, to get to his ultimate (improper) conclusion that DFA "engaged in a multi-faceted conspiracy with processors and other cooperatives,"[9] he opines about the existence of many conspiracies that he calls "different component parts" of the whole.[10]  For example, Professor Elhauge opines in Paragraph 157 that "DFA and DMS conspired with cooperatives to prevent the competitive solicitation of farmer members."[11]  In Paragraph 182, he opines that "DFA/DMS have conspired with dairy

---

[9]     Elhauge Initial R. ¶ 4 (Decl. Ex. 1).
[10]    Elhauge Vol. I Tr. at 54:7-14 (Decl. Ex. 6).
[11]    Elhauge Initial R. ¶ 157 (Decl. Ex. 1).

processors . . . to restrain competition for purchasing of raw milk by processors."[12]  Additional examples abound.[13]  To be clear, he does not say he was told to *assume* the existence of these conspiracies; he *opines* that they existed.  All of these opinions, and his many others like them, are improper; he should be precluded from similarly testifying at trial.  *See U.S. Info Sys.*, 313 F. Supp. 2d at 240 ("Dr. Dunbar would not be permitted to state that the defendants did or did not engage in anticompetitive conduct."); *Holiday Wholesale Grocery v. Philip Morris*, 231 F. Supp. 2d 1253, 1322 (N.D. Ga. 2002) (excluding testimony that a "loose cartel" existed).

## III.  PROFESSOR ELHAUGE CANNOT OFFER OPINIONS ON WHETHER DFA ACTED IN FARMERS' "BEST INTEREST"

Plaintiffs contend that if they show DFA does not act for the "mutual benefit" of its members, then DFA is not entitled to the statutory antitrust immunity permitting dairy farmers to act together "in collectively processing, preparing for market, handling, and marketing" their products.  7 U.S.C. § 291.  Plaintiffs' star witness on that question is, once again, Professor Elhauge.  They repeatedly cite to his opinions that "DFA is not acting in the interest of its members" or "in the best interests of the dairy farmers" to support their attacks on DFA's statutory immunity.[14]  This effort fails the *Daubert* standard in multiple ways.

First, Professor Elhauge offers no economic science in support of his opinions on this issue. Instead, he offers pure legal conjecture that is grounded in no cognizable expertise or scientific methodology.[15]  His opinion that DFA was not acting in the best interest of DFA's farmer-owners

---

[12]     Elhauge Initial R. ¶ 182 (Decl. Ex. 1).

[13]     *See, e.g.*, Elhauge Initial R. ¶¶ 4-6, 87-93, 107, 157, 182 (among others) (Decl. Ex. 1).

[14]     Elhauge Vol. I Tr. at 41:25-42:18 (Decl. Ex. 6).  For examples of plaintiffs relying upon Professor Elhauge's testimony to support this legal argument, see PSOF ¶¶ 93-116.

[15]     Notably, Professor Elhauge has no personal experience with dairy farming; he has never worked for an agricultural cooperative, never been to a dairy processing plant in the United States, never visited any of the plaintiffs' dairy farms, and there is no indication he has even spoken with a dairy-farmer plaintiff in this case.  *See* Elhauge Vol. I Tr. at 47:13-49:2 (Decl. Ex. 6) (discussing Professor Elhauge's work history).  Furthermore, we are unaware of any instance where Professor

or farmers flows circularly from his inadmissible conclusion that DFA engaged in a conspiracy to pay farmers lower premiums.[16]  He purports to buttress that opinion with his lay interpretation of line-items in DFA's financial statements,[17] which he is unqualified to provide, as he is not an accountant and does not rely on any reasoned basis for reaching that interpretation except his own *ipse dixit*.  *See 24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 514 F. Supp. 2d 571, 575 (S.D.N.Y. 2007) (excluding business valuation opinion that was "connected to the existing data only by the *ipse dixit* of the expert" (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 13, 146 (1997)).

