## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| **GARRETT SITTS, et al.,**<br><br>      **Plaintiffs,**<br><br>**v.**<br><br>**DAIRY FARMERS OF AMERICA, INC. and DAIRY MARKETING SERVICES, LLC,**<br><br>      **Defendants.** | **Civil Action No. 2:16-cv-00287-cr** |

**DEFENDANTS DAIRY FARMERS OF AMERICA, INC. AND DAIRY MARKETING SERVICES LLC'S MOTION *IN LIMINE* NO. 9: TO PRECLUDE EVIDENCE AND ARGUMENT THAT DFA IS NOT AN AGRICULTURAL COOPERATIVE OPERATED FOR THE MUTUAL BENEFIT OF ITS MEMBERS UNDER THE CAPPER-VOLSTEAD ACT**
**AND MEMORANDUM IN SUPPORT**

**EVIDENTIARY HEARING REQUESTED**

Defendants Dairy Farmers of America, Inc. and Dairy Marketing Services, LLC (collectively "DFA") bring this motion *in limine* under Federal Rules of Evidence 401, 402, and 403 to preclude evidence and argument challenging DFA's status as an agricultural cooperative that is operated for the mutual benefit of its members under the Capper-Volstead Act ("Act"). This motion is *not* about whether the Act immunizes DFA from antitrust liability for the specific conduct alleged by plaintiffs. It addresses only the distinct, threshold question of whether plaintiffs can argue that DFA does not qualify for the Act's protections in the first instance.[1]

Plaintiffs have made it abundantly clear that they intend to argue to the jury that DFA fails to qualify for *any* of the Act's protections because, they claim, DFA has not been operated for the "mutual benefit" of its members.[2] In support of that argument, plaintiffs intend to question the wisdom of an array of DFA's business decisions over the last twenty years including, among other things, DFA's decisions to invest in processing plants[3]; to invest a portion of the cooperative's earnings to grow its commercial business and to cover administrative expenses[4]; and to attract, retain, and compensate top management talent.[5] Plaintiffs also take issue with two unauthorized payments involving a DFA employee almost two decades ago.[6] In plaintiffs' subjective view, DFA's members would have been better off had the cooperative managed its business differently.

---

[1]    Because motions *in limine* are not due until June 17, 2020, DFA reserves the right to file additional motions *in limine* after this date.

[2]    *See* Pls.' Statement of Disputed Material Facts in Supp. of Opp'n to Defs.' Mot. for Summ. J. § X(B), ECF No. 102 ("PSOF"); *see also id.* ¶ 93 ("DFA CEO Rick Smith testified that DFA, as a cooperative, must operate for the mutual benefit of the farmer-members.").

[3]    *Id*. ¶¶ 97-98.

[4]    *Id*. ¶¶ 101-05.

[5]    *See id*. ¶¶ 105, 114.

[6]    *Id*. ¶ 112. These rogue actions involving a long-gone former employee are the subject of DFA's separate Motion *in Limine* No. 3: To Preclude Evidence of Payments to the Individuals Herman Brubaker and Buckey Jones, ECF No. 202 (filed May 21, 2020).

But in the nearly 100 years that have passed since Congress enacted the Capper-Volstead Act, no court has so much as hinted that a duly-formed agricultural cooperative, operated for the purpose of handling, processing, preparing for market, and marketing its members' farm products, can be stripped of the Act's protections by faulting management's business judgment or by pointing to any rogue action of an individual employee or member.[7]  This Court should not be the first.  The "mutual benefit" provision serves to limit the Act's protections to associations owned and operated for the benefit of their farmer members when those farmers are acting as producers of agricultural products, rather than corporations where profits inure to stockholders.  And the United States Department of Agriculture ("USDA") regularly reviews and certifies associations as qualifying cooperatives under the Capper-Volstead Act—including DFA, specifically—based on purely objective indicia of the cooperative's structure and operations.  Plaintiffs' attempt to transform the "mutual benefit" provision from an objective inquiry into a subjective and open-ended assessment of a cooperative's business decisions is unprecedented and unworkable, and any such approach would harm the very farmers Congress intended to protect.  A ruling precluding evidence and argument regarding the "mutual benefit" provision is needed now to ensure a fair trial.[8]

## ARGUMENT

Courts play a vital role in ensuring that juries decide cases under a correct interpretation of the law and based only on relevant evidence.  Fed. R. Evid. 401, 402.  Plaintiffs have made clear

---

[7]     *See supra* n.6 (discussing Motion *in Limine* No. 3).

