U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2020 JUN 24  PM 4: 35

CLERK

BY _____
DEPUTY CLERK

GARRETT AND RALPH SITTS, LEON
ATWELL, VICTOR BARRICK, DANIEL
BAUMGARDER, WILLIAM BOARD,
GEORGE BOLLES, ROGER BOLLES, ANDY
BOLLINGER, THOMAS BOLLINGER,
LOGAN BOWER, DWIGHT
BRANDENBURG, BERNARD
BROUILLETTE, THOMAS BROUILLETTE,
AARON BUTTON, HESTER CHASE,
THOMAS CLARK, THOMAS
CLATTERBUCK, PAUL CURRIER, GERRY
DELONG, PETE AND ALICE DIEHL, MARK
DORING, MARK AND BARBARA DULKIS,
GLEN EAVES, MIKE EBY, WILLIAM
ECKLAND, DOUG ELLIOT, JAMES
ELLIOT, WENDALL ELLIOTT, MICHAEL
FAUCHER, DAVID AND ROBIN FITCH,
DUANE AND SUSAN FLINT, JOSEPH
FULTS, RICHARD GANTNER, STEFAN
AND CINDY GEIGER, WILLIAM GLOSS,
JOHN GWOZDZ, DAVID AND LAURIE
GRANT, JIM AND JOYCE GRAY, DENNIS
HALL, ROGER AND JOHN HAMILTON,
NEVIN AND MARLIN HILDEBRAND, JAKE
AND HARLEN HILLYERD, RICHARD AND
TERRI HOLDRIDGE, PAUL HORNING,
TERRY AND ROBERT HUYCK, DONALD
SCOTT HYMERS, TERRY INCH, RANDY
AND LYNETTE INMAN, THEODORE
JAYKO, JACK KAHLER, JAMES AND
TERESA KEATOR, JIM AND SHARON
KEILHOLTZ, GEORGE KEITH, LEE AND
ELLEN KLOCK, MIKE AND LISA
KRAEGER, FRED LACLAIR, TIM LALYER,
FRANK AND JOHN LAMPORT, CORRINE
LULL, CHARLES AND GRETCHEN MAINE,
THOMAS AND DEBORA MANOS, FRED
MATTHEWS, RUSSELL MAXWELL,
GERRY MCINTOSH, STEPHEN MELLOTT,
JOHN AND DAVID MITCHELL, THOMAS
MONTEITH, WALT MOORE, RICHARD
AND SHEILA MORROW, DEAN MOSER,
MELISSA MURRAY AND SEAN QUINN,
THOMAS NAUMAN, CHARLES NEFF,

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 2:16-cv-00287

DAVID NICHOLS, MICHAEL NISSLEY,       )
LOU ANN PARISH, DANIEL PETERS,        )
MARSHA PERRY, CAROLYN AND DAVE        )
POST, JUDY LEE POST, SCOTT            )
RASMUSEU, BRIAN REAPE, DAVID AND      )
LYNETTE ROBINSON, BRIAN AND LISA      )
ROBINSON, CALVIN ROES, BRADLEY        )
ROHRER, PAUL AND SARAH                )
ROHRBAUGH, ROBERTA RYAN, SCOTT        )
AND LIN SAWYER, S. ROBERT SENSENIG,   )
THOMAS AND DALE SMITH, DALE AND       )
SUSAN SMITH, DENNIS SMITH, DONALD     )
T. AND DONALD M. SMITH, ROGER AND     )
TAMMY, SMITH, TODD SNYDER,            )
RICHARD SOURWINE, DANNY               )
SOURWINE, RANDY SOWERS, SHANE         )
STALTER, GEORGE AND SHIRLEY           )
STAMBAUGH, TRACY STANKO, STEPHEN      )
SOURWINE, RICHARD SWANTAK,            )
GEORGE AND PATRICIA THOMPSON,         )
JEREMY THOMPSON, KEN AND JUDY         )
TOMPKINS, DANIEL VAUGHN, MARK         )
VISSAR, ERIC WALTS, EDWARD            )
WALLDROFF, GERALD WETTERHAHN,         )
JR., EUGENE WILCZEWSKI, STEVE         )
WILSON,                               )
                                      )
              Plaintiffs,             )
                                      )
       v.                             )
                                      )
DAIRY FARMERS OF AMERICA, INC.,       )
and DAIRY MARKETING SERVICES,         )
LLC,                                  )
                                      )
              Defendants.             )

## OPINION AND ORDER
## DENYING DEFENDANTS' MOTION TO STRIKE EXPERT OPINION OF EINER ELHAUGE, GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO EXCLUDE VARIOUS OPINIONS OF EINER ELHAUGE, AND GRANTING PLAINTIFFS' MOTION TO PRECLUDE CERTAIN OPINIONS AND TESTIMONY OF EDWARD SNYDER
(Docs. 146, 148 & 149)

Plaintiffs allege claims pursuant to the Sherman Act, 15 U.S.C. §§ 1-2, for asserted antitrust violations committed by Defendants Dairy Farmers of America, Inc. ("DFA") and Dairy Marketing Services, LLC ("DMS") (collectively, "Defendants"). Pending before the court are three motions concerning expert witnesses. On January 17, 2020, Defendants moved to strike Professor Einer Elhauge's most recent expert report (the "Second Supplemental Expert Report") as an untimely and improper supplement under Fed. R. Civ. P. 26(e) and Fed. R. Civ. P. 37 (Doc. 149). On January 10, 2020, Defendants also moved to exclude portions of Professor Elhauge's opinions at trial on the basis that those opinions are either not the proper subjects of expert testimony or are insufficiently reliable (Doc. 146). On January 10, 2020, Plaintiffs moved to preclude a portion of the opinions of Defendants' expert, Edward Snyder, Ph.D., on the basis that his opinion regarding processing plant options for Plaintiffs is insufficiently reliable and reflects no specialized knowledge (Doc. 148). Both parties oppose the challenges to the opinions of their experts. The court held oral argument on March 27, 2020, at which time it took the pending motions under advisement.

