**UNITED STATES DISTRICT COURT**
**DISTRICT OF VERMONT**

GARRET SITTS, et al.,                          )
                                               )
                    *Plaintiffs*,              )
                                               )
v.                                             )          Case No. 2:16-cv-00287-cr
                                               )
DAIRY FARMERS OF AMERICA, INC.                 )
and                                            )
DAIRY MARKETING SERVICES, LLC,                 )
                                               )
                    *Defendants*.              )

## STATEMENT OF INTEREST ON BEHALF OF THE UNITED STATES OF AMERICA

## INTEREST OF THE UNITED STATES

The United States respectfully submits this statement under 28 U.S.C. § 517, which

permits the Attorney General to direct any officer of the U.S. Department of Justice to attend to

the interests of the United States in any case pending in a federal court.  The United States is

principally responsible for enforcing the federal antitrust laws, *United States v. Borden Co.*, 347

U.S. 514, 518 (1954); 15 U.S.C. §§ 4, 25, and has a strong interest in their correct application.  In

particular, the United States seeks to ensure that antitrust exemptions, including the Capper-

Volstead Act, 7 U.S.C. §§ 291-92, are not interpreted more broadly than necessary because

antitrust law "is a central safeguard for the Nation's free market structures."  *N.C. State Bd. of*

*Dental Exam'rs v. FTC*, 574 U.S. 494, 502 (2015).[1]

The United States also has an interest in ensuring that the protections of the antitrust laws

are applied widely, so that the competition those laws protect benefits not only purchasers of

---

[1] The United States submitted a brief *amicus curiae* concerning the Capper-Volstead Act in *Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037 (2d Cir. 1980).

goods and services but also sellers of goods and services—such as farmers selling their produce. *See, e.g.*, *Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948) (Sherman Act "does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers").

## SUMMARY OF ARGUMENT

This Court recognized at the summary judgment stage that in this case the Court must apply principles of antitrust law on monopsonies against the background of the Capper-Volstead Act because this case involves agricultural cooperatives. *Sitts v. Dairy Farmers of Am., Inc.*, 417 F. Supp. 3d 433, 462-63 (D. Vt. 2019). We offer the following analysis of the Capper-Volstead Act as an aid to the Court in applying it to this case, whether to motions under Fed. R. Civ. P. 50, or, if the Court finds it necessary, to jury instructions.

Congress enacted the Capper-Volstead Act to give farmers who produce food greater bargaining power with processors and other corporate handlers of food products. It would be inconsistent with the Act's text and purpose to allow a defendant to use the Act as a shield when it acts as a food processor or exercises monopsony power to harm individual farmers. With respect to conspiracy claims under Section 1 of the Sherman Act, 15 U.S.C. § 1, the Capper-Volstead Act does not protect a cooperative's agreements with non-cooperatives, and it should not protect agreements between cooperatives that have nothing to do with "processing, preparing for market, handling, and marketing" the cooperatives' products. With respect to monopsony claims under Section 2 of the Sherman Act, 15 U.S.C. § 2, the range of "predatory" conduct that falls outside the scope of the Act's exemption should be construed broadly to include exclusionary acts, and the totality of the defendant's predatory acts should be considered. The

Act also should be treated as an affirmative defense, so that the defendant bears the burden of showing that the Act encompasses its alleged monopsonization.[2]

## BACKGROUND

1.      Plaintiffs are "dairy farmers who opted out of a settlement approved by this court in a class action[.]" *Sitts*, 417 F. Supp. 3d at 441.  Defendant Dairy Farmers of America (DFA) "is a member-owned milk marketing cooperative" and "the largest dairy cooperative in the United States[.]"  *Id.*  at 443.[3]  Defendant Dairy Marketing Services is an arm of DFA.  Plaintiffs assert a conspiracy to restrain trade under Section 1 of the Sherman Act and three violations of Section 2 of the Sherman Act, all based on monopsonization.

