**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT**

| | |
|---|---|
| **GARRET SITTS, et al.,**<br><br>    **Plaintiffs,**<br><br>**v.**<br><br>**DAIRY FARMERS OF AMERICA, INC. and DAIRY MARKETING SERVICES, LLC,**<br><br>    **Defendants.** | **Civil Action No. 2:16-cv-00287-cr** |

**DEFENDANTS DAIRY FARMERS OF AMERICA, INC. AND DAIRY MARKETING SERVICES, LLC'S RESPONSE TO STATEMENT OF INTEREST ON BEHALF <u>OF THE UNITED STATES OF AMERICA</u>**

The Department of Justice's Statement of Interest ("SOI"), ECF No. 285, provides the Antitrust Division's ("Division") unsolicited views on four propositions of law related to the Capper-Volstead Act (the "CVA") that are not in dispute in this case. The Division does not address the threshold question of whether Dairy Farmers of America, Inc. ("DFA") qualifies as a "*bona fide* agricultural cooperative" under the CVA in the first instance. The one question of statutory interpretation before this Court that is actually in dispute is relevant only to that threshold question—namely, what evidence is relevant to determine whether a cooperative is "operated for the mutual benefit of the members thereof, as such producers" in order to qualify under the CVA. 7 U.S.C. § 291. The Division skips over that question regarding DFA's initial qualification for CVA protection, and focuses exclusively on the secondary issue of whether that qualification immunizes DFA from the specific allegations in this case. That secondary question is not disputed; DFA does not contend that the CVA immunizes any of the alleged predatory conduct that plaintiffs challenge.[1]

Because the Division does not address any actual legal issue that is in dispute in this case, 28 U.S.C. § 517 does not give the Division any legal authority to provide its views on the Capper-Volstead Act, and the Court can disregard the SOI altogether.[2] In any event, the Court does not

---

[1] *See infra* n.7 (reserving DFA's rights based on the presentation of evidence at trial).
[2] *See, e.g.*, *United States v. Salus Rehab.*, 2017 WL 1495862, at *1 (M.D. Fla. Apr. 26, 2017) ("Nothing about Section 517 supports an intent to create in the Solicitor General the right to appear and submit argument in any case in which the United States articulates a generic interest in the 'development' and the 'correct application' of the law."); *Oscar Ins. Co. of Fla. v. Blue Cross & Blue Shield of Fla., Inc.*, 413 F. Supp. 3d 1198, 1200 n.1 (M.D. Fla. 2019) (same). Courts have recently denied the Division's requests to argue orally in private litigation. *See, e.g.*, Order Den. Req. of the U.S. to Participate in the Dec. 6, 2019 Hr'g on Defs.' Mot. to Dismiss, *William Morris Endeavor Entm't, LLC v. Writers Guild of Am.*, No. 2:19-cv-05465-AB-AFMx (C.D. Cal. Dec. 2, 2019), ECF No. 62; Order Den. Opposed Mot. of the U.S. to Participate in the Dec. 4, 2019 Hr'g, *NextEra Energy Capital Holdings, Inc. v. Walker*, No. 1:19-cv-00626-LY (W.D. Tex. Dec. 2, 2019), ECF No. 132.

owe any deference to the Division's views about the contours of the CVA or its application to the facts here.[3] We briefly address each of the Division's points below solely to eliminate any confusion that the Division's filing may have caused about what is (and is not) in dispute in this case.

