# Exhibit "A"

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| GARRET SITTS, *et al.,* | : | |
| Plaintiffs | : | |
| | : | |
| vs. | : | Civil Action No. 2:16-cv-287 |
| | : | |
| DAIRY FARMERS OF AMERICA, | : | |
| INC., *et al.,* | : | |
| Defendants | : | |

## BRIEF OF THE *AMICI CURIAE,*
## NATIONAL COUNCIL OF FARMER COOPERATIVES,
## NATIONAL COOPERATIVE BUSINESS ASSOCIATION, AND CoBANK, ACB IN
## RESPONSE TO THE STATEMENT OF INTEREST ON BEHALF OF
## THE UNITED STATES OF AMERICA

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... iii

STATEMENT OF THE *AMICI CURIAE* ..................................................................... 1

I.      INTRODUCTION .............................................................................................. 2

II.     THE CAPPER-VOLSTEAD ACT GREW OUT OF THE COOPERATIVE
        MOVEMENT AND AUTHORIZED COOPERATIVE ASSOCIATIONS

        A.      BRIEF HISTORY OF CAPPER-VOLSTEAD ...................................... 3

        B.      REQUIREMENTS FOR QUALIFICATION AS A CAPPER-VOLSTEAD
                ASSOCIATION .................................................................................. 6

III.    THERE IS NO BASIS IN COURT INTERPRETATIONS OF THE CAPPER-
        VOLSTEAD ACT TO SUPPORT ANY IMPLIED SUBSTANTIVE STANDARDS
        FOR "MUTUAL BENEFIT" ................................................................................ 9

IV.     PLACING A CONDUCT DISQUALIFIER ON CVA STATUS VIA THE "MUTUAL
        BENEFIT" CLAUSE WOULD PUT FARMERS, COOPERATIVES, AND
        MARKETING AGENCIES IN COMMON AT ANTITRUST RISK ............................ 12

V.      PRODUCER MEMBERS OF COOPERATIVES HAVE COOPERATIVE LAW
        REMEDIES FOR INTERNAL COOPERATIVE MANAGERIAL AND
        OPERATIONAL DISPUTES ............................................................................ 15

VI.     CONCLUSION ................................................................................................ 15

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*Agritronics Corp. v. National Dairy Herd Ass'n,*
  1994 U.S. Dist. LEXIS 14168 (N.D.N.Y. 1994) ........................................................ 11, 12

*Alexander v. National Farmers Organization,*
  687 F.2d 1173 (8th Cir. 1982) ....................................................................................... 11, 12

*Case-Swayne Co. v. Sunkist Growers, Inc.,*
  389 U.S. 384 (1967) .......................................................................................5, 7, 10, 11

*Gold Medal Farms, Inc.,*
  29 F.T.C. 356 (1939) ................................................................................................ 10

*In re Mushroom Direct Purchaser Antitrust Litig.,*
  621 F. Supp. 2d 274 (E.D. Pa. 2009) ............................................................................ 13

*In re Processed Egg Prods. Antitrust Litig.,*
  2018 U.S. Dist. LEXIS 57990 ....................................................................................... 13

*In re Uranium Antitrust Litig.,*
  617 F.2d 1248 (7th Cir. 1980) ..................................................................................... 13

*Maryland & Virginia Milk Producers Ass'n, v. United States,*
  362 U.S. 458 (1960)...................................................................................................5, 15

*Nat'l Broiler Mktg. Ass'n. v. United States,*
  436 U.S. 816 (1978).....................................................................................................5, 7

*Sheffield Farms Co.,*
  44 F.T.C. 555 (1948) .................................................................................................... 10

*Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co.,*
  370 U.S. 19 (1962).....................................................................................................7, 8, 11

*Waters v. National Farmers Organization, Inc.,*
  328 F. Supp. 1229 ................................................................................................. 11, 12

**<u>Statutes</u>**

K.S.A. § 17-1628 .............................................................................................................. 15

K.S.A. § 60-223a .............................................................................................................. 15

7 U.S.C. § 291 ..............................................................................................................1, 5

