UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| GARRETT SITTS, et al.,<br><br>PLAINTIFFS,<br><br>v.<br><br>DAIRY FARMERS OF AMERICA, INC., and DAIRY MARKETING SERVICES, LLC,<br><br>DEFENDANTS. | Civil Action No. 2:16-cv-00287-cr |

**PLAINTIFFS' SUBMISSION REGARDING PROPOSED SPECIAL VERDICT FORM**

During the July 21, 2020 hearing, the Court directed Plaintiffs to submit their proposed special verdict form (attached as Exhibit A) prior to the August 10, 2020 charging conference. This submission explains the flow of the special verdict form, including: (1) the impact of Defendants' Capper-Volstead affirmative defense on the elements or required proof of Plaintiffs' claims; and (2) the need to include specific jury questions on Capper-Volstead, market-wide suppression, and other issues to streamline subsequent trials in this case.

## I. Defendants' Capper-Volstead Affirmative Defense Impacts the Elements of Plaintiffs' Claims and Structure of the Jury Verdict Slip (Questions 5, 13, 15).

Defendants' Capper-Volstead affirmative defense impacts the elements of Plaintiffs' claims for conspiracy to monopsonize (Count I) and monopsony (Count III). Specifically, Capper-Volstead allows qualifying agricultural cooperatives to combine and form lawful monopsonies. Thus, if DFA proves that it qualifies for Capper-Volstead immunities, then Plaintiffs must prove that its monopsony power is *unlawful—i.e.*, that Defendants acquired or maintained monopsony power *through predatory conduct* (*e.g.*, non-solicitation agreements, coercing membership, full supply and outsourcing agreements, side payments for non-

competition, *etc.*).  On the other hand, if the jury finds that Defendants do not qualify for Capper-Volstead immunities (because they do not operate for the mutual benefit of its members as producers[1]), then Plaintiffs need only prove that Defendants willfully acquired or maintained monopsony power.

As such, there are two ways for Plaintiffs to prevail on their monopsony claims.  *First*, the jury could find that Defendants engaged in predatory conduct, in which case, Capper-Volstead is no defense.  *Second*, the jury could find that Defendants did not engage in predatory conduct, but their monopsony is unlawful because they do not qualify for Capper-Volstead immunities.  Plaintiffs' proposed special verdict form captures both scenarios.  (*See* Special Verdict Questions 5 and 13).

Defendants' Capper-Volstead affirmative defense also impacts the elements of Plaintiffs' claim for conspiracy to restrain trade (Count IV).   Indeed, if the jury finds that Defendants do not qualify for Capper-Volstead immunities, then DMS itself (a common marketing agency formed by competing cooperatives) constitutes an agreement, combination, or conspiracy to restrain trade in violation of Section I of the Sherman Act.  Again, Plaintiffs' special verdict form captures this scenario.  (*See* Special Verdict Question 15).

---

[1] In denying Defendants' Daubert motion, this Court recognized that "[a]lthough the Capper-Volstead Act may permit cooperatives to own processing plants, it does not authorize them to profit from that ownership at the expense of their own members in violation of the antitrust laws." *See* Order re Daubert and Motion to Strike [ECF 261] at 12.  Similarly, the Justice Department's Antitrust Division stated that "Congress enacted the Capper-Volstead Act to give farmers who produce food greater bargaining power with processors and other corporate handlers of food products.  It would be inconsistent with the Act's text and purpose to allow a defendant to use the Act as a shield **when it acts as a food processor** or exercises monopsony power **to harm individual farmers**. . . . To the extent that Plaintiffs show at trial that DFA violated the Sherman Act i**n reaping profits as a handler or processor from lower milk prices rather than 'for the mutual benefit of the members thereof,** *as such producers***,' it would turn the Act on its head to allow DFA to use the Act as a legal shield.**" *See* Statement of Interest on behalf of the United States of America [ECF 285] at 1, 8 (emphasis added).

**II.    The Jury's Findings in the First Trial May Trigger Offensive Collateral Estoppel So Long as the Special Verdict Form Establishes that the Issue Was "Actually Decided."**

In their request for separate trials, Defendants assured the Court that it would seeks ways to shorten and streamline subsequent trials:

> There may be several ways to shorten and streamline subsequent trials to avoid duplication of evidence. Although the issues of impact and damages will necessarily be different for each plaintiff in each trial—which is why severance is necessary—courts and parties are extremely capable of designing structures that address overlapping legal and evidentiary issues across separate actions, in order to promote efficiency.

