# ATTACHMENT A

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

GARRETT AND RALPH SITTS, LEON          )
ATWELL, VICTOR BARRICK, DANIEL         )
BAUMGARDER, WILLIAM BOARD,             )
GEORGE BOLLES, ROGER BOLLES, ANDY      )
BOLLINGER, THOMAS BOLLINGER,           )
LOGAN BOWER, DWIGHT                     )
BRANDENBURG, BERNARD                    )
BROUILLETTE, THOMAS BROUILLETTE,       )
AARON BUTTON, HESTER CHASE,            )
THOMAS CLARK, THOMAS                    )
CLATTERBUCK, PAUL CURRIER, GERRY       )
DELONG, PETE AND ALICE DIEHL, MARK     )
DORING, MARK AND BARBARA DULKIS,       )
GLEN EAVES, MIKE EBY, WILLIAM          )
ECKLAND, DOUG ELLIOT, JAMES ELLIOT,    )
WENDALL ELLIOTT, MICHAEL FAUCHER,      )
DAVID AND ROBIN FITCH, DUANE AND       )
SUSAN FLINT, JOSEPH FULTS, RICHARD     )
GANTNER, STEFAN AND CINDY GEIGER,      )   Case No. 2:16-cv-00287
WILLIAM GLOSS, JOHN GWOZDZ, DAVID      )
AND LAURIE GRANT, JIM AND JOYCE        )
GRAY, DENNIS HALL, ROGER AND JOHN      )
HAMILTON, NEVIN AND MARLIN             )
HILDEBRAND, JAKE AND HARLEN            )
HILLYERD, RICHARD AND TERRI            )
HOLDRIDGE, PAUL HORNING, TERRY         )
AND ROBERT HUYCK, DONALD SCOTT         )
HYMERS, TERRY INCH, RANDY AND          )
LYNETTE INMAN, THEODORE JAYKO,         )
JACK KAHLER, JAMES AND TERESA          )
KEATOR, JIM AND SHARON KEILHOLTZ,      )
GEORGE KEITH, LEE AND ELLEN KLOCK,     )
MIKE AND LISA KRAEGER, FRED            )
LACLAIR, TIM LALYER, FRANK AND         )
JOHN LAMPORT, CORRINE LULL,            )
CHARLES AND GRETCHEN MAINE,            )
THOMAS AND DEBORA MANOS, FRED          )
MATTHEWS, RUSSELL MAXWELL,             )

GERRY MCINTOSH, STEPHEN MELLOTT,        )
JOHN AND DAVID MITCHELL, THOMAS          )
MONTEITH, WALT MOORE, RICHARD            )
AND SHEILA MORROW, DEAN MOSER,           )
MELISSA MURRAY AND SEAN QUINN,           )
THOMAS NAUMAN, CHARLES NEFF,             )
DAVID NICHOLS, MICHAEL NISSLEY,          )
LOU ANN PARISH, DANIEL PETERS,           )
MARSHA PERRY, CAROLYN AND DAVE           )
POST, JUDY LEE POST, SCOTT               )
RASMUSEU, BRIAN REAPE, DAVID AND         )
LYNETTE ROBINSON, BRIAN AND LISA         )
ROBINSON, CALVIN ROES, BRADLEY           )
ROHRER, PAUL AND SARAH                   )
ROHRBAUGH, ROBERTA RYAN, SCOTT           )
AND LIN SAWYER, S. ROBERT SENSENIG,      )
THOMAS AND DALE SMITH, DALE AND          )
SUSAN SMITH, DENNIS SMITH, DONALD        )
T. AND DONALD M. SMITH, ROGER AND        )
TAMMY, SMITH, TODD SNYDER,               )
RICHARD SOURWINE, DANNY                  )
SOURWINE, RANDY SOWERS, SHANE            )
STALTER, GEORGE AND SHIRLEY              )
STAMBAUGH, TRACY STANKO, STEPHEN         )
SOURWINE, RICHARD SWANTAK,               )
GEORGE AND PATRICIA THOMPSON,            )
JEREMY THOMPSON, KEN AND JUDY            )
TOMPKINS, DANIEL VAUGHN, MARK            )
VISSAR, ERIC WALTS, EDWARD               )
WALLDROFF, GERALD WETTERHAHN,            )
JR., EUGENE WILCZEWSKI, STEVE            )
WILSON,                                  )
                                         )
              Plaintiffs,                )
                                         )
       v.                                )
                                         )
DAIRY FARMERS OF AMERICA, INC., and      )
DAIRY MARKETING SERVICES, LLC,           )
                                         )
              Defendants.                )

2

## JURY CHARGE

Members of the Jury:

Now that you have heard the evidence and the arguments, it is my duty to instruct you on the law. It is your duty to accept these instructions of law and apply them to the facts as you determine them. You are not to single out one instruction alone as stating the law, but must consider the instructions as a whole. You are not to be concerned with the wisdom of any rule of law stated by the court. Regardless of any opinion you may have as to what the law is or ought to be, it would be a violation of your sworn duty to base a verdict upon any view of the law other than that given in the instructions of the court, just as it would also be a violation of your sworn duty, as judges of the facts, to base a verdict upon anything other than the evidence presented during the trial.

The lawyers may have referred to some of the rules of law in their arguments. If any difference appears between the law as stated by the lawyers and the law as stated by the court in these instructions, you must follow the court's instructions.

Our judicial system requires you to carefully and impartially consider all of the evidence, follow the law, and reach a just verdict, regardless of the consequences.

## JURORS AS FINDERS OF FACT/RULINGS OF THE COURT

You and you alone are the triers of the facts. Each of you, as jurors, must determine the facts for yourselves in reaching a verdict. By the rulings which I made during the course of the trial, I did not intend to indicate to you or to express my own views about this case.

## SYMPATHY/PREJUDICE

Neither sympathy nor prejudice, for or against the parties, or any other person involved with this case, should influence you in any manner in reaching your verdict. Your deliberations should be well-reasoned and impartial.

## IMPORTANT CASE

This is an important case to the parties and the court. You should give it serious and fair consideration.

## ARGUMENTS/STATEMENTS/OBJECTIONS OF THE ATTORNEYS

The opening statements and closing arguments of the attorneys, their questions and objections, and all other statements that they made during the course of the trial are not evidence. The attorneys have a duty to object to evidence that they believe is not admissible. You may not hold it against either side if any attorney feels it is necessary to make an objection.

## NUMBER OF WITNESSES

The fact that one side may have called more witnesses than the other side is of no significance. Your task is to evaluate the credibility of the witnesses and to weigh all of the evidence.

## EVIDENCE IN THE CASE

The evidence in this case consists of the sworn testimony of the witnesses and the exhibits admitted into evidence, regardless of which party presented the evidence, and any evidence of which the court took judicial notice. Any evidence to which an objection was sustained or stricken by the court must be disregarded.

## EVIDENCE – DIRECT OR CIRCUMSTANTIAL

There are two types of evidence from which you may find the facts of this case: direct and circumstantial evidence. Direct evidence is the testimony of someone who asserts actual knowledge of a fact, such as an eyewitness or the exhibits in the trial. Circumstantial evidence is proof of a chain of facts and circumstances tending to prove or disprove an issue in the case.

For example, if a witness were to testify that he or she had seen cows in a field, that would be an example of direct evidence that there were cows in a field. On the other hand, if a witness were to testify that he or she had seen fresh cow tracks in the field, that would be an example of circumstantial evidence that there had been cows in the field.

The law does not require a party to prove its claims or defenses by direct evidence alone, that is, by testimony of an eyewitness. One or more of the essential elements, or all of the essential elements, may be established by reasonable inference from other facts that are established by direct testimony. Circumstantial evidence may alone be sufficient to

prove a claim or defense.

The law makes no distinction between the weight to be given to direct or circumstantial evidence. Nor is a greater degree of certainty required of circumstantial evidence than of direct evidence. You should consider all the evidence in the case and give it such weight as you think it deserves.

## CREDIBILITY OF WITNESSES

You are the sole judges of the credibility of the witnesses, and the weight to give their testimony is up to you. In considering the testimony of any witness, you may take into account his or her ability and opportunity to observe; his or her demeanor while testifying; any interest or bias he or she may have; and the reasonableness of his or her testimony, considered in light of all of the evidence in the case. Consider also any relation each witness may bear to either side of the case, any bias or prejudice, the manner in which each witness might be affected by the verdict, and the extent to which, if at all, each witness is either supported or contradicted by other evidence in the case.

Inconsistencies or discrepancies in the testimony of a witness, or between the testimony of different witnesses, may or may not cause you to discredit a witness's testimony. Two or more persons witnessing an incident or transaction may see or hear it differently. It is your duty to reconcile conflicting testimony if you can do so.

In weighing the effect of a discrepancy, consider whether it pertains to a matter of importance or to an unimportant detail, and whether the discrepancy results from innocent error or intentional falsehood.

You may give the testimony of each witness such weight, if any, you think it deserves. You may believe all of the testimony of any witness, you may believe it in part and disbelieve it in part, or you may reject it altogether. You do not have to accept the testimony of any witness, even if it is uncontradicted. It is for you to say what you will believe and what you will disbelieve.

## EXPERT WITNESSES

You have heard evidence from witnesses who are known as expert witnesses. An expert witness is a person who has special knowledge, experience, training, or education in

his or her profession or area of study. Because of this expertise, an expert witness may offer an opinion about one or more of the issues in the case. In evaluating their testimony, you should evaluate their credibility and statements just as you would with any other witness. You should also evaluate whether the expert witness's opinion is supported by the facts that have been proved, and whether the opinion is supported by the witness's knowledge, experience, training, or education. You are not required to give the testimony of an expert witness any greater weight than you believe it deserves just because the witness has been referred to as an expert.

## INTEREST IN THE OUTCOME

As a general matter, in evaluating the credibility of each witness, you should take into account any evidence that the witness who testified may benefit in some way from the outcome of this case. Such an interest may create a motive to testify falsely and may sway the witness to testify in a way that advances his or her own interests. Therefore, if you find that any witness whose testimony you are considering has an interest in the outcome of this trial, then you should bear that factor in mind when evaluating the credibility of his or her testimony and accept it only with great care.

