**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF VERMONT**

| | |
|---|---|
| GARRETT SITTS, et al.,<br><br>                        **PLAINTIFFS,**<br><br>     **v.**<br><br>**DAIRY FARMERS OF AMERICA, INC.,**<br>**and DAIRY MARKETING SERVICES,**<br>**LLC,**<br><br>                  **DEFENDANTS.** | **Civil Action No. 2:16-cv-00287-cr** |

# <u>EXHIBIT A</u>

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| VICTOR BARRICK, LOGAN BOWER, MARK AND DWIGHT BRANDENBURG, THOMAS CLARK, GERRY DELONG, MARK AND BARBARA DULKIS, GLEN EAVES, RICHARD GANTNER, STEFAN AND CINDY GIEGER, SCOTT AND GAIL HYMERS, RANDY AND LYNETTE INMAN, FRANK AND JOHN LAMPORT, RUSSELL AND DIANE MAXWELL, WALT MOORE, MICHAEL NISSLY, CALVIN ROES, BRADLEY ROHRER, DONALD T. AND DONALD M. SMITH, KEN AND JUDY TOMPKINS, and MARK AND ERIC VISSER, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| DAIRY FARMERS OF AMERICA, INC., and DAIRY MARKETING SERVICES, LLC, | ) Case No. 2:16-cv-00287 ) ) |
| Defendants. | ) |

## JURY CHARGE

Members of the Jury:

Now that you have heard the evidence and the arguments, it is my duty to instruct you on the law. It is your duty to accept these instructions of law and apply them to the facts as you determine them. You are not to single out one instruction alone as stating the law, but must consider the instructions as a whole. You are not to be concerned with the wisdom of any rule of law stated by the court. Regardless of any opinion you may have as to what the law is or ought to be, it would be a violation of your sworn duty to base a verdict upon any view of the law other than that given in the instructions of the court, just as it would also be a violation of your sworn duty, as judges of the facts, to base a verdict upon anything other than the evidence presented during the trial.

The lawyers may have referred to some of the rules of law in their arguments. If any difference appears between the law as stated by the lawyers and the law as stated by the court in these instructions, you must follow the court's instructions.

Our judicial system requires you to carefully and impartially consider all of the evidence, follow the law, and reach a just verdict, regardless of the consequences.

## JURORS AS FINDERS OF FACT/RULINGS OF THE COURT

You and you alone are the triers of the facts. Each of you, as jurors, must determine the facts for yourselves in reaching a verdict. By the rulings which I made during the course of the trial, I did not intend to indicate to you or to express my own views about this case.

## SYMPATHY/PREJUDICE

Neither sympathy nor prejudice, for or against the parties, or any other person involved with this case, should influence you in any manner in reaching your verdict. Your deliberations should be well-reasoned and impartial.

## IMPORTANT CASE

This is an important case to the parties and the court. You should give it serious and fair consideration.

## ARGUMENTS/STATEMENTS/OBJECTIONS OF THE ATTORNEYS

The opening statements and closing arguments of the attorneys, their questions and objections, and all other statements that they made during the course of the trial are not evidence. The attorneys have a duty to object to evidence that they believe is not admissible. You may not hold it against either side if any attorney feels it is necessary to make an objection.

## NUMBER OF WITNESSES

The fact that one side may have called more witnesses than the other side is of no significance. Your task is to evaluate the credibility of the witnesses and to weigh all of the evidence.

## EVIDENCE IN THE CASE

The evidence in this case consists of the sworn testimony of the witnesses and the exhibits admitted into evidence, regardless of which party presented the evidence, and any evidence of which the court took judicial notice. Any evidence to which an objection was sustained or stricken by the court must be disregarded.

## EVIDENCE – DIRECT OR CIRCUMSTANTIAL

There are two types of evidence from which you may find the facts of this case: direct and circumstantial evidence. Direct evidence is the testimony of someone who asserts actual knowledge of a fact, such as an eyewitness or the exhibits in the trial. Circumstantial evidence is proof of a chain of facts and circumstances tending to prove or disprove an issue in the case.

For example, if a witness were to testify that he or she had seen cows in a field, that would be an example of direct evidence that there were cows in a field. On the other hand, if a witness were to testify that he or she had seen fresh cow tracks in the field, that would be an example of circumstantial evidence that there had been cows in the field.

The law does not require a party to prove its claims or defenses by direct evidence alone, that is, by testimony of an eyewitness. One or more of the essential elements, or all of the essential elements, may be established by reasonable inference from other facts that are established by direct testimony. Circumstantial evidence may alone be sufficient to prove a claim or defense.

The law makes no distinction between the weight to be given to direct or circumstantial evidence. Nor is a greater degree of certainty required of circumstantial evidence than of direct evidence. You should consider all the evidence in the case and give it such weight as you think it deserves.

## CREDIBILITY OF WITNESSES

You are the sole judges of the credibility of the witnesses, and the weight to give their testimony is up to you. In considering the testimony of any witness, you may take into account his or her ability and opportunity to observe; his or her demeanor while testifying; any interest or bias he or she may have; and the reasonableness of his or her testimony,

considered in light of all of the evidence in the case. Consider also any relation each witness may bear to either side of the case, any bias or prejudice, the manner in which each witness might be affected by the verdict, and the extent to which, if at all, each witness is either supported or contradicted by other evidence in the case.

Inconsistencies or discrepancies in the testimony of a witness, or between the testimony of different witnesses, may or may not cause you to discredit a witness's testimony. Two or more persons witnessing an incident or transaction may see or hear it differently. It is your duty to reconcile conflicting testimony if you can do so.

In weighing the effect of a discrepancy, consider whether it pertains to a matter of importance or to an unimportant detail, and whether the discrepancy results from innocent error or intentional falsehood.

You may give the testimony of each witness such weight, if any, you think it deserves. You may believe all of the testimony of any witness, you may believe it in part and disbelieve it in part, or you may reject it altogether. You do not have to accept the testimony of any witness, even if it is uncontradicted. It is for you to say what you will believe and what you will disbelieve.

## EXPERT WITNESSES

You have heard evidence from witnesses who are known as expert witnesses. An expert witness is a person who has special knowledge, experience, training, or education in his or her profession or area of study. Because of this expertise, an expert witness may offer an opinion about one or more of the issues in the case. In evaluating their testimony, you should evaluate their credibility and statements just as you would with any other witness. You should also evaluate whether the expert witness's opinion is supported by the facts that have been proved, and whether the opinion is supported by the witness's knowledge, experience, training, or education. You are not required to give the testimony of an expert witness any greater weight than you believe it deserves just because the witness has been referred to as an expert.

## INTEREST IN THE OUTCOME

As a general matter, in evaluating the credibility of each witness, you should take into account any evidence that the witness who testified may benefit in some way from the outcome of this case. Such an interest may create a motive to testify falsely and may sway the witness to testify in a way that advances his or her own interests. Therefore, if you find that any witness whose testimony you are considering has an interest in the outcome of this trial, then you should bear that factor in mind when evaluating the credibility of his or her testimony and accept it only with great care.

This is not to suggest that any witness who has an interest in the outcome of a case will testify falsely. It is for you to decide to what extent, if at all, the witness's interest has affected or colored his or her testimony.

## PRIOR INCONSISTENT STATEMENTS

You may find that a witness has made statements outside of this trial that are inconsistent with the statements that the witness gave here. You may consider the out-of-court statements not made under oath only to determine the credibility of the witness and not as evidence of any facts contained in the statements. As to out-of-court statements that were made under oath, such as statements made in prior testimony, you may consider them for all purposes, including for the truth of the facts contained therein.

## SPECIALIZED KNOWLEDGE AND EXPERIENCE OF JURORS

In deliberating upon your verdict, you are not expected to put aside your common sense or your own observations or experience of the general affairs of life. However, a juror having special knowledge of a subject may neither state this knowledge to fellow jurors nor act upon it himself or herself in arriving at a verdict. You must not tell your fellow jurors about matters which are based on special knowledge concerning an issue in the case that did not come from the evidence received in the courtroom.

## PREPONDERANCE OF THE EVIDENCE

To "establish by a preponderance of the evidence" means to prove that something is more likely than not. In other words, a preponderance of the evidence means such evidence that, when considered and compared with that opposed to it, has more persuasive force, and

produces in your minds a belief that what is sought to be proved is more likely true than not true. A preponderance of the evidence means the greater weight of the evidence. In determining whether a fact, claim, or defense has been proven by a preponderance of the evidence, you may consider the testimony of witnesses, regardless of who may have called them, and the exhibits in evidence, and the stipulations, regardless of who may have produced or introduced them. No proof of absolute certainty is required.

## INSTRUCTIONS ON THE SUBSTANTIVE LAW OF THE CASE

Having explained the general guidelines by which you will evaluate the evidence in this case, I will now instruct you with regard to the law that is applicable to your determinations in this case.

## PLAINTIFFS' THEORY OF THE CASE

In this case, each Plaintiff alleges claims against Defendants under a federal antitrust statute called the Sherman Act. The purpose of the Sherman Act is to preserve free competition in the marketplace. I will now briefly walk through Plaintiffs' theory of the case. I want to be clear, however, that there are two sides to the story. And I am not endorsing one side's view of the case over the other. It is your job—and yours alone—to judge the facts of the case and decide whom you believe. The Court is providing this overview *only* so that you have a better understanding of where certain evidence and factual disputes fit within the law as I am giving it to you.

Plaintiffs' theory of the case is that cooperatives and processors compete for farmers' raw milk, and this competition benefits farmers because it can lead to higher pay prices for farmers. Plaintiffs claim that Defendants, who operate as both a cooperative and milk processor, sought to restrict this competition to gain control over the milk supply in Order 1, obtain monopsony power (*i.e.*, buyer side market power), and suppress the price paid to farmers for raw milk. Plaintiffs' theory is that the Defendants suppressed raw milk prices to benefit their milk processing operations. In other words, DFA's processing operations buy raw milk to make their products (pasteurized milk, yogurt, ice cream, *etc*.) and would be more profitable when raw milk prices are lower.

Plaintiffs contend that Defendants engaged in three categories of anticompetitive conduct to eliminate competition for raw milk and suppress the prices paid to farmers. *First*, Plaintiffs claim that Defendants entered into agreements with other cooperatives not to compete for farmers' milk including: agreements not to solicit each other's members; and agreements to share farmer pay price information so that all farmers are paid the same amount and have little incentive to switch cooperatives.

*Second*, Plaintiffs contend that Defendants entered into agreements with other processors not to compete for farmer's milk. Plaintiffs claim that the Defendants used full supply and outsourcing agreements to force farmers to have to market through DMS or join DFA as a member in order to sell their milk to the processing facilities. In addition, Plaintiffs assert that these agreements gave Defendants control over both the prices paid to the independent farmers and access to the processors, further strengthening their market power and restricting competition in Order 1. Plaintiffs also claim that Defendants guaranteed the processors the lowest price for the milk (through most favored nations provisions); and paid these processors "non-compete" payments in exchange for not buying milk directly from farmers.

*Third*, Plaintiffs claim that Defendants used their market power to coerce farmers who were independent or belonged to other cooperatives to join DFA in order for them to continue to have an outlet to sell their raw milk.

It is Plaintiffs' position that the operation of DMS (which Defendants used to collectively market milk for multiple cooperatives and independent producers) constitutes an unlawful restraint of trade. Plaintiffs' theory is that common marketing agencies like DMS are only permissible if each participant qualifies for Capper Volstead immunities. Plaintiffs claim that DFA does <u>not</u> qualify for Capper Volstead immunities because DFA does not operate for the mutual benefit of its members as producers. Specifically, Plaintiffs claim that DFA management favors growth of its commercial operations at the expense of farmer pay prices in order to generate revenue that DFA management can use ~~to empire build and fund lavish executive compensation and benefits~~<u>for purposes that are not beneficial to dairy farmers and which</u>~~that~~ are not disclosed to the farmer members.

7

Defendants deny each of these allegations.

## PLAINTIFFS' CLAIMS

Each Plaintiff in this case alleges the same four claims against Defendants:

(1)     conspiracy to restrain trade in violation of Section 1 of the Sherman Act;

(2)     conspiracy to monopsonize in violation of Section 2 of the Sherman Act;

(3)     monopsony in violation of Section 2 of the Sherman Act; and

(4)     attempted monopsony in violation of Section 2 of the Sherman Act.

I will first address Section 1 of the Sherman Act and Plaintiffs' claims under that section.

## INSTRUCTIONS APPLICABLE TO ALL CLAIMS

**[Per Court's instruction on 9/1, Plaintiffs deleted the "Definition" section]**

## CORPORATIONS

DFA is an agricultural cooperative organized as a corporation. DMS is a joint milk marketing agency organized as a limited liability company.

