**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF VERMONT**

| | |
|---|---|
| **GARRET AND RALPH SITTS, et al.,** | |
| **PLAINTIFFS,** | **Civil Action No. 2:16-cv-00287-cr** |
| **v.** | |
| **DAIRY FARMERS OF AMERICA, INC., and DAIRY MARKETING SERVICES, LLC,** | |
| **DEFENDANTS.** | |

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| VICTOR BARRICK, LOGAN BOWER, | ) |
| MARK AND DWIGHT BRANDENBURG, | ) |
| THOMAS CLARK, GERRY DELONG, | ) |
| MARK AND BARBARA DULKIS, GLEN | ) |
| EAVES, RICHARD GANTNER, STEFAN | ) |
| AND CINDY GIEGER, SCOTT AND GAIL | ) |
| HYMERS, RANDY AND LYNETTE INMAN, | ) |
| FRANK AND JOHN LAMPORT, RUSSELL | ) |
| AND DIANE MAXWELL, WALT MOORE, | ) |
| MICHAEL NISSLY, CALVIN ROES, | ) |
| BRADLEY ROHRER, DONALD T. AND | ) |
| DONALD M. SMITH, KEN AND JUDY | ) |
| TOMPKINS, and MARK AND ERIC VISSER, | ) |
| | ) |
|        Plaintiffs, | ) |
| | ) |
|    v. | ) |
| | ) |
| DAIRY FARMERS OF AMERICA, INC., and | ) Case No. 2:16-cv-00287 |
| DAIRY MARKETING SERVICES, LLC, | ) |
| | ) |
|        Defendants. | ) |

## <u>JURY CHARGE</u>

Members of the Jury:

Now that you have heard the evidence and the arguments, it is my duty to instruct you on the law. It is your duty to accept these instructions of law and apply them to the facts as you determine them. You are not to single out one instruction alone as stating the law, but must consider the instructions as a whole. You are not to be concerned with the wisdom of any rule of law stated by the court. Regardless of any opinion you may have as to what the law is or ought to be, it would be a violation of your sworn duty to base a verdict upon any view of the law other than that given in the instructions of the court, just

as it would also be a violation of your sworn duty, as judges of the facts, to base a verdict upon anything other than the evidence presented during the trial.

The lawyers may have referred to some of the rules of law in their arguments. If any difference appears between the law as stated by the lawyers and the law as stated by the court in these instructions, you must follow the court's instructions.

Our judicial system requires you to carefully and impartially consider all of the evidence, follow the law, and reach a just verdict, regardless of the consequences.

## JURORS AS FINDERS OF FACT/RULINGS OF THE COURT

You and you alone are the triers of the facts. Each of you, as jurors, must determine the facts for yourselves in reaching a verdict. By the rulings which I made during the course of the trial, I did not intend to indicate to you or to express my own views about this case.

## SYMPATHY/PREJUDICE

Neither sympathy nor prejudice, for or against the parties, or any other person involved with this case, should influence you in any manner in reaching your verdict. Your deliberations should be well-reasoned and impartial.

## IMPORTANT CASE

This is an important case to the parties and the court. You should give it serious and fair consideration.

## ARGUMENTS/STATEMENTS/OBJECTIONS OF THE ATTORNEYS

The opening statements and closing arguments of the attorneys, their questions and objections, and all other statements that they made during the course of the trial are not evidence. The attorneys have a duty to object to evidence that they believe is not admissible. You may not hold it against either side if any attorney feels it is necessary to make an objection.

## NUMBER OF WITNESSES

The fact that one side may have called more witnesses than the other side is of no significance. Your task is to evaluate the credibility of the witnesses and to weigh all of the evidence.

## EVIDENCE IN THE CASE

The evidence in this case consists of the sworn testimony of the witnesses and the exhibits admitted into evidence, regardless of which party presented the evidence, and any evidence of which the court took judicial notice. Any evidence to which an objection was sustained or stricken by the court must be disregarded.

## EVIDENCE – DIRECT OR CIRCUMSTANTIAL

There are two types of evidence from which you may find the facts of this case: direct and circumstantial evidence. Direct evidence is the testimony of someone who asserts actual knowledge of a fact, such as an eyewitness or the exhibits in the trial. Circumstantial evidence is proof of a chain of facts and circumstances tending to prove or disprove an issue in the case.

For example, if a witness were to testify that he or she had seen cows in a field, that would be an example of direct evidence that there were cows in a field. On the other hand, if a witness were to testify that he or she had seen fresh cow tracks in the field, that would be an example of circumstantial evidence that there had been cows in the field.

The law does not require a party to prove its claims or defenses by direct evidence alone, that is, by testimony of an eyewitness. One or more of the essential elements, or all of the essential elements, may be established by reasonable inference from other facts that are established by direct testimony. Circumstantial evidence may alone be sufficient to prove a claim or defense.

The law makes no distinction between the weight to be given to direct or circumstantial evidence. Nor is a greater degree of certainty required of circumstantial evidence than of direct evidence. You should consider all the evidence in the case and give it such weight as you think it deserves.

## CREDIBILITY OF WITNESSES

You are the sole judges of the credibility of the witnesses, and the weight to give their testimony is up to you. In considering the testimony of any witness, you may take into account his or her ability and opportunity to observe; his or her demeanor while testifying; any interest or bias he or she may have; and the reasonableness of his or her testimony,

considered in light of all of the evidence in the case. Consider also any relation each witness may bear to either side of the case, any bias or prejudice, the manner in which each witness might be affected by the verdict, and the extent to which, if at all, each witness is either supported or contradicted by other evidence in the case.

Inconsistencies or discrepancies in the testimony of a witness, or between the testimony of different witnesses, may or may not cause you to discredit a witness's testimony. Two or more persons witnessing an incident or transaction may see or hear it differently. It is your duty to reconcile conflicting testimony if you can do so.

In weighing the effect of a discrepancy, consider whether it pertains to a matter of importance or to an unimportant detail, and whether the discrepancy results from innocent error or intentional falsehood.

You may give the testimony of each witness such weight, if any, you think it deserves. You may believe all of the testimony of any witness, you may believe it in part and disbelieve it in part, or you may reject it altogether. You do not have to accept the testimony of any witness, even if it is uncontradicted. It is for you to say what you will believe and what you will disbelieve.

## **EXPERT WITNESSES**

You have heard evidence from witnesses who are known as expert witnesses. An expert witness is a person who has special knowledge, experience, training, or education in his or her profession or area of study. Because of this expertise, an expert witness may offer an opinion about one or more of the issues in the case. In evaluating their testimony, you should evaluate their credibility and statements just as you would with any other witness. You should also evaluate whether the expert witness's opinion is supported by the facts that have been proved, and whether the opinion is supported by the witness's knowledge, experience, training, or education. You are not required to give the testimony of an expert witness any greater weight than you believe it deserves just because the witness has been referred to as an expert.

## INTEREST IN THE OUTCOME

As a general matter, in evaluating the credibility of each witness, you should take into account any evidence that the witness who testified may benefit in some way from the outcome of this case. Such an interest may create a motive to testify falsely and may sway the witness to testify in a way that advances his or her own interests. Therefore, if you find that any witness whose testimony you are considering has an interest in the outcome of this trial, then you should bear that factor in mind when evaluating the credibility of his or her testimony and accept it only with great care.

This is not to suggest that any witness who has an interest in the outcome of a case will testify falsely. It is for you to decide to what extent, if at all, the witness's interest has affected or colored his or her testimony.

## PRIOR INCONSISTENT STATEMENTS

You may find that a witness has made statements outside of this trial that are inconsistent with the statements that the witness gave here. You may consider the out-of-court statements not made under oath only to determine the credibility of the witness and not as evidence of any facts contained in the statements. As to out-of-court statements that were made under oath, such as statements made in prior testimony, you may consider them for all purposes, including for the truth of the facts contained therein.

## SPECIALIZED KNOWLEDGE AND EXPERIENCE OF JURORS

In deliberating upon your verdict, you are not expected to put aside your common sense or your own observations or experience of the general affairs of life. However, a juror having special knowledge of a subject may neither state this knowledge to fellow jurors nor act upon it himself or herself in arriving at a verdict. You must not tell your fellow jurors about matters which are based on special knowledge concerning an issue in the case that did not come from the evidence received in the courtroom.

## PREPONDERANCE OF THE EVIDENCE

To "establish by a preponderance of the evidence" means to prove that something is more likely than not. In other words, a preponderance of the evidence means such evidence that, when considered and compared with that opposed to it, has more persuasive force, and

produces in your minds a belief that what is sought to be proved is more likely true than not true. A preponderance of the evidence means the greater weight of the evidence. In determining whether a fact, claim, or defense has been proven by a preponderance of the evidence, you may consider the testimony of witnesses, regardless of who may have called them, and the exhibits in evidence, and the stipulations, regardless of who may have produced or introduced them. No proof of absolute certainty is required.

### INSTRUCTIONS ON THE SUBSTANTIVE LAW OF THE CASE

Having explained the general guidelines by which you will evaluate the evidence in this case, I will now instruct you with regard to the law that is applicable to your determinations in this case.

### PLAINTIFFS' THEORY OF THE CASE

In this case, each Plaintiff alleges claims against Defendants under a federal antitrust statute called the Sherman Act. The purpose of the Sherman Act is to preserve free competition in the marketplace. I will now briefly walk through Plaintiffs' theory of the case. I want to be clear, however, that there are two sides to the story. And I am not endorsing one side's view of the case over the other. It is your job—and yours alone—to judge the facts of the case and decide whom you believe. The Court is providing this overview *only* so that you have a better understanding of where certain evidence and factual disputes fit within the law as I am giving it to you.

Plaintiffs' theory of the case is that cooperatives and processors compete for farmers' raw milk, and this competition benefits farmers because it can lead to higher pay prices for farmers. Plaintiffs claim that Defendants, who operate as both a cooperative and milk processor, sought to restrict this competition to gain control over the milk supply in Order 1, obtain monopsony power (*i.e.*, buyer-side market power), and suppress one small component of the price paid to farmers for raw milk, known as the "over order premium." Plaintiffs' theory is that the Defendants suppressed this small component of raw milk prices

to benefit their milk processing operations.[1] In other words, DFA's processing operations buy raw milk to make their products (pasteurized milk, yogurt, ice cream, etc.) and would be more profitable when raw milk prices are lower.

Plaintiffs contend that Defendants engaged in three categories of anticompetitive conduct to eliminate competition for raw milk and suppress the prices paid to farmers. *First*, Plaintiffs claim that Defendants entered into agreements with other cooperatives not to compete for farmers' milk including: agreements not to solicit each other's members; and agreements to share farmer pay price information so that all farmers are paid the same amount and have little incentive to switch cooperatives.

*Second*, Plaintiffs contend that Defendants entered into agreements with other processors not to compete for farmers' milk. Plaintiffs claim that the Defendants used full supply and outsourcing agreements to force farmers to have to market through DMS or join DFA as a member in order to sell their milk to the processing facilities. In addition, Plaintiffs assert that these agreements gave Defendants control over both the prices paid to the independent farmers and access to the processors, further strengthening their market power and restricting competition in Order 1. Plaintiffs also claim that Defendants guaranteed the processors the lowest price for the milk (through most favored nations provisions); and paid these processors "non-compete" payments in exchange for not buying milk directly from farmers.

*Third*, Plaintiffs claim that Defendants used their market power to coerce farmers who were independent or belonged to other cooperatives to join DFA in order for them to continue to have an outlet to sell their raw milk.

Finally, each Plaintiff contends that DFA does not qualify under a statute known as the Capper-Volstead Act because DFA does not operate for the mutual benefit of its members as producers. Specifically, Plaintiffs claim that DFA management favors growth

---

[1]     *See* Expert Report of Einer R. Elhauge ¶¶ 247, 263, Table 4, Exhibit Z to Pls.' Mem. in Opp'n to Defs.' Mot. for Summ. J. (Oct. 3, 2018), ECF No. 102 (calculating the average "mailbox price" to be $17.97 and the average farmer "premium" to be $0.358, or approximately 2% of the average mailbox price).

of its commercial operations at the expense of farmer pay prices in order to generate revenue that DFA management can use for purposes that are not beneficial to dairy farmers and which are not disclosed to the farmer members.[2]

---

[2]     DFA has proposed minor revisions to the instruction regarding "Plaintiffs' Theory of the Case", above, to avoid misleading and confusing the jury. First, it is undisputed that plaintiffs' theory relates only to the effect that DFA's alleged conduct on over-order premiums—which is only one component of the overall milk price that dairy farmers receive. *See* Pls.' Mem. in Opp'n to Defs.' Mot. for Summ. J. at 26-27, ECF No. 102. Indeed, it is uncontested that the majority of the milk price is a regulated price. Second, it is uncontested that plaintiffs only challenge one element of DFA's Capper-Volstead Act eligibility. Sept. 1, 2020 Hr'g Tr. 243:11-244:6, ECF No. 311. Finally, plaintiffs' contention that common marketing agencies are permissible only if the participants enjoy Capper-Volstead Act immunity is an inaccurate statement of the law that cannot be put to the jury; indeed, non-agricultural entities routinely form and operate lawful joint ventures, in a context wholly outside of the Capper Volstead Act, without violating the antitrust laws. *See generally Texaco v. Dagher*, 547 U.S. 1, 7 (2006) (in the context of a lawful joint venture, a restraint that is ancillary to the legitimate and competitive purposes of the business association cannot be analyzed as a *per se* restraint); *North Am. Soccer League v. Nat'l Football League*, 670 F.2d 1249, 1259 (2d Cir. 1982) ("agreements between members of a joint venture . . . are subject to scrutiny under the rules of reason"); *Major League Baseball Props. v. Salvino*, 542 F.3d 290, 336-38 (2d Cir. 2008) (Sotomayor, J, concurring) (explaining that that clubs' joint decision to license intellectual property exclusively through a single agent was not a horizontal restraint of trade that should be evaluated *per se*, but rather, an ancillary restraint to a legitimate joint venture that should be evaluated under the rule of reason and adding that "to protect the efficiency-enhancing potential of joint ventures and cooperatives, the rule of reason is the favored method of analysis for these ventures, preventing courts from intervening before a full market analysis is completed") (citing *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984) (recognizing that because joint ventures "hold the promise of increasing a firm's efficiency and enabling it to compete more effectively," joint ventures are presumptively legal and should normally be analyzed under a rule of reason)); *see also Med. Ctr. at Elizabeth Place v. Atrium Health Sys.*, 922 F.3d 713, 724-28 (6th Cir. 2019) (explaining that joint ventures are themselves evaluated under the rule of reason due to their possibility for procompetitive efficiencies and observing that restraints that are ancillary to the legitimate and competitive purposes of a joint venture and may contribute to the success of the joint venture are inappropriate for *per se* treatment). To the extent that plaintiffs argue that DMS is itself illegal, that relies on a heavily disputed interpretation of the law—one that the Court has not yet accepted—that cannot be put to the jury without risking severe confusion and prejudice to DFA. *Cf.* Sept. 1, 2020 Hr'g Tr. 293:23-294:5, ECF No. 311;

## DEFENDANTS' THEORY OF THE CASE

**[The Court tasked DFA with including this Instruction. Sept. 1, 2020 Hr'g Tr. 339:18-340:9, ECF No. 311.]**

Defendants deny each Plaintiff's allegations, including the allegation that they conspired with anyone to suppress the premiums paid to farmers for raw milk or to gain control over the milk supply in any market.

DFA contends that it is a cooperative that is owned entirely by dairy farmers and that those dairy farmer-owners govern the cooperative and direct and oversee DFA's strategic business decisions. The other cooperatives with whom DFA allegedly conspired are also farmer-owned and farmer-run. It is DFA's position that it would make no economic sense for the farmers that own and run these other cooperatives to conspire together to suppress any aspect of the amount of money that their farmers all receive for their own milk, nor would it make any sense for these other cooperatives or any dairy processor to conspire to give DFA sole control over the milk supply in the Northeast or in Order 1.

DFA contends that the over-order premiums farmers have received for their milk have been determined, among other things, by the forces of supply and demand, and not by any wrongful conduct by DFA, alone or through any conspiracy. DFA further contends that its farmer-owners controlled the business decisions to invest in DFA's processing plants and to work together with other cooperatives to achieve efficiencies in milk marketing, hauling, and other areas. DFA contends that those decisions benefit all of DFA's farmer-owners—and especially its smallest farmer-owners—by ensuring that there is a home for their milk, and by increasing farmers' power to bargain for higher prices against large processing customers. DFA contends that those decisions have kept those farmers' milk checks higher than they otherwise would have been in the face of decreasing consumer demand, increasing milk supply, and growing competitive pressures.

---

*id*. at 297:13-16, (rejecting plaintiffs' attempt to characterize the legality of DFA's conduct).

DFA denies that it ever coerced any farmer to join it as a member. DFA contends that, although supply and demand have put pressure on independent (and all other) dairy farmers in the Northeast—and have caused recent decreases in raw milk premiums—independent farmers continue to have options to sell their milk other than joining DFA. DFA disputes that any Plaintiff in this case has proven a relevant product or geographic market, and contends that these Plaintiffs, who are spread over a large geographic area, cannot all be in the same relevant market.

DFA further contends that it qualifies under a law known as the Capper-Volstead Act. This law encourages farmers and cooperatives to work together to process and market raw milk, and to make any necessary agreements with other cooperatives to further that legitimate purpose. DFA contends that working together with other cooperatives enables DFA to cut costs in the supply chain, negotiate higher prices with processors, and make more money for farmers in the Northeast.

DFA denies that any Plaintiff has been injured by anything supposedly unlawful that DFA did. DFA also denies that any Plaintiff is entitled to damages.

## **PLAINTIFFS' CLAIMS**

Each Plaintiff in this case alleges the same four claims against Defendants:

(1)     conspiracy to restrain trade in violation of Section 1 of the Sherman Act;

(2)     conspiracy to monopsonize in violation of Section 2 of the Sherman Act;

(3)     monopsony in violation of Section 2 of the Sherman Act; and

(4)     attempted monopsony in violation of Section 2 of the Sherman Act.

## <u>DFA'S CAPPER-VOLSTEAD ACT AFFIRMATIVE DEFENSE</u>

**[The Court tasked DFA with redrafting this Instruction. Sept. 1, 2020 Hr'g Tr. 258:5-22, 268:2-24, ECF No. 311. Plaintiffs were permitted to proffer quotes from cases they thought should be included. *Id.* at 273:16-18. DFA has incorporated the concepts from plaintiffs' suggestions that are legally accurate and/or relevant to the inquiry here, and includes the remaining portions of plaintiffs' suggestions in Ex. C, attached to this filing.]**

The Capper-Volstead Act is a federal law that permits agricultural producers, including dairy farmers, to market, price, process, and sell their products collectively without violating the federal antitrust laws, including the Sherman Act.

In this case, the Capper-Volstead Act is a partial affirmative defense. The fact that it is an affirmative defense means it is something that the defendant, rather than the plaintiff, has the burden of proving. Here, that means that DFA has the burden of proving, by a preponderance of the evidence, that it is a cooperative that qualifies under the Capper-Volstead Act. There are four requirements that a cooperative like DFA must meet in order to qualify as the type of entity entitled to the antitrust protections afforded by the Capper-Volstead Act, only one of which is contested.

The four requirements are:

- First, the cooperative must limit its membership to persons engaged in the production of agricultural products (in this case, milk).

- Second, the cooperative must not deal in the products of non-members to an amount greater in value than such as are handled by it for members.