Second, even if Professor Elhauge could offer some reliable scientific methodology to support his conclusion that DFA somehow did not act in "the best interest of farmers," that opinion would be irrelevant and inadmissible because it is not the standard established for Capper-Volstead immunity.  *See Andrews v. Metro N. Commuter R.R.*, 882 F.2d 705, 710 (2d Cir. 1989) (reversing admission of purported expert that "made his own law" that was "promulgated not by the courts or the legislature"); *Herbert v. Lisle Corp.*, 99 F.3d 1109, 1117 (Fed. Cir. 1996) ("Incorrect statements of law are no more admissible through 'experts' than are falsifiable scientific theories."); Hearing Tr. at 34:17-20, *United States v. Apple, Inc*., No. 12-cv-2826 (S.D.N.Y. May 23, 2013), ECF No. 265 (Decl. Ex. 13) (concluding that economist's testimony "is premised on a faulty legal assumption and is irrelevant in this case").  Certainly plaintiffs have presented no case law, and we are aware of none, concluding that an agricultural cooperative loses its antitrust immunity by choosing longer-term investments over short-term payouts, or by allegedly paying executives "too much."  In fact, the case law supports the opposite view.  *See, e.g.*, *Bell v. Fur*

---

Elhauge has published an article, taught a course, or been certified as an expert in assessing cooperative members' "best interests."

[16]     Elhauge Vol. I Tr. at 41:25-43:9 (Decl. Ex. 6).

[17]     *See* Elhauge Initial R. ¶¶ 135-146 (Decl. Ex. 1) (discussing DFA's retained earnings and whether that is in the "best interest" of farmers).

*Breeders Agric. Co-op.*, 348 F.3d 1224, 1235 (10th Cir. 2003) (finding cooperative directors were "well within their authority" to make decisions benefitting only some); *Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1184-85 (8th Cir. 1982) (rejecting argument "that because NFO cannot distribute income, its marketing program cannot be considered to be 'for the mutual benefit' of its members"); *Agritronics Corp. v. Nat'l Dairy Herd Assoc.*, 1994 WL 542203, at *5 (N.D.N.Y. Sept. 22, 1994) (concluding "there is no authority" for invalidating CVA immunity due to benefits being provided to some non-members).

The thrust of Professor Elhauge's testimony on this issue seems to be that DFA's ownership of milk processing facilities, in and of itself, creates a conflict of interest for its dairy farmer members. But that opinion cannot stand because it does not fit the law: the Capper-Volstead Act expressly protects DFA's right to engage in "processing" of dairy products and its investment in processing facilities. *See* 7 U.S.C. § 291. Professor Elhauge acknowledges that it is not uncommon for cooperatives to own processing plants,[18] but then draws a negative inference from DFA's ownership of processing plants without doing anything to "differentiate between legal and illegal" plant ownership. *See Williamson Oil Co. v. Phillip Morris USA*, 346 F.3d 1287, 1323 (11th Cir. 2003) (approving exclusion of testimony that "could not have aided a finder of fact to determine whether appellees' behavior was or was not legal"); *Estate of Puppolo v. Welch*, 2017 WL 4042342, at *16 (D. Vt. Sept. 12, 2017), *aff'd* 771 F. App'x 64 (2d Cir. 2019) ("[Expert testimony] should not be received if it is based on 'inadequately explored legal criteria.'").

Professor Elhauge's testimony regarding the "best interest of farmers" is further improper because it is an implicit legal opinion and one the jury is likely to improperly credit given Professor

---

[18]     Elhauge Initial R. ¶ 16 (Decl. Ex. 1) ("In addition to these bargaining and related activities, a cooperative might also own processing plants for fluid milk or manufactured dairy products.").

Elhauge's status as a law professor. *See id.* at *17 ("[E]ven if a court reminds a jury that a lawyer's views of the law are 'not binding' 'such a charge cannot always cure the trial court's error in allowing inadmissible evidence.'"); *Gordon*, 2019 WL 5084160, at *3 ("Evidence that would communicate a legal standard, whether explicit or implicit, is not admissible.").

## IV.   PROFESSOR ELHAUGE CANNOT OFFER INTERPRETATIONS OF CONTRACTS OR OTHER DOCUMENTS

Although Professor Elhauge is a lawyer by training, his role in this case cannot extend to interpreting documents, including contracts. "The question of interpretation of [a] contract is for the jury and the question of legal effect is for the judge." *Marx & Co., Inc. v. Diners' Club, Inc.*, 550 F.2d 505, 510 (2d Cir. 1977); *Media Sport & Arts v. Kinney Shoe Corp.*, 1999 WL 946354, at *3-4 (S.D.N.Y. 1999). Professor Elhauge violates that principle in three notable ways:

*Full Supply Agreements*: Professor Elhauge purports to interpret the quantity clauses in thirteen contracts as being "full supply." Elhauge Initial R. ¶ 213 (Decl. Ex. 1). But he does not have any objective definition of what constitutes "full supply," admits there is no "clear definition in antitrust economics," and he has not disclosed any economic method or analysis for determining if the quantities identified in the contracts, which are sometimes stated as "loads" or "truck loads," actually make up a plant's full supply or capacity.[19]