[8]     DFA submitted separate motions *in limine* to explain why plaintiffs' "mutual benefit" evidence is irrelevant on the merits or otherwise inadmissible under the Rules of Evidence.  DFA will not repeat those arguments here.  This motion explains why plaintiffs' argument that this evidence bears on whether DFA is a qualified cooperative under the Capper-Volstead Act is wrong as a matter of law.

that they intend to present evidence and argument regarding various business and investment decisions to argue that DFA fails to satisfy the Capper-Volstead Act's requirement that an agricultural association "operate for the mutual benefit" of its members.  Because the relevance of this evidence and argument presents a purely legal question regarding the correct interpretation of the "mutual benefit" language, this Court must first interpret that statutory phrase.  *See, e.g.*, *Henderson v. Nat'l R.R. Passenger Corp.*, 87 F. Supp. 3d 610, 614-15 (S.D.N.Y 2015) (ruling on motion *in limine* to preclude evidence where relevance turned on an issue of "first impression" regarding the interpretation of a federal statute).

## I.  THE "MUTUAL BENEFIT" REQUIREMENT ENSURES THAT THE ACT'S PROTECTIONS ARE LIMITED TO AGRICULTURAL ASSOCIATIONS IN WHICH MEMBERS SHARE THE RISKS AND REWARDS OF OPERATION

No court has considered relevant the sort of evidence and argument that plaintiffs intend to present at trial to argue against DFA's qualification as a Capper-Volstead cooperative.  For good reason.  Like the Act's other requirements, the "mutual benefit" language operates objectively, focusing on how the association distributes the benefits and burdens of membership.  This understanding of "mutual benefit" is compelled by the longstanding practice of the United States Department of Agriculture, the Act's text and history, and its surrounding statutory context.

### A.  The Capper-Volstead Act Lays Out Purely Objective Criteria for Qualification

The Capper-Volstead Act provides that "[p]ersons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers may act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling, and marketing" the "products of persons so engaged." 7 U.S.C. § 291.  It expressly authorizes agricultural cooperatives to "have marketing agencies in common" and "make the necessary contracts and agreements to effect such purposes."  *Id.*

Congress intended the Act to give farmers "the same 'unified competitive advantage' available to businessmen acting through corporations." *Fairdale Farms v. Yankee Milk, Inc.*, 635 F.2d 1037, 1043 (2d Cir. 1980) (quoting *Md. & Va. Milk Producers Ass'n v. United States*, 362 U.S. 458, 466 (1960)).

The Act imposes several requirements that an association must satisfy.  First, the Act requires an association to limit its membership to "[p]ersons engaged in the production of agricultural products."  7 U.S.C. § 291; *see also Case-Swayne Co. v. Sunkist*, 389 U.S. 384, 389-90 (1967).  Second, it prohibits "deal[ing] in the products of nonmembers to an amount greater in value than such as are handled by it for members."  7 U.S.C. § 291.  Third, it requires either that: (a) "no member of the association is allowed more than one vote because of the amount of stock or membership capital he may own"; *or* (b) "the association does not pay dividends on stock or membership capital in excess of 8 per centum per annum."  7 U.S.C. § 291.[9]  Finally, the Act provides that a qualifying "association" be "operated for the mutual benefit of the members thereof, as such producers."  *Id*.  All of these criteria are objective: farmers, associations, and enforcement agencies must be able to determine whether an association qualifies under the Act without an individualized, and highly subjective, inquiry each time the matter is put in issue.  This is discussed further in Section II, below.

**B.      USDA Has Long Understood the Capper-Volstead Act to Impose Purely Objective Qualifications And Has Repeatedly Certified DFA As A Qualifying Cooperative**

Congress charged the USDA with overseeing agricultural cooperatives under the Capper-Volstead Act and related statutes governing agricultural marketing.  *See, e.g.*, 7 U.S.C. § 292

---

[9]      Plaintiffs have not—and could not—argue that DFA fails to satisfy these qualifications. DFA is owned entirely by its member dairy farmers; it has elected not to issue capital stock; and no member is allowed more than one vote on account of his or her membership capital.