Plaintiffs are represented by Dana A. Zakarian, Esq., Elizabeth A. Reidy, Esq., Gary L. Franklin, Esq., Joel G. Beckman, Esq., Michael Paris, Esq., and William C. Nystrom, Esq. Defendants are represented by Alfred C. Pfeiffer, Jr., Esq., Elyse M. Greenwald, Esq., Ian P. Carleton, Esq., Jennifer L. Giordano, Esq., Margaret M. Zwisler, Esq., Molly M. Barron, Esq., Sarah M. Ray, Esq., and W. Todd Miller, Esq.

## I.      Factual and Procedural Background.

Plaintiffs are 116 dairy farmers who opted out of a settlement approved by this court in a class action case, *Allen v. Dairy Farmers of America, Inc.*, No. 5:09-cv-230. In support of their claims that Defendants allegedly conspired to suppress the price of raw Grade A milk, Plaintiffs seek to rely on the testimony of their proffered antitrust expert, Professor Elhauge.

Professor Elhauge is the Petrie Professor of Law at Harvard University and a co-author of several leading treatises on antitrust law and economics. Numerous federal courts have determined that Professor Elhauge is qualified to opine on antitrust

economics. *See, e.g., In re EpiPen Mktg., Sales Practices & Antitrust Litig.*, 2020 WL 1164869, at \*23 (D. Kan. Mar. 10, 2020) (holding that Professor Elhauge was qualified to provide expert opinions in light of his "extensive expertise applying economics and econometrics to antitrust issues"); *In re Mushroom Direct Purchaser Antitrust Litig.*, 2015 WL 5767415, at \*4 (E.D. Pa. July 29, 2015) (denying challenge to Professor Elhauge's qualifications and noting he "has been described as a highly qualified antitrust titan" who has "demonstrated his command of the technical issues related to multiple regression analysis in the antitrust context") (internal quotation marks, alterations, and citations omitted).

In his initial expert report and subsequent supplemental reports, Professor Elhauge uses a regression analysis to evaluate whether market conditions were consistent with the existence of a monopsony and in furtherance of his calculation of damages caused by the alleged conspiracy. Plaintiffs disclosed his first expert report on October 3, 2018.

In a report submitted on November 30, 2018, Defendants' expert witness, Daniel A. Sumner, Ph.D., identified errors in Professor Elhauge's data set. Professor Elhauge responded to this criticism by agreeing that his initial data set was flawed and by submitting a supplemental expert report on January 18, 2019. On February 5, 2019, Defendants moved to strike Professor Elhauge's first supplemental expert report, asserting that it was untimely and constituted an improper supplemental disclosure pursuant to Fed. R. Civ. P. 26(e). On May 3, 2019, Defendants also moved to strike Professor Elhauge's opinion that Defendants possess monopsony power without considering the market power of their alleged co-conspirators on the basis that the opinion was not included in Professor Elhauge's earlier expert disclosures and was proffered for the first time at his deposition. On July 23, 2019, the court denied Defendants' motions, finding that Professor Elhauge had properly supplemented his expert witness opinion to provide a more reliable proxy for calculating damages and Defendants elicited the undisclosed opinion regarding monopsony power at Professor Elhauge's deposition and thus could not be heard to complain regarding its untimely disclosure.

Thereafter, Dr. Sumner submitted a second supplemental expert report on December 16, 2019 wherein he identified what he deemed a further error in Professor Elhauge's regression analysis based on its use of a proxy that "approximate[d] the location adjustment for [a] farmer without delivery data by using the location adjustment for [an]other farmer in the same zip code and Federal Order[.]" (Doc. 150-5 at 7, ¶ 9.) Plaintiffs attribute the error to the voluminous data set produced by Defendants which was missing various zip codes and which Professor Elhauge's Stata database software erroneously processed by treating a period (.) in the data field (which is a computer-generated placeholder for missing data) as its own zip code. On December 27, 2019, Professor Elhauge submitted his Second Supplemental Expert Report to correct this mistake by adding "ifzip!=." to the computer code and re-running his regression analysis with a smaller data set, yielding what he claims is evidence of antitrust impact and damages of 98.7 cents per cwt.

## II.  Conclusions of Law and Analysis.

### A.  Whether to Strike Professor Elhauge's Second Supplemental Expert Report (Doc. 149).

Defendants seek to strike Professor Elhauge's Second Supplemental Expert Report on the basis that it is not an appropriate supplement pursuant to Fed. R. Civ. P. 26(e) and therefore should be excluded pursuant to Fed. R. Civ. P. 37. The issue is whether the Second Supplemental Expert Report merely corrects an honest mistake or substitutes an alternative methodology for an earlier flawed approach.

Rule 26(e) requires a party to "supplement or correct its disclosure or response . . . in a timely manner if the party learns that in some material respect [its] disclosure or response is incomplete or incorrect[.]" Fed. R. Civ. P. 26(e)(1). The rule further provides that "additions or changes to [expert disclosures]" must be made "by the time the party's pretrial disclosures under Rule 26(a)(3) are due." Fed. R. Civ. P. 26(e)(2). Pursuant to Rule 26(a)(3), "[u]nless the court orders otherwise, these disclosures must be made at least [thirty] days before trial." Fed. R. Civ. P. 26(a)(3).