2.      "Plaintiffs contend that Defendants have obtained control over dairy farmers' milk in [parts of the northeast] through a series of allegedly anticompetitive agreements at both the cooperative and processor levels."  *Sitts*, 417 F. Supp. 3d at 445.  The various agreements are described in the Court's Opinion and Order on summary judgment, *Sitts* (Doc. 130).  In particular, Plaintiffs allege that Defendants engaged in several overt acts in furtherance of the alleged conspiracy's unlawful objective to monopsonize, including, but not limited to: (1) written and unwritten non-solicitation agreements and sharing of information regarding farmer pay programs; (2) supply agreements; (3) most favored nation clauses and pricing; and (4) outsourcing agreements.  *Id.* at 458.   The alleged effect of these agreements is "to depress prices paid to dairy farmers for their raw Grade A milk."  *Id.* at 462.

---

[2] This Statement takes no position on the merits of the Plaintiffs' antitrust claims.

[3] This Statement assumes, for purposes of this argument only, that DFA is a *bona fide* agricultural cooperative under the Capper-Volstead Act with respect to its membership.  *See National Broiler Marketing Ass'n v. United States*, 436 U.S. 816, 827-29 (1978) (Capper-Volstead requires that all members of the cooperative be farmers, and even one middleman is sufficient to void the Capper-Volstead exemption).

3.      The Court's Opinion and Order granted in part and denied in part Defendants' motion for summary judgment.  With respect to Plaintiffs' Section 1 and 2 conspiracy claims, the Court ruled that Plaintiffs cannot as a matter of law prove a "hub-and-spoke" conspiracy, but Plaintiffs are not precluded from characterizing their claims as a single conspiracy.  *Sitts*, 417 F. Supp. 3d at 470.  The Court then found disputed issues of material fact on the existence of a conspiracy, the identity of its members, and the overt acts taken in furtherance of it, and therefore denied summary judgment.  *Id*. at 473.  With respect to Plaintiffs' monopsonization and attempted monosponization claims under Section 2, the Court found disputed issues of material fact on Defendants' market share; whether Defendants have monopsony power or a dangerous probability of achieving it; and whether that monopsony power is derived from legitimate or predatory acts, *id*. at 478, and therefore the Court denied summary judgment.

4.      A jury trial currently is scheduled to begin on September 30, 2020.

## ARGUMENT

**I.      The Allegations in This Case Fall Outside the Heartland of Agricultural Activity Shielded by the Capper-Volstead Act From the Antitrust Laws.**

**A.      The Act Protects Efforts to Increase Farmers' Bargaining Power Against Corporate Food Handlers and Does Not Insulate Monopsonies from the Antitrust Laws.**

Competition is "the fundamental principle governing commerce in this country."  *City of Lafayette v. La. Power & Light Co.*, 435 U.S. 389, 398 (1978).  Deviations from that fundamental policy, in the form of exemptions from the federal antitrust laws, therefore are disfavored and narrowly construed.  *E.g.*, *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 126 (1982) (exemption for business of insurance in McCarran-Ferguson Act "must be construed narrowly"); *Grp. Life & Health Inc. Co. v. Royal Drug Co.*, 440 U.S. 205, 231 (1979) (same, also explaining statutory and non-statutory labor exemptions are "narrowly construed"); *FTC v.*

3

*Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 225 (2013) ("given the fundamental national values of free enterprise and economic competition that are embodied in the federal antitrust laws, state action immunity is disfavored, much as are repeals by implication") (citation omitted); *see also In re Midwest Milk Monopolization Litig.*, 510 F. Supp. 381, 426 (W.D. Mo. 1981) (Supreme Court precedent "requires that the Capper-Volstead exemption be narrowly construed"), *aff'd in part, rev'd in part*, *Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173 (8th Cir. 1982).  Consistent with those precedents, courts have interpreted the Capper-Volstead Act narrowly to protect efforts to increase farmers' bargaining power against corporate food handlers, but not as a shield insulating monopsonies from the antitrust laws.