## DISCUSSION

### I. DFA ACKNOWLEDGES THAT CAPPER-VOLSTEAD ACT IMMUNITY IS AN AFFIRMATIVE DEFENSE FOR WHICH DFA BEARS THE BURDEN OF PROOF

The Division spends over two pages in the SOI arguing that qualifying for immunity under the CVA is an affirmative defense, and thus, it is DFA's burden to prove that it is a "*bona fide cooperative*" (*i.e.*, that it meets the statutory requirements). SOI at 11-13. Contrary to the Division's suggestion, DFA has not argued otherwise. In reality, the Division aims these pages of its statement at its own hypothetical speculation about DFA's position. *See id.* at 13 ("To the extent that Defendants' argument is . . . ."). But there is no need to guess at DFA's views on this issue, because DFA has made them clear. During the July 21, 2020 hearing on motions *in limine*

---

[3] *See Rhodes-Bradford v. Keisler*, 507 F.3d 77, 80 (2d Cir. 2007) ("The agency's claim . . . is merely a litigating position taken before this Court, and, as such, is not entitled to *Chevron* deference."); *LSP Transmission Holdings, LLC v. Lange*, 329 F. Supp. 3d 695, 703 (D. Minn. 2018) ("It is solely within the Court's discretion to permit or deny a statement of interest."). When arguing that deference should not attach to another federal agency's interpretation of the Capper-Volstead Act, plaintiffs took the position that affording *Chevron* deference to an agency interpretation "is warranted *only* when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *Kellogg v. Wyeth*, 612 F. Supp. 2d 421, 433 (D. Vt. 2008) (Sessions, J.) (emphasis added) (citation omitted) (cited in Pls.' Opp'n to DFA's Mot. *In Limine* No. 9, ECF No. 265). The Division does not satisfy those requirements. The Antitrust Division of the U.S. Department of Justice has no specially delegated authority from Congress to promulgate binding interpretations of the Sherman Act, much less the Capper-Volstead Act. *See, e.g.*, *New York v. Deutsche Telekom AG*, 439 F. Supp. 3d 179, 232 (S.D.N.Y. 2020) (ruling that Antitrust Division's guidelines on application and interpretation of antitrust laws "are not ultimately binding upon the courts"); *FTC v. PPG Indus., Inc.*, 798 F.2d 1500, 1503 n.4 (D.D.C. 1986) ("We note that the Department of Justice Guidelines offer a useful illustration of the application of the [Herfindahl-Hirschman Index], but are by no means to be considered binding on the court.").

(which the Division did not attend), for example, DFA expressly confirmed that it agrees that the CVA is an affirmative defense for which DFA bears the burden of proof.[4]

DFA did not argue otherwise in its summary judgment reply brief.  There, DFA simply argued that, *if* DFA meets its threshold showing that it qualifies for CVA protection by satisfying the statutory requirements (which it does), then under the Second Circuit's decision in *Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037 (2d Cir. 1980), plaintiffs cannot establish a Section 2 violation unless they prove that DFA acquired its alleged monopsony power through predatory conduct.  *See* DFA's Reply in Supp. of Mot. for Summ. J. at 7-9, ECF No. 115.  DFA of course bears the burden of proving that it is a qualified cooperative under the CVA.  Thus, the Division's statement on the allocation of this burden does not provide any useful guidance on any disputed issue.

II.   **DFA DOES NOT CONTEND THAT IT HAS IMMUNITY FOR ANY OF THE THREE TYPES OF THIRD-PARTY AGREEMENTS THAT PLAINTIFFS CLAIM ARE ANTICOMPETITIVE, SO DFA BEARS NO BURDEN TO PROVE THAT THE CVA APPLIES TO THAT CONDUCT**

The Division's second core proposition is equally misdirected.  The Division contends that, after DFA establishes that it meets the CVA's threshold requirements, DFA also bears the burden of showing that the CVA protects against liability for the specific type of alleged anticompetitive conduct at issue.  SOI at 12-13 ("[A]pplying the Act as an affirmative defense means that once plaintiffs have made such allegations, the defendant then bears the burden to show that its alleged conduct falls within the terms of the Act.").  That would be true if DFA claimed immunity for engaging in allegedly predatory conduct.  But it is irrelevant here because DFA makes no such claim.

---

[4]   *See* July 21, 2020 Hr'g Tr. 107:21-22, ECF No. 282 ("Hr'g Tr.") ("We agree it's an affirmative defense.  We bear the burden of proof on that.").