15 U.S.C. § 1-7 ..................................................................................................4, 13

15 U.S.C. § 17 ....................................................................................................4, 5

## **Other Authorities**

58 Cong. Rec. 9646 (1919) .......................................................................................5

58 Cong. Rec. 9811 (1919) .......................................................................................5

59 Cong. Rec. 7851 (1920) .......................................................................................5

59 Cong. Rec. 7852 (1920) .......................................................................................5

59 Cong. Rec. 8017 (1920) .......................................................................................5

59 Cong. Rec. 9698 (1920) .......................................................................................5

59 Cong. Rec. 9763 (1920) .......................................................................................5

59 Cong. Rec. 9766 (1920) .......................................................................................5

62 Cong. Rec. 2057 (1922) .......................................................................................6

Donald A. Frederick, U.S. Department of Agriculture, *Antitrust Status of Farmer Cooperatives:
The Story of The Capper-Volstead Act* (2002) ...........................................................3

Ewell P. Roy, *Cooperatives: Today and Tomorrow* (Danville, IL:
Interstate Printers & Publishers, 1964) 215-216 ........................................................3

H.R. 2373, 67th Cong., 1st Sess. (1921) ...............................................................5, 7

H.R. 7783, 66th Cong., 1st Sess. (1919) ...............................................................5, 7

H.R. 7784, 66th Cong., 1st Sess. (1919) ...................................................................5

H.R. 13703, 66th Cong., 2nd Sess. (1920) ................................................................5

H.R. 13931, 66th Cong., 2nd Sess. (1920) ................................................................5

Sen. 845, 66th Cong., 1st Sess. (1919) ......................................................................5

Sen. 983, 67th Cong., 1st Sess. (1921) ......................................................................5

Sen. 4344, 66th Cong., 2nd Sess. (1920) ...................................................................5

## STATEMENT OF THE *AMICI CURIAE*[1]

Founded in 1929, the National Council of Farmer Cooperatives ("NCFC") is the only nationwide trade association representing America's farmer cooperatives.  NCFC's nationwide membership includes approximately 200 local and regional marketing, supply, bargaining, and farm credit bank cooperatives, as well as state councils of cooperatives.  NCFC members represent nearly 2,000 local farmer cooperatives across the country, whose own members include a majority of the nation's more than two million farmers, ranchers, and growers.  NCFC's members handle almost every type of agricultural commodity produced in the United States and provide jobs for more than 250,000 Americans, many in rural areas.

NCFC serves as the primary voice of the agricultural cooperative industry in this country, including briefing courts and lawmakers regarding how, in practice, the Capper-Volstead Act (the "Act" or "CVA"), 7 U.S.C. §§291–92, and other statutory cooperative exemptions are vital to farmer cooperatives and their members.  NCFC also provides information to courts, lawmakers, and executive departments and agencies on the effects of interpretation or application of the Act and other laws relating to farmers or agricultural cooperatives and on the vitality of U.S. agriculture, farmers, and farmer cooperatives (and their employees).

The National Cooperative Business Association Cooperative League of the United States of America ("NCBA") was founded in 1916[2] to develop, advance and protect cooperative

---

[1] No counsel for a party authored this brief in whole or in part.  No party, no counsel for a party, and no person other than NCFC, NCBA, and CoBank, their members, or their counsel made a monetary contribution intended to fund the preparation or submission of this brief.  Dairy Farmers of America ("DFA") is an NCFC member but has not made any direct monetary contribution to fund the preparation or submission of this brief.  DFA is also a CoBank borrower and cooperative owner.  A list of NCFC member-cooperatives is at www.ncfc.org and a list of NCBA's membership is at https://ncbaclusa.coop/ncba-clusa-membership/.

[2] NCBA was founded as "The Cooperative League of the United States of America" which remains its legal name.

enterprise for the betterment of the lives of Americans through cooperatives. NCBA members include national associations as well as individual cooperatives that, in turn, count over 100 million Americans as cooperative members. NCBA members include cooperatives from various industries including agricultural, financial, housing, and rural electric among others. NCBA's membership includes cooperatives that rely on the CVA consistent with the intent of Congress to provide antitrust protection to farmer cooperatives.

NCBA carries out its mission through policy advocacy and creation of public awareness through leadership and cooperative development. NCBA engages with officials from all branches and levels of government to ensure they understand the purpose of cooperatives, the numerous benefits of cooperatives to many millions of Americans, and the impact of proposed policies and decisions on those cooperative.

CoBank, ACB ("CoBank"), is one of the largest private providers of credit to the rural economy, delivering loans, leases and other financial services to agribusiness and rural infrastructure in all 50 states. As a cooperative member of the Farm Credit System, CoBank is a successor entity to the National Bank for Cooperatives. Pursuant to its authorities under the Farm Credit Act of 1971, CoBank lends to, among other entities, agricultural and rural infrastructure cooperatives. CoBank's customer-owners include a number of agricultural marketing cooperatives that rely on the CVA to provide them with antitrust protections.