Defendants' Reply in Support of Motion to Sever [ECF 182] at 6.  Indeed, Defendants stated that subsequent trials would be shorter "because some issues would be decided" in the first trial.  *See* Email from A. Pfeiffer to D. Zakarian (Jan. 29, 2020) [ECF 172-1] ("I actually said I expected any subsequent trial, if needed after the first result, would logically be quite a bit shorter than the first (not that each would take 3   4 weeks) because some issues would be decided.").

Courts in the Second Circuit have long held that a jury's verdict may trigger offensive collateral estoppel **where there is a special verdict form showing that the jury "actually decided" the issues in question**.  *See GAF Corp. v. Eastman Kodak Co.*, 519 F. Supp. 1203, 1211 (S.D.N.Y. 1981) (applying offensive collateral estoppel in a private antitrust action to preclude defendant from relitigating the jury's findings concerning market definition and monopoly power).  Plaintiffs' proposed special verdict slip will capture the jury's findings on core issues to shorten and streamline subsequent trials. *See id.* at 1214 (rejecting defendant's argument that it was difficult to determine what jury decided).

Under the doctrine of offensive collateral estoppel, a defendant is precluded from "relitigating an issue that has been previously decided against the same defendant." *Flood v. Just Energy Marketing Corp.*, 904 F.3d 219, 236 (2d Cir. 2018); *GAF*, 519 F. Supp. at 1211 (applying

3

offensive collateral estoppel in a private antitrust action to preclude defendant from relitigating market definition and monopoly power); *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 434 (2d Cir. 1995) (offensive collateral estoppel is available "to a new plaintiff when the defendant had essentially the same opportunity and incentive to litigate the issue fully and fairly in the other suit"). The "principal virtue" of offensive collateral estoppel is that it "promotes judicial economy." *S.E.C. v. Monarch Funding Corp.*, 192 F.3d 295, 303 (2d Cir. 1999) (citing *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 (1979)). This Court has wide discretion to determine when offensive collateral estoppel should be applied." *Remington Rand Cop. V. Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1486 (2d Cir. 1995); *Flood*, 904 F.3d at 236 (same).

In determining whether to apply offensive collateral estoppel, courts consider the following factors:

> (1) the party against whom collateral estoppel is being asserted must have been a party, or in privity with a party, to the prior action;
>
> (2) there must have been a final determination of the merits of the issues sought to be collaterally estopped;
>
> (3) the issues sought to be precluded must have been necessary, material, and essential to the prior outcome;
>
> (4) the issues sought to be precluded must have been actually litigated in the prior action, with the party against whom the estoppel is asserted having had a full and fair opportunity to litigate the issues; and
>
> (5) the issues actually and necessarily decided in the prior litigation must be identical to the issues sought to be estopped.

*Angstrohm Precision, Inc. v. Vishay Intertech., Inc.*, 567 F. Supp. 537, 540 (E.D.N.Y. 1982); *GAF*, 519 F. Supp. at 1211.

Here, the factors set forth above will permit the use of offensive collateral estoppel in any future trial(s) in this matter. Specifically, Defendants will be the same defendants in all trials, and they will have a full and fair opportunity to litigate the issues. The jury's verdict will amount to "final determination of the merits of the issues." *United States v. Seaboard Sur. Co.*, 622 F. Supp. 882, 885 (E.D.N.Y. 1985) (collateral estoppel "estops relitigation of only those matters that were litigated and the subject of a final determination or verdict"); *Angstrohm*, 567 F. Supp. at 540 (jury verdict); *Stegemann v. Rensselaer County Sheriff's Office*, 2018 WL 5629775, at * 6 (N.D.N.Y. Oct. 31, 2018) ("[P]ending appeals do not alter the finality or preclusive effect of a judgment."); *Struder v. S.E.C.*, 148 Fed. Appx. 58 (2d Cir. 2005) (same).[2] And, the majority of the issues "actually and necessarily decided" will be identical in all trials.

### III. The Jury's Decision on Market-Wide Suppression May Significantly Shorten Future Trials (Questions 4, 8, 12, 17).