This is not to suggest that any witness who has an interest in the outcome of a case will testify falsely. It is for you to decide to what extent, if at all, the witness's interest has affected or colored his or her testimony.

## PRIOR INCONSISTENT STATEMENTS

You may find that a witness has made statements outside of this trial that are inconsistent with the statements that the witness gave here. You may consider the out-of-court statements not made under oath only to determine the credibility of the witness and not as evidence of any facts contained in the statements. As to out-of-court statements that were made under oath, such as statements made in prior testimony, you may consider them for all purposes, including for the truth of the facts contained therein.

## SPECIALIZED KNOWLEDGE AND EXPERIENCE OF JURORS

In deliberating upon your verdict, you are not expected to put aside your common sense or your own observations or experience of the general affairs of life. However, a

juror having special knowledge of a subject may neither state this knowledge to fellow jurors nor act upon it himself or herself in arriving at a verdict. You must not tell your fellow jurors about matters which are based on special knowledge concerning an issue in the case that did not come from the evidence received in the courtroom.

## PREPONDERANCE OF THE EVIDENCE

To "establish by a preponderance of the evidence" means to prove that something is more likely than not. In other words, a preponderance of the evidence means such evidence that, when considered and compared with that opposed to it, has more persuasive force, and produces in your minds a belief that what is sought to be proved is more likely true than not true. A preponderance of the evidence means the greater weight of the evidence. In determining whether a fact, claim, or defense has been proven by a preponderance of the evidence, you may consider the testimony of witnesses, regardless of who may have called them, and the exhibits in evidence, and the stipulations, regardless of who may have produced or introduced them. No proof of absolute certainty is required.

## INDIVIDUAL CLAIMS OF EACH PLAINTIFF

There are twenty separate plaintiffs in this lawsuit. Each plaintiff has the burden to prove every element of his or her claims against DFA. Although some of the evidence you have heard may be relevant for multiple plaintiffs, other pieces of evidence may only be relevant to one plaintiff but not others. You must determine which evidence is relevant for each plaintiff, and keep separate each plaintiff's individual claims for relief where appropriate.

If you find that one plaintiff has satisfied his or her burden of proof against DFA, you may not use that finding to find in favor of any other plaintiff, unless that other plaintiff has independently met his or her own burden of proof. Nor may you find in favor of one plaintiff solely because you have found in favor of another plaintiff. You must evaluate each plaintiff's claim on its own individual merits.[1]

---

[1]   For ease of reference, DFA hereafter inserts any new or revised jury instructions into the prior version of the jury instructions circulated pursuant to the August 10, 2020

Authority:    *See generally* Op. & Or. Granting in Part Defs.' Mot. to Sever Claims for Trial at 8-10, ECF No. 191 (citing *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990); *Ulysse v. Waste Mgmt. Inc. of Fl.*, 2013 WL 11327137, at *4 (S.D. Fla. Sept. 13, 2013), *aff'd*, 645 F. App'x 838 (11th Cir. 2016); *Hofmann v. EMI Resorts, Inc.*, 2010 WL 9034908, at *3 (S.D. Fla. July 21, 2010); *Thompson v. Sanderson Farms, Inc.*, 2006 WL 2559852, at *2, *4-6 (S.D. Miss. Sept. 1, 2006)); *see also Alabama v. Blue Bird Body Co.,* 573 F.2d 309, 320 (5th Cir. 1978); *cf. In re Brooklyn Navy Yard Asbestos Litig.*, 971 F.2d 831, 853 (2d Cir. 1992); *Garber v. Randell*, 477 F.2d 711, 716-17 (2d Cir. 1973).

## INSTRUCTIONS ON THE SUBSTANTIVE LAW OF THE CASE

Having explained the general guidelines by which you will evaluate the evidence in this case, I will now instruct you with regard to the law that is applicable to your determinations in this case.

## PLAINTIFFS' CLAIMS

In this case, each Plaintiff alleges claims against Defendants under a federal antitrust statute called the Sherman Act. The Sherman Act's purpose is to preserve free competition in the marketplace.

Plaintiffs claim that Defendants have a monopsony over the raw Grade A milk market in Federal Milk Marketing Order 1. You may be familiar with the term "monopoly," which refers to a seller's market power. Monopsony, on the other hand, refers to the buyer's market power—a monopsony is to the buy side of the market as a monopoly is to the sell side of the market. In a monopsony, a buyer has the ability to control the price at which producers can sell their goods or to exclude competing buyers from the marketplace.

Each Plaintiff in this case alleges the same four claims against Defendants:

(1)    conspiracy in violation of Section 1 of the Sherman Act;

(2)    conspiracy to monopsonize in violation of Section 2 of the Sherman Act;

(3)    monopsony in violation of Section 2 of the Sherman Act

---

charge conference. DFA does not waive any objection to any other instruction in this version.

(4)     attempted monopsony in violation of Section 2 of the Sherman Act.

I will first address Section 1 of the Sherman Act and Plaintiffs' claims under that section.

## SECTION 1 OF THE SHERMAN ACT

Plaintiffs allege that Defendants conspired in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Section 1 of the Sherman Act prohibits contracts, combinations, and conspiracies that unreasonably restrain trade. To establish a violation of Section 1 of the Sherman Act, Plaintiffs must prove the following:

(1)     the existence of a contract, combination, or conspiracy between or among at least two separate persons or entities;

(2)     that the contract, combination, or conspiracy unreasonably restrains trade, such that:

    a.   it affected competition within a relevant market including two aspects:

        i.   A relevant product market

        ii.  A relevant geographic market

    b.   it resulted in a substantial adverse effect on competition in any such relevant market based on an analysis of the following steps:

        i.   plaintiffs must first prove that any alleged conspiracy resulted in a substantial adverse effect on competition in the relevant market;

        ii.  if plaintiffs prove that any alleged conspiracy resulted in a substantial adverse effect on competition in the relevant market, defendants must prove that the alleged conspiracy also benefitted competition;

        iii. if defendants prove that the alleged conspiracy achieved procompetitive benefits, each plaintiff must prove that any legitimate benefits offered by defendants could have been achieved through less restrictive means, and that the conspiracy's competitive harm substantially outweighs its competitive benefits.

(3)     that the restraint affects interstate commerce; and

(4)     that the restraint caused each Plaintiff to suffer an injury to his or her business or property.

I will describe each of these four elements in detail.

Authority:     Model Jury Instructions in Civil Antitrust Cases, B-2-9 (Am. Bar Ass'n 2016) (modified instruction pursuant to the Court's direction to the parties at the August 10, 2020 charge conference).

## SECTION 1: EXISTENCE OF A CONSPIRACY

Plaintiffs allege that Defendants participated in a conspiracy to restrain trade by reducing and/or eliminating competition in the raw Grade A milk market in Order 1 in violation of Section 1 of the Sherman Act. To prevail on this claim, each Plaintiff must prove both of the following elements by a preponderance of the evidence:

(1)     that a contract, combination, or conspiracy existed; and

(2)     that Defendants knowingly became a member of that conspiracy.

Section 1 applies only to conspiracies between separate persons or entities. A conspiracy is an agreement or an understanding between two or more persons or entities, such as corporations or limited liability companies. An agreement or understanding exists when two or more persons or corporations share a commitment to a common scheme. To establish the existence of a contract, combination, or conspiracy, the evidence does not need to show that there was a formal or written agreement. An agreement or understanding may be entirely unspoken.

A contract, combination, or conspiracy may be formed without all of the parties reaching an agreement at the same time, such as where competitors separately accept invitations to participate in a plan to restrain trade. Similarly, it is not essential that all persons acted exactly alike, nor is it necessary that they all possessed the same motives for entering the agreement. It is also not necessary that all of the means or methods claimed by Plaintiffs were agreed upon to carry out the alleged conspiracy, nor that all of the means or methods that were agreed upon were actually used or put into operation, nor that all the persons alleged to be members of the conspiracy were actually members. It is the agreement or understanding to restrain trade that constitutes a contract, combination, or conspiracy. Therefore, you may find a conspiracy existed regardless of whether it succeeded or failed.

In determining whether an agreement or understanding between two or more persons or entities has been proved, you must view the evidence as a whole. Each Plaintiff may prove the existence of the alleged contract, combination, or conspiracy through direct evidence, circumstantial evidence, or both. Direct evidence is explicit and requires no inferences to establish the existence of a contract, combination, or conspiracy. You may also infer the existence of an agreement from the circumstances, including what you find the alleged members actually did and the words they used. Mere similarity of conduct among various persons, however, or the fact that they may have associated with one another and may have met or assembled together, does not by itself establish the existence of an agreement.

### SECTION 1: ELEMENT 1: THE ROLE OF PARALLEL CONDUCT IN DECIDING WHETHER A CONSPIRACY EXISTED FOR PURPOSES OF THE FIRST ELEMENT OF A SECTION 1 CLAIM

Each plaintiff contends that DFA and the alleged coconspirators in this case engaged in similar conduct. Each plaintiff further contends that this conduct, when considered with other evidence, shows that a conspiracy existed between DFA and its alleged coconspirators.

The mere fact that DFA and other separate entities engaged in similar conduct, if you found that happened, would not by itself establish the existence of a conspiracy between or among DFA and those other entities. Such parallel behavior could be no more than the result of the exercise of independent judgment in response to identical or similar market conditions.

For example, everyone might open their umbrellas on a rainy day, but that similar behavior would not necessarily mean that they had conspired to open their umbrellas. A business may lawfully adopt the same prices or other business practices as its competitors, as long as it does so independently and not as part of an agreement or understanding with one or more of its competitors. If DFA and another entity acted similarly but independently of one another, without any agreement or understanding between two or more of them, then there would not be a conspiracy between them.

You must decide whether DFA's conduct, to the extent you find that it was similar to that of other entities, was more probably than not the result of an agreement or understanding among them.  You may infer that a conspiracy existed only if you find that the evidence, when viewed as a whole, makes it more likely that DFA had an unlawful agreement or understanding, than that DFA acted independently.  In making this determination, you should consider the similar conduct against the entire background in which it took place.