The mere fact that a party is a corporation or a limited liability company does not mean it is entitled to any more or less consideration by you. All litigants are equal before the law, and corporations and limited liability companies, big or small, are entitled to the same fair consideration as you would give any other party.

(Modern Federal Jury Instructions – Civil, Instruction 72-1) (modified).

## ACTUAL AND APPARENT AUTHORITY

As I just mentioned, DFA is a corporation and DMS is a limited liability company. Under the law, a corporation or a limited liability company is a "person," but a person that acts only through its agents, such as its directors, officers, executives, employees, or others acting on its behalf.

A corporation or a limited liability company is legally bound by the acts and statements of its agent or employee done or made within the scope of the agent's actual or apparent authority.

Acts done within the scope of employment are acts performed on behalf of a corporation or limited liability company and directly related to the performance of the duties the agent has general authority to perform. This is called actual authority.

Apparent authority is the authority that persons outside the corporation or limited liability company could reasonably believe the agent has, judging from his or her position with the company, the responsibilities previously entrusted to the person or the person's office or title, and the circumstances surrounding his or her past conduct. An agent can have apparent authority even when the agent is actually acting in a dishonest, fraudulent, or anticompetitive manner.

For a corporation or limited liability company to be legally responsible for the acts or statements of its agents, you must find that the agent was acting within the scope of his or her employment and was acting with either actual or apparent authority.

## A CORPORATION OR LIMITED LIABILITY COMPANY IS NOT CAPABLE OF CONSPIRING WITH ITSELF

A corporation or limited liability company is not capable under the law of conspiring with its own agents, unincorporated divisions, or wholly-owned subsidiaries. A corporation or limited liability company is, however, capable of conspiring with other persons or independent entities.

Because DFA formed DMS to be DFA's agent and to act as a joint marketing agency for its farmer-members' milk, DFA and DMS are not capable of conspiring with each other to violate the Sherman Act. You must therefore only consider whether Defendants conspired with at least one other person or entity.

## FIRST CLAIM: SECTION 1 OF THE SHERMAN ACT

Each Plaintiff alleges that Defendants conspired in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Section 1 of the Sherman Act prohibits contracts, combinations, and conspiracies that unreasonably restrain trade. To establish a violation of Section 1 of the Sherman Act, Plaintiffs must prove the following:

(1) the existence of a contract, combination, or conspiracy between or among at least two separate persons or entities;

(2)     that the contract, combination, or conspiracy unreasonably restrains trade;

    a.    To determine whether an agreement constitutes an unreasonable restraint of trade, the law applies one of two standards:

        i.    The *per se* rule, under which certain agreements are conclusively presumed to be unreasonable restraints of trade; and

        ii.    The rule of reason, under which a restraint of trade is illegal only if it is found to be unreasonable. Using this rule, you must determine:

            1.    Whether the challenged restraint resulted in a substantial harm to competition in a relevant market, which is comprised of:

                a.  A relevant product market; and

                b.  A relevant geographic market.

            2.    Whether the challenged restraints were justified by pro-competitive benefits; and

            3.    Whether the pro-competitive benefits could have been achieved through less restrictive means and the competitive harm substantially outweighs the competitive benefits.

(3)     that the restraint affects interstate commerce; and

(4)     that the restraint caused each Plaintiff to suffer an injury to his or her business or property.

I will describe each of these four elements in detail.

If you find that each Plaintiffs failed to prove all of these elements by a preponderance of the evidence, then you must find for Defendants and against each Plaintiff on this claim. If you find that each Plaintiff has proved each of these elements by a preponderance of the evidence, then you must find for each Plaintiff and against Defendants on this claim.

<u>FIRST CLAIM: SECTION 1 OF THE SHERMAN ACT</u>
<u>EXISTENCE OF A CONSPIRACY</u>
<u>(ELEMENT 1)</u>

Each Plaintiff alleges that Defendants participated in a conspiracy to restrain trade by reducing and/or eliminating competition in the raw Grade A milk market in Order 1 in violation of Section 1 of the Sherman Act. To prevail on this claim, each Plaintiff must prove both of the following elements by a preponderance of the evidence:

(1)     that a contract, combination, or conspiracy existed; and

(2)     that Defendants knowingly became a member of that conspiracy.

Section 1 applies only to conspiracies between separate persons. A conspiracy is an agreement or an understanding between two or more persons to share a conscious commitment to a common scheme designed to achieve an unlawful objective. An agreement or understanding exists when two or more persons or corporations share a commitment to a common scheme. To establish the existence of a contract, combination, or conspiracy, the evidence does not need to show that there was a formal or written agreement. An agreement or understanding may be entirely unspoken. Here, each Plaintiff alleges that the agreements at issue are: (i) agreements with other cooperatives not to compete for farmers' milk including: agreements not to solicit each other's members; and agreements to share farmer pay price information so that all farmers are paid the same amount and have little incentive to switch cooperatives; (ii) agreements with other processors not to compete for farmer's milk, including full supply and outsourcing agreements; (iii) agreements with processors to force independent farmers into DFA membership; and (iv) agreements with cooperatives and processors to give Defendants monopsony power in exchange for, among other things, suppressed pay prices and non-compete payments. *See Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1183 (8th Cir. 1982) ("The impermissible aim is to pursue monopoly power by eliminating or restraining competition with the co-op through predatory or anti-competitive practices. An intent to do so is, therefore, the proper intent element of an attempted monopolization or conspiracy claim under Section 2. Of course, a conspiracy

or combination to eliminate competition through such unlawful means would also violate Section 1 as an unreasonable restraint of trade."); *Maryland & Va. Milk Producers Assoc.*, 362 U.S. 458, 463 (1960) ("Although the Court was not confronted with charges under s 2 of the Sherman Act in that case we do not believe that Congress intended to immunize cooperatives engaged in competition-stifling practices from prosecution under the antimonopolization provisions of s 2 of the Sherman Act, while making them responsible for such practices as violations of the antitrade-restraint provisions of ss 1 and 3 of that Act. These sections closely overlap, and the same kind of predatory practices may show violations of all.").

A contract, combination, or conspiracy may be formed without all of the parties reaching an agreement at the same time, such as where competitors separately accept invitations to participate in a plan to restrain trade. Similarly, it is not essential that all persons acted exactly alike, nor is it necessary that they all possessed the same motives for entering the agreement. It is not necessary that all of the means or methods claimed by Plaintiffs were agreed upon, actually used, or put into operation. It is also not necessary that each Plaintiff prove that all the persons alleged to be members of the conspiracy were actually members provided each Plaintiff proves that at least one other person entered into the alleged agreement or conspiracy with Defendants. It is the agreement or understanding to restrain trade that constitutes a contract, combination, or conspiracy which matters for this element. You may find a conspiracy existed regardless of whether it succeeded or failed.

In determining whether an agreement or understanding between two or more persons has been proved, you must view the evidence as a whole. Each Plaintiff may prove the existence of the alleged contract, combination, or conspiracy through direct evidence, circumstantial evidence, or both. Direct evidence is explicit and requires no inferences to establish the existence of a contract, combination, or conspiracy. You may also infer the existence of an agreement from the circumstances, including what you find the alleged members actually did and the words they used. Mere similarity of conduct among various persons, however, or the fact that they may have associated with one

another and may have met or assembled together, does not by itself establish the existence of an agreement or a conspiracy.

### FIRST CLAIM: SECTION 1 OF THE SHERMAN ACT
### PARALLEL CONDUCT (ELEMENT 1)

Each Plaintiff contends that Defendants and their alleged coconspirators engaged in coordinated efforts to reduce competition for raw Grade A milk in Order 1 through a series of agreements. They allege that Defendants entered into agreements with other cooperatives and with processors to restrain trade. Each Plaintiff contends that this conduct, when considered with other evidence, shows that a conspiracy existed among Defendants and their alleged coconspirators. Defendants deny these allegations.

The mere fact that Defendants may have engaged in similar conduct to other persons or entities does not by itself establish the existence of a conspiracy. Their behavior may be no more than the result of the exercise of independent judgment in response to identical or similar market conditions. For example, everyone might open their umbrellas on a rainy day, but that similar behavior would not necessarily mean that they had agreed or conspired to open their umbrellas. A business may lawfully adopt the same or similar practices as its competitors as long as it does so independently and not as part of an agreement or understanding with one or more of its competitors. Thus, a defendant does not violate the antitrust laws by taking some action in the hope or belief that its competitors will follow, so long as it has not reached an agreement with its competitors. Parallel conduct, without more, does not violate the law. If Defendants and their alleged coconspirators acted similarly but independently of one another, without any agreement or understanding between two or more of them, then there is no conspiracy.

You must decide whether it is more likely than not that Defendants' conduct, if similar to that of another person, was the result of an agreement between Defendants and that person. In doing so, you may consider Defendants' conduct along with other evidence. You may infer that a conspiracy existed only if you find that the evidence, when viewed as a whole, makes it more likely than not that Defendants had an agreement or understanding with their alleged coconspirators than that they acted independently. In

making this determination, you must consider all the surrounding facts and circumstances. The evidence, when viewed together, must satisfy you that it is more likely than not that Defendants' similar actions were the product of an agreement with an alleged coconspirator than the product of each person's independent decisions.

**FIRST CLAIM: SECTION 1 OF THE SHERMAN ACT**
**KNOWING MEMBERSHIP (ELEMENT 1)**

Before you can find that Defendants were a member of the conspiracy alleged by each Plaintiff, each Plaintiff must also prove by a preponderance of the evidence that the Defendants knowingly became members of the conspiracy with the intent to further its purposes.

To act knowingly means to participate deliberately and not because of mistake, accident or other innocent reason. A person may become a member of a conspiracy without full knowledge of all of the details of the conspiracy, the identity of all of its members, or the parts they played. Knowledge of the essential nature of the plan is enough.  On the other hand, a person who has no knowledge of a conspiracy, but happens to act in a way that helps the conspiracy succeed, does not thereby become a conspirator.

A person who knowingly joins an existing conspiracy, or who participates only in part of a conspiracy with knowledge of the overall conspiracy, is just as responsible as if he or she had been one of those who formed or began the conspiracy and participated in every part of it.

In determining whether Defendants or their alleged coconspirators were members of the alleged conspiracy, you should consider the evidence about Defendants' and their alleged coconspirators' statements and conduct, including any evidence of their knowledge and participation in the events involved and any other evidence of their participation in the conspiracy alleged.

You may not find that Defendants or their alleged coconspirators were a member of a conspiracy based only on their association with or knowledge of wrongdoing, but it is a factor you may consider to determine whether they were a member of the alleged conspiracy.  If you find that the alleged contract, combination, or conspiracy existed, then

the acts and statements of the alleged coconspirators are binding on all of those whom you find were members of the conspiracy.

Once you have found that Defendants were members of a conspiracy, they are responsible for all actions taken by all alleged coconspirators during and in furtherance of the conspiracy until it is shown that the conspiracy has been completed or abandoned.

If after considering all of the evidence, you conclude that each Plaintiff has shown that it was more likely than not that Defendants' conduct was the result of an agreement than their independent decisions, you must find for each Plaintiff on the question of whether Defendants participated in a conspiracy. You will then proceed to consider the other essential elements of Plaintiffs' Section 1 Sherman Act violation claim.

If, after considering all of the evidence, you conclude that each Plaintiff failed to prove that Defendants' similar conduct was more likely than not the result of an agreement with one or more of the alleged coconspirators, then you must find in favor of Defendants on the question of whether Defendants participated in a conspiracy. If you find in favor of Defendants on this essential element, you must not proceed further with this claim and you should enter a verdict in favor of Defendants on Plaintiffs' Section 1 claim on the separate verdict form I will provide to you.

## FIRST CLAIM: SECTION 1 OF THE SHERMAN ACT
## UNREASONABLE RESTRAINT OF TRADE
## (ELEMENT 2)

The second element that each Plaintiff must prove is that the alleged conspiracy or agreement resulted in an "unreasonable" restraint on interstate commerce. An unreasonable restraint of trade results in a substantial harm to competition in a relevant market. Harm that occurs merely to the individual business of a Plaintiff is not sufficient, by itself, to demonstrate harm to competition.