- Third, either (a) no member of the cooperative may be allowed more than one vote because of the amount of stock or membership capital he may own, or (b) the cooperative may not pay dividends on stock or membership capital in excess of 8% per annum.

- And fourth, a cooperative must be operated for the mutual benefit of the members thereof, as such producers.

In conjunction with each other, these four requirements of the Capper-Volstead Act "insure that qualifying associations be truly organized and controlled by, and for, producers." *Case-Swayne Co., Inc. v. Sunkist Growers, Inc.*, 389 U.S. 384, 394 (1967).

If you find that DFA has proved each of these four elements, it qualifies as a Capper-Volstead protected entity. As I said, no Plaintiff contests that DFA satisfies the first three requirements. Thus, I instruct you that those three elements are satisfied.

Each Plaintiff only contests the fourth requirement, which is whether DFA is operated for the mutual benefit of its members as producers. I will instruct you on that element now.

DFA satisfies the "mutual benefit" requirement if it proves the following by a preponderance of the evidence:

- The cooperative acts as the marketing agency for all of its members and pays over to its members the proceeds of its sales with a deduction for expenses, *see United States v. Maryland & Virginia Milk Producers Ass'n*, 167 F. Supp. 45, 49 (D.D.C. 1958), *aff'd in part, rev'd in part on other grounds*, 362 U.S. 458 (1960) (holding that the analogous "mutual help" requirement of Section 6 of the Clayton Act is satisfied where a cooperative "acts as the marketing agency for all of its members and pays over to its members the proceeds of the milk sales, with a deduction, of course, for overhead and similar expenses"); *Fairdale Farms Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037, 1042 (2d Cir. 1980) (explaining that Congress passed the Capper-Volstead to "broaden the scope" of the immunity Section 6 provided); and

- The members of the cooperative own the profits and surplus of DFA's operations, *see generally Ohio State Life Insurance Co. v. Clark*, 274 F.2d 771, 775 (6th Cir. 1960) (explaining the difference between companies doing business on a "mutual benefit plan" and for-profit corporations, and noting that in mutual companies, "beneficial ownership of the profits and surplus" is in the member-owners/policyholders); *see also Boyd v. S. Mut. Aid Ass'n*, 145 Ala. 167, 175 (1906) ("the essential and distinguishing

feature of the mutual aid association [is] its mutuality of obligations and benefits"); *Kennan v. Rundle*, 81 Wis. 212, 221 (1892) ("The one thing absolutely essent[i]al to a mutual company is the obligation of the members to pay their pro rata share of the necessary expenses and losses of the company, and that they are bound to so contribute.").

The "mutual benefit" element of the Capper-Volstead Act does not require DFA to prove that all of its members equally benefit from every decision that DFA makes, that every decision that DFA makes benefits every member, or that every member must agree with every decision that DFA's farmer board of directors or DFA's management make. *Bell v. Fur Breeders Agric. Coop.*, 348 F.3d 1224, 1235 (10th Cir. 2003) (finding that Capper-Volstead Act immunity applied to the defendant-cooperative's pricing policy—despite challenges to it from members of that cooperative who complained that the policy disadvantaged them relative to other members of the cooperative—because "it is [] unlikely that every decision by Fur Breeders' board members will always benefit every individual member" even where the decision "benefitted the membership as a whole").

If you find, based on the instruction that I have just provided you, that DFA has proved by a preponderance of the evidence that it operates for the mutual benefit of its members as producers, then DFA qualifies as a Capper-Volstead protected entity.

If you find that DFA qualifies as a Capper-Volstead protected entity, that does not mean that it is exempt or immune from the antitrust laws altogether. But it does mean that certain types of conduct by DFA cannot be the basis for liability under the antitrust laws. For purposes of each Plaintiff's Section 1 claim, the Capper-Volstead Act makes clear that among the authorized activities of a cooperative are the "processing, preparing for market, handling, and marketing" of its members' and other farmers' milk on a collective basis—and all agreements necessary to effect these legitimate purposes. Capper-Volstead qualified cooperatives are also permitted to form marketing agencies in common with other cooperatives to market raw milk and to enter into agreements to effect these purposes. None of these activities are themselves violations of Section 1 of the Sherman Act.

For purposes of Plaintiffs' Section 2 claims, if you decide that DFA has met its burden to show that it is a Capper-Volstead protected cooperative, each Plaintiff is required to prove that DFA acquired or maintained its monopsony power through predatory—not simply anticompetitive—acts. Predatory acts include only those that exclude or destroy competition from other buyers of raw milk, and do not include conduct that DFA is lawfully permitted to engage in under the Capper-Volstead Act. For example, DFA cannot be found liable for "[monopsony] power that results from acts such as the formation, growth, and combination of agricultural cooperatives" or from its ownership or operation of processing plants, but only for "the acquisition of [monopsony] power by other, predatory means" that exclude competition between buyers of raw milk. *Fairdale Farms Inc. v. Yankee Milk, Inc.*, 635 F.2d 1037, 1045 (6th Cir. 1980). Predatory practices "are not aimed at consumers, but at 'an identifiable competitor or potential competitor or an identifiable group of them'" in the relevant market. *Fairdale Farms, Inc. v. Yankee Milk, Inc.*, 715 F.2d 30, 32 (2d Cir. 1983) (citation omitted).

## INSTRUCTIONS APPLICABLE TO ALL CLAIMS[3]
### INDIVIDUAL CLAIMS OF EACH PLAINTIFF

There are twenty separate Plaintiffs in this lawsuit. Each Plaintiff has the burden to prove every element of his, her, or its claims against DFA. Although some of the evidence you have heard may be relevant for multiple Plaintiffs, other pieces of evidence may only be relevant to one Plaintiff but not others. You must determine which evidence is relevant for each Plaintiff, and keep separate each Plaintiff's individual claims for relief where appropriate.

If you find that one Plaintiff has satisfied his, her, or its burden of proof against DFA, you may not use that finding to find in favor of any other Plaintiff, unless that other Plaintiff has independently met his, her, or its own burden of proof. Nor may you find in favor of one

---

[3]    Because the Court instructed that its proposed "Definitions" instruction would not be given to the jury, DFA has deleted that section accordingly from this version of the proposed Instructions of Law. Sept. 1, 2020 Hr'g Tr. 291:12-22, ECF No. 311.

Plaintiff solely because you have found in favor of another Plaintiff. You must evaluate each Plaintiff's claim on its own individual merits.[4]

## **CORPORATIONS**

**[this was cut and pasted from the Court's additions sent on 8/19/20]**

DFA is an agricultural cooperative organized as a corporation. DMS is a joint milk marketing agency organized as a limited liability company.

The mere fact that a party is a corporation or a limited liability company does not mean it is entitled to any more or less consideration by you. All litigants are equal before

---

[4]    DFA continues to request an instruction that informs the jury that it must decide each plaintiff's claim on its own merits and keep each plaintiff's claim—and the evidence pertaining to each claim for relief—separate where appropriate. This instruction is necessary to prevent the kind of plaintiff-blending—wherein the jury improperly decides the claim of one plaintiff on the basis of evidence only relevant to another, or extrapolates the unique circumstances of one or two plaintiffs to the remaining plaintiffs in the case— that would severely prejudice DFA. *See generally* Op. & Or. Granting in Part Defs.' Mot. to Sever Claims for Trial at 11, ECF No. 191 (observing that the presence of the numerous plaintiffs in the litigation would produce "the real risk that the jury will not address the claims on an individual basis . . . because of the difficulty of keeping [those] claims separate" and contemplating the need for the Court to "strenuously and carefully" instruct the jury to consider each claim on an individual basis); *see id.* at 8-10 (citing *Thompson v. Sanderson Farms, Inc.*, 2006 WL 2559852, at *2, *4-6 (S.D. Miss. Sept. 1, 2006) (identifying that a trial with numerous plaintiffs pursuing individual claims against a defendant created the risk that the jury will "simply consider the evidence in toto when deliberating on each respective claim" and find in favor of one plaintiff based on evidence presented by another plaintiff)). Indeed, the Second Circuit and its courts have regularly recognized the propriety of such a jury instruction in cases involving multiple parties who are pursuing individualized claims or defenses. *See generally Malcolm v. Nat'l Gypsum Co.,* 995 F.2d 346, 349 (2d Cir. 1993) (commending the district court for "valiantly attempt[ing] to maintain the identity of each claim throughout the trial" and noting that "[t]he jury was instructed on several occasions to consider each case separately"); *United States v. Casamento,* 887 F.2d 1141, 1153 (2d Cir. 1989) (affirming verdict where "the district judge instructed the jury to consider the evidence against each defendant separately from the evidence presented against the other defendants"); *Lewis v. Triborough Bridge & Tunnel Auth.*, 2000 WL 423517, at *5 (S.D.N.Y. Apr. 19, 2000) (observing that "while an unguided jury might improperly award money damages against [one party] solely on account of [a different party's] actions . . . prejudice or confusion can be remedied by a carefully drafted jury instruction"). A similar type of instruction is warranted here.

the law, and corporations and limited liability companies, big or small, are entitled to the same fair consideration as you would give any other party.

(Modern Federal Jury Instructions – Civil, Instruction 72-1) (modified).

## ACTUAL AND APPARENT AUTHORITY

**[this was cut and pasted from the Court's additions sent on 8/19/20]**

As I just mentioned, DFA is a corporation and DMS is a limited liability company. Under the law, a corporation or a limited liability company is a "person," but a person that acts only through its agents, such as its directors, officers, executives, employees, or others acting on its behalf.

A corporation or a limited liability company is legally bound by the acts and statements of its agent or employee done or made within the scope of the agent's actual or apparent authority.

Acts done within the scope of employment are acts performed on behalf of a corporation or limited liability company and directly related to the performance of the duties the agent has general authority to perform. This is called actual authority.

Apparent authority is the authority that persons outside the corporation or limited liability company could reasonably believe the agent has, judging from his or her position with the company, the responsibilities previously entrusted to the person or the person's office or title, and the circumstances surrounding his or her past conduct. An agent can have apparent authority even when the agent is actually acting in a dishonest, fraudulent, or anticompetitive manner.

For a corporation or limited liability company to be legally responsible for the acts or statements of its agents, you must find that the agent was acting within the scope of his or her employment and was acting with either actual or apparent authority.

## A CORPORATION OR LIMITED LIABILITY COMPANY IS NOT CAPABLE OF CONSPIRING WITH ITSELF

**[this was cut and pasted from the Court's additions sent on 8/19/20]**

A corporation or limited liability company is not capable under the law of conspiring with its own agents, unincorporated divisions, or wholly-owned subsidiaries. A corporation

or limited liability company is, however, capable of conspiring with other persons or independent entities.

Because DFA formed DMS to be DFA's agent and to act as a joint marketing agency for its farmer-members' milk, DFA and DMS are not capable of conspiring with each other to violate the Sherman Act. You must therefore only consider whether Defendants conspired with at least one other person or entity.

## FIRST CLAIM: SECTION 1 OF THE SHERMAN ACT

**[The Court tasked plaintiffs with redrafting this Instruction but agreed that the revisions proposed by DFA below should be included.  Sept. 1, 2020 Hr'g Tr. 317:5-18, 318:3-5, ECF No. 311.]**

Each Plaintiff alleges that Defendants conspired in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Section 1 of the Sherman Act prohibits contracts, combinations, and conspiracies that unreasonably restrain trade. To establish a violation of Section 1 of the Sherman Act, Plaintiffs must prove the following:

(1)   The existence of a contract, combination, or conspiracy between or among at least two separate persons or entities;

(2)   That the contract, combination, or conspiracy unreasonably restrains trade, such that, if the claim is evaluated under the rule of reason, rather than *per se*:

    a. It affected competition within a relevant market including two aspects:

        i.   A relevant product market; and

        ii.   A relevant geographic market;

    b. It resulted in a substantial adverse effect on competition in any such relevant market based on an analysis of the following steps:

        i.   Plaintiffs must first prove that any alleged conspiracy resulted in a substantial adverse effect on competition in the relevant market;

        ii.   If Plaintiffs prove that any alleged conspiracy resulted in a substantial adverse effect on competition in the relevant market, Defendants must prove that the alleged conspiracy also benefitted competition;

        iii.   If Defendants prove that the alleged conspiracy achieved procompetitive benefits, each Plaintiff must prove that any

legitimate benefits offered by Defendants could have been achieved through less restrictive means, and that the conspiracy's competitive harm substantially outweighs its competitive benefits;[5]

(3)    That the restraint affects interstate commerce; and

---

[5]    DFA continues to maintain that no *per se* instruction is proper in the case, because no piece of conduct that allegedly underlies the alleged conspiracy in this case is subject to *per se* review. As DFA has explained, the evidence at trial will demonstrate that any alleged non-solicitation agreements in this case, to the extent that they existed, were ancillary to a legitimate joint venture and therefore must be analyzed under the rule of reason pursuant to well-established law in both the Second Circuit and elsewhere. *See, e.g.*, *Texaco v. Dagher*, 547 U.S. 1, 7 (2006) (in the context of a lawful joint venture, a restraint that is ancillary to the legitimate and competitive purposes of the business association cannot be analyzed as a *per se* restraint); *North Am. Soccer League v. Nat'l Football League*, 670 F.2d 1249, 1259 (2d Cir. 1982) ("agreements between members of a joint venture . . . are subject to scrutiny under the rules of reason"); *Major League Baseball Props. v. Salvino*, 542 F.3d 290, 336-38 (2d Cir. 2008) (Sotomayor, J, concurring) (explaining that that clubs' joint decision to license intellectual property exclusively through a single agent was not a horizontal restraint of trade that should be evaluated *per se*, but rather, an ancillary restraint to a legitimate joint venture that should be evaluated under the rule of reason and adding that "to protect the efficiency-enhancing potential of joint ventures and cooperatives, the rule of reason is the favored method of analysis for these ventures, preventing courts from intervening before a full market analysis is completed") (citing *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984) (recognizing that because joint ventures "hold the promise of increasing a firm's efficiency and enabling it to compete more effectively," joint ventures should normally be analyzed under a rule of reason)); *Med. Ctr. at Elizabeth Place v. Atrium Health Sys.*, 922 F.3d 713, 724-28 (6th Cir. 2019) (explaining that joint ventures are themselves evaluated under the rule of reason due to their possibility for procompetitive efficiencies and observing that restraints that are ancillary to the legitimate and competitive purposes of a joint venture and may contribute to the success of the joint venture are inappropriate for per se treatment); *see also Bogan v. Hodgkins,* 166 F.3d 509, 514-16 (2d Cir. 1999) (holding that alleged agreement between insurance agents not to solicit or compete for each other's sales agents in the New York City metropolitan area was subject to rule of reason, rather than *per se* review); *Union Circulation Co. v. F.T.C.*, 241 F.2d 652, 657 (2d Cir. 1957) (holding that "no switching" agreements between magazine subscription solicitation agencies regarding each other's sales agents was not illegal *per se* but rather subject to rule of reason review). Because DFA maintains that no *per se* instruction is appropriate, DFA has proposed revisions to the Instruction that incorporates a rule of reason "road map" within the elements of a Section 1 claim.

(4)     That the restraint caused each Plaintiff to suffer an injury to his, her, or its business or property.

I will describe each of these four elements in detail.

If you find that each Plaintiffs failed to prove all of these elements by a preponderance of the evidence, then you must find for Defendants and against Plaintiffs on this claim. If you find that each Plaintiff has proved each of these elements by a preponderance of the evidence, then you must consider whether DFA has qualified as a protected entity under the Capper-Volstead Act. If you find that DFA qualifies for protection under the Capper-Volstead Act, then you must not base any finding of Section 1 liability on any conduct that is immune under the Capper-Volstead Act, as I have previously instructed you. If you find that DFA has not proven that it qualifies for Capper-Volstead Act protection or that the alleged conduct is not exempt from antitrust liability, and that each Plaintiff has proved each element of his, her or, its claim, then you must find for each Plaintiff and against Defendants on this claim.[6]

## FIRST CLAIM: SECTION 1 OF THE SHERMAN ACT
## EXISTENCE OF A CONSPIRACY
## (ELEMENT 1)[7]

**[The Court tasked plaintiffs with redrafting this Instruction but agreed that the revisions proposed by DFA below should be included.  Sept. 1, 2020 Hr'g Tr. 328:14-17, 329:6-16, 332:12-14, ECF No. 311.]**

Each Plaintiff alleges that Defendants participated in a conspiracy to restrain trade by reducing and/or eliminating competition in the raw Grade A milk market in Order 1 in

---

[6]     For ease of the Court's reference, DFA has proposed a Capper-Volstead Act "toggle" pursuant to the Court's discussion at the September 1, 2020 charge conference. *See generally* Sept. 1, 2020 Hr'g Tr. 317:13-18, ECF No. 311.

[7]     DFA continues to request an instruction that informs the jury of the difference between a Section 1 claim premised on a single conspiracy versus a claim premised on multiple conspiracies, as set forth by DFA in its initial Proposed Jury Instructions Attachment A at Proposed Instruction No. 22, ECF No. 276-1—which is based on the *ABA Model Jury Instructions in Criminal Antitrust Cases*—or as proposed by DFA in its Notice of Revised Proposed Jury Instructions, at Exhibit A, ECF No. 309-1—which is based upon the instruction given to the jury by the district court in *In re Processed Egg Products*

violation of Section 1 of the Sherman Act. To prevail on this claim, each Plaintiff must prove both of the following elements by a preponderance of the evidence:

(1)     That a contract, combination, or conspiracy existed; and

(2)     That Defendants knowingly became a member of that conspiracy.

Section 1 applies only to conspiracies between separate persons. A conspiracy is an agreement or an understanding between two or more persons. An agreement or understanding exists when two or more persons share a commitment to a common scheme

---

*Antitrust Litigation*, No. 08-md-2002 (E.D. Pa.).  The instruction is critical because the jury's analysis of whether an alleged conspiracy is an unreasonable restraint of trade with an adverse effect on competition will necessarily depend upon the nature, scope and participants of any conspiracy that it finds (if it does so).  An instruction that directs the jury that it must evaluate the existence and effect of the single conspiracy that plaintiffs claim—and not some other conspiracy—is therefore essential to ensuring that the jury only bases any finding of competitive harm and/or impact to any plaintiff on the precise conspiracy that it finds to have existed, if indeed, it finds any such thing.  Moreover, the jury's finding on the single-versus-multiple conspiracies question will have profound consequences for the Court's assessment of the claims in the case as a matter of law.  Among other things, the jury's potential finding regarding the participants in, and scope of, any alleged conspiracy will impact whether each plaintiff can prove that he has standing as a direct seller within the meaning of the Supreme Court's decision in *Illinois Brick*.  *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 747 (1977) (holding that indirect purchasers could not recover for antitrust damages of a price fixing conspiracy); *Zinser v. Cont'l Grain Co.*, 660 F.2d 754, 760-61 (10th Cir. 1981) ("[T]he rule of *Illinois Brick* precludes an antitrust action by a seller who alleges price-fixing by a defendant with whom he has not dealt directly, unless the seller can bring himself within some exception to the general rule."); *see also Simon v. KeySpan Corp.*, 694 F.3d 196, 201 (2d Cir. 2012) ("The Supreme Court has therefore established a general rule that the direct purchaser is the only appropriate antitrust plaintiff."); *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1059, 1067 (N.D. Cal. 2007) ("[A] plaintiff does not state a claim for relief for an illegal overcharge due to an anticompetitive agreement if the plaintiff did not purchase directly from a member of the conspiracy.").  It is black letter law, for example, that no plaintiff has standing to recover damages for sales of milk that were not made to any alleged coconspirator in this case.  For these reasons, DFA continues to object to the Court's decision not to include an instruction on single versus multiple conspiracies as part of these instructions.

designed to achieve an unlawful objective.[8] Here, each Plaintiff claims the common unlawful objective of this conspiracy is to give DFA control over the supply of raw Grade A milk in a relevant market. To establish the existence of a contract, combination, or conspiracy, the evidence does not need to show that there was a formal or written agreement. An agreement or understanding may be entirely unspoken.