*Contract Term*: Professor Elhauge purports to interpret the interaction between the "initial term" clause and the "renewal term" clause of those same thirteen contracts to conclude that each of the contracts is for a term longer than one year within the meaning of a legal consent decree or DFA's Antitrust Policy. He openly interprets the contracts, offering his "simple" view of the

---

[19]     Elhauge Vol. I Tr. at 243:25-244:4; 245:14-20 (Decl. Ex. 6). For example, Prof. Elhauge interprets as "full supply" in Table 3 of his Report agreements only referring to truck "loads" to be delivered. *See* Oct. 2006 Milk Supply Agree. (Decl. Ex. 10) ("Seller agrees and shall sell and deliver a total of ten (10) loads of Milk per week . . . ."); Jan. 2007 Milk Supply Agree. (Decl. Ex. 11) ("Seller agrees and shall sell and deliver a total of five (5) loads of Milk per week . . . .").

meaning of the words "initial term" and "renewal term," as well as expressing his unfamiliarity with "any economic theory that supports the claim that the term of an agreement is best understood as its notice-of-cancellation period."  Elhauge R. ¶¶ 212-13.  Of course, economics does not provide a methodology for interpretation of *any* contract terms and Professor Elhauge cites to none.

_DocuWare Agreements_:  Professor Elhauge concludes that several aspects of the purported "multi-faceted" conspiracy continue to the present day based *purely* on his interpretation of the solicitation clause in so-called "DocuWare Access Agreements."  These agreements allow signatories to access a database of information about farmers' non-use of rBST.  One such clause says "[t]his covenant shall remain in effect for so long as *Agri-Mark has access* to the DocuWare Data and for a period of 24 months after such access is terminated."[20]  Despite that duration clause, Professor Elhauge—employing his own, idiosyncratic and undisclosed rules of contract interpretation—opines that the clause does not contain any timing limitation and lasts as long as the *farmer's information* is in the database.[21]  Thus, according to Professor Elhauge, whether Agri-Mark continues to access the DocuWare Data "wouldn't be relevant."[22]  That improper and unsupported testimony about the legal meaning and effect of the contract is what Professor Elhauge relies upon to conclude that "antisolicitation agreements" (his characterization) with several processors continue to the present day.[23]

In the best-case scenario, Professor Elhauge's interpretation of these contracts arises from what he calls, "a commonsense meaning of the words," or "just reading the plain meaning of it."[24]  And in the worst-case scenario, he offers opinions that directly conflict with the contract terms

---

[20]     Elhauge Initial R. ¶ 161 (Decl. Ex. 1) (citing a DocuWare Access Agreement).
[21]     Elhauge Vol. I Tr. at 115:10-119:5 (Decl. Ex. 6) (objections omitted).
[22]     Elhauge Vol. I Tr. at 115:15-20 (Decl. Ex. 6).
[23]     Elhauge Initial R. ¶¶ 4, 93, 161 n.345 (Decl. Ex. 1).
[24]     Elhauge Vol. I Tr. at 130:4-5; 130:16-20 (Decl. Ex. 6).

altogether.  Either way, his testimony is inadmissible.  *See Marx*, 550 F.2d at 510 ("The question

of interpretation of [a] contract is for the jury and the question of legal effect is for the judge.").

## V.     PROFESSOR ELHAUGE CANNOT TESTIFY ON PARTIES' MENTAL STATES, MOTIVATIONS, OR CREDIBILITY

An economic expert has no specialized skill within the meaning of Rule 702 to intuit what

an individual or corporation understands, expects, or relied upon when making a business decision.

Testimony of that kind violates the fundamental rule that "experts may not opine on a party's state

of mind." *Scentsational Techs. v. Pepsi, Inc.*, 2018 WL 1889763, at *8 (S.D.N.Y. Apr. 18, 2018).

Professor Elhauge flaunts that rule by repeatedly testifying about corporations' and individuals'

"motive[s],"[25] "expectations,"[26] and "underst[andings]."[27]  The Court should preclude him from

doing so at trial.  *In re Rezulin*, 309 F. Supp. 2d at 546 ("[O]pinions . . . on the intent, motive or

states of mind of corporations . . . have no basis in any relevant body of knowledge or expertise.").