[Capper-Volstead Section 2] (authorizing the USDA to hold hearings where it believes a cooperative is charging undue prices); *id.* §§ 601-674 (governing agricultural adjustment and marketing). The USDA's longstanding practice under these statutes confirms that the Capper-Volstead's criteria operate as purely objective requirements regarding a cooperative's organizational structure, non-member business, voting rules, and how the risks and rewards of membership are distributed among members.

The Agricultural Marketing Agreement Act of 1937 ("AMAA") governs pricing and marketing conditions in regulated milk markets, including Federal Order 1. Congress granted the USDA broad authority to implement the AMAA through rules and regulations carrying the force of law. *See* 7 U.S.C. § 610(c) (providing that the Secretary of Agriculture "is authorized, with the approval of the President, to make such regulations with the force and effect of law as may be necessary to carry out the powers vested in him" under Title 7's provisions regarding agricultural marketing and adjustment); Exec. Order No. 10199, 15 Fed. Reg. 9217 (Dec. 21, 1950) (Presidential order authorizing "the Secretary of Agriculture to make without the approval of the President such regulations with the force and effect of law as may be necessary to carry out the powers vested in him by the Agricultural Marketing Agreement Act of 1937"). Under USDA regulations, agricultural associations seeking to benefit from the AMAA must submit an initial application to the USDA, which the USDA uses to determine whether the association qualifies for the AMAA's "privileges and exemptions." 7 C.F.R. § 900.350. And because the USDA's initial determination is subject to "amendment, termination or suspension if the association does not *currently* meet the qualification standards," the regulations require agricultural associations to submit annual reports to allow the USDA to determine if the association presently qualifies. *Id.* § 900.355 (emphasis added). Of critical importance here, the USDA's first consideration is whether

the association is a "cooperative marketing association of producers, *qualified under the provisions of the . . . Capper-Volstead Act*." *Id.* § 900.353 (emphasis added).  Put simply, a cooperative cannot qualify under these regulations unless the USDA concludes that the association is "qualified under the provisions of" the Capper-Volstead Act.  *Id.*

In making this determination, the USDA looks to objective criteria regarding a cooperative's purpose, membership, members voting rights, and how members share the benefits and burdens of operation.[10]  A cooperative's annual report to the USDA must therefore provide notice of changes to its articles of incorporation or bylaws, the existence of any inactive or retired members with voting rights, the value of nonmember business, and accounting statements.[11]  As far as DFA is aware, the USDA has never taken the position that a cooperative's business judgment, or matters of internal self-governance, bear on whether an agricultural association is "qualified under the provisions of" the Capper-Volstead Act.  *See* 7 C.F.R. § 900.353.  This certification process shows that the expert agency charged with overseeing agricultural cooperatives under the "labyrinth of the federal milk marketing provisions," *Zuber v. Allen*, 396 U.S. 169, 172 (1969), views the Capper-Volstead Act's requirements as purely objective.

Applying that objective criteria, the USDA has routinely (and recently) certified DFA as a qualifying cooperative under the Capper-Volstead Act. DFA's predecessor, Mid-America Dairymen, Inc., first received a determination that it qualified under the AMAA in 1968.[12]  The USDA reached the same conclusion in 1998 when Mid-America Dairymen changed its name to

---

[10]  *See* Decl. Exs. 1-2 (1968 Mid-America Dairymen Certification; 1998 DFA Certification). Exhibits referenced herein refer to the concurrently filed June 15, 2020 Declaration of W. Todd Miller.

[11]  A current version of the form that cooperative milk marketing associations must submit annually to the USDA is available at https://www.ams.usda.gov/sites/default/files/media/DA24.pdf (last visited June 15, 2020).

[12]  *See* Decl. Ex. 1 (1968 Mid-America Dairymen Certification).

DFA.[13]  Since 1998, DFA has submitted annual reports to the USDA every year, and each year the USDA has certified DFA under the AMAA.[14]  Under the regulations discussed above, the USDA could not have certified DFA unless it determined that DFA qualified under the Capper-Volstead Act.