In asserting that Professor Elhauge could and should have identified the software error in his analysis independently, Defendants remind the court that it has held that "[i]f an expert's report does not rely [on] any information that was previously unknown or unavailable to him, it is not an appropriate supplemental report under Rule 26." (Doc. 129 at 9) (quoting *Allen v. Dairy Farmers of Am., Inc.*, 2014 WL 2040133, at *5 (D. Vt. May 16, 2014) (alterations in original). While it is true that newly discovered evidence, not reasonably available at the time of an initial expert witness opinion, is one ground for supplementation, it is not the only ground. Where an expert "does not advance new theories of liability or undermine the original report's conclusions[,]" a revised report that corrects an "honest mistake[]" is an appropriate supplement. *Associated Elec. Gas Ins. Servs. v. Babcock & Wilcox Power Generation Grp., Inc.*, 2013 WL 4456640, at *4 (D. Conn. Aug. 16, 2013) (ruling expert report revising earlier findings to account for corrected calculations by second expert was a proper supplement); *see also Sibley v. Sprint Nextel Corp.*, 2013 WL 1819773, at *4 (D. Kan. Apr. 30, 2013) (permitting supplementation of expert report where party "revised its code[,]" finding "this [is] a technical correction of the sort to be expected given the extraordinarily large data set with which the experts in this case were working").

Once Professor Elhauge learned of the processing error and corrected it, he applied the same regression methodology he previously employed to reanalyze the data. The Second Supplemental Expert Report is therefore a proper supplemental disclosure under Rule 26(e). *Cf. Cedar Petrochems., Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 279 (S.D.N.Y. 2011) (noting that exclusion of supplemental expert evidence is warranted where "it expounds a wholly new and complex approach designed to fill a significant and logical gap in the first report") (internal quotation marks, alteration, and citation omitted). The question of whether the error in Professor Elhauge's analysis could have been easily detected or is the result of inexcusable carelessness is fodder for cross-examination. *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) ("A minor flaw in an expert's reasoning or a slight modification

of an otherwise reliable method will not render an expert's opinion *per se* inadmissible.").

Even if Professor Elhauge's Second Supplemental Expert Report were untimely or otherwise improper pursuant to Rule 26(e), exclusion of the report as a sanction is not always required. Instead, courts consider the following factors in determining the appropriate sanction:

> (1) the party's explanation for the failure to comply with the discovery order; (2) the importance of the testimony of the precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance.

*Softel, Inc. v. Dragon Med. & Sci. Commc'ns, Inc.*, 118 F.3d 955, 961 (2d Cir. 1997) (citing *Outley v. City of New York*, 837 F.2d 587, 590-91 (2d Cir. 1988)).

The Second Supplemental Expert Report was timely submitted on December 27, 2019, far in advance of both the deadline set by the court and the deadline to supplement expert disclosures pursuant to Rule 26. There is no indication that Professor Elhauge was aware that his software did not function properly until Defendants' expert witness, Dr. Sumner, pointed it out in his supplemental report submitted on December 16, 2019. In a matter of days, Professor Elhauge had corrected his mistake and candidly admitted to its existence.

Professor Elhauge's regression analysis is critical to Plaintiffs' case, which arguably could not proceed without it. The prejudice suffered by Defendants is minimal and, at Defendants' request, a continuance of trial has already been granted. As a result, all of the *Outley* factors weigh in favor of allowing the Second Supplemental Expert Report provided Plaintiffs proffer Professor Elhauge as a witness and pay Defendants' reasonable costs of re-deposing him. *See Browe v. CTC Corp.*, 2017 WL 5992333, at *6 (D. Vt. Dec. 1, 2017) (conditionally denying motion to exclude expert testimony and ordering defendants to pay costs of plaintiffs' preparation for and taking of expert's deposition); *Lab Crafters, Inc. v. Flow Safe, Inc.*, 2007 WL 7034303, at *8 (E.D.N.Y. Oct. 26, 2007) ("Courts to address this issue have stated that any prejudice to the opposing party can be alleviated by allowing them to depose the expert prior to trial.").

Defendants' motion to strike Professor Elhauge's Second Supplemental Expert Report is therefore DENIED. Plaintiffs must proffer Professor Elhauge for deposition and pay the reasonable costs incurred by Defendants in taking the deposition.

## B.    Whether Certain of Professor Elhauge's Opinions Must Be Excluded (Doc. 146).

Defendants ask the court to preclude Professor Elhauge from offering six categories of opinions concerning: the existence of a conspiracy or conspiracies; whether DFA operated in the best interest of its farmer members; the proper interpretation of certain agreements entered into by Defendants; any party's motivation, mental state, or credibility; a summary or narration of Plaintiffs' case whereby the facts are introduced for the first and only time through Plaintiffs' expert witness; and regression analysis which is allegedly unreliable and insufficiently tied to the facts.

Federal Rule of Evidence 702 provides that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The trial court is tasked with completing a "preliminary assessment of whether the reasoning or methodology underlying" proffered expert testimony is reliable and will be helpful to the jury. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993). The "inquiry envisioned by Rule 702 is . . . a flexible one[,]" *id.* at 594 (footnote omitted), and "'must be tied to the facts of a particular case[.]'" *Amorgianos*, 303 F.3d at 266 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)).

In conducting its analysis, "[t]he court . . . assumes a 'gatekeeping' role 'to make certain that an expert, whether basing testimony upon professional studies or personal

experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Estate of Puppolo v. Welch*, 2017 WL 4042342, at \*13 (D. Vt. Sept. 12, 2017) (quoting *Kumho Tire Co.*, 526 U.S. at 152). Although "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the . . . appropriate means of attacking shaky but admissible evidence[,]" *Daubert*, 509 U.S. at 596, an expert witness's opinion must be "reliable at every step" to warrant admission. *Amorgianos*, 303 F.3d at 267.