As the Court described on summary judgment, "[d]airy cows produce milk seven days a week, a schedule that cannot be immediately adjusted for demand short of throwing away milk.  As a result, dairy farmers must find a processor that will take their milk regardless of demand."  *Sitts,* 417 F. Supp. 3d at 442.  Historically, this reality put individual and geographically dispersed dairy farmers at the mercy of large milk processors that sought to buy raw milk at the cheapest price.  Farmers therefore were "probably the strongest constituency behind the passage of the Sherman Act."  Jon Lauck, *Toward an Agrarian Antitrust: A New Direction for Agricultural Law*, 75 N.D. L. Rev. 449, 467 (1999).  The legislative history of the Sherman Act shows that its passage was motivated in large part by the harmful effect that agricultural trusts were thought to have had in reducing the prices paid to farmers.  For example, Senator Sherman attacked trusts for "increas[ing] beyond reason the cost of necessaries of life and business, and they decrease the cost of raw material, the farm products of the country."  21 Cong. Rec. 2461 (1890).  In both houses of Congress, members specifically condemned the beef trust for suppressing the prices paid to cattle farmers.  *Id*. at 2470 (Sen. Allison) ("there is a

4

combination in the city of Chicago . . . [that] keeps down the price of cattle upon the hoof"); *id.* at 4098 (Rep. Taylor) ("The beef trust fixes arbitrarily the daily price of cattle. . . . The farmers get from one-third to half of the former value of their cattle and yet beef is as costly as ever. . . . This monster robs the farmer on the one hand and the consumer on the other."). *See also* S. Rep. 829, 51st Cong., pp. 4, 33 (1890) (select committee to investigate the beef trust urges passage of the Sherman Act); *Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 235 (1948) (alleged conspiracy in purchasing sugar beets "is the sort of combination condemned by the [Sherman] Act, even though the price-fixing was by purchasers, and the persons specially injured . . . are sellers, not customers or consumers").

By the 1920's, Congress became convinced that the Sherman and Clayton Acts did not sufficiently aid farmers, and that a stronger statute was needed. Congress passed the Capper-Volstead Act to support the cooperative form of organization that would help equalize farmers' bargaining power with processors, packing houses, railroads, and other corporations handling agricultural products. Specifically, the aim of the legislation was to "equalize existing privileges" between the farmers and business corporations with whom they dealt, "not . . . to place these associations above the law" or permit them to use their power to injure competition. H.R. Rep. No. 24, 67th Cong., 1st Sess., pp. 2-3 (1922); 61 Cong. Rec. 1033 (1921) (Rep. Volstead); *id.* at 1038 (Rep. Reavis); *id.* at 1040 (Rep. Towner); 62 Cong. Rec. 2218 (1922) (Sen. Calder); *id.* at 2225 (Sen. Lenroot); *id.* at 2257 (Sen. Norris); *id.* at 2264 (Sen. Cummins). *See also* Lauck, 75 N.D. L. Rev. at 492 & n.284 ("Congressional passage of the agricultural antitrust exemption encouraged the formation of agricultural cooperatives intended to countervail the monopsony power then held by the corporate purchasers.") (quoting David L.

Baumer et al., *Curdling the Competition: An Economic and Legal Analysis of the Antitrust Exemptions for Agriculture*, 31 Vill. L. Rev. 183, 185 (1986)).[4]

The Capper-Volstead Act realizes this goal by declaring that "[p]ersons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers *may act together in associations*, corporate or otherwise, with or without capital stock, *in collectively processing, preparing for market, handling, and marketing* in interstate and foreign commerce, *such products of persons so engaged*."  7 U.S.C. § 291 (emphases added). The Act also declares that "[s]uch associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purpose," as long as "such associations are operated for the *mutual benefit of the members thereof, as such producers*, and conform to" certain membership and organization requirements. *Id.* (emphasis added).[5]