4

DFA has never argued that the CVA insulates DFA from any of the specific alleged anticompetitive conduct that plaintiffs have based their claims on—as set forth in plaintiffs' Proposed Jury Instructions Nos. 8 and 23, ECF No. 275—at all.  *See, e.g.*, Hr'g Tr. 104:23-106:13 (agreeing that DFA has the burden to prove that it is a qualifying cooperative and that the CVA does not provide a blanket immunity for all conduct); *see also id.* at 105:17-24 (emphasizing that DFA is "not asking to immunize under the Capper-Volstead Act any agreements that are alleged to exist between [DFA] and any nonproducers," including non-solicitation agreements, because "[w]e are not saying that the Capper-Volstead Act protects any of that").

Because DFA does not seek CVA immunity for the specific allegedly anticompetitive acts that plaintiffs say give rise to their claims,[5] DFA of course has no burden to prove that such conduct falls within the ambit of what the CVA protects.

To be very clear:  DFA never conspired with any entity, at all, for any purposes whatsoever—much less to suppress dairy farmer pay prices or eliminate competition among buyers of raw milk in Order 1.  Nor did DFA engage in any conduct at all to "coerce" farmers to do anything.  The "conduct" plaintiffs primarily complain about—including supply and outsourcing agreements between DFA and its customers, and normal procompetitive efforts to vertically integrate—are not unreasonable restraints of trade that had any adverse effect on competition at all, nor are they "predatory" conduct within any meaning of the word.  They are basic, every-day-type business arrangements that are common in every industry, and that

---

[5]   *See* Pls.' Proposed Jury Instr. Nos. 8 and 23, ECF No. 275 (describing plaintiffs' contentions regarding the "agreements" that form the bases for plaintiffs' claims).

demonstrably benefitted DFA's and other farmers.[6] DFA intends to defend them to the jury on that basis, not as conduct immune under the CVA.[7]

The point is simply this: DFA acknowledges that the CVA does not provide immunity for conduct that was "predatory." The Division's view of DFA's burdens thus aligns with what DFA has always claimed. *See* Hr'g Tr. 106:14-18 (reiterating that DFA is not asserting CVA immunity in order "to defeat [plaintiffs'] claims").

The fact that some conduct might fall outside of the CVA's protections, however, says nothing about whether DFA *is qualified* for the protections that the CVA *does afford*. And here, it is clear the CVA does afford some protections. The CVA protects certain *other* conduct that the jury will hear about in this case—specifically, DFA's ability (1) to own and operate plants to

---

[6] *See, e.g.*, Ed Jesse & Bob Cropp, Basic Milk Pricing Concepts for Dairy Farmers (A3379) at 9, Univ. of Wisconsin-Madison Coop. Extension (2008), http://www.kydairy.org/uploads/2/4/0/0/24007917/session_3_resources_milk_pricing.pdf ("Dairy cooperatives provide a number of market-wide services that enable federal orders to **operate more efficiently**. These include such services as milk procurement at the producer level, **full supply arrangements** to milk bottlers (supplying the milk bottlers' need for fluid purposes and handling what is not needed), moving milk to the highest use and best use, and providing milk quality testing services." (emphases added)); Rural Dev., U.S. Dep't of Agric., Cooperatives in the Dairy Industry, Cooperative Information Report 1 Section 16 at 12 (rev. 2005), https://www.rd.usda.gov/files/cir1-16.pdf ("**Owning manufacturing facilities improves a cooperative's ability to balance member milk supply with customer demand, strengthening its negotiating position**. These cooperatives can provide their customers a full supply of raw milk and remove the burden of disposing of unneeded milk. **Manufacturing operations also offer cooperatives the opportunity to add value to their members' milk**." (emphases added)); *id.* at 8 ("Many of these large, highly specialized investor-owned fluid processing plants grew interested in avoiding the cumbersome job of obtaining, managing, and coordinating milk supplies so they could focus their resources on processing and marketing. They increasingly looked to cooperatives to provide the exact amount of milk they needed. Large-scale, multi-plant cooperatives negotiated 'full supply' contracts with these fluid processors (and in some cases, manufacturers). Under a full-supply contract, a cooperative provides just the milk volume the plants need and manufactures whatever volume of milk is in excess of processor demand into other products . . . .").