## I.    INTRODUCTION

NCFC, NCBA, and CoBank respectfully file this memorandum in response to part I.B[3] of the Statement of Interest (ECF 285) filed by the United States Department of Justice ("DOJ"). There the DOJ implicitly argues for an interpretation of the "mutual benefit" provision of the Act

---

[3] This memorandum does not address any other portion of the Statement of Interest and the *amici* take no position on any other contention therein.

that would subject the internal financial, managerial, and operational decisions of every Capper-Volstead "association of producers" to antitrust scrutiny to determine, on some not-fully-articulated basis, whether those producers acting collectively through their cooperative were serving their own "mutual benefit . . . *as such producers*." (ECF 285, p. 8; emphasis added by DOJ)  This novel interpretation of the Act's requirements has no basis in the language of the statute itself, in its legislative history, or in its interpretation by the courts in the nearly 100 years since it was passed.

This issue has significant implications for all of this country's agricultural cooperatives which are authorized and protected by the CVA.  This issue is of particular importance to the farmers who own and govern these cooperatives because the decisions of member-elected boards and board-selected management could be subject to a new level of second-guessing by antitrust plaintiffs[4] and enforcement authorities under a qualitative "mutual benefit" test.

NCFC, NCBA, and CoBank take no position on the underlying facts or other antitrust issues in this case.

## II.   THE CAPPER-VOLSTEAD ACT GREW OUT OF THE COOPERATIVE MOVEMENT AND AUTHORIZED COOPERATIVE ASSOCIATIONS

### A.   A BRIEF HISTORY OF CAPPER-VOLSTEAD

The CVA has frequently been called the "Magna Carta" of farmers' cooperatives,[5] and for good reason.  Although the word "cooperative" does not appear in the Act, the history of the

---

[4] Plaintiffs, for instance, question whether DFA's level of cash earnings distribution to members (ECF 111, p. 12) – a core internal management decision that the member-elected boards of directors of every cooperative makes annually (or more frequently) – satisfies Plaintiffs' under-specified version of a "mutual benefit" test. Such a "mutual benefit" test could also unduly interfere with long-established state and federal precedent recognizing the cooperative board of directors as the prime decision-making body of the cooperative (similar to the role of other corporate boards) – and that the board is entitled to the benefits of the "business judgment rule."

[5] Frederick, *Antitrust Status of Farmer Cooperatives: The Story of the Capper-Volstead Act* (2002), P. 1; Roy, *Cooperatives: Today and Tomorrow* (1964) P. 215-216

legislation makes clear that it was designed for, written for, and intended to benefit farmer cooperative associations.  Indeed, it was intended to free farmer cooperatives to form and prosper without fear of criminal or civil prosecution under the antitrust laws. The language and structure of the Act must be read and understood in the context of the cooperative movement.  It is in this context that the Capper-Volstead proviso for "mutual benefit of the members thereof, as such producers" should be read.

The CVA was the culmination of efforts by Congress to clarify that the joinder of farmers into agricultural cooperatives was not intended to be prohibited by the federal antitrust laws. The Sherman Act of 1890,[6] the primary federal antitrust legislation, was intended to maintain competition throughout the American economy. Its basic provisions condemn (l) "every contract, combination ... or conspiracy, in restraint of trade" and (2) acts of monopolization, attempts to monopolize, or combinations or conspiracies to monopolize any part of trade or commerce.  As agricultural cooperatives grew in numbers and influence in the 1900's, farmers became concerned that organizing to strengthen their bargaining power against the corporations to whom they sold would be viewed as "combinations" in "restraint of trade." In 1914, Congress made its first attempt to assure that the antitrust laws would not be used to prevent the formation of cooperatives. Section 6 to the Clayton Act provided, in pertinent part, that:

> Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor agricultural, or horticultural organizations, instituted for the purposes of mutual help and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws.[7]

---

[6] 15 U.S.C. §§ 1-7.
[7] Clayton Act, Ch. 323, §6, 38 Stat. 730 (1914); 15 U.S.C.§ 17.

In the years after its enactment, Section 6 was found inadequate in two important respects. First, it failed to explicitly enumerate which activities of agricultural organizations fell within its provisions.  Second, Section 6 did not protect cooperatives with capital stock -- the kind of cooperatives that some farmers were finding necessary to market products effectively.[8] The CVA was Congress's response to the inadequacies of the Clayton Act and its attempt to clarify the antitrust exemption for agriculture.