One of the core issues that the jury will need to decide is antitrust impact (*i.e.*, causation). Professor Elhauge will testify that Defendants suppressed the over-order premiums for conventional raw Grade A milk for the *entire market* of Order 1. As such, individual farmer characteristics are irrelevant because every farmer would have otherwise received an additional $0.987 per cwt for their milk. In denying summary judgment, the Court ruled that Plaintiffs could prove antitrust impact through: (1) Professor Elhauge's regression analysis showing Defendants' conduct suppressed the over-order premiums for conventional raw Grade A milk for

---

[2] "The preclusive effect of a prior judicial determination of a material and essential fact is not affected by the fact that the losing party failed to take an appeal to a higher court or could not take such an appeal. Nor is the preclusive effect of a judicial determination affected by the withdrawal of an appeal by the losing party." *Angstrohm*, 567 F. Supp. at 540.

5

the entire market of Order 1; and (2) evidence that each Plaintiff participated in that market.[3]  *See* Summary Judgment Order [ECF 130] at 53-54.

Defendants dispute Professor Elhauge's claim of market-wide suppression and argue that they are entitled to present "individualized defenses" relating to the "required element of impact, and turn on the unique, individualized circumstances of each plaintiff's own farm and the ways in which those circumstances affected his or her personal ability to bargain for higher premiums based on factors like farm size, milk quality, and proximity to processors."[4]  Thus, Defendants argued that separate trials were necessary so that the jury could follow the individualized defenses for each Plaintiff.

Defendants' "individualized defenses," however, only come into play if the jury rejects Plaintiffs' claim of market-wide suppression.  If the jury finds that there *was* market-wide suppression, Defendants need not present "individualized defenses" in any subsequent trial(s).

---

[3] Defendants should stipulate to the second element.  Indeed, the United State Department of Agriculture ("USDA") has certified the amount of milk that each Plaintiff sold in Order 1 in each year (2005 through 2017).  *See* USDA Certified Milk Weights (Exhibit 223), attached as Exhibit B.  Pursuant to 7 U.S.C. § 608(c) and the regulations promulgated thereunder (including but not limited to 7 C.F.R. §§ 1000.9, 1000.25, 1001.30, 1001.31, and 1001.73(e)), Handlers (including DFA and DMS) are required to provide true and accurate monthly reports to the Market Administrator for Federal Order 1 stating, among other things, "the name, address, Grade A identifier assigned by a duly constituted regulatory agency, and the payroll number of the producer," as well as "the month and date that milk was received from the producer, including the daily and total pounds of milk received."  Plaintiffs served a trial subpoena on the USDA seeking the annual amount of conventional raw Grade A milk that each Plaintiff produced in Order 1 for the years 2005 through 2017.

[4] *See* Defendants' Opposition to Plaintiffs' Motion *in Limine* to Exclude Deposition Designations [ECF 270] at 5 n.4.

As such, it is critical that the special verdict form include questions on market-wide suppression, so that the jury may "actually decide" the issue for purposes of offensive collateral estoppel.[5]

## CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court adopt their proposed special verdict form.

Respectfully Submitted,

PLAINTIFFS,

By their attorneys,

*/s/ Dana A. Zakarian*
Joel G. Beckman
Dana A. Zakarian
Michael G. Paris
Elizabeth A. Reidy
NYSTROM BECKMAN & PARIS LLP
One Marina Park Drive, 15th Fl.
Boston, Massachusetts 02210
(617) 778-9100
jbeckman@nbparis.com
dzakarian@nbparis.com
mparis@nbparis.com
ereidy@nbparis.com

Dated: August 6, 2020                *Admitted Pro Hac Vice*

---

[5] Based on Defendants' witness and exhibit lists (which do not appear to address "individualized defenses") and the fact that reducing the number of Plaintiffs from 116 to 20 did not alter the number of trial days required by Defendants, it appears that these so-called "individualized defenses" are merely a ruse to delay trial. *See* Transcript of June 3, 2020 Hearing at 11-12 (The Court: "So I must have misjudged your motion to sever, because I believe you told the Court that one of the reasons why you needed to sever is because you were going to present evidence with regard to all 115 plaintiffs. . . . I am not persuaded that, notwithstanding a significant reduction in the number of plaintiffs, the defendants' case has remained unchanged. In fact, that was one of the persuasive arguments the defendant made in seeking severance and the reason why the Court granted it.").

> Gary L. Franklin, Esq.
> PRIMMER PIPER EGGLESTON & CRAMER PC
> 150 South Champlain Street
> P.O. Box 1489
> Burlington, VT  05402-1489
> (802) 864-0880
> gfranklin@primmer.com

## CERTIFICATE OF SERVICE

    I, Dana A. Zakarian, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 6th day of August 2020.

                                                */s/ Dana A. Zakarian*