Authority:    Model Jury Instructions in Civil Antitrust Cases, A-17 (Am. Bar Ass'n 2016) (modified instruction pursuant to the Court's direction to the parties at the August 10, 2020 charge conference).

## SECTION 1: CORPORATIONS

DFA is a corporation and DMS is a limited liability company. Under the law, a corporation or limited liability company is a person, but they act only through its agents, such as their directors, officers, executives, employees, or others acting on their behalf. A corporation or limited liability company is not capable under the law of conspiring with their own agents, unincorporated divisions, or wholly-owned subsidiaries. Through its agents, however, a corporation or limited liability company is capable of conspiring with other persons or independent entities.

A corporation or a limited liability company is legally bound by the acts and statements of its agents or employees done or made within the scope of the agent's employment or apparent authority. Acts done within the scope of employment are acts performed on behalf of the corporation or limited liability company and directly related to the performance of the duties the agent has general authority to perform. Apparent authority is the authority that persons outside the corporation or limited liability company could reasonably believe the agent would have, judging from his or her position with the company, the responsibilities previously entrusted to the person or the office, and the circumstances surrounding his or her past conduct. An agent can have apparent authority

even when, despite these appearances, the agent is actually acting in a dishonest, fraudulent, or anticompetitive manner.

To summarize, for a corporation or limited liability company to be legally responsible for the acts or statements of its agents, you must find that the agent was acting within the scope of his employment with apparent authority. The fact that a corporation or limited liability company has instructed its agents not to violate the antitrust laws does not excuse the corporation or limited liability company from responsibility for the unlawful acts of its agents done within the scope of their employment or apparent authority. Corporations and limited liability companies are entitled to the same fair trial as a private individual. The acts of a corporation or limited liability companies are to be judged by the same standard as the acts of a private individual, and you may hold a corporation or limited liability company liable only if such liability is established by the preponderance of the evidence. All persons, including corporations and limited liability companies, are equal before the law.

## SECTION 1: ELEMENT 1:  PARTICIPATION AND INTENT

Before you can find that any person or entity was a member of the conspiracy alleged by each plaintiff, the evidence must show that person or entity knowingly joined in the unlawful plan at its inception, or at some later time, with the intent to further the alleged purpose of the conspiracy.

To act knowingly means to participate deliberately, voluntarily, and intentionally, and not because of mistake, accident, or other innocent reason. A person or entity may become a member of a conspiracy without full knowledge of all the details of the conspiracy, the identity of all its members, or the parts they played.  Knowledge of the essential nature of the plan is enough.  On the other hand, a person or entity who has no knowledge of a conspiracy, but happens to act in a way that helps the conspiracy succeed, does not thereby become a conspirator.

A person or entity who knowingly joins an existing conspiracy, or who participates only in part of a conspiracy with knowledge of the overall conspiracy, is just as responsible

as if he, she, or it had been one of those who formed or began the conspiracy and participated in every part of it.

In determining whether a person or entity was a member of the alleged conspiracy, you should consider only the evidence about that particular person's or entity's statements and conduct, including any evidence of his, her, or its knowledge and participation in the events involved and any other evidence of his, her, or its participation in the conspiracy alleged.

You may not find that a person or entity was a member of a conspiracy based only on his, her, or its association with or knowledge of wrongdoing, but it is a factor you may consider to determine whether he, she, or it was a member of the alleged conspiracy.

If you find that the alleged conspiracy existed, then the acts and statements of the conspirators are binding on all those whom you find were members of the conspiracy.

Once you have found that a person or entity is a member of a conspiracy, he, she, or it is presumed to remain a member and is responsible for all actions taken by all coconspirators during and in furtherance of the conspiracy until it is shown that the conspiracy has been completed or abandoned.

Authority:    Model Jury Instructions in Civil Antitrust Cases, A-21 (Am. Bar Ass'n 2016).

## SECTION 1: UNREASONABLE RESTRAINT OF TRADE (PER SE RULE)

The second element that Plaintiffs must prove is that the alleged conspiracy or agreement resulted in an "unreasonable" restraint on interstate commerce. Here, Plaintiffs allege that Defendants and their coconspirators restricted and/or eliminated competition for farmers' milk in the raw Grade A milk market in Order 1 through the use of horizontal agreements, which resulted in an unreasonable restraint of trade. A horizontal agreement is an agreement among competitors.

Plaintiffs contend that Defendants entered into: (1) agreements with other cooperatives not to compete for farmers' milk, including but not limited to, agreements

not to solicit each other's members and to share pay prices; (2) agreements with processors not to compete for farmers' milk, including but not limited to outsourcing and long term supply agreements that coupled with most-favored nations pricing and kickbacks for non-competition; and (3) agreements to coerce farmers or who were independent farmers or belonged to other cooperatives to join DFA. Plaintiffs allege that each of these agreements is a horizontal agreement among competitors that restrict competition.

The Sherman Act makes unlawful certain agreements that, because of their harmful effect on competition and lack of redeeming value, are conclusively presumed to be illegal and an unreasonable restraint of trade, without inquiry about the precise harm they have caused or the business excuse for their use. Where a plaintiff alleges and proves what is called a "per se" violation, the plaintiff is not required to prove that the conduct hurt competition in the market. Included in this category of unlawful agreements are horizontal agreements amongst competitors that restrict competition. I instruct you that the agreements between Defendants and their coconspirators were all horizontal agreements. Therefore, if you find that Plaintiffs have proven the existence of an agreement or conspiracy to restrain trade by Defendants and their coconspirators, you do not need to be concerned with whether the agreements was reasonable or unreasonable, the justifications for the agreement, or the harm, if any, done by it. It is not a defense that the parties may have acted with good motives, thought that what they were doing was legal, or that the conspiracy may have had some good results. If there was, in fact, a conspiracy or agreement as alleged by Plaintiffs, I instruct you that it was an "unreasonable" restraint of trade in violation of the federal antitrust laws.

## SECTION 1: UNREASONABLE RESTRAINT OF TRADE (RULE OF REASON)

Under Section 1 of the Sherman Act, a restraint of trade is illegal only if it is found to be unreasonable. Thus, the second fact that Plaintiffs must prove is that the alleged conspiracy resulted in an "unreasonable" restraint on interstate commerce. Plaintiffs claim that Defendants unreasonably restrained trade by entering into agreements with processors not to compete for farmers' milk. Specifically, Plaintiffs claim that these

15

restraints are long-term supply agreements (including full-supply agreements), outsourcing agreements, and payments for non-competition.

You must determine whether the challenged restraints were reasonable. In making this determination, you must first determine whether Plaintiffs have proven that the challenged restraints resulted in a substantial harm to competition in the raw Grade A milk market in Order 1. If you find that Plaintiffs have proven that the challenged restraints resulted in substantial harm to competition, then the burden shifts to Defendants to prove that the restraints were justified by legitimate procompetitive benefits. If Defendants prove such legitimate procompetitive benefits, the burden shifts back to the Plaintiffs to show that any legitimate competitive benefits established by Defendants could have been achieved through less restrictive means. You must then balance the competitive harm against the procompetitive benefit. The challenged restraints are illegal under Section 1 of the Sherman Act only if you find that the competitive harm substantially outweighs any legitimate procompetitive benefit. I will now review each step of the analysis in more detail.

## SECTION 1: RESTRAINT OF TRADE – PROOF OF COMPETITIVE HARM

As I mentioned, to prove that the challenged restraints are unreasonable, Plaintiffs first must demonstrate that the restraints resulted in, or are likely to result in, substantial harm to competition.

Plaintiffs must show that the harm to competition occurred in an identified market, known as the relevant market. There are two aspects to a relevant market. The first aspect is known as the relevant product market. The second aspect is known as the relevant geographic market. Here, the relevant product market is conventional raw Grade A milk and the relevant geographic market is Order 1. Therefore, you must determine whether Plaintiffs have proven that the challenged restraint has, or is likely to have, a substantial harmful effect on competition in that market. [NOTE: DEFENDANTS CHALLENGE BOTH THE PRODUCT MARKET AND GEOGRAPHIC MARKET DEFINITIONS].

A harmful effect on competition means a reduction in competition that results in the loss of some of the benefits of competition. If the challenged conduct has not resulted

16

in, or is not likely to result in the loss of some other competitive benefit, then there has been no effect on competition, and you should find that the challenged conduct was not unreasonable.

In determining whether the challenged restraints have produced, or are likely to produce, harm to competition, you may consider the following factors:

- the effect of the restraint on prices, output, product quality and service;

- the purpose and nature of the restraint;

- the nature and structure of the relevant market;

- the number of competitors in the relevant market and the level of competition among them, both before and after the restraint was imposed; and

- whether the Defendants possess market power.

The last factor mentioned, market power, includes the ability to control price, exclude competition, or restrict output. An important factor in determining whether Defendants possess market power is Defendants' market share, that is, the percentage of the products or services it sells in the relevant market compared to those sold by all competitors. Other factors that you may consider in determining whether Defendants have market power include barriers to entry by new competitors in the relevant market. If a party does not possess a substantial market share, it is less likely that party possesses market power. If Defendants do not possess market power, it is less likely that the challenged restraint has resulted in, or will result in, a substantial harmful effect on competition in the market.

## SECTION 1 CONSPIRACY: ELEMENT 2(b)(ii): UNREASONABLE RESTRAINT OF TRADE – PROOF OF COMPETITIVE BENEFITS

If you find that each plaintiff has proven that the challenged restraint resulted in substantial harm to competition in a relevant market, then you next must determine whether the restraint also benefits competition in other ways. Some of the benefits to competition can include increased output, higher quality, greater cost savings and other efficiencies. If you find that the challenged restraint does result in competitive benefits, then the burden shifts back to each plaintiff to prove that the restraint was not reasonably necessary to

achieve the benefits. If each plaintiff proves that the same benefits could have been readily achieved by other, reasonably available alternative means that create substantially less harm to competition, then they cannot be used to justify the restraint.

Authority:      Model Jury Instructions in Civil Antitrust Cases, C-8 (Am. Bar Ass'n 2016); *see also id.* at C-7; *Capital Imaging Assocs. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 543 (2d Cir. 1993).