**[Deleted Horizontal / Vertical Restraint Instruction, per Court's Instruction]**

### FIRST CLAIM: SECTION 1 OF THE SHERMAN ACT
### UNREASONABLE RESTRAINT OF TRADE
### (TWO ANALYSES AS TO WHETHER RESTRAINTS ARE UNREASONABLE –
### PER SE RULE AND RULE OF REASON)
### (ELEMENT 2A)

To determine whether an agreement constitutes an unreasonable restraint of trade, the law generally applies one of two standards: the *per se* rule or the rule of reason. If multiple agreements are part of a conspiracy, then you must apply the correct standard to each specific agreement. I will now explain both standards to you and instruct you as to which one applies to each alleged restraint of trade at issue in this case.[1]

### FIRST CLAIM: SECTION 1 OF THE SHERMAN ACT
### UNREASONABLE RESTRAINT OF TRADE
### (PER SE RULE AND RULE OF REASON OVERVIEW)
### (ELEMENT 2A(i) & (ii))

**[Note: the court will determine which standard applies to a particular restraint based on the evidence presented. *See In re Southeastern Milk Antitrust Litig.*, 739 F.3d 262, 271 (6th Cir. 2014) ("The district court's decision to use the rule of reason is a question of law[.]"). This legal issue "is predicated on a factual inquiry into the restraint's competitive effect[.]" *Nat'l Bancard Corp. v. VISA U.S.A., Inc.*, 779 F.2d 592, 596 (11th Cir. 1986).]**

The second element that each Plaintiff must prove is that the alleged conspiracy or agreement resulted in an "unreasonable" restraint on interstate commerce. Here, each

---

[1] *See In re Processed Egg Prod. Antitrust Litig.*, 962 F.3d 719, 727-28 (3d Cir. 2020) (separate components of a conspiracy may be assessed under different standards); *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886, 889-93 (2007) (courts apply different standards to separate components of a conspiracy and when determining what standard to apply, courts are required to look at the "economic effect rather than rely upon formalistic line drawing); *Zenith Radio Corp. v. Matshita Elec. Indus. Co.*, 513 F. Supp. 1100, 1167-68 (E.D. Pa. 1981) ("In *Continental Ore* itself, the Supreme Court engaged in a detailed analysis of the record with respect to three of the four ventures which the Court of Appeals had addressed on their facts, concluding with respect to each of the three considered separately that there was enough evidence of causation to preclude a directed verdict. If the warning against "compartmentalizing" an antitrust conspiracy case were meant to prevent a court from breaking down a plaintiff's allegation of a "unitary" conspiracy into its component parts for purposes of analysis, the Court would not have engaged in the "forbidden" analysis in the very same opinion in which it issued the warning.").

Plaintiff alleges that Defendants and their alleged coconspirators entered into agreements that restricted and/or eliminated competition for farmers' milk in the raw Grade A milk market in Order 1.

**PER SE RULE: [Court to redraft]**

The Sherman Act makes unlawful certain agreements that, because of their harmful effect on competition and lack of redeeming value, are conclusively presumed to be illegal and an unreasonable restraint of trade, without examining the precise harm they have caused or the business excuse for their use. *See In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1191 (9th Cir. 2015) ("Once the [inherently anticompetitive horizontal agreement's] existence is established, no further inquiry into the practice's actual effect on the market or the parties' intentions is necessary to establish a § 1 violation.") (citing *N. Pac. Ry. v. United States*, 356 US. 1, 5 (1958)). Where a plaintiff alleges and proves what is called a "per se" violation, the plaintiff is not required to prove that the conduct hurt competition in the market. *See NYNEX Corp.*, 525 U.S. at 133 ("[C]ertain kinds of agreements will so often prove so harmful to competition and so rarely prove justified that the antitrust laws do not require proof that an agreement of that kind is, in fact, anticompetitive in the particular circumstances."). In this case, Plaintiffs have alleged that agreements with other cooperatives not to compete for farmers' milk including agreements not to solicit each other's members are *per se* violations. For these types of alleged violations, you will need only to determine whether they took place and then determine what, if any, damages they caused.

**RULE OF REASON: [Court to redraft]**

Under the rule of reason standard, a restraint of trade is illegal only if it is found to be unreasonable. Thus, for this type of agreement, the second element that Plaintiffs must prove is that the alleged agreement resulted in an "unreasonable" restraint on interstate commerce. Here, Plaintiffs claim that Defendants unreasonably restrained trade by entering into agreements: (i) with cooperatives to share farmer pay price information so that all farmers are paid the same amount and have little incentive to switch cooperatives; (ii) with processors not to compete for farmer's milk, such as full supply and outsourcing

17

agreements; (iii) with processors to force independent farmers into DFA membership; and (iv) with both cooperatives and processors to give Defendants monopsony power in exchange for, among other things, suppressed pay prices and non-compete payments.

You must determine whether the challenged restraints were unreasonable. In making this determination, you must first determine whether Plaintiffs have proven that the challenged restraints resulted in a substantial harm to competition in the raw Grade A milk market in Order 1. *See Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 317 (2d Cir. 2008) ("[T]he plaintiffs bear an initial burden to demonstrate the defendants' challenged behavior had an actual adverse effect on competition as a whole in the relevant market.") (citation and emphasis omitted). If you find that Plaintiffs have proven that the challenged restraints resulted in substantial harm to competition, then the burden shifts to Defendants to prove that the restraints were justified by legitimate procompetitive benefits. *Id.* ("[T]he burden shifts to the defendants to offer evidence of the pro-competitive effects of their agreement[.]") (citation omitted). If Defendants prove such legitimate procompetitive benefits, you must then balance the competitive harm against the procompetitive benefit. *Id.* ("Ultimately, the factfinder must engage in a careful weighing of the competitive effects of the agreement—both pro and con—to determine if the effects of the challenged restraint tend to promote or destroy competition.") (citation omitted). The challenged restraints are illegal under Section 1 of the Sherman Act only if you find that the competitive harm substantially outweighs any legitimate procompetitive benefit. (ABA Model Jury Instructions in Civil Antitrust Cases, Instruction 3A) ("The challenged restraint is illegal under Section 1 of the Sherman Act only if you find that the competitive harm substantially outweighs the competitive benefit.").

### FIRST CLAIM: SECTION 1 OF THE SHERMAN ACT UNREASONABLE RESTRAINT OF TRADE (PER SE RULE) (ELEMENT 2A(i)) [Court to redraft]

I will start with the "per se" rule. Certain agreements are so harmful to competition that they are conclusively presumed to be illegal and an unreasonable

restraint of trade, without inquiry about the precise harm they have caused or the business excuse for their use. These are called "per se" violations. Where a plaintiff alleges and proves what is called a "per se" violation, the plaintiff is not required to prove that the conduct hurt competition in the market. And it is not a defense that the defendant may have acted with good motives, thought that what they were doing was legal, or that the conspiracy may have had some good results.

In this case, each Plaintiff claims that Defendants entered into certain agreements to which the per se rule applies. *First*, each Plaintiff claims that Defendants entered into agreements with other cooperatives not to solicit each other's members and to report to each other if a farmer approached them about switching cooperatives. Defendants deny that any such agreements ever existed. If you find that such agreements existed, these agreements are ~~conclusively~~ presumed to be unreasonable restraints of trade.[2]

---

[2] *See United States v. Coop. Theatres of Ohio, Inc.*, 845 F.2d 1367, 1373 (6th Cir. 1988) ("In sum, we find that the so-called "no-solicitation" agreement alleged in this case is undeniably a type of customer allocation scheme which courts have often condemned in the past as a per se violation of the Sherman Act."); *United States v. Consol. Laundries Corp.*, 291 F.2d 563, 574–75 (2d Cir. 1961) (internal citations omitted) ("Similarly their agreement to suppress all competition as to one phase of their business, i.e., old customers, should be per se illegal irrespective of their competition for new customers."); XII Areeda & Hovenkamp, Antitrust Law p. 2030 at 216 (2012) ("A 'naked' market division agreement is unlawful per se and **may take many forms**, including agreements that require participants from (1) producing one another's products, (2) selling in one another's territories, (3) **soliciting or selling to one another's customers**, or (4) expanding into a market in which another participant is an actual or potential rival."). *See also United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972) (analogizing non-solicitation agreements (*i.e.*, agreements not to call on each other's customers, or, an allocation of customers) with agreements to allocate territories, which are "classic examples of a per se violation of s 1."); *Consol. Laundries*, 291 F.2d at 574–75 ("Assuming that customers were allocated in the case at bar, no more need be proved; we agree that the per se rule should be applied. We fail to see any significant difference between an allocation of customers and an allocation of territory."); *United States v. Cadillac Overall Supply Co.*, 568 F.2d 1078, 1087-90 (5th Cir. 1978) (agreements not to solicit each other's customers is the equivalent of customer allocation and constitutes a per se violation of the Sherman Act); *United States v. Brown*, 936 F.2d 1042, 1045 (9th Cir. 1991) ("[T]he agreement in this case should be characterized as per se illegal. The agreement restricted each company's ability to compete for the other's billboard sites.").

The United States Supreme Court has explained that "an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition" is

You also have heard evidence about the Docuware agreements, which contain a non-solicitation clause. I instruct you that those Docuware agreements are to be analyzed under the rule of reason analysis, which I will explain to you shortly. ~~If you make this finding with regard to the non-solicitation agreements not contained in the Docuware agreements, you must indicate this conclusion on the verdict form I provide to you and proceed to analyze damages for this claim.~~

*Second*, each Plaintiff claims that Defendants entered into agreements with other cooperatives to collectively market their milk through DMS.[3] Defendants have asserted

---

"usually termed a 'horizontal' restraint," which "[t]his Court has reiterated time and time again that (h)orizontal territorial limitations . . . are naked restraints of trade with no purpose except stifling of competition. Such limitations are per se violations of the Sherman Act." *Topco*, 405 U.S. at 608. Likewise, the Second Circuit explained, "[a]nd when, as here, the allocation [of customers] is coupled with predatory practices against independent linen suppliers in order to compel them to join the conspiracy or be put out of business, there is even more reason not to permit the conspirators to justify their activities on the ground that business expediency makes them reasonable." *Consol. Laundries*, 291 F.2d at 574-75; *Interphoto Corp. v. Minolta Corp.*, 295 F. Supp. 711, 720 (S.D.N.Y. 1969) (citing *Consolidated Laundries*, 291 F.2d at 574-575) (agreement prohibiting party from soliciting or accepting orders from customer is an agreement to allocate customers among competitors and a per se violation of the Sherman Act). The same rationale applies here—there is no purpose for the non-solicitation agreements except to stifle competition.

[3] **NOTE**: While Plaintiffs understand that the Court instructed them to insert the Capper-Volstead "toggle" in the overview instruction for Section 1, Plaintiffs do not believe that the toggle fits in that section. As Defendants have repeatedly stated, Plaintiffs claims fall outside of Capper-Volstead protection (*i.e.*, Capper-Volstead does not protect "predatory" conduct at issue here). According to Defendants, Capper-Volstead, however, does allow them to "form marketing agencies in common, such as [DMS], for the purpose of marketing raw milk." [ECF 290 at 7]. Without Capper-Volstead protection, the formation of DMS—*i.e.* a milk marketing agency formed to share and set price—is a *per se* violation of the antitrust laws. Therefore, there is no need for a "toggle" for Capper-Volstead under Section 1, and it only comes into play here. *See Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037, 1040 (2d Cir. 1980) ("Capper-Volstead provides that farmers may act together in associations in collectively 'processing, preparing for market, handling, and marketing' their products."); *United States v. Maryland Co-op. Milk Producers, Inc.*, 145 F. Supp. 151, 155 (D.D.C 1956) ("The Court concludes that a combination between two or more agricultural cooperatives to fix prices of their products is exempt from the antitrust laws."); *Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1184 (8th Cir. 1982) ("This arrangement plainly reflects a horizontal combination of producers agreeing to have NFO fix the prices at which their product will be sold. Unless exempt from the antitrust laws, horizontal price-fixing is, of course, a per se violation of the Sherman Act. . . . NFO is nonetheless not liable for price-fixing, however, because its milk marketing arrangements were

the affirmative defense  that the Capper Volstead Act allows them to collectively market their milk with other cooperatives through common marketing agencies such as DMS.  It is Defendants' burden to prove that they are entitled to rely on this defense. If you find that Defendants have met their burden to prove that they qualify under the Capper-Volstead Act, then you must find for Defendants on Plaintiffs' claim that Defendants' collectively marketing their milk with other cooperatives through DMS is an unreasonable restraint of trade.  If you find that Defendants have not met their burden to prove that they qualify under the Capper-Volstead Act, , then the agreement to collectively market milk through DMS is presumed to be an unreasonable restraint of trade.

### FIRST CLAIM: SECTION 1 OF THE SHERMAN ACT UNREASONABLE RESTRAINT OF TRADE (RULE OF REASON) (ELEMENT 2A(ii))
### [Court to redraft]

Now I will talk to you about the second standard, which is called the "rule of reason." The rule of reason balances pro-competitive and anti-competitive effects of challenged acts or agreements to determine if they unreasonably restrain trade in the relevant market. You are to apply this standard to the remaining alleged restraints and agreements in this case.