A contract, combination, or conspiracy may be formed without all of the parties reaching an agreement at the same time, such as where competitors separately accept invitations to participate in a plan to restrain trade. Similarly, it is not essential that all persons acted exactly alike, nor is it necessary that they all possessed the same motives for entering the agreement. It is not necessary that all of the means or methods claimed by Plaintiffs were agreed upon, actually used, or put into operation. It is also not necessary that each Plaintiff prove that all the persons alleged to be members of the conspiracy were actually members provided each Plaintiff proves that at least one other person entered into the alleged agreement or conspiracy with Defendants. It is the agreement or understanding to restrain trade that constitutes a contract, combination, or conspiracy which matters for this element. You may find a conspiracy existed regardless of whether it succeeded or failed.

In determining whether an agreement or understanding between two or more persons has been proved, you must view the evidence as a whole. Each Plaintiff may prove the existence of the alleged contract, combination, or conspiracy through direct evidence, circumstantial evidence, or both. Direct evidence is explicit and requires no inferences to establish the existence of a contract, combination, or conspiracy. You may also infer the existence of an agreement from the circumstances, including what you find the alleged members actually did and the words they used. Mere similarity of conduct among various persons, however, or the fact that they may have associated with one another and may have

---

[8]    DFA has proposed these revisions consistent with the Court's discussion at the September 1, 2020 charge conference. Sept. 1, 2020 Hr'g Tr. 326:19-329:16, ECF No. 311.

met or assembled together, does not by itself establish the existence of an agreement or a conspiracy.

### FIRST CLAIM: SECTION 1 OF THE SHERMAN ACT
### PARALLEL CONDUCT (ELEMENT 1)

**[The Court tasked plaintiffs with redrafting this Instruction but agreed that the revisions proposed by DFA below should be included.  Sept. 1, 2020 Hr'g Tr. at 341:16-17, 342:24-25, ECF No. 311.]**

Each Plaintiff contends that Defendants and their alleged coconspirators engaged in coordinated efforts to reduce competition for raw Grade A milk in Order 1 through a series of agreements.  They allege that Defendants entered into agreements with other cooperatives and with processors to restrain trade. Each Plaintiff contends that this conduct, when considered with other evidence, shows that a conspiracy existed among Defendants and their alleged coconspirators. Defendants deny these allegations. Defendants deny that they engaged in any agreement with any entity to improperly reduce competition; to the contrary, DFA contends that all of its conduct during the relevant period of this case has been designed to increase efficiencies, reduce costs, increase premiums and enhance the overall value of DFA's members' milk checks.[9]

The mere fact that Defendants may have engaged in similar conduct to other persons or entities does not by itself establish the existence of a conspiracy. Their behavior may be no more than the result of the exercise of independent judgment in response to identical or similar market conditions. For example, everyone might open their umbrellas on a rainy day, but that similar behavior would not necessarily mean that they had agreed or conspired to open their umbrellas. A business may lawfully adopt the same or similar practices as its competitors as long as it does so independently and not as part of an agreement or understanding with one or more of its competitors. Thus, a defendant does not violate the antitrust laws by taking some action in the hope or belief that its competitors will follow,

---

[9]    *See generally* Sept. 1, 2020 Hr'g Tr. 340:7-340:9, ECF No. 311 (permitting DFA to provide a balanced description of its contentions to accompany plaintiffs' theory of the case as articulated throughout the Instructions of Law).

so long as it has not reached an agreement with its competitors. Parallel conduct, without more, does not violate the law. If Defendants and their alleged coconspirators acted similarly but independently of one another, without any agreement or understanding between two or more of them, then there is no conspiracy.

You must decide whether it is more likely than not that Defendants' conduct, if similar to that of another entity or affiliate, was the result of an agreement between Defendants and that person. In doing so, you may consider Defendants' conduct along with other evidence. You may infer that a conspiracy existed only if you find that the evidence, when viewed as a whole, makes it more likely than not that Defendants had an agreement or understanding with their alleged coconspirators than that they acted independently. In making this determination, you must consider all the surrounding facts and circumstances. The evidence, when viewed together, must satisfy you that it is more likely than not that Defendants' similar actions were the product of an agreement with an alleged coconspirator than the product of each person's independent decisions.

## FIRST CLAIM: SECTION 1 OF THE SHERMAN ACT
## PARTICIPATION AND INTENT (ELEMENT 1)

**[The Court instructed that DFA's proposed "Participation and Intent" instruction, included in its Revised Proposed Jury Instructions Attachment A at 13-14, ECF No. 307-1, would be used here.  Sept. 1, 2020 Hr'g Tr. 352:8-353:5, ECF No. 311.]**

Before you can find that any person was a member of the conspiracy alleged by each Plaintiff, the evidence must show that person knowingly joined in the unlawful plan at its inception, or at some later time, with the intent to further the alleged purpose of the conspiracy.

To act knowingly means to participate deliberately, voluntarily, and intentionally, and not because of mistake, accident, or other innocent reason. A person may become a member of a conspiracy without full knowledge of all the details of the conspiracy, the identity of all its members, or the parts they played. Knowledge of the essential nature of the plan is enough. On the other hand, a person who has no knowledge of a conspiracy, but

happens to act in a way that helps the conspiracy succeed, does not thereby become a conspirator.

A person who knowingly joins an existing conspiracy, or who participates only in part of a conspiracy with knowledge of the overall conspiracy, is just as responsible as if he or she had been one of those who formed or began the conspiracy and participated in every part of it.

In determining whether a person was a member of the alleged conspiracy, you should consider the evidence about that particular person's statements and conduct, including any evidence of his or her knowledge and participation in the events involved and any other evidence of his or her participation in the conspiracy alleged.

You may not find that a person was a member of a conspiracy based only on his or her association with or knowledge of wrongdoing, but it is a factor you may consider to determine whether he or she was a member of the alleged conspiracy.

If you find that the alleged conspiracy existed, then the acts and statements of the conspirators are binding on all those whom you find were members of the conspiracy.

Once you have found that a person is a member of a conspiracy, he or she is presumed to remain a member and is responsible for all actions taken by all alleged coconspirators during and in furtherance of the conspiracy until it is shown that the conspiracy has been completed or abandoned.

## FIRST CLAIM: SECTION 1 OF THE SHERMAN ACT
### UNREASONABLE RESTRAINT OF TRADE
#### (ELEMENT 2)

**[The Court observed that this Instruction should be edited to refer to "each Plaintiff." Sept. 1, 2020 Hr'g Tr. 353:20-355:1, ECF No. 311.]**

The second element that each Plaintiff must prove is that the alleged conspiracy or agreement resulted in an "unreasonable" restraint on interstate commerce. An unreasonable restraint of trade results in a substantial harm to competition in a relevant market. Harm that occurs merely to the individual business of a Plaintiff is not sufficient, by itself, to demonstrate harm to competition.

### FIRST CLAIM: SECTION 1 OF THE SHERMAN ACT
### UNREASONABLE RESTRAINT OF TRADE[10]
### (TWO ANALYSES AS TO WHETHER RESTRAINTS ARE UNREASONABLE –
### PER SE RULE AND RULE OF REASON)
### (ELEMENT 2B)

[The Court has not definitively ruled on the *per se* versus rule of reason issue. Sept. 1, 2020 Hr'g Tr. 312:8-11. The Court tasked the parties with briefing the issue.  *Id.* at 364:7-365:12, ECF No. 311.]

To determine whether an agreement constitutes and unreasonable restraint of trade, the law generally applies one of two standards: the *per se* rule or the rule of reason. If multiple agreements are part of a conspiracy, then you must apply the correct standard to each specific agreement.[11] I will now explain both standards to you and instruct you as to which one applies to each alleged restraint of trade at issue in this case.[12]

---

[10]   DFA has removed instructions where applicable, pursuant to the Court's direction at the September 1, 2020 charge conference. Sept. 1, 2020 Hr'g Tr. 314:25-315:10, ECF No. 311; *see id.* at 354:20-22.

[11]   DFA continues to object to this sentence as an inaccurate statement of the law. *See In re Processed Egg Prod. Antitrust Litig.*, 962 F.3d 719, 727-28 (3d Cir. 2020) (indicating that the *court* may analyze the nature of the alleged conspiracy, based on its component part, in order to assess the appropriate standard for the jury to apply to the claims, but never suggesting that the jury itself should apply separate standards of law to separate components of a single conspiracy); *see also* Op. & Or. Granting in Part and Denying in Part Defs.' Mot. for Summ. J. at 27, *Allen v. DFA*, No. 9-230 (D. Vt. June 14, 2011), ECF No. 525 (referring to plaintiffs' single alleged conspiracy and finding that "the court cannot examine each agreement in isolation, determine its alleged impact on competition, rule whether it is or is not an unlawful restraint of trade, and thereafter designate the parties to its conspirators or non-conspirators. Instead, the agreements in question need to be examined in the context of the alleged conspiracy."). For this reason and those set forth at the September 1, 2020 charge conference and in its forthcoming brief on this issue, DFA continues to object to this Instruction in its entirety. Nonetheless, DFA has edited this Instruction pursuant to the Court's discussion at the September 1, 2020 charge conference. *See* Sept. 1, Hr'g Tr. 365:13-366:14, ECF No. 311.

[12]   *See In re Processed Egg Prod. Antitrust Litig.*, 962 F.3d 719, 727-28 (3d Cir. 2020) (separate components of a conspiracy may be assessed under different standards); *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886, 889-93 (2007) (courts apply different standards to separate components of a conspiracy and when determining what

### FIRST CLAIM: SECTION 1 OF THE SHERMAN ACT
### UNREASONABLE RESTRAINT OF TRADE
### (PER SE RULE AND RULE OF REASON OVERVIEW)
### (ELEMENT 2B)

[**Note: the court will determine which standard applies to a particular restraint based on the evidence presented.** *See In re Southeastern Milk Antitrust Litig.*, **739 F.3d 262, 271 (6th Cir. 2014) ("The district court's decision to use the rule of reason is a question of law[.]"). This legal issue "is predicated on a factual inquiry into the restraint's competitive effect[.]"** *Nat'l Bancard Corp. v. VISA U.S.A., Inc.*, **779 F.2d 592, 596 (11th Cir. 1986).**]

[this was cut and pasted from the Court's additions sent on 8/19/20, but the title was modified to comply with the format requested by the Court (*i.e.*, it ties back to the element of the claim)]

[The Court reserved judgment on this Instruction, pending the parties' briefing on this issue, due September 14, 2020. Sept. 1, 2020 Hr'g Tr. 312:8-11, 364:7-365:10, 369:8-9, 371:6-7, 374:24-375:2, ECF No. 311. Plaintiffs were permitted to send the Court language to insert into the brackets below. *Id.* at 369:13-370:5, 371:10-14.]

The second element that Plaintiffs must prove is that the alleged conspiracy or agreement resulted in an "unreasonable" restraint on interstate commerce. Here, Plaintiffs allege that Defendants and their coconspirators entered into agreements that restricted

---

standard to apply, courts are required to look at the "economic effect rather than rely upon formalistic line drawing); *Zenith Radio Corp. v. Matshita Elec. Indus. Co.*, 513 F. Supp. 1100, 1167-68 (E.D. Pa. 1981) ("In *Continental Ore* itself, the Supreme Court engaged in a detailed analysis of the record with respect to three of the four ventures which the Court of Appeals had addressed on their facts, concluding with respect to each of the three considered separately that there was enough evidence of causation to preclude a directed verdict. If the warning against 'compartmentalizing' an antitrust conspiracy case were meant to prevent a court from breaking down a plaintiff's allegation of a 'unitary' conspiracy into its component parts for purposes of analysis, the Court would not have engaged in the 'forbidden' analysis in the very same opinion in which it issued the warning.").

and/or eliminated competition for farmers' milk in the raw Grade A milk market in Order 1.[13]

**PER SE RULE:**

The Sherman Act makes unlawful certain agreements that, because of their harmful effect on competition and lack of redeeming value, are conclusively presumed to be illegal and an unreasonable restraint of trade, without examining the precise harm they have caused or the business excuse for their use. *See In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1191 (9th Cir. 2015) ("Once the [inherently anticompetitive horizontal agreement's] existence is established, no further inquiry into the practice's actual effect on the market or the parties' intentions is necessary to establish a § 1 violation.") (citing *N. Pac. Ry. v. United States*, 356 US. 1, 5 (1958)). Where a plaintiff alleges and proves what is called a "per se" violation, the plaintiff is not required to prove that the conduct hurt competition in the market. *See NYNEX Corp.*, 525 U.S. at 133 ("[C]ertain kinds of agreements will so often prove so harmful to competition and so rarely prove justified that the antitrust laws do not require proof that an agreement of that kind is, in fact, anticompetitive in the particular circumstances."). In this case, Plaintiffs have alleged the following *per se* violations [insert agreements that require *per se* analysis]. If you find that each Plaintiff has proved that violation by a preponderance of the evidence, then you must consider whether DFA has qualified as a protected entity under the Capper-Volstead Act. If you find that DFA qualifies for protection under the Capper-Volstead Act, then you must not base any finding of Section 1 liability on any conduct that is immune under the Capper-Volstead Act, as I have previously instructed you. If you find that DFA is not entitled to Capper-Volstead Act protection, or that the types of alleged violations are not exempt under the Capper-Volstead Act, then, for these types of alleged violations, you

---

[13]   For ease of reference, DFA has removed language from this Instruction pursuant to the Court's discussion at the September 1, 2020 charge conference. Sept. 1, 2020 Hr'g Tr. 365:13-366:1, ECF No. 311.

will need only to determine whether they took place and then determine what, if any, injury-in-fact to each Plaintiff and damages to each Plaintiff, they caused.[14]

**RULE OF REASON:**

Under the rule of reason standard, a restraint of trade is illegal only if it is found to be unreasonable. Thus, for this type of agreement, the second element that each Plaintiff must prove is that the alleged agreement resulted in an "unreasonable" restraint on interstate commerce. Here, each Plaintiff claims that Defendants unreasonably restrained trade by [insert agreements that fall within rule of reason analysis].

You must determine whether the challenged restraints were unreasonable. In making this determination, you must first determine whether Plaintiffs have proven that the challenged restraints resulted in a substantial harm to competition in the alleged raw Grade A milk market in Order 1. *See Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 317 (2d Cir. 2008) ("[T]he plaintiffs bear an initial burden to demonstrate the defendants' challenged behavior had an actual adverse effect on competition as a whole in the relevant market.") (citation and emphasis omitted). If you find that each Plaintiff has proven that the challenged restraints resulted in substantial harm to competition, then the burden shifts to Defendants to prove that the restraints were justified by legitimate procompetitive benefits. *Id.* ("[T]he burden shifts to the defendants to offer evidence of the pro-competitive effects of their agreement[.]") (citation omitted). If Defendants prove such legitimate procompetitive benefits, you must then balance the competitive harm against the procompetitive benefit. *Id.* ("Ultimately, the factfinder must engage in a careful weighing of the competitive effects of the agreement—both pro and con—to determine if the effects of the challenged restraint tend to promote or destroy competition.") (citation omitted). The challenged restraints are illegal under Section 1 of the Sherman Act only if you find that

---

[14]     DFA continues to object to this "Per Se Rule" Instruction in its entirety, on the basis that no alleged conduct in this case is properly evaluated under the *per se* rule. *See supra* note 5 and citations therein. Nonetheless, DFA has respectfully proposed the above edits to the Instruction, pursuant to the Court's discussion of this element at the September 1, 2020 charge conference. *See* Sept. 1, 2020 Hr'g Tr. 367:16-369:7, ECF No. 311.

the competitive harm substantially outweighs any legitimate procompetitive benefit. (ABA Model Jury Instructions in Civil Antitrust Cases, Instruction 3A) ("The challenged restraint is illegal under Section 1 of the Sherman Act only if you find that the competitive harm substantially outweighs the competitive benefit.").[15]

## FIRST CLAIM: SECTION 1 OF THE SHERMAN ACT
## UNREASONABLE RESTRAINT OF TRADE (PER SE RULE)
## (ELEMENT 2B(i))[16]

**[The Court reserved judgment on this Instruction, pending its resolution of the parties' legal dispute regarding the propriety of any *per se* instruction in this case and the parties' forthcoming briefs on this issue. Sept. 1, 2020 Hr'g Tr. 312:8-11, 364:7-365:10, 386:4-13, ECF No. 311.]**

I will start with the "per se" rule. Certain agreements are so harmful to competition that they are conclusively presumed to be illegal and an unreasonable restraint of trade, without inquiry about the precise harm they have caused or the business excuse for their use. These are called "per se" violations. Where a plaintiff alleges and proves what is called a "per se" violation, the plaintiff is not required to prove that the conduct hurt competition in the market. And it is not a defense that the defendant may have acted with good motives, thought that what they were doing was legal, or that the conspiracy may have had some good results.

In this case, each Plaintiff claims that Defendants entered into certain agreements to which the *per se* rule applies. Each Plaintiff claims that Defendants entered into agreements with other cooperatives not to solicit each other's members that were not contained in the DocuWare agreements and also were not part of cooperatives working together as DMS.

---

[15]     DFA has respectfully proposed the above edits to the Instruction, pursuant to the parties' discussion of this element at the September 1, 2020 charge conference. *See* Sept. 1, 2020 Hr'g Tr. 370:10-371:5, 374:6-375:2, ECF No. 311.

[16]     DFA continues to object to this Instruction in its entirety, on the basis that no alleged conduct in this case is properly evaluated under the *per se* rule. *See supra* note 5 and citations therein.  DFA has also proposed edits to reflect the discussion at the September 1, 2020 charge conference.

Defendants deny that any such agreements ever existed. If you find that such agreements existed, these agreements are presumed to be unreasonable restraints of trade.[17] If you make

---

[17]     *See United States v. Coop. Theatres of Ohio, Inc.*, 845 F.2d 1367, 1373 (6th Cir. 1988) ("In sum, we find that the so-called "no-solicitation" agreement alleged in this case is undeniably a type of customer allocation scheme which courts have often condemned in the past as a per se violation of the Sherman Act."); *United States v. Consol. Laundries Corp.*, 291 F.2d 563, 574–75 (2d Cir. 1961) (internal citations omitted) ("Similarly their agreement to suppress all competition as to one phase of their business, i.e., old customers, should be per se illegal irrespective of their competition for new customers."); XII Areeda & Hovenkamp, Antitrust Law p. 2030 at 216 (2012) ("A 'naked' market division agreement is unlawful per se and *may take many forms*, including agreements that require participants from (1) producing one another's products, (2) selling in one another's territories, (3) *soliciting or selling to one another's customers*, or (4) expanding into a market in which another participant is an actual or potential rival."). *See also United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972) (analogizing non-solicitation agreements (*i.e.*, agreements not to call on each other's customers, or, an allocation of customers) with agreements to allocate territories, which are "classic examples of a per se violation of s 1."); *Consol. Laundries*, 291 F.2d at 574–75 ("Assuming that customers were allocated in the case at bar, no more need be proved; we agree that the per se rule should be applied. We fail to see any significant difference between an allocation of customers and an allocation of territory."); *United States v. Cadillac Overall Supply Co.*, 568 F.2d 1078, 1087-90 (5th Cir. 1978) (agreements not to solicit each other's customers is the equivalent of customer allocation and constitutes a per se violation of the Sherman Act); *United States v. Brown*, 936 F.2d 1042, 1045 (9th Cir. 1991) ("[T]he agreement in this case should be characterized as per se illegal. The agreement restricted each company's ability to compete for the other's billboard sites.").