Professor Elhauge also appears to expect to tell the jury which witnesses to believe and

which to discredit.  He argues, as a lawyer would, that DFA and Dean's employees' explanation

for entering in a particular supply agreement was "a conclusory assertion" that he "discredits" as

not "persuasive."[28]  And that witnesses' sworn testimony on the motivations for rebates associated

with those supply agreements are "not to be credited" because Professor Elhauge did not see a

"contemporaneous analysis" of the benefits of those rebates in the record (Professor Elhauge did

not test whether there were any such benefits).[29]  This assessment of "the credibility of witnesses

is a matter for the trier of fact and not the proper subject for expert testimony." *Dibella v. Hopkins*,

2002 WL 31427362, at *3-4 (S.D.N.Y. Oct. 30, 2002); *U.S. v. Scop*, 846 F.2d 135, 142 (2d Cir.

---

[25]     PSOF ¶ 55 (citing Elhauge Initial R. ¶ 198).
[26]     PSOF ¶ 52 (citing Elhauge Initial R. ¶ 196).
[27]     PSOF ¶ 60 (citing Elhauge Initial R. ¶ 60).
[28]     Elhauge Vol. I Tr. at 258:3-259:15 (Decl. Ex. 6).
[29]     Elhauge Vol. I Tr. at 257:5-258:12 (Decl. Ex. 6).

1988) ("[W]itnesses may not opine as to the credibility of the testimony of other witnesses . . . .").

Professor Elhauge's testimony regarding the underlying motivation for DFA's decision to cease marketing the milk of certain farmers violates both principles: it is an improper attempt at mind reading and an opinion on witness credibility.  DFA's business decision to phase-out milk from certain cooperatives and farmers was not a decision that DFA took lightly.  Plaintiffs questioned multiple witnesses at length about this topic in deposition, and explaining DFA's decision-making process will, no doubt, be the subject of direct and cross examination of percipient fact witnesses at trial.  Professor Elhauge has no personal knowledge of those facts.  He merely read the deposition transcripts and documents and concluded that "Defendants' purported reasons for terminating independent farmers and other cooperatives are pretextual."[30]  He cannot offer that opinion.  That is for the jury to decide after hearing from witnesses with actual knowledge of those business decisions.  *See Lippe v. Bairnco Corp.*, 288 B.R. 678, 688 (S.D.N.Y. 2003) (precluding expert from testifying as to "defendants' 'real purpose,' their true motivation, in engaging" in a transaction); *Holiday Wholesale Grocery Co. v. Philip Morris, Inc.*, 231 F. Supp. 2d 1253, 1322 (W.D. Ga. 2002) (excluding economic expert's "opinion that Defendants' justification is pretextual").

## VI.    PROFESSOR ELHAUGE CANNOT NARRATE PLAINTIFFS' CASE

The infirmity of Professor Elhauge's intended testimony goes beyond the many specific issues described above.  There is also a broader, overarching problem:  plaintiffs plan to use Professor Elhauge to summarize, apparently for hours, the *facts* of how they believe a conspiracy formed and operated.  About forty pages of his report merely, in his own words, "explain the effectuation of the conspiracy."[31]  That "explanation" is not based on any economic principles, but

---

[30]    Elhauge Initial R. ¶ 226 (Decl. Ex. 1).
[31]    Elhauge Initial R. ¶¶ 110-11 (Decl. Ex. 1).

is instead based on his interpretation and weighing of the evidence; at one point, he strings together 262 footnotes *in a row* to hand-selected discovery documents and deposition testimony.[32]   His methodology for interpreting these documents was just reading their "plain"[33] or "commonsense meaning."[34]   There is no science, technical, or specialized knowledge involved in his "explaining" these facts.  *See Mid-State Fertilizer Co. v. Exch. Nat'l Bank*, 877 F.2d 1333, 1340 (7th Cir. 1989) (excluding economists who merely "examined material produced in discovery and drew inferences from the record" instead of "draw[ing] on the skills of an economist"); *JamsSports Entm't v. Paradama Prods., Inc.*, 2005 WL 14917, at *10 (N.D. Ill. 2005) (excluding economist's testimony that "simply examined materials produced in discovery and dr[ew] inferences" because it "does not constitute the application of scientific, technical, or other specialized knowledge").