The USDA's longstanding and consistent interpretation and practice warrant substantial deference.  *See United States v. Mead Corp.*, 533 U.S. 218, 229, 235 (2001); *Oak Tree Farm Dairy, Inc. v. Block*, 544 F. Supp. 1351, 1358-60 (E.D.N.Y. 1982) (concluding that Secretary of Agriculture's longstanding interpretation of milk classification statute was entitled to deference because it was "a reasonable interpretation of the ordinary meaning attributable to the statutory language, and clear evidence of a contrary, more confining legislative intent is lacking"); *see also Sec'y of Labor v. Cranesville Aggregate Coms.*, 878 F.3d 25, 33 (2d. Cir. 2017) (affording *Chevron* deference to Secretary of Labor's decision to bring a citation under OSHA as opposed to the Mine Act because, by doing so, the Secretary "necessarily ruled that the Mine Act does not except workplace conditions").

C.     **The USDA's Understanding of the Capper-Volstead Act Comports with the Act's Text, Purpose, and History**

The USDA's understanding of the Act's qualifications finds ample support in the statute's language, purpose, and history.  Congress enacted the Capper-Volstead Act in 1922 near the height

---

[13]     *See* Decl. Ex. 2 (1998 DFA Certification).

[14]     *See* Decl. Ex. 3 (List of Cooperative Milk Marketing Associations Holding Determinations of Qualification Under the Agricultural Marketing Agreement Act of 1937, as amended as of May 27, 2020, Agricultural Marketing Service, USDA).  The USDA's list of cooperative milk marketing associations that currently hold determinations of qualification under the AMAA is published on the USDA's website at https://www.ams.usda.gov/sites/default/files/media/QualifiedCooperativeMilkMarketingAssociat ions.pdf (last visited June 15, 2020).  DFA's qualification is indicated on page 2.

of the "cooperative movement," which gained steam after World War I as support for "large-scale, cooperative commodity marketing began to spread" across the country. *Fairdale Farms*, 635 F.2d at 1041. But the Sherman Act, aimed as it is against concerted action by potential competitors, threatened to imperil the growth of effective agricultural cooperatives. *See Sunkist*, 389 U.S. at 390-91.

To remove that barrier, Congress first enacted Section 6 of the Clayton Act, declaring that the antitrust laws shall not "forbid the existence and operation of labor, agricultural, or horticultural organizations," provided the organization is "instituted for the purposes of mutual help" and does not operate for profit or issue capital stock. 15 U.S.C. § 17. The Capper-Volstead Act, enacted eight years later, "broaden[ed] the scope of Section 6" by expressly authorizing agricultural associations to conduct specific activities and to issue capital stock. *Fairdale Farms*, 635 F.2d at 1042; *see also Sunkist*, 389 U.S. at 391.

But in seeking to give farmers the "competitive advantage" available to business associations, *Fairdale Farms*, 635 F.2d at 1043, Congress particularly favored organizational forms reflecting cooperative principles. Cooperatives have long distinguished themselves from other corporate forms based on their "purpose," "ownership and control," and "how benefits are distributed."[15] *See, e.g.*, *Shafer v. Farmers' Grain Co. of Embden*, 268 U.S. 189, 194 (1925) (describing "farmers' cooperative companies, which buy grain grown by their stockholders and others in the vicinity of their elevators, ship and sell the same, and distribute as patronage dividends the surplus arising from such transactions"). Congress crafted the Capper-Volstead Act's statutory prerequisites with these cooperative principles in mind. *See Fairdale Farms*, 635 F.2d at 1037.

---

[15]    Rural Business-Cooperative Service, U.S. Department of Agriculture, Understanding Cooperatives: Cooperative Business Principles, Cooperative Information Report § 2, 1 (rev. Apr. 2011), https://www.rd.usda.gov/files/CIR45_2.pdf.

Statutory usage from the early 19th century shows that statutes and courts drew distinctions between (1) "mutual benefit associations" or "mutual benefit societies," (2) traditional non-profit organizations, and (3) traditional for-profit corporations.[16] "Mutual benefit" associations or societies were creatures of state law, similar to mutual life insurance companies. *See, e.g.*, *Idaho ex rel. Conner v. W. Mut. Benefit Ass'n*, 276 P. 37, 39 (Idaho 1929) (despite some distinctions, "it has sometimes been said that there is no difference between mutual insurance companies and mutual benefit societies"). The "fundamental difference" between mutual benefit societies and for-profit corporations lies in the organizations' purpose, ownership and control, and how benefits are distributed. *Ohio State Life Ins. Co. v. Clark*, 274 F.2d 771, 775 (6th Cir. 1960). A for-profit corporation "is owned and managed by the stockholders, who need not be policyholders," and "the corporation is operated for the purpose of profits for the stockholders and the beneficial ownership of the profits and surplus is in the stockholders." *Id.* By contrast, a "mutual benefit" society "is owned and managed by policyholders and the business is conducted *for the benefit of the policyholders*. The beneficial ownership of the profits and surplus is in the policyholders." *Id.* (emphasis added).