### 1. Opinions Regarding the Existence of a Conspiracy or Conspiracies.

Defendants argue Professor Elhauge's opinion that Defendants engaged in a conspiracy or multiple conspiracies must be excluded because it is an impermissible legal conclusion as well as an opinion on the ultimate question for the jury. Plaintiffs agree that they will not ask Professor Elhauge whether there is a "conspiracy" or whether an individual or an entity is a "co-conspirator," but argue they should be free to ask him to explain Defendants' economic incentives to undertake certain actions and enter into certain agreements, as well as the effects of those actions on the relevant market and its participants.

Although Federal Rule of Evidence 704 provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue[,]" Fed. R. Evid. 704, an expert witness opinion that states a legal conclusion or "communicat[es] a legal standard—explicit or implicit—to the jury" is inadmissible. *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992). As a result, in the antitrust context, an expert "cannot testify to whether a party's conduct was 'anticompetitive' or 'unlawful' under the Sherman Act, but can, for example, testify about factors that would tend to show anticompetitive conduct in a market and describe why, in the expert's opinion, those factors are present in [the] case at hand." *SourceOne Dental, Inc. v. Patterson Cos., Inc.*, 2018 WL 2172667, at \*1 (E.D.N.Y. May 10, 2018) (citing *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3*, 313 F. Supp. 2d 213, 240-41 (S.D.N.Y. 2004)). Economic experts in antitrust cases have also been permitted to "explain how certain conduct could affect a

9

market through the use of hypothetical statements[.]" *Fleischman v. Albany Med. Ctr.*, 728 F. Supp. 2d 130, 152 (N.D.N.Y. 2010) (quoting *U.S. Info. Sys., Inc.*, 313 F. Supp. 2d at 240); *see also id.* (permitting expert opinion that "information exchanges, engaged in by the [d]efendant hospitals, made it easier for [d]efendants to form and maintain a wage agreement").[1]

In his report, Professor Elhauge opines that "Defendants have engaged in a multi-faceted conspiracy with processors and other cooperatives to reduce competition, acquire monopsony power, and suppress raw milk prices in the market for raw milk sales in Order 1." (Doc. 147-1 at 6, ¶ 4.) He further describes specific agreements entered into by Defendants as "anticompetitive[.]" *Id.* These types of opinions are inadmissible because they usurp the function of the court as well as the role of the jury in determining whether Plaintiffs have proved their case. *See Gordon v. N.E. Cent. R.R.*, 2019 WL 4068639, at *3 (D. Vt. Aug. 28, 2019) (excluding "testimony [that] will 'usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it'") (quoting *United States v. Lumpkin*, 192 F.3d 280, 289 (2d Cir. 1999)); *see also Union Carbide Corp. v. Montell N.V.*, 28 F. Supp. 2d 833, 843 (S.D.N.Y. 1998) (ruling an expert witness may not testify that "conduct was either 'anti-competitive' or 'unlawful'").

Without objection, Defendants' motion is GRANTED and Professor Elhauge may not proffer legal conclusions in his testimony or tell the jury what result it should reach at trial.

---

[1] *See also DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 2019 WL 1515231, at *7 (E.D.N.Y. Feb. 21, 2019) (holding antitrust expert could not testify "that defendants' conduct was anticompetitive or unlawful" nor "provide any type of conclusion about whether a price-fixing conspiracy existed or whether anticompetitive conduct occurred" but could explain "that the market was not competitive and explain how he reached that conclusion) (internal alterations, quotation marks, and citation omitted); *TC Sys. Inc. v. Town of Colonie, N.Y.*, 213 F. Supp. 2d 171, 182 (N.D.N.Y. 2002) (excluding portions of expert opinion that stated impermissible legal conclusions and "merely [told] the jury what result to reach[,]" but permitting opinions regarding why a local law constituted a barrier to entry into the market at issue).

## 2.    Opinions Regarding the Best Interests of Cooperative Members.

Defendants ask the court to preclude Professor Elhauge from testifying that Defendants did not act in the best interests of their dairy farmer cooperative members because that opinion is not related to his area of expertise,[2] is not derived by a scientific methodology, and "flows circularly from his inadmissible conclusion that [Defendants] engaged in a conspiracy[.]" (Doc. 146 at 12.) They further assert that this "best interests" opinion should be excluded as irrelevant to the test for Capper-Volstead immunity. Plaintiffs respond that Professor Elhauge will explain how Defendants' economic interests were at odds with those of their farmer members without offering any legal opinion regarding Capper-Volstead immunity.

The Capper-Volstead Act, 7 U.S.C. § 291, "gives farmers the right to combine into cooperative monopolies[,]" *Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037, 1040 (2d Cir. 1980), but does not shield cooperatives from liability for anticompetitive behavior such as restraining trade or suppressing competition. *Id.* at 1044 ("Neither may [a cooperative] use its legitimately acquired monopoly power in such a manner as to stifle or smother competition."). To be shielded from antitrust liability by the Capper-Volstead Act, a cooperative must be "operated for the mutual benefit of the members thereof[.]" 7 U.S.C. § 291.

Professor Elhauge specifically disclaimed any opinion regarding the applicability of the Capper-Volstead Act at his deposition. Instead, he opines that Defendants' roles as a cooperative-producer, milk marketer, and processor of raw Grade A milk give rise to inherent conflicts of interest that incentivize Defendants to suppress the price of raw

---

[2] Contrary to Defendants' suggestion, Professor Elhauge is not required to have any personal expertise with dairy farming or agricultural cooperatives. *See TC Sys. Inc.*, 213 F. Supp. 2d at 175 (rejecting challenge to antitrust expert's qualifications based on expert's lack of experience in telecommunications industry and noting that "[a]n economist, through his or her educational training, is qualified to educate the fact finder about . . . broad economic principles and market forces"). Nor is he required to be an economist if, by virtue of his knowledge, skill, experience, training, or education, he is qualified to offer an opinion that will be helpful to the jury. *See* Fed. R. Evid. 701; *see also In re Mushroom Direct Purchaser Antitrust Litig.*, 2015 WL 5767415, at * 5 ("There is no serious question that Prof[essor] Elhauge 'posses[es] skill or knowledge' in conducting regression analysis in antitrust cases[.]") (citation omitted).