Consistent with that text, in *Maryland and Virginia Milk Producers Ass'n, Inc. v. United States*, 362 U.S. 458, 463 (1960), the Supreme Court held that the Capper-Volstead Act did not "immunize cooperatives engaged in competition-stifling practices from prosecution under the antimonopolization provisions of § 2 of the Sherman Act[.]"  A review of the legislative history convinced the Court that the purpose of the Capper-Volstead Act "was simply that individual farmers should be given . . . the same unified competitive advantage—and responsibility—

---

[4] The prototypical example in the Capper-Volstead debates was the ownership of many grain elevators by a "corporation . . . composed of thirty to forty thousand members," while the antitrust laws at that time forbade farmers to form an association to own and operate those same elevators.  *See* H.R. Rep. No. 24, at 2; 61 Cong. Rec. 1033 (Rep. Volstead).

[5] Those requirements are: "First. That no member of the association is allowed more than one vote because of the amount of stock or membership capital he may own therein, or, Second. That the association does not pay dividends on stock or membership capital in excess of 8 per centum per annum. And in any case to the following:  Third. That the association shall not deal in the products of nonmembers to an amount greater in value than such as are handled by it for members."

available to businessmen acting through corporations as entities." *Id*. at 466.  The Court

explained that "[a]lthough contrary inferences could be drawn from some parts of the legislative

history, we are satisfied that the part of the House Committee Report just quoted[6] correctly

interpreted the Capper-Volstead Act, and that the Act did not leave cooperatives free to engage

in practices against other persons in order to monopolize trade, or restrain trade and suppress

competition *with the cooperative*." *Id*. at 467 (emphasis added).

The Supreme Court also has recognized that the Act does not protect agreements that

would be unlawful under Section 1 of the Sherman Act when they are between cooperatives and

non-cooperatives, except perhaps those agreements that are "necessary" to carry out the purposes

of a cooperative as set forth in the Act.  "The Court has held, for example, that an exempt

agricultural cooperative under the Capper-Volstead Act loses its exemption if it conspires with

nonexempt parties.  *Case-Swayne Co. v. Sunkist Growers, Inc.*, 389 U.S. 384, 88 S. Ct. 528, 19

L.Ed.2d 621; *United States v. Borden Co.*, 308 U.S. 188, 60 S. Ct. 182, 84 L.Ed. 181." *Grp. Life*

*& Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 231 (1979).  The case precedent thus

establishes "the *Borden* and *Maryland* principles that cooperatives [1] may not lawfully combine

or conspire with noncooperatives in restraint of trade or [2] employ predatory or coercive

practices [to stifle competition].  Such behavior remains subject to normal antitrust

remedies." IB P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 249c (4th ed. 2013) (bracketed

numbers added).

      **B.**    **The Allegations in This Case Do Not Appear to Involve Efforts to Increase Farmers' Bargaining Power Against Corporate Food Handlers But Rather Efforts at Monopsonization.**

---

[6] The just-quoted passage was: "In the event that associations authorized by this bill shall do anything forbidden by the Sherman Antitrust Act, they will be subject to the penalties imposed by that law."

The claims at issue in this case fall outside the heartland of Capper-Volstead protection because they do not involve claims that farmer cooperatives acted anticompetitively against processors and other middlemen, but rather claims that farmer cooperatives—through agreements with processors, middlemen, and other cooperatives—acted anticompetitively *against other farmers*.  On summary judgment, this Court noted that DFA is both a milk marketing cooperative and "also one of the largest milk handlers in the United States." *Sitts*, 417 F. Supp. 3d at 443.  DFA's "'Commercial Investments' segment participates in joint-venture partnerships and affiliate relationships with leading food manufacturing and marketing companies." *Id*.  To the extent that Plaintiffs show at trial that DFA violated the Sherman Act in reaping profits as a handler or processor from lower milk prices (*see id*. at 471), rather than "for the mutual benefit of the members thereof, *as such producers*," 7 U.S.C. § 291 (emphasis added), it would turn the Act on its head to allow DFA to use the Act as a legal shield.  *See United States v. Hinote*, 823 F. Supp. 1350, 1358-59 (S.D. Miss. 1993) (finding it would violate the purpose of Capper-Volstead to extend exemption to vertically-integrated companies that acted as processor-"middlemen" in seeking lower prices from farmers).  A cooperative acting on behalf of its members "as such producers"—farmers selling raw milk—"wants to sell that raw milk at the highest price." *Sitts,* 417 F. Supp. 3d at 458 (quoting Professor Elhauge).  As this Court explained, "a rational jury could conclude that DFA management favored growth of its commercial operations and empire building over the interests of its farmer-members[.]" *Id*. at 459.