[7] Based on the facts introduced at trial, DFA reserves the right to argue that these agreements were "necessary" to carry out the purposes set forth in the CVA. *See* 7 U.S.C. § 291 (authorizing "such associations and their members [to] make the necessary contracts and agreements to effect such purposes"). DFA acknowledges it would carry the burden of making that showing.

6

process its and other farmers' raw milk, (2) to form marketing agencies in common, such as Dairy Marketing Services, LLC ("DMS"), for the purpose of marketing raw milk, and (3) to make the necessary contracts and agreements to effect such purposes. *See generally* DFA's Proposed Jury Instr. Nos. 17-18, 29, 35, ECF No. 276. For example, during trial, the jury will hear evidence that DFA formed DMS and worked together with other cooperatives, and the jury will learn that DFA owns and operates plants that process milk from its members and other farmers. As the Court agreed at the July 21 hearing, the jury must understand, through the jury charge, that the CVA does insulate that type of conduct, so that the jury does not improperly base a finding of liability on that behavior, or infer from it that DFA somehow behaved wrongfully. Hr'g Tr. 106:14-107:11.

Of course, plaintiffs are not pursuing Sherman Act violations based on any of that conduct. Nor could they: the text of the CVA expressly immunizes these very acts, as the Division itself acknowledges. *See, e.g.*, SOI at 6 (noting act immunizes cooperatives "hav[ing] marketing agencies in common," engaging in "collectively processing," and other conduct); *see also* 7 U.S.C. § 291. Accordingly, there is no credible dispute that the three categories of conduct discussed above fall within the CVA's protections. Not even the plaintiffs or the Division has ever suggested otherwise.

### III. DFA HAS NEVER CONTENDED THAT THE CVA PROVIDES A COOPERATIVE WITH BLANKET IMMUNITY FOR <u>ALL</u> ANTICOMPETITIVE ACTS

In context, the majority of the Division's statement has nothing to do with the realities of this case. The Division spends the bulk of its statement establishing its third main point: that the CVA does not provide blanket immunity for all conceivable anticompetitive acts. *See* SOI at 3-9. In the Division's words, there are some anticompetitive acts that "fall outside the heartland of Capper-Volstead protection," meaning that the CVA simply does not immunize those acts, even though the cooperative is still a "*bona fide* cooperative" entitled to the protections that the CVA

7

*does afford* for other conduct. But again, DFA has never argued otherwise. *See* Hr'g Tr. 105:14-15 ("[W]e're not asking for blanket immunity or anything close to that . . . ."). As a result, to the extent the Division believes that DFA could not claim CVA immunity for certain conduct that plaintiffs allege is anticompetitive—*e.g.*, alleged (1) agreements with non-producers; (2) non-solicitation of farmers; and (3) coercion of farmers, *see* SOI at 8-9, the Division's analysis is purely academic. DFA never engaged in any anticompetitive conduct of this nature, but DFA does not contend that, if it had, the CVA would immunize these types of agreements. The Division's analysis thus does not bear on any matter at issue in this case.

Indeed, there is only one disputed Capper-Volstead Act issue before the Court, and it is one issue the Division conspicuously did not address: the proper standard to determine whether a cooperative is "operated for the mutual benefit of the members thereof, as such producers" in order to make a threshold showing that it qualifies for the CVA's protections. 7 U.S.C. § 291. Instead of addressing this issue, the Division focused its analysis on the separate analytical question of whether DFA's alleged *conduct* at issue could give rise to a Sherman Act violation in light of the CVA's limited immunity for certain types of behavior.