Legislation to clarify the Clayton Act was considered in Congress for nearly four years before "An Act to Authorize Association of Agricultural Producers," commonly referred to as the CVA, was passed in 1922.[9]  The CVA had two sections.  Section 1, 7 U.S.C. §291, explicitly extended the antitrust exemption of Section 6 of the Clayton Act to agricultural cooperatives with capital stock by authorizing "associations, corporate or otherwise, with or without capital stock."  It also listed the activities for which farmers were authorized to act together including "collectively processing, preparing for market, handling, and marketing" their products.  In addition, these associations could "have marketing agencies in common" and both the associations and their members could "make the necessary contracts and agreements to effect such purposes."  Congressional concern for the possibility that cooperatives could "monopolize

---

[8] *Nat'l Broiler Mktg. Ass'n. v. United States*, 436 U.S. 816, 824-25 (1978) ("Only nonstock organizations were exempt under the Clayton Act… The Capper-Volstead Act was passed to make it clear that the formation of an agricultural organization with capital would not result in a violation of the antitrust laws…"); *Case-Swayne Co. v. Sunkist Growers, Inc.,* 389 U.S. 384, 391 (1967); *Maryland & Virginia Milk Producers Ass'n, v. United States*, 362 U.S. 458, 464-68 (1960). *See also* 59 Cong. Rec. 7851-52 (1920) (remarks of Rep. Morgan); *Id.* 8017 (remarks of Rep. Volstead).

[9] Predecessor bills were first introduced in 1919. *See* Sen. 845, 66th Cong., 1st Sess., 58 Cong. Rec. 9646 (1919) and H.R. 7783, 7784 66th Cong., 1st Sess., 58 Cong. Rec. 9811 (1919).  In 1920: H.R. 13703, 66th Cong., 2nd Sess., 59 Cong. Rec. 9763 (1920) and H.R. 13931, 66th Cong., 2nd Sess., 59 Cong. Rec. 9766 (1920); Sen. 4344, 66th Cong., 2nd Sess., 59 Cong. Rec. 9698 (1920).  In 1921: H.R. 2373, 67th Cong., 1st Sess. (1921) and Sen. 983, 67th Cong., 1st Sess. (1921).

or restrain trade . . . to such an extent that the price of any agricultural product is unduly enhanced" was met in Section 2 of the Act by granting the Secretary of Agriculture the authority to bring a civil action requiring the cooperative to "cease and desist from [such] monopolization or restraint of trade."

Senator Capper cogently summarized the purpose and function of the Act as follows: "[T]o make definite the law relating to cooperative associations of farmers and to establish a basis on which these organizations may be legally formed .... [T]o give to the farmer the same right to bargain collectively that is already enjoyed by corporations."[10]  Thus, the provisions of the Act established the basis and the rules for legal formation of Capper-Volstead cooperatives and gave those cooperative associations so qualified the "same right," but no more than the same right, to operate in commerce under the antitrust laws as "is already enjoyed by corporations."

## B.    REQUIREMENTS FOR QUALIFICATION AS A CAPPER-VOLSTEAD ASSOCIATION

As Senator Capper stated, the Act made definite and established the basis upon which qualifying associations may be legally formed.  Those qualifications, as stated in the Act, are: (1) that the members be "persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers"; (2) that their associations may be "corporate or otherwise, with or without capital stock"; (3) that "such associations are operated for the mutual benefit of the members thereof, as such producers"; (4) that "no member of the association is allowed more than one vote because of the amount of stock or membership capital he may own, or the association does not pay dividends on stock or membership capital in excess of 8 per centum per annum"; and (5) that "the association shall not deal in the products of

---

[10] 62 Cong. Rec. 2057 (1922) (remarks of Sen. Capper).

6

nonmembers to an amount greater in value than such as are handled by it for members."
Qualified association activities include "collectively processing, preparing for market, handling,
and marketing such products of persons so engaged."  Furthermore, the association may have
marketing agencies in common and both associations and their members may make the
necessary contracts to effectuate the purposes of the Act.

Taken together these requirements codified Congress's intent to authorize the various
activities of the cooperatives that came before them to request the legislation.  These
organizations spanned many commodities[11], varied from very local to more regional[12], included
bargaining[13] and marketing groups, as well as fully vertically integrated processing
cooperatives[14].  At the same time, the confines of the Act made clear that Capper-Volstead
associations did not have a license to operate entirely free of antitrust scrutiny.