## SECTION 1 CONSPIRACY: ELEMENT 2(b)(iii): UNREASONABLE RESTRAINT OF TRADE – BALANCING THE COMPETITIVE EFFECTS

If you find that the alleged restraint was reasonably necessary to achieve competitive benefits, then you must balance those competitive benefits against the competitive harm resulting from the same conduct.

If the competitive harm substantially outweighs the competitive benefits, then the alleged restraint is unreasonable. If the competitive harm does not substantially outweigh the competitive benefits, then the alleged restraint is not unreasonable. In conducting this analysis, you must consider the benefits and harm to competition and consumers, not just to a single competitor or group of competitors. Each plaintiff bears the burden of proving that the anticompetitive effect of DFA's alleged conduct substantially outweighs its benefits.

Authority:      Model Jury Instructions in Civil Antitrust Cases, C-9 (Am. Bar Ass'n 2016).

## SECTION 1 CONSPIRACY: ELEMENT 2(b): UNREASONABLE RESTRAINT OF TRADE – EXCLUSIVE DEALING

Each plaintiff asserts that, as part of the conspiracy he, she, or it alleges, DFA entered into full supply agreements with certain processors, which required those

processors to purchase raw milk exclusively from DFA for a period of time. DFA disputes plaintiffs' characterization of these agreements.

Exclusive dealing arrangements require a buyer of a product or service to obtain that product or service exclusively from one supplier for a period of time. From the standpoint of the buyer or seller, exclusive dealing arrangements may have potential procompetitive effects that benefit consumers and that need to be weighed against the potential anticompetitive effect of foreclosing competing suppliers' access to the buyer and the buyer's access to competing suppliers' products and services.

If you determine that DFA entered into exclusive supply agreements with certain processors, then, in determining whether DFA's supply agreements with those processors had a substantially harmful effect on competition in a relevant market, you should consider the nature and history of the use of full supply agreements in the dairy industry, whether buyers have independent reasons for entering into full supply agreements or were coerced into entering into them, whether other competing suppliers also offer full supply agreements, the extent of competition among competing suppliers for full supply agreements with buyers, DFA's position in the marketplace, the competitive alternatives to DFA's products or services, the reasons DFA and processors entered into the full supply agreements at issue, and the effect of the use of the full supply agreements on the ability of other competing buyers to enter the market and on price and other competition in the market for buyers of raw milk.

By considering all of these factors, you should determine whether the exclusive dealing contracts adversely affected the premiums paid by buyers, output, or quality of raw milk in the relevant market. Where a restraint does not adversely affect price, output, or quality, it is unlikely to substantially harm competition between buyers for the relevant product.

Authority:    Model Jury Instructions in Civil Antitrust Cases, D-71, D-73 (Am. Bar Ass'n 2016) (modified instruction).

## SECTION 1 CONSPIRACY: ELEMENT 2(b): UNREASONABLE RESTRAINT OF TRADE – JOINT VENTURES

Each plaintiff also alleges that DFA entered into agreements with other cooperatives that affected raw milk premiums that farmers received. DFA disputes each plaintiff's characterization of the evidence. DFA contends it operated DMS as a joint venture with several other cooperatives during the relevant period of this case, and that this joint venture—including any agreement reached pursuant to it—was lawful.

The antitrust laws treat agreements relating to price that are part of an integration of the assets or resources of two or more businesses—which is sometimes known as a joint venture—differently than naked agreements on price. Naked agreements on price are simply agreements on the price that two separate companies will charge for their products, and those agreements are always unlawful outside of the context of agricultural cooperatives. On the other hand, where two companies combine substantial portions of their businesses, an agreement on the price to be charged can be a natural aspect of the business integration. The law recognizes that these business integrations often have positive effects on competition and can provide benefits to consumers.

If you conclude that there was an agreement between DFA and other cooperatives, you should assess whether that agreement was part of an integration of the cooperatives' assets and resources for a purpose other than merely to suppress farmer pay premiums.  In making this determination, you should first assess whether DFA and those cooperatives have combined their assets or resources and whether that business integration was designed to achieve competitive benefits, such as creating a new product or service, generating efficiencies that the cooperatives would not have been able to achieve independently, or providing some other benefit to competition or farmers. The mere coordination of decisions on price, output, customers, territories, and the like is not an integration of assets or resources. Cost savings alone, without an integration of assets or resources, are not proof of a procompetitive benefit.

If you conclude that there was an integration of assets or resources, you should next assess whether the alleged agreement was reasonably necessary to achieve the competitive

benefits of the business integration.  If the alleged agreement was reasonably necessary to achieve the competitive benefits of the business integration, then you should conclude that the alleged agreement was part of an integration of the companies' assets or resources, and you should assess whether that agreement results in an adverse effect on competition that outweighs any procompetitive benefit.

Authority:    Model Jury Instructions in Civil Antitrust Cases, B-27 (Am. Bar Ass'n 2016) (modified instruction).

## SECTION 1: EFFECT ON INTERSTATE COMMERCE

The Sherman Act applies only to conduct or restraints that affect interstate or foreign commerce. The term "interstate commerce" refers to business transacted across state lines.

In this case, Plaintiffs contend that Defendants' conduct and the challenged restraints affect interstate commerce. It is not necessary that Defendants' conduct or restraint occur in multiple states. It is enough if some of Defendants' activities that were affected by the conduct or restraint have some effect on interstate commerce.

## SHERMAN ACT SECTION 2: MONOPSONIZATION – ELEMENTS

Plaintiffs allege that they were injured by Defendants' unlawful monopsonization of the raw Grade A milk market in Order 1 in violation of Section 2 of the Sherman Act. As I explained earlier, a monopsony exists where a single buyer substantially controls the market as the primary purchaser of products offered by sellers. Here, a monopsony may exist if the purchasers of raw Grade A milk exert unlawful control over where farmers can either sell their milk or the price at which they can sell it. A Section 2 violation is legally distinct from a violation of Section 1; however, a monopsony is a type of restraint of trade under Section 1.

To prevail on this claim, each Plaintiff must prove each of the following elements by a preponderance of the evidence:

(1)    the alleged market is a valid antitrust market;

(2)     Defendants possessed monopsony power in that market;

(3)     Defendants willfully acquired or maintained monopsony power in that market by engaging in anticompetitive conduct;

(4)     Defendants' conduct occurred in or affected interstate commerce; and

(5)     Plaintiffs were injured in their business or property because of Defendants' anticompetitive conduct.

I will explain each of these elements in more detail.

If you find that Plaintiffs failed to prove any of these elements, then you must find for Defendants and against Plaintiffs on this claim. If you find that Plaintiffs have proved each of these elements by a preponderance of the evidence, then you must find for Plaintiffs and against Defendants on this claim.

### SECTION 2: MONOPSONIZATION – RELEVANT MARKET

Plaintiffs must prove by a preponderance of the evidence that Defendants had monopsony power in a relevant market. Defining the relevant market is essential because you are required to make a judgment about whether Defendants have monopsony power in a properly defined economic market. To make this judgment, you must be able to determine what, if any, economic forces restrain Defendants' freedom to set prices in the relevant product market. The most likely and most important restraining force will be actual and potential competition from other firms and their products. This includes all firms and products that act or likely could act as restraints on Defendants' power to exclude competition or set prices as it pleases because sellers could switch if Defendants set the prices too low. All the firms and products that exert such restraining force are within what is called the relevant market.

I instruct you that in this case, the relevant product market is conventional raw Grade A milk and the relevant geographic market is Federal Milk Marketing Order 1.

### SECTION 2: MONOPSONIZATION – MONOPSONY POWER

To prove their monopsonization claim, Plaintiffs must prove that Defendants have monopsony power in a relevant antitrust market. Monopsony power is the power to control prices or exclude competition in a relevant antitrust market as the purchaser of products. More precisely, a firm is a monopsonist if it can exert control over or reduce the

22

price for the sale of a goods, here, conventional raw Grade A milk, from a seller or sellers, here, the farmers. Possession of monopsony power, in and of itself, is not unlawful.

## SECTION 2: MONOPSONIZATION – DIRECT AND INDIRECT PROOF OF MONOPSONY POWER

You must determine whether Defendants have monopsony power in the relevant market. As I instructed you earlier, a monopsony is to the buy side of the market what a monopoly is to the sell side of the market. Monopsony power is the power to control prices or exclude competition in a relevant antitrust market. More precisely, a firm is a monopsonist if it can profitably lower or maintain prices for a significant period of time, below competitive levels.

There are two ways that Plaintiffs may show Defendants possessed monopsony power in the relevant market: the first is through "direct" proof and the second is through "indirect" proof. Under the direct method, Plaintiffs can meet their burden by showing that Defendants have the ability to reduce or control the price of conventional raw Grade A milk or otherwise reduce competition in the relevant market. Plaintiffs must prove that Defendants have the power to do so by itself or with its coconspirators. Plaintiffs must also prove that Defendants have the power to reduce or control prices below a competitive level for a significant period of time. If Defendants would lose too much business to other competitors that it would become unprofitable to continue excluding competition or reducing prices, then Defendants do not have monopsony power.

Under the second method of proving monopsony power, the indirect method, Plaintiffs have introduced evidence of the structure of the market to show that Defendants have monopsony power. The evidence presented by the parties includes evidence of Defendants' market share, barriers to entry, history of plant closures, and market share trends. If this evidence establishes that Defendants have the power to control prices or exclude competition in the relevant market, then you may conclude that Defendants have monopsony power in the market.

The first factor you should consider is Defendants' share of the relevant market. Based on the evidence that you have heard about Defendants' market share, you should determine Defendants' market share as a percentage of sales of raw Grade A milk in the relevant market. Defendants must have a significant share of the market in order to possess monopsony power. The higher the company's share, the higher the likelihood that a company has monopsony power.

In evaluating whether the percentage of market share supports a finding of monopsony power, you also should consider other aspects of the relevant market, including barriers to entry, market share trends, the number and size of competitors. Along with Defendants' market share, these factors should inform you as to whether Defendants have monopsony power.

A market share below 50 percent is ordinarily not sufficient to support a conclusion that a defendant has monopsony power. However, if you find that the other evidence demonstrates that Defendants do, in fact, have monopsony power despite having a market share below 50 percent, you may conclude that Defendants have monopsony power.