Under the rule of reason test, each Plaintiff must first prove by a preponderance of the evidence that the challenged restraints resulted in a substantial harm to competition in the for raw Grade A milk market in Order 1. If they do, then Defendants must prove by a preponderance of the evidence that the restraints were justified by legitimate procompetitive benefits. IAnd if Defendants prove thissatisfy their burden, then each Plaintiff must prove by a preponderance of the evidence that any legitimate competitive

exempt under the Capper-Volstead Act."); *Kinnett Dairies, Inc. v. Dairymen, Inc.*, 512 F. Supp. 608, 632 (M.D. Ga. 1981), *aff'd*, 715 F.2d 520 (11th Cir. 1983) ("Thus, through D.I. its members can present a common, agreed upon price to milk buyers . . . even though similar conduct by private businessmen who are not farmers would be 'price fixing' in violation of the antitrust law.").

benefits established by Defendants could have been achieved through less restrictive means.

You must then balance the competitive harm against the procompetitive benefit. The challenged restraints ~~are illegal under~~ violate Section 1 of the Sherman Act only if you find that the competitive harm substantially outweighs any legitimate procompetitive benefit. I will now review each step of that analysis in more detail.

**FIRST CLAIM: SECTION 1 OF THE SHERMAN ACT**
**UNREASONABLE RESTRAINT OF TRADE (RULE OF REASON): HARM TO**
**COMPETITION**
**(ELEMENT 2B(ii)(1))**
**[Defendants to Revise]**

As I mentioned, to prove that the challenged restraints are unreasonable, each Plaintiff first must ~~demonstrate~~ prove by a preponderance of the evidence that the restraints resulted in, or are likely to result in, substantial harm to competition in the relevant product and geographic market.  I will explain to you what a relevant product and geographic market is next.

A harmful effect on competition means a reduction in competition that results in the loss of some of the benefits of competition. If the challenged conduct has not resulted in, or is not likely to result in the loss of some other competitive benefit, then there has been no effect on competition, and you should find that the challenged conduct was not unreasonable. This element requires each Plaintiff to prove harm to competition, not to individual competitors.

In determining whether the challenged restraints have produced, or are likely to produce, harm to competition, you may consider the following factors:

- the effect of the restraint on prices, output, product quality and service;

- the purpose and nature of the restraint;

- the nature and structure of the relevant market;

- the number of competitors in the relevant market and the level of competition among them, both before and after the restraint was imposed; and

- whether the Defendants possess market power.

The last factor mentioned, market power, includes the ability to control price, exclude competition, or restrict output. An important factor in determining whether Defendants possess market power is Defendants' market share, that is, the percentage of the products or services it buys in the relevant market compared to those bought by all other competitors. Think of the market as a pie with each competitor having a share. The question is, how much of the pie do the Defendants control or possess? Other factors that you may consider in determining whether Defendants have market power include barriers to entry by new competitors in the relevant market. A barrier to entry is something that makes it more difficult for a new competitor to enter the market and compete. If a party does not possess a substantial market share, it is less likely that party possesses market power. If Defendants do not possess market power, it is less likely that the challenged restraint has resulted in, or will result in, a substantial harmful effect on competition in the market.

## Exclusive Dealing
### (Revised from Defendants' Draft [ECF 307-1 at 18-19] per Court's instruction)

Each Plaintiff asserts that, as part of the conspiracy he, she, or it alleges, Defendants entered into full and partial supply agreements with certain processors, which required those processors to purchase Grade A raw milk exclusively, or partially, from Defendants for a period of time.  And, as a result of those agreements, farmers were forced to either join DFA or market their milk through DMS if they wanted to sell their milk to those processors.  Defendants dispute Plaintiffs' characterization of these agreements.

Exclusive dealing arrangements take several forms.  Some require a buyer of a product or service to obtain that product or service exclusively from one supplier for a period of time. Others may operate as a partial exclusive dealing arrangement, which limit the practical ability of the seller to sell its product to other buyers.  From the standpoint of the buyer or seller, exclusive dealing arrangements may have potential procompetitive effects that benefit suppliers and that need to be weighed against the

potential anticompetitive effect of foreclosing competing suppliers' access to the buyer and the buyer's access to competing suppliers' products.

If you determine that Defendants entered into full or partial supply agreements with certain processors, then, in determining whether Defendants' supply agreements with those processors had a substantially harmful effect on competition in the relevant market, you should consider, among other things:

- The nature and history of the use of supply agreements in the dairy industry;

- Whether buyers have independent reasons for entering into full supply agreements or were coerced into entering into them;

- Whether other competing suppliers also offer supply agreements;

- The extent of competition among competing suppliers for supply agreements with buyers;

- Defendants' position in the marketplace, including their size and market share;

- The reasons Defendants and processors entered into the supply agreements at issue;

- The effect of the use of the supply agreements on the ability of other competing buyers to enter the market and on price and other competition in the market for buyers of raw milk;

- The extent to which these supply agreements foreclosed outlets for farmers' milk; and

- Whether these agreements comported with Defendants' antitrust guidelines or their agreements with federal regulators.

In determining the extent to which Defendants' exclusive dealing contracts foreclose competition on the merits, it is also relevant to consider the percentage of the market foreclosed and the length of the foreclosure. The longer the contract's duration, the more likely that the harm to competition will be greater. You should also consider

the Defendants' market power, which I will explain to you shortly. Finally, you should also consider whether the process in which Defendants secured exclusive contracts itself involved competition. If you determine that the processors formally or informally put their exclusive contracts out for bid, and other competitors had an equal opportunity to compete for the exclusive contracts against defendant, this is evidence that the Defendants do not have market power.

By considering all of these factors, you should determine whether the exclusive dealing contracts adversely affected the premiums paid by buyers, output, or quality of raw milk in the relevant market. Where a restraint does not adversely affect price, output, or quality, it is unlikely to substantially harm competition between buyers for the relevant product.

## FIRST CLAIM: SECTION 1 OF THE SHERMAN ACT
### UNREASONABLE RESTRAINT OF TRADE (RULE OF REASON)
### RELEVANT MARKET (ELEMENT 2A(ii)(1)(a), (b)))

### [Moved per Court's Instruction]

To prevail on a Section 1 claim under the rule of reason, each plaintiff must prove by a preponderance of the evidence the relevant market. The relevant market has two components: the product market and the geographic market. I will define each for you in more detail.

## FIRST CLAIM: SECTION 1 OF THE SHERMAN ACT
### UNREASONABLE RESTRAINT OF TRADE (RULE OF REASON)
### PRODUCT MARKET (ELEMENT 2A(ii)(1)(a)))

### [Defendants to Revise][4]

The basic idea of a relevant product market is that the products within it are reasonable substitutes for each other from the buyer's or seller's point of view; that is, the products compete with each other. In other words, the relevant product market includes the products that a buyer or seller believe are reasonably interchangeable or reasonable substitutes for each other. This is a practical test with reference to the actual behavior of

---

[4] Plaintiffs reserve their rights to respond to Defendants' proposed instruction.

buyers and marketing efforts of sellers. Products need not be identical or precisely interchangeable as long as they are reasonable substitutes.

To determine whether products are reasonable substitutes for each other, you may consider:

- Whether a small, but significant, increase in the price of one product would result in enough customers switching from that product to another product, such that the price increase would not be profitable. In other words, will customers accept the price increase or will so many switch to alternative products that the price increase will be withdrawn?

- Consumers' views on whether various products are interchangeable;

- The perceptions of the industry or the public.

Here, each Plaintiff must prove that the relevant product market is raw Grade A milk.

## FIRST CLAIM: SECTION 1 OF THE SHERMAN ACT UNREASONABLE RESTRAINT OF TRADE (RULE OF REASON) GEOGRAPHIC MARKET (ELEMENT 2A(ii)(1)(b)))

### [Defendants to Revise][5]

The relevant geographic market is the area in which the Defendants face competition from other firms that compete in that relevant product market and to which producers can reasonably turn to sell their milk. When analyzing the relevant geographic market, you should consider whether changes in prices or product offerings in one area have substantial effects on prices or sales in another area, which would tend to show that both areas are in the same relevant geographic market. The geographic market may be as large as global or nationwide, or as small as a single town or even smaller.

In determining whether each Plaintiff has met his or her burden and proven that his or her proposed geographic market is proper, you may consider several factors, including:

[5] Plaintiffs reserve their rights to respond to Defendants' proposed instruction.

- The geographic area in which Defendants sell and where Defendants' customers are located;

- The geographic area to which customers turn for supply of the product;

- The geographic area to which customers tum for supply of the relevant products or have seriously considered turning;

- The transportation cost differences between areas;

- The time interval in which milk must be transported due to its perishability;

- The geographic areas that suppliers view as potential sources of competition; and

- Whether governmental licensing requirements, taxes, or quotas have the effect of limiting competition in certain areas.

Here, each Plaintiff must prove that the relevant geographic market is the Northeastern Area of the United States, as defined by Federal Milk Marketing Order 1.

## FIRST CLAIM: SECTION 1 OF THE SHERMAN ACT UNREASONABLE RESTRAINT OF TRADE (RULE OF REASON): PROOF OF COMPETITIVE BENEFITS
### (ELEMENT 2B(ii)(2))
### [Defendants to Revise]

If you find that Plaintiffs have proven that the challenged restraints resulted in substantial harm to competition in the relevant market, then you must next determine whether the restraints also benefit competition in other ways. The burden is on Defendants to prove that the challenged restraints benefited competition—in other words, that the restraints had procompetitive effects or advanced procompetitive objectives. In conducting this inquiry, you should consider whether Defendants could have achieved the procompetitive objectives without the challenged restraints.

If you find that the challenged restraints do result in competitive benefits, then you also must consider whether the restraints were reasonably necessary to achieve the benefits.

If you find that Defendants meet their burden to prove a pro-consumer business justification by a preponderance of the evidence, then the burden shifts back to the each

Plaintiffs to demonstrate by a preponderance of the evidence that the same benefits could have been readily achieved by other, reasonably alternative means that create substantially less harm to competition.

If you find that the challenged restraints were reasonably necessary to achieve competitive benefits, then you must balance those competitive benefits against the competitive harm resulting from the same restraint. If the competitive harm substantially outweighs the competitive benefits, then the challenged restraints are unreasonable. If the competitive harm does not substantially outweigh the non-pretextual competitive benefits, then the challenged restraints are not unreasonable. In conducting this analysis, you must consider the benefits and harm to competition and consumers, not just to a single competitor or group of competitors. Plaintiffs bear the burden of proving that the anticompetitive effect of the conduct substantially outweighs its benefits.

## FIRST CLAIM: SECTION 1 OF THE SHERMAN ACT
## EFFECT ON INTERSTATE COMMERCE
## (ELEMENT 3)

The Sherman Act applies only to conduct or restraints that affect interstate or foreign commerce. Here, the essential element of interstate or foreign commerce has been established.

## FIRST CLAIM: SECTION 1 OF THE SHERMAN ACT
## INJURY IN FACT AND ANTITRUST INJURY
## (ELEMENT 4)

**[Court to Revise first paragraph.  Defendants to revise remaining]**

Each Plaintiff is entitled to recover damages for an injury to his or her business= if he, she, or it can establish three four elements of injury:

(1)    The Plaintiff was in fact injured as a result of Defendants' violation of the antitrust laws;

(2)    Defendants' illegal conduct was a material cause of the Plaintiff's injury; and

(3)    The Plaintiff's injury is an injury of the type that the antitrust laws were intended to prevent.

(3)(4)  The injury was to the Plaintiff's business or property.

In order to establish "injury in fact," it must be established that the Plaintiff was injured as a result of Defendants' violation of the antitrust laws. Proving the fact of damage does not require a Plaintiff to prove the dollar value of his or her injury. It requires only that it be established that the Plaintiff in fact suffered an injury as a result of Defendants' antitrust violation. ~~If you find that a Plaintiff has established that it was in fact injured, you may consider the amount of that Plaintiff's damages.~~

Each Plaintiff must also establish by a preponderance of the evidence that Defendants' conduct was a material cause of his or her injury. This means that some damage occurred to that Plaintiff as a result of Defendants' antitrust violation, and not some other cause. It is not required that Defendants' antitrust violation be the sole cause of the Plaintiff's injury, nor do all other possible causes of injury need to be eliminated. It is enough if the Plaintiff proves that the antitrust violation was a material cause of its injury.

Each Plaintiff must also establish that its injury was the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If a Plaintiff's injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm producers, then that Plaintiff's injuries are antitrust injuries. If the injury is solely to a particular Plaintiff, and not to competition in the relevant marketplace, it is not "antitrust injury." In establishing antitrust injury, Plaintiffs can rely on the aggregate effect of the alleged conspiracy provided that the harm occurred within the statute of limitations, which I will address later in my instructions.[6]

If you find that a Plaintiff has established that ~~he, she, or~~ ~~it was in fact injured~~suffered "injury in fact,"~~,~~ ~~you may~~must then consider the amount of that Plaintiff's damages.