The United States Supreme Court has explained that "an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition" is "usually termed a 'horizontal' restraint," which "[t]his Court has reiterated time and time again that (h)orizontal territorial limitations . . . are naked restraints of trade with no purpose except stifling of competition. Such limitations are per se violations of the Sherman Act." *Topco*, 405 U.S. at 608. Likewise, the Second Circuit explained, "[a]nd when, as here, the allocation [of customers] is coupled with predatory practices against independent linen suppliers in order to compel them to join the conspiracy or be put out of business, there is even more reason not to permit the conspirators to justify their activities on the ground that business expediency makes them reasonable." *Consol. Laundries*, 291 F.2d at 574-75; *Interphoto Corp. v. Minolta Corp.*, 295 F. Supp. 711, 720 (S.D.N.Y. 1969) (citing *Consolidated Laundries*, 291 F.2d at 574-575) (agreement prohibiting party from soliciting or accepting orders from customer is an agreement to allocate customers among competitors and a per se violation of the Sherman Act). The

this finding with regard to any non-solicitation agreements that were not contained in the DocuWare agreements or part of DMS, you must indicate this conclusion on the verdict form I provide to you and proceed to analyze whether only those agreements caused injury-in-fact and damages to any Plaintiff.

## FIRST CLAIM: SECTION 1 OF THE SHERMAN ACT
## UNREASONABLE RESTRAINT OF TRADE (RULE OF REASON)
## (ELEMENT 2B(ii))

**[The Court tasked itself with redrafting this Instruction. Sept. 1, 2020 Hr'g Tr. 388:24, ECF No. 311.]**

Now I will talk to you about the second standard, which is called the "rule of reason." The rule of reason balances pro-competitive and anti-competitive effects of challenged acts or agreements to determine if they unreasonably restrain trade in the relevant market. You are to apply this standard to the remaining alleged restraints and agreements in this case.

Under the rule of reason test, each Plaintiff must first prove by a preponderance of the evidence that the challenged restraints resulted in a substantial harm to competition in the alleged market for raw Grade A milk in Order 1. If they do, then Defendants must prove by a preponderance of the evidence that the restraints were justified by legitimate procompetitive benefits. If Defendants satisfy their burden, then each Plaintiff must prove by a preponderance of the evidence that any legitimate competitive benefits established by Defendants could have been achieved through less restrictive means.

You must then balance the competitive harm against the procompetitive benefit. The challenged restraints violate Section 1 of the Sherman Act only if you find that the competitive harm substantially outweighs any legitimate procompetitive benefit. I will now review each step of that analysis in more detail.

---

same rationale applies here—there is no purpose for the non-solicitation agreements except to stifle competition.

## FIRST CLAIM:  SECTION 1 OF THE SHERMAN ACT
### RELEVANT MARKET
#### (ELEMENT 2(a))

[The Court instructed that the Relevant Market instructions be placed here. Sept. 1, 2020 Hr'g Tr. 93:20-22, 394:15-16, ECF No. 311. The Court tasked plaintiffs with implementing revisions to this Instruction.  *Id.* at 395:3-8.]

To prevail on a Section 1 claim under the rule of reason, each Plaintiff must prove by a preponderance of the evidence the relevant market. The relevant market has two components: the product market and the geographic market. I will define each for you in more detail.

## FIRST CLAIM:  SECTION 1 OF THE SHERMAN ACT
### RELEVANT MARKET:  PRODUCT MARKET
#### (ELEMENT 2(a)(i))

[The Court tasked DFA with redrafting this Instruction. Sept. 1, 2020 Hr'g Tr. 406:5-9, ECF No. 311.]

The basic idea of a relevant product market in an antitrust case like this one, that alleges monopsonistic behavior, is to identify the market in terms of the competing buyers to which producers can sell their product. In other words, the relevant product market is comprised of that set of buyers or potential buyers who are seen by sellers as being reasonably interchangeable or reasonable substitutes for each other.[18] This is a practical test with reference to the actual behavior of buyers and marketing efforts of sellers. The buyers need not be identical or precisely interchangeable as long as they are reasonable substitutes. And the relevant market may include not only current buyers, but also persons or entities that reasonably could become buyers, even if they are not presently buyers. These are known as "potential buyers."

---

[18]    *See Todd v. Exxon*, 275 F.3d 191, 202 (2d Cir. 2001) ("These factors are *reversed* in the context of a buyer-side conspiracy. In such a case, 'the market is not the market of competing sellers but of competing buyers. This market is comprised of buyers who are seen by sellers as being reasonably good substitutes.'" (quoting Roger D. Blair & Jeffrey L. Harrison, *Antitrust Policy and Monopsony*, 76 Cornell L. Rev. 297, 324 (1991))).

To determine whether buyers are reasonable substitutes for each other, you may consider:

- Whether a small, but significant, decrease in the price paid by one buyer would result in enough sellers switching from that buyer to another buyer, such that the price decrease would not be profitable. In other words, will sellers accept the price decrease or will so many switch to alternative buyers that the price decrease will be withdrawn?;

- Sellers' views on whether various buyers are interchangeable;

- The perceptions of the industry or the public as to whether the buyers are in separate markets;

- The views of each Plaintiff and Defendants regarding who their respective competitors are;

- The existence or absence of different seller groups or distribution channels.

Here, each Plaintiff contends that the relevant product market is raw Grade A milk. By contrast, DFA contends that each Plaintiff has failed to allege a proper relevant product market. DFA contends that not all Plaintiffs have the same buyer options, and thus, all Plaintiffs do not all have the same relevant market. DFA also contends that there are other buyers or potential buyers of raw milk that are reasonable substitutes for DFA and its alleged coconspirators. If you find that a Plaintiff has proven a relevant product market, then you should continue to evaluate the remainder of that Plaintiff's claim. However, if you find that a Plaintiff has failed to prove such a market, then you must find in DFA's favor on this claim.

### FIRST CLAIM:  SECTION 1 OF THE SHERMAN ACT
### RELEVANT MARKET:  GEOGRAPHIC MARKET
### (ELEMENT 2(a)(ii))

**[The Court tasked DFA with redrafting this Instruction. Sept. 1, 2020 Hr'g Tr. 411:13-21, ECF No. 311.]**

The relevant geographic market is the area in which the Defendants face competition from other firms that compete in that relevant product market and to which producers can reasonably turn to sell their milk. When analyzing the relevant geographic

market, you should consider whether changes in prices paid by buyers in one area have substantial effects on prices paid by or quantities sold to buyers in another area, which would tend to show that both areas are in the same relevant geographic market. The geographic market may be as large as global or nationwide, or as small as a single town or even smaller.

In determining whether each Plaintiff has met his, her, or its burden and proven that his, her, or its proposed geographic market is proper, you may consider several factors, including:

- The geographic area in which Defendants buy and where Defendants' suppliers are located;

- The geographic area to which sellers turn or have seriously considered turning;

- The transportation cost differences between areas;

- The time interval in which milk must be transported due to its perishability;

- The geographic areas that buyers view as potential sources of competition; and

- Whether governmental licensing requirements, taxes, or quotas have the effect of limiting competition in certain areas.

Here, each Plaintiff must prove that the relevant geographic market is the Federal Milk Marketing Order 1.[19] A Federal Milk Marketing Order is a geographic area defined by the federal government for purposes of the U.S. Department of Agriculture ("USDA") setting minimum prices for raw Grade A milk. There are eleven Federal Milk Marketing Orders. The geographic area of Federal Milk Marketing Order 1 covers all of Connecticut,

---

[19] The majority of the language in this Instruction was included in the Court's September 1, 2020 Proposed Instructions. *See* Court's Proposed Instr. on "Geographic Market" at 13-14. DFA has edited certain words, such as changing "sell" to "buy" and "customers" to "suppliers," to implement the Second Circuit's instruction in *Todd v. Exxon*, 275 F.3d 191 (2d Cir. 2001), that in a monopsony case, the relevant market analysis is a "'mirror image' of the traditional seller-side market analysis." *Id.* at 202; *see also* Model Jury Instructions in Civil Antitrust Cases at A-113 (Am. Bar Ass'n 2016) ("ABA Model Instructions").

Delaware, Massachusetts, New Hampshire, New Jersey, Rhode Island, Vermont, and the District of Columbia, as well as certain parts, but not all, of Maryland, New York, Pennsylvania, and Virginia.[20]

DFA disputes that the entirety of Federal Milk Marketing Order 1 is a relevant market for any plaintiff. DFA contends that some buyers of milk in Federal Milk Marketing Order 1 are too far away from some Plaintiffs to be reasonable options. DFA also contends that some buyers located outside the boundaries of Federal Milk Marketing Order 1 are viable options for some Plaintiffs.

**FIRST CLAIM: SECTION 1 OF THE SHERMAN ACT
UNREASONABLE RESTRAINT OF TRADE (RULE OF REASON): HARM TO
COMPETITION
(ELEMENT 2(b)(i))**

**[The Court tasked DFA with redrafting this Instruction.  Sept. 1, 2020 Hr'g Tr.
414:4-6, ECF No. 311.]**

As I mentioned, to prove that the challenged restraints are unreasonable, each Plaintiff first must prove by a preponderance of the evidence that the restraints resulted in,

---

[20]     This definition of Federal Milk Marketing Order 1 is adapted from the Court's September 1, 2020 proposed definition of "Federal Milk Marketing Order" and "Order 1." *See* Court's Jury Charge at 9, Proposed Definition of "Order 1" (Aug. 26, 2020) (on file with author) ("Order 1 covers all of Connecticut, Delaware, Massachusetts, New Hampshire, New Jersey, Rhode Island, Vermont, and the District of Columbia, as well as certain portions of Maryland, New York, Pennsylvania, and Virginia."); *see also id*. at 8-9, Proposed Definition of "Federal Milk Marketing Order" ("The federal government has issued regulations that the U.S. Department of Agriculture ('USDA') uses to set the minimum price that must be paid for raw Grade A milk in a designated geographic area known as a FMMO. This means those who buy milk from producers in a particular FMMO must pay at least the set minimum price to producers. A FMMO also imposes certain quality standards; all milk that is 'pooled' on the FMMO must comply with these standards. A FMMO is where milk is sold, not necessarily where it is produced. There are eleven FMMOs in the United States. FMMOs are identified by number, but they are not numbered consecutively. As a result, although you may hear reference, for example, to 'Order 32,' that does not mean there are thirty-two FMMOs. Not all states are in a FMMO. Milk and milk pricing may also be regulated at the state level. There are also parts of the United States where there is no regulation of raw Grade A milk at either the state or federal level.").

or are likely to result in, substantial harm to competition in the relevant product and geographic market, as I defined earlier.

A harmful effect on competition means a reduction in competition that results in the loss of some of the benefits of competition, such as lower prices, increased output, or higher product quality. If the challenged conduct has not resulted in, or is not likely to result in, higher prices, decreased output, lower quality, or the loss of some other competitive benefit, then there has been no effect on competition, and you should find that the challenged conduct was not unreasonable.[21] This element requires each Plaintiff to prove harm to competition, not to individual competitors.

In determining whether the challenged restraints have produced, or are likely to produce, harm to competition, you may consider the following factors:

- the effect of the restraint on prices, output, product quality and service;

- the purpose and nature of the restraint;

- the nature and structure of the relevant market;

- the number of competitors in the relevant market and the level of competition among them, both before and after the restraint was imposed; and

- whether the Defendants possess market power.

The last factor mentioned, market power, includes the ability to control price, exclude competition, or restrict output. An important factor in determining whether Defendants possess market power is Defendants' market share, that is, the percentage of the products or services it buys in the relevant market compared to those bought by all other competitors. Think of the market as a pie with each competitor having a share. The question is, how much of the pie do the Defendants control or possess? Other factors that you may consider in determining whether Defendants have market power include barriers to entry by new competitors in the relevant market. A barrier to entry is something that makes it more difficult for a new competitor to enter the market and compete. If a party

---

[21]     *See* ABA Model Instructions at C-5.

does not possess a substantial market share, it is less likely that party possesses market power. If Defendants do not possess market power, it is less likely that the challenged restraint has resulted in, or will result in, a substantial harmful effect on competition in the market.

### FIRST CLAIM: SECTION 1 OF THE SHERMAN ACT
### UNREASONABLE RESTRAINT OF TRADE: PROOF OF COMPETITIVE
### BENEFITS
### (ELEMENT 2(b)(ii))

**[The Court tasked DFA with redrafting this Instruction. Sept. 1, 2020 Hr'g Tr. 418:17-25, ECF No. 311.]**

If you find that each Plaintiff has proven that the challenged restraint resulted in substantial harm to competition in a relevant market, then you next must determine whether the restraint also benefits competition in other ways. If you find that the challenged restraint does result in competitive benefits, then the burden shifts back to each Plaintiff to prove that the restraint was not reasonably necessary to achieve the benefits. If each Plaintiff proves that the same benefits could have been readily achieved by other, reasonably available alternative means that create substantially less harm to competition, then they cannot be used to justify the restraint.

### FIRST CLAIM: SECTION 1 OF THE SHERMAN ACT
### UNREASONABLE RESTRAINT OF TRADE: BALANCING THE
### COMPETITIVE EFFECTS
### (ELEMENT 2(b)(iii))

**[The Court tasked DFA with redrafting this Instruction. Sept. 1, 2020 Hr'g Tr. 418:17-25, ECF No. 311; *see also id.* at 428:13-14, 435:13-23.]**

If you find that the alleged restraint was reasonably necessary to achieve competitive benefits, then you must balance those competitive benefits against the competitive harm resulting from the same conduct.

If the competitive harm substantially outweighs the competitive benefits, then the alleged restraint is unreasonable. If the competitive harm does not substantially outweigh the competitive benefits, then the alleged restraint is not unreasonable. In conducting this

analysis, you must consider the benefits and harm to competition and consumers, not just to a single competitor or group of competitors. Each Plaintiff bears the burden of proving that the anticompetitive effect of DFA's alleged conduct substantially outweighs its benefits.

### FIRST CLAIM: SECTION 1 OF THE SHERMAN ACT UNREASONABLE RESTRAINT OF TRADE: BALANCING THE COMPETITIVE EFFECTS – ADDITIONAL CONSIDERATION FOR EXCLUSIVE DEALING (ELEMENT 2(b)(iii)))[22]

**[The Court tasked DFA with redrafting this Instruction.  *See* Sept. 1, 2020 Hr'g Tr. Sept. 1, 2020 Hr'g Tr. 435:13-23, ECF No. 311.]**

In this case, you should take into account two additional considerations as you conduct your analysis to balance competitive benefits against any competitive harm resulting from the same conduct.

First, each Plaintiff contends that DFA has entered into exclusive supply agreements with certain processors (also known as "full supply agreements"). Exclusive dealing

---

[22]    During the September 1, 2020 charge conference, the Court directed DFA to incorporate its instruction regarding exclusive dealing arrangements into the prior instruction regarding "Proof of Competitive Benefits." *See* Sept. 1, 2020 Hr'g Tr. 435:13-23, ECF No. 311. DFA respectfully submits that because any instruction on exclusive dealing provides the jury with additional legal context for applying the rule of reason balancing test to the alleged full supply agreements in this case—and, thus, instructs the jury on how to assess the alleged agreements' potential competitive harms compared to any potential procompetitive benefits—it must follow any instruction regarding "Balancing the Competitive Effects." *See generally* ABA Model Instructions at D-71, D-73 (explaining that "exclusive dealing arrangements and partial exclusive dealing arrangements, whatever form they may take, are analyzed under the rule of reason to determine if they result in a substantial and unreasonable harm to competition in a relevant market."); *see also Elec. Commc'n Corp. v. Toshiba*, 129 F.3d 240, 243-46 (2d Cir. 1997) (analyzing alleged exclusive dealing agreement under the rule of reason and finding no evidence of an adverse effect on competition); *Charych v. Siriusware*, 790 F. App'x 299, 302 (2d Cir. 2019) (noting that alleged exclusive dealing agreement was a run of the mill business arrangement that was presumptively legal); *cf. Geneva Pharms. v. Barr Labs.*, 386 F.3d 485, 508 (2d Cir. 2004) (explaining that exclusive dealing arrangements may "have pro-competitive purposes and effects, such as assuring steady supply, affording protection against price fluctuations, reducing selling expenses, and promoting stable,

arrangements require a buyer of a product or service to obtain that product or service exclusively from one supplier for a period of time. To the extent that you find that any Plaintiff has proven that DFA entered into an exclusive supply agreement with any processor, you should consider that, from the standpoint of the buyer or seller, these types of exclusive dealing arrangements may have potential procompetitive effects that benefit consumers and that need to be weighed against the potential anticompetitive effects of foreclosing competing suppliers' access to the buyer and the buyer's access to competing suppliers' products and services.

If you determine that DFA entered into exclusive supply agreements with certain processors, then, in determining whether DFA's supply agreements with those processors had a substantially harmful effect on competition in a relevant market, you should consider the nature and history of the use of full supply agreements in the dairy industry, whether buyers have independent reasons for entering into full supply agreements or were coerced into entering into them, whether other competing suppliers also offer full supply agreements, the extent of competition among competing suppliers for full supply agreements with buyers, DFA's position in the marketplace, the competitive alternatives to DFA's products or services, the reasons DFA and processors entered into the full supply agreements at issue, and the effect of the use of the full supply agreements on the ability of other competing buyers to enter the market and on price and other competition in the alleged market for buyers of raw Grade A milk.

By considering all of these factors, you should determine whether the exclusive dealing contracts adversely affected the premiums paid by buyers, output, or quality of raw

---

long-term business relationships" and therefore must be analyzed under the rule of reason and adding that, "[i]n order not to condemn the positive aspects of exclusive dealing agreements" the decision-maker "must take care to consider the competitive characteristics of the relevant market" through a fact-based analysis). As previously explained, DFA's proposed Instruction derives directly from the applicable Model Instructions regarding exclusive dealing arrangements. *See* ABA Model Instructions at D-71, D-73. The Court instructed plaintiffs to send any proposed additions to this Instruction to DFA's counsel. Sept. 1, 2020 Hr'g Tr 430:3-11. As of the time of this filing, plaintiffs had not done so.

Grade A milk in the relevant market. Where a restraint does not adversely affect price, output, or quality, it is unlikely to substantially harm competition between buyers for the relevant product.

### FIRST CLAIM: SECTION 1 OF THE SHERMAN ACT UNREASONABLE RESTRAINT OF TRADE: BALANCING THE COMPETITIVE EFFECTS – ADDITIONAL CONSIDERATION FOR JOINT VENTURES (ELEMENT 2(b)(iii))[23]

**[The Court tasked DFA with inclusion of this Instruction.  *See* Sept. 1, 2020 Hr'g Tr. 435:5-11, ECF No. 311.]**

The second additional consideration you should take into account as you conduct your analysis to balance competitive benefits against any competitive harm relates to how the antitrust laws treat agreements that are part of an integration of the assets or resources of two or more businesses—which is sometimes known as a joint venture. Defendants contend that DMS is a joint venture among DFA and other dairy cooperatives.