        That would never be proper, whether Professor Elhauge's expertise were law, economics, or any other subject.  The jury does not need Professor Elhauge or any other expert to summarize, weigh, or interpret the evidence.  He has no personal knowledge of these facts and instead "present[s] a narrative of the case which a lay juror is equally capable of constructing."  *Taylor v. Evans*, 1997 WL 1540, at *2 (S.D.N.Y. Apr. 1, 1997).  We recognize that Professor Elhauge's report itself is inadmissible hearsay,[35] but it provides a useful preview of plaintiffs' intent to use Professor Elhauge to summarize, characterize, and argue the weight of the documents and testimony they believe show the existence of a conspiracy.  Plaintiffs confirmed that intent by

---

[32]        *See* Elhauge Initial R. ¶¶ 155-233 (encompassing nn.335-561).
[33]        Elhauge Vol. I Tr. at 130:16-18 (Decl. Ex. 6).
[34]        Elhauge Vol. I Tr. at 130:4-5 (Decl. Ex. 6).
[35]        *See, e.g.*, *Crown & Cork Seal Co. v. Credit Suisse First Boston*, 2013 WL 978980, at *7 (S.D.N.Y. Mar. 12, 2013) ("[C]ourts have held that where an expert is expected to testify at trial, his report is inadmissible hearsay and redundant." (quotation omitted)); *Millennium Pipeline Co. v. Acres of Land, Inc.*, 2015 WL 6126949, at *3 (W.D.N.Y. Oct. 16, 2015) ("The report itself is hearsay.  As such, it is presumptively inadmissible.").

allocating four hours of their affirmative case to Professor Elhauge's testimony, while nearly all of the third-parties with firsthand knowledge of the events that allegedly effectuated the conspiracy are slated for only ten minutes.[36]  And plaintiffs cited to Professor Elhauge in 133 out of the 143 paragraphs in the "concise" statement of their case on summary judgment, with the vast majority of those citations going to his explanation of the "effectuation of the conspiracy."[37]  That type of characterization and summarization of documents is reserved for lawyers arguing as lawyers, not lawyers testifying as experts.  *See Scentsational*, 2018 WL 1889763, at *4 (barring expert from acting "as a vehicle to present a factual narrative of interesting or useful documents for a case, in effect simply accumulating and putting together one party's 'story'"); *Simuro v. Shedd*, 2016 WL 9526418, at *5 (D. Vt. Nov. 9, 2016) (excluding testimony that "weaves together the facts from the record that support his opinion"); *Lippe*, 288 B.R. at 688 (excluding "summation to the jury").  Thus, the Court should preclude Professor Elhauge from offering at trial this type of prolonged narrative summary of documents and testimony.

## VII.   PROFESSOR ELHAUGE'S REGRESSION ANALYSES ARE NOT RELIABLE

The one part of Professor Elhauge's analysis that *should be* within his purview as an "antitrust economist" is his regression analysis.  We emphasize "should be" because Professor Elhauge is not an economist, and his econometric work has been horribly flawed and unfamiliar to him.  When reviewing Professor Elhauge's econometric work, the court "must determine whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered."  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002).  It is not enough that Professor Elhauge is using a regression analysis; the fact that some regression

---

[36]   *See* Plfs.' Preliminary Witness List, ECF No. 136-1 (Nov. 8, 2019) (Decl. Ex. 9) ("Third Parties (by video deposition or read ins, 10 minutes for most witnesses and possibly 30 minutes for two witnesses)").
[37]   *See generally* PSOF.

analyses may be reliable does not make his work admissible. *See Reed v. Advocate Health*, 268 F.R.D. 573, 593 (N.D. Ill. 2009) ("Multiple regression analysis is not a magic formula."). One important indicia of reliability is whether "the witness has applied the principles and methods reliably to the facts of the case." *Id.* (citing Fed. R. Evid. 702(d)). To be admissible, "it is critical that an expert's analysis be reliable at every step." *Amorgianos*, 303 F.3d at 267.

Professor Elhauge's first attempt at estimating damages, by his own admission, committed egregious data errors that this Court has recognized "could and should have been avoided."[38] As a result, in the words of plaintiffs' counsel, Professor Elhauge had to abandon his regression because to rely on it "wouldn't be truthful" and would "mislead the jury."[39] Professor Elhauge failed to include over 179,000 available records of farmer payments[40] and failed altogether to test the reliability of a critical "proxy" he used to estimate damages.[41] Plaintiffs' counsel tried to minimize those errors by saying Professor Elhauge did not have enough delivery data to check his regressions, but Professor Elhauge later admitted in deposition he *did have the data*, he just failed to run the check.[42] Professor Elhauge only changed his position that his regression results were the "best"[43] (abandoning them as "unreliable" and indefensible) when an actual economist, DFA's expert Dr. Sumner, pointed out Professor Elhauge's errors.