Congress was aware of the distinction between "mutual benefit" societies and for-profit corporations when it enacted the Capper-Volstead Act. During the floor debates, Senator Walsh proposed an alternate bill providing a more limited grant of immunity to agricultural associations. The bill provided that "[s]uch associations shall not be deemed organized for pecuniary profit in the sense of paying a return or dividends on the stock investment, but for the *mutual benefit* of its

---

[16]     *See Young Men's Protestant Temperance & Ben. Soc'y v. Fall River*, 36 N.E. 57, 57-58 (Mass. 1894) (distinguishing ordinary non-profits from "mutual insurance societies or mutual benefit societies," operated "not as charitable institutions," but "for the mutual benefit of the contributors").

members through the application of *cooperative principles*."   62 Cong. Rec. 2171 (1922)

(emphases added).  By placing "mutual benefit" in context, Senator Walsh's proposal shows that

Congress understood the term as a principle distinguishing cooperatives from for-profit

corporations.

Section 6 of the Clayton Act is also illustrative.  Enacted eight years before the Capper-

Volstead Act, Section 6 afforded immunity to associations "instituted for the purposes of mutual

help."  15 U.S.C. § 17.  Congress passed the Capper-Volstead to "broaden the scope" of the

immunity Section 6 provided.  *Fairdale Farms*, 635 F.2d at 1042.  Section 6's requirement that an

association be "instituted for the purposes of mutual help," 15 U.S.C. § 17, parallels Capper-

Volstead's requirement that an association be "operated for the mutual benefit" of members, 7

U.S.C. § 291.  And in interpreting Section 6, courts have held that its "mutual help" requirement

is satisfied if the association "acts as the marketing agency for all of its members and pays over to

its members the proceeds of the milk sales, with a deduction, of course, for overhead and similar

expenses."  *United States v. Md. & Va. Milk Producers Assoc.*, 167 F. Supp. 45, 49 (D.D.C. 1958),

*aff'd in part, rev'd in part on other grounds*, 362 U.S. 458 (1960); *see also N. Cal. Supermarkets,*

*Inc. v. Cent. Cal. Lettuce Producers Coop.*, 413 F. Supp. 984, 988-89 (N.D. Cal. 1976) ("The

structural requirements for Section 6 exemptions are not stringent").  Because the Capper-Volstead

Act was intended to expand, not constrict, Section 6 immunity, it would make little sense to read

the Act's "mutual benefit" requirement more narrowly than Section 6.  *See Fairdale Farms*, 635

F.2d at 1042.[17]

Read in context, the "mutual benefit" requirement works together with the Act's other

---

[17]     DFA does not have capital stock and is not conducted for profit, and therefore qualifies for
Section 6's exemptions.  *See* 15 U.S.C. § 17.  Plaintiffs have not indicated that they intend to
challenge that DFA was "instituted for the purposes of mutual help" as required by Section 6.

qualifications to "insure that qualifying associations be truly organized and controlled by, and for, producers." *Sunkist*, 389 U.S. at 393-94. They do so by limiting membership to agricultural producers; imposing objective limits on voting or capital-returns; capping dealings in the products of non-members; and ensuring that producers share in the benefits and burdens of operation. *See id.* Nothing in the Act, its legislative history, or broader statutory context supports an interpretation of "mutual benefit" that would make the Act's important protections turn on the subjective inquiry plaintiffs' argument and evidence here entail.

## II. PLAINTIFFS' UNDERSTANDING OF "MUTUAL BENEFIT" IS UNPRECEDENTED, UNPRINCIPLED, AND WOULD HARM FARMERS

Plaintiffs, of course, never dispute that DFA is structured as a cooperative, and that members share the risks and rewards of membership. Nor could they. While plaintiffs have yet to articulate precisely how they would define the "mutual benefit" requirement, they apparently believe it gives courts license to strip a cooperative of immunity based on an open-ended and subjective inquiry into a cooperative's business judgments or the actions of rogue employees.[18] Such an interpretation finds no support in the case law, would put courts (and juries) in the impossible position of second-guessing business decisions under an undefined and amorphous standard, and—most troubling of all—would harm the very farmers that Congress intended to protect. That cannot be the law.