Grade A milk even though their farmer members would benefit from higher prices. His "best interests" opinion thus addresses competing economic incentives as well as conduct that would be atypical in a competitive market. These topics are well within Professor Elhauge's specialized knowledge as an antitrust expert and fit the facts of this case. *See Allen v. Dairy Mktg. Servs., LLC*, 2013 WL 6909953, at *11 (D. Vt. Dec. 31, 2013) (holding expert witness may "opine regarding the identity of coconspirators, their economic incentives to participate in the conspiracy (including the incentives of their management), and whether the climate of a specific market was consistent with a conspiracy") (internal quotation marks and citation omitted).

Although the Capper-Volstead Act may permit cooperatives to own processing plants, it does not authorize them to profit from that ownership at the expense of their own members in violation of the antitrust laws. Professor Elhauge's opinion is confined to this narrower proposition:

> To be clear, I am not opining that a dairy cooperative having interests in dairy processing is in and of itself conspiratorial and/or anticompetitive conduct. Rather, I am highlighting that such interests create a conflict of interest that can explain the motivation behind a conspiracy to suppress raw milk prices – i.e. to favor the profitability of processing operations – especially when understood in context of all of the defendants' conduct explained in this report.

(Doc. 147-1 at 71, ¶ 134.)

Because Professor Elhauge's "best interests" opinion pertains to matters within his expertise and does not offer a legal conclusion regarding Capper-Volstead immunity, Defendants' motion to exclude this portion of Professor Elhauge's opinion is DENIED.

### 3. Opinions Regarding Contract Terms.

Defendants assert that Professor Elhauge should be prohibited from interpreting contract provisions, including characterizing certain contracts as "full supply" without relying on any commonly understood economic definition of that term. They further argue that Professor Elhauge should not be permitted to interpret certain DocuWare Access Agreements as containing "antisolicitation" provisions.

12

"Generally, the proper interpretation of a contract is a question of law" for the court to decide. *Rounds v. Malletts Bay Club, Inc.*, 2016 VT 102, ¶ 16, 203 Vt. 473, 479, 157 A.3d 1101, 1105; *see also Ascent Healthcare Solutions, Inc. v. Dumont*, 2012 WL 1599868, at \*4 (D. Vt. May 7, 2012) ("Whether ambiguity exists and the interpretation of an unambiguous contract are questions of law, not fact."). If the court determines that a contract's meaning is ambiguous, "the issue then becomes a mixed question of law and fact." *B & C Mgmt. Vt., Inc. v. John*, 2015 VT 61, ¶ 11, 199 Vt. 202, 207, 122 A.3d 511, 514; *see also Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 510 (2d Cir. 1977) ("The question of interpretation of [a] contract is for the jury and the question of legal effect is for the judge.") (internal quotation marks and citation omitted).

Although interpretation of an unambiguous agreement is the province of the judge, expert witness testimony may explain how a contract operates in the marketplace. For example, in *Cary Oil Co. v. MG Ref. & Mktg., Inc.*, an expert witness was permitted to testify "regarding the financial and logistical ability of [p]laintiffs to absorb certain volumes of petroleum under the [c]ontracts" at issue where he applied a "relatively straightforward analysis" to draw conclusions regarding what would happen if certain options in the agreements were exercised. 2003 WL 1878246, at \*3 (S.D.N.Y. Apr. 11, 2003). Similarly, in a suit regarding a partnership dispute, "[e]xpert testimony was admissible for the purpose of explaining the meaning of the technical contract terms" in the partnership agreement. *Moore v. Tristar Oil & Gas Corp.*, 528 F. Supp. 296, 310 (S.D.N.Y. 1981).

In this case, in denying summary judgment, the court observed that "additional information" would be necessary to determine whether certain contracts were "full supply" agreements. (Doc. 130 at 24 n.8.) At oral argument, Plaintiffs emphasized that Professor Elhauge's opinions concerning the full supply contracts and DocuWare Access Agreements rely in part on admissions made by Defendants' representatives in depositions and documentary evidence and the opinions he offers at trial will therefore depend on the state of the record. Until that record is established, or Plaintiffs anticipate in good faith that it will be furnished by a subsequent witness, Professor Elhauge will not

13

be permitted to interpret non-technical contractual terms for the jury. He may, however, opine as to how a contract or contractual term operates in the marketplace.

For the foregoing reasons, Defendants' motion to exclude Professor Elhauge's opinions is GRANTED IN PART with regard to interpretation of non-technical contractual terms and CONDITIONALLY DENIED IN PART with regard to the operation of contracts or contractual terms in the marketplace.

### 4. Opinions Regarding Parties' Mental States, Motivations, or Credibility.

Defendants assert that some of Professor Elhauge's opinions as to why Defendants made certain business decisions would "tell the jury which witnesses to believe and which to discredit." (Doc. 146 at 16.) Plaintiffs agree that Professor Elhauge will not opine as to the credibility of witnesses but will opine as to the economic motivations of the various market participants.