Similarly, to the extent that Plaintiffs show at trial that DFA, even when acting as a milk marketing cooperative, made agreements with non-cooperatives that would violate Section 1 of the Sherman Act (*e.g.*, *Sitts,* 417 F. Supp. 3d at 460, 471-73) and were not necessary to carry out

DFA's functions as a cooperative,[7] Capper-Volstead protection should not apply.  Likewise, to the extent that Plaintiffs show that DFA made anticompetitive agreements with other cooperatives that were unrelated to "processing, preparing for market, handling, and marketing" the cooperatives' products, such as non-solicitation agreements that restrict competition for cooperative *membership*, *see id.* at 446-51, 470-71, Capper-Volstead protection should not apply.

Finally, to the extent that Plaintiffs show that DFA had monopsony power and used it to injure other cooperatives or independent dairy farmers who actively or potentially compete with DFA (*e.g.*, *Sitts,* 417 F. Supp. 3d at 456-58, alleged coercion of independent farmers to join DFA), it would be inconsistent with the Act to allow a monopsony to use it as a shield when Congress had no intention to "vest cooperatives with unrestricted power to restrain trade or to achieve monopoly by preying on independent producers[.]"  *Maryland*, 362 U.S. at 467.

## II.     The Capper-Volstead Act Does Not Insulate Exclusionary Acts from the Antitrust Laws Prohibiting Monopsonization.

In *Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037, 1043 (2d Cir. 1980), the Court of Appeals construed the Capper-Volstead Act to protect "the voluntary and natural growth that agricultural cooperatives needed to accomplish their assigned purpose of effective farmer representation."  A corollary of this principle is that "[o]f course, a cooperative may neither acquire nor exercise monopoly power in a predatory fashion by the use of such tactics as picketing and harassment, . . . coerced membership, . . . and discriminatory pricing . . . .  Neither may it use its legitimately acquired monopoly power in such a manner as to stifle or smother competition."  *Id*. at 1044 (citations omitted).  Thus, the Court held that the normal requirements

---

[7] In this regard, the Supreme Court explained that a contract merely "useful" to a cooperative is not protected if, "viewed in the context of all the evidence and findings, was not one made merely to advance the Association's own permissible processing and marketing business; it was entered into by both parties . . . because of its usefulness as a weapon to restrain and suppress competitors and competition[.]" *Maryland,* 362 U.S. at 471-72.

for a Sherman Act Section 2 claim of monopolization "appl[y] only to the acquisition of such

[monopoly] power by other, predatory means." *Id*. at 1045.  Although the Court gave some

illustrations of "predatory" conduct, it did not attempt to define "predatory" or give an

exhaustive listing (which likely is impossible) of "predatory means."