Although the Division offers no position on whether DFA is correct that a threshold showing of "mutual benefit" is an objective test into the structure of the cooperative, it is clear that—for the reasons DFA has explained at length in its Motion *in Limine* No. 9, ECF No. 234—plaintiffs cannot be right that the test is a boundless, wholly subjective inquiry, and nothing in the Division's statement should be read to the contrary. *See id.* at 4-11; *see also* DFA's Reply in Supp. of Mot. *in Limine* No. 9 at 7-9, ECF No. 274 (noting that plaintiffs' interpretation of mutual benefit would punish the farmers that the CVA is meant to protect and result in an industry-wide nightmare for any vertically integrated cooperative).

8

Nor can it be the case that dairy farmers can be prohibited from operating as a cooperative altogether based on a definition of "mutual benefit" that turns on the percentage of farmer-members' income that comes in the short term from the sale of raw milk as compared to from long-term investments enabling the sale of products processed from that raw milk. DFA's Reply in Supp. of Mot. *in Limine* No. 9 at 3-9; *see also* Hr'g Tr. 117:23-118:3 (agreeing that no case has ever suggested that a cooperative's decision to prioritize long-term versus short-term returns and distributions to its members affects its CVA qualifications as a cooperative).[8] Such an interpretation would grievously injure the very farmers that the CVA seeks to protect. It also makes no sense in this context: as plaintiffs (and perhaps the Division) ignore, any profits that DFA may earn from processing operations belong to DFA's members and are distributed to those members in accordance with decisions made by DFA's farmer board, including in the form of patronage dividends. Indeed, plaintiffs admit those processing operations are equally profitable, and benefit DFA's members. Pls.' Separate Concise Statement of Disputed Material Facts in Opp'n to Summ. J. ¶ 99, ECF No. 102. Profitable processing plants are a boon for DFA's and other farmers. In fact, the ability to operate as a vertically integrated producer-processor was an explicit benefit Congress intended when passing the CVA.[9] *See Nat'l Broiler Mktg. Ass'n v.*

---

[8] Nor does the mutual-benefit language involve an inquiry into whether a cooperative is engaged in too much processing; the question of "how much processing is too much" is already answered by objective tests contained in the clear language of the Capper-Volstead Act. For example, "the association shall not deal in the products of nonmembers to an amount greater in value than such as are handled by it for members." 7 U.S.C. § 291. In other words, any cooperative that is processing a greater value of raw product from non-members than from its members would not be qualified under the CVA.

[9] Throughout the debates on the Capper-Volstead Act, it is clear that Congress viewed a primary goal of the CVA as being to "bring the producers and consumer in closer contact" by, to the extent possible, eliminating middlemen to make a "more economical system of marketing, manufacturing, transporting, and distributing the products of the farm." 59 Cong. Rec. 7852 (1920) (statement of Rep. Morgan); *see also* 59 Cong. Rec. 8022 (1920) (statement of Rep. Swope) ("The problem, then, seems to be to, as nearly as possible, eliminate this Intermediate speculator

*United States*, 436 U.S. 816, 824-25 (1978) (concluding that the CVA was passed, in part, so that "cooperative associations could develop and **provide the handling and processing services** that were needed before their members' products could be sold" (emphasis added)).  There is simply no basis under the statute or its legislative history for any conclusion that DFA's strategy (as directed and supported by its dairy farmer Board of Directors) for distributing the profits of its processing operations has any bearing on whether DFA operated for the "mutual benefit" of its members.  *See Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1184-85 (8th Cir. 1982) (even though cooperative could not pay dividends under the laws of the state where it was incorporated, court rejected argument that it was not operated for mutual benefit of its members).  The Division's brief does not argue otherwise.