The foundational requirement that Capper-Volstead associations are only and exclusively
for farmers is critical and initially determinative.  It has been the subject of substantial litigation
in the intervening nearly 100 years, including three Supreme Court cases.[15]  This membership-
limiting qualification also informs the "mutual benefit" requirement (as we will see).

---

[11] The first hearings brought representatives of organizations of producers of milk, potatoes,
poultry, olives, tomatoes, beans, prunes and apricots, berries, oranges, cabbage, cucumbers and
more.  See "Collective Bargaining for Farmers" Hearing on H.R. 7783 Before the H.R. Comm.
on the Judiciary, 66th Cong., 1st Sess.  Serial 7 (Oct. 28-31, 1919) at 12, 28, 58, 97.
[12] *See id*. at 97 (local: Aroostook County, Maine, potatoes); 81 (regional: dairy farmers from six
states supplying New York).
[13] *See id*. at 28-56 (Statement of Mr. Aaron Sapiro).
[14] *See,* "Authorizing Associations of Producers of Agricultural Products: Hearings on H.R. 2373
before a Subcomm. of the Sen. Comm. on the Judiciary, 67th Cong, 1st Sess. (June 1921), at 12
(Raisin growers "cure, pack, handle, sell" and otherwise dispose of grapes); 174 (dairy
cooperative activities "include the operation of manufacturing plants and even . . . retail
distribution of bottled milk" ).
[15] *See Case-Swayne, supra; Nat'l Broiler Mktg. Ass'n, supra; Sunkist Growers, Inc. v. Winckler
& Smith Citrus Products Co.*, 370 U.S. 19 (1962).

The permissive authorization of corporate or non-corporate forms, and stock or non-stock capitalization, codifies the Congressional intention that legal forms and particulars are less important than who is involved in the association and what the association does.  At the same time, the Capper-Volstead Congress made clear its intention that these associations serve producers and not capital by requiring mutual producer benefit and limiting the influence of "stock or membership capital" with the limitation on dividends and voting rights.

The authorization for "collectively processing, preparing for market, handling, and marketing such products of persons so engaged" is explicit and expansive in allowing collective action from farm to consumer.  At the same time, this activity is limited in two ways:  First, it is limited to the farmers' agricultural products[16] – the "products of persons so engaged."  Second, the collective activity must be predominately of the products of the members themselves:  "the association shall not deal in the products of nonmembers to an amount greater in value than such as are handled by it for members."  Together these activity parameters define and require a majority member-produced product enterprise, which can involve raw, processed, or finished products of the members, the "persons so engaged."

 Within this framework, the general requirement of operating for the "mutual benefit of the members thereof, as such producers" sums up the Act's imperatives that the collective activity involve the member-farmers' products being collectively marketed for the member-farmers' benefit.  It does not provide a license to second-guess the decisions of farmer-elected

---

[16] "Agricultural products" is properly understood including not only the primary product produced from the crop delivered by the farmer, but also any byproducts that the cooperative produces by processing delivered crops.  *Sunkist*, 370 U.S. at 21n.1 (joint marketing of various products and by-products, such as "juices, concentrates, oil, pectin, pharmaceuticals, and cattle feed," by a lemon and orange cooperative).

cooperative boards, and it does not establish any principle (much less a mandatory rule) that cooperative boards must follow in distributing revenues among the cooperative's members.

The Act's plain language also expressly permits a cooperative's "collectively processing" and dealing in products of nonmembers. In the face of this clear language, DOJ cannot seriously argue that the "mutual benefit" proviso somehow takes back these expressly granted rights. To suggest, without any basis in the legislative history or elsewhere, that the Capper-Volstead Congress, somehow buried in the "mutual benefit" proviso, some unspecified parameters for the association's internal transaction with members for the raw product simply falls of its own weight and is contrary to the CVA's express "processing" language.

Capper-Volstead cooperatives operate for the "mutual benefit of the members thereof, as such producers" when their membership is composed exclusively of farmers; when the association collectively markets, handles, processes, and/or prepares for market the members' production; when the association does not deal in the products of nonmembers to an amount in value greater than that of members' products; when no member is allowed more than one vote because of her membership or stock capital (or, in the alternative no capital dividends in excess of 8% are paid); when such associations join together in marketing agencies in common; and when the associations and their members make the contracts and agreements necessary to carry out these statutory purposes. That is how cooperatives in all commodities, of all types from bargaining to fully integrated processors, in all regions, nationwide, for decades have understood the CVA, and that is how this Court should interpret it.