The trend in Defendants' market share is also something you may consider. An increasing market share may strengthen an inference that a company has monopsony power, particularly where that company has a high market share.

You may also consider whether there are barriers to entry into the relevant market. Barriers to entry make it difficult for new competitors to enter the relevant market in a meaningful and timely way. Barriers to entry might include the large financial investment required to build a plant or satisfy governmental regulations. Evidence of low or no entry barriers may be evidence that Defendants do not have monopsony power, regardless of Defendants' market share, because new competitors could enter easily if Defendants attempted to reduce prices for a substantial period of time. By contrast, evidence of high barriers to entry along with high market share may support an inference that Defendants have monopsony power.

The history of entry and exit into the relevant market may be helpful to consider. Entry of new competitors or expansion of existing competitors may be evidence that Defendants lack monopsony power. On the other hand, departures from the market, or the failure of firms to enter the market, may support an inference that Defendants have monopsony power.

If you find that Defendants have monopsony power in the relevant market, then you must consider the remaining elements of this claim.

## SECTION 2: MONOPSONIZATION – WILLFUL ACQUISITION OR MAINTENANCE OF MONOPSONY POWER

The next element Plaintiffs must prove is that Defendants willfully acquired or maintained monopsony power through anticompetitive or predatory acts or practices. Anticompetitive acts are acts or practices, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating or foreclosing the efforts of other companies to compete for customers within the relevant market. Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition.

Mere possession of monopsony power, if lawfully acquired, does not violate the antitrust laws. A company with monopsony power may compete aggressively without violating the antitrust laws. Conduct only becomes unlawful where it involves anticompetitive acts. All companies have a desire to increase their profits and increase their market share. These goals are an essential part of a competitive marketplace, and the antitrust laws do not make these goals—or the achievement of these goals—unlawful, as long as the company does not use anticompetitive means to achieve these goals.

In determining whether Defendants' conduct was anticompetitive or whether it was legitimate business conduct, you should determine whether the conduct is consistent with competition on the merits, whether the conduct provides benefits to consumers, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors.

25

The acts or practices that result in the acquisition or maintenance of monopsony power must represent more than the conduct of business that is part of that normal competitive process or commercial success. They must represent conduct that has made it very difficult or impossible for competitors to compete and that was taken for no legitimate business reason. You may not find that a company willfully acquired or maintained monopsony power through anticompetitive means if it has acquired or maintained that power solely through the exercise of superior foresight and skill.

If you find that Plaintiffs have proven by a preponderance of the evidence that Defendants willfully acquired or maintained monopsony power through anticompetitive acts, then you must consider whether plaintiffs have proved the remaining elements of this claim.

## SECTION 2: MONOPSONIZATION – ANTICOMPETITIVE CONDUCT

One of the elements Plaintiffs must prove to prevail on their monopsonization claim is that Defendants engaged in anticompetitive or predatory conduct. Plaintiffs claim that this element is satisfied in this case because Defendants acquired and/or maintained monopsony power through predatory means by entering into or otherwise agreeing with other cooperatives and processors not to compete for farmers' milk. Plaintiffs also claim that Defendants coerced farmers to market their milk through DMS and/or join DFA.

## SECTION 2: MONOPSONIZATION: ELEMENT 3 – WILLFUL ACQUISITION OR MAINTENANCE OF MONOPSONY POWER THROUGH ANTICOMPETITIVE CONDUCT (REFUSAL TO DEAL)

As I have told you, one of the elements each plaintiff must prove is that DFA engaged in anticompetitive conduct. Each plaintiff claims that this element is satisfied in this case because DFA unlawfully refused to deal with itself or another plaintiff, competitors of DFA.

Ordinarily, a company may deal or refuse to deal with whomever it pleases, so long as it acts independently. Even a company with monopsony power in the relevant market has no general duty to cooperate with its business rivals and ordinarily may refuse to deal with them.

Considering all of the facts and circumstances, you must decide whether DFA's refusal to deal was motivated solely by an anticompetitive intent. A refusal to deal with a competitor constitutes anticompetitive conduct only where the refusal is contrary to the short-run best interest of DFA or its farmer-members, and where it makes sense for DFA or its farmer-members only because it harms competitors in the purchase of raw milk and helps DFA achieve or maintain monopsony power in that market in the long run.

DFA has introduced evidence that its refusal to deal with certain independent farmers and cooperatives was based on legitimate business purposes. A refusal to deal that is based in part on legitimate business reasons does not violate the antitrust laws, even if it is also motivated by a desire to harm competitors or does in fact harm competitors. In general, the desire to maintain monopsony power or to block entry of competitors is not a legitimate business purpose. A legitimate business purpose is one that benefits DFA regardless of any harmful effects on competitors, such as a purpose to promote efficiency, quality, offer a better product or service, or increase short-term profits. In other words, if the refusal to deal results in short-term or long-term benefits to DFA or its farmer-members—such as more profits, reduction of costs, a higher market share, or avoiding the loss of customers—then it is not anticompetitive, and you must find for DFA on this element. On the other hand, if the refusal to deal hurts DFA in the short-term and is undertaken only because DFA expects it to harm competitors and enhance its monopsony power in the long run, then you may conclude that it constitutes anticompetitive conduct.

Authority:    Model Jury Instructions in Civil Antitrust Cases, B-129 (Am. Bar Ass'n 2016).

## SECTION 2: ATTEMPT TO MONOPSONIZE – ELEMENTS

Plaintiffs also allege that they were injured by Defendants' unlawful attempt to monopsonize the market for raw Grade A milk in Order 1. To prevail on their claim of

attempted monopsonization, Plaintiffs must prove each of the following elements by a preponderance of the evidence:

(1)    Defendants engaged in predatory or anticompetitive conduct;

(2)    Defendants had a specific intent to achieve monopsony power in a relevant market;

(3)    there was a dangerous probability that Defendants would achieve their goal of monopsony power in the relevant market;

(4)    Defendants' conduct occurred in or affected interstate commerce; and

(5)    Plaintiffs were injured in their business by Defendants' anticompetitive conduct.

If you find that the evidence is sufficient to prove all five elements, then you must find for Plaintiffs on their claim for attempted monopsonization. I will explain these elements in more detail.

## SECTION 2: ATTEMPT TO MONOPSONIZE – ANTICOMPETITIVE CONDUCT

To establish the first element of their attempted monopsony claim, it is not sufficient for Plaintiffs to prove that Defendants intended to monopsonize the relevant market. Plaintiffs must also show that Defendants engaged in predatory conduct, coupled with an intent to monopsonize and a dangerous probability that Defendants would succeed.

## SECTION 2: ATTEMPT TO MONOPSONIZE – SPECIFIC INTENT

The second element that Plaintiffs must prove is that Defendants had a specific intent to monopsonize in a relevant market. In other words, you must decide if the evidence shows the Defendants acted with the conscious aim of acquiring the power to control prices or to exclude or destroy competition in the relevant market.

There are several ways in which Plaintiffs may prove Defendants had the specific intent to monopsonize. There may be evidence of direct statements of Defendants' intent to obtain a monopsony in the relevant market. Specific intent may also be inferred from what Defendants did. For example, if the evidence shows that Defendants lacked a legitimate business justification for their conduct in the relevant market and the natural

and probable consequence of that was to give Defendants control over prices or to exclude competition, and this was plainly foreseeable by Defendants, then you may (but are not required to) infer Defendants specifically intended to acquire monopsony power.

## SECTION 2: ATTEMPT TO MONOPSONIZE – DANGEROUS PROBABILITY OF SUCCESS

You also must determine if the evidence shows that there was a dangerous probability that Defendants would succeed in achieving monopsony power if they continued to engage in the same or similar conduct.

In making this determination, you should consider such factors as:

- Defendants' market share;

- the trend in Defendants' market share;

- whether the barriers to entry into the market made it difficult for competitors to enter the market; and

- the likely effect of any anticompetitive conduct on Defendants' share of the market.

Again, the purpose of looking at these and other factors is to determine whether there was a dangerous probability that Defendants would ultimately acquire monopsony power. A dangerous probability of success need not mean that success was nearly certain, but it does mean that there was a substantial and real likelihood that Defendants would ultimately acquire monopsony power.

## SECTION 2: CONSPIRACY TO MONOPSONIZE – ELEMENTS

Each plaintiff alleges that DFA conspired to monopsonize in violation of Section 2 of the Sherman Act. To prevail on this claim, each plaintiff must prove, by a preponderance of the evidence, each of the following elements:

(1)     DFA and one or more corporations or entities knowingly entered into an agreement or mutual understanding for DFA to obtain or maintain monopsony power in a relevant antitrust market;

(2)     With regard to that agreement, DFA and the other alleged coconspirator or coconspirators specifically intended that DFA would obtain or maintain monopsony power in the raw Grade A milk market in Order 1;

(3)     DFA committed an overt act in furtherance of the conspiracy;

(4)     DFA's activities occurred in or affected interstate commerce; and

(5)     Each plaintiff was injured in his, her, or its business because of the conspiracy to monopsonize.

As I instructed you earlier, each plaintiff is required to prove that DFA possessed monopsony power in the relevant market. In considering each plaintiff's claim for conspiracy to monopsonize, you may consider the aggregate market share of the coconspirators in evaluating the likely effects of an alleged conspiracy. However, you may not aggregate the market share of the coconspirators for purposes of determining whether DFA has monopsony power, in terms of the monopsony power element of this or any claim.

If you find that the evidence is sufficient to prove each element, then you must find for that plaintiff and against DFA on that plaintiff' conspiracy to monopsonize claim. If you find that the evidence is not sufficient to prove each element by a preponderance of the evidence, then you must find for DFA.

Authority:     Model Jury Instructions in Civil Antitrust Cases, E-167 (Am. Bar Ass'n 2016) (modified instruction pursuant to the Court's direction to the parties at the August 10, 2020 charge conference).