---

[6] Plaintiffs reserve their right to comment on Defendants' proposed revisions with respect to the statute of limitations.  Plaintiffs note, however, that the Court previously explained that "the plaintiffs can recover from the aggregate effect of the alleged conspiracy." (08/10/20 Trans. at 206).

## FIRST CLAIM: SECTION 1 OF THE SHERMAN ACT
## MARKET WIDE SUPPRESSION
## (ELEMENT 4)

In this case, each Plaintiff claims that Professor Elhauge's regression analysis shows both their antitrust impact and damages. Specifically, Plaintiffs claim that his regression analysis shows market-wide suppression of the over-order premiums in Order 1, which reduced the amount paid to Plaintiffs by 98.7 cents per hundred weight. Plaintiffs claim that you can calculate their individualized damages by multiplying the reduction in price 98.7 cents per hundred weight, by the total number of hundred weights of milk that each Plaintiffs sold in Order 1 during the relevant time period. Defendants deny these claims, and dispute Professor Elhauge's opinions, and contest Plaintiffs' method of establishing damages.

Both sides have presented you with expert testimony to assist you in determining what, if any, antitrust impact or damages were sustained by Plaintiffs. It is for you to decide whether to accept or reject the experts' testimony. The verdict form will ask you questions concerning your findings on whether there was market wide suppression guide you in recording your conclusions with regard to the issue of damages.

## SECOND CLAIM: SECTION 2 OF THE SHERMAN ACT
## MONOPSONIZATION - ELEMENTS

Each Plaintiff alleges that they were injured by Defendants' unlawful monopsonization of the raw Grade A milk market in Order 1 in violation of Section 2 of the Sherman Act.

As I explained earlier, a monopsony exists where a single buyer substantially controls the market as the primary purchaser of products offered by sellers. Here, a monopsony may exist if the purchasers of raw Grade A milk exert unlawful control over where farmers can either sell their milk or the price at which they can sell it.

To prevail on this claim, each Plaintiff must prove by a preponderance of the evidence each of the following essential elements by a preponderance of the evidence:

(1)    the alleged market is a valid antitrust market (as previously defined);

(2)    Defendants possessed monopsony power in that market;

     a.     Direct proof of monopsony power;

     b.     Indirect proof of monopsony power;

(3)     Defendants willfully acquired or maintained monopsony power in that market by engaging in:

     a.     Predatory conduct (to the extent you find Defendants have Capper-Volstead immunity); or

     b.     Anticompetitive conduct (to the extent that you find that Defendants do not have Capper-Volstead immunity).[7]

     ~~t;~~

(4)     Defendants' conduct occurred in or affected interstate commerce (as previously instructed, this element has been met); and

(5)     Plaintiffs were injured in their business or property because of Defendants' anticompetitive conduct.

I will explain each of these elements in more detail.

If you find that ~~each~~ Plaintiffs failed to prove ~~any~~ all of these elements by a preponderance of the evidence, then you must find for Defendants and against Plaintiffs on this claim. If you find that ~~each~~ Plaintiffs ha~~ve~~s proved each of these elements by a preponderance of the evidence, then you must find for Plaintiffs and against Defendants on this claim.

## SECOND CLAIM: SECTION 2 OF THE SHERMAN ACT MONOPSONIZATION – RELEVANT MARKET (ELEMENT 1)

As I instructed you earlier, Plaintiffs must prove by a preponderance of the evidence that Defendants had monopsony power in a relevant market, which Plaintiffs claim is the raw Grade A milk market in ~~federal~~ Order 1. Defining the relevant market is essential because you are required to make a judgment about whether Defendants have monopsony power in a properly defined economic market. To make this judgment, you must be able to determine what, if any, economic forces restrain Defendants' freedom to

---

[7] Note: Plaintiffs understand that the Court wanted to include a Capper-Volstead "toggle" within the initial instruction for each claim.  Upon drafting, the "toggle" fit better within the specific element (i.e., willfully acquiring or maintaining monopsony power).  We identified the "toggle" in the roadmap for each claim.

set prices in the relevant product market. The most likely and most important restraining force will be actual and potential competition from other firms and their products. This includes all firms and products that act or likely could act as restraints on Defendants' power to exclude competition or set prices as it pleases because sellers could switch to other options available in the marketplace if Defendants set the prices too low. All the firms and products that exert such restraining force are within what is called the relevant market.

## SECOND CLAIM: SECTION 2 OF THE SHERMAN ACT MONOPSONIZATION – MONOPSONY POWER
## (ELEMENT 2)

You must determine whether Defendants have monopsony power in the relevant market. As I instructed you earlier, a monopsony is to the buy side of the market what a monopoly is to the sell side of the market. ~~Monopsony power is the power to control prices or exclude competition in a relevant antitrust market. More precisely, a firm is a monopsonist if it can profitably lower or maintain prices for a significant period of time, below competitive levels.~~

To prove their monopsonization claim, Plaintiffs must prove that Defendants have monopsony power in a relevant antitrust market. Monopsony power is the power to control prices or exclude competition in a relevant antitrust market as the purchaser of products. More precisely, a firm is a monopsonist if it can exert control over or reduce the price for the sale of goods, here, raw Grade A milk, from a seller or sellers, here, the farmers. A person or entity is a monopsonist if it can profitably lower or maintain prices for a significant period of time, below competitive levels.

There are two ways that Plaintiffs may show Defendants possessed monopsony power in the relevant market: the first is through "direct" proof and the second is through "indirect" proof. I will describe each method to you.

**SECOND CLAIM: SECTION 2 OF THE SHERMAN ACT
MONOPSONIZATION – DIRECT PROOF OF MONOPSONY POWER
(ELEMENT 2A)**

Under the direct method, Plaintiffs can ~~meet~~ satisfy their burden of proof by showing that Defendants have the ability to reduce or control the price of ~~conventional~~ raw Grade A milk or otherwise reduce competition in the relevant market which Plaintiffs claim is Order 1. Plaintiffs must also prove that Defendants have the power to reduce or control prices below a competitive level for a significant period of time. If Defendants would lose too much business to other competitors that it would become unprofitable to continue excluding competition or reducing prices, then Defendants do not have monopsony power.

Plaintiffs claim to have direct proof of monopsony power through the alleged 2017 Independent Plan. Defendants dispute this claim.

**SECOND CLAIM: SECTION 2 OF THE SHERMAN ACT
MONOPSONIZATION – INDIRECT EVIDENCE OF MONOPSONY POWER
(ELEMENT 2B)**

As I stated, monopsony power also can be established through indirect, or circumstantial, proof. Such proof includes Defendants' market share, barriers to entry, history of plant closures, and market share trends. If this evidence establishes that Defendants have the power to control prices or exclude competition in the relevant market, then you may conclude that Defendants have monopsony power in the market.

The first factor you should consider is Defendants' share of the relevant market. Based on the evidence that you have heard about Defendants' market share, you should determine Defendants' market share as a percentage of sales of raw Grade A milk in the relevant market. Defendants must have a significant share of the market in order to possess monopsony power. The higher the company's share, the higher the likelihood that a company has monopsony power.

In evaluating whether the percentage of market share supports a finding of monopsony power, you also should consider other aspects of the relevant market, including barriers to entry, market share trends, the number and size of competitors.

Along with Defendants' market share, these factors should inform you as to whether Defendants have monopsony power.

A market share below 50 percent is ordinarily not sufficient to support a conclusion that a defendant has monopsony power. However, if you find that the other evidence demonstrates that Defendants do, in fact, have monopsony power despite having a market share below 50 percent, you may conclude that Defendants have monopsony power.

The trend in Defendants' market share is also something you may consider. An increasing market share may strengthen an inference that a company has monopsony power, particularly where that company has a high market share. ~~Similarly~~Conversely, a decreasing market share may weaken an inference that a company has monopsony power. You may also consider whether there are barriers to entry into the relevant market. Barriers to entry make it difficult for new competitors to enter the relevant market in a meaningful and timely way. Barriers to entry might include the large financial investment required to build a plant or satisfy governmental regulations. Evidence of low or no entry barriers may be evidence that Defendants do not have monopsony power, regardless of Defendants' market share, because new competitors could enter easily if Defendants attempted to reduce prices for a substantial period of time. By contrast, evidence of high barriers to entry along with high market share may support an inference that Defendants have monopsony power.

The history of ~~entry and exit~~competitors entering and exiting ~~into~~ the relevant market may also be helpful to consider. Entry of new competitors or expansion of existing competitors may be evidence that Defendants lack monopsony power. On the other hand, departures from the market, or the failure of firms to enter the market, may support an inference that Defendants have monopsony power.

If you find that Defendants have monopsony power in the relevant market, then you must consider the remaining elements of ~~this~~ Plaintiffs' Section 2 claim.

## SECOND CLAIM: SECTION 2 OF THE SHERMAN ACT MONOPSONIZATION – WILLFUL ACQUISITION OR MAINTENANCE OF MONOPSONY POWER (ELEMENT 3A, 3B)

The next element Plaintiffs must prove by a preponderance of the evidence is that Defendants willfully acquired or maintained monopsony power.

In analyzing this element, you must first determine whether Defendants have met their burden to prove that they are entitled to Capper-Volstead protection.  If you find that Defendants have proven by a preponderance of the evidence that they are entitled to Capper-Volstead protection, then Plaintiffs must prove by a preponderance of the evidence that Defendants either: (1) willfully acquired or maintained monopsony power by predatory means; or (2) used their monopsony power to stifle or smother competition. *See Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 715 F.2d 30, (2d Cir. 1983) ("We held that the effect of the Capper-Volstead Act, 7 U.S.C. §§ 291–92, 'is to prevent the full application of the second element of this test to agricultural cooperatives,' so that the acquisition, maintenance, or exercise of monopoly power by 'predatory means' only was proscribed.") (citing *Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037, 1045 (2d Cir. 1980); *Agritronics Corp. v. Nat'l Dairy Herd Ass'n, Inc.*, 914 F. Supp. 814, 825 (N.D.N.Y. 1996) ("Nor are farmers immune when they or their cooperative engage in predatory practices directed at restraining trade, or use their legitimately acquired monopoly power in such a manner as to smother competition under Section 2 of the Sherman Act.").  "Predatory" acts include, but are not limited to, acts intended to eliminate or reduce competition, or acts that otherwise prey on independent producers. *See* Black's Law Dictionary (11th ed. 2019) (modified); *Fairdale*, 635 F.2d at 1044 ("Of course, a cooperative may neither acquire nor exercise monopoly power in a predatory fashion by the use of such tactics as picketing and harassment.  Neither may it use its legitimately acquired monopoly power in such a manner as to stifle or smother competition."); *Maryland & Va. Milk Producers Ass'n v. U.S.*, 362 U.S. 458, 466-67 (1960) ("[Capper-Volstead] does not suggest a congressional desire to vest cooperatives with unrestricted power to restrain trade or to achieve a monopoly by preying on

independent producers, processors or dealers intent on carrying on their own businesses in their own legitimate way.").  In determining whether a practice is "predatory," you must look at the totality of the circumstances.  *Farmland Dairies, Inc. v. New York Farm Bureau, Inc.*, 1996 WL 191971, at * 6 (N.D.N.Y. Apr. 15, 1996) ("Courts must look at the totality of the circumstances when evaluating whether a practice is predatory.").[8]

If you do find that Defendants have not met their burden to prove by a preponderance of the evidence that they are entitled to Capper-Volstead protection, Plaintiffs must instead prove that Defendants willfully acquired or maintained monopsony power in a relevant market by anticompetitive – not predatory – conduct. Conduct is anticompetitive when it attempts to exclude rivals without enhancing efficiency in the market.  *See* ABA Model Jury Instructions, Instruction D-158. Anticompetitive acts are acts or practices, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating or foreclosing the efforts of other companies to compete for customers within the relevant market. Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition.

Mere possession of monopsony power, if lawfully acquired, does not violate the antitrust laws. A company with monopsony power may compete aggressively without violating the antitrust laws. Conduct only becomes unlawful where it involves: (i) anticompetitive acts, if Defendants do not qualify for Capper-Volstead protection; or (ii) predatory acts, if Defendants qualify for Capper-Volstead protection. All companies have a desire to increase their profits and increase their market share. These goals are an essential part of a competitive marketplace, and the antitrust laws do not make these goals—or the achievement of these goals—unlawful, as long as the company does not use anticompetitive or predatory means to achieve these goals.

---

[8] NOTE: While Plaintiffs recognize that the parties did not discuss Section 2 claims during day two of the charge conference, they understand that the Court wants to add the Capper-Volstead "toggle" to all instructions.  As such, Plaintiffs have included a proposed "toggle" for Section 2 claims.