Where two or more entities combine substantial portions of their businesses in a joint venture, an agreement on the price to be charged can be a natural aspect of the business integration. The law recognizes that these business integrations often have positive effects on competition and can provide benefits to consumers. When the businesses involved in the joint venture are cooperatives, they do not necessarily have to qualify for Capper-Volstead Act protections in order for their business integration to provide these pro-competitive effects.

If you conclude that there was an agreement between DFA and other cooperatives, you should assess whether that agreement was part of an integration of the cooperatives' assets and resources for a purpose other than merely to suppress farmer pay premiums. In making this determination, you should first assess whether DFA and those cooperatives have combined their assets or resources and whether that business integration was designed

---

[23]    DFA's proposed Instruction closely tracks and derives from the Model Instruction on joint ventures, and deviates from that Model Instruction only to reflect the unique facts and situations of this case. *See* ABA Model Instructions at B-27.

to achieve competitive benefits, such as creating a new product or service, generating efficiencies that the cooperatives would not have been able to achieve independently, or providing some other benefit to competition or farmers. The mere coordination of decisions on price, output, customers, territories, and the like is not an integration of assets or resources. Cost savings alone, without an integration of assets or resources, are not proof of a procompetitive benefit.

If you conclude that there was an integration of assets or resources, you should next assess whether the alleged agreement was reasonably necessary to achieve the competitive benefits of the business integration. If the alleged agreement was reasonably necessary to achieve the competitive benefits of the business integration, then you should conclude that the alleged agreement was part of an integration of the companies' assets or resources, and you should assess whether that agreement results in an adverse effect on competition that outweighs any procompetitive benefit.[24]

---

[24]     The law is clear that agreements that are ancillary to a lawful joint venture must be evaluated under the rule of reason—and, therefore, must be evaluated by balancing the alleged agreements' purported adverse effect on competition against their procompetitive benefits. *See, e.g.*, *Texaco v. Dagher*, 547 U.S. 1, 7 (2006) (in the context of a lawful joint venture, a restraint that is ancillary to the legitimate and competitive purposes of the business association cannot be analyzed as a per se restraint); *North Am. Soccer League v. Nat'l Football League*, 670 F.2d 1249, 1259 (2d Cir. 1982) ("agreements between members of a joint venture . . . are subject to scrutiny under the rules of reason."); *Major League Baseball Props. v. Salvino*, 542 F.3d 290, 336-38 (2d Cir. 2008) (Sotomayor, J, concurring) (explaining that that clubs' joint decision to license intellectual property exclusively through a single agent was not a horizontal restraint of trade that should be evaluated *per se*, but rather, an ancillary restraint to a legitimate joint venture that should be evaluated under the rule of reason and adding that "to protect the efficiency-enhancing potential of joint ventures and cooperatives, the rule of reason is the favored method of analysis for these ventures, preventing courts from intervening before a full market analysis is completed") (citing *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S.752, 768 (1984) (recognizing that because joint ventures "hold the promise of increasing a firm's efficiency and enabling it to compete more effectively," joint ventures should normally be analyzed under a rule of reason)); *Med. Ctr. at Elizabeth Place v. Atrium Health Sys.*, 922 F.3d 713, 724-28 (6th Cir. 2019) (explaining that joint ventures are themselves evaluated under the rule of reason due to their possibility for procompetitive efficiencies and observing that restraints that are ancillary to the legitimate and competitive purposes of a

### FIRST CLAIM: SECTION 1 OF THE SHERMAN ACT
### EFFECT ON INTERSTATE COMMERCE
### (ELEMENT 3)

The Sherman Act applies only to conduct or restraints that affect interstate or foreign commerce. Here, Here, the essential element of interstate or foreign commerce has been established.

### FIRST CLAIM: SECTION 1 OF THE SHERMAN ACT
### INJURY IN FACT AND ANTITRUST INJURY
### (ELEMENT 4)
**[The Court tasked DFA with redrafting this Instruction. Sept. 1, 2020 Hr'g Tr. 440:8-9, 441:15-16, 442:17-20, 446:12-15, ECF No. 311.]**

Each Plaintiff is entitled to recover damages for an injury to his, her, or its business, if he, she, or it can establish three elements of injury:

(1)     The Plaintiff was in fact injured as a result of Defendants' violation of the antitrust laws;

(2)     Defendants' illegal conduct was a material cause of the Plaintiff's injury; and

(3)     The Plaintiff's injury is an injury of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as "injury in fact" or "fact of damage." For each Plaintiff to establish that he, she, or it is entitled to recover damages, each Plaintiff must prove that he, she, or it was injured as a result of Defendants' violation of the antitrust laws. Proving the fact of damage does not require a Plaintiff to prove the dollar value of his, her, or its injury. It requires only that each Plaintiff prove that he, she, or it was in fact injured by Defendants' alleged antitrust violation. It is important to understand, however,

---

joint venture and may contribute to the success of the joint venture are inappropriate for *per se* treatment). As a result, DFA respectfully submits that this Instruction regarding "Joint Ventures" must be given to the jury as part of the Court's instructions to the jury regarding the rule of reason analysis governing each plaintiff's claim. *See* ABA Model Instructions at B-27. Moreover, because the antitrust jurisprudence regarding ancillary restraints and lawful joint ventures exists independently of the Capper-Volstead Act, DFA submits that it would be incorrect for the Court to instruct the jury that its consideration of DMS as a lawful joint venture is appropriate only in connection with DFA's status as a Capper-Volstead protected entity.

that injury and amount of damage are different concepts and that you cannot consider the amount of a Plaintiff's damage unless and until you have concluded that he, she, or it has established that he, she or it was in fact injured.

Each Plaintiff must also establish by a preponderance of the evidence that Defendants' alleged illegal conduct was a material cause of his, her, or its injury. This means that each Plaintiff must have proved that some damage occurred to that Plaintiff as a result of Defendants' alleged antitrust violation, and not some other cause. Each Plaintiff is not required to prove that Defendants' alleged antitrust violation was the sole cause of that Plaintiff's injury, nor need a Plaintiff eliminate all other possible causes of injury. It is enough if each Plaintiff has proved that the alleged antitrust violation was a material cause of his, her, or its injury.

Each Plaintiff must also establish that his, her, or its injury was the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If a Plaintiff's injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm producers, then that Plaintiff's injuries are antitrust injuries. On the other hand, if a Plaintiff's injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then that Plaintiff's injuries are not antitrust injuries, and that Plaintiff may not recover damages for those injuries under the antitrust laws. In establishing antitrust injury, each Plaintiff can only rely on acts that occurred within the statute of limitations, which I will address later in my instructions.[25]

---

[25]     *Zenith Radio Corp. v. Hazeltine Research, Inc*., 401 U.S. 321, 338-39 (1971). (holding that a cause of action accrues in an antitrust conspiracy case "when a defendant commits an act that injures [the] plaintiff's business" such that "if a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date"); *see also Klehr et ux. v. A.O. Smith Corp. et al*., 521 U.S. 179, 181, 190 (1997) (holding that while the continuing violations doctrine might allow a plaintiff to recover for damages caused by a "separable, new predicate act within the 4-year limitations period," a plaintiff "cannot use an

If you find that a Plaintiff has established that he, she, or suffered "injury in fact" from an antitrust injury, you must then consider the amount of that Plaintiff's damages.

## FIRST CLAIM: SECTION 1 OF THE SHERMAN ACT
## MARKET WIDE SUPPRESSION
## (ELEMENT 4)[26]

In this case, each Plaintiff claims that Professor Elhauge's regression analysis shows both their antitrust impact and damages. Specifically, Plaintiffs claim that his regression analysis shows market-wide suppression of the over-order premiums in Order 1, which reduced the amount paid to Plaintiffs by 98.7 cents per hundred weight. Plaintiffs claim that you can calculate their individualized damages by multiplying the reduction in price

---

independent, new act as a bootstrap to recover for injuries caused by other predicate acts that took place outside the limitations period").

[26]    DFA continues to object to this Instruction in its entirety because it is unduly argumentative and confusing to the jury. Among other things, this Instruction inaccurately reflects the allegations in this case, mischaracterizes DFA's position, incorrectly instructs the jury on the nature of the inquiry it must undertake in deciding whether each plaintiff has met its burden to prove injury and damages, and improperly suggests to the jury that it must place dispositive weight on either side's expert testimony, when unequivocally, it need not. Indeed, the jury has no legal duty to "decide whether to accept or reject the experts' testimony" as a zero-sum proposition and the verdict will not require any such decision with respect to any expert's testimony. To the contrary, in deciding whether each plaintiff has proven injury and damages, the jury is entitled to consider a wide array of evidence—expert and otherwise—in analyzing whether each plaintiff received lower pay premiums than it otherwise would have because of something illegal that DFA allegedly did. The expert regression in this case may be merely one piece of that evidence that the jury may consider in reaching its decision. In the event the jury is permitted to consider the regression at all following the Federal Rule of Civil Procedure 50(a) stage of the case, it will be entitled to place whatever weight on this evidence as it sees fit and this decision may vary from plaintiff to plaintiff. To the extent plaintiffs' proposed Instruction tells the jury otherwise, it is entirely unsupported as a matter of law. Moreover, the Instruction is improper because it suggests incorrectly that DFA's defense to the elements of injury and damages amounts solely to a rebuttal of plaintiffs' expert's evidence. In reality, DFA has made clear to plaintiffs and the Court that it intends to defend against each plaintiff's claim of injury and damages by introducing factual, non-expert evidence from its own percipient witnesses as well as evidence elicited through cross examination of the individual plaintiffs. Because plaintiffs' proposed Instruction improperly reduces DFA's defense on injury and damages to a battle of the experts, it is misleading and should not be given to the jury.

98.7 cents per hundred weight, by the total number of hundred weights of milk that each Plaintiffs sold in Order 1 during the relevant time period. Defendants deny these claims, dispute Professor Elhauge's opinions, and contest Plaintiffs' method of establishing damages

Both sides have presented you with expert testimony to assist you in determining what, if any, antitrust impact or damages were sustained by Plaintiffs. It is for you to decide whether to accept or reject the experts' testimony. The verdict form will guide you in recording your conclusions with regard to the issue of damages.

## SECOND CLAIM: SECTION 2 OF THE SHERMAN ACT MONOPSONIZATION - ELEMENTS

Each Plaintiff alleges that they were injured by Defendants' unlawful monopsonization of the alleged raw Grade A milk market in Order 1 in violation of Section 2 of the Sherman Act. As I explained earlier, a monopsony exists where a single buyer substantially controls the market as the primary purchaser of products offered by sellers. Here, a monopsony may exist if the purchasers of raw Grade A milk exert unlawful control over where farmers can either sell their milk or the price at which they can sell it.

To prevail on this claim, each Plaintiff must prove by a preponderance of the evidence each of the following essential elements:

(1)   The alleged market is a valid antitrust market (as previously defined);

    a.   Relevant product market;

    b.   Relevant geographic market;

(2)   Defendants possessed monopsony power in that market;

    a.   Direct proof of monopsony power;

    b.   Indirect proof of monopsony power;

(3)   Defendants willfully acquired or maintained monopsony power in that market by engaging in anticompetitive conduct;

(4)   Defendants' conduct occurred in or affected interstate commerce (as previously instructed, this element has been met); and

(5)   Plaintiffs were injured in their business or property because of Defendants' anticompetitive conduct.

I will explain each of these elements in more detail.

If you find that each Plaintiff failed to prove all of these elements by a preponderance of the evidence, then you must find for Defendants and against Plaintiffs on this claim. If you find that each Plaintiff has proved each of these elements by a preponderance of the evidence, then you must consider whether DFA has qualified as a protected entity under the Capper-Volstead Act. If you find that DFA qualifies for protection under the Capper-Volstead Act, then you must not base any finding of Section 2 liability on any conduct that is immune under the Capper-Volstead Act, as I have previously instructed you. If you find that DFA has not proven that it qualifies for Capper-Volstead Act protection or that it has engaged in predatory conduct that is not immune, within the meaning of the instruction that I gave you, then you must find for Plaintiffs and against Defendants on this claim.[27]

## SECOND CLAIM: SECTION 2 OF THE SHERMAN ACT
## MONOPSONIZATION – RELEVANT MARKET
## (ELEMENT 1)[28]

As I instructed you earlier, each Plaintiff must prove by a preponderance of the evidence that Defendants had monopsony power in a relevant market. Plaintiffs claim the

---

[27]    For ease of the Court's reference, DFA has proposed a Capper-Volstead Act "toggle" pursuant to the Court's discussion at the September 1, 2020 charge conference and has further edited this instruction to properly reflect the elements of the claim and the role of the market analysis in determining DFA's alleged liability under Section 2. *See generally* Sept. 1, 2020 Hr'g Tr. 317:13-18, ECF No. 311; *see also* ABA Model Instructions at A-102.

[28]    At the August 10, 2020 charge conference, the Court tasked plaintiffs with incorporating the relevant market instructions into each claim. *See* Aug. 10, 2020 Hr'g Tr. 137:23-138:4, ECF No. 296 ("We're going to have new definitions of those, and I'll just ask that the plaintiffs patch those new definitions over here and just add a phrase 'as previously instructed' so that the jury knows that this is not something new that they're hearing but the instruction **should be self-contained** so that they – they can grasp what the elements are **without flipping back** and seeing the previous instruction." (emphases added)); *see also id.* at 138:20-139:1 ("I'm telling Mr. Zakarian, whatever you come up with there, paste it in here and let the jury know 'as previously instructed' so that, A, you alert the jury that 'you've already heard this' and, B, it's **self-contained in the instruction so they're not trying to go back to find out where the 'relevant market' definitions are**." (emphasis added)).   Because the Court tasked DFA with redrafting the relevant

relevant market is the raw Grade A milk market in Order 1. Defendants dispute that all Plaintiffs have the same relevant market because the selling options differ from Plaintiff to Plaintiff.

Defining the relevant market is essential because you are required to make a judgment about whether Defendants have monopsony power in a properly defined economic market. To make this judgment, you must be able to determine what, if any, economic forces restrain Defendants' freedom to set prices for the purchasing of raw Grade A milk.  The most likely and most important restraining force will be actual and potential competition from other buyers. This includes all buyers and potential buyers that act or likely could act as restraints on Defendants' power to set prices as it pleases because sellers could switch to other options available in the marketplace if Defendants set their own prices too low. All the buyers that exert such restraining force are within what is called the relevant market.[29]

There are two aspects you must consider in determining whether a Plaintiff has met his, her, or its burden to prove the relevant market by a preponderance of the evidence. The first is the relevant product market.  The second is the relevant geographic market.

---

product and geographic market instructions during the September 1, 2020 Charge Conference, *see* Sept. 1, 2020 Hr'g Tr. 406:5-9, 411:13-21, ECF No. 311, and because plaintiffs did not copy the relevant market instructions into each claim as instructed, DFA has included those redrafted instructions before each claim in these proposed instructions.

[29]   *See* ABA Model Jury Instructions at A-106 ("The most likely and important restraining force will be actual and potential competition from other firms and their products. This includes all firms and products that act or likely could act as restraints on defendant's power to set prices as it pleases because customers could switch to them if defendant sets its own prices too high. All the firms and products that exert such restraining force are within what is called the relevant market.").

**SECOND CLAIM:  SECTION 2 OF THE SHERMAN ACT
MONOPSONIZATION -- RELEVANT MARKET:  PRODUCT MARKET
(ELEMENT 1(a))**

**[The Court tasked DFA with redrafting this Instruction for the First Claim.  Sept. 1, 2020 Hr'g Tr. at 406:5-9, ECF No. 311.]**

As I explained before, the relevant product market is comprised of that set of buyers or potential buyers who are seen by sellers as being reasonably interchangeable or reasonable substitutes for each other.[30] This is a practical test with reference to the actual behavior of buyers and marketing efforts of sellers. The buyers need not be identical or precisely interchangeable as long as they are reasonable substitutes. And the relevant market may include not only current buyers, but also persons or entities that reasonably could become buyers, even if they are not presently buyers. These are known as "potential buyers."

To determine whether buyers are reasonable substitutes for each other, you may consider:

- Whether a small, but significant, decrease in the price paid by one buyer would result in enough sellers switching from that buyer to another buyer, such that the price decrease would not be profitable. In other words, will sellers accept the price decrease or will so many switch to alternative buyers that the price decrease will be withdrawn?;

- Sellers' views on whether various buyers are interchangeable;

- The perceptions of the industry or the public as to whether the buyers are in separate markets;

- The views of each plaintiff and Defendants regarding who their respective competitors are;

- The existence or absence of different seller groups or distribution channels.

---

[30]     *See Todd v. Exxon*, 275 F.3d 191, 202 (2d Cir. 2001) ("These factors are *reversed* in the context of a buyer-side conspiracy. In such a case, 'the market is not the market of competing sellers but of competing buyers. This market is comprised of buyers who are seen by sellers as being reasonably good substitutes.'" (quoting Roger D. Blair & Jeffrey L. Harrison, *Antitrust Policy and Monopsony*, 76 Cornell L. Rev. 297, 324 (1991))).

Here, each Plaintiff contends that the relevant product market is raw Grade A milk. By contrast, DFA contends that each Plaintiff has failed to allege a proper relevant product market. DFA contends that not all Plaintiffs have the same buyer options, and thus, all Plaintiffs do not all have the same relevant market. DFA also contends that there are other buyers or potential buyers of raw milk that are reasonable substitutes for DFA and its alleged coconspirators. If you find that a Plaintiff has proven a relevant product market, then you should continue to evaluate the remainder of that Plaintiff's claim. However, if you find that a Plaintiff has failed to prove such a market, then you must find in DFA's favor on this claim.

### SECOND CLAIM:  SECTION 2 OF THE SHERMAN ACT MONOPSONIZATION -- RELEVANT MARKET:  GEOGRAPHIC MARKET (ELEMENT 1(b))

**[The Court tasked DFA with redrafting this Instruction for the First Claim.  Sept. 1, 2020 Hr'g Tr. 411:13-21, ECF No. 311.]**

As I explained before, the relevant geographic market is the area in which the Defendants face competition from other firms that compete in that relevant product market and to which producers can reasonably turn to sell their milk. When analyzing the relevant geographic market, you should consider whether changes in prices paid by buyers in one area have substantial effects on prices paid by or quantities sold to buyers in another area, which would tend to show that both areas are in the same relevant geographic market. The geographic market may be as large as global or nationwide, or as small as a single town or even smaller.

In determining whether each Plaintiff has met his, her, or its burden and proven that his, her, or its proposed geographic market is proper, you may consider several factors, including:

- The geographic area in which Defendants buy and where Defendants' suppliers are located;

- The geographic area to which sellers turn or have seriously considered turning;

- The transportation cost differences between areas;

- The time interval in which milk must be transported due to its perishability;

- The geographic areas that buyers view as potential sources of competition; and

- Whether governmental licensing requirements, taxes, or quotas have the effect of limiting competition in certain areas.

Here, each Plaintiff must prove that the relevant geographic market is the Federal Milk Marketing Order 1. A Federal Milk Marketing Order is a geographic area defined by the federal government for purposes of the U.S. Department of Agriculture ("USDA") setting minimum prices for raw Grade A milk. There are eleven Federal Milk Marketing Orders. The geographic area of Federal Milk Marketing Order 1 covers all of Connecticut, Delaware, Massachusetts, New Hampshire, New Jersey, Rhode Island, Vermont, and the District of Columbia, as well as certain parts, but not all, of Maryland, New York, Pennsylvania, and Virginia.