Professor Elhauge then created a new regression that he once again touted as the best

---

[38]   *Sitts v. DFA, Inc.*, 2019 WL 3298537, at *5 (D. Vt. July 23, 2019).
[39]   Apr. 9, 2019 Hearing Tr. at 23:19-24:6 (Decl. Ex. 8); Pls.' Opp'n at 4.
[40]   Expert Report of D. Sumner ¶¶ 79-81 (Nov. 30, 2018) ("Sumner Initial R.") (Decl. Ex. 2).
[41]   Elhauge Vol. II Tr. at 344:25-345:11 (Decl. Ex. 7).
[42]   *Compare* Apr. 9, 2019 Hearing Tr. at 33:4-13 (Decl. Ex. 8) ("[T]here wasn't enough data to check that proxy or even to do it because we didn't have enough delivery data."), *with* Elhauge Vol. II Tr. at 345:12-21 (Decl. Ex. 7) ("Q. But at the time of the original report, you had, albeit a smaller subset, you did still have a subset of hundreds of thousands of such observations that you could have run the test against?  A.  Yes.").
[43]   *See, e.g.*, Elhauge Vol. I Tr. at 195:12-196:6 (Decl. Ex. 6).

available measure of damages.  But as before, Professor Elhauge did not know how his new regression operates, and he did not apply his own methodology as he described it.  *See Amorgianos*, 303 F.3d at 269 (expert opinion "was not based on 'good grounds'" where it "rested on a faulty assumption due to his failure to apply his stated methodology 'reliably to the facts of the case'").

The mistake, though technical, is very material to reliability.  Professor Elhauge admits that he must determine where a farm's milk is shipped, because that influences the federal minimum price the farm receives.  Miscalculating the federal minimum prices is a serious error because it can "artificially inflate Plaintiffs' damages."  *Allen v. DFA, Inc.*, 2013 WL 6909953, at *15 (D. Vt. Dec. 31, 2013) (Reiss, J.).  Professor Elhauge erroneously *thought* that his new regression fills in the gaps of farms that are missing delivery data by looking where other farms in the same ZIP code shipped their milk.  This approach stumbles out of the starting blocks because in over 274,000 instances, there is no other farm in the same ZIP code to use as a reference point. Professor Elhauge just whistles past that problem, throwing out all of those observations— representing approximately 23.5 percent of his original sample.  That was an unreasonable choice that renders this analysis unreliable by itself,[44] but at least Professor Elhauge knew about and disclosed that he excluded over a quarter-million instances of farm payments.

Professor Elhauge failed to understand and disclose other failings of his new regression. The largest looming example is his treatment of farms *without any ZIP code information*.  Because Professor Elhauge's new regression estimates a farm's delivery location based on where other farms in the same ZIP code ship, the inability to identify the farm's ZIP code would be a massive problem.  Professor Elhauge never disclosed encountering, or even considering, this problem in

---

[44]     Second Suppl. Expert Report of Daniel A. Sumner ¶¶ 33-38 (Dec. 16, 2019) ("Sumner Second Suppl. R.") (Decl. Ex. 5).

his supplemental report.  He said this in deposition:

> Q.  . . .  [A]re you aware that there were some reported observations in the data set that had no ZIP code associated with them?
>
> A.  I don't recall that being an issue, no.
>
> Q.  Okay.  And we can agree your supplemental report does not disclose any approach for dealing with observations without delivery data and without a ZIP code, correct?
>
> A.  No, I mean, you – you can deal with – you can deal with observations without delivery data by using the average result in the same ZIP code.  But, obviously, if you have no ZIP code data for them at all, you can't use those.
>
> * * *
>
> Q.  Is that your understanding, sir, that all the observations that you were are [sic] aware of in the data set had ZIP code information?
>
> A.  I mean, all the ones that we used originally, because we need the farmer location in order to do the analysis.[45]

In reality, almost 94,000 instances of farm payments in his data sample are missing delivery data and *missing a ZIP code* altogether.  Instead, those observations—over 10% of his new sample—have a "." as a placeholder, indicating missing data.  Even a cursory review of the data would have revealed these absent ZIP codes, but Professor Elhauge completely missed it.  Professor Elhauge's new regression (unbeknownst to him) treated those 93,943 farm payments as if they were all located in the *same ZIP code*.[46]  If that had been an intentional choice, it would have been indefensible because those farms are actually scattered across **23 states**.[47]  But it was not intentional; it was a failure of econometrics rendering Professor Elhauge's re-do regression unreliable and inadmissible.  *See Amorgianos*, 303 F.3d at 269 (excluding expert for "failure to apply his stated methodology 'reliably to the facts of the case'").  Professor Elhauge eventually recognized that this error, too, was so serious that he improperly tried to submit another re-do.[48]

---

[45]     Elhauge Vol. II Tr. at 393:16-396:3 (Decl. Ex. 7).