In the 100-year history of the Act, not a single court has adopted plaintiffs' preferred reading of "mutual benefit." The dearth of precedent supporting plaintiffs speaks volumes. Agricultural cooperatives frequently raise the Capper-Volstead Act as a defense in antitrust cases, and like any large business organization, cooperatives are not immune from the sort of governance disputes, familiar to corporate law, that plaintiffs hope to make a centerpiece of this antitrust case.

---

[18]    *See supra* n.6 (discussing Motion *in Limine* No. 3).

*See, e.g., Bell v. Fur Breeders Agric. Coop.*, 348 F.3d 1224, 1234-35 (10th Cir. 2003) (the Act anticipates that management will "act unilaterally in benefit of the single enterprise," though it is "unlikely that every decision by [the cooperative's] board members will always benefit every individual member").  The fact that no court has ever treated this sort of evidence as relevant under the "mutual benefit" element suggests that plaintiffs' interpretation of that language is wrong.

Indeed, only a few courts have even considered an argument that a fully farmer-owned cooperative should be stripped of its Capper-Volstead Act immunity because it did not operate for the "mutual benefit" of its members, and all have rejected that argument.  Although these courts did not offer an affirmative interpretation of "mutual benefit," none support plaintiffs' understanding of the requirement.  *See Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1184-85 (8th Cir. 1982) (rejecting argument that a dairy cooperative did not operate for the mutual benefit because it was precluded from paying a dividend under the laws of the state where it was incorporated); *Waters v. Nat'l Farmers Org.*, 328 F. Supp. 1229, 1245 (S.D. Ind. 1971) (same); *Agritronics Corp. v. Nat'l Dairy Herd Ass'n*, No. 94-cv-0066, 1994 WL 542203, at *5 (N.D.N.Y. Sept. 22, 1994) (finding "no authority" to support plaintiff's argument that a cooperative did not operate for the mutual benefit of its members because it was "intertwined with Pennsylvania State University," which provided the association with "facility and employees").

Not only is plaintiffs' understanding of "mutual benefit" unprecedented and wrong, it is unworkable.  Plaintiffs take aim at what they characterize as management's "favoring of growth over farmer patronage," or a supposed over-investment in processing capacity.[19]  But "processing," "handling," "preparing for market," and "marketing" are all activities that the Capper-Volstead Act affirmatively authorizes producer-owned cooperatives to perform.  7 U.S.C. § 291.  To the

---

[19]    PSOF ¶ 104; *see also id.* ¶¶ 96-98.

extent plaintiffs envision a standard that would permit a court to decide whether a cooperative has gone *too far* in investing in "processing" or "marketing" activities, there is simply no principled way to draw that line. And the Act's explicit authorization of these activities shows that Congress did not want courts in the business of line drawing at all.

Finally, any standard that would permit courts to erase a cooperative's Capper-Volstead Act immunity by second-guessing how a cooperative manages its business would harm the very farmers the Act was designed to help. Allowing litigants to strip a cooperative's Capper-Volstead Act immunity by pointing to these sorts of disputes would carry devastating repercussions for *each* of the cooperative's farmer-members, who could immediately find themselves exposed to treble damages for price-fixing with fellow farmer members. Congress could not have intended that result.

## III.   A PRE-TRIAL RULING IS NEEDED TO ENSURE A FAIR TRIAL

The sole issue addressed by this motion—whether discrete categories of evidence and argument are relevant to a statutory precondition—is a pure question of law ripe for resolution. *See United States v. Torniero*, 735 F.2d 725, 730 (2d Cir. 1984) ("Relevance is a question of law to be decided by the trial judge."); *United States v. Williams*, 733 F.3d 448, 452 (2d Cir. 2013) (statutory interpretation is a question of law). Courts in the Second Circuit routinely decide motions *in limine* where the relevance of evidence turns on statutory interpretation, as that is often the only way to ensure the jury does not hear inflammatory and ultimately irrelevant evidence. *See, e.g.*, *Henderson*, 87 F. Supp. 3d at 614-15 (ruling on motion *in limine* to preclude evidence where relevance turned on an issue of "first impression" regarding the interpretation of a federal statute); *United States v. Laughlin*, 768 F. Supp. 957, 960 (N.D.N.Y 1991) (finding it "proper to resolve" a dispute regarding the elements of an offense given "the unsettled state of the law").