While the "intent, motives[,] or states of mind of corporations, regulatory agencies and others have no basis in any relevant body of knowledge or expertise[,]" *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 541, 546 (S.D.N.Y. 2004) (footnote omitted), experts in antitrust cases frequently testify concerning economic incentives, the market behaviors they are likely to induce, and the market events or conditions that may contribute to monopsony power. *See DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 2019 WL 1515231, at *7 (E.D.N.Y. Feb. 21, 2019) (holding that antitrust expert could "point to factors that would tend to show anticompetitive conduct in a market" and "indicate whether he believed those factors existed" in the case). Thus, while Professor Elhauge may not ascribe a particular motivation to Defendants or their representatives or call their credibility into question, he may explain why a particular action would be inconsistent with normal market incentives or why certain payments or compensation are consistent with the existence of a quid pro quo. *See Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 98 (2d Cir. 2018) (holding that, consistent with *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986), an antitrust plaintiff must show that "the

conspiratorial explanation is more likely than not") (internal quotation marks and citation omitted).

Certain of Professor Elhauge's opinions, however, are more problematic and impermissibly address credibility. For example, he describes Defendants' explanation regarding why they ceased marketing milk for independent farmers and cooperatives as "pretextual[,]" (Doc. 147-1 at 122), which arguably carries a connotation of deceit. Similarly, he characterizes other explanations as "conclusory[,]" not "persuasive[,]" and "not to be credited[.]" (Doc. 146 at 16.) These types of opinions are inadmissible. *See Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005) ("Thus, this court, echoed by our sister circuits, has consistently held that expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702."); *United States v. Scop*, 846 F.2d 135, 142 (2d Cir. 1988) (ruling "witnesses may not opine as to the credibility of the testimony of other witnesses").

In addition, Professor Elhauge may not opine as to a party's true motivation, as this also suggests that a proffered motive is false. *See Lippe v. Bairnco Corp.*, 288 B.R. 678, 688 (S.D.N.Y. 2003) (excluding an expert witness opinion regarding the "defendants' 'real purpose,' their true motivation, in engaging in [a] transaction[]"); *see also Scentsational Techs., LLC v. Pepsi, Inc.*, 2018 WL 1889763, at *8 (S.D.N.Y. Apr. 18, 2018) (excluding opinions that defendant did not act "in good faith" and that "emotions were running undoubtedly high") (internal alterations omitted).

For the foregoing reasons, Defendants' motion is GRANTED insofar as it seeks to preclude Professor Elhauge's opinions regarding the credibility and motive of any party or witness.

### 5. Opinions Summarizing Plaintiffs' Theory of the Case.

Defendants argue that Plaintiffs intend to use Professor Elhauge's testimony to parrot Plaintiffs' view of the case and introduce facts that should be admitted only through lay witnesses based upon personal knowledge. They further assert that testimony that simply "explain[s]" the facts involves "no science, technical, or specialized

knowledge" that would qualify it as an expert opinion. (Doc. 146 at 18.) At oral argument, Plaintiffs disclaimed any intent to use Professor Elhauge to narrate their case and stated that Professor Elhauge will refer to and rely upon only evidence that will be admitted through exhibits and fact witnesses.

"Expert testimony is not admissible if it merely serves as a conduit to construct a factual narrative" because such testimony will not be helpful to the finder of fact. *SourceOne Dental, Inc.*, 2018 WL 2172667, at \*7 (citing *Highland Capital Management, L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y. 2005)); *see also Rotman v. Progressive Ins. Co.*, 955 F. Supp. 2d 272, 283 (D. Vt. 2013) (observing that "[t]o the extent [an expert witness] merely repeats or recasts the testimony of [a fact witness] in order to arrive at a theory of causation, he is not testifying as an expert witness based upon specialized knowledge, but rather is acting as a conduit for another witness's testimony in the guise of an expert's opinion"); *Estate of Puppolo*, 2017 WL 4042342, at \*16 (finding expert opinion that simply communicated "the opinions of [p]laintiff and her counsel" was inadmissible). "It is therefore inappropriate for experts to act as a vehicle to present a factual narrative of interesting or useful documents for a case, in effect simply accumulating and putting together one party's 'story.'" *Scentsational Techs., LLC*, 2018 WL 1889763, at \*4.

However, "an expert may and often must rely on facts" and "state them in a report." *Id.* Where an expert uses record evidence "to describe the setting in which the parties were operating" and "applies economic principles to determine whether the situation described was one that tended to show economic indicators of" anticompetitive behavior, his or her opinions are admissible. *U.S. Info. Sys., Inc.*, 313 F. Supp. 2d 213 at 237.

At this juncture, any concern regarding the manner of presenting Professor Elhauge's testimony is premature. *See Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 2015 WL 5459662, at \*12 (S.D.N.Y. Sept. 16, 2015) ("It is frankly unclear whether [expert witness] intends to offer such testimony live or whether any factual narrative in his report simply provides the foundation for his opinions.").

Plaintiffs represent that, at trial, they will establish the factual foundation for Professor Elhauge's analyses, and he may rely upon that evidence consistent with Fed. R. Evid. 703. Defendants' motion to exclude is therefore DENIED WITHOUT PREJUDICE.

> **6.      Admissibility of Professor Elhauge's Regression Analysis, Damages Calculation, and Opinions Regarding Antitrust Impact.**

Defendants seek to exclude opinions based on Professor Elhauge's regression analysis for two reasons. First, they contend that because Professor Elhauge's software erroneously processed observations missing zip code data, his regression analysis is unreliable because the error "infects an additional [ten] percent of his data" and "treat[s] all those transactions as if they fell within the same [zip] code, when in reality the farms at issue are located across [twenty-three] states." (Doc. 146 at 7-8.) And second, Defendants assert that Professor Elhauge relies too extensively on averaged values in calculating the premiums paid for milk in the relevant market, yielding an analysis which does not "fit" the facts of this case.

Under *Daubert*, the court must examine "whether the expert's technique can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability" and "whether the theory or method has been generally accepted by the relevant scientific community." *U.S. Info. Sys., Inc.*, 313 F. Supp. 2d at 227 (citing *Daubert*, 509 U.S. at 593-94). "In undertaking this flexible inquiry, the district court must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Fleischman*, 728 F. Supp. 2d at 144 (quoting *Amorgianos*, 303 F.3d at 266).