   The range of conduct that may be considered "predatory" for a Sherman Act Section 2

claim, and therefore outside the protection of the Capper-Volstead Act, should be construed

broadly because exemptions from the antitrust laws are narrowly construed, *see supra* Part I.A.[8]

Courts have recognized as much in accepting numerous practices as sufficiently "predatory" and

rejecting the argument that Capper-Volstead "prohibits co-ops only from engaging in narrowly

defined 'predatory practices.'" *Alexander*, 687 F.2d at 1182-83 (collecting cases).  For example,

as the Eighth Circuit explained, "[w]hether a co-op's business practice is unlawful thus is not

merely a question of whether it is 'predatory' in a strict sense, e.g., lacking a legitimate business

justification." *Id*. at 1183.  Rather, Capper-Volstead protection should not apply to conduct that

may otherwise have a legitimate business justification but is "undertaken with unlawful intent

and in the desire to achieve an unlawful goal." *Id*. (quoting *United States v. Dairymen, Inc.*, 660

F.2d 192, 195 (6th Cir. 1981)); *accord*, *Agritronics Corp. v. National Dairy Herd Ass'n*, 914 F.

Supp 814, 826 (N.D.N.Y. 1996) (same); *Cape Cod Food Products, Inc. v. National Cranberry

Ass'n*, 119 F. Supp. 900, 907 (D. Mass. 1954) ("it would be a prohibited monopolization for a

person or group of persons to seek to secure a dominant share of the market through a restraint of

trade which was prohibited, or through a predatory practice, or through the bad faith use of

---

[8] The "predatory" concept applies to single-firm conduct under Sherman Act Section 2, not to agreements among
two or more firms under Section 1.  As shown above, a cooperative's agreements with non-exempt parties (except
those "necessary" for a cooperative to carry out the functions specified in 7 U.S.C. § 291), are not exempt from the
Sherman Act whether or not they are "predatory."

otherwise legitimate devices").  Indeed, overt acts "are not immunized simply because they might also have other justifications or because they are merely 'anti-competitive' rather than 'predatory." *Alexander*, 687 F.2d at 1183.  Thus, the requirement for "predatory" acts generally should be construed as coextensive with the category of "exclusionary" acts that satisfy the Section 2 element of anticompetitive or exclusionary conduct.[9]  *See New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 651-52 (2d Cir. 2015); *Antitrust Law* ¶ 249d ("exclusionary practices by cooperatives are generally non-immune").

An aggregation of acts also may amount to unlawful anticompetitive conduct, even if each specific act by itself might not be sufficient.  *See Case-Swayne Co. v. Sunkist Growers, Inc.*, 369 F.2d 449, 451-52 (9th Cir. 1966) ("Even though the proof as to each of the specific acts may be insufficient in itself to establish wrongful use of monopoly powers, the jury must look at the 'whole picture' . . . and draw the ultimate conclusion"), *rev'd on other grounds*, 389 U.S. 384 (1967).  This is consistent with the basic Sherman Act principle that legality is to be determined by "look[ing] at the whole picture" without "tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each[.]" *Cont'l Ore Co. v. Union Carbide and Carbon Corp.*, 370 U.S. 690, 699 (1962); *accord Sitts*, 417 F. Supp. 3d at 470.

## III.  Defendants Bear the Burden of Proof that They Are Protected by the Capper-Volstead Act.

Antitrust exemptions typically are treated as affirmative defenses, with defendants bearing the burden of proof to show that an exemption applies in a particular case.  *E.g.*, *United States v. First City Nat'l Bank of Houston*, 386 U.S. 361, 363 (1967) (holding that statutory

---

[9] Of course, if the conduct is simply collective action between farmers regarding the "processing, preparing for market, handling, and marketing" of their products, and other requirements of the Capper-Volstead Act are satisfied, that conduct cannot be treated as predatory, consistent with the purposes of the Capper-Volstead Act, even if it would qualify as anticompetitive conduct under Section 2.

exemption found in 12 U.S.C. § 1828(c)(5)(B) of the Bank Merger Act is an affirmative

defense); *Dental Examiners*, 574 U.S. at 509 (state board claiming state-action exemption "must

satisfy [the] active supervision requirement"); *Consol. Express, Inc. v. N.Y. Shipping Ass'n*, 602

F.2d 494, 521 (3d Cir. 1979) (non-statutory labor exemption to claim under Section 4 of the

Clayton Act is an affirmative defense), *vacated on other grounds*, 448 U.S. 902 (1980).