### IV.   THE DIVISION AGREES WITH THIS COURT, DFA, AND THE SECOND CIRCUIT THAT PLAINTIFFS MUST PROVE THAT DFA ENGAGED IN PREDATORY CONDUCT TO PROVE THEIR SECTION 2 CLAIMS

Lastly, without even purporting to disagree with any decision of this Court or argument by DFA on the issue, the Division discusses the type of conduct that might constitute an unlawful "willful acquisition or maintenance" of monopoly power sufficient to satisfy the second element of the *United States v. Grinnell Corporation*[10] test for proving a Section 2 violation in a case

---

between the producer and the consumer, and then the producer and consumer can share the $2 that is now being levied by the middle party.  The question is, How can this be done?  By bringing the producer and consumer together."); 59 Cong. Rec. 8027 (1920) (statement of Rep. Mann) ("the experience of mankind is that wherever you eliminate waste between the producer and the consumer it is to the advantage of both and to the disadvantage of no one"); 59 Cong. Rec. 8028 (1920) (statement of Rep. Larsen) ("This bill provides a method whereby the producer and the ultimate consumer may be brought closer together and whereby waste may be eliminated."); 59 Cong. Rec. 8035 (1920) (statement of Rep. Browne) ("I am heartily in favor of this bill.  Under it I believe farmers will cooperate and will eventually eliminate the middleman, and by so doing they will bring their products to the consumer at a much cheaper rate than the consumer now pays and with a better profit to themselves.").  The point was not that cooperatives would literally "eliminate" middlemen, since milk still needs to be processed.  The point was that cooperatives would take on that function and the corresponding revenue stream.
[10]   384 U.S. 563 (1966).

governed by the CVA.[11]  The Division's statement on this point begins where it should end, with a citation to the governing Second Circuit's pronouncement on that point in *Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037 (2d Cir. 1980).  *See* SOI at 9.  The Division acknowledges, as it must, that the law in this Circuit, when the CVA is involved, is "that Grinnell does not apply to monopoly power that results from such acts as the formation, growth and combination of agricultural cooperatives, but applies only to the acquisition of such power *by other, predatory means*."  *Fairdale Farms*, 635 F.2d at 1045 (emphasis added); *see also* SOI at 9-10 (discussing *Fairdale Farms*).  That is the position that DFA has advanced in this case, *see* DFA's Reply in Support of Summary Judgement at 7-9, ECF No. 115, and the interpretation this Court adopted in its summary judgment ruling, Opinion and Order on Summary Judgement at 55, ECF No. 130 (quoting *Fairdale Farms* and ruling that "[i]n the instant case, Plaintiffs must go one step further and establish that Defendants' monopsony power is derived *from predatory acts*" (emphasis added)).  The Division's statement does not purport to take issue with either of those interpretations of the binding precedent in this Circuit.

After acknowledging that *Fairdale Farms* is the controlling law, and that plaintiffs must prove that DFA acquired monopsony power through "other, predatory acts," the Division contends that "[t]he range of conduct that may be considered 'predatory' for a Sherman Act Section 2 claim, and therefore outside the protection of the Capper-Volstead Act, should be construed broadly because exemptions from the antitrust laws are narrowly construed."[12]  SOI at 10.  The Division

---

[11] The elements of the *Grinnell* test are "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Fairdale Farms*, 635 F.2d at 1045 (quoting *Grinnell*, 384 U.S. at 570-71).

[12] When making this argument, the Division omits that its view on interpreting antitrust immunities "neither requires nor permits a court to disregard the plain language of the statute when interpreting an exemption" and that "[c]ourts have repeatedly rejected proposed narrow

11

also argues that "the requirement for 'predatory' acts generally should be construed as coextensive with the category of 'exclusionary' acts that satisfy the Section 2 element of anticompetitive or exclusionary conduct." *Id.* at 11.  At the same time, the Division acknowledges that "[o]f course, if the conduct is simply collective action between farmers regarding the 'processing, preparing for market, handling, and marketing' of their products, and other requirements of the Capper-Volstead Act are satisfied, that conduct cannot be treated as predatory, consistent with the purposes of the Capper-Volstead Act, *even if it would qualify as anticompetitive conduct* under Section 2." *Id.* at 11 n.9 (emphasis added).  Although the Division's positions are in conflict with themselves, the Court need not strain to reconcile them.  The Division acknowledges that *Fairdale Farms* is the governing authority and cannot argue that this Court should deviate from that controlling Second Circuit law.  Thus, the Division's view on the meaning of "predatory" in other Circuits or contexts has no bearing on the direction of this case, which is proceeding under the faithful interpretation of binding Second Circuit law on this issue.