## III.   THERE IS NO BASIS IN COURT INTERPRETATIONS OF THE CAPPER-VOLSTEAD ACT TO SUPPORT ANY IMPLIED SUBSTANTIVE STANDARDS FOR "MUTUAL BENEFIT"

In the nearly 100 years since the adoption of the CVA, there has been no shortage of antitrust litigation involving agricultural cooperatives and the CVA exemption, but there have

been very few cases involving the interpretation of the "mutual benefit of the members" clause

of the Act.   The clause is briefly discussed in one Supreme Court decision and directly

addressed in only three lower court decisions of which we are aware. There is no support in any

of those cases for an interpretation of the clause invited by the plaintiffs and the DOJ.

In *Case-Swayne*, the question was whether proprietary, non-farmer-owned packing

houses that "participate in the control and policy making of Sunkist" affected its exempt status

under the CVA.  The Court held that Sunkist lost the CVA exemption because it did not comply

with the Act's requirements, which states "those whose collective activity is privileged under it .

. . [which] is limited in quite specific terms to producers of agricultural products."  389 U.S. at

393.  In reaching that decision, the Court in passing noted that the proviso "that such associations

are operated for the mutual benefit of the members thereof" did not "broaden" the membership

limitation provisions of the Act.  Rather,

> [t]hat provision, in conjunction with the other prerequisites for qualification
> under the Act -- either that each member be limited to one vote without regard
> to the capital he furnished or that dividends on capital be limited to 8%, and
> that dealings in products of nonmembers be limited -- was designed to insure
> that qualifying associations be truly organized and controlled by, and for,
> producers. In short, Congress was aware that even organizations of producers
> could serve a purpose other than the mutual obtaining of a fair return to their
> members, as producers, or be controlled by persons other than producers, and
> the proviso adds a measure of insurance that such organizations do not gain
> the Act's benefits.

*Id*. at 393-94.[17]  There is no suggestion that Sunkist's status as a fully integrated processing

cooperative was jeopardized by the "mutual benefits" proviso.  The Court referenced with

approval the legislative history of the CVA where Sunkist "was favorably referred to," while

---

[17] At the end of this quoted statement, the court cited two FTC cases which both involved
attempts by proprietary dairy companies to control or manipulate the affairs of producer
cooperatives without being members.  See *Sheffield Farms Co.*, 44 F.T.C. 555 (1948) and *Gold
Medal Farms, Inc.*, 29 F.T.C. 356 (1939).  This underscores the central point that "mutual
benefit" means that the cooperative must be operated for the benefit of its members as producers.

pointing out that there was nothing to indicate that the legislators had any knowledge of Sunkist's non-producer interests. 389 U.S. at 394 n.12.

In *Alexander v. National Farmers Organization,* 687 F.2d 1173 (8th Cir. 1982), the National Farmers Organization's CVA status was challenged on the basis of its corporate structure and by-laws. NFO was a non-stock, nonprofit corporation, not a cooperative corporation. Its membership was limited to producers of agricultural commodities and it provided collective bargaining and marketing services to the members. Its bylaws, however, prohibited distribution of income to the members, so "when it began to market milk, NFO created a separate legal entity – essentially a trust custodial account – that received payment for milk sales and, in turn, paid the producers." 687 F.2d at 1183. On the basis of its no-income-distribution disability, the argument was made that "because NFO cannot distribute income, its marketing program cannot be considered to be 'for the mutual benefit' of its members." 687 F.2d at 1183-84. The Eighth Circuit rejected the argument, and relying upon *Sunkist Growers, Inc. v. Winckler & Smith Citrus Products Co.*, 370 U.S. 19 (1962), the Court held that because the benefit of the marketing program went to the member farmers, it should not "impose grave legal consequences upon organizational distinctions that are of *de minimus* meaning and effect." (687 F.2d at 1185 (quoting *Sunkist*, 370 U.S. at 29). In the earlier decision (which the *Alexander* court cited) of *Waters v. National Farmers Organization, Inc.*, 328 F. Supp. 1229, 1245 (S.D. Ind. 1971), the district court reached the same result.

The only other court case of which we are aware which discusses directly the "mutual benefits" clause is *Agritronics Corp. v. National Dairy Herd Ass'n*, 1994 U.S. Dist. LEXIS 14168 (N.D.N.Y. 1994). There the CVA status of the Pennsylvania Dairy Herd Improvement Association ("Pa. DHIA") was challenged on the basis that it was "intertwined with Pennsylvania State University in a fashion that casts substantial doubt as to the association's

independence." The court rejected this argument. Although a Penn State extension specialist participated in meetings of the Executive Committee of the association's board, the court found that the Penn State specialist "did not have any voting rights within the association," and Penn State "does not have any control over the affairs of the association." *Id*. at 9. Thus, there was nothing "evincing that the Pa. DHIA is not operated for the benefit of its members." *Id*.at 13.