## SECTION 2: CONSPIRACY TO MONOPSONIZE – SPECIFIC INTENT

If you determine that there was an agreement among Defendants and their coconspirators to monopsonize in the raw Grade A milk market in Order 1, you must then decide, as to each Defendant, whether Plaintiffs have proven that Defendants specifically intended that the members of the conspiracy would acquire or maintain monopsony power in the raw Grade A milk market in Order 1. In other words, you must decide whether the evidence shows that Defendants entered into agreements with the conscious aim of using anticompetitive conduct to acquire or maintain the power to control prices or exclude competition. It is not essential that Plaintiffs prove the use of the power to exclude or the actual exclusion of existing or potential competitors.

There are several ways in which Plaintiffs may prove that Defendants had the specific intent to monopsonize. There may be evidence of direct statements of Defendants' intent to use anticompetitive means to acquire monopsony power in the market.

Specific intent may also be inferred from what Defendants did. For example, if the evidence shows that the natural and probable consequence of the agreement or of the conduct of the parties to the agreement was to exclude or destroy competition in the raw Grade A milk market in Order 1, that there was no legitimate business justification but the destruction or damage to competition, and that this was plainly foreseeable by Defendants, then you may (but are not require to) infer that Defendants specifically intended to acquire monopsony power by using anticompetitive conduct.

In determining whether each Defendant has a specific intent to monopsonize, you should take into consideration the extent of competition Defendants would face from buyers of identical or equivalent goods and whether they had or probably could have acquired sufficient power, acting together as a group, to control prices in and to exclude competition in the relevant market. If you find that it is unlikely that Defendants could have achieved the power to exclude competition, then you may consider this as circumstantial evidence that Defendants did not have the required specific intent to monopsonize.

## SECTION 1 AND SECTION 2: INJURY AND CAUSATION

If you find that Defendants' conduct violated either Section 1 or Section 2 of the Sherman Act, then you must decide if each Plaintiff was injured by that conduct. Each Plaintiff is entitled to recover damages for an injury to his or her business if he or she can establish three elements of injury and causation:

(1)    The Plaintiff was in fact injured as a result of Defendants' violation of the antitrust laws;

(2)    Defendants' illegal conduct was a material cause of the Plaintiff's injury; and

(3)    The Plaintiff's injury is an injury of the type that the antitrust laws were intended to prevent.

In order to establish "injury in fact," it must be established that the Plaintiff was injured as a result of Defendants' violation of the antitrust laws. Proving the fact of damage does not require a Plaintiff to prove the dollar value of his or her injury. It requires only that it be established that the Plaintiff in fact suffered an injury as a result of Defendants' antitrust violation. If you find that a Plaintiff has established that it was in fact injured, you may consider the amount of that Plaintiff's damages.

Each Plaintiff must also establish by a preponderance of the evidence that Defendants' conduct was a material cause of his or her injury. This means that some damage occurred to that Plaintiff as a result of Defendants' antitrust violation, and not some other cause. It is not required that Defendants' antitrust violation be the sole cause of the Plaintiff's injury, nor do all other possible causes of injury need to be eliminated. It is enough if the Plaintiff proves that the antitrust violation was a material cause of its injury.

Each Plaintiff must also establish that its injury was the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If a Plaintiff's injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm producers, then that Plaintiff's injuries are antitrust injuries. In establishing antitrust injury, Plaintiffs can rely on the aggregate effect of the alleged conspiracy.

## STATUTE OF LIMITATIONS

The statute of limitations for the Sherman Act does not permit recovery of damages for any injuries sustained by any of the Plaintiffs prior to October 8, 2005. In deciding whether Defendants' conduct caused a Plaintiff's injury in fact, you may only consider overt acts taken by Defendants after October 8, 2005. Agreements that Defendants entered into prior to October 8, 2005 cannot be the cause of an injury in fact for which any Plaintiff may recover damages in this case. You may only find that a Plaintiff was, in fact, injured by an alleged antitrust violation if you find Defendants' actions after October 8, 2005 injured that Plaintiff.

# CAPPER-VOLSTEAD ACT[2]

## Preface To DFA's Two Proposed Alternative Instructions:

DFA respectfully objects to the Court's current contemplated placement of this Instruction regarding the Capper-Volstead Act, to the extent that the Court still intends for it to follow instructions on the elements of plaintiffs' Sherman Act claims that are given without regard to plaintiffs' burden on those elements if DFA is found to be a qualified Capper-Volstead Act cooperative.

There is no dispute that the analysis of the necessary elements of plaintiffs' claims will differ if DFA qualifies as a Capper-Volstead protected entity. That is because, in the context of this case, the Capper-Volstead Act does not operate in the manner of a classic affirmative defense, because everyone agrees that it does not provide complete immunity to any legal claim that any plaintiff has asserted against DFA. However, if DFA qualifies as a Capper-Volstead protected entity, it does affect the type of conduct upon which a jury can rely to find that a plaintiff has met its burden to prove a Section 1 or Section 2 violation. Specifically, some collective action (in particular, collective marketing, price-setting, and processing) is not actionable when undertaken by an entity that qualifies under the Capper-Volstead Act. Moreover, as the Court has recognized, if DFA qualifies as a Capper-Volstead protected entity, only predatory conduct by DFA—as opposed to conduct that is merely anticompetitive—may suffice to establish Section 2 liability. *See generally* Op. & Or. Granting in Part & Denying in Part Defs' Mot. for Summ. J. at 34, Sept. 27, 2019, ECF No. 130 (noting that the Capper-Volstead Act does not extend immunity to a cooperative who acquires or exercises monopsony power in a predatory fashion) (citing *Fairdale Farms v. Yankee Milk*, 635 F.2d 1037, 1044 (2d Cir. 1980)).  Further, if DFA is found to qualify for Capper-Volstead Act protections, the existence, nature, and purpose of the Capper-Volstead Act provides important context for the jury's evaluation of the evidence.

---

[2]    DFA requests the opportunity to further amend its proposed Capper-Volstead Act instruction, offered herein, in the event the Court agrees that this Instruction should precede its instructions on the substantive elements of plaintiffs' Sherman Act claims.

For this reason, DFA maintains that the best and most efficient course is for the Court to instruct the jury regarding the existence and requirements of the Capper-Volstead Act—and its potential impact on the remaining claims in the case—at the outset of the jury instructions. This Instruction should follow the summary of plaintiffs' claims, but precede the Court's substantive instructions on Section 1 or Section 2 of the Sherman Act. Any other approach risks unduly confusing the jury and prejudicing DFA.

The Court's currently contemplated order of jury instructions implies that the jury would have to analyze each of the plaintiffs' claims under one set of instructions for both Section 1 and Section 2, without considering any potential ramifications of the Capper-Volstead Act, and to form a view about each claim essentially with blinders on. If and only if the jury concludes that some plaintiff has satisfied his, her, or its burden under that first set of instructions, the jury would then go on to consider whether DFA is a Capper-Volstead protected entity. However, if the jury finds that DFA is Capper-Volstead protected, then the jury would have to be instructed to go back and reconsider whether each plaintiff has still met his, her, or its burden for Section 1 and/or Section 2 liability under an entirely different set of instructions. Placing all the Capper-Volstead Act instructions after the end of the instructions relating to plaintiffs' liability elements would thus require the jury to have to do everything twice, and would force it to waste considerable time debating the implications of some DFA conduct that would not be actionable if the jury finds that it is a qualifying cooperative. That order and burden on the jury would severely, unduly, and disproportionately prejudice DFA and no reasonable jury could be expected to keep all of this straight.

For these reasons, DFA proposes two alternative instructions. The first would apply if the Court determines that the better course is to instruct on the Capper-Volstead Act before the instructions about the merits of plaintiffs' claims. The second would apply if the Court (over DFA's continuing objection) concludes that the jury can only be instructed on Capper-Volstead at the end.

* * *

## DFA'S PROPOSED CAPPER-VOLSTEAD ACT INSTRUCTION – TO FOLLOW THE SUMMARY OF PLAINTIFFS' CLAIMS AND TO PRECEDE ANY SUBSTANTIVE INSTRUCTION ON SECTION 1 OR SECTION 2 OF THE SHERMAN ACT:

The defendant in this case, DFA, is a cooperative of dairy farmers who jointly market, and in some instances jointly process, the raw milk produced on their farms. As in other agricultural industries, dairy cooperatives, including DFA, join common marketing agencies, through which multiple cooperatives jointly market raw milk. These activities are generally exempted from the application of the U.S. antitrust laws under federal laws, including the Capper-Volstead Act and Section Six of the Clayton Act.

In this case, the Capper-Volstead Act is a partial affirmative defense. The fact that it is an affirmative defense means it is something that the defendant, rather than the plaintiff, has the burden of proving. Here, that means that DFA has the burden of proving, by a preponderance of the evidence, that it qualifies as a cooperative under the Capper-Volstead Act. There are four main requirements that a cooperative like DFA must meet in order to qualify as the type of entity entitled to the antitrust protections afforded by that law. I will explain those four requirements now.

First, the cooperative must limit its membership to persons engaged in the production of agricultural products (in this case, milk). This means that all of DFA's voting members must be dairy farmers engaged in the production of raw milk. The fact that DFA itself owns processing plants does not defeat this requirement, so long as no non-farming processors are themselves DFA members.

Second, the cooperative must not deal in the products of non-members to an amount greater in value than such as are handled by it for members. If DFA shows that the value of its annual business done with or on behalf of its members exceeds the value of its annual business done with or on behalf of non-members, this requirement has been satisfied.

35

Third, either (a) no member of the cooperative may be allowed more than one vote because of the amount of stock or membership capital he may own, or (b) the cooperative may not pay dividends on stock or membership capital in excess of 8% per annum.

And fourth, a cooperative must be operated for the mutual benefit of the members thereof, as such producers. The key word in this provision is "mutual." This requirement is designed to ensure that all of DFA's farmer-members share in the benefits and burdens of owning the cooperative. Evidence that DFA's farmer-members all participate in the results of the cooperative and mutually share in the highs and lows of DFA's ownership— the profits and the losses of it—is evidence that DFA is operated for the mutual benefit of its members. This does not mean that all members must equally benefit from any decision by DFA, that every decision by DFA must benefit every member, or that every member must agree with every decision made by DFA's farmer board of directors or DFA's management. It is enough that all of DFA's members mutually obtain, or share in, the returns (and expenses) that arise from DFA's collective processing, handling and marketing of their products (here, raw milk).