In analyzing Defendants' conduct, you should consider whether the conduct is consistent with competition on the merits, whether the conduct provides benefits to consumers, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors.

The acts or practices that result in the acquisition or maintenance of monopsony power must represent more than the conduct of business that is part of that normal competitive process or commercial success. You may not find that a company willfully acquired or maintained monopsony power through anticompetitive means if it has acquired or maintained that power solely through the exercise of superior foresight and skill.

If you find that each Plaintiff has proven by a preponderance of the evidence that Defendants willfully acquired or maintained monopsony power (using the applicable standard I just described) then you must consider whether Plaintiffs have proved the remaining elements of this claim.

## SECOND CLAIM: SECTION 2 OF THE SHERMAN ACT MONOPSONIZATION – WILLFUL ACQUISITION OR MAINTENANCE OF MONOPSONY POWER (REFUSAL TO DEAL) (ELEMENT 3)

A company ordinarily may deal or refuse to deal with whomever it pleases, so long as it acts independently and not for anticompetitive purposes. Even a company with monopsony power has no general duty to cooperate with its business rivals and ordinarily may refuse to deal with them.

A refusal to deal with a competitor constitutes anticompetitive conduct only where the refusal is contrary to the short-run best interest of a company, and where it makes sense for that company only because it harms competitors and helps the company achieve or maintain monopsony power in the long run.

In contrast, a legitimate business purpose is one that benefits the company regardless of any harmful effects on competitors, such as a purpose to promote efficiency or quality. In general, the desire to maintain monopsony power or block entry of competitors is not a legitimate business purpose.

## SECOND CLAIM: SECTION 2 OF THE SHERMAN ACT MONOPSONIZATION – EFFECT ON INTERSTATE COMMERCE (ELEMENT 4)

As I previously stated, the Sherman Act applies only to conduct or restraints that affect interstate or foreign commerce. ~~I instruct you that~~Here, the ~~Defendants' conduct and the alleged restraints affect interstate commerce and, therefore,~~ essential element of interstate or foreign commerce has been established~~this element is met~~.

## SECOND CLAIM: SECTION 2 OF THE SHERMAN ACT MONOPSONIZATION – INJURY IN FACT AND ANTITRUST INJURY (ELEMENT 5)

As I explained before, each Plaintiff is entitled to recover damages ~~for an injury to his or her business~~ if he~~, or~~ she, or it can establish ~~three~~ four elements of injury:

(1)     The Plaintiff was in fact injured as a result of Defendants' violation of the antitrust laws;

(2)     Defendants' illegal conduct was a material cause of the Plaintiff's injury; and

(3)     The Plaintiff's injury is an injury of the type that the antitrust laws were intended to prevent.

~~(3)~~(4)  The injury was to the Plaintiff's business or property.

In order to establish "injury in fact," it must be established that the Plaintiff was injured as a result of Defendants' violation of the antitrust laws. Proving the fact of damage does not require a Plaintiff to prove the dollar value of his or her injury. It requires only that it be established that the Plaintiff in fact suffered an injury as a result of Defendants' antitrust violation. If you find that a Plaintiff has established that it was in fact injured, you may consider the amount of that Plaintiff's damages.

Each Plaintiff must also establish by a preponderance of the evidence that Defendants' conduct was a material cause of his or her injury. This means that some damage occurred to that Plaintiff as a result of Defendants' antitrust violation, and not some other cause. It is not required that Defendants' antitrust violation be the sole cause of the Plaintiff's injury, nor do all other possible causes of injury need to be eliminated. It

is enough if the Plaintiff proves that the antitrust violation was a material cause of its injury.

Each Plaintiff must also establish that its injury was the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If a Plaintiff's injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm producers, then that Plaintiff's injuries are antitrust injuries. If the injury is solely to a particular Plaintiff and not to competition in the relevant marketplace, it is not "antitrust injury."

## SECOND CLAIM: SECTION 1 OF THE SHERMAN ACT MONOPSONIZATION - MARKET WIDE SUPPRESSION (ELEMENT 5)

In this case, each Plaintiff claims that Professor Elhauge's regression analysis shows both their antitrust impact and damages. Specifically, Plaintiffs claim that his regression analysis shows market-wide suppression of the over-order premiums in Order 1, which reduced the amount paid to Plaintiffs by 98.7 cents per hundred weight. Defendants deny these claims, ~~and~~ dispute Professor Elhauge's opinions, and contest Plaintiffs' measure of damages.

Both sides have presented you with expert testimony to assist you in determining what, if any, antitrust impact or damages were sustained by Plaintiffs. It is for you to decide whether to accept or reject the experts' testimony. The verdict ~~slip~~ form will ask you questions concerning your findings ~~on whether there was market wide suppression~~ with regard to damages.

## THIRD CLAIM: SECTION 2 OF THE SHERMAN ACT ATTEMPT TO MONOPSONIZE – ELEMENTS

In their third claim, each Plaintiff alleges that they were injured by Defendants' unlawful attempt to monopsonize the market for raw Grade A milk in Order 1. To prevail on their claim of attempted monopsonization, each Plaintiff must prove by a preponderance of the evidence each of the following essential elements ~~by a preponderance of the evidence~~:

(1)     Defendants engaged in anticompetitive conduct;

(2)     Defendants had a specific intent to achieve monopsony power in a relevant market;

(3)     there was a dangerous probability that Defendants would achieve their goal of monopsony power in the relevant market;

(4)     Defendants' conduct occurred in or affected interstate commerce; and

(5)     That each Plaintiff was injured in their business by Defendants' anticompetitive conduct.

If you find that the evidence is sufficient to prove all five elements, then you must find for each Plaintiff on their claims for attempted monopsonization. If you find that Plaintiffs have failed to prove any element of their Section 2 attempt to monopsonize claim, you must enter a verdict for Defendants on this claim. I will explain these elements in more detail.

### THIRD CLAIM SECTION 2 OF THE SHERMAN ACT ATTEMPT TO MONOPSONIZE – ANTICOMPETITIVE CONDUCT (ELEMENT 1)

To establish the first element of their attempted monopsony claim, it is not sufficient for each Plaintiff to prove that Defendants intended to monopsonize the relevant market. Instead, each Plaintiff must show that Defendants engaged in anticompetitive conduct, coupled with an intent to monopsonize and a dangerous probability that Defendants would succeed.  In analyzing this element, you must first determine whether Defendants have met their burden to prove that they are entitled to Capper-Volstead protection.  If you find that Defendants have proven by a preponderance of the evidence that they are entitled to Capper-Volstead protection, then Plaintiffs must prove by a preponderance of the evidence that Defendants engaged in (1) predatory conduct; or (2) acts that smothered or stifled competition. *See Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 715 F.2d 30, (2d Cir. 1983) ("We held that the effect of the Capper-Volstead Act, 7 U.S.C. §§ 291–92, 'is to prevent the full application of the second element of this test to agricultural cooperatives,' so that the acquisition, maintenance, or exercise of monopoly power by 'predatory means' only was proscribed.") (citing *Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037, 1045 (2d Cir. 1980);

*Agritronics Corp. v. Nat'l Dairy Herd Ass'n, Inc.*, 914 F. Supp. 814, 825 (N.D.N.Y. 1996) ("Nor are farmers immune when they or their cooperative engage in predatory practices directed at restraining trade, or use their legitimately acquired monopoly power in such a manner as to smother competition under Section 2 of the Sherman Act."). "Predatory" acts include, but are not limited to, acts intended to eliminate or reduce competition, or acts that otherwise prey on independent producers. *See* Black's Law Dictionary (11th ed. 2019) (modified); *Fairdale*, 635 F.2d at 1044 ("Of course, a cooperative may neither acquire nor exercise monopoly power in a predatory fashion by the use of such tactics as picketing and harassment. Neither may it use its legitimately acquired monopoly power in such a manner as to stifle or smother competition."); *Maryland & Va. Milk Producers Ass'n v. U.S.*, 362 U.S. 458, 466-67 (1960) ("[Capper-Volstead] does not suggest a congressional desire to vest cooperatives with unrestricted power to restrain trade or to achieve a monopoly by preying on independent producers, processors or dealers intent on carrying on their own businesses in their own legitimate way."). In determining whether a practice is "predatory," you must look at the totality of the circumstances. *Farmland Dairies, Inc. v. New York Farm Bureau, Inc.*, 1996 WL 191971, at * 6 (N.D.N.Y. Apr. 15, 1996) ("Courts must look at the totality of the circumstances when evaluating whether a practice is predatory.").[9]

If you do find that Defendants have not met their burden to prove by a preponderance of the evidence that they are entitled to Capper-Volstead protection, Plaintiffs must instead prove that Defendants willfully acquired or maintained monopsony power in a relevant market by anticompetitive – not predatory – conduct. Conduct is anticompetitive when it attempts to exclude rivals without enhancing efficiency in the market. *See* ABA Model Jury Instructions, Instruction D-158.

---

[9] NOTE: While Plaintiffs recognize that the parties did not discuss Section 2 claims during day two of the charge conference, they understand that the Court wants to add the Capper-Volstead "toggle" to all instructions. As such, Plaintiffs have included a proposed "toggle" for Section 2 claims.

## THIRD CLAIM: SECTION 2 OF THE SHERMAN ACT
## ATTEMPT TO MONOPSONIZE – SPECIFIC INTENT
## (ELEMENT 2)

The second element that Plaintiffs must prove is that Defendants had a specific intent to monopsonize in a relevant market. In other words, you must decide if the evidence shows the Defendants acted with the conscious aim of acquiring the power to control prices or to exclude or destroy competition in the relevant market.

There are several ways in which Plaintiffs may prove Defendants had the specific intent to monopsonize. There may be evidence of direct statements of Defendants' intent to obtain a monopsony in the relevant market. Specific intent may also be inferred from what Defendants did. For example, if the evidence shows that Defendants lacked a legitimate business justification for their conduct in the relevant market and the natural and probable consequence of that was to give Defendants control over prices or to exclude competition, and this was plainly foreseeable by Defendants, then you may (but are not required to) infer Defendants specifically intended to acquire monopsony power.

## THIRD CLAIM: SECTION 2 OF THE SHERMAN ACT
## ATTEMPT TO MONOPSONIZE – DANGEROUS PROBABILITY OF SUCCESS
## (ELEMENT 3)

You also must determine if the evidence shows that there was a dangerous probability that Defendants would succeed in achieving monopsony power if they continued to engage in the same or similar conduct.

In making this determination, you should consider ~~such factors as~~:

- Defendants' market share;

- the trend in Defendants' market share;

- whether the barriers to entry into the market made it difficult for competitors to enter the market; and

- the likely effect of any anticompetitive conduct on Defendants' share of the market.

Again, the purpose ~~of looking at~~examining these ~~and other~~ factors is to determine whether there was a dangerous probability that Defendants would ultimately acquire monopsony power. A dangerous probability of success need not mean that success was

nearly certain, but it does mean that there was a substantial and real likelihood that Defendants would ultimately acquire monopsony power.

### THIRD CLAIM: SECTION 2 OF THE SHERMAN ACT
### ATTEMPT TO MONOPSONIZE – EFFECT ON INTERSTATE COMMERCE
### (ELEMENT 4)

As I previously stated, the Sherman Act applies only to conduct or restraints that affect interstate or foreign commerce. Here, the ~~parties agree that Defendants' conduct and the alleged restraints affect interstate commerce~~essential element of interstate or foreign commerce has been established.

### THIRD CLAIM: SECTION 2 OF THE SHERMAN ACT
### ATTEMPT TO MONOPSONIZE – INJURY IN FACT AND ANTITRUST INJURY
### (ELEMENT 5)

~~As I explained before, e~~Each Plaintiff is entitled to recover damages for an injury to his or her business if he or she can establish ~~three~~ four elements of injury:

(1) The Plaintiff was in fact injured as a result of Defendants' violation of the antitrust laws;

(2) Defendants' illegal conduct was a material cause of the Plaintiff's injury; and

(3) The Plaintiff's injury is an injury of the type that the antitrust laws were intended to prevent.

~~(3)~~(4)  The Plaintiff was injured in his, her, or its business or property.

In order to establish "injury in fact," it must be established that the Plaintiff was injured as a result of Defendants' violation of the antitrust laws. Proving the fact of damage does not require a Plaintiff to prove the dollar value of his or her injury. It requires only that it be established that the Plaintiff in fact suffered an injury as a result of Defendants' antitrust violation. If you find that a Plaintiff has established that it was in fact injured, you may consider the amount of that Plaintiff's damages.