DFA disputes that the entirety of Federal Milk Marketing Order 1 is a relevant market for any Plaintiff. DFA contends that some buyers of milk in Federal Milk Marketing Order 1 are too far away from some Plaintiffs to be reasonable options. DFA also contends that some buyers located outside the boundaries of Federal Milk Marketing Order 1 are viable options for some Plaintiffs.

## SECOND CLAIM: SECTION 2 OF THE SHERMAN ACT MONOPSONIZATION – MONOPSONY POWER (ELEMENT 2)[31]

To prove its monopsonization claim, each Plaintiff must prove that Defendants have monopsony power in a relevant antitrust market. Monopsony power is the power to control prices or exclude competition in a relevant antitrust market as the purchaser of products. More precisely, a firm is a monopsonist if it can exert control over the price for the sale of goods, here, raw Grade A milk, from a seller or sellers, here, the farmers. A person or entity is a monopsonist if it can profitably lower or maintain prices for a significant period of

---

[31]    DFA proposes the above edits to ensure that this Instruction conforms to the ABA Model Instruction and relevant law. *See* ABA Model Instructions at A-104.

time, below competitive levels. However, possession of monopsony power, in and of itself, is not unlawful.  *See* ABA Model Jury Instructions A-104.

There are two ways that Plaintiffs may show Defendants possessed monopsony power in the relevant market: the first is through "direct" proof and the second is through "indirect" proof. I will describe each method to you.

## SECOND CLAIM: SECTION 2 OF THE SHERMAN ACT
## MONOPSONIZATION – DIRECT PROOF OF MONOPSONY POWER
## (ELEMENT 2A)[32]

Under the direct method, each Plaintiffs can satisfy his, her, or its burden of proof by showing that Defendants have the ability to control the price of raw Grade A milk or otherwise reduce competition in a relevant market.  Each Plaintiff must also prove that Defendants have the power to control prices substantially below a competitive level for a significant period of time. If Defendants would lose too much business to other competitors that it would become unprofitable to continue excluding competition or reducing prices, then Defendants do not have monopsony power.

Plaintiffs claim to have direct proof of monopsony power through the alleged 2017 Independent Plan. Defendants dispute this claim.

## SECOND CLAIM: SECTION 2 OF THE SHERMAN ACT
## MONOPSONIZATION – INDIRECT EVIDENCE OF MONOPSONY POWER
## (ELEMENT 2B)[33]

As I stated, monopsony power also can be established through indirect, or circumstantial, proof. Such proof includes Defendants' market share, barriers to entry,

---

[32]    DFA continues to object to this Instruction on the basis that plaintiffs have not identified any evidence in this case that constitutes "direct proof" of DFA's alleged monopsony power as a matter of law. DFA's Objs. to Pls.' Jury Instr. at 26-28, ECF No. 293; Aug. 10, 2020 Hr'g Tr. 151:19-154:18, ECF No. 296. DFA also objects to the instruction to the extent it improperly deviates from the Model Instructions and misstates the law. *See* ABA Model Instructions at A-121.

[33]    For ease of the Court's reference, DFA proposes the following revisions to ensure this Instruction aligns with the ABA Model Instruction and properly instructs the jury in its assessment of each plaintiff's monopsony—rather than monopoly—claim against DFA. *See generally* ABA Model Instructions at A-115.

history of plant closures, and market share trends. If this evidence establishes that Defendants have the power to control prices or exclude competition in a relevant market, then you may conclude that Defendants have monopsony power in the market.

The first factor you should consider is Defendants' share of the relevant market. Based on the evidence that you have heard about Defendants' market share, you should determine Defendants' market share as a percentage of purchases of raw Grade A milk in the relevant market. Defendants must have a significant share of the market in order to possess monopsony power.

In evaluating whether the percentage of market share supports a finding of monopsony power, you also should consider other aspects of the relevant market, including barriers to entry, market share trends, the number and size of competitors. Along with Defendants' market share, these factors should inform you as to whether Defendants have monopsony power. The higher the company's share, the higher the likelihood that a company has monopsony power.

A market share below 50 percent is ordinarily not sufficient to support a conclusion that a defendant has monopsony power. However, if you find that the other evidence demonstrates that Defendants do, in fact, have monopsony power despite having a market share below 50 percent, you may conclude that Defendants have monopsony power.

The trend in Defendants' market share is also something you may consider. An increasing market share may strengthen an inference that a company has monopsony power, particularly where that company has a high market share. Conversely, a decreasing market share may weaken an inference that a company has monopsony power. You may also consider whether there are barriers to entry for purchasers of raw milk into the relevant market. Barriers to entry make it difficult for new competitors to enter the relevant market for purchasing raw Grade A milk in a meaningful and timely way. Barriers to entry might include the large financial investment required to build a plant or satisfy governmental regulations. Evidence of low or no entry barriers may be evidence that Defendants do not have monopsony power, regardless of Defendants' market share, because new competitors could enter easily if Defendants attempted to reduce prices for a substantial period of time.

By contrast, evidence of high barriers to entry along with high market share may support an inference that Defendants have monopsony power.

The history of competitors entering and exiting the relevant market may also be helpful to consider. Entry of new competitors or expansion of existing competitors may be evidence that Defendants lack monopsony power. On the other hand, departures from the market, or the failure of firms to enter the market, may support an inference that Defendants have monopsony power.

If you find that Defendants have monopsony power in the relevant market, then you must consider the remaining elements of Plaintiffs' Section 2 claim.

## SECOND CLAIM: SECTION 2 OF THE SHERMAN ACT MONOPSONIZATION – WILLFUL ACQUISITION OR MAINTENANCE OF MONOPSONY POWER (ELEMENT 3)[34]

The next element each Plaintiff must prove by a preponderance of the evidence is that Defendants willfully acquired or maintained monopsony power through anticompetitive acts or practices. Anticompetitive acts are acts or practices, other than competition on the merits, that have the effect of preventing or excluding competition or frustrating or foreclosing the efforts of other companies to compete as buyers for suppliers within the relevant market. Harm to competition is to be distinguished from harm to a single competitor or group of competitors, which does not necessarily constitute harm to competition.

Mere possession of monopsony power, if lawfully acquired, does not violate the antitrust laws. A company with monopsony power may compete aggressively without violating the antitrust laws. Conduct only becomes unlawful where it involves anticompetitive acts. All companies have a desire to increase their profits and increase their market share. These goals are an essential part of a competitive marketplace, and the

---

[34] For ease of the Court's reference, DFA proposes the following revisions to ensure this instruction aligns with the ABA Model Instruction and properly instructs the jury to evaluate each plaintiff's monopsony—rather than monopoly—claim against DFA. *See generally* ABA Model Instructions at A-123.

antitrust laws do not make these goals—or the achievement of these goals—unlawful, as long as the company does not use anticompetitive means to achieve these goals.

In determining whether Defendants' conduct was anticompetitive or whether it was legitimate business conduct, you should determine whether the conduct is consistent with competition on the merits, whether the conduct provides benefits to consumers, and whether the conduct would make business sense apart from any effect it has on excluding competition or harming competitors.

The acts or practices that result in the acquisition or maintenance of monopsony power must represent more than the conduct of business that is part of that normal competitive process or commercial success. You may not find that a company willfully acquired or maintained monopsony power through anticompetitive means if it has acquired or maintained that power solely through the exercise of superior foresight and skill.

If you find that each Plaintiff has proven by a preponderance of the evidence that Defendants willfully acquired or maintained monopsony power through anticompetitive acts, then you must consider whether DFA has qualified as a protected entity under the Capper-Volstead Act. If you find that DFA qualifies for protection under the Capper-Volstead Act, then you must consider whether DFA has engaged in predatory—as opposed to merely anticompetitive acts. You may not base any finding of Section 2 liability on any conduct that is immune under the Capper-Volstead Act, as I have previously instructed you. If you find that DFA has not proven that it qualifies for Capper-Volstead Act protection or that it engaged in predatory conduct that is not immune, within the meaning of the instruction I previously gave you, then you must consider whether each plaintiff has proved the remaining elements of its claim.[35]

---

[35]     For ease of the Court's reference, DFA has proposed a Capper-Volstead Act "toggle" pursuant to the Court's discussion at the September 1, 2020 charge conference. *See generally* Sept. 1, 2020 Hr'g Tr. 317:13-18, ECF No. 311.

### SECOND CLAIM: SECTION 2 OF THE SHERMAN ACT MONOPSONIZATION – ANTICOMPETITIVE CONDUCT (REFUSAL TO DEAL) (ELEMENT 3)[36]

**[The Court tasked DFA with redrafting this Instruction during the August 10, 2020 charge conference.  Aug. 10, 2020 Hr'g Tr. 177:22-178:2, ECF No. 296.]**

As I have told you, one of the elements each plaintiff must prove is that DFA engaged in anticompetitive conduct. Each plaintiff claims that this element is satisfied in this case because DFA unlawfully refused to deal with itself or another plaintiff.

Ordinarily, a company may deal or refuse to deal with whomever it pleases, so long as it acts independently. Even a company with monopsony power in the relevant market has no general duty to cooperate with its business rivals and ordinarily may refuse to deal with them.

Considering all of the facts and circumstances, you must decide whether DFA's refusal to deal was motivated solely by an anticompetitive intent. A refusal to deal with a competitor constitutes anticompetitive conduct only where the refusal is contrary to the short-run best interest of DFA or its farmer-members, and where it makes sense for DFA or its farmer-members only because it harms competitors in the purchase of raw milk and helps DFA achieve or maintain monopsony power in that market in the long run.

A refusal to deal that is based in part on legitimate business reasons does not violate the antitrust laws, even if it is also motivated by a desire to harm competitors or does in fact harm competitors. In general, the desire to maintain monopsony power or to block entry of competitors is not a legitimate business purpose. A legitimate business purpose is one that benefits DFA regardless of any harmful effects on competitors, such as a purpose to promote efficiency, quality, offer a better product or service, or increase short-term profits. In other words, if the refusal to deal results in short-term or long-term benefits to DFA or its farmer-members—such as more profits, reduction of costs, a higher market

---

[36]     Pursuant to the Court's instruction at the August 10, 2020 charge conference, DFA has inserted its proposed Instruction here, which derives directly from the ABA Model Instructions at B-129.

share, or avoiding the loss of customers—then it is not anticompetitive, and you must find for DFA on this element. On the other hand, if the refusal to deal hurts DFA in the short-term and is undertaken only because DFA expects it to harm competitors and enhance its monopsony power in the long run, then you may conclude that it constitutes anticompetitive conduct.[37]

### SECOND CLAIM: SECTION 2 OF THE SHERMAN ACT MONOPSONIZATION – EFFECT ON INTERSTATE COMMERCE (ELEMENT 4)

As I previously stated, the Sherman Act applies only to conduct or restraints that affect interstate or foreign commerce. Here, the essential element of interstate or foreign commerce has been established.

### SECOND CLAIM: SECTION 2 OF THE SHERMAN ACT MONOPSONIZATION – INJURY IN FACT AND ANTITRUST INJURY (ELEMENT 5)

As I explained before, each Plaintiff is entitled to recover damages for an injury to his, her, or its business, if he, she, or it can establish three elements of injury:

(1)   The Plaintiff was in fact injured as a result of Defendants' violation of the antitrust laws;

(2)   Defendants' illegal conduct was a material cause of the Plaintiff's injury; and

(3)   The Plaintiff's injury is an injury of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as "injury in fact" or "fact of damage." For each Plaintiff to establish that he, she, or it is entitled to recover damages, each Plaintiff must prove that he, she, or it was injured as a result of Defendants' violation of the antitrust laws. Proving the fact of damage does not require a Plaintiff to prove the dollar value of his, her, or its injury. It requires only that each Plaintiff prove that he, she, or it was in fact injured by Defendants' alleged antitrust violation. It is important to understand, however, that injury and amount of damage are different concepts and that you cannot consider the

---

[37]   *See* ABA Model Instructions at B-129.

amount of a Plaintiff's damage unless and until you have concluded that he, she, or it has established that he, she or it was in fact injured.

Each Plaintiff must also establish by a preponderance of the evidence that Defendants' alleged illegal conduct was a material cause of his, her, or its injury. This means that each Plaintiff must have proved that some damage occurred to that Plaintiff as a result of Defendants' alleged antitrust violation, and not some other cause. Each Plaintiff is not required to prove that Defendants' alleged antitrust violation was the sole cause of that Plaintiff's injury, nor need a Plaintiff eliminate all other possible causes of injury. It is enough if each Plaintiff has proved that the alleged antitrust violation was a material cause of his, her, or its injury.

Each Plaintiff must also establish that his, her, or its injury was the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If a Plaintiff's injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm producers, then that Plaintiff's injuries are antitrust injuries. On the other hand, if a Plaintiff's injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then that Plaintiff's injuries are not antitrust injuries, and that Plaintiff may not recover damages for those injuries under the antitrust laws. In establishing antitrust injury, each Plaintiff can only rely on acts that occurred within the statute of limitations, which I will address later in my instructions.[38]

---

[38]     *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338-39 (1971). (holding that a cause of action accrues in an antitrust conspiracy case "when a defendant commits an act that injures [the] plaintiff's business" such that "if a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date"); s*ee also Klehr et ux. v. A.O. Smith Corp. et al*., 521 U.S. 179, 181, 190 (1997) (holding that while the continuing violations doctrine might allow a plaintiff to recover for damages caused by a "separable, new predicate act within the 4-year limitations period," a plaintiff "cannot use an independent, new act as a bootstrap to recover for injuries caused by other predicate acts that took place outside the limitations period").

If you find that a Plaintiff has established that he, she, or it suffered "injury in fact" from an antitrust injury, you must then consider the amount of that Plaintiff's damages.

## SECOND CLAIM: SECTION 1 OF THE SHERMAN ACT
## MONOPSONIZATION - MARKET WIDE SUPPRESSION
## (ELEMENT 5)[39]

In this case, each Plaintiff claims that Professor Elhauge's regression analysis shows both their antitrust impact and damages. Specifically, Plaintiffs claim that his regression analysis shows market-wide suppression of the over-order premiums in Order 1, which reduced the amount paid to Plaintiffs by 98.7 cents per hundred weight. Defendants deny these claims, dispute Professor Elhauge's opinions, and contest Plaintiffs' measure of damages.

Both sides have presented you with expert testimony to assist you in determining what, if any, antitrust impact or damages were sustained by Plaintiffs. It is for you to decide whether to accept or reject the experts' testimony. The verdict form will ask you questions concerning your findings with regard to damages.

## THIRD CLAIM: SECTION 2 OF THE SHERMAN ACT
## ATTEMPT TO MONOPSONIZE – ELEMENTS

In their third claim, each Plaintiff alleges that he, she, or it was injured by Defendants' unlawful attempt to monopsonize the market for raw Grade A milk in Order 1. To prevail on their claim of attempted monopsonization, each Plaintiff must prove by a preponderance of the evidence each of the following essential elements:

(1)    Defendants engaged in anticompetitive conduct;

(2)    The alleged market is a valid antitrust market (as previously defined);[40]

        a.    Relevant product market;

---

[39]    DFA continues to object to this Instruction in its entirety for the reasons set forth in note 26, *supra*, which DFA incorporates by reference herein.

[40]    For ease of the Court's reference, DFA edited these Instructions for consistency and pursuant to the Court's direction to DFA about the relevant market instructions at the September 1, 2020 charge conference. *See* Sept. 1, 2020 Hr'g Tr. 406:5-9, ECF No. 311 (discussing product market instruction); *id.* at 411:13-21 (discussing geographic market instruction).

b.      Relevant geographic market;

(3)     Defendants had a specific intent to achieve monopsony power in that relevant market;

(4)     There was a dangerous probability that Defendants would achieve their goal of monopsony power in the relevant market;

(5)     Defendants' conduct occurred in or affected interstate commerce; and

(6)     That each Plaintiff was injured in their business by Defendants' anticompetitive conduct.

If you find that any Plaintiff has failed to prove any element of its Section 2 attempt to monopsonize claim, you must enter a verdict for Defendants on that Plaintiff's claim. If you find that each Plaintiff has met his, her, or its burden on the elements of its claim, you must consider whether DFA has qualified as a protected entity under the Capper-Volstead Act. You may not base any finding of Section 2 liability on any conduct that is immune under the Capper-Volstead Act, as I have previously instructed you. If you find that DFA has not proven that it qualifies for Capper-Volstead Act protection or that it engaged in conduct that is predatory and/ or not exempt from antitrust liability, and that each Plaintiff has otherwise proved the elements its claim, then you must find for that Plaintiff then you must consider whether each Plaintiff has proved the remaining elements of his, her, or its claim for attempted monopsonization.[41] I will explain these elements in more detail.

### THIRD CLAIM SECTION 2 OF THE SHERMAN ACT ATTEMPT TO MONOPSONIZE – ANTICOMPETITIVE CONDUCT (ELEMENT 1)

To establish the first element of their attempted monopsony claim, it is not sufficient for each Plaintiff to prove that Defendants intended to monopsonize the relevant market. Instead, each Plaintiff must show that Defendants engaged in anticompetitive conduct, coupled with an intent to monopsonize and a dangerous probability that Defendants would succeed. If you find that each Plaintiff has proved that Defendants engaged in

---

[41]     For ease of the Court's reference, DFA has proposed a Capper-Volstead Act "toggle" pursuant to the Court's discussion at the September 1, 2020 charge conference. *See generally* Sept. 1, 2020 Hr'g Tr. 317:13-18, ECF No. 311.

anticompetitive conduct, then you must also whether DFA has qualified as a protected entity under the Capper-Volstead Act. If you find that DFA qualifies for protection under the Capper-Volstead Act, then you must consider whether DFA has engaged in predatory— as opposed to merely anticompetitive acts. You may not base any finding of Section 2 liability on any conduct that is immune under the Capper-Volstead Act, as I have previously instructed you. If you find that DFA has not proven that it qualifies for Capper-Volstead Act protection or that it engaged in predatory conduct within the meaning of the instruction I previously gave you, then you must consider whether each Plaintiff has proved the remaining elements of his, her, or its claim.[42]

## THIRD CLAIM: SECTION 2 OF THE SHERMAN ACT<br>ATTEMPT TO MONOPSONIZE – RELEVANT MARKET<br>(ELEMENT 2)

As I instructed you earlier, each Plaintiff must prove by a preponderance of the evidence that Defendants had a specific intent to achieve monopsony power in a relevant market. As I explained before, Plaintiffs claim the relevant market is the raw Grade A milk market in Order 1. Defendants dispute that all Plaintiffs have the same relevant market because the selling options for each Plaintiff are different.

Defining the relevant market is essential because you are required to make a judgment about whether Defendants had a specific intent and dangerous probability of achieving monopsony power in a properly defined economic market. To make this judgment, you must be able to determine what, if any, economic forces restrain Defendants' freedom to set prices for the purchasing of raw Grade A milk. The most likely and most important restraining force will be actual and potential competition from other buyers. This includes all buyers and potential buyers that act or likely could act as restraints on Defendants' power to set prices as it pleases because sellers could switch to other

---

[42] For ease of the Court's reference, DFA has proposed a Capper-Volstead Act "toggle" pursuant to the Court's discussion at the September 1, 2020 charge conference. *See generally* Sept. 1, 2020 Hr'g Tr. 317:13-18, ECF No. 311.

options available in the marketplace if Defendants set their own prices too low. All the buyers that exert such restraining force are within what is called the relevant market.[43]

There are two aspects you must consider in determining whether Plaintiff has met his, her, or its burden to prove the relevant market by a preponderance of the evidence. The first is the relevant product market. The second is the relevant geographic market.