[46]     Sumner Second Supp. R. ¶ 33 (Decl. Ex. 5).

[47]     *See* Sumner Second Suppl. R. ¶¶ 16-17 (Decl. Ex. 5).

[48]     *See supra* n.8.  DFA intends to promptly move to strike that improper and belated report.

## VIII.   PROFESSOR ELHAUGE'S REGRESSION ANALYSES DO NOT "FIT"

Professor Elhauge's testimony regarding his regression analysis is independently inadmissible because his principles and methods do not "fit" the facts of the case.  *Gordon*, 2019 WL 4068639, at *3.  Fit concerns often arise when an expert misuses or over-relies upon representative evidence, such as averages or samples.  The concern is that "[r]epresentative evidence that is statistically inadequate or based on implausible assumptions could not lead to a fair or accurate estimate." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1048 (2016) (noting statistical evidence would have been allowed because "each employee worked in the same facility, did similar work, and was paid under the same policy").  This is a special concern in antitrust cases, when "the prices used by economists are averages of a number of different prices charged to different customers or for somewhat different products.  Using such averages can lead to **serious analytical problems**." *Sheet Metal Workers v. GlaxoKline*, 2010 WL 3855552, at 30 (E.D. Pa. Sept. 30, 2010) (quoting ABA Section of Antitrust Law, *Econometrics: Legal, Practical, & Technical Issues* at 220 (2005)).  "[A]veraging 'by definition glides over what may be important differences,'" that create "substantial variation" in how individual plaintiffs may experience the allegedly wrongful conduct. *Reed*, 268 F.R.D. at 591.

Professor Elhauge's regression analysis is a layer cake of averages, attempting to glaze over myriad differences in farmers' circumstances.  To even identify what premiums any particular farm received in any given month, Professor Elhauge often uses one of several averages for where other farms shipped their milk.[49]  He then averages those premiums again over thirteen years.  And, finally, he compares the thirteen-year average in Order 1 to the same averages in Order 32.[50]  At best, this analysis is only relevant to what the "hypothetical average" farm received, not to what

---

[49]     *See* Sumner Second Suppl. R. ¶¶ 14-15, 19 (Decl. Ex. 5).
[50]     Elhauge Vol. II Tr. 382:10-19 (Decl. Ex. 7); Elhauge Vol. I Tr. 143:7-11 (Decl. Ex. 6).

any particular plaintiff in this case received.  *See Reed*, 268 F.R.D. at 592.

Professor Elhauge's use of averages masks important differences among the plaintiffs that would cause them to experience the alleged conspiracy differently, depending on factors such as time, location of the farm, size of the farm, efficiency at the farm, and contractual partners—among other things.  For example, only 28 percent of plaintiffs have sold milk directly to a processor, while the rest marketed through cooperatives;[51] and plaintiffs vary greatly as to which cooperatives they tried to join or were even aware of.[52]  Unsurprisingly, plaintiffs received wildly different premiums.[53]  These are exactly the types of substantial differences that make heavy reliance on averages improper.  *See In re Genetically Modified Rice*, 251 F.R.D. 392, 398 (E.D. Mo. 2008) (excluding average price comparison where "[s]ome rice producers entered pools or cooperatives to sell their rice" and "[o]thers sold rice through booking contracts"); *Reed*, 268 F.R.D. at 595 ("[P]laintiffs' reliance on averages ignores differences over time, nurse performance and merit, . . .  or other factors that may play into an individual nurse's (or class of nurses') wage.").

Testing Professor Elhauge's methodology by breaking down some of his averaging into more manageable pieces yields dramatic results.  It is not surprising, and it is uncontested, that applying Professor Elhauge's model on a year-by-year basis estimates *no damages* in 2005, 2006, and 2007, as well as in 2015.[54]  But by using aggregate averages over the entire thirteen-year period without considering that plaintiffs dropped out of the production pool over time,[55] Professor

---

[51]     *See* Sumner R. Ex. 2 (at p.33) (Decl. Ex. 2).
[52]     *See* Sumner First Suppl. R. ¶ 4, Ex. A (Decl. Ex. 3).
[53]     *See, e.g.*, Sumner Second Suppl. R. Ex. 3 (Decl. Ex. 5).
[54]     *See* Sumner Second Suppl. R. ¶ 27 n.29 (Decl. Ex. 5).
[55]     At least 11 plaintiffs had no production data by 2010; 32 by 2016, and 37 ***percent*** by 2017. *See* FARM_C_7_Plaintiff Damages Detail.xlsx (Decl. Ex. 12).  This is a spreadsheet of plaintiffs' production data that Professor Elhauge used to calculate damages in his first supplemental analysis.  *See* Suppl. Expert Report of E. Elhauge ¶ 14 n.26 (Jan. 18, 2019) (Decl. Ex. 4).