A pre-trial ruling is particularly warranted here.  The argument plaintiffs intend to offer to rebut DFA's Capper-Volstead status appears calculated to bias the jury against DFA.  *See United States v. Al-Moayad*, 545 F.3d 139, 161 (2d Cir. 2008) (overturning district court's admission of "inflammatory" testimony "almost entirely unrelated" to government's case because it amounted to a "blatant appeal to the jury's emotions and prejudices").  And there can be no question that plaintiffs intend for it to feature prominently at trial.[20]  Once heard by the jury, no motion to strike, limiting instruction, or jury charge could possibly cure the prejudice to DFA.

## CONCLUSION

For the foregoing reasons, DFA respectfully requests that the Court grant its motion *in limine* to preclude the introduction of evidence or argument that DFA does not satisfy the Capper-Volstead Act's qualification requirement that it be operated for the "mutual benefit" of its members, and exclude evidence or argument that DFA is not a Capper-Volstead cooperative.  DFA respectfully requests a hearing on this motion.

---

[20]      *See*, *e.g.*, PSOF ¶¶ 93-116.

Dated: June 15, 2020                    Respectfully submitted,

                                        /s/ *Alfred C. Pfeiffer Jr.*
                                        Alfred C. Pfeiffer Jr. (admitted *pro hac vice*)
                                        LATHAM & WATKINS LLP
                                        505 Montgomery Street, Suite 2000
                                        San Francisco, CA 94111
                                        Telephone: 415-391-0600
                                        Facsimile: 415-395-8095
                                        Email: al.pfeiffer@lw.com

                                        Margaret M. Zwisler (admitted *pro hac vice*)
                                        Jennifer L. Giordano (admitted *pro hac vice*)
                                        LATHAM & WATKINS LLP
                                        555 Eleventh Street, NW, Suite 1000
                                        Washington, DC 20004
                                        Telephone: 202-637-2200
                                        Facsimile: 202-637-2201
                                        Email: margaret.zwisler@lw.com
                                        Email: jennifer.giordano@lw.com

                                        W.  Todd Miller (admitted *pro hac vice*)
                                        BAKER & MILLER PLLC
                                        2401 Pennsylvania Avenue, NW, Suite 300
                                        Washington, DC 20037
                                        Telephone: 202-663-7820
                                        Facsimile: 202-663-7849
                                        Email: tmiller@bakerandmiller.com

                                        Ian P. Carleton
                                        SHEEHEY FURLONG & BEHM P.C.
                                        30 Main Street, P.O. Box 66
                                        Burlington, VT 05402
                                        Telephone: 802-864-9891
                                        Email: icarleton@sheeheyvt.com

                                        *Counsel for Defendants Dairy Farmers of*
                                        *America, Inc. and Dairy Marketing Services,*
                                        *LLC*

## <u>LOCAL RULE 7(A)(7) CERTIFICATION OF COUNSEL</u>

Pursuant to Local Rule 7(a)(7), the undersigned counsel for DFA certifies that DFA made a good faith attempt to obtain plaintiffs' agreement to the requested relief in this motion, but was not able to do so.

Dated: June 15, 2020

/s/ *Alfred C. Pfeiffer Jr.*
Alfred C. Pfeiffer Jr. (admitted *pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: 415-391-0600
Facsimile: 415-395-8095
Email: al.pfeiffer@lw.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2020, I electronically filed with the Clerk of Court the foregoing document using the CM/ECF system.  The CM/ECF system will provide service of such filing via Notice of Electronic Filing (NEF) to the following NEF parties:

Joel G. Beckman, Esq. (jbeckman@nbparis.com)

Gary L. Franklin, Esq. (gfranklin@primmer.com)

William C. Nystrom, Esq. (wnystrom@nbparis.com)

Elizabeth A. Reidy, Esq. (ereidy@nbparis.com)

Dana A. Zakarian, Esq. (dzakarian@nbparis.com)

Dated: June 15, 2020

    /s/ *Alfred C. Pfeiffer Jr.*
Alfred C. Pfeiffer Jr. (admitted *pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: 415-391-0600
Facsimile: 415-395-8095
Email: al.pfeiffer@lw.com