The question of an expert opinion's "fit" depends on whether the opinion is sufficiently relevant to the disputed facts and issues. *See Daubert*, 509 U.S. at 591 (noting that expert testimony must be "sufficiently tied to the facts of the case" in order to "aid the jury in resolving a factual dispute" to satisfy the fit requirement). An expert witness opinion must therefore have a "valid scientific connection to the pertinent inquiry as a

precondition to admissibility." *Daubert*, 509 U.S. at 592. "A proffered expert opinion may fail to meet the fit requirement if it relates to facts or data that have not been adequately established in the case." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 137 F. Supp. 2d 147, 163 (E.D.N.Y. 2001) (internal quotation marks and citation omitted), *aff'd*, 303 F.3d at 256. "'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Daubert*, 509 U.S. at 591.

Defendants' reliability challenge is based on a coding error in Professor Elhauge's regression model which failed to correctly process missing zip codes in the vast data set which Defendants produced to Plaintiffs. As Defendants concede, the coding error was addressed and corrected in Professor Elhauge's Second Supplemental Expert Report. A computer code problem is akin to a "mistake[] in arithmetic [that] can be corrected (unlike the mistake of using an unreliable methodology)" and therefore does not render the regression inadmissible, particularly where the problem has been redressed. *Malletier v. Dooney & Bourke*, 525 F. Supp. 2d 558, 657 (S.D.N.Y. 2007); *see also Encompass Advisors, Ltd. v. Unapen, Inc.*, 2013 WL 6331157, at \*3 (D. Conn. Dec. 5, 2013) (finding objection based on unreliability moot where expert subsequently examined the subject at issue and supplemented his disclosure).

Defendants further challenge Professor Elhauge's corrected regression analysis as inadequate in light of the corresponding reduction in the data set. As Professor Elhauge notes in his Second Supplemental Expert Report, his analysis is based on 801,560 observations out of a total of 1,169,902, or 69% of the data included in Defendants' production. (*See* Doc. 150-7 at 4, ¶ 3.) Professor Elhauge excluded a portion of the observations because the discovery produced by Defendants lacked data for the variables incorporated in his model. Because Defendants contributed to the missing data, "the [c]ourt will not hold Plaintiffs [solely] responsible[.]" *In re Dig. Music Antitrust Litig.*, 321 F.R.D. 64, 76 (S.D.N.Y. 2017) (rejecting challenge to expert opinion where defendants did not produce individualized data). Although a more robust data set might

be preferable, there is no evidence that the resulting data set is so paltry that it renders Professor Elhauge's entire regression analysis unreliable.

Defendants further object to the "fit" of Professor Elhauge's regression analysis on the ground that it "masks important differences among the [P]laintiffs[,]" such as whether they marketed their milk to processors directly or through cooperatives. (Doc. 146 at 24.)[3] This type of challenge goes to the weight of Professor Elhauge's opinion rather than its admissibility as it pertains only to whether Professor Elhauge's regression analysis is sufficiently detailed and illustrative to yield persuasive conclusions. *See SourceOne Dental, Inc.*, 2018 WL 2172667, at *6 (holding that "objections to [an expert witness's] damages model [that] focus almost entirely on his factual inputs and assumptions rather than his methodology . . . go to the probative value of" the opinion and do not establish its inadmissibility); *see also Cincinnati Ins. Cos. v. Hectic Elec., Inc.*, 2010 WL 1472745, at *3 (D. Vt. Apr. 9, 2010) (analyzing challenge to fit and concluding that expert's "use of an accepted methodology which led him to reach a conclusion . . . after an investigation of data and facts[] is not so flawed as to render his opinions inadmissible").

Similarly, Professor Elhauge's thirteen-year average, while arguably atypical, is supported by a reasonable explanation as to why it is a reliable measure of damages in the facts and circumstances of this case. *See Amorgianos*, 303 F.3d at 267 (observing that the "limitation on when evidence should be excluded accords with the liberal admissibility standards of the federal rules and recognizes that our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony").

To the extent that Defendants challenge other aspects of Professor Elhauge's regression analysis, including the specific proxies he employed, their motion

> asks the [c]ourt to take sides in a dispute between experts about the intricacies of econometric modeling. That is not the proper function of a *Daubert* motion. This is not a case in which an expert is unable to articulate

---

[3] Defendants' reliance on class certification opinions considering the predominance of common issues as required under Fed. R. Civ. P. 23(b) in support of their "fit" argument underscores that the heart of their challenge is whether Plaintiffs may show individualized injury using Professor Elhauge's analysis—a question that the court has already answered in the affirmative.

> a rationale for his methodology; nor is it a case where the proffered
> rationale is patently flawed or unreasonable.

*In re Vitamin C Antitrust Litig.*, 2012 WL 6675117, at *8 (E.D.N.Y. Dec. 21, 2012).

"Reasonable minds may differ as to whether [an expert's analysis] is probative of [a disputed fact]. Resolving that question, however, is the near-exclusive province of the jury." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1049 (2016). Defendants are free to explore the deficiencies in Professor Elhauge's regression analysis on cross-examination. They have not proffered persuasive reasons for excluding it entirely. *Cf. Bouaphakeo*, 136 S. Ct. at 1048-49 (noting that "[r]epresentative evidence that is statistically inadequate or based on implausible assumptions could not lead to a fair or adequate estimate" but "[o]nce a district court finds evidence to be admissible, its persuasiveness is, in general, a matter for the jury"); *see also SourceOne Dental, Inc.*, 2018 WL 2172667, at *6 ("Cross-examination and impeachment at trial, and the contrary opinions of defendants' experts are sufficient to expose any weaknesses in [expert witness's] model.").