    Consistent with that precedent, in *Allen v. Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d

323, 344 & n.17 (D. Vt. 2010) (Reiss, J.), this Court held that the Capper-Volstead Act should be

treated as an affirmative defense, with the defendant bearing the burden of proof.  Specifically,

this Court found "more rational the approach taken by those courts that interpret Capper-

Volstead immunity as an affirmative defense to be established by a defendant seeking its

protection."  *Id*. at 345 (citations omitted).  The defendant thus bears the burden of showing,

*inter alia*, that it is a *bona fide* cooperative; that its alleged anticompetitive conduct constitutes

the "processing, preparing for market, handling, and marketing in interstate and foreign

commerce, such products of [the cooperative]" or constitutes "the necessary contracts and

agreements to effect such purposes"; and that it "operate[s] for the mutual benefit of the

members thereof, as such producers[.]"  7 U.S.C. §  291.

    Notwithstanding this case law, on summary judgment Defendants argued in their Reply

that Plaintiffs' Section 2 claims failed as a matter of law because the Capper-Volstead Act

requires Plaintiffs to identify specific "predatory" acts by which Defendants acquired or

maintained their monopsony power, and Plaintiffs did not do so.  Doc. 115 at 7-9.  Defendants

further argued that Plaintiffs "bear the burden of showing that [DFA's high market share]

resulted from acts that are predatory[.]" *Id*. at 9.  The Court, in its Opinion on summary

judgment, declined to rule on this argument directly, stating: "As Defendants' Capper-Volstead

Act argument was raised for the first time in Defendants' Reply, the court does not analyze each alleged anticompetitive agreement and determine whether it reflects legitimate or predatory means." *Sitts*, 417 F. Supp. 3d at 476 n.21.

To the extent that Defendants' argument is that Plaintiffs bear the burden of proving that the Capper-Volstead exemption does not apply, it conflicts with the nature of the Capper-Volstead Act as an affirmative defense. *See Allen*, 748 F. Supp. 2d at 345 ("DFA and DMS argue that the Capper-Volstead Act immunizes the GNEMMA price-fixing alleged by Plaintiffs and that it is Plaintiffs' burden to demonstrate otherwise. DFA and DMS cite no authority for this allocation of the burden of proof."). While plaintiffs claiming that an agricultural cooperative has violated Section 2 of the Sherman Act must, in this Circuit, allege acts that are "predatory" (broadly construed, as described above), applying the Act as an affirmative defense means that once plaintiffs have made such allegations, the defendant then bears the burden to show that its alleged conduct falls within the terms of the Act. If Defendants re-assert their summary judgment argument, or if the Court determines that it is necessary to instruct the jury on the Capper-Volstead Act, the Court should place the burden of proof on the Defendants to show that they are entitled to the protection of the Act.

## CONCLUSION

The Capper-Volstead exemption should be construed narrowly and consistent with the Act's purpose to enhance the bargaining power of farmer-producers. It should be applied as an affirmative defense, with the defendant bearing the burden of showing that the exemption applies.

Dated at Burlington, in the District of Vermont, this 27th day of July, 2020.

Respectfully submitted,

MAKAN DELRAHIM
*Assistant Attorney General*

MICHAEL F. MURRAY
*Deputy Assistant Attorney General*

ROBERT B. NICHOLSON
STEVEN J. MINTZ
*Attorneys*
U.S. Department of Justice
Antitrust Division
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001
Phone: (202) 353-0256
Fax: (202) 514-0536
Email: Steven.Mintz@usdoj.gov

CHRISTINA E. NOLAN
United States Attorney
District of Vermont

By:     /s/ Jason M. Turner
JASON TURNER
*Assistant U.S. Attorney*
11 Elmwood Avenue, 3rd Floor
Burlington, VT 05401
Phone: (802) 951-6725
Fax: (802) 951-6540
Email: Jason.Turner@usdoj.gov