## CONCLUSION

Although unresolved statutory-interpretation questions of how to qualify for Capper-Volstead Act immunity in the first instance remain to be decided in this case, the Division's Statement of Interest does not purport to address them.  Because the issues the Division has elected to discuss regarding the scope of the Capper-Volstead Act, once qualified for, are not actually in dispute or contrary to this Court's prior rulings in this case, the Division's statement should have no effect on the progress of this case going forward.

---

interpretations of statutory exemptions from the antitrust laws where those interpretations are inconsistent with the plain language of the statute." *Northland Cranberries, Inc. v. Ocean Spray Cranberries, Inc*., 382 F. Supp. 2d 221, 226-27 (D. Mass. 2004) (rejecting narrow interpretation of meaning of "persons" within Capper-Volstead Act).

Dated: August 4, 2020                                  Respectfully submitted,

/s/ *Alfred C. Pfeiffer Jr.*
Alfred C. Pfeiffer Jr. (admitted *pro hac vice*)
Sarah M. Ray (admitted *pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: 415-391-0600
Facsimile: 415-395-8095
Email: al.pfeiffer@lw.com
Email: sarah.ray@lw.com

Margaret M. Zwisler (admitted *pro hac vice*)
Jennifer L. Giordano (admitted *pro hac vice*)
Molly M. Barron (admitted *pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
Telephone: 202-637-2200
Facsimile: 202-637-2201
Email: margaret.zwisler@lw.com
Email: jennifer.giordano@lw.com
Email: molly.barron@lw.com

W. Todd Miller (admitted *pro hac vice*)
BAKER & MILLER PLLC
2401 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20037
Telephone: 202-663-7820
Facsimile: 202-663-7849
Email: tmiller@bakerandmiller.com

Ian P. Carleton
SHEEHEY FURLONG & BEHM P.C.
30 Main Street, P.O. Box 66
Burlington, VT 05402
Telephone: 802-864-9891
Email: icarleton@sheeheyvt.com
*Counsel for Defendants Dairy Farmers of America, Inc. and Dairy Marketing Services, LLC*

## **CERTIFICATE OF SERVICE**

      I hereby certify that on August 4, 2020, I electronically filed with the Clerk of Court the foregoing document using the CM/ECF system or served the below parties via email. The CM/ECF system will provide service of such filing via Notice of Electronic Filing (NEF) to the NEF parties.

    Joel G. Beckman, Esq. (jbeckman@nbparis.com)
    Gary L. Franklin, Esq. (gfranklin@primmer.com)
    William C. Nystrom, Esq. (wnystrom@nbparis.com)
    Elizabeth A. Reidy, Esq. (ereidy@nbparis.com)
    Dana A. Zakarian, Esq. (dzakarian@nbparis.com)
    Jason M. Turner, Esq. (jason.turner4@usdoj.gov)
    Shapleigh Smith, Jr., Esq. (ssmith@dinse.com)
    Marvin Beshore, Esq. (mbeshore@johnsonduffie.com)

Dated:  August 4, 2020                            /s/ *Alfred C. Pfeiffer Jr.*
                                                    Alfred C. Pfeiffer Jr. (admitted *pro hac vice*)
                                                    LATHAM & WATKINS LLP
                                                    505 Montgomery Street, Suite 2000
                                                    San Francisco, CA 94111
                                                    Telephone: 415-391-0600
                                                    Facsimile: 415-395-8095
                                                    Email: al.pfeiffer@lw.com