The significance of the NFO cases, as well as the Pa. DHIA case, is that these courts refused to second guess – with "grave legal consequences" – the internal corporate policies and decision-making of the producers who had joined together to collectively market their production. In reaching that result, the *Alexander* and *Waters* courts found that the CVA allowed the farmer members of NFO to determine, through their corporate governance policies, how the proceeds of the collective sales of their production would be handled, distributed, and disbursed. Similarly, the Pa. DHIA court found no voting rights or control in the University. So long as non-producer interests have no decision-making authority in the cooperative's governance, and all of the other objective standards of the CVA are met, the internal financial policies of the cooperative are not implicated by the "mutual benefits" clause.

**IV.    PLACING A CONDUCT DISQUALIFIER ON CVA STATUS VIA THE "MUTUAL BENEFIT" CLAUSE WOULD PUT FARMERS, COOPERATIVES, AND MARKETING AGENCIES IN COMMON, AT ANTITRUST RISK**

One of the direct consequences of an interpretation or application of the "mutual benefit" clause that strips the cooperative of Capper-Volstead status would be to expose, to joint and several liability, parties who have nothing to do with the association's "disqualifying" policies. The ripple effects of this possibility are incalculable. There are two groups of parties who would be immediately at risk: (1) the producer members of the disqualified cooperative; and (2) any association that has joined with the disqualified association in a CVA-authorized marketing agency in common.

Liability under the federal antitrust laws for treble damages, attorneys' fees and costs, is joint and several.  See, e.g., *In re Uranium Antitrust Litig.*, 617 F.2d 1248, 1257 (7th Cir. 1980) ("Anti-trust liability under Section 1 of the Sherman Act is joint and several.") This is critical for all farmer-members of a Capper-Volstead cooperative, because the cooperative's loss of exempt status directly exposes the members to potential antitrust liability.  *See, e.g., In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002, 2018 U.S. Dist. LEXIS 57990, at *3 (E.D. Pa. Apr. 5, 2018) (where court had held cooperative was not immunized under Capper-Volstead, not even defendant cooperative members who had acted in good faith were protected under Capper-Volstead); *In re Mushroom Direct Purchaser Antitrust Litig.*, 621 F. Supp. 2d 274, 286 (E.D. Pa. 2009) (defendant cooperative members not entitled to Capper-Volstead exemption where, unbeknownst to members, cooperative did not qualify for exemption under Capper-Volstead). Members of marketing agencies in common likewise are subject to antitrust liability for even the most basic of permitted Capper-Volstead activity – price-fixing – if an agency member entity turns out to be nonexempt.  *In re Mushroom Direct Purchaser Antitrust Litig.*, 621 F. Supp. 2d 274, 286 (E.D. Pa. 2009) ("Cooperatives cannot, for example, conspire or combine with nonexempt entities to fix prices or control supply, even though such activities are lawful when engaged in by cooperatives alone.")  This antitrust risk is literally an economic life-and-death matter for the great majority of individual cooperative members and for most cooperatives.

The risk of personal, individual antitrust liability for all members of cooperatives could put into question the formation and continued existence of *any* Capper-Volstead cooperative.  If a cooperative and its members do not know whether the cooperative's policies regarding investment in handling and processing facilities, timing and amount of payment for raw product delivered, and all other internal financial policies will pass muster under the CVA "mutual benefit" test if challenged, they have no way to evaluate the business decision of whether to be a

13

part of the cooperative.  Cooperatives and their members currently have objective standards to meet and comply with for Capper-Volstead status – the producers-only requirement, the 50% member-product rule, and the voting and dividend requirements of the CVA must be followed. The cooperative must be operated for the members' mutual benefit, rather than for the benefit of non-producers.  Any newly-crafted revision to the mutual benefit test will jeopardize the cooperative framework.

Just as crucially, the CVA authorizes marketing agencies in common (MAC) among qualified Capper-Volstead associations.  Joinder in marketing agencies in common routinely requires the certification by each member, to the other members, of its CVA qualifications.  But the current and prospective members of the MAC each have their own organization, membership, management and policies, and no member has any involvement in the internal affairs of the other members.  Nevertheless, if one of the MAC members were to be determined to be non-exempt under the CVA because of (for example) its board decisions, management decisions, or internal financial policies, *all* MAC members could be exposed to antitrust liability for their joint marketing-in-common activity.  This possibility would vitiate the viability of MACs and thereby essentially make that part of the Act a dead letter.