If you find that DFA has proved each of these four elements, it qualifies as a Capper-Volstead protected entity.

If you find that DFA qualifies as a Capper-Volstead protected entity, that does not mean that it is exempt or immune from the antitrust laws altogether. But it does mean that certain types of conduct by DFA are to be exempted from liability under the antitrust laws and you cannot rely upon them to find that any plaintiff has met his, her, or its burden of proof on any claim.

For example, the Capper-Volstead Act makes clear that among the authorized activities of a cooperative are to process, market, handle, and prepare for market its members' and other farmers' milk.  Capper-Volstead qualified cooperatives are also permitted to form marketing agencies in common with other cooperatives to market raw milk and to enter into agreements to effect these purposes.  Thus, you cannot rely on any of the following conduct to conclude that any plaintiff has met his, her, or its burden of proof, and you should not draw any adverse inference against DFA and the cooperatives

36

with which it has marketing agencies for engaging in the following conduct:  (1) DFA's ownership or operation of plants to process its and other farmers' raw milk, (2) DFA's entry into marketing agencies in common for the purpose of marketing raw milk, and (3) any contracts or agreements that DFA entered into to that are necessary to effect such legitimate purposes

I will explain below how the Capper-Volstead Act affects your analysis of each plaintiff's claims in the event that you find that DFA qualifies as a Capper-Volstead protected entity.

\* \* \*

*DFA also requests that the Court insert the following language at the conclusion of the Instruction regarding "**SECTION 1: EXISTENCE OF A CONSPIRACY**":*

If, under my previous instruction, you conclude that DFA has met its burden to show that it qualifies as a Capper-Volstead protected entity, I further instruct you as follows:

First, it is not an antitrust violation for cooperatives to own and operate processing plants. It also is not an antitrust violation for farmers who might otherwise compete directly against each other when selling their raw milk, to come together to form cooperatives and other marketing agencies in common for the purpose of jointly bringing their products to market.

Furthermore, a Capper-Volstead protected cooperative may lawfully perform for its farmer-members the tasks necessary to process, prepare for market, handle, and market the raw milk produced on its members' farms—and it may make any agreements necessary to accomplish those legitimate purposes. This means that in marketing the milk of its members, a dairy cooperative may lawfully fix the prices at which the milk will be sold. A cooperative is also permitted to work together with other cooperatives to price their farmers' products and to figure out how best to handle (get to market) those products in this same way. These cooperatives may agree among themselves on prices they will charge

37

for their products, may allocate territories among themselves, and may make any necessary agreements among themselves to further the legitimate purposes of jointly marketing their farmers' products, even though the antitrust laws may forbid other types of organizations from combining together in similar conduct.

In sum, you may not rely on any of the following conduct to conclude that any plaintiff has met his, her, or its burden of proof to show a violation of Section 1: (1) DFA's ownership or operation of plants to process its and other farmers' raw milk, (2) DFA's entry into marketing agencies in common for the purpose of marketing raw milk, and (3) any contracts or agreements that DFA entered into to effect such purposes.

* * *

*DFA also requests that the Court insert the following language at the conclusion of the Instructions regarding* "**SECTION 2: MONOPSONIZATION – WILLFUL ACQUISITION OR MAINTENANCE OF MONOPSONY POWER**", "**SECTION 2: ATTEMPT TO MONOPSONIZE – ANTICOMPETITIVE CONDUCT**", *and* "**SECTION 2: CONSPIRACY TO MONOPSONIZE – SPECIFIC INTENT**":

If, under my previous instruction, you conclude that DFA has met its burden to show that it qualifies as a Capper-Volstead protected entity, I further instruct you as follows:

The Capper-Volstead Act limits the type of anticompetitive acts you can rely upon to determine whether DFA willfully acquired or maintained monopsony power, attempted to obtain a monopsony, or conspired to obtain a monopsony. That is for the following reason: the Capper-Volstead Act permits the formation of cooperatives and places no limitation on their size. As the cooperative grows, so, normally, does its power within the market, which is perfectly lawful. The Capper-Volstead Act also gives farmers the right to combine into cooperative monopolies, including obtaining up to 100% market share.

If you decide that DFA has met its burden to show that it is a Capper-Volstead protected cooperative, each plaintiff is required to prove that DFA acquired or maintained

38

its monopsony power through predatory—not simply anticompetitive—acts. Predatory acts include only those that excluded or destroyed competition from other buyers of raw milk, and do not include conduct that DFA is lawfully permitted to engage in under the Capper-Volstead Act. For example, DFA cannot be found liable for monopsony power that results from acts such as the voluntary formation, growth. and combination of agricultural cooperatives, or from its ownership or operation of processing plants, but only for the acquisition of monopsony power by other, predatory means that exclude competition between buyers of raw milk.

* * *

## DFA'S ALTERNATIVE PROPOSED CAPPER-VOLSTEAD ACT INSTRUCTION – TO FOLLOW THE INSTRUCTION REGARDING "INJURY AND CAUSATION":

As I have instructed you, DFA is a cooperative of dairy farmers who jointly market, and in some instances jointly process, the raw milk produced on their farms. As in other agricultural industries, dairy farmers and dairy cooperatives, including DFA, join together in common marketing agencies, through which multiple farmers and cooperatives jointly market raw milk. These activities are generally exempted from the application of the U.S. antitrust laws under federal laws, including the Capper-Volstead Act and Section Six of the Clayton Act.

In this case, the Capper-Volstead Act is a partial affirmative defense.  The fact that it is an affirmative defense means it is something that the defendant, rather than the plaintiff, has the burden of proving. Here, that means that DFA has the burden of proving, by a preponderance of the evidence, that it qualifies as a cooperative under the Capper-Volstead Act. There are four main requirements that a cooperative like DFA must meet in order to qualify as the type of entity entitled to the antitrust protections afforded by that law. I will explain those four requirements now.

39

First, the cooperative must limit its membership to persons engaged in the production of agricultural products (in this case, milk). This means that all of DFA's voting members must be dairy farmers engaged in the production of raw milk. The fact that DFA itself owns processing plants does not defeat this requirement, so long as no non-farming processors are themselves DFA members.

Second, the cooperative must not deal in the products of non-members to an amount greater in value than such as are handled by it for members. If DFA shows that the value of its annual business done with or on behalf of its members exceeds the value of its annual business done with or on behalf of non-members, this requirement has been satisfied.

Third, either (a) no member of the cooperative may be allowed more than one vote because of the amount of stock or membership capital he may own, or (b) the cooperative may not pay dividends on stock or membership capital in excess of 8% per annum.

And fourth, a cooperative must be operated for the mutual benefit of the members thereof, as such producers. The key word in this provision is "mutual." This requirement is designed to ensure that all of DFA's farmer-members share in the benefits and burdens of owning the cooperative. Evidence that DFA's farmer-members all participate in the results of the cooperative and mutually share in the highs and lows of DFA's ownership—the profits and the losses of it—is evidence that DFA is operated for the mutual benefit of its members. This does not mean that all members must equally benefit from any decision by DFA, that every decision by DFA must benefit every member, or that every member must agree with every decision made by DFA's farmer board of directors or DFA's management. It is enough that all of DFA's members mutually obtain, or share in, the returns (and expenses) that arise from DFA's collective processing, handling, and marketing of their products (here, raw milk).

If you find that DFA has proved each of these four elements, it qualifies as a Capper-Volstead protected entity. I will next explain to you how it affects your deliberations if you find that DFA qualifies as a Capper-Volstead cooperative.

If you find that DFA qualifies as a Capper-Volstead protected entity, that does not mean that it is exempt or immune from the antitrust laws altogether. But it does mean that

certain types of conduct by DFA are to be exempted from liability under the antitrust laws and you cannot rely upon them to find that any plaintiff has met his, her, or its burden of proof on any claim.

For example, the Capper-Volstead Act makes clear that among the authorized activities of a cooperative are to process, market, handle, and prepare for market its members' and other farmers' milk. Capper-Volstead qualified cooperatives are also permitted to form marketing agencies in common with other cooperatives to market raw milk and to enter into agreements to effect these purposes. Thus, you cannot rely on any of the following conduct to conclude that any plaintiff has met his, her, or its burden of proof, and you should not draw any adverse inference against DFA and the cooperatives with which it has marketing agencies for engaging in the following conduct: (1) DFA's ownership or operation of plants to process its and other farmers' raw milk, (2) DFA's entry into marketing agencies in common for the purpose of marketing raw milk, and (3) any contracts or agreements that DFA entered into to effect such purposes.

If you relied on any of this type of conduct or these types of agreements in connection with your analysis of my instructions above, I instruct you to go back and reconsider each of plaintiffs' claim again based on the following new instructions for each claim:

**Section 1 Claims: Existence Of A Conspiracy**. First, each plaintiff has alleged that DFA entered into a conspiracy that unreasonably restrained trade in a relevant antitrust market. In deciding whether DFA entered into an illegal conspiracy that unreasonably restrained trade, you must consider the following, if you find that DFA qualifies as a Capper-Volstead protected entity.

First, it is not an antitrust violation for cooperatives to own and operate processing plants. It also is not an antitrust violation for farmers who might otherwise compete directly against each other when selling their raw milk, to come together to form cooperatives and other marketing agencies in common for the purpose of jointly bringing their products to market.

Furthermore, a Capper-Volstead protected cooperative may lawfully perform for its farmer-members the tasks necessary to process, prepare for market, handle, and market the raw milk produced on its members' farms—and it may make any agreements necessary to accomplish those legitimate purposes. This means that in marketing the milk of its members, a dairy cooperative may lawfully fix the prices at which the milk will be sold. A cooperative is also permitted to work together with other cooperatives to price their farmers' products and to figure out how best to handle (get to market) those products in this same way. These cooperatives may agree among themselves on prices they will charge for their products, may allocate territories among themselves, and may make any necessary agreements among themselves to further the legitimate purposes of jointly marketing their farmers' products, even though the antitrust laws may forbid other types of organizations from combining together in similar conduct.