Each Plaintiff must also establish by a preponderance of the evidence that Defendants' conduct was a material cause of his or her injury. This means that some damage occurred to that Plaintiff as a result of Defendants' antitrust violation, and not some other cause. It is not required that Defendants' antitrust violation be the sole cause

of the Plaintiff's injury, nor do all other possible causes of injury need to be eliminated. It is enough if the Plaintiff proves that the antitrust violation was a material cause of its injury.

Each Plaintiff must also establish that its injury was the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If a Plaintiff's injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm producers, then that Plaintiff's injuries are antitrust injuries.

## THIRD CLAIM: SECTION 1 OF THE SHERMAN ACT ATTEMPT TO MONOPSONIZE - MARKET WIDE SUPPRESSION (ELEMENT 5)

In this case, each Plaintiff claims that Professor Elhauge's regression analysis shows both their antitrust impact and damages. Specifically, Plaintiffs claim that his regression analysis shows market-wide suppression of the over-order premiums in Order 1, which reduced the amount paid to Plaintiffs by 98.7 cents per hundred weight. Defendants deny these claims, and dispute Professor Elhauge's opinions, and contest Plaintiffs' measure of damages.

Both sides have presented you with expert testimony to assist you in determining what, if any, antitrust impact or damages were sustained by Plaintiffs. It is for you to decide whether to accept or reject the experts' testimony. The verdict slip form will ask you questions concerning your findings on whether there was market wide suppression with regard to damages.

## FOURTH CLAIM: SECTION 2 OF THE SHERMAN ACT CONSPIRACY TO MONOPSONIZE – ELEMENTS

Each Plaintiff alleges that Defendants conspired to monopsonize in violation of Section 2 of the Sherman Act.

To prevail on this claim, each Plaintiff must prove, by a preponderance of the evidence each of the following elements:

(1)    Defendants knowingly entered into an agreement or mutual understanding with another entity to obtain or maintain monopsony power in the raw Grade A milk market in Order 1;[10]

(2)    Defendants and at least one alleged co-conspirator specifically intended that Defendants would obtain or maintain monopsony power in the raw Grade A milk market in Order 1;

(3)    Defendants committed an overt act in furtherance of the conspiracy;

(4)    Defendants' activities occurred in or affected interstate commerce; and

(5)    Each Plaintiff was injured in his, ~~or~~ her, or its business because of the conspiracy to monopsonize.

~~As I instructed you earlier, E~~each Plaintiff is required to prove monopsony power in the relevant market. In considering each Plaintiff's claim for conspiracy to monopsonize, you may aggregate, or in other words add together, the market share of the alleged co-conspirators in evaluating whether Defendants have monopsony power.

If you find that the evidence is sufficient to prove each essential element by a preponderance of the evidence, then you must find for Plaintiffs and against Defendants on the conspiracy to monopsonize claim. A monopsony is a type of restraint under Section 1. Therefore, if you find for each Plaintiff on their fourth claim, conspiracy to monopsonize, you must also find for each Plaintiff on their first claim, conspiracy to restrain trade. *See Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1183 (8th Cir. 1982) ("The impermissible aim is to pursue monopoly power by eliminating or restraining competition with the co-op through predatory or anti-competitive practices. An intent to do so is, therefore, the proper intent element of an attempted monopolization or conspiracy claim under Section 2. Of course, a conspiracy or combination to eliminate competition through such unlawful means would also violate Section 1 as an unreasonable restraint of trade."); *Maryland & Va. Milk Producers Assoc.*, 362 U.S. 458, 463 (1960) ("Although the Court was not confronted with charges under s 2 of the

---

[10] Plaintiffs do not believe that we need a Capper Volstead toggle here because Plaintiffs are claiming that the conspiracy included milk processors, who do not qualify for Capper Volstead protections.

==Sherman Act in that case we do not believe that Congress intended to immunize cooperatives engaged in competition-stifling practices from prosecution under the antimonopolization provisions of s 2 of the Sherman Act, while making them responsible for such practices as violations of the antitrade-restraint provisions of ss 1 and 3 of that Act. These sections closely overlap, and the same kind of predatory practices may show violations of all.").==

If you do not find that the evidence is sufficient to prove each element for each Plaintiff, then you must find for Defendants.

### FOURTH CLAIM: SECTION 2 OF THE SHERMAN ACT CONSPIRACY TO MONOPSONIZE – EXISTENCE OF A CONSPIRACY (ELEMENT 1)

Each Plaintiff alleges that Defendants participated in a conspiracy to monopsonize the raw Grade A milk market in Order 1. To prevail on this claim, each Plaintiff must prove both of the following elements by a preponderance of the evidence:

(1)    that a contract, combination, or conspiracy existed; and

(2)    that Defendants knowingly became a member of that conspiracy.

As I explained before, a conspiracy is an agreement or an understanding between two or more persons or entities. An agreement or understanding exists when two or more persons or corporations share a commitment to a common scheme. To establish the existence of a contract, combination, or conspiracy, the evidence does not need to show that there was a formal or written agreement. An agreement or understanding may be entirely unspoken.

A contract, combination, or conspiracy may be formed without all of the parties reaching an agreement at the same time, such as where competitors separately accept invitations to participate in a plan to restrain trade. Similarly, it is not essential that all persons acted exactly alike, nor is it necessary that they all possessed the same motives for entering the agreement. It is ~~also~~ not necessary that all of the means or methods claimed by Plaintiffs were agreed upon ~~to carry out the alleged conspiracy, nor that all of the means or methods that were agreed upon were~~ , actually used, or put into operation~~,~~.

~~nor that all~~It is also not necessary that each Plaintiff prove that all the persons alleged to be members of the conspiracy were actually members provided each Plaintiff proves that at least one other person entered into the alleged agreement or conspiracy with Defendants. It is the agreement or understanding to monopsonize that constitutes a contract, combination, or conspiracy which matters for this element. ~~Therefore, y~~You may find a conspiracy existed regardless of whether it succeeded or failed.

In determining whether an agreement or understanding between two or more persons ~~or entities~~ has been proved, you must view the evidence as a whole. Each Plaintiff may prove the existence of the alleged contract, combination, or conspiracy through direct evidence, circumstantial evidence, or both. Direct evidence is explicit and requires no inferences to establish the existence of a contract, combination, or conspiracy. You may also infer the existence of an agreement from the circumstances, including what you find the alleged members actually did and the words they used. Mere similarity of conduct among various persons, however, or the fact that they may have associated with one another and may have met or assembled together, does not by itself establish the existence of an agreement or a conspiracy.

### FOURTH CLAIM: SECTION 2 OF THE SHERMAN ACT CONSPIRACY TO MONOPSONIZE – SPECIFIC INTENT (ELEMENT 2)

If you determine that there was an agreement among Defendants and their co-conspirators to monopsonize in the raw Grade A milk market in Order 1, you must then decide whether Plaintiffs have proven that Defendants specifically intended that they would acquire or maintain monopsony power in the raw Grade A milk market in Order 1. In other words, you must decide whether the evidence shows that Defendants entered into agreements with the conscious aim of acquiring or maintaining the power to control prices or exclude competition through the use of anticompetitive conduct.

Thus, in analyzing this element, you must first determine whether Defendants have met their burden to prove that they, along with all of their alleged coconspirators, are entitled to Capper-Volstead protection.  I instruct you that processors like Dean and Hood

are not entitled to Capper Volstead protection.  Thus, if you find that Defendants conspired with processors then Capper Volstead protection does not apply.  *See United States v. Borden Co.*, 308 U.S. 188, 204-05 (1939) (Capper Volstead does not "authorize any combination or conspiracy with **other persons** in restraint of trade that . . . producers may see fit to devise") (emphasis added); *Agritronics Corp. v. Nat'l Dairy Herd Ass'n, Inc.*, 914 F. Supp. 814, 825 (N.D.N.Y. 1996) ("Farmers and their organizations have been held to lose protection from antitrust attack when they combine with nonproducer 'outsiders' to unreasonably restrain trade.").   If you find that Defendants have proven by a preponderance of the evidence that they, and all of their alleged coconspirators are entitled to Capper-Volstead protection, then Plaintiffs must prove by a preponderance of the evidence that Defendants engaged in (1) predatory conduct; or (2) acts that smothered or stifled competition. *See Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 715 F.2d 30, (2d Cir. 1983) ("We held that the effect of the Capper-Volstead Act, 7 U.S.C. §§ 291–92, 'is to prevent the full application of the second element of this test to agricultural cooperatives,' so that the acquisition, maintenance, or exercise of monopoly power by 'predatory means' only was proscribed.") (citing *Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037, 1045 (2d Cir. 1980); *Agritronics Corp. v. Nat'l Dairy Herd Ass'n, Inc.*, 914 F. Supp. 814, 825 (N.D.N.Y. 1996) ("Nor are farmers immune when they or their cooperative engage in predatory practices directed at restraining trade, or use their legitimately acquired monopoly power in such a manner as to smother competition under Section 2 of the Sherman Act.").  "Predatory" acts include, but are not limited to, acts intended to eliminate or reduce competition, or acts that otherwise prey on independent producers.  *See* Black's Law Dictionary (11th ed. 2019) (modified); *Fairdale*, 635 F.2d at 1044 ("Of course, a cooperative may neither acquire nor exercise monopoly power in a predatory fashion by the use of such tactics as picketing and harassment.  Neither may it use its legitimately acquired monopoly power in such a manner as to stifle or smother competition."); *Maryland & Va. Milk Producers Ass'n v. U.S.*, 362 U.S. 458, 466-67 (1960) ("[Capper-Volstead] does not suggest a congressional desire to vest cooperatives with unrestricted power to restrain trade or to achieve a monopoly by preying on

independent producers, processors or dealers intent on carrying on their own businesses in their own legitimate way.").  In determining whether a practice is "predatory," you must look at the totality of the circumstances.  *Farmland Dairies, Inc. v. New York Farm Bureau, Inc.*, 1996 WL 191971, at * 6 (N.D.N.Y. Apr. 15, 1996) ("Courts must look at the totality of the circumstances when evaluating whether a practice is predatory.").[11]

If you do find that Defendants have not met their burden to prove by a preponderance of the evidence that they, and all of their alleged coconspirators, are entitled to Capper-Volstead protection, Plaintiffs must instead prove that Defendants willfully acquired or maintained monopsony power in a relevant market by anticompetitive – not predatory – conduct.  Conduct is anticompetitive when it attempts to exclude rivals without enhancing efficiency in the market.  *See* ABA Model Jury Instructions, Instruction D-158.  It is not essential that Plaintiffs prove the use of the power to exclude or the actual exclusion of existing or potential competitors.

There are several ways in which Plaintiffs may prove that Defendants had the specific intent to monopsonize. There may be evidence of direct statements of Defendants' intent or specific intent may also be inferred from what Defendants did. For example, if the evidence shows that the natural and probable consequence of the agreement or of the conduct of the parties to the agreement was to exclude or destroy competition in the raw Grade A milk market in Order 1, that there was no legitimate business justification but the destruction or damage to competition, and that this was plainly foreseeable by Defendants, then you may (but are not require to) infer that Defendants specifically intended to acquire monopsony power.

---

[11] NOTE: While Plaintiffs recognize that the parties did not discuss Section 2 claims during day two of the charge conference, they understand that the Court wants to add the Capper-Volstead "toggle" to all instructions.  As such, Plaintiffs have included a proposed "toggle" for Section 2 claims.

**FOURTH CLAIM: SECTION 2 OF THE SHERMAN ACT**
**CONSPIRACY TO MONOPSONIZE – OVERT ACT**
**(ELEMENT 3)**

The third element that each Plaintiff must prove by a preponderance of the evidence is that Defendants committed an overt act in furtherance of the conspiracy after October 8, 2005. The term "overt act" means some type of outward, objective action performed by Defendants or their co-conspirators, which evidences that agreement or conspiracy. Plaintiffs are not required to prove that the overt act was predatory. [Each Plaintiff must only prove by a preponderance of the evidence that the overt act in some way furthered the objectives of the conspiracy after October 8, 2005.]

**FOURTH CLAIM: SECTION 2 OF THE SHERMAN ACT**
**CONSPIRACY TO MONOPSONIZE – EFFECT ON INTERSTATE**
**COMMERCE**
**(ELEMENT 4)**

As I previously stated, tThe Sherman Act applies only to conduct or restraints that affect interstate or foreign commerce. Here, the essential element of interstate or foreign commerce has been establishedI instruct you that Defendants' conduct and the alleged restraints affect interstate commerce and, therefore, this element is met.