### THIRD CLAIM: SECTION 2 OF THE SHERMAN ACT ATTEMPT TO MONOPSONIZE – RELEVANT MARKET: PRODUCT MARKET (ELEMENT 2(a))

**[The Court tasked DFA with redrafting this Instruction for the First Claim. Sept. 1, 2020 Hr'g Tr. at 406:5-9, ECF No. 311.]**

As I explained before, the relevant product market is comprised of that set of buyers or potential buyers who are seen by sellers as being reasonably interchangeable or reasonable substitutes for each other.[44] This is a practical test with reference to the actual behavior of buyers and marketing efforts of sellers. The buyers need not be identical or precisely interchangeable as long as they are reasonable substitutes. And the relevant market may include not only current buyers, but also persons or entities that reasonably could become buyers, even if they are not presently buyers. These are known as "potential buyers."

To determine whether buyers are reasonable substitutes for each other, you may consider:

---

[43]    *See* ABA Model Jury Instructions at A-106 ("The most likely and important restraining force will be actual and potential competition from other firms and their products. This includes all firms and products that act or likely could act as restraints on defendant's power to set prices as it pleases because customers could switch to them if defendant sets its own prices too high. All the firms and products that exert such restraining force are within what is called the relevant market.").

[44]    *See Todd v. Exxon*, 275 F.3d 191, 202 (2d Cir. 2001) ("These factors are *reversed* in the context of a buyer-side conspiracy. In such a case, 'the market is not the market of competing sellers but of competing buyers. This market is comprised of buyers who are seen by sellers as being reasonably good substitutes.'" (quoting Roger D. Blair & Jeffrey L. Harrison, *Antitrust Policy and Monopsony*, 76 Cornell L. Rev. 297, 324 (1991))).

- Whether a small, but significant, decrease in the price paid by one buyer would result in enough sellers switching from that buyer to another buyer, such that the price decrease would not be profitable. In other words, will sellers accept the price decrease or will so many switch to alternative buyers that the price decrease will be withdrawn?;

- Sellers' views on whether various buyers are interchangeable;

- The perceptions of the industry or the public as to whether the buyers are in separate markets;

- The views of each plaintiff and Defendants regarding who their respective competitors are;

- The existence or absence of different seller groups or distribution channels.

Here, each Plaintiff contends that the relevant product market is raw Grade A milk. By contrast, DFA contends that each Plaintiff has failed to allege a proper relevant product market. DFA contends that not all Plaintiffs have the same buyer options, and thus, all Plaintiffs do not all have the same relevant market. DFA also contends that there are other buyers or potential buyers of raw milk that are reasonable substitutes for DFA and its alleged coconspirators. If you find that a Plaintiff has proven a relevant product market, then you should continue to evaluate the remainder of that Plaintiff's claim. However, if you find that a Plaintiff has failed to prove such a market, then you must find in DFA's favor on this claim.

### THIRD CLAIM:  SECTION 2 OF THE SHERMAN ACT
### ATTEMPT TO MONOPSONIZE -- RELEVANT MARKET:  GEOGRAPHIC
### MARKET (ELEMENT 2(b))

**[The Court tasked DFA with redrafting this Instruction for the First Claim.  Sept. 1, 2020 Hr'g Tr. at 411:13-21, ECF No. 311.]**

As I explained before, the relevant geographic market is the area in which the Defendants face competition from other firms that compete in that relevant product market and to which producers can reasonably turn to sell their milk. When analyzing the relevant geographic market, you should consider whether changes in prices paid by buyers in one area have substantial effects on prices paid by or quantities sold to buyers in another area,

which would tend to show that both areas are in the same relevant geographic market. The geographic market may be as large as global or nationwide, or as small as a single town or even smaller.

In determining whether each Plaintiff has met his, her, or its burden and proven that his, her, or its proposed geographic market is proper, you may consider several factors, including:

- The geographic area in which Defendants buy and where Defendants' suppliers are located;

- The geographic area to which sellers turn or have seriously considered turning;

- The transportation cost differences between areas;

- The time interval in which milk must be transported due to its perishability;

- The geographic areas that buyers view as potential sources of competition; and

- Whether governmental licensing requirements, taxes, or quotas have the effect of limiting competition in certain areas.

Here, each Plaintiff must prove that the relevant geographic market is the Federal Milk Marketing Order 1. A Federal Milk Marketing Order is a geographic area defined by the federal government for purposes of the U.S. Department of Agriculture ("USDA") setting minimum prices for raw Grade A milk. There are eleven Federal Milk Marketing Orders. The geographic area of Federal Milk Marketing Order 1 covers all of Connecticut, Delaware, Massachusetts, New Hampshire, New Jersey, Rhode Island, Vermont, and the District of Columbia, as well as certain parts, but not all, of Maryland, New York, Pennsylvania, and Virginia.

DFA disputes that the entirety of Federal Milk Marketing Order 1 is a relevant market for any Plaintiff. DFA contends that some buyers of milk in Federal Milk Marketing Order 1 are too far away from some Plaintiffs to be reasonable options. DFA also contends that some buyers located outside the boundaries of Federal Milk Marketing Order 1 are viable options for some Plaintiffs.

## THIRD CLAIM: SECTION 2 OF THE SHERMAN ACT
## ATTEMPT TO MONOPSONIZE – SPECIFIC INTENT
## (ELEMENT 2)

The second element that each Plaintiff must prove is that Defendants had a specific intent to monopsonize in a relevant market. In other words, you must decide if the evidence shows the Defendants acted with the conscious aim of acquiring the power to control prices or to exclude or destroy competition in the relevant market.

There are several ways in which each Plaintiff may prove Defendants had the specific intent to monopsonize. There may be evidence of direct statements of Defendants' intent to obtain a monopsony in the relevant market. Specific intent may also be inferred from what Defendants did. For example, if the evidence shows that Defendants lacked a legitimate business justification for their conduct in the relevant market and the natural and probable consequence of that was to give Defendants control over prices and to exclude competition, and this was plainly foreseeable by Defendants, then you may (but are not required to) infer Defendants specifically intended to acquire monopsony power.[45]

## THIRD CLAIM: SECTION 2 OF THE SHERMAN ACT
## ATTEMPT TO MONOPSONIZE – DANGEROUS PROBABILITY OF SUCCESS
## (ELEMENT 3)

You also must determine if the evidence shows that there was a dangerous probability that Defendants would succeed in achieving monopsony power if they continued to engage in the same or similar conduct.

In making this determination, you should consider:

- Defendants' market share;

- The trend in Defendants' market share;

- Whether the barriers to entry into the market made it difficult for competitors to enter the market; and

- The likely effect of any anticompetitive conduct on Defendants' share of the market.

---

[45]     *See* ABA Model Instructions at D-160.

Again, the purpose examining these factors is to determine whether there was a dangerous probability that Defendants would ultimately acquire monopsony power. A dangerous probability of success need not mean that success was nearly certain, but it does mean that there was a substantial and real likelihood that Defendants would ultimately acquire monopsony power.

## THIRD CLAIM: SECTION 2 OF THE SHERMAN ACT
## ATTEMPT TO MONOPSONIZE – EFFECT ON INTERSTATE COMMERCE
## (ELEMENT 4)

As I previously stated, the Sherman Act applies only to conduct or restraints that affect interstate or foreign commerce. Here, the essential element of interstate or foreign commerce has been established.

## THIRD CLAIM: SECTION 2 OF THE SHERMAN ACT
## ATTEMPT TO MONOPSONIZE – INJURY IN FACT AND ANTITRUST
## INJURY
## (ELEMENT 5)

Each Plaintiff is entitled to recover damages for an injury to his, her, or its business if he, she, or it can establish three elements of injury:

(1)     The Plaintiff was in fact injured as a result of Defendants' violation of the antitrust laws;

(2)     Defendants' illegal conduct was a material cause of the Plaintiff's injury; and

(3)     The Plaintiff's injury is an injury of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as "injury in fact" or "fact of damage." For each Plaintiff to establish that he, she, or it is entitled to recover damages, each Plaintiff must prove that he, she, or it was injured as a result of Defendants' violation of the antitrust laws. Proving the fact of damage does not require a Plaintiff to prove the dollar value of his, her, or its injury. It requires only that each Plaintiff prove that he, she, or it was in fact injured by Defendants' alleged antitrust violation. It is important to understand, however, that injury and amount of damage are different concepts and that you cannot consider the amount of a Plaintiff's damage unless and until you have concluded that he, she, or it has established that he, she or it was in fact injured.

Each Plaintiff must also establish by a preponderance of the evidence that Defendants' alleged illegal conduct was a material cause of his, her, or its injury. This means that each Plaintiff must have proved that some damage occurred to that Plaintiff as a result of Defendants' alleged antitrust violation, and not some other cause. Each Plaintiff is not required to prove that Defendants' alleged antitrust violation be the sole cause of that Plaintiff's injury, nor need a Plaintiff eliminate all other possible causes of injury. It is enough if each Plaintiff has proved that the alleged antitrust violation was a material cause of his, her, or its injury.

Each Plaintiff must also establish that his, her, or its injury was the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust injury." If a Plaintiff's injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm producers, then that Plaintiff's injuries are antitrust injuries. On the other hand, if a Plaintiff's injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then that Plaintiff's injuries are not antitrust injuries, and that Plaintiff may not recover damages for those injuries under the antitrust laws. In establishing antitrust injury, each Plaintiff can only rely on acts that occurred within the statute of limitations, which I will address later in my instructions.[46]

If you find that a Plaintiff has established that he, she, or it suffered "injury in fact" from an antitrust injury, you must then consider the amount of that Plaintiff's damages.

---

[46]     *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338-39 (1971) (holding that a cause of action accrues in an antitrust conspiracy case "when a defendant commits an act that injures [the] plaintiff's business" such that "if a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date"); *see also Klehr et ux. v. A.O. Smith Corp. et al.*, 521 U.S. 179, 181, 190 (1997) (holding that while the continuing violations doctrine might allow a plaintiff to recover for damages caused by a "separable, new predicate act within the 4-year limitations period," a plaintiff "cannot use an independent, new act as a bootstrap to recover for injuries caused by other predicate acts that took place outside the limitations period").

## THIRD CLAIM: SECTION 1 OF THE SHERMAN ACT
## ATTEMPT TO MONOPSONIZE - MARKET WIDE SUPPRESSION
## (ELEMENT 5)[47]

In this case, each Plaintiff claims that Professor Elhauge's regression analysis shows both their antitrust impact and damages. Specifically, Plaintiffs claim that his regression analysis shows market-wide suppression of the over-order premiums in Order 1, which reduced the amount paid to Plaintiffs by 98.7 cents per hundred weight. Defendants deny these claims, dispute Professor Elhauge's opinions, and contest Plaintiffs' measure of damages.

Both sides have presented you with expert testimony to assist you in determining what, if any, antitrust impact or damages were sustained by Plaintiffs. It is for you to decide whether to accept or reject the experts' testimony. The verdict form will ask you questions concerning your findings with regard to damages.

## FOURTH CLAIM: SECTION 2 OF THE SHERMAN ACT
## CONSPIRACY TO MONOPSONIZE – ELEMENTS

Each Plaintiff alleges that Defendants conspired to monopsonize in violation of Section 2 of the Sherman Act. To prevail on this claim, each Plaintiff must prove by a preponderance of the evidence each of the following elements:

(1)    The alleged market is a valid antitrust market (as previously defined);[48]

       a.    Relevant product market;

       b.    Relevant geographic market;

---

[47]    DFA continues to object to this Instruction in its entirety for the reasons set forth in note 26, *supra*, incorporated by reference herein.

[48]    *See Concord Assocs. LP v. Entm't Props. Tr.*, 817 F.3d 46, 53-54 (2d. Cir. 2016) (affirming district court's dismissal of plaintiff's Section 2 conspiracy to monopolize claim based on plaintiff's failure to allege a plausible geographic market and holding that because the product and geographic components of the relevant market analysis are essential for assessing the potential harm to competition from the defendants' alleged misconduct, these elements are required for "claims made under Section Two of the Sherman Act, because without a definition of that market there is no way to measure the defendant's ability to lessen or destroy competition") (citations omitted)).

(2)     Defendants knowingly entered into an agreement or mutual understanding with another person to obtain or maintain monopsony power in the alleged market of raw Grade A milk market in Order 1;

(3)     Defendants and at least one alleged coconspirator specifically intended that Defendants would obtain or maintain monopsony power in the alleged raw Grade A milk market in Order 1;

(4)     Defendants committed an overt act in furtherance of the conspiracy;

(5)     Defendants' activities occurred in or affected interstate commerce; and

(6)     Each Plaintiff was injured in his, her, or its business or property because of the conspiracy to monopsonize.

Each Plaintiff is required to prove that Defendants possessed monopsony power in the relevant market. In considering each Plaintiff's claim for conspiracy to monopsonize, you may consider the aggregate market share of the alleged coconspirators in evaluating the likely effects of an alleged conspiracy. However, you may not aggregate the market share of the alleged coconspirators for purposes of determining whether Defendants have monopsony power, in terms of the monopsony power element of this or any claim.[49]

If you do not find that the evidence is sufficient to prove each element for each Plaintiff, then you must find for Defendants. If you find that the evidence is sufficient to prove each essential element by a preponderance of the evidence, then you must consider whether DFA has qualified as a protected entity under the Capper-Volstead Act. If you find that DFA qualifies for protection under the Capper-Volstead Act, then you must not base any finding of any unlawful conspiracy on any conduct that is immune under the Capper-Volstead Act, as I have previously instructed you. If you find that DFA has not proven that it qualifies for Capper-Volstead Act protection or that you have not based your finding that

---

[49]     *See* Aug. 10, 2020 Hr'g Tr. 191:8-10, ECF No. 296 (agreeing that, for purposes of instructing the jury on the elements of each plaintiff's conspiracy to monopsonize claim, "it should be clear that the aggregate market share is not a substitute for defendants' monopsony power; it's a method of delivering it to the defendant." ); *see also* ABA Model Instructions at E-167. DFA has proposed edits to the Instruction herein to bring it into accordance with the Court's prior directions and the Model Instructions.

any Plaintiff has met his, her, or its burden on any element on conduct that is protected from liability, then you must find for that Plaintiff and against Defendants on the conspiracy to monopsonize claim.[50]

## FOURTH CLAIM: SECTION 2 OF THE SHERMAN ACT
## CONSPIRACY TO MONOPSONIZE – RELEVANT MARKET
## (ELEMENT 1)

As I instructed you earlier, each Plaintiff must prove by a preponderance of the evidence that Defendants and at least one alleged coconspirator specifically intended that Defendants would obtain or maintain monopsony power in a relevant antitrust market. As I explained before, Plaintiffs claim the relevant market is the raw Grade A milk market in Order 1. Defendants dispute that all Plaintiffs have the same relevant market because the selling options for each Plaintiff are different.

Defining the relevant market is essential because you are required to make a judgment about whether Defendants have monopsony power in a properly defined economic market.[51] To make this judgment, you must be able to determine what, if any, economic forces restrain Defendants' freedom to set prices for the purchasing of raw Grade A milk. The most likely and most important restraining force will be actual and potential competition from other buyers. This includes all buyers and potential buyers that act or likely could act as restraints on Defendants' power to set prices as it pleases because sellers could switch to other options available in the marketplace if Defendants set their own prices

---

[50]    For ease of the Court's reference, DFA has proposed a Capper-Volstead Act "toggle" pursuant to the Court's discussion at the September 1, 2020 charge conference. *See generally* Sept. 1, 2020 Hr'g Tr. 317:13-18, ECF No. 311.

[51]    *See Concord Assocs. LP v. Entm't Props. Tr.*, 817 F.3d 46 (2d. Cir. 2016) (affirming district court's dismissal of plaintiff's Section 2 conspiracy to monopolize claim based on plaintiff's failure to allege a plausible geographic market and holding that because the product and geographic components of the relevant market analysis are essential for assessing the potential harm to competition from the defendants' alleged misconduct, these elements are required for "claims made under Section Two of the Sherman Act, because without a definition of that market there is no way to measure the defendant's ability to lessen or destroy competition") (citations omitted)).

too low. All the buyers that exert such restraining force are within what is called the relevant market.[52]

There are two aspects you must consider in determining whether a Plaintiff has met his, her, or its burden to prove the relevant market by a preponderance of the evidence. The first is the relevant product market. The second is the relevant geographic market.

### FOURTH CLAIM:  SECTION 2 OF THE SHERMAN ACT CONSPIRACY TO MONOPSONIZE-- RELEVANT MARKET:  PRODUCT MARKET (ELEMENT 1(a))

**[The Court tasked DFA with redrafting this Instruction for the First Claim.  Sept. 1, 2020 Hr'g Tr. 406:5-9, ECF No. 311.]**

As I explained before, the relevant product market is comprised of that set of buyers or potential buyers who are seen by sellers as being reasonably interchangeable or reasonable substitutes for each other.[53] This is a practical test with reference to the actual behavior of buyers and marketing efforts of sellers. The buyers need not be identical or precisely interchangeable as long as they are reasonable substitutes. And the relevant market may include not only current buyers, but also persons or entities that reasonably could become buyers, even if they are not presently buyers. These are known as "potential buyers."

To determine whether buyers are reasonable substitutes for each other, you may consider:

---

[52]    *See* ABA Model Jury Instructions at A-106 ("The most likely and important restraining force will be actual and potential competition from other firms and their products. This includes all firms and products that act or likely could act as restraints on defendant's power to set prices as it pleases because customers could switch to them if defendant sets its own prices too high. All the firms and products that exert such restraining force are within what is called the relevant market.").

[53]    *See Todd v. Exxon*, 275 F.3d 191, 202 (2d Cir. 2001) ("These factors are *reversed* in the context of a buyer-side conspiracy. In such a case, 'the market is not the market of competing sellers but of competing buyers. This market is comprised of buyers who are seen by sellers as being reasonably good substitutes.'" (quoting Roger D. Blair & Jeffrey L. Harrison, *Antitrust Policy and Monopsony*, 76 Cornell L. Rev. 297, 324 (1991))).

- Whether a small, but significant, decrease in the price paid by one buyer would result in enough sellers switching from that buyer to another buyer, such that the price decrease would not be profitable. In other words, will sellers accept the price decrease or will so many switch to alternative buyers that the price decrease will be withdrawn?;

- Sellers' views on whether various buyers are interchangeable;

- The perceptions of the industry or the public as to whether the buyers are in separate markets;

- The views of each plaintiff and Defendants regarding who their respective competitors are;

- The existence or absence of different seller groups or distribution channels.

Here, each Plaintiff contends that the relevant product market is raw Grade A milk. By contrast, DFA contends that each Plaintiff has failed to allege a proper relevant product market. DFA contends that not all Plaintiffs have the same buyer options, and thus, all Plaintiffs do not all have the same relevant market. DFA also contends that there are other buyers or potential buyers of raw milk that are reasonable substitutes for DFA and its alleged coconspirators. If you find that a Plaintiff has proven a relevant product market, then you should continue to evaluate the remainder of that Plaintiff's claim. However, if you find that a Plaintiff has failed to prove such a market, then you must find in DFA's favor on this claim.

### FOURTH CLAIM:  SECTION 2 OF THE SHERMAN ACT CONSPIRACY TO MONOPSONIZE -- RELEVANT MARKET: GEOGRAPHIC MARKET (ELEMENT 1(b))

**[The Court tasked DFA with redrafting this Instruction for the First Claim.  Sept. 1, 2020 Hr'g Tr. 411:13-21, ECF No. 311.]**

As I explained before, the relevant geographic market is the area in which the Defendants face competition from other firms that compete in that relevant product market and to which producers can reasonably turn to sell their milk. When analyzing the relevant geographic market, you should consider whether changes in prices paid by buyers in one area have substantial effects on prices paid by or quantities sold to buyers in another area,

which would tend to show that both areas are in the same relevant geographic market. The geographic market may be as large as global or nationwide, or as small as a single town or even smaller.