Elhauge impermissibly allows farmers that *only produced when Order 1 premiums were higher* to receive damages based on lower prices after they exited the market.  *See Dzielak v. Whirlpool Corp.*, 2017 WL 6513347, at *12 (D.N.J. Dec. 20, 2017) (concluding that plaintiff would be unable to use a high average as "a proxy" for his own experiences).

The same glaring weaknesses emerge if the model is used to predict individualized plaintiffs' premiums.  According to Professor Elhauge' own regression, some plaintiffs actually received a higher premium in Order 1 than the regression predicts they would have received in Order 32.  Using Professor Elhauge's first supplemental regression analysis, 35 percent of plaintiffs in the regression sample received premiums above what the regression says they would have received in Order 32 in at least some months between 2005 and 2017.[56]  Professor Elhauge's model, thus, glosses over individualized differences driving deviations from his model, and he failed to conduct any individualized analyses to see why that might be the case.  *See, e.g.*, *In re Plastic Additives*, 2010 WL 3431837, at *16 (E.D. Pa. Aug. 31, 2010) (rejecting expert that "did not do anything, such as perform individual regressions, to confirm that his industrywide regressions accurately represented any individual class member's pricing experiences").

<p style="text-align:center">*     *     *</p>

In conclusion, DFA and DMS respectfully request that the Court preclude Professor Elhauge's testimony regarding his econometric measures of purported damages and antitrust injury, preclude Professor Elhauge from narrating plaintiffs' conspiracy theory, and preclude Professor Elhauge from invading the province of the Court and the jury, as described above.

---

[56]     Sumner Second Suppl. R. ¶ 28 n.31 (Decl. Ex. 5).

Dated:  January 10, 2019                    Respectfully submitted,

                                              /s/ *Alfred C. Pfeiffer Jr.*
                                            Alfred C. Pfeiffer Jr. (admitted *pro hac vice*)
                                            LATHAM & WATKINS LLP
                                            505 Montgomery Street, Suite 2000
                                            San Francisco, CA 94111
                                            Telephone:  415-391-0600
                                            Facsimile:  415-395-8095
                                            Email:  al.pfeiffer@lw.com

                                            Margaret M. Zwisler (admitted *pro hac vice*)
                                            Jennifer L. Giordano (admitted *pro hac vice*)
                                            LATHAM & WATKINS LLP
                                            555 Eleventh Street, NW, Suite 1000
                                            Washington, DC 20004
                                            Telephone:  202-637-2200
                                            Facsimile:  202-637-2201
                                            Email:  margaret.zwisler@lw.com
                                            Email:  jennifer.giordano@lw.com

                                            W. Todd Miller (admitted *pro hac vice*)
                                            BAKER & MILLER PLLC
                                            2401 Pennsylvania Avenue, NW, Suite 300
                                            Washington, DC 20037
                                            Telephone:  202-663-7820
                                            Facsimile:  202-663-7849
                                            Email:  tmiller@bakerandmiller.com

                                            Ian P. Carleton
                                            SHEEHEY FURLONG & BEHM P.C.
                                            30 Main Street, P.O. Box 66
                                            Burlington, VT 05402
                                            Telephone:  802-864-9891
                                            Email:  icarleton@sheeheyvt.com

                                            *Counsel for Defendants Dairy Farmers of*
                                            *America, Inc. and Dairy Marketing Services,*
                                            *LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 10, 2019, I electronically filed with the Clerk of Court the

foregoing document using the CM/ECF system.  The CM/ECF system will provide service of such

filing via Notice of Electronic Filing (NEF) to the following NEF parties:

Joel G. Beckman, Esq. (jbeckman@nbparis.com)

Gary L. Franklin, Esq. (gfranklin@primmer.com)

William C. Nystrom, Esq. (wnystrom@nbparis.com)

Elizabeth A. Reidy, Esq. (ereidy@nbparis.com)

Dana A. Zakarian, Esq. (dzakarian@nbparis.com)


Dated:  January 10, 2019

<div style="margin-left:40%">

  /s/ *Alfred C. Pfeiffer Jr.*   
Alfred C. Pfeiffer Jr. (admitted *pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone:  415-391-0600
Facsimile:  415-395-8095
Email:  al.pfeiffer@lw.com

</div>