For the foregoing reasons, Defendants' motion to exclude is DENIED with regard to Professor Elhauge's regression analysis.

## C.   Whether to Exclude Portions of Dr. Snyder's Opinion (Doc. 148).

To counter Professor Elhauge's opinions, Defendants proffer the testimony of their antitrust economics expert, Dr. Edward Snyder, who holds a Ph.D. in economics and currently serves as a dean and professor in the Yale School of Management. Dr. Snyder previously served on the business school faculties at the University of Virginia, the University of Chicago, and the University of Michigan and has been qualified as an antitrust expert by numerous federal district courts. In this case, he rebuts Plaintiffs' allegations of a monopsony for raw Grade A milk in Order 1 by using a benchmark analysis to compare the relevant market to other regions and industries during the relevant time period. In the course of this analysis, he opines that "[s]ome 147 processing plants operated in a typical year during the at-issue period" and "[h]ence, individual farmers have many options for selling their milk." (Doc. 148-1 at 3, ¶ 24.) Plaintiffs

contend this opinion must be excluded because it is not the product of specialized knowledge or expertise and because it is not helpful to the jury.

An expert opinion must be excluded "if . . . the expert lacks good grounds for his or her conclusions." *Amorgianos*, 303 F.3d at 267 (internal quotation marks and citations omitted); *see also Nimely*, 414 F.3d at 396 (finding that if the "data, . . . methodology, or studies . . . are simply inadequate to support the conclusions reached," the opinion is unreliable and subject to exclusion) (internal quotation marks and citation omitted). "'[T]he reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, [and] the link between the facts and the conclusion[.]'" *Amorgianos*, 303 F.3d at 267 (first alteration in original) (quoting *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 155 (3d Cir. 1999)). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert[,]" and the court must exclude proffered expert witness testimony if it "conclude[s] that there is simply too great an analytical gap between the data and the opinion." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Even if the opinion is reliable, the court must also determine that it will be helpful to the jury. *See Nimely*, 414 F.3d at 397 ("Rule 702 requires the district court to make a third inquiry: whether the expert's testimony (as to a particular matter) will 'assist the trier of fact.'"). "[D]efendants' experts have a less demanding task" because "they have no burden to produce models or methods of their own" and "need only attack those of plaintiffs' experts." *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007). Nonetheless, even a rebuttal opinion "must meet *Daubert*'s threshold standards regarding the qualifications of the expert, sufficiency of the data, reliability of the methodology, and relevance of the testimony." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 44 (S.D.N.Y. 2016). "[E]xpert testimony is not helpful if it simply addresses 'lay matters which a jury is capable of understanding and deciding without the expert's help.'" *In re Dig. Music Antitrust Litig.*, 321 F.R.D. at 75 (quoting *United States v. Mulder*, 273 F.3d 91, 101 (2d Cir. 2001)); *see also In re Elec. Books Antitrust Litig.*,

2014 WL 1282298, at *12 (S.D.N.Y. Mar. 28, 2014) ("To be of assistance to the jury, [expert] would have to bring his own expertise as an economist to bear on a subject.").

Dr. Snyder derived his opinion by assembling a list of processing plants in Order 1, eliminating those plants identified by Professor Elhauge as potential co-conspirators, calculating the total capacity of the remaining plants, and calculating the distance from those "free and clear" plants to the zip codes in Order 1. While Defendants contend Dr. Snyder performed a "detailed empirical analysis[,]" (Doc. 164 at 7), his procedure more closely approximates a mathematical and mapping exercise that employs no specialized knowledge or expertise unavailable to the average juror. Although the data in question was obtained from a number of sources, none of it required expert witness interpretation and all of it could be obtained in some form from the public domain.

In formulating his opinion, Dr. Snyder did not investigate or analyze whether the processing plants he deems "free and clear" are willing or able to buy from new sources or are instead subject to long-term or full-supply contracts with other farmers that would limit their capacity to accept Plaintiffs' milk. He also includes in his analysis processing plants that purchase only organic or kosher milk without addressing the modifications necessary for a milk producer to sell to a kosher or organic processer. As those modifications are time-consuming and substantial, processing plants that he identifies as "free and clear" options may not actually be available. *See* Doc. 147-1 at 29, ¶ 49 (citing statement by the Organic Trade Association that conversion from conventional to organic milk production takes at least three years). Dr. Snyder acknowledged as much in his deposition by conceding that a determination of actual availability would require further analysis and that the plants he identifies might be better characterized as "potential" options. (Doc. 148-2 at 4.)

A fact witness may be permitted to provide the information Dr. Snyder proffers concerning the locations of processing plants relative to Order 1 zip codes. This same information, however, should not be presented to the jury in the guise of an expert witness opinion. "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible

prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." *Daubert*, 509 U.S. at 595 (internal quotation marks and citation omitted). As Dr. Snyder's analysis does not require the application of any specialized knowledge or expertise outside the ken of the average juror, and as it does not fit the facts of this case, Plaintiffs' motion to exclude Dr. Snyder's opinion that during the alleged conspiracy there were "many options" for Plaintiffs to sell their milk (Doc. 148-1 at 3, ¶ 24) is GRANTED.

## CONCLUSION

For the foregoing reasons, Defendants' motion to strike Professor Elhauge's Second Supplemental Expert Report (Doc. 149) is DENIED and their motion to exclude certain of Professor Elhauge's opinions (Doc. 146) is GRANTED IN PART and DENIED IN PART. Plaintiffs' motion to preclude Dr. Snyder's opinion regarding the availability of processing options (Doc. 148) is GRANTED.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this **2 4**<sup>th</sup> day of June, 2020.

Christina Reiss, District Judge
United States District Court