We cannot overstate the significance of these ripple-effect liability concerns.  If Capper-Volstead exempt status is subject to currently unarticulated internal financial and operational criteria under the guise of the mutual benefit test, all cooperatives and all farmer- members of cooperatives will face an antitrust risk of unknown metes and bounds and untold magnitude.  The court should not accept the invitation to go down this road.

14

**V.    PRODUCER MEMBERS OF COOPERATIVES HAVE COOPERATIVE LAW REMEDIES FOR INTERNAL COOPERATIVE MANAGERIAL AND OPERATIONAL DISPUTES**

A fundamental proposition of Capper-Volstead adoption was that it was intended to make it possible for "farmer-producers to organize together, set organization policy, fix prices at which their cooperative will sell their produce, and otherwise carry on like a business corporation." *Maryland & Virginia Milk Producers Ass'n, v. United States,* 362 U.S. 458, 466 (1960). Cooperatives are business corporations formed pursuant to the corporate laws of the state of their domicile.  The members of the association have legal rights and remedies under the association's incorporating statute, just as do the members and/or shareholders of any other business corporation.  Consequently, members of DFA (or any other cooperative) who are aggrieved by the cooperative's internal financial policies or practices have remedies under state law and should avail themselves of those remedies.  See K.S.A. § 60-223a and K.S.A. § 17-1628.

**VI.    CONCLUSION**

*Amici*, NCFC, NCBA, and CoBank, respectfully request that the Court reject Plaintiff and the DOJ's proposed application of the mutual benefit language of the Capper-Volstead Act.

Dated:  August 5, 2020

Respectfully submitted,


  /s/  *Marvin Beshore*
Marvin Beshore
*JOHNSON, DUFFIE, STEWART & WEIDNER*
301 Market Street ~ P.O. Box 109
Lemoyne, PA  17043-0109
Phone:  (717) 761-4540
Email: mbeshore@johnsonduffie.com
*Admitted Pro Hac Vice*


Shapleigh Smith, Jr., Esquire
*DINSE, P.C.*
209 Battery Street
Burlington, VT 05401
Phone:  (802) 864-5751
Email: ssmith@dinse.com

*Counsel for National Council of*
*Cooperatives; National Cooperative*
*Business Association; and CoBank, ACB*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF VERMONT**

GARRET SITTS, *et al.,*                    :
              Plaintiffs          :
                              :
         vs.                              :          Civil Action No. 2:16-cv-287-cr
                              :
DAIRY FARMERS OF AMERICA, INC.   :
and DAIRY MARKETING SERVICES,    :
LLC,                                        :
              Defendants          :

## <u>CERTIFICATE OF SERVICE</u>

        I hereby certify that on August 5th, 2020, I electronically filed with the Clerk of Court the foregoing document using the CM/ECF system which will be sent electronically to the registered parties below and paper copies will be sent to those indicated as non-registered participants.

### Registered Parties:

Joel G. Beckman, Esq. (jbeckman@nbparis.com)
Gary L. Franklin, Esq. (gfranklin@primmer.com)
William C. Nystrom, Esq. (wnystrom@nbparis.com)
Michael Paris, Esq. (mparis@nbparis.com)
Elizabeth A. Reidy, Esq. (ereidy@nbparis.com)
Dana A. Zakarian, Esq. (dzakarian@nbparis.com)
Jason M. Turner, AUSA (jason.turner4@usdoj.gov)
Alfred C. Pfeiffer Jr., Esq. (al.pfeiffer@lw.com)
Margaret M. Zwisler, Esq. (margaret.zwisler@lw.com)
Jennifer L. Giordano, Esq. (jennifer.giordano@lw.com)
W. Todd Miller, Esq. (tmiller@bakerandmiller.com)
Ian P. Carleton, Esq. (icarleton@sheeheyvt.com)
Elyse M. Greenwald, Esq. (elyse.greenwald@lw.com)


### Non-registered Parties:
Molly M. Barron, Esquire
Sarah M. Ray, Esquire
*Latham & Watkins, LLP*
505 Montgomery Street, Suite 2000
San Francisco, CA 94111

              JOHNSON, DUFFIE, STEWART & WEIDNER


              By:_____/s/  Marvin Beshore, Esquire_____
                  *Admitted Pro Hac Vice*