In sum, you may not rely on any of the following conduct to conclude that any plaintiff has met his, her, or its burden of proof to show a violation of Section 1: (1) DFA's ownership or operation of plants to process its and other farmers' raw milk, (2) DFA's formation of marketing agencies in common for the purpose of marketing raw milk, and (3) any contracts or agreements that DFA entered into to effect such purposes.

If you previously relied on such conduct to conclude that DFA violated Section 1 of the Sherman Act, I instruct you to disregard that conclusion, and to consider the evidence again under the Capper-Volstead standard I have just outlined.

**Section 2 Claims:  Predatory Conduct**. Each plaintiff has also claimed that DFA has an unlawful monopsony in a relevant market, attempted to monopsonize a relevant market, and conspired to monopsonize a relevant market. If you find that DFA qualifies as a Capper-Volstead protected entity, it will also impact your analysis of these claims based on monopsony. As I have already instructed you, each of these claims ordinarily requires that each plaintiff prove that DFA engaged in anticompetitive conduct. The Capper-Volstead Act, however, limits the type of anticompetitive acts you can rely upon to determine whether DFA willfully acquired or maintained monopsony power, attempted to obtain a monopsony, or conspired to obtain a monopsony. That is for the following reason:

the Capper-Volstead Act permits the formation of cooperatives and places no limitation on their size. As the cooperative grows, so, normally, does its power within the market, which is perfectly lawful. The Capper-Volstead Act also gives farmers the right to combine into cooperative monopolies, including obtaining up to 100% market share.

If you decide that DFA has met its burden to show that it is a Capper-Volstead protected cooperative, each plaintiff is required to prove that DFA acquired or maintained its monopsony power through predatory—not simply anticompetitive—acts. Predatory acts include only those that excluded or destroyed competition from other buyers of raw milk, and do not include conduct that DFA is lawfully permitted to engage in under the Capper-Volstead Act. For example, DFA cannot be found liable for monopsony power that results from acts such as the voluntary formation, growth, and combination of agricultural cooperatives, or from its ownership or operation of processing plants, but only for the acquisition of monopsony power by other, predatory means that exclude competition between buyers of raw milk. If you find that DFA qualifies as a Capper-Volstead protected entity, you must consider these limitations in deciding each element of each plaintiff's Section 2 claims, as I have instructed you. In particular, I instruct you to disregard any previous conclusion you may have reached regarding plaintiffs' Section 2 claims that is inconsistent with this Capper-Volstead instruction.

Authority:    7 U.S.C. § 291; *see generally Case-Swayne Co., Inc. v. Sunkist Growers, Inc.*, 389 U.S. 384, 394-96 (1967); *Nat'l Broiler Mktg. Ass'n v. United States*, 436 U.S. 816, 824-25 (1978); *Fairdale Farms Inc. v. Yankee Milk Inc.*, 635 F.2d 1037, 1039-45 (2d Cir. 1980); *Bell v. Fur Breeders Agric. Coop.*, 348 F.3d 1224, 1235 (10th Cir. 2003); *In re: Processed Egg Prods. Antitrust Litig.*, 322 F. Supp. 3d 599, 600-04 (E.D. Pa. 2018); *Treasure Valley Potato Bargaining Ass'n v. Ore-Ida Foods, Inc.*, 497 F.2d 203, 213-17 (9th Cir. 1974); *Kinnett Dairies v. Dairymen Inc.*, 512 F. Supp. 608, 630-39, 643 (M.D. Ga. 1981), *aff'd,* 715 F.2d 520 (11th Cir. 1983).

## **DAMAGES GENERALLY**

If you decide in favor of Defendants, you will not consider these instructions about damages. But, if you decide for Plaintiffs, you must determine the amount of money that

will fairly compensate each Plaintiff for each item of harm that was caused by Defendants' conduct. This compensation is called "damages." The purpose of compensatory damages is to put an injured Plaintiff in a position as close as possible to that which he or she would occupy if the violation had not occurred. They are not used to punish wrongdoers or to deter particular conduct in the future.

## BASIS FOR CALCULATING DAMAGES

You are permitted to make just and reasonable estimates in calculating Plaintiffs' damages. You are not required to calculate damages with mathematical certainty or precision. Damages may not be based on sympathy, guesswork, or speculation.

Plaintiffs need only proffer a reasonable estimate of damages. They must also prove the reasonableness of each of the assumptions upon which the damages calculation is based. If you find that Plaintiffs have provided a reasonable basis for determining damages, then you may award damages based on a just and reasonable estimate supported by the evidence.

## DAMAGES: CAUSATION AND DISAGGREGATION

If you find that DFA violated the antitrust laws and that any plaintiff was injured by that violation, each such plaintiff is entitled to recover for the injury that was the direct result or likely consequence of the unlawful acts of DFA. Each plaintiff bears the burden of showing that his, her, or its injuries were caused by DFA's alleged violations, as opposed to any other factors. If you find that a plaintiff's alleged injuries were caused in part by DFA's alleged violation and in part by other factors, then you may award damages only for that portion of plaintiff's alleged injuries that was caused by DFA's alleged violation.

Each plaintiff claims that he, she, or it suffered injury because he, she, or it received lower pay premiums for the raw milk he, she, or it sold than he, she, or it would have received had the alleged violation not occurred. DFA contends that any decrease any plaintiff experienced in pay premiums was caused by market factors for which DFA cannot be held liable. No plaintiff is entitled to recover for changes in premiums that resulted solely from other causes, including supply and demand cycles in the dairy industry, conditions specific to that plaintiff's dairy farm, or changes arising from the normal course

of business activity or external market forces. The presence of these factors does not negate the possibility that each plaintiff suffered antitrust injury, but no plaintiff is entitled to recover for damages caused by such external market forces or arising from the normal course of business activity. Each plaintiff only may recover for damages caused to him, her, or it by the alleged antitrust violation.

Each plaintiff bears the burden of proving damages by a preponderance of the evidence, including apportioning damages between lawful and unlawful causes. If you find that any plaintiff was injured by DFA's alleged violation, and there is a reasonable basis to apportion that plaintiff's alleged injury between lawful and unlawful causes, then you may award damages apportioned to unlawful causes for any such plaintiffs.

If you find that any plaintiff's alleged injuries were caused by factors other than DFA's alleged violation, then you must return a verdict for DFA. If you find that there is no reasonable basis to apportion any plaintiff's alleged injury between lawful and unlawful causes, or that apportionment can only be accomplished through speculation or guesswork, then you may not award any damages at all for all such plaintiffs.

Authority:    Model Jury Instructions in Civil Antitrust Cases, B-310 (Am. Bar Ass'n 2016) (modified instruction).

## JOINT AND SEVERAL LIABILITY

Each participant in a conspiracy that violates the antitrust laws is jointly and severally liable for all of the damages resulting from the conspiracy. In other words, each participant in the conspiracy is fully liable for all of the damages caused by the conspiracy.

If you find that Plaintiffs have proven the existence of a conspiracy, that Defendants participated in the conspiracy, and that Plaintiffs are entitled to recover damages, then Defendants would be liable for all damages caused by the conspiracy.

## VERDICT FORM

I will provide you with a verdict form that will guide you in making your

determinations in this action. You must fill out the verdict form in accordance with these jury instructions. If there is any conflict between the verdict form and these instructions, you must follow these instructions.

## CONCLUDING INSTRUCTIONS

## JURY DELIBERATIONS/UNANIMOUS VERDICT

The verdict must represent the considered judgment of each juror. In order to return a verdict, you must all agree. Your verdict must be unanimous.

You must consult with one another. You must try to reach an agreement if you can do so without sacrificing your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. Do not hesitate to re-examine your views and change your opinions if you are convinced they are wrong. But do not surrender your honest opinion as to the weight or effect of evidence solely because of the opinions of your fellow jurors, or for the mere purpose of returning a verdict.

If you need to communicate with me, you should send a note through the Court Officer, signed by your foreperson. You must not discuss with the court or with any other person what is said in deliberations, and any note you send to the court must not include this information. In other words, you may ask the court questions but, in doing so, you must not reveal what the jurors are thinking or saying. You must not tell anyone how the jury stands numerically or otherwise until after you have reached a unanimous verdict and you have been discharged. Even then you need not speak to anyone about this case unless you want to.

When you have reached a verdict, tell the Court Officer that you have reached a verdict, but do not tell the Court Officer what the verdict is. You will then be brought into the courtroom where I shall ask you if you have reached a verdict, and, if you have, what it is.

## JUROR NOTE TAKING

During the trial, you have been provided with pen and paper, and some of you have taken notes. As I explained at the beginning of the trial, all jurors should be given

46

equal attention during the deliberations regardless of whether or not they have taken notes. Any notes you have taken may only be used to refresh your memory during deliberations. You may not use your notes as authority to persuade your fellow jurors as to what a witness did or did not say. In your deliberations you must rely upon your collective memory of the evidence in deciding the facts of the case. If there is any difference between your memory of the evidence and your notes, you may ask that the record of the proceedings be read back. If a difference still exists, the record must prevail over your notes. I will now describe the process for a read back.

## READ BACK OF EVIDENCE

If, during your deliberations, you are unable to recall with any degree of accuracy, a particular part of the testimony, or part of these instructions, you may do the following:

1.    Write out your question, and have the foreperson sign it;

2.    Knock on the door of the jury room; and

3.    Deliver your note to the Court Officer, to give to me.

After the attorneys have been consulted, and the record has been reviewed, I shall decide what action to take. I will tell you my ruling.

## SELECTION AND DUTIES OF A FOREPERSON

I select _____ to act as your foreperson. The foreperson acts as a chairperson or moderator. It is your duty to see that discussions are carried out in a sensible and orderly manner and to see that the issues submitted for the jury's decision are fully and fairly discussed, and that every juror has a chance to say what he or she thinks upon every question. When ballots should be taken, you will see that it is done. You will act as the jury's spokesperson in the courtroom. In all other respects, the foreperson is the same as every other juror. His or her vote or opinions do not count more or less than those of his or her fellow jurors.

Ladies and gentlemen of the jury, you may now take the case and retire to begin your deliberations.

Dated at Burlington, in the District of Vermont, this ___ day of September, 2020.

_____
Christina Reiss, District Judge
United States District Court