**FOURTH CLAIM: SECTION 2 OF THE SHERMAN ACT**
**CONSPIRACY TO MONOPSONIZE – INJURY IN FACT AND ANTITRUST**
**INJURY**
**(ELEMENT 5)**

EAs I explained before, each Plaintiff is entitled to recover damages for an injury to his or her business if he, or she, or it can establish three four elements of injury:

(1)     The Plaintiff was in fact injured as a result of Defendants' violation of the antitrust laws;

(2)     Defendants' illegal conduct was a material cause of the Plaintiff's injury; and

(3)     The Plaintiff's injury is an injury of the type that the antitrust laws were intended to prevent.

(3)(4)  The injury was to the Plaintiff's business or property.

In order to establish "injury in fact," it must be established that the Plaintiff was injured as a result of Defendants' violation of the antitrust laws. Proving the fact of

50

damage does not require a Plaintiff to prove the dollar value of his or her injury. It requires only that it be established that the Plaintiff in fact suffered an injury as a result of Defendants' antitrust violation. If you find that a Plaintiff has established that it was in fact injured, you may consider the amount of that Plaintiff's damages.

Each Plaintiff must also establish by a preponderance of the evidence that Defendants' conduct was a material cause of his or her injury. This means that some damage occurred to that Plaintiff as a result of Defendants' antitrust violation, and not some other cause. It is not required that Defendants' antitrust violation be the sole cause of the Plaintiff's injury, nor do all other possible causes of injury need to be eliminated. It is enough if the Plaintiff proves that the antitrust violation was a material cause of its injury.

Each Plaintiff must also establish that its injury was the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If a Plaintiff's injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm producers, then that Plaintiff's injuries are antitrust injuries. If the injury is solely to a particular Plaintiff and not to competition in the relevant marketplace, it is not "antitrust injury." In establishing antitrust injury, Plaintiffs can rely on the aggregate effect of the alleged conspiracy provided that the harm occurred within the statute of limitations, which I will address later in my instructions. If you find that a Plaintiff has established that he, she, or it suffered "injury in fact," you must then consider the amount of that Plaintiff's damages

## THIRD CLAIM: SECTION 1 OF THE SHERMAN ACT
## CONSPIRACY TO MONOPSONIZE - MARKET WIDE SUPPRESSION
## (ELEMENT 5)

In this case, each Plaintiff claims that Professor Elhauge's regression analysis shows both their antitrust impact and damages. Specifically, Plaintiffs claim that his regression analysis shows market-wide suppression of the over-order premiums in Order

1, which reduced the amount paid to Plaintiffs by 98.7 cents per hundred weight. Defendants deny these claims and dispute Professor Elhauge's opinions.

Both sides have presented you with expert testimony to assist you in determining what, if any, antitrust impact or damages were sustained by Plaintiffs. It is for you to decide whether to accept or reject the experts' testimony. The verdict slip will ask you questions concerning your findings on whether there was market wide suppression.

## DEFENDANTS' AFFIRMATIVE DEFENSES

## AFFIRMATIVE DEFENSE: STATUTE OF LIMITATIONS

The statute of limitations for the Sherman Act does not permit recovery of damages for any injuries sustained by any of the Plaintiffs prior to October 8, 2005. In deciding whether Defendants' conduct caused a Plaintiff's injury in fact, you may only consider overt acts taken by Defendants after October 8, 2005. Agreements that Defendants entered into prior to October 8, 2005 cannot be the cause of an injury in fact for which any Plaintiff may recover damages in this case. You may only find that a Plaintiff was, in fact, injured by an alleged antitrust violation if you find Defendants' actions after October 8, 2005 injured that Plaintiff. **[Per the Court's instruction at the August 10, 2020 charge conference, Plaintiffs have left the jury instruction as is. *See* Tran. at 217:1-2 ("I'm going to leave this jury instruction as is right now, but we'll be revisiting it again."). The Court instructed the parties that she will "await the proof at trial and make sure that this instruction jives with the verdict form." *Id.* at 216:17-19.  As the Court recognized, this instruction as currently drafted "overstates the October 8th, 2005 cutoff because if you entered into agreement prior to October 8th, 2005, and continued it throughout the conspiracy, it doesn't enter into a safe harbor because it was actually executed prior to the statute of limitations." Tran. at 209:9-13, 209-25-210:3 (recognizing that this is not "a continuing violation. That's an agreement that is being maintained during the alleged conspiracy.").]**

## **AFFIRMATIVE DEFENSE: CAPPER-VOLSTEAD ACT**

[Defendants to Revise]

Defendants have raised the Capper-Volstead Act as an affirmative defense. The Capper-Volstead Act is a federal law that permits agricultural producers, including dairy farmers, to market, price and sell their products collectively without violating the federal antitrust laws, including the Sherman Act.

Defendants bear the burden of establishing by a preponderance of the evidence that the Capper-Volstead Act applied to their conduct. First, iIn order for Defendants to claim protection under Capper-Volstead, they must establish:

(1)   that DFA is composed of members of producers of agricultural products;

(2)   it is involved in the processing, preparing for market, handling or marketing of the agricultural products of its members; and

(3)   DFA is operated for the mutual benefit of its members, as producers.

With respect to the first element, Capper-Volstead only protects farmers. It does not protect milk processors. However, the Capper-Volstead Act permits groups of farmers to process their milk collectively. Thus, in order to determine whether DFA is entitled to Capper-Volstead immunity in the first instance, you must consider:

•   the nature of DFA's activities;

•   the degree of integration of its members; and

•   the functions historically performed by dairy farmers.

With respect to the second element, the Capper-Volstead Act may permits cooperatives to own processing plants, but iIt does not authorize them to profit from that ownership at the expense of their own members in violation of the antitrust laws.

With respect to the third element, Plaintiffs contend that DFA does not act for the mutual benefit of its members. DFA maintains that it does operate for the mutual benefit of its members. This is a question for you to decide, and the verdict form will have a question for you on this issue.

If you find that Defendants fail to establish any one of the three elements described above by a preponderance of the evidence, they cannot rely on their~~an~~ affirmative defense based on the Capper-Volstead Act. ~~Second, even i~~If you determine that ~~the~~ Defendants have satisfied their burden to establish that the Capper-Volstead Act applies~~, to Defendants, the scope of the conduct to which it applies is limited~~you must consider whether Defendants engaged in acts that violated the antitrust laws because Capper-Volstead immunity does not shield such conduct.

~~Specifically, the Capper-Volstead Act does not vest cooperatives with unrestricted power to restrain trade or achieve a monopsony.~~ In other words, ~~it~~ Capper-Volstead immunity does not apply to anticompetitive or predatory acts designed to stifle competition. Therefore, the Act does not permit:

(1) Cooperatives to conspire or combine with nonexempt entities— entities that are not protected by the Capper-Volstead Act—to reduce competition, even though such activities are lawful when engaged in by cooperatives alone.

(2) Cooperatives to engage in predatory ~~trade~~ practices ~~at will~~. In other words, cooperatives cannot use ~~their position~~Capper-Volstead protection ~~as a lever~~ to suppress competition.

If you determine that Defendants conspired with non-exempt entities or engaged in predatory trade practices, that conduct is not protected from antitrust liability by the Capper-Volstead Act.

## INSTRUCTIONS APPLICABLE TO ALL CLAIMS

## DAMAGES GENERALLY

If you decide in favor of Defendants, you will not consider these instructions about damages. But, if you decide for any Plaintiff, you must determine the amount of money that will fairly compensate that Plaintiff for each item of harm that was caused by Defendants' conduct. This compensation is called "damages." The purpose of compensatory damages is to put an injured Plaintiff in a position as close as possible to that which he, she, or it would occupy if the violation had not occurred. They are not used to punish wrongdoers or to deter particular conduct in the future.

## BASIS FOR CALCULATING DAMAGES

You are permitted to make just and reasonable estimates in calculating Plaintiffs' damages. You are not required to calculate damages with mathematical certainty or precision. Damages may not be based on sympathy, guesswork, or speculation.

Plaintiffs need only proffer a reasonable estimate of damages. They must also prove the reasonableness of each of the assumptions upon which the damages calculation is based. If you find that Plaintiffs have provided a reasonable basis for determining damages, then you may award damages based on a just and reasonable estimate supported by the evidence.

## LIABILITY FOR THE CONSPIRACY

Each participant in the conspiracy is fully liable for all of the damages caused by the conspiracy. *See Ward v. Apple Inc.*, 791 F.3d 1041, 1048 (9th Cir. 2015) ("[A]ntitrust coconspirators are jointly and severally liable for all damages caused by the conspiracy.") (citations omitted). If you find that a Plaintiff has proven all other elements of his, her, or its conspiracy claims, that Plaintiff is entitled to recover damages from Defendants for all harm caused by the conspiracy.

## BASIS FOR CALCULATING DAMAGES

You are permitted to make just and reasonable estimates in calculating a Plaintiff's damages. You are not required to calculate damages with mathematical certainty or precision. *See J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 565-66 (1981) (noting that "a degree of uncertainty" is acceptable in proving antitrust damages due to the common absence of "concrete, detailed proof of injury which is available in other contexts") (citation omitted). Damages may not be based on sympathy, guesswork, or speculation.

Each Plaintiff need only proffer a reasonable estimate of damages. *See U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1378 (2d Cir. 1988) ("An antitrust plaintiff must thus provide only sufficient evidence to support a 'just and reasonable estimate' of damages.") (quoting *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946)). He, she, or it must also prove the reasonableness of each of the

assumptions upon which the damages calculation is based. *See MCI Comm'cns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1168 (7th Cir. 1983) (finding antitrust plaintiff "must . . . support[] by an adequate foundation . . . all assumptions critical to the calculation of damages"). If you find that a Plaintiff has provided a reasonable basis for determining damages, then you may award damages to that Plaintiff based on a just and reasonable estimate supported by the evidence. *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 124 (1969) ("[T]he jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly.") (citation omitted).

## CONCLUDING INSTRUCTIONS

### VERDICT FORM

I will provide you with a verdict form that will guide you in making your determinations in this action. You must fill out the verdict form in accordance with these jury instructions. If there is any conflict between the verdict form and these instructions, you must follow these instructions.

### JURY DELIBERATIONS/UNANIMOUS VERDICT

The verdict must represent the considered judgment of each juror. In order to return a verdict, you must all agree. Your verdict must be unanimous.

You must consult with one another. You must try to reach an agreement if you can do so without sacrificing your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. Do not hesitate to re-examine your views and change your opinions if you are convinced they are wrong. But do not surrender your honest opinion as to the weight or effect of evidence solely because of the opinions of your fellow jurors, or for the mere purpose of returning a verdict.

If you need to communicate with me, you should send a note through the Court Officer, signed by your foreperson. You must not discuss with the court or with any other person what is said in deliberations, and any note you send to the court must not include this information. In other words, you may ask the court questions but, in doing so, you must not reveal what the jurors are thinking or saying. You must not tell anyone how the

jury stands numerically or otherwise until after you have reached a unanimous verdict and you have been discharged. Even then you need not speak to anyone about this case unless you want to.

When you have reached a verdict, tell the Court Officer that you have reached a verdict, but do not tell the Court Officer what the verdict is. You will then be brought into the courtroom where I shall ask you if you have reached a verdict, and, if you have, what it is.

## JUROR NOTE TAKING

During the trial, you have been provided with pen and paper, and some of you have taken notes. As I explained at the beginning of the trial, all jurors should be given equal attention during the deliberations regardless of whether or not they have taken notes. Any notes you have taken may only be used to refresh your memory during deliberations. You may not use your notes as authority to persuade your fellow jurors as to what a witness did or did not say. In your deliberations you must rely upon your collective memory of the evidence in deciding the facts of the case. If there is any difference between your memory of the evidence and your notes, you may ask that the record of the proceedings be read back. If a difference still exists, the record must prevail over your notes. I will now describe the process for a read back.

## READ BACK OF EVIDENCE

If, during your deliberations, you are unable to recall with any degree of accuracy, a particular part of the testimony, or part of these instructions, you may do the following:

1. Write out your question, and have the foreperson sign it;

2. Knock on the door of the jury room; and

3. Deliver your note to the Court Officer, to give to me.

After the attorneys have been consulted, and the record has been reviewed, I shall decide what action to take. I will tell you my ruling.

## SELECTION AND DUTIES OF A FOREPERSON

I select _____ to act as your foreperson. The foreperson acts as a chairperson or moderator. It is your duty to see that discussions are carried out in a sensible and orderly manner and to see that the issues submitted for the jury's decision are fully and fairly discussed, and that every juror has a chance to say what he or she thinks upon every question. When ballots should be taken, you will see that it is done. You will act as the jury's spokesperson in the courtroom. In all other respects, the foreperson is the same as every other juror. His or her vote or opinions do not count more or less than those of his or her fellow jurors.

Ladies and gentlemen of the jury, you may now take the case and retire to begin your deliberations.

Dated at Burlington, in the District of Vermont, this ___ day of September, 2020.

_____
Christina Reiss, District Judge
United States District Court

58