In determining whether each Plaintiff has met his, her, or its burden and proven that his, her, or its proposed geographic market is proper, you may consider several factors, including:

- The geographic area in which Defendants buy and where Defendants' suppliers are located;

- The geographic area to which sellers turn or have seriously considered turning;

- The transportation cost differences between areas;

- The time interval in which milk must be transported due to its perishability;

- The geographic areas that buyers view as potential sources of competition; and

- Whether governmental licensing requirements, taxes, or quotas have the effect of limiting competition in certain areas.

Here, each Plaintiff must prove that the relevant geographic market is the Federal Milk Marketing Order 1. A Federal Milk Marketing Order is a geographic area defined by the federal government for purposes of the U.S. Department of Agriculture ("USDA") setting minimum prices for raw Grade A milk. There are eleven Federal Milk Marketing Orders. The geographic area of Federal Milk Marketing Order 1 covers all of Connecticut, Delaware, Massachusetts, New Hampshire, New Jersey, Rhode Island, Vermont, and the District of Columbia, as well as certain parts, but not all, of Maryland, New York, Pennsylvania, and Virginia. DFA disputes that the entirety of Federal Milk Marketing Order 1 is a relevant market for any Plaintiff. DFA contends that some buyers of milk in Federal Milk Marketing Order 1 are too far away from some Plaintiffs to be reasonable options. DFA also contends that some buyers located outside the boundaries of Federal Milk Marketing Order 1 are viable options for some Plaintiffs.

## FOURTH CLAIM: SECTION 2 OF THE SHERMAN ACT
## CONSPIRACY TO MONOPSONIZE – EXISTENCE OF A CONSPIRACY
## (ELEMENT 1)

Each Plaintiff alleges that Defendants participated in a conspiracy to monopsonize the raw Grade A milk market in Order 1. To prevail on this claim, each Plaintiff must prove both of the following elements by a preponderance of the evidence:

(1)    That a contract, combination, or conspiracy existed; and

(2)    That Defendants knowingly became a member of that conspiracy.

As I explained before, a conspiracy is an agreement or an understanding between two or more persons. An agreement or understanding exists when two or more persons or corporations share a commitment to a common scheme designed to achieve an unlawful objective. Here, each Plaintiff claims the common unlawful objective of this conspiracy is to give DFA control over the supply of raw Grade A milk in a relevant market. To establish the existence of a contract, combination, or conspiracy, the evidence does not need to show that there was a formal or written agreement. An agreement or understanding may be entirely unspoken.

A contract, combination, or conspiracy may be formed without all of the parties reaching an agreement at the same time, such as where competitors separately accept invitations to participate in a plan to restrain trade. Similarly, it is not essential that all persons acted exactly alike, nor is it necessary that they all possessed the same motives for entering the agreement. It is not necessary that all of the means or methods claimed by Plaintiffs were agreed upon, actually used, or put into operation. It is also not necessary that each Plaintiff prove that all the persons alleged to be members of the conspiracy were actually members provided each Plaintiff proves that at least one other person entered into the alleged agreement or conspiracy with Defendants. It is the agreement or understanding to monopsonize that constitutes a contract, combination, or conspiracy which matters for this element. You may find a conspiracy existed regardless of whether it succeeded or failed.

In determining whether an agreement or understanding between two or more persons has been proved, you must view the evidence as a whole. Each Plaintiff may prove the existence of the alleged contract, combination, or conspiracy through direct evidence, circumstantial evidence, or both. Direct evidence is explicit and requires no inferences to establish the existence of a contract, combination, or conspiracy. You may also infer the existence of an agreement from the circumstances, including what you find the alleged members actually did and the words they used. Mere similarity of conduct among various persons, however, or the fact that they may have associated with one another and may have met or assembled together, does not by itself establish the existence of an agreement or a conspiracy. If they acted similarly but independently of one another, without any agreement among them, then there would not be a conspiracy.[54]

### FOURTH CLAIM: SECTION 2 OF THE SHERMAN ACT CONSPIRACY TO MONOPSONIZE – SPECIFIC INTENT (ELEMENT 2)

If you determine that there was an agreement among Defendants and their coconspirators to monopsonize in the raw Grade A milk market in Order 1, you must then decide whether Plaintiffs have proven that Defendants specifically intended that they would acquire or maintain monopsony power in the raw Grade A milk market in Order 1. In other words, you must decide whether the evidence shows that Defendants entered into agreements with the conscious aim of using anticompetitive conduct to acquire or maintain the power to control prices or exclude competition. It is not essential that Plaintiffs prove the use of the power to exclude or the actual exclusion of existing or potential competitors.

There are several ways in which Plaintiffs may prove that Defendants had the specific intent to monopsonize. There may be evidence of direct statements of Defendants' intent to use anticompetitive means to acquire monopsony power in the market. Specific intent may also be inferred from what Defendants did. For example, if the evidence shows that the natural and probable consequence of the agreement or of the conduct of the parties

---

[54]    DFA has proposed the above revisions to this Instruction to ensure it aligns with the ABA Model Instructions and the Court's discussion of this element at the September 1, 2020 charge conference. *See* ABA Model Instructions at A-13, E-169.

to the agreement was to exclude or destroy competition in the raw Grade A milk market in Order 1, that there was no legitimate business justification but the destruction or damage to competition, and that this was plainly foreseeable by Defendants, then you may (but are not required to) infer that Defendants specifically intended to acquire monopsony power by using anticompetitive conduct.

### FOURTH CLAIM: SECTION 2 OF THE SHERMAN ACT CONSPIRACY TO MONOPSONIZE – OVERT ACT (ELEMENT 3)[55]

The third element that each Plaintiff must prove by a preponderance of the evidence is that Defendants committed an overt act in furtherance of the conspiracy after October 8, 2005. The term "overt act" means some type of outward, objective action performed by Defendants or their coconspirators, which evidences that agreement or conspiracy. Plaintiffs are not required to prove that the overt act was predatory. [Each Plaintiff must only prove by a preponderance of the evidence that the overt act in some way furthered the objectives of the conspiracy after October 8, 2005.]

### FOURTH CLAIM: SECTION 2 OF THE SHERMAN ACT CONSPIRACY TO MONOPSONIZE – EFFECT ON INTERSTATE COMMERCE (ELEMENT 4)

The Sherman Act applies only to conduct or restraints that affect interstate or foreign commerce. Here, the essential element of interstate or foreign commerce has been established.

---

[55]    DFA objects to this Instruction to the extent that it deviates from the Model Instructions and improperly conflates the overt act element of a conspiracy to monopsonize claim and the requirement that, pursuant the applicable statute of limitations in this case, each plaintiff must demonstrate that it was injured by an overt act by DFA in furtherance of an alleged conspiracy after October 8, 2005.

## FOURTH CLAIM: SECTION 2 OF THE SHERMAN ACT
## CONSPIRACY TO MONOPSONIZE – INJURY IN FACT AND ANTITRUST
## INJURY
## (ELEMENT 5)

Each Plaintiff is entitled to recover damages for an injury to his, her, or its business, if he, she, or it can establish three elements of injury:

(1)     The Plaintiff was in fact injured as a result of Defendants' violation of the antitrust laws;

(2)     Defendants' illegal conduct was a material cause of the Plaintiff's injury; and

(3)     The Plaintiff's injury is an injury of the type that the antitrust laws were intended to prevent.

The first element is sometimes referred to as "injury in fact" or "fact of damage." For each Plaintiff to establish that he, she, or it is entitled to recover damages, each Plaintiff must prove that he, she, or it was injured as a result of Defendants' violation of the antitrust laws. Proving the fact of damage does not require a Plaintiff to prove the dollar value of his, her, or its injury. It requires only that each Plaintiff prove that he, she, or it was in fact injured by Defendants' alleged antitrust violation. It is important to understand, however, that injury and amount of damage are different concepts and that you cannot consider the amount of a Plaintiff's damage unless and until you have concluded that he, she, or it has established that he, she, or it was in fact injured.

Each Plaintiff must also establish by a preponderance of the evidence that Defendants' alleged illegal conduct was a material cause of his, her, or its injury. This means that each Plaintiff must have proved that some damage occurred to that Plaintiff as a result of Defendants' alleged antitrust violation, and not some other cause. Each Plaintiff is not required to prove that Defendants' alleged antitrust violation was the sole cause of that Plaintiff's injury, nor need a Plaintiff eliminate all other possible causes of injury. It is enough if each Plaintiff has proved that the alleged antitrust violation was a material cause of his, her, or its injury.

Each Plaintiff must also establish that his, her, or its injury was the type of injury that the antitrust laws were intended to prevent. This is sometimes referred to as "antitrust

injury." If a Plaintiff's injuries were caused by a reduction in competition, acts that would lead to a reduction in competition, or acts that would otherwise harm producers, then that Plaintiff's injuries are antitrust injuries. On the other hand, if a Plaintiff's injuries were caused by heightened competition, the competitive process itself, or by acts that would benefit consumers, then that Plaintiff's injuries are not antitrust injuries, and that Plaintiff may not recover damages for those injuries under the antitrust laws. In establishing antitrust injury, each Plaintiff can only rely on acts that occurred within the statute of limitations, which I will address later in my instructions.[56]

If you find that a Plaintiff has established that he, she, or it suffered "injury in fact" from an antitrust injury, you must then consider the amount of that Plaintiff's damages.

### THIRD CLAIM: SECTION 1 OF THE SHERMAN ACT CONSPIRACY TO MONOPSONIZE - MARKET WIDE SUPPRESSION (ELEMENT 5)[57]

In this case, each Plaintiff claims that Professor Elhauge's regression analysis shows both their antitrust impact and damages. Specifically, Plaintiffs claim that his regression analysis shows market-wide suppression of the over-order premiums in Order 1, which reduced the amount paid to Plaintiffs by 98.7 cents per hundred weight. Defendants deny these claims and dispute Professor Elhauge's opinions.

---

[56]    *Zenith Radio Corp. v. Hazeltine Research, Inc*., 401 U.S. 321, 338-39 (1971). (holding that a cause of action accrues in an antitrust conspiracy case "when a defendant commits an act that injures [the] plaintiff's business" such that "if a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date"); s*ee also Klehr et ux. v. A.O. Smith Corp. et al*., 521 U.S. 179, 181, 190 (1997) (holding that while the continuing violations doctrine might allow a plaintiff to recover for damages caused by a "separable, new predicate act within the 4-year limitations period," a plaintiff "cannot use an independent, new act as a bootstrap to recover for injuries caused by other predicate acts that took place outside the limitations period").

[57]    DFA continues to object to this Instruction in its entirety for the reasons set forth in note 26, *supra*, which DFA incorporates by reference herein.

Both sides have presented you with expert testimony to assist you in determining what, if any, antitrust impact or damages were sustained by Plaintiffs. It is for you to decide whether to accept or reject the experts' testimony. The verdict slip will ask you questions concerning your findings on whether there was market wide suppression.

## AFFIRMATIVE DEFENSE: STATUTE OF LIMITATIONS

The statute of limitations for the Sherman Act does not permit recovery of damages for any injuries sustained by any of the Plaintiffs prior to October 8, 2005. In deciding whether Defendants' conduct caused a Plaintiff's injury in fact, you may only consider overt acts taken by Defendants after October 8, 2005. Agreements that Defendants entered into prior to October 8, 2005 cannot be the cause of an injury in fact for which any Plaintiff may recover damages in this case. You may only find that a Plaintiff was, in fact, injured by an alleged antitrust violation if you find Defendants' actions after October 8, 2005 injured that Plaintiff.

## INSTRUCTIONS APPLICABLE TO ALL CLAIMS
## DAMAGES GENERALLY
### [this was cut and pasted from the Court's additions sent on 8/19/20]

If you decide in favor of Defendants, you will not consider these instructions about damages. But, if you decide for any Plaintiff, you must determine the amount of money that will fairly compensate that Plaintiff for each item of harm that was caused by Defendants' conduct. This compensation is called "damages." The purpose of compensatory damages is to put an injured Plaintiff in a position as close as possible to that which he, she, or it would occupy if the violation had not occurred. They are not used to punish wrongdoers or to deter particular conduct in the future.

## BASIS FOR CALCULATING DAMAGES
### [this was cut and pasted from the Court's additions sent on 8/19/20]

You are permitted to make just and reasonable estimates in calculating a Plaintiff's damages. You are not required to calculate damages with mathematical certainty or precision. *See J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 565-66 (1981) (noting that "a degree of uncertainty" is acceptable in proving antitrust damages due to the

common absence of "concrete, detailed proof of injury which is available in other contexts") (citation omitted). Damages may not be based on sympathy, guesswork, or speculation.

Each Plaintiff need only proffer a reasonable estimate of damages. *See U.S. Football League v. Nat'l Football League*, 842 F.2d 1335, 1378 (2d Cir. 1988) ("An antitrust plaintiff must thus provide only sufficient evidence to support a 'just and reasonable estimate' of damages.") (quoting *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946)). He, she, or it must also prove the reasonableness of each of the assumptions upon which the damages calculation is based. *See MCI Comm'cns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1168 (7th Cir. 1983) (finding antitrust plaintiff "must . . . support[] by an adequate foundation . . . all assumptions critical to the calculation of damages"). If you find that a Plaintiff has provided a reasonable basis for determining damages, then you may award damages to that Plaintiff based on a just and reasonable estimate supported by the evidence. *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 124 (1969) ("[T]he jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly.") (citation omitted)).

## DAMAGES: CAUSATION AND DISAGGREGATION

If you find that DFA violated the antitrust laws and that any Plaintiff was injured by that violation, each such plaintiff is entitled to recover for the injury that was the direct result or likely consequence of the unlawful acts of DFA. Each Plaintiff bears the burden of showing that his, her, or its injuries were caused by DFA's alleged violations, as opposed to any other factors. If you find that a Plaintiff's alleged injuries were caused in part by DFA's alleged violation and in part by other factors, then you may award damages only for that portion of plaintiff's alleged injuries that was caused by DFA's alleged violation.

Each Plaintiff claims that he, she, or it suffered injury because he, she, or it received lower pay premiums for the raw milk he, she, or it sold than he, she, or it would have received had the alleged violation not occurred. DFA contends that any decrease any Plaintiff experienced in pay premiums was caused by market factors for which DFA cannot be held liable. No Plaintiff is entitled to recover for changes in premiums that resulted

solely from other causes, including supply and demand cycles in the dairy industry, conditions specific to that Plaintiff's dairy farm, or changes arising from the normal course of business activity or external market forces. The presence of these factors does not negate the possibility that each Plaintiff suffered antitrust injury, but no Plaintiff is entitled to recover for damages caused by such external market forces or arising from the normal course of business activity. Each Plaintiff only may recover for damages caused to him, her, or it by the alleged antitrust violation.

Each Plaintiff bears the burden of proving damages by a preponderance of the evidence, including apportioning damages between lawful and unlawful causes. If you find that any Plaintiff was injured by DFA's alleged violation, and there is a reasonable basis to apportion that Plaintiff's alleged injury between lawful and unlawful causes, then you may award damages apportioned to unlawful causes for any such plaintiffs.

If you find that any Plaintiff's alleged injuries were caused by factors other than DFA's alleged violation, then you must return a verdict for DFA. If you find that there is no reasonable basis to apportion any Plaintiff's alleged injury between lawful and unlawful causes, or that apportionment can only be accomplished through speculation or guesswork, then you may not award any damages at all for all such Plaintiffs.[58]

## LIABILITY FOR THE CONSPIRACY

[this was cut and pasted from the Court's additions sent on 8/19/20]

Each participant in the conspiracy is fully liable for all of the damages caused by the conspiracy. *See Ward v. Apple Inc.*, 791 F.3d 1041, 1048 (9th Cir. 2015) ("[A]ntitrust coconspirators are jointly and severally liable for all damages caused by the conspiracy.") (citations omitted). If you find that a Plaintiff has proven all other elements of his, her, or its conspiracy claims, that Plaintiff is entitled to recover damages from Defendants for all harm caused by the conspiracy.

---

[58]   DFA continues to request the above Instruction, adopted directly from the ABA Model Instructions at B-310.

## CONCLUDING INSTRUCTIONS

### VERDICT FORM

I will provide you with a verdict form that will guide you in making your determinations in this action. You must fill out the verdict form in accordance with these jury instructions. If there is any conflict between the verdict form and these instructions, you must follow these instructions.

### JURY DELIBERATIONS/UNANIMOUS VERDICT

The verdict must represent the considered judgment of each juror. In order to return a verdict, you must all agree. Your verdict must be unanimous.

You must consult with one another. You must try to reach an agreement if you can do so without sacrificing your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. Do not hesitate to re-examine your views and change your opinions if you are convinced they are wrong. But do not surrender your honest opinion as to the weight or effect of evidence solely because of the opinions of your fellow jurors, or for the mere purpose of returning a verdict.

If you need to communicate with me, you should send a note through the Court Officer, signed by your foreperson. You must not discuss with the court or with any other person what is said in deliberations, and any note you send to the court must not include this information. In other words, you may ask the court questions but, in doing so, you must not reveal what the jurors are thinking or saying. You must not tell anyone how the jury stands numerically or otherwise until after you have reached a unanimous verdict and you have been discharged. Even then you need not speak to anyone about this case unless you want to.

When you have reached a verdict, tell the Court Officer that you have reached a verdict, but do not tell the Court Officer what the verdict is. You will then be brought into the courtroom where I shall ask you if you have reached a verdict, and, if you have, what it is.

### JUROR NOTE TAKING

During the trial, you have been provided with pen and paper, and some of you have taken notes. As I explained at the beginning of the trial, all jurors should be given equal attention during the deliberations regardless of whether or not they have taken notes. Any notes you have taken may only be used to refresh your memory during deliberations. You may not use your notes as authority to persuade your fellow jurors as to what a witness did or did not say. In your deliberations you must rely upon your collective memory of the evidence in deciding the facts of the case. If there is any difference between your memory of the evidence and your notes, you may ask that the record of the proceedings be read back. If a difference still exists, the record must prevail over your notes. I will now describe the process for a read back.

## READ BACK OF EVIDENCE

If, during your deliberations, you are unable to recall with any degree of accuracy, a particular part of the testimony, or part of these instructions, you may do the following:

1.      Write out your question, and have the foreperson sign it;

2.      Knock on the door of the jury room; and

3.      Deliver your note to the Court Officer, to give to me.

After the attorneys have been consulted, and the record has been reviewed, I shall decide what action to take. I will tell you my ruling.

## SELECTION AND DUTIES OF A FOREPERSON

I select _____ to act as your foreperson. The foreperson acts as a chairperson or moderator. It is your duty to see that discussions are carried out in a sensible and orderly manner and to see that the issues submitted for the jury's decision are fully and fairly discussed, and that every juror has a chance to say what he or she thinks upon every question. When ballots should be taken, you will see that it is done. You will act as the jury's spokesperson in the courtroom. In all other respects, the foreperson is the same as every other juror. His or her vote or opinions do not count more or less than those of his or her fellow jurors.

Ladies and gentlemen of the jury, you may now take the case and retire to begin your deliberations.

Dated at Burlington, in the District of Vermont, this ___ day of September, 2020.


_____
Christina Reiss, District Judge
United States District Court